No. 24-10736

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

NATIONAL SMALL BUSINESS UNITED, et al.,

Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF THE TREASURY, et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the Northern District of Alabama

_____

## BRIEF FOR APPELLANTS

_____

*Of Counsel:*

NEIL H. MACBRIDE
   *General Counsel*

JACOB LOSHIN
   *Assistant General Counsel for Enforcement
   and Intelligence*

SEAN BOYCE
   *Deputy Chief Counsel, Financial Crimes
   Enforcement Network*

*Department of the Treasury*

BRIAN M. BOYNTON
   *Principal Deputy Assistant Attorney
   General*

PRIM F. ESCALONA
   *United States Attorney*

DANIEL TENNY
STEVEN H. HAZEL
   *Attorneys, Appellate Staff
   Civil Division, Room 7217
   U.S. Department of Justice
   950 Pennsylvania Avenue NW
   Washington, DC 20530
   (202) 514-2498*

*NSBU v. Yellen*, No. 24-10736

## AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, undersigned counsel certifies that the following have an interest in the outcome of this appeal:

Alabama Property Management, Inc.

Bardwell, Will

Barger, James Frederick Jr.

*Boyce, Sean

Burke, Liles C., U.S. District Judge

Boynton, Brian M.

Brown, Kenyen

Das, Himamauli, former Acting Director of the Financial Crimes Enforcement Network

Escalona, Prim F., United States Attorney

Gacki, Andrea, Director of the Financial Crimes Enforcement Network

Hazel, Steven H.

Healy, Terence M.

Kelleher, Diane

Lee, Thomas

*Loshin, Jacob

*MacBride, Neil H.

 * Additions to previous certificate marked with an asterisk.

*NSBU v. Yellen*, No. 24-10736

McCracken, Todd

Miller, Kristen Paige

National Small Business United

Neiman, John C. Jr.

Pitz, Taylor

Robinson, Stuart Justin

Tenny, Daniel

U.S. Department of the Treasury

Walthall, James Elliott

Winkles, Isaac

Yellen, Janet, Secretary of the U.S. Department of the Treasury

*s/ Steven H. Hazel*

Steven H. Hazel

**STATEMENT REGARDING ORAL ARGUMENT**

The district court facially invalidated the Corporate Transparency Act, a statute Congress enacted to facilitate the enforcement of prohibitions on money laundering, terrorist financing, and other serious crimes.  The federal government believes that oral argument is therefore appropriate.

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ................................................................. 1

STATEMENT OF THE ISSUE ...................................................................... 1

STATEMENT OF THE CASE ........................................................................ 2

      A.     Statutory and Regulatory Background ............................................. 2

      B.     Factual Background and Prior Proceedings .................................. 9

      C.     Standard of Review ....................................................................... 12

SUMMARY OF ARGUMENT ...................................................................... 12

ARGUMENT ................................................................................................ 14

THE CORPORATE TRANSPARENCY ACT IS A VALID EXERCISE OF
CONGRESS'S POWERS ............................................................................. 14

      A.     Congress Has Broad Authority to Enact Economic Regulations .......... 14

      B.     The CTA Permissibly Effectuates Prohibitions on Financial
             Crime .............................................................................................. 17

      C.     The District Court's Approach Misunderstands Governing
             Precedent and the CTA Itself ....................................................... 27

CONCLUSION .............................................................................................. 35

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Alabama-Tombigbee Rivers Coal. v. Kempthorne,*
477 F.3d 1250 (11th Cir. 2007) ............................................................ 11, 33

*California Bankers Ass'n v. Shultz,*
416 U.S. 21 (1974) .................................................................................... 2

*Electric Bond & Share Co. v. Securities & Exch. Comm'n,*
303 U.S. 419 (1938) .................................................................................. 23

*Gonzales v. Raich,*
545 U.S. 1 (2005) .............................................................. 15, 16, 22, 31

*Helvering v. Mitchell,*
303 U.S. 391 (1938) .................................................................................. 24

*Hodel v. Virginia Surface Min. & Reclamation Ass'n Inc.,*
452 U.S. 264 (1981) .................................................................................. 35

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010) ...................................................................................... 25

*Jinks v. Richland County,*
538 U.S. 456 (2003) .................................................................................. 34

*Kennedy v. Mendoza-Martinez,*
372 U.S. 144 (1963) .................................................................................. 25

*Lowery v. AmGuard Ins. Co.,*
90 F.4th 1098 (11th Cir. 2024) ................................................................ 12

*McCulloch v. Maryland,*
17 U.S. (4 Wheat.) 316 (1819) .......................................................... 16, 17

*National Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012) ........................................................ 15, 17, 22, 23, 32

*NLRB v. Jones & Laughlin Steel Corp.,*
301 U.S. 1 (1937) ...................................................................................... 15

*North Am. Co. v. SEC,*
327 U.S. 686 (1946) .................................................................................. 24

*Sabri v. United States,*
    541 U.S. 600 (2004) ........................................................... 30, 31, 32

*Ullman v. United States,*
    350 U.S. 422 (1956) ........................................................... 25

*United States v. Baston,*
    818 F.3d 651 (11th Cir. 2016) ............................................. 26

*United States v. Caro,*
    454 F. App'x 817 (11th Cir. 2012) ...................................... 19

*United States v. Comstock,*
    560 U.S. 126 (2010) ...................................... 13, 16, 17, 21, 27, 34

*United States v. Curtiss-Wright Export Corp.,*
    299 U.S. 304 (1936) ........................................................... 26

*United States v. Darby,*
    312 U.S. 100 (1941) ........................................................... 17

*United States v. Lopez,*
    514 U.S. 549 (1995) ...................................... 11, 15, 16, 21, 22, 31

*United States v. Maxwell,*
    446 F.3d 1210 (11th Cir. 2006) ...................................... 10, 11, 33

*United States v. Mendez,*
    420 F. App'x 933 (11th Cir. 2011) ...................................... 19

*United States v. Morrison,*
    529 U.S. 598 (2000) ........................................................... 16, 22

*United States v. Ruggiero,*
    791 F.3d 1281 (11th Cir. 2015) .......................................... 25

*United States v. Schneider,*
    853 F. App'x 463 (11th Cir. 2021) ...................................... 19

*Wickard v. Filburn,*
    317 U.S. 111 (1942) ........................................................... 16

**U.S. Constitution:**

Art. I, § 8, cl. 1 ............................................................................................... 24

Art. I, § 8, cl. 3 .......................................................................................... 14, 26

Art. I, § 8, cl. 18 ....................................................................................... 16, 26

Art. II, § 1, cl. 1 ............................................................................................. 26

Art. II, § 3 ....................................................................................................... 26

**Statutes:**

Anti-Money Laundering Act of 2020,
    Pub. L. No. 116-283, div. F, 134 Stat. 4547 (2021):
        § 6002(2), 134 Stat. at 4547 .................................................... 6, 20, 33
        § 6002(5), 134 Stat. at 4547 ............................................... 6, 19, 20, 33
        § 6002(5)(A), 134 Stat. at 4547 ...................................................... 21
        § 6402, 134 Stat. at 4604-05 ............................................................. 3
        § 6402(2), 134 Stat. at 4604 ......................................................... 3, 18
        § 6402(3), 134 Stat. at 4604 .......................................... 3, 5, 18, 24, 25, 28
        § 6402(4), 134 Stat. at 4604 .............................................................. 4
        § 6402(5), 134 Stat. at 4604 ...................................... 1, 6, 13, 19, 25, 26, 34
        § 6402(5)-(6), 134 Stat. at 4604-05 .................................................. 27
        § 6402(5)(E), 134 Stat. at 4604 ....................................................... 25
        § 6402(8), 134 Stat. at 4605 ....................................................... 19, 20
        § 6402(8)(C), 134 Stat. at 4605 ...................................................... 24
        § 6402(5)(E), 134 Stat. at 4604 ........................................................ 6
        § 6402(6)(A), 134 Stat. at 4605 ........................................................ 6
        § 6402(8)(C), 134 Stat. at 4605 ........................................................ 6
        § 6403(d), 134 Stat. at 4624 ........................................................... 35

Bank Secrecy Act,
    12 U.S.C. § 1951) .................................................................................. 2-3

Corporate Transparency Act:
    31 U.S.C. § 5311 *et seq.* ................................................................. 2, 23
        31 U.S.C. § 5336 ........................................................................... 1
        31 U.S.C. § 5336(a)(1) .................................................................... 7
        31 U.S.C. § 5336(a)(2) .................................................................... 7

31 U.S.C. § 5336(a)(3)(A) ......................................................................... 7
31 U.S.C. § 5336(a)(3)(B) ......................................................................... 7
31 U.S.C. § 5336(a)(11) .......................................................... 1, 7, 12, 28
31 U.S.C. § 5336(a)(11)(A) ...................................................................... 8
31 U.S.C. § 5336(a)(11)(B) ...................................................................... 8
31 U.S.C. § 5336(a)(11)(B)(xiv) ............................................................. 8
31 U.S.C. § 5336(a)(11)(B)(xix) ....................................................... 8, 29
31 U.S.C. § 5336(a)(11)(B)(xxiii) ......................................................... 29
31 U.S.C. § 5336(a)(11)(B)(xxiv)(II) .................................................... 33
31 U.S.C. § 5336(b)(1)(A) ...................................................................... 29
31 U.S.C. § 5336(b)(1)(B) ...................................................................... 29
31 U.S.C. § 5336(b)(1)(D) ................................................................ 7, 29
31 U.S.C. § 5336(b)(1)(F)(iv) ................................................................ 13
31 U.S.C. § 5336(b)(2)(A) ........................................................................ 7
31 U.S.C. § 5336(b)(5) .............................................................................. 9
31 U.S.C. § 5336(c) ................................................................................ 13
31 U.S.C. § 5336(c)(2) ............................................................................ 21
31 U.S.C. § 5336(c)(2)(B) ...................................................................... 21
31 U.S.C. § 5336(c)(2)(B)(i)(I) ................................................................ 9
31 U.S.C. § 5336(c)(2)(B)(i)(II) ............................................................... 9
31 U.S.C. § 5336(c)(5)(B) .................................................................. 6, 24
31 U.S.C. § 5336(c)(11)(A)(iv) .............................................................. 33
31 U.S.C. § 5336(h) .................................................................................. 7
31 U.S.C. § 5336(h)(3)(C) ........................................................................ 7

Fair Labor Standards Act,
   29 U.S.C. § 201 *et seq.* ...................................................................... 23

Federal Trade Commission Act,
   15 U.S.C. § 45 .................................................................................... 23

Occupational Safety and Health Act,
   29 U.S.C. § 651 *et seq.* ...................................................................... 23

Sarbanes-Oxley Act,
   15 U.S.C. § 7201 *et seq.* .................................................................... 24

Securities and Exchange Act,
   15 U.S.C. § 78a *et seq.* ...................................................................... 24

Sherman Act,
   15 U.S.C. § 1 *et seq.* .......................................................................... 23

8 U.S.C. § 1324a ........................................................................... 23

12 U.S.C. § 1829b(a)(2) ............................................................. 2-3

18 U.S.C. § 1001 ............................................................................ 2

18 U.S.C. § 1341 ............................................................................ 2

18 U.S.C. § 1343 ............................................................................ 2

18 U.S.C. § 1956 ...................................................................... 2, 17

18 U.S.C. § 1957 ...................................................................... 2, 17

18 U.S.C. § 2339C .................................................................... 2, 17

26 U.S.C. § 6012 .......................................................................... 23

26 U.S.C. § 7201 ...................................................................... 2, 17

28 U.S.C. § 1291 ............................................................................ 1

28 U.S.C. § 1331 ............................................................................ 1

29 U.S.C. § 2000e *et seq.* ............................................................ 23

31 U.S.C. § 310(b)(2)(C)(i) .......................................................... 3

52 U.S.C. § 30104 ........................................................................ 23

Del. Code Ann. tit. 8, § 122 ............................................... 18, 20-21

**Regulations:**

31 C.F.R. § 1010.230 .................................................................. 34

31 C.F.R. § 1010.230(a) ......................................................... 11, 34

31 C.F.R. § 1010.380(a)(1)(i)(A) .................................................. 9

31 C.F.R. § 1010.380(a)(1)(i)(B) .................................................. 9

31 C.F.R. § 1010.380(a)(1)(iii) ..................................................... 9

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ................................................................... 1

**Legislative Material:**

H.R. Rep. No. 116-227 (2019) ........................................ 3, 12, 18, 20

**Other Authorities:**

*Beneficial Ownership Information Reporting Requirements*,
   87 Fed. Reg. 59,498 (Sept. 30, 2022)
   (codified at 31 C.F.R. § 1010.380, as amended by
   88 Fed. Reg. 83,499) ............................................ 2, 3, 4, 5, 6, 9, 18, 19, 25, 34, 34-35

Steven M. D'Antuono, Acting Deputy Assistant Dir.,
   Criminal Investigative Div., Fed. Bureau of Investigation,
   *Combatting Illicit Financing by Anonymous Shell Companies:*
   *Statement Before the Senate Banking, Housing, and Urban Affairs*
   *Committee* (May 21, 2019), https://perma.cc/Y9TN-G4UV ....................................... 4

U.S. Dep't of the Treasury, *National Money Laundering Risk*
   *Assessment* (2018) ................................................................................................ 2

U.S. Dep't of the Treasury, *National Strategy for Combating*
   *Terrorist and Other Illicit Financing* (2020),
   https://perma.cc/C48C-AGBC ................................................................................... 4

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331 in this constitutional challenge to an Act of Congress. Dkt. No. 1, at 9.[1] The district court granted plaintiffs' motion for summary judgment and entered final judgment on March 1, 2024. Dkt. No. 52. The government filed a timely notice of appeal on March 11, 2024. Dkt. No. 54; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Federal law has long prohibited money laundering, terrorist financing, and other harmful forms of economic activity. For decades, criminals evaded those prohibitions by using anonymous shell corporations to conduct illicit transactions. To close this enforcement gap, Congress passed the Corporate Transparency Act (CTA), *see* 31 U.S.C. § 5336. The CTA generally requires "corporation[s], limited liability compan[ies], [and] other similar entit[ies]" to report certain information about their owners to the Department of the Treasury's Financial Crimes Enforcement Network (FinCEN). *Id.* § 5336(a)(11). Congress determined that these reporting requirements are "needed" to "better enable critical national security, intelligence, and law enforcement efforts" to counter financial crime. Anti-Money Laundering Act of 2020, Pub. L. No. 116-283, div. F, § 6402(5), 134 Stat. 4547, 4604 (2021). The

---

[1] References in this format refer to a document's district court docket number and page number.

question presented is whether the CTA is a valid exercise of Congress's powers under Article I of the Constitution.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

This case arises from the federal government's efforts to combat financial crime.

**1.** Federal law has long prohibited money laundering, *see* 18 U.S.C. §§ 1956, 1957, providing financing for terrorism, *see id.* § 2339C, evading taxes, *see* 26 U.S.C. § 7201, and other harmful economic activities, *see, e.g.,* 18 U.S.C. §§ 1001, 1341, 1343 (prohibiting false statements and various forms of fraud). According to one estimate, "domestic financial crime, excluding tax evasion, generates approximately $300 billion of proceeds" each year. *Beneficial Ownership Information Reporting Requirements*, 87 Fed. Reg. 59,498, 59,579 (Sept. 30, 2022) (citing U.S. Dep't of the Treasury, *National Money Laundering Risk Assessment* 2 (2018)).

Because financial crime is complex, easily concealed, and facilitated by an interconnected financial system, Congress has adopted various measures to aid enforcement. The Bank Secrecy Act of 1970, for example, requires that banks keep records regarding account owners and submit reports regarding certain transactions. *See* 31 U.S.C. § 5311 *et seq.* Congress determined that these requirements would "have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings," *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 26 (1974) (quoting 12

U.S.C. §§ 1829b(a)(2), 1951), and it directed the Department of the Treasury's Financial Crimes Enforcement Network (FinCEN) to use the reported information to "identify possible criminal activity to appropriate Federal, State, local, Tribal, and foreign law enforcement agencies," 31 U.S.C. § 310(b)(2)(C)(i).

Despite these efforts, there remained a significant gap in the government's ability to detect and prosecute financial crime.  Under state law, "corporations, limited liability companies, [and] other similar entities" are generally not required to report "information about the[ir] beneficial owners."  Anti-Money Laundering Act of 2020, Pub. L. No. 116-283, div. F, § 6402(2), 134 Stat. 4547, 4604 (2021).  "A person forming a corporation or limited liability company within the United States" thus "typically provides less information at the time of incorporation than is needed to obtain a bank account or driver's license."  H.R. Rep. No. 116-227, at 2 (2019).  That enables "malign actors" to "conceal their ownership of corporations" and then use those anonymous corporations to engage in "money laundering," "the financing of terrorism," and "serious tax fraud."  § 6402(3), 134 Stat. at 4604.

Congress and the Executive Branch have identified "[t]his lack of transparency" as "a primary obstacle to tackling financial crime in the modern era."  H.R. Rep. No. 116-227, at 10.  When investigators trace illicit funds to a corporation, they often cannot identify the corporation's owners from available sources because ownership records "do not exist."  87 Fed. Reg. at 59,504.  Instead, investigators must pursue "human source information, grand jury subpoenas, surveillance operations,

3

witness interviews, search warrants, and foreign legal assistance requests to get behind the outward facing structure of the[] shell companies."[2]  *Id.* (quotation marks omitted).  The "strategic use" of such companies by criminals thus "makes investigations exponentially more difficult and laborious."  *Id.* at 59,505 (quoting Steven M. D'Antuono, Acting Deputy Assistant Dir., Criminal Investigative Div., Fed. Bureau of Investigation, *Combatting Illicit Financing by Anonymous Shell Companies: Statement Before the Senate Banking, Housing, and Urban Affairs Committee* (May 21, 2019), https://perma.cc/Y9TN-G4UV).  And because criminals may "layer" multiple shell companies "like Russian nesting 'Matryoshka' dolls," even the most thorough investigation may not yield results.  § 6402(4), 134 Stat. at 4604.

Criminals routinely exploit this enforcement gap.  Federal prosecutors report that "large-scale schemes that generate substantial proceeds for perpetrators and smaller white-collar cases alike routinely involve shell companies."  87 Fed. Reg. at 59,503 (quoting U.S. Dep't of the Treasury, *National Strategy for Combating Terrorist and Other Illicit Financing* 14 (2020), https://perma.cc/C48C-AGBC).  Likewise, drug traffickers "commonly use shell and front companies to commingle illicit drug proceeds with legitimate revenue of front companies, thereby enabling the [drug

---

[2] "Shell companies" are entities "that have no physical presence beyond a mailing address, generate little to no independent economic value, and generally are created without disclosing their beneficial owners."  87 Fed. Reg. at 59,501 (footnote omitted).  Thus, shell companies "can be used to conduct financial transactions while concealing [the] true beneficial owners' involvement."  *Id.*

traffickers] to launder their drug proceeds." *Id.* And more broadly, the absence of company-ownership information in the United States undermines the federal government's longstanding diplomatic efforts to combat cross-border financial crime by "mak[ing] the United States a jurisdiction of choice to establish shell companies" and a "weak link in the integrity of the global financial system." *Id.* at 59,506.

In addition to facilitating domestic crime, the absence of company-ownership information threatens U.S. national-security and foreign-policy interests. For instance, "Russian elites, state-owned enterprises, and organized crime, as well as the Government of the Russian Federation have attempted to use U.S. and non-U.S. shell companies to evade sanctions." 87 Fed. Reg. at 59,498. The Government of Iran has likewise deployed shell companies "to obfuscate the source of funds and hide its involvement in efforts to generate revenue." *Id.* at 59,502.

For similar reasons, criminals can use the government's lack of information about the ownership of corporations to obscure their income and assets and thus perpetrate "serious tax fraud." § 6402(3), 134 Stat. 4604. Indeed, a "[Department of the] Treasury study based on a statistically significant sample of adjudicated [Internal Revenue Service] cases from 2016-2019 found legal entities were used in a substantial proportion of the reviewed cases to perpetrate tax evasion and fraud." 87 Fed. Reg. at 59,503 (quotation omitted). Because it did not collect ownership information, the United States had fallen out of "compliance with international anti-money laundering

and countering the financing of terrorism standards." § 6402(5)(E), 134 Stat. at 4604;
87 Fed. Reg. at 59,506.

**2.** To address this enforcement gap, Congress enacted ownership reporting
requirements. The Anti-Money Laundering Act of 2020 adopts various provisions
designed to "modernize" federal "anti-money laundering and countering the financing
of terrorism laws." § 6002(2), 134 Stat. at 4547. Among those provisions is the
Corporate Transparency Act (CTA), which "establish[es] uniform beneficial
ownership information reporting requirements." § 6002(5), 134 Stat. at 4547.

In enacted findings accompanying the CTA, Congress determined that "the
collection of beneficial ownership information" is "needed" to "protect interstate and
foreign commerce" and to "better enable critical national security, intelligence, and
law enforcement efforts to counter money laundering, the financing of terrorism, and
other illicit activity." § 6402(5), 134 Stat. at 4604. Congress further determined that
the reporting requirements would "facilitate important national security, intelligence,
and law enforcement activities," § 6402(6)(A), 134 Stat. at 4605, assist in improving
"tax administration," 31 U.S.C. § 5336(c)(5)(B), and "bring the United States into
compliance with international anti-money laundering and countering the financing of
terrorism standards," § 6402(5)(E), 134 Stat. at 4604 And Congress described the
reported information as "highly useful to national security, intelligence, and law
enforcement agencies and Federal functional regulators." § 6402(8)(C), 134 Stat.
4605.

6

The CTA accordingly requires that certain businesses report information about their beneficial owners and applicants to FinCEN. A "beneficial owner" is "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise[] (i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity." 31 U.S.C. § 5336(a)(3)(A). *But see id.* § 5336(a)(3)(B) (establishing certain exceptions). And an "applicant" is an individual who files documents to register the corporate entity. *See id.* § 5336(a)(2). For each applicant and beneficial owner, a covered business must report the individual's legal name, date of birth, residential or business address, and driver's license number or other "unique identifying number." *Id.* § 5336(a)(1), (b)(2)(A).

In addition to providing that covered businesses file reports when they first become subject to the CTA, the statute also requires that those businesses submit updated reports when ownership information changes. In particular, when "there is a change with respect to any" ownership information, a covered business must "submit to FinCEN a report that updates the information relating to the change." 31 U.S.C. § 5336(b)(1)(D). A person who willfully violates either the initial or ongoing reporting requirements is subject to civil and criminal penalties. *See* 31 U.S.C. § 5336(h). *But see id.* § 5336(h)(3)(C) (providing certain safe harbors).

These requirements apply to "reporting compan[ies]." 31 U.S.C. § 5336(a)(11). That term generally includes any "corporation, limited liability company, or other

7

similar entity that is" either "created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe," or "formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe."  31 U.S.C. § 5336(a)(11)(A).

Congress exempted from the reporting requirements various categories of businesses the provision of whose information to FinCEN would not significantly facilitate the detection and prosecution of financial crime.  The CTA excludes banks, public accounting firms, and other businesses already subject to reporting or recordkeeping requirements.  *See* 31 U.S.C. § 5336(a)(11)(B).  It excludes certain domestically-owned entities no longer engaged in business, which the statute generally defines in terms of whether an entity has been in existence for over a year but is "not engaged in active business" or "otherwise hold[ing] any kind or type of assets."  *Id.* § 5336(a)(11)(B)(xxiii).  It also excludes certain trusts, political organizations, and non-profits.  *See id.* § 5336(a)(11)(B)(xix).  And it allows the government to exempt any other "entity or class of entities" for which "requiring beneficial ownership information" would not "serve the public interest" and "would not be highly useful" in "efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, . . . or other crimes."  *Id.* § 5336(a)(11)(B)(xxiv).

Consistent with Congress's purposes, the CTA generally contemplates that reported information be used to facilitate the investigation and prosecution of

financial crimes.  For example, FinCEN may share ownership information with federal agencies "engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity."  31 U.S.C. § 5336(c)(2)(B)(i)(I). FinCEN may share the same information with state and local law-enforcement agencies when a court "authorize[s] the law enforcement agency to seek the information in a criminal or civil investigation."  *Id.* § 5336(c)(2)(B)(i)(II).

The CTA directs FinCEN to implement certain aspects of the statute by regulation, *see* 31 U.S.C. § 5336(b)(5), and FinCEN accordingly issued a final rule in September 2022, *see* 87 Fed. Reg. 59,498 (codified at 31 C.F.R. § 1010.380, as amended by 88 Fed. Reg. 83,499).  As relevant here, the rule, as amended, establishes the deadlines by which covered entities must comply with the statute.  For businesses created or registered before 2024, compliance is required by January 1, 2025.  *See* 31 C.F.R. § 1010.380(a)(1)(iii).  For businesses created or registered during 2024, compliance is required within 90 days of their formation.  *See id.* § 1010.380(a)(1)(i)(A).  And for businesses created or registered after 2024, compliance will be required within 30 days of their formation.  *See id.* § 1010.380(a)(1)(i)(B).

### B.    Factual Background and Prior Proceedings

**1.** Plaintiffs own and represent small businesses.  Plaintiff Isaac Winkles owns corporations that "manage and lease real property" and that have at least "3 full-time employees" and "annual turnover of under $20 million."  Dkt. No 39-3, at 1-2.  And

plaintiff National Small Business United (NSBU) represents about 65,000 small businesses from "every sector of the U.S. economy, including manufacturing, retail, food service, and professional services." Dkt. No. 39-2, at 2. Plaintiffs claimed that the CTA is beyond Congress's power to enact and that it also contravenes the First, Fourth, Fifth, and Ninth Amendments. Dkt. No. 1, at 24-37 (Complaint). As relevant here, plaintiffs claimed that the CTA is facially unconstitutional and sought an injunction barring the government from enforcing it against them. *Id.* at 29.

**2.** The district court granted plaintiffs' motion for summary judgment. Although the government argued that the CTA falls within Congress's authority under both the Commerce Clause and the Necessary and Proper Clause, the court disagreed. With respect to the Commerce Clause, the court acknowledged that Congress could constitutionally "impos[e] the CTA's disclosure requirements on State entities as soon as they engaged in commerce." Dkt. No. 51, at 32. But the court construed the CTA as addressing the "isolated" act of filing incorporation papers and therefore concluded that the statute "does not regulate economic or commercial activity on its face." *Id.* at 42-43 (quoting *United States v. Maxwell*, 446 F.3d 1210, 1217 n.7 (11th Cir. 2006)). And the court regarded the link between the businesses covered by the CTA and commerce as "too attenuated" to implicate the commerce power. *Id.* at 40.

The district court also declined to sustain the CTA under the Necessary and Proper Clause. The court recognized that Congress has authority to enact laws that

10

form an "essential part of a larger regulation of economic activity." *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1272 (11th Cir. 2007) (quoting *United States v. Lopez*, 514 U.S. 549, 561 (1995)). The court believed, however, that the CTA constitutes a "single-subject statute" unrelated to the government's broader efforts to combat money laundering, terrorist financing, and tax evasion. Dkt. No. 51, at 41 (quoting *Maxwell*, 446 F.3d at 1216 n.6). In addition, the court determined, notwithstanding Congress's contrary finding, *see* § 6402, 134 Stat. at 4604-05, that the CTA is "far from essential" to effectuate federal prohibitions on financial crime, Dkt. No. 51, at 43 (citing 31 C.F.R. § 1010.230(a)). The court similarly viewed as insufficient Congress's related determinations that the CTA is necessary to effectuate its taxing and foreign-affairs powers. *See id.* at 22, 52. The court then held the statute facially unconstitutional and enjoined the government from enforcing it against plaintiffs. The court did not address plaintiffs' alternative arguments regarding the First, Fourth, Fifth, and Ninth Amendments.

**3.** After the government appealed, the parties submitted a joint motion to expedite briefing and argument in this case. *See* Joint Mot., Mar. 20, 2024. As that motion explains, expedition is warranted in light of the January 1, 2025, deadline by which most covered entities must comply with the CTA. The motion is pending.

11

**C.     Standard of Review**

This Court reviews de novo the district court's disposition of a motion for summary judgment. *See Lowery v. AmGuard Ins. Co.*, 90 F.4th 1098, 1103 (11th Cir. 2024).

## SUMMARY OF ARGUMENT

The CTA effectuates prohibitions on financial crime by regulating commercial enterprises. Under state law, an applicant typically can form a corporation or similar entity without disclosing the entity's owners. That allows criminals to create anonymous companies and use them to launder money or engage in other illicit transactions without detection. Both Congress and the Executive Branch have identified "[t]his lack of transparency" as "a primary obstacle to tackling financial crime in the modern era." H.R. Rep. No. 116-227, at 10.

To close this enforcement gap, Congress established reporting requirements for certain commercial enterprises. In particular, the CTA regulates "corporation[s], limited liability compan[ies], or other similar entit[ies]" that are "created by the filing of a document with a secretary of state or a similar office." 31 U.S.C. § 5336(a)(11). By focusing on businesses created by state filings, the statute captures entities with legal authority to conduct commercial transactions in their own names. Other statutory provisions tailor the reporting requirements to active, for-profit businesses with an especially close connection to commerce. The statute therefore continues Congress's long and unquestioned practice—exemplified by laws addressing

12

competition, securities, unions, and workplace safety, among many others—of regulating businesses. That the CTA regulates entities engaged in commercial activity is confirmed by plaintiffs themselves: the individual plaintiff owns enterprises engaged in substantial economic activity, and plaintiff NSBU represents businesses from "every sector of the U.S. economy," Dkt. No. 39-2, at 2.

The CTA thus plays an essential role in the federal government's larger program to combat fight financial crime. Reporting requirements represent a conventional legislative response to enforcement challenges. And in this case, Congress found that "the collection of beneficial ownership information" is "needed" to "better enable critical national security, intelligence, and law enforcement efforts" to detect and prosecute financial crime. § 6402(5), 134 Stat. at 4604. The statute accordingly describes the reported information as "highly useful" and directs that it be used to aid enforcement efforts. *See* 31 U.S.C. § 5336(b)(1)(F)(iv), (c). Because the CTA is "rationally related to the implementation" of valid prohibitions, even if it were not justified under the Commerce Clause itself, it would fall readily within Congress's authority under the Necessary and Proper Clause. *United States v. Comstock*, 560 U.S. 126, 134 (2010).

For similar reasons, the CTA is necessary and proper to implement other powers, including Congress's foreign-affairs and taxing powers and the Executive's law enforcement and foreign-affairs powers. Congress reasonably determined that the Act's reporting requirements would facilitate efforts to protect national security by

13

interfering with the financing of terrorism and similar illicit activities.  Congress likewise reasonably determined that the reporting requirements would make it more difficult for criminals to shield their income and assets and thus engage in tax evasion.  And Congress also reasonably determined that the requirements would effectuate the President's power to enforce laws and protect national security.  Congress therefore did not rely on any single authority in isolation but understood the CTA as essential to effectuating a combination of Congressional and Presidential powers.

The district court's contrary conclusion rests on two principal errors.  First, although the court construed the CTA as regulating the isolated act of filing incorporation papers, the statute in fact regulates a class of commercial entities.  It refers to the state incorporation process only as a means of identifying entities with legal authority to conduct commercial transactions.  Second, although the district court viewed the CTA as unrelated to the government's broader efforts to curb financial crime, there is no proper basis for disregarding the elected Branches' shared judgment that the reporting requirements are needed for those efforts.

## ARGUMENT

## THE CORPORATE TRANSPARENCY ACT IS A VALID EXERCISE OF CONGRESS'S POWERS

### A.    Congress Has Broad Authority to Enact Economic Regulations

The Constitution grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States."  U.S. Const. art. I, § 8, cl. 3.  "[T]he

14

power to regulate commerce is the power to enact 'all appropriate legislation' for its 'protection or advancement'; to adopt measures 'to promote its growth and insure its safety'; 'to foster, protect, control and restrain.'" *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 36-37 (1937) (citations omitted).  It is thus "well established" that "Congress has broad authority" under the Commerce Clause.  *National Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 549 (2012) (opinion of Roberts, C.J.).

In addition to regulating the "channels of interstate commerce," "the instrumentalities of interstate commerce, and persons or things in interstate commerce," Congress may "regulate activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005).  When Congress acts in this third category, it has the power to "regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.* at 17.  And "[w]hen Congress decides that the 'total incidence' of a practice poses a threat to a national market, it may regulate the entire class." *Id.* (quotation marks omitted).  In reviewing such a determination, a court's "task . . . is a modest one." *Id.* at 22.  A court "need not determine whether [the regulated] activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Id.* (quoting *United States v. Lopez*, 514 U.S. 549, 557 (1995)).

The Necessary and Proper Clause, which authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its other

enumerated powers and the powers vested in the Executive Branch, U.S. Const. art. I, § 8, cl. 18, also "grants Congress broad authority to enact federal legislation," *United States v. Comstock*, 560 U.S. 126, 133 (2010); *see Raich*, 545 U.S. at 39 (Scalia, J., concurring in the judgment). While the federal government is one of enumerated powers, "'a government, entrusted with such' powers 'must also be entrusted with ample means for their execution.'" *Comstock*, 560 U.S. at 133 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 408 (1819)). "Accordingly, the Necessary and Proper Clause makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive', to the authority's 'beneficial exercise.'" *Id.* at 133-34 (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 413, 418). It is therefore sufficient if "the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Id.* at 134.

In assessing the breadth of Congress's authority, the Supreme Court has distinguished between laws with an "apparent commercial character," *United States v. Morrison*, 529 U.S. 598, 611 & n.4 (2000)—such as regulations addressing the intrastate farming of wheat, *see Wickard v. Filburn*, 317 U.S. 111, 127-29 (1942), and the intrastate manufacture and possession of marijuana for personal use, *see Raich*, 545 U.S. at 15—and laws that have "nothing to do with 'commerce' or any sort of economic enterprise," *Lopez*, 514 U.S. at 561—such as prohibitions on possessing firearms in school zones and on gender-motivated violence, *see id.*; *Morrison*, 529 U.S. at 613. The

16

Court has also drawn a distinction between regulations of commercial activity and regulations that would address inactivity by requiring individuals to engage in commercial transactions in which they would prefer not to engage. *See NFIB*, 567 U.S. at 553 (opinion of Roberts, C.J.); *id.* at 652 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting).

### B.    The CTA Permissibly Effectuates Prohibitions on Financial Crime

Plaintiffs do not dispute that Congress holds authority to prohibit harmful forms of economic activity, such as money laundering, *see* 18 U.S.C. §§ 1956, 1957, providing financing for terrorism, *see id.* § 2339C, and evading taxes, *see* 26 U.S.C. § 7201. Nor do plaintiffs dispute that Congress may adopt measures to effectuate those prohibitions. Plaintiffs maintain, however, that the CTA is not a permissible means of advancing the legislature's concededly valid ends. Yet as the Supreme Court has recognized since the time of Chief Justice Marshall, if "the end be legitimate," *McCulloch*, 17 U.S. (4 Wheat.) at 421, Congress's authority is at its apogee when it determines what means to deploy to achieve that end, *see Comstock*, 560 U.S. at 133-34; *United States v. Darby*, 312 U.S. 100, 121 (1941).

The CTA represents a particularly appropriate means for accomplishing Congress's legitimate ends. The reporting requirements enable investigators to trace the flow of illicit funds and thus to enforce valid prohibitions on financial crime. And the statute regulates businesses with legal authority to conduct commercial

17

transactions.  In both these respects, the statute falls well within the established scope of Congress's authority.

**1.** For decades, criminals have used anonymous corporations to evade criminal prohibitions on money laundering, terrorism financing, tax fraud, and other economic crimes.  By definition, a corporate entity has legal authority to conduct economic transactions in its own name, including by "[m]ak[ing] contracts," "borrow[ing] money," "incur[ring] liabilities," and transferring "real or personal property."  *E.g.*, Del. Code Ann. tit. 8, § 122.  But state law generally does not require "corporations, limited liability companies, [and] other similar entities" to report "information about the[ir] beneficial owners."  Anti-Money Laundering Act of 2020, Pub. L. No. 116-283, div. F, § 6402(2), 134 Stat. 4547, 4604 (2021).  "[M]align actors" can thus "conceal their ownership of corporations" and use them to conduct illicit transactions without detection.  § 6402(3), 134 Stat. at 4604.

The elected Branches have identified "[t]his lack of transparency" as "a primary obstacle to tackling financial crime in the modern era."  H.R. Rep. No. 116-227, at 10.  When investigators trace illicit funds to a corporation or similar entity, they often find that corporate-ownership records are not "attainable because they do not exist."  87 Fed. Reg. at 59,504.  And even when ownership information can be obtained, recovering that information typically "requires human source information, grand jury subpoenas, surveillance operations, witness interviews, . . . and foreign legal assistance requests to get behind the outward facing structure of the[] shell companies."  *Id.*

18

(quotation marks omitted).  The "strategic use" of such companies by criminals thus "makes investigations exponentially more difficult and laborious." *Id.* at 59,505 (quoting D'Antuono, *supra*).

Many criminals, both foreign and domestic, seek to exploit this enforcement gap.  For instance, federal prosecutors observe that "large-scale schemes that generate substantial proceeds for perpetrators and smaller white-collar cases alike routinely involve shell companies."  87 Fed. Reg. at 59,503 (quotation marks omitted).  Likewise, drug traffickers "commonly use shell and front companies to commingle illicit drug proceeds with legitimate revenue of front companies, thereby enabling the [drug traffickers] to launder their drug proceeds." *Id.*  This Court's cases provide many additional examples of circumstances in which criminals have used shell companies to perpetrate and conceal illicit activity. *See, e.g.*, *United States v. Schneider*, 853 F. App'x 463, 463-64 (11th Cir. 2021) (per curiam); *United States v. Caro*, 454 F. App'x 817, 820 (11th Cir. 2012); *United States v. Mendez*, 420 F. App'x 933, 935 (11th Cir. 2011) (per curiam).

Congress accordingly found that "the collection of beneficial ownership information" is "needed" to "better enable . . . law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity." § 6402(5), (8), 134 Stat. at 4604, 05.  Congress emphasized that "beneficial ownership information reporting requirements" would "discourage the use of shell corporations as a tool to disguise and move illicit funds" and would "assist national security, intelligence, and

19

law enforcement agencies with the pursuit of crimes." § 6002(5), 134 Stat. at 4547-48. And Congress described the reported information as "highly useful" to "national security, intelligence, and law enforcement agencies and Federal functional regulators." § 6402(8), 134 Stat. at 4605.

These findings rest on an extensive legislative record. "[R]eports and testimony by officials from the Department of Justice, the Department of Homeland Security, the Department of the Treasury, and the Government Accountability Office" demonstrated that "efforts to investigate corporations and limited liability companies suspected of committing crimes have been impeded by the lack of available beneficial ownership information." H.R. Rep. No. 116-227, at 2. "[T]he leading international antimoney laundering standard-setting body" similarly identified the lack of "'timely access to adequate, accurate and current beneficial ownership information' as a fundamental gap in United States efforts to combat money laundering and terrorist finance." *Id.*

To close this enforcement gap, Congress enacted reporting requirements for corporations and similar commercial enterprises. The Anti-Money Laundering Act of 2020 aims "to modernize" federal "anti-money laundering and countering the financing of terrorism" legislation. § 6002(2), 134 Stat. at 4547. Among these modernization efforts is the CTA, which "establish[es] uniform beneficial ownership information reporting requirements." § 6002(5), 134 Stat. at 4547. In particular, the statute requires corporate entities—that is, those entities that have the ability to

engage in commercial transactions in their own name, *see, e.g.*, Del. Code Ann. tit. 8, § 122—to disclose the identities of the human beings who created the entities and have authority to direct their operations.

Consistent with Congress's purposes, the statute contemplates that the reported information will be used for law enforcement and related activities. *See* 31 U.S.C. § 5336(c)(2). For instance, the Department of the Treasury's Financial Crimes Enforcement Network may share information with federal agencies when it would be "in furtherance" of "national security, intelligence, or law enforcement activity," *id.* § 5336(c)(2)(B), and with state or local agencies when a court "has authorized the law enforcement agency to seek the information in a criminal or civil investigation," *id.*

As these provisions illustrate, the CTA effectuates concededly legitimate prohibitions on harmful forms of economic activity. The reporting requirements enable investigators to trace "the flow of illicit funds" into and through corporations and thus to detect and prosecute financial crimes. § 6002(5)(A), 134 Stat. at 4547. The CTA is therefore "rationally related to the implementation" of valid prohibitions, *Comstock*, 560 U.S. at 134, and it accordingly falls within the established scope of Congress's authority under both the Commerce and Necessary and Proper Clauses.

**2.** The CTA is thus a fundamental part of Congress's regulation of interstate commerce and bears no resemblance to the enactments that the Supreme Court has held to exceed Congress's authority. In *Lopez*, the Supreme Court observed that the challenged provision "ha[d] nothing to do with 'commerce' or any sort of economic

21

enterprise, however broadly one might define those terms." 514 U.S. at 561. And in *Morrison*, the Court reasoned that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." 529 U.S. at 613. To connect those laws with commerce, the Court would have needed "to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567. No such series of inferences is necessary here. And unlike this case, neither *Lopez* nor *Morrison* "involved the power of Congress to exert control over intrastate activities in connection with a more comprehensive scheme of regulation; *Lopez* expressly disclaimed that it was such a case, and *Morrison* did not even discuss the possibility that it was." *Raich*, 545 U.S. 1 at 39 (Scalia, J., concurring in the judgment) (citation omitted).

The reporting requirements also stand in stark contrast to the statutory provision at issue in *NFIB*. That provision "requir[ed] that individuals purchase health insurance." *NFIB*, 567 U.S. at 548 (opinion of Roberts, C.J.). In declining to uphold that provision under the Commerce Clause, the Court emphasized that the insurance requirement "primarily affects healthy, often young adults, who are less likely to need significant health care," and thus targets "a class whose commercial inactivity rather than activity is its defining feature." *Id.* at 556; *see also id.* at 652-53 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting) ("If Congress can reach out and command even those furthest removed from an interstate market to participate in the

market, then the Commerce Clause becomes a font of unlimited power[] . . . .").
Here, however, the CTA regulates a class of entities—primarily active, for-profit
businesses—whose defining feature is their authority and propensity to conduct
commercial transactions.

In addition, in contrast to a circumstance in which Congress asserts
unprecedented and "extraordinary" powers, *NFIB*, 567 U.S. at 560 (opinion of
Roberts, C.J.), "[r]egulation requiring the submission of information" is a "familiar
category" of federal legislation, *Electric Bond & Share Co. v. Securities & Exch. Comm'n*,
303 U.S. 419, 437 (1938). Examples include laws requiring taxpayers to file tax
returns, 26 U.S.C. § 6012; banks to report information about certain transactions, *see*
31 U.S.C. § 5311 *et seq.*; employers to collect and make available information about
new employees' eligibility to work, *see* 8 U.S.C. § 1324a; and political campaigns to
report contributions and expenditures, *see* 52 U.S.C. § 30104. The CTA's reporting
requirements thus represent a conventional legislative response to enforcement
challenges.

And more generally, the CTA continues Congress's long and extensive history
of regulating businesses. Among other examples, federal law forbids anti-competitive
conduct, *see* 15 U.S.C. § 1 *et seq.* (Sherman Act); sets minimum wage and maximum
hour requirements, *see* 29 U.S.C. § 201 *et seq.* (Fair Labor Standards Act); establishes
workplace health and safety standards, *see id.* § 651 *et seq.* (Occupational Safety and
Health Act); bars employment discrimination, *see id* § 2000e *et seq.*, (Title VII); forbids

unfair business practices, *see* 15 U.S.C. § 45 (Federal Trade Commission Act); restricts the issuance of securities and requires often-extensive reporting, *see id.* § 78a *et seq.* (Securities and Exchange Act); and implements auditing and disclosure requirements for public companies, *see id.* § 7201 *et seq.* (Sarbanes-Oxley Act). All of these laws regulate businesses, and the government is unaware of any decision questioning Congress's power to enact them. *See North Am. Co. v. SEC*, 327 U.S. 686, 706 (1946) (identifying additional examples of federal regulation of corporations and recognizing Congressional authority to regulate "a corporation's financial practices, its business structure, or its security portfolio").

**3.** The CTA is also necessary and proper for carrying into execution other powers, including the tax, foreign-affairs, and foreign-commerce powers. As part of the authority to "lay and collect Taxes," U.S. Const. art. I, § 8, cl. 1, Congress may enact legislation designed to facilitate tax collection, *see Helvering v. Mitchell*, 303 U.S. 391, 399 (1938). Here, for example, Congress determined that the lack of ownership information allows criminals to obscure their income and assets and thus "facilitate[s] . . . serious tax fraud." § 6402(3), 134 Stat. at 4604. Congress therefore found that the reporting requirements would be "highly useful" in enabling investigators to detect financial crimes such as tax fraud, *see* § 6402(8)(C), 134 Stat. 4605, and in improving "tax administration" generally, 31 U.S.C. § 5336(c)(5)(B).

In addition to facilitating tax collection, the CTA also aids the enforcement of prohibitions designed to advance U.S. foreign-policy objectives and protect national-

security interests.  As the Supreme Court has explained, "Congress has broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs," *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963), as well as national-security policy, *Ullman v. United States*, 350 U.S. 422, 436 (1956).  The already "strong presumption" of constitutionality, *United States v. Ruggiero*, 791 F.3d 1281, 1284 (11th Cir. 2015), is heightened where a statute "implicates sensitive and weighty interests of national security and foreign affairs," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010).  In this case, Congress found that the absence of ownership reporting requirements facilitates "the financing of terrorism," "piracy," and "proliferation financing" (that is, financing for the spread of nuclear, chemical, and biological weapons), and thus "harm[s] the national security interests of the United States."  § 6402(3), 134 Stat. at 4604.  Congress also found that the new reporting requirements were needed to "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards."  § 6402(5)(E), 134 Stat. at 4604.  Those standards are part of a longstanding diplomatic effort by the United States to strengthen the global financial system and encourage international cooperation on financial crime.  *See* 87 Fed. Reg. at 59,528.  Congress therefore assessed that the CTA "is needed" to "protect vital United States national security interests" and "facilitate important national security" activities."  § 6402(5), 134 Stat. at 4604-05.  The Executive Branch agrees with that assessment.  *See, e.g.*, 87 Fed. Reg. at 59,498.

25

For similar reasons, the CTA also effectuates Congress's power "[t]o regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3. Federal prohibitions on terrorist financing and other financial crimes rest in part on the legislature's authority to restrict harmful forms of foreign commerce. *See United States v. Baston*, 818 F.3d 651, 668 (11th Cir. 2016) (stating that Congress's power to regulate foreign commerce is "at least" as broad as its power over interstate commerce). Congress accordingly recognized that the CTA is "needed" to "protect . . . foreign commerce." § 6402(5), 134 Stat. at 4604.

Finally, the Necessary and Proper Clause empowers Congress to carry into execution not only its own powers, but also "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18. The CTA effectuates the President's "executive Power," *id.* art. II, § 1, cl. 1, and his duty to "take Care that the Laws be faithfully executed," *id.* art. II, § 3, by facilitating "law enforcement efforts," § 6402(5), 134 Stat. 4604. The Act also facilitates the President's powers over foreign policy and national security, *see, e.g.*, *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936), by enabling the gathering of "intelligence," the protection of "national security," and the prevention of "terrorism," § 6402(5), 134 Stat. 4604.

**4.** As the above discussion reflects, the CTA is necessary and proper to support a number of Congressional and Executive Branch powers. The Necessary and Proper Clause does not require a direct connection between a statute and "a single specific

26

enumerated power." *Comstock*, 560 U.S. at 143.  In enacting the CTA, Congress therefore did not rely on any single power in isolation.  Instead, it understood the statute as "needed" to implement Congress's own commerce, foreign affairs, and taxing powers, as well as the Executive's law-enforcement and foreign-affairs powers. § 6402(5)-(6), 134 Stat. 4604-05.  There is no basis for disregarding Congress's determination that the reporting requirements represent an essential means for effectuating that combination of powers.

C.    **The District Court's Approach Misunderstands Governing Precedent and the CTA Itself**

The district court's decision to invalidate the CTA reflects two principal errors. First, although the court understood the CTA as regulating the isolated act of filing incorporation papers, the statute in fact addresses active, for-profit businesses with a close connection to commerce.  Second, although the court regarded the CTA as unconnected to the federal government's larger efforts to combat financial crime, there is no sound reason for supplanting the elected Branches' shared judgment that the statute plays a critical role in those efforts.

**1.** The district court did not dispute that the regulation of financial transactions falls within Congress's authority or that the CTA's operative provisions, which impose reporting requirements, are a permissible means of exercising that authority as a general matter.  Instead, the district court's invalidation of the statute was premised on the provision defining the universe of entities that are required to make reports.  As

27

discussed above, *see supra* pp. 18-21, the reporting requirements apply to the class of entities that can be used to conduct and conceal illicit transactions—namely, domestic corporations that are incorporated under state or local law or foreign entities that obtain permission from a State or locality to engage in business in the United States, *see* 31 U.S.C. § 5336(a)(11). This definitional provision confirms, rather than refutes, that the statute is a commercial regulation that falls in the heartland of Congress's authority.

The district court's contrary view was premised on its erroneous suggestion that the statute regulates "the act of incorporation." Dkt. No. 51, at 40. The statute does not purport to override or preempt any state-law provisions regarding incorporation. It does not limit the class of entities that are entitled to be incorporated or alter the means by which entities may be incorporated. Nor does it require any entity to incorporate that does not wish to do so. Instead, the CTA refers to businesses "created by the filing of a document with a secretary of state" as a means of identifying entities with authority to perform economic transactions in their own names, 31 U.S.C. § 5336(a)(11), and that can accordingly be used by "malign actors" to perpetrate "money laundering," "the financing of terrorism," and other crimes without disclosing the owners, § 6402(3), 134 Stat. at 4604. The fact that Congress identified with specificity the entities that have authority to engage in commercial transactions, instead of referring to that class of entities generally, does

28

not transform a reporting requirement for corporations into a regulation of the "act of incorporation."

Other statutory provisions underscore that the CTA regulates commercial entities, not the act of incorporation. Covered entities must furnish FinCEN with accurate information about their owners not just when they first become subject to the statute, *see* 31 U.S.C. § 5336(b)(1)(A),(B), but also on an ongoing basis, *see id.* § 5336(b)(1)(D). Congress also created an exception for certain domestically-owned companies that are inactive, a term the statute generally defines to include companies that have been in existence for over a year but are "not engaged in active business" or "otherwise hold[ing] any kind or type of assets." 31 U.S.C. § 5336(a)(11)(B)(xxiii).

The CTA's focus on commercial entities is especially apparent given that it addresses for-profit businesses. Other types of entities, such as certain trusts, political organizations, and non-profit organizations, may incorporate but not be subject to the Act. *See* 31 U.S.C. § 5336(a)(11)(B)(xix). The reporting requirements thus govern entities with both the power and the purpose of conducting the types of commercial transactions that concerned Congress.

There is therefore no room to dispute that Congress effectively identified entities that would engage in commercial activity. It is hardly speculative that entities that incur the trouble and expense of filing papers to obtain authority to conduct commercial transactions in their own name are likely to go on to engage in commercial activity. Plaintiffs do not seriously suggest otherwise. And their own

29

declarations confirm the point.  Plaintiff Winkles owns corporations that "manage and lease real property," involve at least "3 full-time employees," and generate "annual turnover of under $20 million."  Dkt. No. 39-3, at 1-2.  Likewise, plaintiff NSBU represents "small businesses" from "every sector of the U.S. economy, including manufacturing, retail, food service, and professional services."  Dkt. No. 39-2, at 2.  The record does not reflect any entities that register as corporations but then decline to engage in any economic activity.

The district court nonetheless invalidated the statute on its face, despite expressly acknowledging that the statute would "easily . . . pass constitutional muster," App.194, if it were limited to entities that engage in commercial activity.  It is unclear that such a statute would be meaningfully different from the one that Congress enacted, and as noted there was no evidence before the court of any practical difference because plaintiffs identified no entity that failed to engage in commercial activity.  But the reporting requirements are valid even with respect to an entity that does not engage in commercial activity immediately upon incorporation or for some period thereafter.  Such entities are authorized, by virtue of incorporation, to conduct economic transactions in their own name.  The reporting requirements serve to ensure that ownership information is available when those entities do engage in commercial activity.

In any event, the Supreme Court has held that "laws should not be invalidated by 'reference to hypothetical cases,'" *Sabri v. United States*, 541 U.S. 600, 608 (2004),

30

and the Court has "never required Congress to legislate with scientific exactitude," *Raich*, 545 U.S. at 17. The theory that the CTA cannot be constitutionally applied to a hypothetical entity that does not engage in commercial activity fails to support a constitutional challenge by plaintiffs, who fall in the heartland of the statute's permissible regulation of entities that conduct economic activity under a corporate name. *See Sabri*, 541 U.S. at 609 (noting that where the "acts charged against [the defendant] himself were well within the limits of legitimate congressional concern," any "substantive constitutional claim[] . . . had to be seen as an overbreadth challenge" and emphasizing that "challenges of this sort are especially to be discouraged" because they depart "from the norms of adjudication in federal courts").

For similar reasons, the district court erred in finding it "crucial" that the CTA contain a "jurisdictional element." Dkt. No. 51, at 45 (quoting *Lopez*, 514 U.S. at 562). The court acknowledged that Congress could constitutionally "impos[e] the CTA's disclosure requirements" on businesses that "engage[] in commerce." *Id.* at 32. The court believed, however, that because the CTA does not include an "express jurisdictional element" drawing an "explicit connection with . . . interstate commerce," it lies beyond Congress's authority to enact. *Id.* at 45 (quoting *Lopez*, 514 U.S. at 562). But the Supreme Court "simply do[es] not presume the unconstitutionality of federal criminal statutes lacking explicit provision of a jurisdictional hook, and there is no occasion even to consider the need for such a requirement where there is no reason to suspect that enforcement of a criminal statute would extend beyond a legitimate

31

interest cognizable under Article I, § 8." *Sabri*, 541 U.S. at 605. Thus, no jurisdictional element is needed here, where Congress crafted the CTA to focus on active, for-profit businesses.

The district court's mistaken view that the CTA regulates the act of incorporation also undergirded its belief that there is a "lack of historical precedent" supporting the statute. Dkt. No. 51, at 35 (quoting *NFIB*, 567 U.S. at 549 (opinion of Roberts, C.J.)). The court reasoned that the Constitution leaves "general incorporation to the States," and regarded the CTA as intruding on that domain. *Id.* at 20. But as discussed, the CTA leaves untouched the States' authority to determine which entities can be incorporated and the means by which they are incorporated and instead forms part of Congress's separate and permissible scheme for regulating commercial entities.

**2.** The district court likewise erred in determining that the CTA is unrelated to the government's larger program to curb financial crime. The court recognized that Congress has authority to prohibit money laundering and other financial crimes. *See* Dkt. No. 51, at 39. And the court acknowledged that in enacting the CTA, "Congress aimed to prevent financial crimes like money laundering and tax evasion, which are often committed through shell corporations." *Id.* at 2. The court nonetheless refused the sustain the CTA as a critical component of the government's broader efforts to combat financial crime.

That refusal rested primarily on the district court's mistaken view that the CTA is a "single-subject statute" untethered to any larger regulatory program. Dkt. No. 51, at 41 (quoting *United States v. Maxwell*, 446 F.3d 1210, 1216 n.6 (11th Cir. 2006)). But as described above, *see supra* pp. 20-21, Congress included the CTA within the Anti-Money Laundering Act, a statute intended to "modernize" federal "anti-money laundering and countering the financing of terrorism laws" generally. § 6002(2), 134 Stat. at 4547. And in enacted findings, Congress identified "beneficial ownership information reporting requirements" as an important part of the government's broader efforts to fight financial crime. § 6002(5), 134 Stat. at 4547-48. The CTA's text reflects the same understanding. *See, e.g.*, 31 U.S.C. § 5336(c)(11)(A)(iv) (referring to the reporting requirements as among the "program requirements provided for in the Anti-Money Laundering Act"); *id.* § 5336(a)(11)(B)(xxiv)(II) (permitting FinCEN to exempt from those requirements businesses whose information would not be "highly useful" to "efforts to detect, prevent, or prosecute money laundering, . . . or other crimes").

It was likewise error for the district court to disregard Congress's determination that the reporting requirements are necessary to detect and prosecute financial crime. It is black-letter law that such determinations are subject only to rational-basis review, a standard that is readily satisfied here. *See Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1276-77 (11th Cir. 2007).

33

The court believed that FinCEN's 2016 "Customer Due Diligence rule"—which requires certain financial institutions to retain beneficial ownership information about specified types of entity customers—renders the CTA "far from essential" because it "provides[s] FinCEN with nearly identical information" as the CTA.  Dkt. No. 51, at 43-44 (citing 31 C.F.R. § 1010.230).  But the court's understanding of that rule was mistaken, as information collected under the rule "is not reported to the Government," and "is [thus] not immediately available to law enforcement."  87 Fed. Reg. at 59,505.  In any event, the question is not whether the CTA is "absolutely necessary," *Jinks v. Richland County*, 538 U.S. 456, 462 (2003), as the district court suggested, but whether the statute is "convenient, or useful," *Comstock*, 560 U.S. at 133-34.  And compared with the CTA, the 2016 rule has significant "limitations."  87 Fed. Reg. at 59,505.  In addition to lacking a reporting requirement, the rule only covers companies that choose to become customers of covered financial institutions, *see* 31 C.F.R. § 1010.230(a), and it therefore leaves open opportunities for evasion.  It was thus eminently reasonable for Congress to determine that the CTA remained "needed" to facilitate the detection and prosecution of financial crime.  § 6402(5), 134 Stat. at 4604.

Respecting that legislative judgment is particularly appropriate because Congress expressly addressed the relationship between the CTA and the 2016 rule. The statute contains detailed instructions requiring that the Treasury "rescind" certain portions of the rule and "revise" others to harmonize them with the statute.  87 Fed.

34

Reg. at 59,548 (citing § 6403(d), 134 Stat. at 4624). Congress thus considered each set of requirements and concluded that both remain essential to curbing financial crime. *See Hodel v. Virginia Surface Min. & Reclamation Ass'n Inc.*, 452 U.S. 264, 283 (1981) ("[T]he effectiveness of existing laws in dealing with a problem identified by Congress is ordinarily a matter committed to legislative judgment").

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

*Of Counsel:*

NEIL H. MACBRIDE
　*General Counsel*

JACOB LOSHIN
　*Assistant General Counsel for Enforcement*
　　*and Intelligence*

SEAN BOYCE
　*Deputy Chief Counsel, Financial Crimes*
　　*Enforcement Network*

*Department of the Treasury*

BRIAN M. BOYNTON
　*Principal Deputy Assistant Attorney*
　　*General*

PRIM F. ESCALONA
　*United States Attorney*

DANIEL TENNY

　*s/ Steven H. Hazel*
STEVEN H. HAZEL
　*Attorneys, Appellate Staff*
　*Civil Division, Room 7217*
　*U.S. Department of Justice*
　*950 Pennsylvania Avenue NW*
　*Washington, DC 20530*
　*(202) 514-2498*
　*Steven.H.Hazel@usdoj.gov*

April 2024

35

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,322 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Steven H. Hazel*
Steven H. Hazel

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Steven H. Hazel*
Steven H. Hazel

**ADDENDUM**

# TABLE OF CONTENTS

31 U.S.C. § 5336 (excerpts) ................................................................................. A1

**31 U.S.C. § 5336**

**§ 5336. Beneficial ownership information reporting requirements**

**(a) Definitions.**--In this section:

. . . .

    **(2) Applicant.**--The term "applicant" means any individual who--

        **(A)** files an application to form a corporation, limited liability company, or other similar entity under the laws of a State or Indian Tribe; or

        **(B)** registers or files an application to register a corporation, limited liability company, or other similar entity formed under the laws of a foreign country to do business in the United States by filing a document with the secretary of state or similar office under the laws of a State or Indian Tribe.

    **(3) Beneficial owner.**--The term "beneficial owner"--

        **(A)** means, with respect to an entity, an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise--

          **(i)** exercises substantial control over the entity; or

          **(ii)** owns or controls not less than 25 percent of the ownership interests of the entity; and

. . . .

    **(11) Reporting company.**--The term "reporting company"--

        **(A)** means a corporation, limited liability company, or other similar entity that is--

          **(i)** created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or

          **(ii)** formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe; and

        **(B)** does not include--

        **(xix)** any--

          **(I)** organization that is described in section 501(c) of the Internal Revenue Code of 1986 (determined without regard to section 508(a) of such Code)

and exempt from tax under section 501(a) of such Code, except that in the case of any such organization that loses an exemption from tax, such organization shall be considered to be continued to be described in this subclause for the 180-day period beginning on the date of the loss of such tax-exempt status;

**(II)** political organization (as defined in section 527(e)(1) of such Code) that is exempt from tax under section 527(a) of such Code; or

**(III)** trust described in paragraph (1) or (2) of section 4947(a) of such Code;

. . . .

**(xxiii)** any corporation, limited liability company, or other similar entity--

**(I)** in existence for over 1 year;

**(II)** that is not engaged in active business;

**(III)** that is not owned, directly or indirectly, by a foreign person;

**(IV)** that has not, in the preceding 12-month period, experienced a change in ownership or sent or received funds in an amount greater than $1,000 (including all funds sent to or received from any source through a financial account or accounts in which the entity, or an affiliate of the entity, maintains an interest); and

**(V)** that does not otherwise hold any kind or type of assets, including an ownership interest in any corporation, limited liability company, or other similar entity;

**(xxiv)** any entity or class of entities that the Secretary of the Treasury, with the written concurrence of the Attorney General and the Secretary of Homeland Security, has, by regulation, determined should be exempt from the requirements of subsection (b) because requiring beneficial ownership information from the entity or class of entities--

**(I)** would not serve the public interest; and

**(II)** would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes.

. . . .

**(b) Beneficial ownership information reporting.**--

**(1) Reporting.—**

    **(A)** In general.**--**In accordance with regulations prescribed by the Secretary of the Treasury, each reporting company shall submit to FinCEN a report that contains the information described in paragraph (2).

    **(B)** Reporting of existing entities.--In accordance with regulations prescribed by the Secretary of the Treasury, any reporting company that has been formed or registered before the effective date of the regulations prescribed under this subsection shall, in a timely manner, and not later than 2 years after the effective date of the regulations prescribed under this subsection, submit to FinCEN a report that contains the information described in paragraph (2).

    **(C)** Reporting at time of formation or registration.--In accordance with regulations prescribed by the Secretary of the Treasury, any reporting company that has been formed or registered after the effective date of the regulations promulgated under this subsection shall, at the time of formation or registration, submit to FinCEN a report that contains the information described in paragraph (2).

    **(D)** Updated reporting for changes in beneficial ownership.--In accordance with regulations prescribed by the Secretary of the Treasury, a reporting company shall, in a timely manner, and not later than 1 year after the date on which there is a change with respect to any information described in paragraph (2), submit to FinCEN a report that updates the information relating to the change.

. . . .

**(2) Required information**.--

    **(A) In general**.--In accordance with regulations prescribed by the Secretary of the Treasury, a report delivered under paragraph (1) shall, except as provided in subparagraph (B), identify each beneficial owner of the applicable reporting company and each applicant with respect to that reporting company by--

        **(i)** full legal name;

        **(ii)** date of birth;

        **(iii)** current, as of the date on which the report is delivered, residential or business street address; and

        **(iv)(I)** unique identifying number from an acceptable identification document; or

        **(II)** FinCEN identifier in accordance with requirements in paragraph (3).

. . . .

**(c) Retention and disclosure of beneficial ownership information by FinCEN.**--

    **(1) Retention of information.**--Beneficial ownership information required under subsection (b) relating to each reporting company shall be maintained by FinCEN for not fewer than 5 years after the date on which the reporting company terminates.

    **(2) Disclosure.**--

. . . .

    **(B)** Scope of disclosure by FinCEN.--FinCEN may disclose beneficial ownership information reported pursuant to this section only upon receipt of--

    **(i)** a request, through appropriate protocols--

        **(I)** from a Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity; or

        **(II)** from a State, local, or Tribal law enforcement agency, if a court of competent jurisdiction, including any officer of such a court, has authorized the law enforcement agency to seek the information in a criminal or civil investigation;

    **(ii)** a request from a Federal agency on behalf of a law enforcement agency, prosecutor, or judge of another country, including a foreign central authority or competent authority (or like designation), under an international treaty, agreement, convention, or official request made by law enforcement, judicial, or prosecutorial authorities in trusted foreign countries when no treaty, agreement, or convention is available--

        **(I)** issued in response to a request for assistance in an investigation or prosecution by such foreign country; and

        **(II)** that--

            **(aa)** requires compliance with the disclosure and use provisions of the treaty, agreement, or convention, publicly disclosing any beneficial ownership information received; or

            **(bb)** limits the use of the information for any purpose other than the authorized investigation or national security or intelligence activity;

    **(iii)** a request made by a financial institution subject to customer due diligence requirements, with the consent of the reporting company, to facilitate the

compliance of the financial institution with customer due diligence requirements under applicable law; or

**(iv)** a request made by a Federal functional regulator or other appropriate regulatory agency consistent with the requirements of subparagraph (C).

**(C)** Form and manner of disclosure to financial institutions and regulatory agencies.--The Secretary of the Treasury shall, by regulation, prescribe the form and manner in which information shall be provided to a financial institution under subparagraph (B)(iii), which regulation shall include that the information shall also be available to a Federal functional regulator or other appropriate regulatory agency, as determined by the Secretary, if the agency--

**(i)** is authorized by law to assess, supervise, enforce, or otherwise determine the compliance of the financial institution with the requirements described in that subparagraph;

**(ii)** uses the information solely for the purpose of conducting the assessment, supervision, or authorized investigation or activity described in clause (i); and

**(iii)** enters into an agreement with the Secretary providing for appropriate protocols governing the safekeeping of the information.

. . . .