# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

———————————

NATIONAL SMALL BUSINESS UNITED, et al.,

Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF THE TREASURY, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of Alabama

———————————

## APPELLANTS' APPENDIX

———————————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

PRIM F. ESCALONA
*United States Attorney*

DANIEL TENNY
STEVEN H. HAZEL
*Attorneys, Appellate Staff
Civil Division, Room 7217
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-2498*

*Counsel for Defendants-Appellants*

# **TABLE OF CONTENTS**

Docket Sheet ............................................................................................. Tab 1

Complaint (Dkt. No. 1) ............................................................................ Tab 2

McCracken Declaration (Dkt. No. 39, Ex. A) ........................................... Tab 3

Winkles Declaration (Dkt. No. 39, Ex. B) ................................................ Tab 4

Transcript of November 20, 2023 Motion Hearing (Dkt. No. 46) ......................... Tab 5

Transcript of February 2, 2024 Telephone Hearing ................................. Tab 6

Memorandum Opinion (Dkt. No. 51) ....................................................... Tab 7

Final Judgment (Dkt. No. 52) ................................................................... Tab 8

Notice of Appeal (Dkt. No. 54) ................................................................ Tab 9

CERTIFICATE OF SERVICE

Tab 1

# U.S. District Court
## Northern District of Alabama (Northeastern)
## CIVIL DOCKET FOR CASE #: 5:22–cv–01448–LCB

National Small Business United et al v. Yellen et al
Assigned to: Judge Liles C Burke
 Case in other court:  11th Circuit, 24–10736–J
Cause: 05:702 Administrative Procedure Act

Date Filed: 11/15/2022
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

| | | |
|---|---|---|
| **National Small Business United**<br>*doing business as*<br>National Small Business Association | represented by | **John C Neiman , Jr**<br>MAYNARD NEXSEN, PC<br>1901 Sixth Avenue North, Suite 1700<br>Suite 1700<br>Birmingham, AL 35203<br>205–254–1000<br>Fax: 205–254–1999<br>Email: jneiman@maynardnexsen.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Kenyen Brown**<br>HUGHES HUBBARD & REED LLP<br>1775 I Street, NW<br>Washington, DC 20006–2401<br>202–721–4600<br>Fax: 202–721–4646<br>Email: kenyen.brown@hugheshubbard.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Terence Healy**<br>HUGHES HUBBARD & REED LLP<br>One Battery Park Plaza<br>New York, NY 10004<br>202–779–0890<br>Email: terence.healy@hugheshubbard.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Thomas Lee**<br>HUGHES HUBBARD & REED LLP<br>310 East 15th Street #2A<br>New York, NY 10003<br>347–324–6000<br>Email: thomas.lee@hugheshubbard.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Isaac Winkles** | represented by | **John C Neiman , Jr**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Kenyen Brown**<br>(See above for address)<br>*LEAD ATTORNEY* |

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Terence Healy**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Janet Yellen**
*in her official capacity as the Secretary of the United States Department of the Treasury*

represented by **Stuart J Robinson**
U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
Federal Programs Branch
450 Golden Gate Ave., Suite 7–5395
San Francisco, CA 94102
415–436–6635
Email: stuart.j.robinson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Taylor Pitz**
DEPARTMENT OF JUSTICE
Civil
1100 L Street NW
Washington, DC 20005
202–305–5200
Email: taylor.n.pitz@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of the Treasury**

represented by **Stuart J Robinson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Taylor Pitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Himamauli Das**
*in his official capacity as Acting Director of the Financial Crimes Enforcement Network*

represented by **Stuart J Robinson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Taylor Pitz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**FACT Coalition**

represented by **James F Barger , Jr.**
FROHSIN & BARGER LLC
Frohsin Barger & Walthall

100 Main Street
St. Simons Island, GA 31522
205–933–4006
Email: jim@frohsinbarger.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristen Paige Miller**
DEMOCRACY FORWARD
FOUNDATION
PO Box 34553
Washington, DC 20043
202–701–1782
Email: kmiller@democracyforward.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Will Bardwell**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–773–0490
Email: wbardwell@democracyforward.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J Elliott Walthall**
FROHSIN, BARGER & WALTHALL
102 College Station Drive, PMB 153
Brevard, NC 28712
205–933–4006
Fax: 205–933–4008
Email: elliott@frohsinbarger.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Transparency International U.S.**     represented by     **James F Barger , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristen Paige Miller**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Will Bardwell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J Elliott Walthall**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Main Street Alliance**     represented by     **James F Barger , Jr.**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Kristen Paige Miller**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Will Bardwell**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J Elliott Walthall**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/15/2022 | 1 | COMPLAINT against All Defendants filed by Isaac Winkles, National Small Business United.(LCB) (Entered: 11/15/2022) |
| 11/15/2022 | 2 | NOTICE of assignment of case to a United States Magistrate Judge for Trial. (LCB) (Entered: 11/15/2022) |
| 11/15/2022 | 3 | MOTION for Leave to Appear Pro Hac Vice *of Kenyen Brown* <span style="color:red">Motion is **RIPE 11/15/2022**. Any party may file a motion to reconsider within three (3) business days of a ruling on the motion.</span> Filed by National Small Business United, Isaac Winkles. (Attachments: # 1 Exhibit Declaration of Kenyen Brown)(Neiman, John) (Entered: 11/15/2022) |
| 11/15/2022 | 4 | MOTION for Leave to Appear Pro Hac Vice *of Terence Healy* <span style="color:red">Motion is **RIPE 11/15/2022**. Any party may file a motion to reconsider within three (3) business days of a ruling on the motion.</span> Filed by National Small Business United, Isaac Winkles. (Attachments: # 1 Exhibit Declaration of Terence Healy)(Neiman, John) (Entered: 11/15/2022) |
| 11/15/2022 | 5 | MOTION for Leave to Appear Pro Hac Vice *of Thomas Lee* <span style="color:red">Motion is **RIPE 11/15/2022**. Any party may file a motion to reconsider within three (3) business days of a ruling on the motion.</span> Filed by National Small Business United, Isaac Winkles. (Attachments: # 1 Exhibit Declaration of Thomas Lee)(Neiman, John) (Entered: 11/15/2022) |
| 11/15/2022 | | PHV Fee paid: $ 75, receipt number AALNDC−4211614 (B−2310). (Neiman, John) Modified on 11/15/2022 (LCB). (Entered: 11/15/2022) |
| 11/15/2022 | | PHV Fee paid: $ 75, receipt number AALNDC−4211616 (B−2311). (Neiman, John) Modified on 11/15/2022 (LCB). (Entered: 11/15/2022) |
| 11/15/2022 | | PHV Fee paid: $ 75, receipt number AALNDC−4211618 (B−2312). (Neiman, John) Modified on 11/15/2022 (LCB). (Entered: 11/15/2022) |
| 11/15/2022 | | Filing Fee: Filing fee $ 402, receipt_number AALNDC−4211619 (B−2316). related document 1 COMPLAINT against All Defendants filed by Isaac Winkles, National Small Business United.(LCB). (Neiman, John) Modified on 11/15/2022 (LCB). (Entered: 11/15/2022) |
| 11/15/2022 | 6 | TEXT ORDER granting 3 Motion for Leave to Appear pro hac vice. Signed by Magistrate Judge Herman N Johnson, Jr on November 15, 2022. (ADH) (Entered: 11/15/2022) |
| 11/15/2022 | 7 | TEXT ORDER granting 4 Motion for Leave to Appear pro hac vice. Signed by Magistrate Judge Herman N Johnson, Jr on November 15, 2022. (ADH) (Entered: 11/15/2022) |

| 11/15/2022 | 8 | TEXT ORDER granting 5 Motion for Leave to Appear pro hac vice. Signed by Magistrate Judge Herman N Johnson, Jr on November 15, 2022. (ADH) (Entered: 11/15/2022) |
|---|---|---|
| 11/17/2022 | 9 | Corporate Disclosure Statement by National Small Business United. filed by National Small Business United (Neiman, John) (Entered: 11/17/2022) |
| 11/17/2022 | 10 | Summons Issued by the clerk and delivered to plaintiff for service as to Himamauli Das, United States Department of the Treasury, Janet Yellen, U.S. Attorney and U.S. Attorney General (LCB) (Entered: 11/18/2022) |
| 11/23/2022 | 11 | SUMMONS Returned Executed by Isaac Winkles. US Attorney's Office NDAL served on 11/21/2022, answer due 1/20/2023. (LCB) (Entered: 11/23/2022) |
| 11/28/2022 | 12 | SUMMONS Returned Executed Himamauli Das served (no date provided on green card) answer due 01/20/2023. (LCB) (Entered: 11/28/2022) |
| 11/30/2022 | 13 | SUMMONS Returned Executed Attorney General of the US served on 11/21/2022, answer due 1/20/2023. (LCB) (Entered: 11/30/2022) |
| 01/10/2023 | 14 | NOTICE of Appearance by Stuart J Robinson on behalf of All Defendants (Robinson, Stuart) (Entered: 01/10/2023) |
| 01/11/2023 | 15 | **NOTICE OF REASSIGNMENT**: The parties having not unanimously consented to the dispositive jurisdiction by a Magistrate Judge, this action has been randomly reassigned to the **HONORABLE LILES C. BURKE**. Please use case number **5:22–CV–1448–LCB** on all subsequent pleadings. Magistrate Judge Herman N. Johnson, Jr is no longer assigned to this case. (LCB) (Entered: 01/11/2023) |
| 01/11/2023 | 16 | Joint MOTION FOR BRIEFING SCHEDULE by Himamauli Das, United States Department of the Treasury, Janet Yellen. (Robinson, Stuart) (Entered: 01/11/2023) |
| 01/11/2023 | 17 | NOTICE of Appearance by Taylor Pitz on behalf of All Defendants (Pitz, Taylor) (Entered: 01/11/2023) |
| 01/11/2023 | 18 | **INITIAL ORDER GOVERNING ALL FURTHER PROCEEDINGS** – with appendices attached. Signed by Judge Liles C Burke on 1/11/2023. (AHI) (Entered: 01/11/2023) |
| 01/19/2023 | 19 | Unopposed MOTION for Extension of Time *to File Responsive Pleading* by Himamauli Das, United States Department of the Treasury, Janet Yellen. (Pitz, Taylor) (Entered: 01/19/2023) |
| 01/26/2023 | 20 | **EXPEDITED SCHEDULING ORDER:** The Court **GRANTS** the 19 Unopposed MOTION for Extension of Time to File Responsive Pleading and the 16 Joint MOTION FOR BRIEFING SCHEDULE as more fully set out in order. Signed by Judge Liles C Burke on 1/26/2023. (AHI) (Entered: 01/26/2023) |
| 02/03/2023 | 21 | Joint MOTION to Stay *Rule 26 Obligations* by Himamauli Das, United States Department of the Treasury, Janet Yellen. (Attachments: # 1 Text of Proposed Order)(Pitz, Taylor) (Entered: 02/03/2023) |
| 02/10/2023 | 22 | TEXT ORDER: For good cause shown, the Court **GRANTS** the parties' joint motion (Doc. 21) and **STAYS** the parties' Rule 26 and discovery obligations pending disposition of the forthcoming summary judgment motions. Assuming the case proceeds past the summary judgment stage, the parties shall hold their Rule 26 conference within 21 days after the Court issues its ruling on the forthcoming summary judgment motions.Signed by Judge Liles C Burke on 2/10/2023. (AHI) (Entered: 02/10/2023) |
| 02/15/2023 | 23 | MOTION for Summary Judgment *and Brief in Support Thereof* by National Small Business United, Isaac Winkles. (Attachments: # 1 Exhibit Brief in Support of Motion for Summary Judgment, # 2 Exhibit Corporate Transparency Act)(Neiman, John) (Entered: 02/15/2023) |
| 03/29/2023 | 24 | MOTION to Dismiss *or, in the alternative*, Cross MOTION for Summary Judgment by Himamauli Das, United States Department of the Treasury, Janet Yellen. (Attachments: # 1 Brief in Support of Defendants' Motion and Opposition to Plaintiffs' Motion for Summary Judgment)(Robinson, Stuart) (Entered: 03/29/2023) |

| | | |
|---|---|---|
| 03/29/2023 | 25 | Evidentiary Material re: 24 MOTION to Dismiss *or, in the alternative* Cross MOTION for Summary Judgment . (Attachments: # 1 Exhibit A – Sausser Decl., # 2 Att. 1 – Final Rule, # 3 Att. 2 – NPRM, # 4 Att. 3 – ANPRM, # 5 Att. 4 – CRS Report, # 6 Att. 5 – 2022 Illicit Financial Strategy, # 7 Att. 6 – 2005 Threat Assessment, # 8 Att. 7 – FinCEN Advisory, # 9 Att. 8 – DOJ Press Release, # 10 Att. 9 – Treasury Press Release, # 11 Att. 10 – Treasury Press Release, # 12 Att. 11 – DOJ Press Release, # 13 Att. 12 – DOJ Press Release, # 14 Att. 13 – Remarks by Treasury Dep. Sec., # 15 Att. 14 – Remarks by Treasury Dep. Sec., # 16 Att. 15 – Open Ownership Map, # 17 Att. 16 – FATF Recommendation 24, # 18 Att. 17 – FATF Guidance, # 19 Att. 18 – Global Financial Integrity Report, # 20 Att. 19 – World Bank Report, # 21 Att. 20 – GAO Report, # 22 Att. 21 – NASS Summary, # 23 Att. 22 – 2018 Risk Assessment, # 24 Att. 23 – FinCEN Advisory, # 25 Att. 24 – FinCEN Report, # 26 Att. 25 – Blanco Remarks, # 27 Att. 26 – FATF Evaluation Report Part 1, # 28 Att. 26 – FATF Evaluation Report Part 2, # 29 Att. 26 – FATF Evaluation Report Part 3, # 30 Att. 26 – FATF Evaluation Report Part 4, # 31 Att. 26 – FATF Evaluation Report Part 5, # 32 Att. 27 – AAG Remarks, # 33 Att. 28 – Fowler Testimony, # 34 Att. 29 – Day Testimony, # 35 Att. 30 – Blanco Remarks, # 36 Att. 31 – 2022 Risk Assessment Part 1, # 37 Att. 31 – 2022 Risk Assessment Part 2, # 38 Att. 32 – 2018 National Strategy Part 1, # 39 Att. 32 – 2018 National Strategy Part 2, # 40 Att. 32 – 2018 National Strategy Part 3, # 41 Att. 33 – 2020 National Strategy, # 42 Att. 34 – FinCEN AML Priorities, # 43 Att. 35 – White House Strategy, # 44 Att. 36 – DEA Assessment Part 1, # 45 Att. 36 – DEA Assessment Part 2, # 46 Att. 36 – DEA Assessment Part 3, # 47 Att. 36 – DEA Assessment Part 4, # 48 Att. 36 – DEA Assessment Part 5, # 49 Att. 37 – D'Antuono Testimony, # 50 Att. 38 – DOJ Press Release, # 51 Att. 39 – Blanco Testimony, # 52 Att. 40 – Adams Testimony, # 53 Att. 41 – Sec. Mnuchin Testimony, # 54 Att. 42 – Sec. Yellen Remarks, # 55 Att. 43 – G8 Action Plan, # 56 Att. 44 – Lough Erne Declaration, # 57 Att. 45 – G20 Principles, # 58 Att. 46 – U.S. Action Plan, # 59 Att. 47 – Egmont Group Report Part 1, # 60 Att. 47 – Egmont Group Report Part 2, # 61 Att. 48 – FATF Statement, # 62 Att. 49 – ANPRM Comment, # 63 Att. 50 – ANPRM Comment, # 64 Att. 51 – ANPRM Comment, # 65 Att. 52 – ANPRM Comment, # 66 Att. 53 – ANPRM Comment, # 67 Att. 54 – ANPRM Comment, # 68 Att. 55 – ANPRM Comment, # 69 Att. 56 – ANPRM Comment, # 70 Att. 57 – ANPRM Comment, # 71 Att. 58 – ANPRM Comment, # 72 Att. 59 – NPRM Comment, # 73 Att. 60 – NPRM Comment, # 74 Att. 61 – NPRM Comment, # 75 Att. 62 – NPRM Comment, # 76 Att. 63 – NPRM Comment, # 77 Att. 64 – NPRM Comment, # 78 Att. 65 – NPRM Comment, # 79 Att. 66 – NPRM Comment, # 80 Att. 67 – NPRM Comment, # 81 Att. 68 – NPRM Comment, # 82 Att. 69 – NPRM Comment, # 83 Att. 70 – NPRM Comment, # 84 Att. 71 – NPRM Comment, # 85 Att. 72 – NPRM Comment, # 86 Att. 73 – NPRM Comment, # 87 Att. 74 – NPRM Comment, # 88 Att. 75 – White House Fact Sheet, # 89 Att. 76 – Gardineer Testimony, # 90 Att. 77 – Jones Testimony, # 91 Att. 78 – Vicini Statement, # 92 Att. 79 – O'Carroll Statement, # 93 Att. 80 – NDAA Letter, # 94 Att. 81 – FOP Letter, # 95 Att. 82 – Chamber Letter, # 96 Att. 83 – FATF 2006 Evaluation Report Part 1, # 97 Att. 83 – FATF 2006 Evaluation Report Part 2, # 98 Att. 84 – Alabama SoS Form, # 99 Att. 85 – Alabama Property Management, # 100 Att. 86 – LinkedIn Profile of Plaintiff Winkles)(Robinson, Stuart) (Entered: 03/29/2023) |
| 04/05/2023 | 26 | MOTION for Leave to File *Amicus Brief* by FACT Coalition, Transparency International U.S., Main Street Alliance. (Attachments: # 1 Proposed Amicus Brief)(Walthall, J) (Entered: 04/05/2023) |
| 04/05/2023 | 27 | NOTICE of Appearance by J Elliott Walthall on behalf of FACT Coalition, Main Street Alliance, Transparency International U.S. (Walthall, J) (Entered: 04/05/2023) |
| 04/05/2023 | 28 | MOTION for Leave to Appear Pro Hac Vice *of Will Bardwell* by FACT Coalition, Main Street Alliance, Transparency International U.S.. (Walthall, J) (Entered: 04/05/2023) |
| 04/05/2023 | 29 | MOTION for Leave to Appear Pro Hac Vice *of Kristen Miller* by FACT Coalition, Main Street Alliance, Transparency International U.S.. (Walthall, J) (Entered: 04/05/2023) |
| 04/06/2023 | | PHV Fee paid: $ 75, receipt number AALNDC–4312255 (B–4660). (Miller, Kristen) Modified on 4/6/2023 (AHI). (Entered: 04/06/2023) |

| 04/06/2023 | | PHV Fee paid: $ 75, receipt number AALNDC–4312262 (B–4661). (Bardwell, Will) Modified on 4/6/2023 (AHI). (Entered: 04/06/2023) |
|---|---|---|
| 04/11/2023 | 30 | TEXT ORDER granting 28 Motion for Leave for Will Bardwell to Appear Pro Hac Vice. Signed by Judge Liles C Burke on 4/11/23. (SPT ) (Entered: 04/11/2023) |
| 04/11/2023 | 31 | TEXT ORDER granting 29 Motion for Leave for Kristen Miller to Appear Pro Hac Vice. Signed by Judge Liles C Burke on 4/11/23. (SPT ) (Entered: 04/11/2023) |
| 04/12/2023 | 32 | RESPONSE in Opposition re 26 MOTION for Leave to File *Amicus Brief* filed by National Small Business United, Isaac Winkles. (Attachments: # 1 Exhibit Emails between counsel)(Neiman, John) (Entered: 04/12/2023) |
| 04/13/2023 | 33 | TEXT ORDER: The Financial Accountability & Corporate Transparency Coalition, Transparency International U.S., and Main Street Alliance move for leave to proceed as amici curiae and file a brief in support of Defendants' motion to dismiss. (Doc. 26 at 2). Because the proposed amici brief is timely and offers relevant information, the motion for leave (Doc. 26) is **GRANTED**. Plaintiffs may respond in a separate brief, not exceeding twenty–five pages, on or before May 3, 2023. Signed by Judge Liles C Burke on 4/13/2023. (AHI) M (Entered: 04/13/2023) |
| 04/14/2023 | 34 | Brief *of Amici Curiae in Support of Defendants' Motion to Dismiss or in the Alternative Cross Motion for Summary Judgement* filed by FACT Coalition, Main Street Alliance, Transparency International U.S.. (Miller, Kristen) (Entered: 04/14/2023) |
| 05/02/2023 | 35 | REPLY in support of Plaintiffs' 23 Motion for Summary Judgment and Opposition to Defendants' 24 Motion to Dismiss or in the Alternative, Cross–Motion for Summary Judgment filed by National Small Business United, Isaac Winkles. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, Request to Entry of Summary Judgment)(Lee, Thomas) Modified on 5/3/2023 (AHI). (Entered: 05/02/2023) |
| 05/03/2023 | 36 | Opposition to re 34 filed by National Small Business United, Isaac Winkles. (Lee, Thomas) (Entered: 05/03/2023) |
| 05/08/2023 | 37 | MOTION to Amend/Correct 35 REPLY (other), by National Small Business United, Isaac Winkles. (Lee, Thomas) (Entered: 05/08/2023) |
| 05/11/2023 | 38 | TEXT ORDER: For good cause shown, Plaintiffs' motion (Doc. 37) is **GRANTED**. Plaintiffs may file a corrected reply by May 12, 2023. Signed by Judge Liles C Burke on 5/11/2023. (AHI) (Entered: 05/11/2023) |
| 05/12/2023 | 39 | CORRECTED REPLY to re 23 , 24 filed by National Small Business United, Isaac Winkles. (Attachments: # 1 Table of Contents of Evidentiary Material, # 2 Exhibit A (McCracken Decl.), # 3 Exhibit B (Winkles Decl.))(Lee, Thomas) (Entered: 05/12/2023) |
| 05/25/2023 | 40 | REPLY Brief filed by Defendants Himamauli Das, Janet Yellen, Amicus United States Department of the Treasury re: 24 MOTION to Dismiss *or, in the alternative*Cross MOTION for Summary Judgment filed by Himamauli Das, United States Department of the Treasury, Janet Yellen. (Robinson, Stuart) (Entered: 05/25/2023) |
| 09/15/2023 | 41 | TEXT ORDER that a Motion Hearing is set for 10:00 a.m. on Monday, 10/30/23, in the Federal Courthouse, Huntsville, AL before Judge Liles C Burke; Counsel should be prepared to argue all pending motions. Signed by Judge Liles C Burke on 9/15/23. (SPT ) (Entered: 09/15/2023) |
| 10/24/2023 | 42 | NOTICE of Supplemental Authority by National Small Business United, Isaac Winkles regarding 23 MOTION for Summary Judgment *and Brief in Support Thereof*, 41 Order,, Set Hearings, 39 REPLY (other), 35 REPLY (other), *of Supplemental Authority* (Attachments: # 1 Exhibit 1 –– September 2023 FinCEN BOI compliance guide)(Neiman, John) Modified on 10/24/2023 (AHI). (Entered: 10/24/2023) |
| 10/24/2023 | 43 | TEXT ORDER that the Motion Hearing is **RESET** for 1:30 p.m. on Monday, 11/6/23, in the Federal Courthouse, Huntsville, AL before Judge Liles C Burke; Counsel should be prepared to argue all pending motions. Signed by Judge Liles C Burke on 10/24/23. (SPT ) (Entered: 10/24/2023) |

| | | |
|---|---|---|
| 10/27/2023 | 44 | Unopposed MOTION to Continue *Hearing* by Himamauli Das, United States Department of the Treasury, Janet Yellen. (Pitz, Taylor) (Entered: 10/27/2023) |
| 10/30/2023 | 45 | TEXT ORDER that the 44 Unopposed MOTION to Continue *Hearing* is GRANTED; The Motion Hearing set for 11/6/23 is CANCELED and RESET for **10:00 a.m. on Monday, 11/20/23** in the Federal Courthouse, Huntsville, AL; Counsel should be prepared to argue all pending motions. Signed by Judge Liles C Burke on 10/30/23. (SPT ) (Entered: 10/30/2023) |
| 11/20/2023 | | Minute Entry for proceedings held before Judge Liles C Burke: Motion Hearing held on 11/20/2023 regarding all pending motions; John Neiman, Jr. and Thomas Lee present for plaintiffs; Stuart Robinson and Taylor Pitz present for defendants Yellen and Das. (Court Reporter Christina Decker.) (SPT ) (Entered: 11/20/2023) |
| 11/30/2023 | 46 | Transcript of the Motion Hearing held on 11/20/2023, before Judge Liles C. Burke. Court Reporter/Transcriber Christina Decker. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. (A copy can be obtained at http://www.alnd.uscourts.gov/local/court%20forms/transcripts/Transcript%20Redaction%20Policy.pdf) See Transcript Redaction Policy Redaction Request due 12/21/2023. Redacted Transcript Deadline set for 12/31/2023. Release of Transcript Restriction set for 2/28/2024. (AHI) (Entered: 11/30/2023) |
| 02/01/2024 | 47 | ORDER: The Court **SETS** a Telephone Conference set for 2/2/2024 02:00 PM before Judge Liles C Burke. Signed by Judge Liles C Burke on 2/1/2024. (AHI) (Entered: 02/01/2024) |
| 02/02/2024 | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 2/2/2024; John Neiman Jr. and Thomas Lee present for the plaintiffs; Stuart Robinson and Taylor Pitz present for the defendants; Kristen Miller present for amicus parties; Telephone Conference regarding the status of the parties motions for summary judgment and further arguments regarding the application of the substantial effects doctrine. (Court Reporter Christina Decker.) (SPT ) (Entered: 02/02/2024) |
| 02/08/2024 | 48 | Transcript of Telephone Conference held on 2/2/2024, before Judge Liles C. Burke. Court Reporter/Transcriber Christina Decker. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. (A copy can be obtained at http://www.alnd.uscourts.gov/local/court%20forms/transcripts/Transcript%20Redaction%20Policy.pdf) See Transcript Redaction Policy Redaction Request due 2/29/2024. Redacted Transcript Deadline set for 3/10/2024. Release of Transcript Restriction set for 5/8/2024. (AHI) (Entered: 02/08/2024) |
| 02/12/2024 | 49 | TEXT ORDER that a Telephone Conference is set for 9:00 a.m. on Friday, 2/16/2024; dial in information will be emailed to counsel prior to call. Signed by Judge Liles C Burke on 2/12/24. (SPT ) (Entered: 02/12/2024) |
| 02/16/2024 | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 2/16/2024; John Neiman and Thomas Lee present for plaintiffs; Stuart Robinson and Taylor Pitz present for defendants; Kristen Miller present for Amicus parties. (Court Reporter None.) (SPT ) (Entered: 02/16/2024) |
| 02/16/2024 | 50 | TEXT ORDER that a Telephone Conference is set for 1:00 p.m. on Tuesday, 2/20/2024; dial in information will be emailed to counsel prior to call. Signed by Judge Liles C Burke on 2/16/24. (SPT ) (Entered: 02/16/2024) |
| 02/20/2024 | | Minute Entry for proceedings held before Judge Liles C Burke: Telephone Conference held on 2/20/2024; John Neiman Jr. and Thomas Lee present for the plaintiffs; Stuart Robinson and Taylor Pitz present for the defendants; Kristen Miller present for Amicus parties. (Court Reporter None.) (SPT ) (Entered: 02/20/2024) |

| 03/01/2024 | 51 | MEMORANDUM OPINION: The Court **GRANTS** the Plaintiffs' Motion for Summary Judgment and **DENIES** the Defendant's Motion to Dismiss or Alternative Cross Motion for Summary Judgment. The Court will separately issue a final judgment. Signed by Judge Liles C Burke on 3/1/2024. (AHI) (Entered: 03/01/2024) |
|---|---|---|
| 03/01/2024 | 52 | FINAL JUDGMENT: The Court **FINDS** that the Plaintiffs are entitled to summary judgment as a matter of law, and **GRANTS** the Plaintiffs' request for relief as follows: The Court **ENTERS** this final declaratory judgment; the Defendants, along with any other agency or employee acting on behalf of the United States, are **PERMANENTLY ENJOINED** from enforcing the Corporate Transparency Act against the Plaintiffs and the Court will hear the parties arguments concerning the allocation and amount of costs on a date to be determined. Signed by Judge Liles C Burke on 3/1/2024. (AHI, ) (Entered: 03/01/2024) |
| 03/04/2024 | 53 | TEXT ORDER that a Hearing Regarding Costs is set for 1:30 p.m. on Thursday, 4/4/24, in the Federal Courthouse, Huntsville, AL before the undersigned. Signed by Judge Liles C Burke on 3/4/24. (SPT ) (Entered: 03/04/2024) |
| 03/11/2024 | 54 | NOTICE OF APPEAL by Himamauli Das, United States Department of the Treasury, Janet Yellen. (Robinson, Stuart) (Entered: 03/11/2024) |
| 03/11/2024 | 55 | TRANSMITTAL LETTER Regarding the 54 Notice of Appeal (AHI) (Entered: 03/11/2024) |
| 03/11/2024 | 56 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals regarding 54 Notice of Appeal (AHI) (Entered: 03/11/2024) |
| 03/12/2024 | 57 | USCA Case Number 24–10736–J for the 54 Notice of Appeal (AHI) (Entered: 03/12/2024) |
| 03/20/2024 | 58 | TRANSCRIPT REQUEST by Himamauli Das, United States Department of the Treasury, Janet Yellen (Pitz, Taylor) (Entered: 03/20/2024) |
| 03/22/2024 | 59 | Consent MOTION to Vacate *Costs Hearing* by Himamauli Das, United States Department of the Treasury, Janet Yellen. (Pitz, Taylor) (Entered: 03/22/2024) |

Tab 2



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL SMALL BUSINESS UNITED d/b/a/ the NATIONAL SMALL BUSINESS ASSOCIATION and | ) ) ) | |
| ISAAC WINKLES, | ) | Case No. _____ |
| Plaintiffs, | ) | |
| vs. | ) | |
| JANET YELLEN, in her official capacity as the Secretary of the United States Department of the Treasury, | ) ) ) | |
| UNITED STATES DEPARTMENT OF THE TREASURY, and | ) ) | **COMPLAINT** |
| HIMAMAULI DAS, in his official capacity as Acting Director of the Financial Crimes Enforcement Network, | ) ) ) | |
| Defendants. | ) ) ) | |

Plaintiffs National Small Business United, d/b/a/ the National Small Business Association ("NSBA"), and Isaac Winkles, major shareholder of an NSBA member ("Winkles"), bring this civil action for declaratory and injunctive relief against Janet Yellen, in her official capacity as the Secretary of the United States Department of the Treasury ("Yellen"), the United States Department of the Treasury (the "Treasury"), and Himamauli Das, in his official capacity as Acting Director of the

Financial Crimes Enforcement Network ("Das"), and allege as follows:

## PRELIMINARY STATEMENT

1.      Justice Louis Brandeis once warned—in a dissenting opinion that would later become law—that the "greatest dangers to liberty lurk in the insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead v. United States*, 277 U.S. 438, 471, 479 (1928) (Brandeis, J., dissenting) (objecting against warrantless wiretap of bootleggers' private phone calls by federal agents). The Corporate Transparency Act, Pub. L. No. 116-283, 134 Stat. 4604, *codified at* 31 U.S.C. § 5336 (the "CTA" or the "Act")—a federal statute enacted on January 1, 2021, mandating that persons forming entities under State law report "sensitive information," *id.* § 5336 note (6), to the federal Financial Crimes Enforcement Network ("FinCEN"), or face monetary penalties, imprisonment, or both—is just such an "insidious encroachment."

2.      The CTA's reporting requirements will apply to approximately 32.6 million "reporting companies" in 2024 and to an estimated 5 million additional companies per year thereafter, including the vast majority of NSBA's members, located on every main street in America and in every corner of every State in the Union. *See* Beneficial Ownership Information Reporting Requirements for Financial Crimes Enforcement Network (FinCEN), 87 Fed. Reg. 59498, 59549 (Sept. 30, 2022) (to be codified at 31 C.F.R. pt. 1010). These "reporting companies"

include mom-and-pop businesses, franchisees, manufacturers, on-line retailers, plumbers, restaurateurs, electricians, mechanics, lawyers, architects, dentists, doctors, fitness studios, landscapers, and any other privately owned enterprise or business with 20 or fewer full-time employees **or** less than $5 million in annual gross receipts or sales.  *See* 31 U.S.C. § 5336(a)(11)(B)(xxi).  But the CTA goes further. It also covers entities that are not engaged in any commercial activity at all, including (i) not-for-profit entities that do not have a federal 501(c) tax-exempt designation, (ii) entities formed by U.S. persons solely to hold private property in the State (*e.g.*, a family residence), and (iii) local, private social clubs that have formed entities with no intent to apply for federal 501(c) tax-exempt status.

3.      The primary stated purpose of the CTA is to enhance measures to combat financial crimes, such as money laundering and terrorism financing.  Those are admirable and important aims.  However, while attempting to fight crime, the CTA imposes its heaviest burdens on law-abiding U.S. citizens and permanent residents.  The CTA's obligations to report sensitive personal information are imposed on a "reporting company" even though:

> (i)      the federal government does not know in what activities the reporting company[1] is engaged or will engage;

---

[1] Although we use the term "reporting company," which is used in the statute, the word "company" implies that the only entities affected by the CTA are those that engage in commerce when, in fact, State laws explicitly authorize entity formation for lawful, non-commercial purposes.  Accordingly, Plaintiffs do not concede that "reporting company," as vaguely defined in the CTA, is limited to companies that engage in commerce.

(ii)    the federal government does not know whether the activities engaged in, or to be engaged in, by the reporting company constitute "commerce with foreign Nations, and among the several States, and with the Indian Tribes" such that they are subject to Congress's authority under Article I of the United States Constitution;

(iii)   the federal government does not know or suspect that the reporting company is engaging in, or will engage in, any illegal activity or any activity that is subject to federal regulation; and

(iv)   the federal government has no suspicion of wrongdoing, probable cause, or any other basis justifying the imposition of an obligation to divulge sensitive personal information to FinCEN for law enforcement purposes.

4.    Thus, the CTA is a law enforcement dragnet of sweeping proportions imposed by Congress on law-abiding U.S. citizens and permanent residents who own or control small businesses in the United States (as well as upon non-business entities), where neither Congress nor any other branch of the federal government has established any legal or regulatory predicate to justify this demand for personal information. The statute compels self-identification of private individuals seeking to engage in—or to continue engaging in—lawful, federally unregulated commercial and non-commercial activity under State laws allowing them to form an entity, whether or not such activity affects interstate, foreign, or Indian commerce.

5.    Compounding the error of this jurisdictional overreach, the CTA will likely weaken—rather than strengthen—the existing federal framework for collecting beneficial ownership information from economic actors in the U.S. financial system. The CTA will supplant the existing beneficial ownership reporting

requirements under the Customer Due Diligence Requirements for Financial Institutions (the "CDD Rule"), which requires financial institutions to obtain beneficial ownership information from persons or entities that voluntarily avail themselves of the U.S. financial system by opening a financial account with a federally regulated financial institution.  Under the CDD Rule, financial institution customers provide detailed and verifiable documentation demonstrating beneficial ownership information, subject to vetting and reporting of suspicious activity by the relevant financial institution.  The CTA, on the other hand, requires no verifiable documentation, no review of the information submitted, and no monitoring or reporting to FinCEN by a disinterested third party.  Making matters worse, the CTA will likely reduce the role of financial institutions—the very actors most likely to be used for improper financial activity and most equipped to detect and prevent such activity—in combatting financial crimes.  Money laundering and terrorism funding are important U.S. national security problems, but the logical cure is to establish laws that follow the money, not to build a Big-Brother database of predominantly U.S. citizens and permanent residents who are simply engaging in lawful activities. The Framers of the Constitution "conferred, as against the government, the right to be let alone – the most comprehensive of rights and the right most valued by civilized men." *Olmstead,* 277 U.S. at 478 (Brandeis, J., dissenting).  The CTA turns this bedrock principle of American freedom from governmental intrusion on its head.

6.     The Act also claims to "set a clear, Federal standard for incorporation practices" for "entities formed under the laws of the States," 31 U.S.C. § 5336 note (5)(A), and prohibits any State from authorizing any "corporation, limited liability company, or other similar entity" formed under its laws from issuing "a certificate in bearer form evidencing either a whole or fractional interest in the entity," *id.* § 5336(f).  These are unprecedented federal intrusions into the States' sovereign powers to charter and regulate the formation of entities under State law.  For more than two centuries, the States have had independent, plenary authority to regulate the formation and internal structuring of corporate entities under State law, subject only to the constraint set forth in Article I, Section 10 of the U.S. Constitution that "no State shall make any Law impairing the Obligation of Contracts," which the Supreme Court has held to encompass corporate charters vested by the British Crown before the United States was established.  *See Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819).  The federal government does not have the constitutional authority to impose additional requirements on the formation of entities under State laws nor to prescribe the conditions under which an entity charter may be granted under State laws.  This includes banning one or more indicia of ownership such as bearer shares, notwithstanding the power Congress possesses to regulate entities after formation **if** the entities, once formed, engage in foreign, interstate, or Indian commerce.

7.     The Constitution does not grant unlimited authority to Congress. Rather, the Constitution limits Congress's authority to the specific powers enumerated in Article I and the Civil War Amendments and reserves to the States and to the People "powers not delegated to the United States by the Constitution." U.S. Const. amend. X.  Consequently, the Constitution's enumeration of specific rights "shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX.  The CTA violates these constitutional principles:

(i)     The CTA infringes on the States' sovereign powers over the formation and governance of entities under State law.

(ii)    The CTA does not regulate commerce.  Rather, it imposes obligations on the States and State entity filers at the moment of entity formation, which is an entirely ministerial act, not a "commercial activity" over which Congress can assert its power to "regulate Commerce." U.S. Const. art. I, § 8, cl. 3.  In fact, many States permit entities to be formed for purposes other than commerce or business.  *See, e.g.*, Ala. Code § 10A-1-2.01 ("A domestic entity may have *any lawful purpose or purposes*, unless otherwise provided by this title.") (emphasis added).[2]

(iii)   The CTA's application to all entities formed under State law sweeps in entities engaged solely in activities confined to the territory of the State in which they are formed and entities that do not engage in any commercial activity at all.  The CTA's indiscriminate regulation of entity formations therefore exceeds Congress's power to regulate interstate, foreign, and Indian commerce.

---

[2] *See* also Ala. Code § 10A-1-2.11 ("[a] domestic entity has the same powers as an individual to take action necessary or convenient to carry out its business ***and affairs***") (emphasis added).  Delaware law is more explicit in making a distinction between business and other purposes. *See* Del. G. Corp. L. § 101 (b) ("[a] corporation may be incorporated or organized under this chapter to conduct or promote any lawful business ***or purposes***") (emphasis added).

(iv)    The CTA infringes upon individuals' rights to apply for, form, own, and provide for the self-governance of entities under State law.  By compelling individuals who apply for, form, own, or control entities formed under State law to identify themselves to the federal government where the federal government has no basis for regulatory power, the CTA violates these individuals' constitutional rights to free speech and free association.

(v)    By compelling the disclosure of "sensitive" personal information for law enforcement purposes under penalty of criminal sanctions for non-compliance, and, in certain cases, allowing federal and foreign government agencies to access such sensitive information regarding U.S. persons without U.S. court authorization, the CTA enables "unreasonable searches and seizures" of the "right of the people to be secure in their persons, houses, papers, and effects" with no prior suspicion of wrongdoing, in violation of the Fourth Amendment.  *See* U.S. Const. amend. IV.  These aspects of the CTA also violate the privilege against self-incrimination and privacy rights protected by the Fifth and Ninth Amendments.  *See* U.S. Const. amends. V & IX.

(vi)    The CTA is unconstitutionally vague because its definitions of "applicant" and "beneficial owner" have no evident analogues in relevant State entity laws, provide insufficient notice of who is subject to its criminal sanctions for noncompliance, and vest too much interpretive discretion in the federal government.

8.     Therefore, Plaintiffs seek declaratory and injunctive relief against the CTA's implementation to avoid an unconstitutional intrusion by the federal government into the rights of U.S. persons seeking to form corporate entities under State law and to protect the sovereignty of the States.  The Act directs the Secretary of the Treasury to promulgate regulations to implement the statute.  On September 29, 2022, FinCEN issued a final rule (the "Final Rule") implementing the CTA's beneficial ownership reporting requirements to take effect on January 1, 2024 for

newly-formed entities and January 1, 2025 for existing entities.  Consequently, immediate action by this Court to enjoin the Act and to declare it unconstitutional is necessary.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States and has jurisdiction to render declaratory relief because an "actual controversy" exists between the parties within the meaning of 28 U.S.C. § 2201(a).

10.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(3) because no real property is involved, Plaintiff Winkles resides in this District as do other officers and major shareholders of companies that are members of Plaintiff NSBA, and Defendants are agencies or officers of the United States sued in their official capacities.

## PARTIES

11.      The National Small Business Association, an Ohio nonprofit mutual benefit corporation, is one of the leading and oldest associations of small businesses in the United States, with members in all fifty States and the District of Columbia. The predecessor entity of the NSBA was formed in the 1930s to represent the interests of small-business operators struggling to survive in the face of increased federal and state government taxes and regulations triggered by the Great

Depression.  Today, NSBA's mission is to represent and protect the rights of its members who operate their small businesses in compliance with lawfully enacted government regulation.

12.     NSBA's members include numerous reporting companies owned or operated by U.S. persons who object to forced compliance with the CTA's unconstitutional command that they turn over "sensitive" personal information to the federal government to form or continue to operate entities formed under State law, requiring a diversion of resources from their businesses.  NSBA joins in those objections on behalf of its members across the nation, including:

> (i)     A small software company that has developed a mobile-phone application, with no employees and less than $5,000,000 in gross receipts or sales  in 2021;
>
> (ii)    A company formed to operate a retail food franchise with less than twenty full-time employees and less than $5,000,000 in gross receipts or sales in 2021;
>
> (iii)   A single-owner business consulting company with no employees and less than $5,000,000 in gross receipts or sales in 2021;
>
> (iv)    A private, family-owned real estate development company, some of whose owners hold their private residences inside a limited liability company formed under State law in the State where the residences are located; and
>
> (v)     A construction, electrical, and plumbing services company with less than twenty full-time employees and less than $5,000,000 in gross receipts or sales in 2021.

13.     Moreover, because a primary mission of NSBA is to provide its members with information and advice regarding legal and regulatory issues faced by

small businesses, NSBA has already incurred and will continue to incur substantial costs in assisting its members in understanding how the Act applies to them and affects their businesses. These costs and efforts will only increase now that the Final Rule has been issued.

14.     Plaintiff Isaac Winkles is a citizen of the State of Alabama and of the United States and a resident of Huntsville, Alabama. Winkles and his wife are the sole shareholders of Alabama Property Management, Inc., an Alabama domestic corporation that owns and operates a business managing real estate properties in northern Alabama. Alabama Property Management, Inc., is a member of NSBA, and Winkles will be subject to the Act's reporting requirements to give his sensitive personal information to FinCEN. He objects to being forced to comply with the Act as a violation of his constitutional rights and an encroachment on the sovereignty of the State of Alabama to regulate entity formation. The Supreme Court has held that individual citizens of a State have standing to raise claims that the federal government has infringed on a State's sovereignty. *See Bond v. United States*, 564 U.S. 211, 222 (2011) ("An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable. Fidelity to principles of federalism is not for the States alone to vindicate.").

15.     Defendant United States Department of the Treasury is an executive-branch department of the federal government headquartered in Washington, D.C. responsible for the administration and enforcement of the CTA, through FinCEN.

16.     Defendant Yellen is the Secretary of the United States Treasury and is named as a party in her official capacity.

17.     Defendant Das is Acting Director of FinCEN and is named as a party in his official capacity.

## FACTUAL ALLEGATIONS
### The Requirements of the CTA

18.     The CTA was enacted on January 1, 2021, as part of the omnibus National Defense Authorization Act for Fiscal Year 2021.[3]  The stated purpose of the CTA is to combat money laundering, the financing of terrorism, and other illicit activity by cracking down on the use of anonymous "shell companies."  To that end, the CTA requires most U.S. corporate entities to provide extensive personal ownership information to FinCEN.

19.     **Reporting Obligations**.  Specifically, the Act requires "reporting companies" to provide to FinCEN data regarding each "beneficial owner" and "applicant."  Each of those terms is broadly and ambiguously defined:

- A "reporting company" is defined as a "corporation, limited

---

[3] William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388.

liability company, or similar entity that is (i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11)(A).

- A "beneficial owner" is defined as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise" (i) "exercises substantial control over the entity;" or (ii) "owns or controls not less than 25 percent of the ownership interests of the entity." *Id*. § 5336(a)(3)(A).

- An "applicant" is defined as any individual who files an application to form a reporting company or "registers or files an application to register" a non-U.S. company to do business in the United States. *Id*. § 5336(a)(2).

20.   For each of the covered individuals, the reporting company must provide to FinCEN their full legal name, date of birth, current residential or business street address, and "unique identifying number from an acceptable identification document," such as an unexpired passport or State-issued identification card or driver's license, or FinCEN-issued identifier number.  31 U.S.C. § 5336(b)(2)(A). This personal information must be reported upon formation or registration of the reporting company, or, in the case of existing reporting companies, in a "timely manner," and not later than two years after the effective date of the regulations that FinCEN is directed to promulgate. *Id*. § 5336(b)(1)(B), (C).  If there are any changes to the reported data—such as if a "beneficial owner" or "applicant" moves their personal residence or gets a new driver's license—the entity must provide updated

information to FinCEN no more than one year after the change.  *Id*. § 5336(b)(1)(D).

21.     Reporting companies that "willfully" fail to comply with the CTA's reporting requirements are subject to a civil penalty of up to $500 per day up to $10,000, two years' imprisonment, or both a fine and confinement.  *Id*. § 5336(h)(1), (3).

22.     **Database of Personal Information**.  The disclosures required by the CTA will be used to create a vast database of personal information regarding "beneficial owners" and "applicants."

23.     The CTA requires FinCEN to keep the personal data of a reporting company's beneficial owners and applicants for at least five years after the date on which the reporting company is wound down.  31 U.S.C. § 5336(c)(1).  For the duration of FinCEN's possession of the required personal information—which, given the lifespan of many companies, is likely to far exceed five years—FinCEN may share the reported personal data of reporting companies with federal, State, local, and tribal law enforcement agencies; with financial institutions for customer due diligence (with the reporting company's consent); and with "a Federal functional regulator or other appropriate regulatory agency," including foreign governmental agencies.  *Id*. § 5336(c)(2)(B).

24.     If the request for personal data comes from a State, local, or tribal law enforcement agency, the statute requires that it come through "appropriate

protocols," and that "a court of competent jurisdiction . . . has authorized the law enforcement agency to seek the information in a criminal or civil investigation." *Id*. § 5336(c)(2)(B)(i)(II). However, no court authorization is required if the request comes from a "Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity." *Id*. § 5336(c)(2)(B)(i)(I). Likewise, if a federal agency makes a request for a beneficial owner or an applicant's personal data on behalf of a non-U.S. law enforcement agency, prosecutor, or judge, for instance, pursuant to an international treaty, then FinCEN appears to have no explicit authority to deny the request so long as the requested data is limited to the "investigation or national security or intelligence activity" that the foreign or international entity has in mind.[4] *Id*. § 5336(c)(2)(B)(ii).

25.    Thus, for example, if a foreign government, acting pursuant to a U.S.-ratified treaty like the United Nations Convention Against Corruption, requested certain beneficial owners' or applicants' personal data related to LLC-owned real property located in the United States, FinCEN is authorized to provide such data without any independent examination of the foreign country's need for the information.

---

[4] According to Defendant Das, FinCEN is "currently developing a second" Notice of Proposed Rulemaking regarding regulations to govern access by federal, State, tribal, and foreign agencies to the "beneficial ownership information," and intends to "publish this proposed rule this year." Statement by Himamauli Das, Acting Director, Financial Crimes Enforcement Network, United States Department of the Treasury before the Committee on Financial Services, U.S. House of Representatives (April 28, 2022), at 5.

26.   **Burdens Imposed on States**.  The CTA requires that relevant federal, State, and tribal agencies, as determined by the Secretary of the Treasury, must "cooperate with and provide information requested by FinCEN" to create and maintain the intended database of "sensitive" personal information.   *Id.* § 5336(d)(2).

27.   While the Act contemplates that funds will be made available to States to alleviate the financial and other burdens imposed upon them by the CTA, upon information and belief, no such funds have yet been made available.  According to the CTA, as a condition of the supposed funds, "each State and Indian Tribe shall, not later than 2 years after the effective date of [FinCEN's reporting regulations]," notify reporting company filers of the personal-data reporting requirements and update relevant websites, instructions, and forms.   *See id.* § 5336(e)(2)(A). However, because the penalties for individual non-compliance with the CTA, including upon State citizens and permanent residents, are so severe and because the federal government itself has no ability to notify actual State-level filers of the CTA's requirements at the time of formation, the States will be compelled to notify their citizens and permanent residents of the CTA's requirements to save them from fines and imprisonment, whether or not federal funds are actually made available.

## The CTA's Injurious Impact on Plaintiffs

28.   According to FinCEN, the "reporting companies" subject to the CTA

will include approximately 32.6 million existing entities in 2024, plus roughly five

million additional corporate entities created or registered under State law every year

from 2025 to 2035, as well as foreign companies registered to do business in the

United States. Beneficial Ownership Information Reporting Requirements for

Financial Crimes Enforcement Network (FinCEN), 87 Fed. Reg. at 59549 (2022).

However, the CTA excludes two dozen categories of large business entities and

companies, the broadest exclusion being for companies with (a) more than 20 full-

time employees in the United States, (b) more than $5 million in gross receipts or

sales, and (c) an operating presence at a physical office in the United States.  31

U.S.C. § 5336(a)(11)(B).  Banks, insurance companies, investment funds, public

companies, broker dealers, public accounting firms, money-transmitting businesses

and existing shell companies with no foreign owners, assets, or active business, are

also excluded.  *Id.*

29.    Despite these broad carve-outs, the CTA does **not** exempt reporting

companies formed solely by U.S. citizens or permanent residents, including small

businesses with 20 or fewer full-time employees and less than $5 million in gross

receipts or sales, as well as entities formed for strictly intrastate commerce or non-

business purposes such as entities formed to hold a family residence (*e.g.*, a high-

profile individual wanting privacy for personal security reasons), entities that are

formed with the intent to seek 501(c) federal tax-exempt status but have not yet so

(*e.g.*, a small artists' collective), or non-profit entities such as local private social clubs that do not intend to seek 501(c) federal tax-exempt status.

30.     Nor does the Act contain any limitations that would restrict reporting obligations to individuals or entities that are suspected of a crime or wrongdoing.

31.     Therefore, the Act's burden will fall substantially and disproportionately on privately-owned small businesses and non-commercial organizations, regardless of whether there is any reason to believe that these small businesses and organizations have engaged in any misconduct whatsoever.

32.     The CTA will have a profound and injurious impact on NSBA's members and small business owners, including Plaintiff Winkles.  Among other burdens imposed by the CTA, business owners may have to consult lawyers to parse through nearly 100 pages of the Final Rule to determine whether the vague and confusing reporting requirements of the CTA apply or, alternatively, risk interpreting such terms on their own.  For example, the Act provides that an individual who "indirectly" by any "understanding" "exercises substantial control" over an entity must be reported as a "beneficial owner."  31 U.S.C. § 5336(a)(3)(A). Businesses cannot know the actual meaning of "beneficial ownership" when the Final Rule defines it using vague terms such as "understanding," "arrangement,"

"relationship," or "otherwise."[5]   Rather than sharpen or narrow the definitions of these protean terms that do not appear in State entity formation laws, the Final Rule only compounds the confusion.

33.    The reporting obligations of the CTA have no obvious analogues in the existing laws of all fifty States, none of which appear to require the disclosure of personal information regarding "applicants" and "beneficial owners."  For example, Alabama law requires only "the name and address of each organizer of the filing entity," Ala. Code § 10-A-1-3.05, not their birth dates or active personal-identification numbers as the CTA requires, and makes no reference to "beneficial owners" or "applicants."   And if the entity to be formed is a limited liability company, the name and address of organizers is not required at all.  Ala. Code § 10A-4A-2.01(a).  In fact, based on Plaintiffs' review of all fifty States' incorporation laws, no State appears to require birth dates or active passports, driver's licenses, or other such personal identification information for individuals who form an entity. The Act thus requires reporting of data to the federal government above and beyond what Alabama and most States currently require for entity formations in their respective jurisdictions, and without regard to whether the entity is engaging in

_____

[5] In another instance, the Final Rule defines "substantial control" as including a circumstance where an individual, "[h]as **any other form of substantial control** over such reporting company." 87 Fed. Reg. at 59595 (emphasis added).  This definition is not only vague ("any other form"), it is also self-referential and thus virtually meaningless.

commercial activity or generating income such as the Internal Revenue Service requires for the reporting of such personal information for tax purposes.

34.     Many small businesses, including members of the NSBA, have tight profit margins, and the costs of compliance with the CTA's requirements will be considerable.   A small business owner or applicant, say a small retail-food franchisee, would first have to consult an attorney to see if he, she, or they qualify for a CTA exemption (e.g., by having the qualifying number of full-time employees and amount of gross receipts or sales).  If the answer is no, the relevant person or persons in charge of the "reporting company" would have to determine who its "beneficial owners" are.  Determining beneficial owners would be no easy feat with respect to many reporting companies, such as those formed to hold real estate (*e.g.*, a family vacation home held by a limited liability company), shares in the title to which may be dispersed among family members of multiple generations. Furthermore, because the necessary "sensitive" personal data regarding beneficial owners would have to be updated, affected small businesses, property-holders, and other persons may have to consult attorneys again when their circumstances change. In addition to the countless hours that millions of Americans operating small businesses or affiliated with non-commercial entities will have to expend to read and understand the CTA and its regulations, these Americans will likely have to pay hundreds or even thousands of dollars to attorneys to navigate the statute's

labyrinthine reporting requirements.  The threat of such crippling federal regulatory overhang on small businesses was the precise reason why NSBA was formed in the first place.

35.     The CTA contains no provisions to protect individuals who have formed or would form entities for associational or similar reasons, without seeking or having yet applied for 501(c) federal tax-exempt status, such as a local all-women's social club formed to discuss current health, reproduction rights, and sexual orientation issues in a confidential group setting.  In so doing, such persons are exercising their constitutionally protected free speech and association rights.  The prospect of reporting their sensitive personal information to FinCEN may deter or chill such persons from participating in the management of the entity in a significant way and thereby risk being classified as a "beneficial owner" or "applicant" because of fear of exposure of their beliefs or activities.  These concerns are substantial given the fact that the statute encompasses potential access to the personal information even by foreign governments, such as a Chinese government request for information about the "beneficial owners" of an entity established under State laws by U.S. persons to protest Chinese government policies.

36.     The burdens the CTA imposes upon entity formation in every State will have a direct, predictable impact on NSBA itself.  An important service  NSBA offers to its membership is the provision of information, education, and assistance

regarding legal and regulatory compliance issues faced by small businesses. To serve faithfully the needs and interests of its membership, NSBA has already been—and will continue to be—forced to devote its own scarce resources to assisting members in understanding how the CTA applies to them, how it will affect their businesses, and what they must do to comply.

37.     The benefits of the CTA do not justify the burdens it imposes on small business owners. To the contrary, the CTA does little to effectively combat financial crime and is inferior to the existing CDD Rule.

38.     The CTA was enacted to supplant existing beneficial ownership reporting requirements under the CDD Rule.[6]  The existing CDD Rule requires financial institutions to develop and update a risk profile (specifically for anti-money laundering and illicit transaction purposes) for every customer and obtain documentary and verifiable beneficial ownership information, including formation and governance documents, passports, driver's licenses, home addresses, trust agreements, or other information. The information submitted under the CDD Rule is reviewed, vetted, and verified by compliance staff of covered financial institutions (*e.g.*, banks, credit unions, brokers, dealers, and registered investment advisors). Furthermore, these financial institutions have an ongoing obligation to monitor their

---

[6] *See* 31 U.S.C § 5318(h) and 31 CFR § 1010.210 for anti-money laundering program requirements, and, as applied to specific financial institutions, in 31 C.F.R. §§ 1020.210, 1021.210, 1022.210, 1023.210, 1024.210, 1025.210, 1026.210, 1027.210, 1028.210, 1029.210, and 1030.210.

client relationships and report suspicious activities to FinCEN.

39.     The CTA, on the other hand, requires no supporting documentation, no review of the information, and no third-party monitoring or reporting to FinCEN about suspicious financial activity.  Without a disinterested intermediary to make sure that filers are making full and accurate disclosures, bad actors will manipulate or avoid disclosure requirements, undermining the purported purpose of the CTA. The likely result is that the CTA will simply create a database containing personal information about law-abiding reporting companies and their owners who will predominantly be U.S. persons, not the foreign individuals and entities engaging in money laundering and illegal activities that the statute was designed to target.

40.     The CTA is nothing more than a first salvo in a campaign to transfer responsibility from the very institutions (*i.e.*, big banks, financial institutions, and escrow agents, which are exempted from the CTA's coverage) that process the targeted illicit transactions to law-abiding, small business owners.   It is the quintessential example of the government prioritizing Wall Street to the detriment of Main Street.  Plaintiffs fully support Congress's desire to attack money laundering and terrorism financing, but passing an unconstitutional statute penalizing hard-working U.S. small business owners is not the answer.

## CAUSES OF ACTION

### COUNT ONE

**Unconstitutional Usurpation of the States' Power to Regulate Entity Formations in Excess of Congress's Constitutional Powers (U.S. Const. Art. I, amends. IX, X)**

41.     Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in paragraphs 1 through 33 and 36, above.

42.     For more than two centuries, the States have had independent authority to charter corporations and otherwise regulate the formation and governance of corporations they have chartered.  This was a sovereign power of the British Crown that was commonly understood to have devolved to the original thirteen States through their charters after the adoption of the Declaration of Independence in 1776. The newly independent States began chartering corporations soon after independence for the purposes of creating financial and transportation infrastructure, forming subordinate municipal governments, and for charitable and other public purposes.  *See* Ronald E. Seavoy, *The Public Service Origins of the American Business Corporation*, 52 Bus. History R. 30, 33 (1978).

43.     The Constitution did not intrude on this power of the States to charter corporations.  At the Constitutional Convention, Virginia delegate James Madison introduced a proposal to give Congress the authority "to grant charters of incorporation where the interest of the U.S. might require & the legislative provisions of individual States may be incompetent."  2 *The Records of the Federal*

*Convention of 1787*, at 615 (Max Farrand, ed., 1911).  Madison's proposal reflected the settled understanding that the States possessed—and would continue to retain under the new Constitution—the primary sovereign powers for chartering corporate entities.  *See id*. at 616 (containing James Madison's notes documenting the defeat of his proposal for an explicit Congressional power of chartering corporations by a vote of 3 in favor and 8 against).

44.    As the Supreme Court made clear in 1819, other than ensuring that State legislatures did not impair vested colonial-era corporate charters, the Constitution does not vest the federal government—including Congress and the Treasury Department—with any authority to dictate to the States the terms under which they charter companies.  *See Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819).  This fundamental principle remains true today, as corporations formed for private business purposes have proliferated and now outnumber the public-purpose and non-commercial corporations prevalent in the Founding era.  The States remain the primary sovereigns for the creation of corporate entities and, pursuant to the well-established "internal affairs" doctrine, the internal functioning of such entities remains a matter of the law of the State of formation.  "It thus is an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares."  *CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 91,

(1987).[7]

45.    Despite this original constitutional meaning, history, and tradition, the CTA aims to establish "a clear, Federal standard for incorporation practices," 31 U.S.C. § 5336 note (5)(A), above and beyond what State entity laws require, imposing a penalty—mandatory disclosure of names, addresses, birth dates, and identification numbers of all beneficial owners and applicants—on persons who seek to form entities under State law.  As detailed above, failure to make these disclosures is punishable by fines and imprisonment.  In addition, the CTA also interferes with State authority to determine the permissible structures of corporate ownership by prohibiting any State from authorizing the issuance of "a certificate in bearer form evidencing either a whole or fractional interest" in an entity created and organized under that State's laws.  31 U.S.C. § 5336(f).  Upon information and belief, although many States authorized such bearer certificates through the early twenty-first century, no State currently does so.  Nevertheless, the Act's categorical prohibition is an unprecedented intrusion on the States' sole authority to regulate the formation and governance of State-entities' internal affairs.

46.    One of the enumerated powers of Congress—and perhaps the most heavily used of those powers in recent decades—is the power to regulate foreign,

---

[7] Although Congress has the ability to create federally chartered corporations, it has no authority to intervene in the internal affairs of entities organized under State law, except as noted above.

interstate, or Indian commerce.  Congress also can wield its taxing power to tax income earned by individuals through corporate entities as it currently does through federal income taxes on corporations.  However, Congress has no regulatory interest or constitutional authority over corporate **formation** because a reporting company has not yet engaged in any foreign, interstate, or Indian commerce at the moment of its inception.  The formation of an entity under State law is an entirely ministerial act and many entities will engage in no activity until some indeterminate time after they have been formed.

47.  Indeed, many of the "reporting companies" subject to the Act may **never** engage in any such foreign, interstate, or Indian commerce.  State law permits the formation of a corporate entity for numerous purposes unrelated to commerce, such as local property holding or associational entities like neighborhood organizations and residential housing associations.  For example, Section 10A-1-2.01 of the Alabama Business and Nonprofit Entities Code indicates that a "domestic entity may have **any lawful purpose or purposes**, unless otherwise provided by this title."  Ala. Code § 10A-1-2.01 (2014) (emphasis added).  Section 101(b) of the Delaware General Corporation Law provides that a "corporation may be incorporated or organized under this chapter to conduct or promote any lawful business **or purposes**, except as may otherwise be provided by the Constitution or other law of this State." 8 Del. Code § 101(b) (emphasis added).  Similarly, Section

18-106(a) of the Delaware Limited Liability Company Act provides that "[a] limited liability company may carry on any lawful business, purpose or activity, whether or not for profit . . . ." 6 Del. Code § 18-1101. A large proportion of the CTA's coverage is thus likely to include entities that do not engage in commerce or business at all, or that engage in strictly intrastate commerce (such as residential real property holding) outside the reach of federal regulation.

48. This fact exposes a fundamental flaw in the CTA's structure: it does not regulate any specifically identified **commercial** activity. "The Constitution grants Congress the power to '*regulate* Commerce.' The power to *regulate* commerce presupposes the existence of commercial activity to be regulated." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 520 (2012) (emphasis in original). As discussed above, there is no exercise of commerce inherent in the creation of a state-chartered entity; it is an entirely ministerial act, and many entities so formed do not engage in any commercial activity. By imposing requirements on the mere act of entity formation without any inkling as to whether the formed entity will engage in commercial activity, the CTA clearly exceeds Congress's power to regulate interstate, foreign, and Indian commerce.

49. The CTA commandeers State agencies by coercing States into giving notice to State filers of the CTA's reporting requirements and providing filers with a copy of the CTA filing form. Because the States are the only agents capable of

providing notice to entity formation filers at the time of formation, States are likely to feel compelled to provide the notice and the FinCEN filing form to protect their citizens from the severe criminal penalties that would result from failure to comply with the CTA's filing requirements.

50.     Through these requirements, the CTA violates Plaintiffs' rights and the rights of all NSBA members by exceeding the enumerated powers of the federal government set forth in Article I, Section 8 of the Constitution of the United States, violating the Ninth and Tenth Amendments, and violating the constitutional principles of federalism and retained State sovereignty upon which this Nation was founded.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A.     Declare the CTA to be unconstitutional;

B.     Declare that the CTA exceeds Congress's authority under Article I of the Constitution and encroaches upon the States' respective sovereignties in violation of the Ninth and Tenth Amendments and constitutional principles of federalism and retained State sovereignty;

C.     Enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the Act against Plaintiffs, and to take such actions as are necessary and proper to remedy their violations deriving from any such actual or attempted enforcement; and

D.     Award Plaintiffs their costs and grant such other relief as the Court may deem just and proper.

## COUNT TWO

**Unconstitutional Invasion of Privacy**
**Unreasonable Search and Seizure Violation of the Fourth Amendment**
**Compelled Self Incrimination Violation of the Fifth Amendment**
**Right of Privacy Violation of the Ninth Amendment**
**(U.S. Const. amends. IV, V, IX)**

51.     Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in paragraphs 1-25, 28-31, 33, and 36-39 above.

52.     The CTA is a statute providing for criminal punishments enacted for the purpose of harvesting "sensitive" personal information from individuals to create a database for law enforcement purposes by FinCEN and other United States and foreign law-enforcement and intelligence agencies.  The stated purpose of the CTA is to provide the federal government with a supplemental means of enforcing federal criminal laws.  But no matter the degree of invasiveness, suspicionless searches and compelled disclosures are never allowed if their principal end is crime-solving.

53.     Privacy is often a key motivation in State entity formation.  No State has chosen to require the extent of disclosure of beneficial ownership and applicant information upon filing that the CTA mandates.  Upon information and belief, no State, for instance, appears to require birth dates and personal identification numbers of filers.  The States' entity-formation laws reflect the States' judgment that

individuals need not disclose sensitive information as a condition of forming corporate entities. Individuals who form an entity under such State laws have a reasonable expectation of privacy from the intrusion of the federal government as to that information. The CTA's requirements violate that expectation of privacy by compelling the disclosure of that information by individuals protected by the Fourth, Fifth, and Ninth Amendments.

54.     The CTA contains no limitations on the provision of the required personal information to situations where there is an articulable individualized suspicion of a crime or wrongdoing by such beneficial owners and applicants. The CTA also authorizes the provision of private, personal information to foreign governments, federal regulators, and regulatory agencies without any court authorization or specific requirements regarding those federal and foreign government agencies' need for the information.

55.     By requiring, under threat of criminal penalty, reporting companies to provide individuals' "sensitive" personal information for law enforcement purposes in the absence of specific prior indicia of wrongdoing, the CTA deprives Plaintiffs and the members of the NSBA of their privacy rights, and violates the Fourth Amendment, Fifth Amendment, and Ninth Amendment of the Constitution of the United States.

56.     By compelling disclosures and permitting the release of sensitive

personal data to federal and foreign government agencies without the reporting company's consent or authorization from a court of competent jurisdiction, *see* 31 U.S.C. § 5336(c)(2)(B) (requiring court authorization for requests from state, local, or tribal law enforcement agencies and consent from a financial institution, without imposing a similar requirement of court authorization for requests from federal or non-U.S. law enforcement agencies), the CTA violates the Fourth, Fifth, and Ninth Amendment rights of Plaintiffs and the members of the NSBA.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A.      Declare the CTA to be unconstitutional;

B.      Declare that the CTA violates (i) the Fourth Amendment's reasonable expectation of privacy from unreasonable searches and seizures without probable cause or articulable suspicion; (ii) the Fifth Amendment's privilege against self-incrimination; and (iii) the Ninth Amendment's retention of unenumerated rights to the People;

C.      Enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the Act against the Plaintiffs and to take such actions as are necessary and proper to remedy their violations deriving from any such actual or attempted enforcement; and

D.      Award Plaintiffs their costs and grant such other relief as the Court may deem just and proper.

## COUNT THREE

### Compelled Speech and Unreasonable Burdens on the Freedoms of
### Speech and Association
### (U.S. Const. amend. I)

57.     Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in paragraphs 1-25, 28-30, and 35-40 above.

58.     Under the CTA, the obligation to report personal information to the federal government arises at the time of formation of an entity under State law.  The CTA forces filers to disclose more personal information to the federal government than what is required to be disclosed under State entity-formation statutes; in most States, disclosure of "beneficial ownership" as expansively set forth in the CTA and "applicant" personal information is not required at all.  State laws providing for entity formation, however, reflect the States' respective judgments that the provision of such information is not a necessary or appropriate prerequisite of entity formation.

59.     Some U.S. persons form or seek to form entities under State law, without seeking 501(c) federal tax-exempt status, for social or other non-commercial reasons, such as to organize a private social club or to hold a family vacation property.  Many of these entities and the U.S. persons who would have to be registered under the CTA have a heightened reason to desire privacy.  The CTA compels such entities and individuals to publicly reveal their associations to the federal government, which may in turn transmit that information upon request to:

(i) federal and State law enforcement agencies, courts, and prosecutors; (ii) foreign governments and law enforcement authorities; (iii) financial institutions; and (iv) various federal regulators and regulatory agencies.  This forced disclosure will also deter such persons from exercising their rights of free speech and association and dissuade others from joining or assuming leadership positions in the entities (and thus arguably becoming "beneficial owners").

60.    The United States does not have a compelling, overriding interest in obtaining the information required by the CTA because less onerous alternatives are available to accomplish the stated goals of the CTA and the methods employed by the Act are not narrowly tailored for their stated purpose.  To wit, the most obvious and direct way to stem money laundering and international terrorism funding is to ramp up regulation and scrutiny of large cross-border money transfers, for instance, by banks, financial agents, and escrow agents.  Vacuuming up personal information about every American who sets up or has a significant stake in a corporate entity is overkill given the CTA's stated aims.  The requirements of the CTA are neither justified by nor necessary to promote the stated goals of the CTA.

61.    By requiring, under threat of criminal sanction, Plaintiffs and all members of NSBA to disclose information in the manner mandated by the CTA despite the availability of less onerous alternative methods to achieve the statute's stated goals, the CTA's disclosure requirements constitute compelled speech in

violation of the First Amendment to the Constitution of the United States.

62.     By requiring U.S. persons who have formed or wish to form a legal entity to engage in protected speech despite the availability of less onerous alternative methods to achieve the stated goals of the CTA, the CTA violates the First Amendment by burdening the right to speech and private association.  As the Supreme Court recently affirmed, "a substantial relation to an important interest is not enough to save a disclosure regime that is insufficiently tailored.  This requirement makes sense.  Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'"  *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384 (2021) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A.     Declare the CTA to be unconstitutional;

B.     Declare that the CTA violates the First Amendment's right to speech and private association and prohibition on compelled speech;

C.     Enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the Act against Plaintiffs, and to take such actions as are necessary and proper to remedy their violations deriving from any such actual or attempted enforcement; and

D.     Award Plaintiffs their costs and grant such other relief as the Court

may deem just and proper.

## COUNT FOUR

### Unconstitutional Violation of Due Process
### (U.S. Const. amend. V)

63.     Plaintiffs reallege and incorporate by reference each of the Complaint's allegations stated in paragraphs 1-25, 32-34, and 36 above.

64.     Both the CTA and the FinCEN rules relating to the CTA fail to provide definitions specific enough for Plaintiffs, members of the NSBA, or other ordinary small businesses or non-business entities to understand what conduct is required to avoid criminal sanctions including, but not limited to, failing to sufficiently define "beneficial owner," "understanding," "relationship," "substantial control," and "applicant." All these terms, most significantly "beneficial owner" and "applicant," have no obvious analogue in State entity formation laws, which typically address "organizers" and "incorporators." In addition, the CTA's overall framework for mandatory reporting, updating, access, and record-keeping is so vague and complex that Plaintiffs, members of the NSBA, or other ordinary small businesses or non-business entities cannot reasonably comply with these requirements.

65.     Should Plaintiffs, members of the NSBA, and other ordinary small businesses or non-business entities be forced to attempt to comply with the vague and complex requirements of the CTA to avoid criminal penalties, they will be forced to incur substantial costs and other burdens. The stated goals of the CTA do

not justify the enormous burden it places on small businesses and non-business entities and can be accomplished through less onerous alternative means.

66.     By subjecting Plaintiffs and all other individuals, including millions of U.S. persons, covered by the CTA to potential criminal sanctions without adequate notice of the actions required to avoid the sanctions, and, by the same token, expanding the federal government's discretion in enforcing the requirements, the CTA violates the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A.     Declare the CTA to be unconstitutional;

B.     Declare that the CTA violates the due process requirements of the Fifth Amendment;

C.     Enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the Act against the Plaintiffs, and to take such actions as are necessary and proper to remedy their violations deriving from any such actual or attempted enforcement; and

D.     Award Plaintiffs their costs and grant such other relief as the Court may deem just and proper.

Dated: November 15, 2022      Respectfully submitted,

  */s/ John Neiman*

John Neiman
MAYNARD COOPER & GALE
1901 Sixth Avenue North
Suite 1700
Birmingham, AL 35203
Telephone: (205) 254-1000
jneiman@maynardcooper.com

Kenyen Brown*
HUGHES HUBBARD & REED LLP
1775 I Street, N.W.
Washington, D.C., 20006-2401
Telephone: (202) 721-4600
Fax: (202) 721-4646
kenyen.brown@hugheshubbard.com

Thomas Lee*
thomas.lee@hugheshubbard.com
Terence Healy*
terence.healy@hugheshubbard.com
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
Telephone:  (212) 837-6000
Fax:  (212) 422-4726
*pro hac vice motion forthcoming*

*ATTORNEYS FOR PLAINTIFF*

Tab 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL SMALL BUSINESS UNITED d/b/a/ the NATIONAL SMALL BUSINESS ASSOCIATION, *et al.* | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. <u>5:22-cv-01448</u> |
| v. | ) ) ) | |
| JANET YELLEN, *et al.* | ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF TODD MCCRACKEN

I, Todd McCracken, declare:

1.      I am a resident of the District of Columbia over the age of 18, and a citizen of the United States.  I have personal knowledge of the facts stated in this declaration.

2.      I am the President and Chief Executive Officer ("CEO") of National Small Business United, doing business as the National Small Business Association ("NSBA").  I have been employed by the NSBA since 1988.  I first served as its Vice President of Government Affairs before becoming President in 1997.

3.      The NSBA is an Ohio non-profit corporation that represents and protects the rights of small businesses across the United States.  The NSBA has been advocating for small businesses since 1937 when its founder, DeWitt McKinley Emery, formed

1

an association of small businesspeople with the express purpose of promoting their interests in Washington, D.C.  It is a staunchly non-partisan advocacy organization.

4.      The NSBA represents over 65,000 businesses and entrepreneurs located in all 50 states.  Our members come from every sector of the U.S. economy, including manufacturing, retail, food service, and professional services.

5.      The NSBA's principal activities are to advocate for its members—and the 67.1 million Americans who make their livings employed by small businesses—before the federal government and to provide its members guidance and data on how to navigate government regulations.  Among the resources we provide are educational programming regarding federal regulations and periodic training for members. Since 2020, for example, thousands of our members relied on our guidance and online programming to take advantage of the many pandemic-related programs for small businesses, but also on how to comply with their obligations as employers.

6.      Since the passage of the Corporate Transparency Act ("CTA"), NSBA members have regularly expressed to me and my staff their concerns about being compelled to turn over personal information for storage in a federal law enforcement database.  Some NSBA members use corporate entities to protect their private information (like their home addresses), and do not understand why forming a

company or an LLC should subject them to suspicion of criminal activity or required reporting of their private information to a federal law-enforcement database.

7.     The CTA also poses significant problems to the NSBA's efforts to assist its members comply with a variety of regulations.  The NSBA regularly counsels small businesses on federal requirements, often because such businesses do not have the expertise to navigate these requirements on their own and do not have the resources to hire outside advisors.  I am concerned that the burden imposed by the CTA's reporting requirements will lead to significant confusion among NSBA's members, in particular, in trying to parse who constitutes a "beneficial owner" or "applicant," such that members may be at risk of running afoul of the CTA's criminal penalties.

8.     I understand that the CTA exempts certain businesses from its reporting requirements, including those businesses that employ more than 20 full-time employees, have an operating presence in a physical office in the United States, and have more than $5 million in annual gross receipts or sales.  The other exceptions, which I believe are mostly related to financial institutions, appear to be less relevant to the NSBA's members.

9.     Unfortunately, about eighty percent of NSBA's members represent businesses owned by U.S. persons that have fewer than 20 full-time employees and less than $5,000,000 in gross receipts or sales.  I understand that, as a result, many of NSBA's members would be subject to the CTA's reporting requirements if they go into effect

as regulations currently provide, in January 2024 and 2025.  Moreover, our members frequently file to form new entities according to their operational needs, and therefore would be subject to the CTA's reporting requirements regarding applicants as well as those regarding beneficial owners.  Others may currently have existing companies but intend to file applications to form other entities for different purposes.

10.    The burdens and risks imposed by the CTA's reporting requirements are significant.  In February of this year, NSBA hosted a national conference of small-business leaders.  The conference was designed to assess the top issues facing the small business community.  Ultimately, the CTA requirements were voted as the Number 5 priority—ahead of tax simplification, workforce training, immigration reform, and other issues critical to smaller businesses.

11.    Isaac Winkles is a member of the NSBA who resides in Huntsville, Alabama. The NSBA has other members, like Mr. Winkles, who also reside or have businesses in northern Alabama.  In total, NSBA has 10 member companies in Huntsville and at least six additional members in other parts of the Northeastern Division of the Northern District of Alabama.  As with our members nationally, the vast majority of these entities will be subject to the CTA's reporting requirements.

12.    Based on my conversations with various members, many—and likely the majority—of NSBA's members are not aware of the CTA or its reporting requirements.  The job of notifying members will itself consume NSBA resources.

Consequently, I am concerned that CTA compromises our ability to provide our members with the necessary guidance that they have come to expect from the NSBA. Once the CTA and its implementing regulations come into effect, I expect the association will need to engage in a significant and sustained education and awareness campaign around the CTA. Given the finite resources of the association, this work will necessarily result in fewer opportunities for NSBA to educate and train member companies on other topics, such as raising capital; finding, training and retaining workers; complying with employment laws; and protecting themselves, their customers, and employees from a range of cyber-security threats.

13.    In sum, the CTA's disclosure requirements will substantially impair the NSBA's ability to provide necessary services to its members and will detract from its ability to continue to provide the services and advice its members have come to expect.


I declare under penalty of perjury under the laws of the United States and the District of Columbia that the foregoing is true and correct.

Executed at Washington, DC          Respectfully submitted,
on: May 1, 2023

Todd McCracken
President & CEO
National Small Business Association

Tab 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

NATIONAL SMALL BUSINESS
UNITED d/b/a/ the NATIONAL SMALL
BUSINESS ASSOCIATION, *et al.*

               Plaintiffs,

   v.

JANET YELLEN, *et al.*

             Defendants.

Case No.  5:22-cv-01448

## <u>DECLARATION OF ISAAC WINKLES</u>

I, Isaac Winkles, declare:

1.     I am a resident of Huntsville, Alabama over the age of 18, and a citizen of the United States.  I have personal knowledge of the facts stated in this declaration.

2.     I have lived in Huntsville for 58 years.  I live with my wife, Patricia Winkles, who is also a citizen of the United States and has been a Huntsville resident for 58 years.

3.     Together, my wife and I created Alabama Property Management, Inc. ("APM"), and Isaac Winkles, Inc.  Both are Alabama corporations that advocate for  sellers and purchasers and manage and lease real property in Northern Alabama.  I own 50% percent of shares of APM and my wife owns 50% percent of

1

its shares.  APM is a small, family business with 3 full-time employees and annual turnover of under $20 million.

4.     I hold an unexpired U.S. passport with my legal name and date and place of birth indicated on the passport.

5.     APM has been a dues-paying member of the National Small Business Association ("NSBA") since 2021.

6.     When I formed Isaac Winkles Inc. in 2009 and APM in 2019 as an Alabama Corporation, we followed Alabama's requirements to charter S-corporations which included reporting my name and address to the Secretary of State.  This was not the first time I have formed an entity in Alabama: I have formed others in the past for business needs, and I anticipate forming other Alabama entities over the next few years.  In forming these companies, I have never had to provide personal information beyond my name and address.

7.     Because Isaac Winkles Inc. and APM has fewer than 20 full-time employees and less than $8 million and $5 million, respectively, in annual gross receipts or sales in 2022, and because this will most likely be the case in 2023, I understand the Corporate Transparency Act ("CTA") will force me and my wife to report our names, addresses, birthdates, and active identification document numbers (with images) to the Financial Crimes Enforcement Network ("FinCEN")

for storage in its database.  If I do not comply with these rules, I understand that I may face fines and even imprisonment.

8.     I strongly object to supplying my personal information to FinCEN for inclusion in its law enforcement database just because I am a small business owner.   I understand that state, federal, and foreign law enforcement and intelligence agencies who have no reason to suspect me or APM of any crime may access to FinCEN's beneficial-owner database for law enforcement purposes.  I do not want FinCEN employees to have access to my birthdate, address, or personal identification numbers, and I do not want this information to be shared with other governments, including other state governments, federal agencies, and foreign governments.

9.     I rely on the idea that when I form an entity under Alabama law, that my information will remain as private as Alabama law allows, and that I will not have to provide additional private information to an entity (the U.S. Treasury) of a separate government (the federal government) that has nothing to do with forming that entity in the first place, unless and until the federal government has a valid reason for asking for the information such as the Treasury would for taxing income that an entity I formed might make.

10.    If the CTA does go into effect, I will need to pay an attorney, advisor, or employee to help me comply with the law's requirements.  I do not wish to spend

my limited resources on this type of advice but, as I understand, the CTA authorizes the federal Government to prosecute me, and I could face up to $10,000 in fines and two years in jail if I—or my wife—do not surrender our personal information to a FinCEN.  In order to avoid the risk of these penalties, I will have to hire additional help.

11.    I have brought this lawsuit because I do not believe the federal government has the right to treat me as a potential criminal suspect just because I have set up a lawful corporate entity in Alabama.  However, if the CTA goes into effect, I will feel compelled to turn over the required information because I do not want to go to jail or pay fines of thousands of dollars.

I declare under penalty of perjury under the laws of the United States and the State of Alabama that the foregoing is true and correct.

Executed at Huntsville, AL on:  Respectfully submitted,
May 1, 2023

_____
Isaac Winkles
President
Isaac Winkles Incorporated
Alabama Property Management Incorporated

Tab 5

FILED

2023 Nov-30  AM 11:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

1                     IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ALABAMA
2                          NORTHEASTERN DIVISION

3

4

5    NATIONAL SMALL BUSINESS UNITED,  *
                    Plaintiff,         *    5:22-cv-1448-LCB
                                       *    November 20, 2023
6    vs.                               *    Huntsville, Alabama
                                       *    10:00 a.m.
7    YELLEN, ET AL.,                   *
                    Defendant.         *
8    *********************************

9

10

11                   TRANSCRIPT OF MOTION HEARING
                BEFORE THE HONORABLE LILES C. BURKE
12                 UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23   Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
     pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
24   and Procedures Vol. VI, Chapter III, D.2.  Transcript
                 produced by computerized stenotype.
25

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                          <u>APPEARANCES</u>

2

3       <u>FOR THE PLAINTIFFS</u>:
        John C Neiman, Jr
        MAYNARD NEXSEN, PC
4       1901 Sixth Avenue North, Suite 1700
        Suite 1700
5       Birmingham, AL 35203
        205-254-1000
6
        Thomas Lee
7       HUGHES HUBBARD & REED LLP
        310 East 15th Street #2A
8       New York, NY 10003
        347-324-6000
9       Thomas.lee@hugheshubbard.com

10

11      <u>FOR THE DEFENDANT</u>:
        Stuart J Robinson
12      U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
        Federal Programs Branch
13      450 Golden Gate Ave., Suite 7-5395
        San Francisco, CA 94102
14      415-436-6635
        Stuart.j.robinson@usdoj.gov
15
        Taylor Pitz
16      DEPARTMENT OF JUSTICE
        Civil
17      1100 L Street NW
        Washington, DC 20005
18      202-305-5200
        Taylor.n.pitz@usdoj.gov

19

20

21
        <u>COURTROOM DEPUTY</u>:  Stephanie P. Tolen
22

23

24      <u>COURT REPORTER</u>:  Christina K. Decker, RMR, CRR

25

<pre>
 1                    P R O C E E D I N G S

 2              (In open court.)

 3         THE COURT:  Good morning.

 4         (In chambers:)

 5         THE COURT:  So just before we get started, I wanted to

 6  disclose something to the parties.  I don't think it matters,

 7  but I would rather put it out there, anyway.

 8         So probably a year, two years ago, a guy I know in

 9  Huntsville named Ken Rivenbark, who owns an antique store down

10  the street that I've bought from before, I think he was on the

11  board of this National Small Business Association.

12         And he mentioned something to me while I was in there,

13  Hey, I think we might be filing something in Huntsville.  Does

14  that create a conflict for any of the judges?  Because he knows

15  several.  And I said it could.  I can't think of any.  I guess

16  it depends on what you file, you know, et cetera, et cetera, et

17  cetera.  And he said at the time, Well, I am about to get off

18  that board, anyway, so that's what I'm going to do.

19         And so maybe a month later, I was in there, and he said,

20  Well, if they file anything, I have just resigned from the

21  board.

22         So I put that out to y'all.  I don't have any outside

23  relationship with him other than I just buy stuff in his store.

24  I have never been in his home.  But I do want you to know that.

25         And I didn't know ahead of time what he was filing -- what
</pre>

1  this group was filing or what it was.

2      But does that create any questions for anybody or

3  thoughts?

4          MR. ROBINSON:  Not for defendants, Your Honor.

5          MR. NEIMAN:  Not for plaintiffs.

6          THE COURT:  I wanted to make sure everybody knew that,

7  because it's better to err on the front than the end.

8          (End of in-chambers conference.)

9          THE COURT:  All right.  Court calls National Small

10  Business United vs. Yellen.

11      I would ask the attorneys please to identify themselves

12  for the record and who they represent.

13          MR. NEIMAN:  Good morning, Your Honor.  My name is

14  John Neiman.  I am from the Maynard Nexsen firm in Birmingham.

15  And I'm here representing the plaintiffs, Mr. Isaac Winkles,

16  and the National Small Business Association.

17          MR. LEE:  Good morning, Your Honor.  My name is Thomas

18  Lee of the Hughes Hubbard & Reed Law Firm in New York.  And I

19  also represent plaintiffs Isaac Winkles and the National Small

20  Business Association.

21          MR. ROBINSON:  Good morning, Your Honor.  Stuart

22  Robinson from the Department of Justice on behalf of the

23  defendants.

24          MS. PITZ:  Good morning, Your Honor.  Taylor Pitz from

25  the Department of Justice on behalf of the defendants.

```
 1              THE COURT:  Got it.

 2         So it seems like maybe instead of me just letting

 3   everybody get up and give long arguments covering a multitude

 4   of issues, that we might organize this a little bet better, and

 5   just kind of go back and forth on maybe each issue.

 6         And probably the logical issue to begin with might be

 7   standing.

 8         Does anybody have a suggested order they might want to

 9   take these arguments in?

10              MR. NEIMAN:  Your Honor, that certainly makes sense to

11   me.  Mr. Lee is going to make our presentation regarding

12   standing.  I will largely be focusing on the merits issues.

13         I don't know whether it makes more sense for Mr. Lee to go

14   first since --

15              THE COURT:  Well -- I'm sorry.  Go ahead.  Go ahead.

16              MR. NEIMAN:  We are the plaintiffs.  We filed the

17   first motion, but defendants are the ones who raised standing.

18              THE COURT:  Right.  Right.

19         And so I would say probably let the Department start on

20   standing.  And then he can maybe hand the bat to you for the

21   next arguments after that.

22         So just for time management, you know, how much time would

23   the government need for each of these arguments?  We can break

24   it down by standing, and then by individual amendment.

25              MR. ROBINSON:  Your Honor, I think collectively we
```

 1  would like the opportunity to present over a 30-minute time

 2  period, give or take, depending on what the plaintiffs present,

 3  as well.  But we think we can cover all of the issues within

 4  that time frame.

 5          THE COURT:  You can cover all of the issues in

 6  30 minutes.

 7          MR. ROBINSON:  I think so, Your Honor.  I think the

 8  briefings speak to a lot of these issues.

 9          THE COURT:  It does.  Well, that would be fantastic.

10     All right.  So we will just kick off on standing.

11          MR. NEIMAN:  Your Honor, let me just say my

12  presentation is a bit longer than 30 minutes just on the

13  merits.  I can certainly streamline.  And if the Court wants me

14  to rest on briefing on certain issues, I am more than happy to

15  do that, but I am not quite where the government is.

16          THE COURT:  I expected to hear 45 to 50 per side.  And

17  so if you need a little longer, that's fine.

18     I mean, I would say if we're out of here by 11:30, 11:45,

19  we're doing fine, so...

20     All right.  All yours.

21          MR. ROBINSON:  Thank you, Your Honor.

22     And in terms of our division of labor, with the Court's

23  permission, I would like to cover standing and the Article 1

24  arguments.  And my colleague, Ms. Pitz, will be covering the

25  other --

1          THE COURT:  Perfectly fine.

2          MR. ROBINSON:  Thank you.

3     Good morning again, Your Honor.

4          THE COURT:  Good morning.

5          MR. ROBINSON:  The Corporate Transparency Act

6   represents a culmination of a decades-long effort by the

7   political branches to address a key vulnerability in the U.S.

8   financial system:  The ability of foreign and domestic actors

9   to establish corporate entities, hide their involvement in

10  those entities, and facilitate less activity through those

11  entities.

12         Since the early 2000s, law enforcement agencies, national

13  security experts, and our international partners have urged the

14  United States to shore up this deficiency by collecting

15  information on beneficial owners and applicants at the time of

16  formation.  The CTA does just that.  And in doing so, carries

17  on the longstanding tradition that, once formed, corporate

18  entities are subject to federal laws.

19         In light of the Congress's findings in the legislative

20  record, plaintiffs simply cannot show that the CTA could never

21  be applied in a constitutional manner, which is the burden they

22  carry for their facial challenge.

23         The Court need not reach those issues because no plaintiff

24  before the Court has standing to assert their claims.  I will

25  begin with Mr. Winkles.

 1          It is undisputed that Mr. Winkles has already disclosed

 2     the information required by the CTA both publicly and to

 3     government entities.  In their briefing, plaintiffs' standing

 4     arguments focus on the idea that Mr. Winkles's injury arises

 5     from the requirement to report personal information not to the

 6     government generally, but specifically to the Financial Crimes

 7     Enforcement Network, also known as FinCEN.

 8          That, of course, is inconsistent with the allegations of

 9     the complaint, which is not limited to FinCEN.  And I would

10     refer the Court to complaint paragraphs 3, 7, 8, 12, and other

11     paragraphs.  That pleading cannot be amended through their

12     briefing.

13          But even if it were able to be amended, plaintiffs don't

14     explain why that distinction makes any difference.  That is,

15     why injury turns on the specific recipient of previously

16     disclosed information within a unitary executive branch.

17          For similar reasons, there's no traceability or

18     redressibility.  To the extent Mr. Winkles is concerned about

19     information being disclosed, enjoining the CTA won't make

20     secret the information he has already published, again both

21     publicly and reported to the government.

22          I would emphasize, Your Honor, that plaintiffs are not

23     asserting injury based on the risk of disclosure outside of

24     FinCEN.  That's at their reply page 7 and note 2.

25          And to the extent that plaintiffs are relying primarily on

1  the Ted Cruz for Senate case for standing, that case is
2  inapposite.  It did not consider standing to challenge a
3  recording requirement for previously disclosed information.
4  And standing was based on economic harm.

5       Additionally, the Supreme Court recognized in that case
6  the ability of a party to establish standing by subjecting
7  himself to a statute's requirements; in other words, standing
8  for tester cases.

9       That's not true here.  There is no indication that
10 Mr. Winkles disclosed the information in order to bring that --
11 or record any information, or to bring a lawsuit.  He
12 independently disclosed it.

13      NSBA also lacks standing.  In terms of organizational
14 standing, they cannot claim an injury based on a need to engage
15 in activity that is consistent with its primary mission and
16 regular operations.

17      Mr. McCracken's declaration at paragraph 5 says that NSBA
18 exists to provide guidance and data on how to navigate
19 government regulations, educational programming regarding
20 federal regulations, and periodic training for members.

21      Paragraph 7 talks about now NSBA regularly counsels small
22 businesses on federal requirements.  That is exactly what they
23 aim to do here, with respect to the CTA.

24      In order to establish organizational standing, there must
25 be some impairment of an organization's ability to engage in

1   its projects because of a forced diversion or resources.

2   There's not a sufficient showing of resource diversion here.

3       Mr. McCracken's declaration at paragraph 12 is the closest

4   they get, talking about an education campaign, about the CTA

5   that will result in fewer opportunities to educate and train

6   companies on other topics.

7       But in light of the precedent that we cite, it is simply

8   insufficient.  The declaration doesn't describe that campaign

9   in detail, doesn't explain why NSBA must spend more hours than

10  usual following a change in policy affecting small businesses,

11  doesn't identify a time period for other projects, or why

12  specifically they can't be accomplished, and, importantly, does

13  not account for the outreach efforts of FinCEN.

14       THE COURT:  Do you want to address the affidavit issue

15  and what the requirements under Lujan are?

16       MR. ROBINSON:  Sure.

17       At the motion to dismiss stage, there's a much more

18  lenient standard to establish standing.  But at the motion for

19  summary judgment stage, there must be -- it's much more

20  exacting scrutiny.  And conclusory allegations are not -- or

21  vague allegations are insufficient even if accepted as true to

22  establish standing for Article 3.  I think that's clear, not

23  just on Lujan, but the other cases we cite, as well.

24       So even accepting, you know, the words that Mr. McCracken

25  has provided in his declaration, it doesn't mean that those are

1  sufficient to establish injury for Article 3 purposes in a

2  motion for summary judgment stage.

3      And the cases that the plaintiffs cite I think are helpful

4  comparisons.  The Browning case had evidence that the

5  organization will spend many more hours than it otherwise would

6  have.

7      There was proof of actual ability to conduct specific

8  projects during a specific time period that will be frustrated

9  by the statute's enforcement.

10      In Billups, at pages 350 to 51, there was testimony about

11  specific number of planned projects and information about

12  expenses.  Here there's no comparable that was with specificity

13  in the McCracken declaration.

14      To the extent SBA is relying on an associational standing

15  theory, that fails because Mr. Winkles himself does not have

16  standing.

17      To the extent that that theory rests on the 16 unnamed

18  member entities that Mr. McCracken references at paragraph 11

19  in his declaration, that also is insufficient.  By that

20  declaration's own admission, not all of those member entities

21  are subject to the CTA.  There's been no discussion in the

22  declaration about whether those entities have previously

23  disclosed information or not disclosed information required by

24  the CTA.

25      And perhaps most importantly, in the Georgia Republican

1    Party case, the Eleventh Circuit made clear that for

2    associational standing, there must be named members, not

3    unnamed members to proceed.

4         Finally, Your Honor, to the extent that plaintiffs are

5    arguing standing based on potential compliance costs -- and

6    here I think the closest they get is Winkles's declaration

7    paragraph 10.  This is, at best, a vague and conclusory

8    allegation.

9         Mr. Winkles says that he needs to hire additional help to

10   comply with the requirements, but does not explain why costs

11   are even necessary -- costs are necessary or even likely.

12        And the cases we cite, Interstate and Aaron Private Clinic

13   Management, explain that these types of threadbare assertions

14   of additional costs are inadequate.

15        If the Court has no further questions, that's all we have

16   on standing.

17             THE COURT:  Plaintiffs?

18             MR. LEE:  Your Honor, I was wondering if my colleague

19   Mr. Neiman could make a short introductory remark before I talk

20   about the standing argument.

21             THE COURT:  That's fine.

22             MR. NEIMAN:  Thank you, Your Honor.

23        Let me say at the start it's an honor to be across the

24   aisle in this case from the attorneys who represent the United

25   States through Main Justice.  I think they have done an

1  admirable job defending the statute that's no doubt important

2  to the federal government.

3      It's also, I'm willing to concede, a statute that is

4  clearly very well intentioned, just as the Violence Against

5  Women Act that was struck down in the Supreme Court's decision

6  in Morrison was well intentioned, and just as the Gun-Free

7  School Zones Act that was struck down in the Supreme Court's

8  decision in Lopez was undoubtedly well intentioned.

9      What those Supreme Court decisions show, however, is that

10 even the best of intentions from Congress can't justify a

11 statute that crosses the constitutional lines.  They can't

12 justify instances of Congress throwing outside the strike zone.

13     And as to the issues that the Corporate Transparency Act

14 is designed to address, there are other ways for Congress to

15 address those issues.  Congress can pass laws that combat money

16 laundering and terrorism that actually fall within Congress's

17 enumerated powers.  Congress can pass laws that achieve these

18 goals without intruding on the constitutional rights of

19 ordinary Americans like my client, Mr. Winkles, a realtor here

20 in Huntsville.  Congress can't, however, try to achieve those

21 roles through one of these -- a statute that crosses the

22 relevant constitutional lines here.

23     Now, Mr. Lee is going to address Mr. Robinson's arguments

24 on standing.  But I thought it would be helpful at the outset

25 to offer up four points of background that I think help

1   illustrate our legal arguments, both on the merits, but also

2   what Mr. Lee is about to tell you on standing.

3       I've put together a slide declaration that, if I can get

4   Mr. Lee to administer for me, and if I can get it put up on the

5   screen today.  It's largely just materials that are in the

6   record already, but points of background that I wanted to

7   highlight for the Court.

8       So, Tom, if you can, turn to my next slide.

9       The first point of background that I would emphasize at

10  the outset is that the action that the Corporate Transparency

11  Act regulates by the plain terms of the statute, it's not a

12  commercial or economic action.  And we actually see the

13  government conceding as much in its briefing, its sur-reply to

14  the Court.

15      So to walk the Court through the key parts of the statute

16  in that regard, up on the screen now is 5336(b)(1).  It states

17  that the point of regulation here is something that the statute

18  refers to as a reporting company.  That's the entity that must

19  provide the sensitive information about beneficial owners to

20  this law enforcement database.

21      Tom, if you can, turn to my next slide.

22      This is 5336(a)(11) in the definitional section of the

23  statute.  It defines reporting company in a really important

24  way.  It says that it's a corporation or LLC that's created by

25  the filing of a document with a secretary of state or a similar

1    office under the law of the state or Indian tribe.

2         That's important because that act of filing, which is, as

3    Mr. Robinson said today, deals with the time of formation of

4    one of these entities, that act is a governmental act,

5    administerial act, and not in and of itself an act of engaging

6    in commerce.

7         So once we get to the merits, I will talk a little bit

8    more about that point.  But it's crucial to the discussion of

9    the Commerce Clause.

10        My second point, by way of background, is that the statute

11   really does require disclosure of sensitive personal

12   information.

13        So, Tom, if you can turn to slide 4.

14        This is all the more clear because of what the regulations

15   implemented by the agency FinCEN here say.  So here's what the

16   statute says.  This is 5336(b)(2).

17        It requires the reports that come in from the reporting

18   company to show, among other things, the names, dates of birth,

19   addresses, and critically for present purposes, the ID number

20   that appears on an ID, such as a passport or a driver's

21   license.

22        One thing that we referenced in our briefs, but that I

23   would really like to emphasize today is that the final rule

24   adopted by the agency here, FinCEN, interpreted and is

25   implementing that requirement in a way that actually requires a

1    digital image, a photocopy of the ID card as part of the

2    package that comes in from the reporting company.

3        Third point by way of background is that although the

4    statute on its face requires these reports to come in from the

5    companies, the statute achieves that goal by compelling

6    individuals to give up the information under threat of

7    prosecution.

8        So a few weeks ago, we filed a notice of supplemental

9    authority with the Court containing some guidance that FinCEN

10   had just issued about small businesses' compliance with the

11   statute.  This guidance says, among other things -- let me grab

12   my notes really quickly.

13       So the guidance responds to a question about what happens

14   if my company is unable to report the BOI, the Beneficial

15   Ownership Information, in the required time frame.

16       The answer is really telling.  So the first paragraph says

17   that a person -- a person, not the company -- may be subject to

18   civil or criminal penalties when that happens.

19       And the following paragraph explains that an individual

20   who qualifies as a beneficial owner may refuse to provide

21   information to the company, knowing that it would lead the

22   company to not be able to comply with the reporting mandate

23   under the statute.

24       The guidance from FinCEN says in that circumstance the

25   individual may be prosecuted if the individual says I don't

1 want to hand over the image of my driver's license, my date of

2 birth, and the like.  That's going to be important both with

3 respect to Mr. Lee's arguments on standing, but also with

4 respect to the merits of our arguments on the Fourth Amendment.

5     One fourth and final background point is that although the

6 government has suggested that there's no injury in fact to my

7 clients, like Mr. Winkles, FinCEN itself in the same discussion

8 of the final rule has admitted that there is.  So all the

9 parties cited the federal register notice that announced that

10 FinCEN had adopted a final rule.

11     One thing that was discussed in the briefs that may not be

12 as apparent as I would like it to be is that in that notice,

13 FinCEN engaged in a fairly detailed and thorough analysis about

14 the compliance costs that companies would have to sustain in

15 order to comply with the statute.

16     So on the screen is Table 2 from that analysis.  It says

17 that for a company with a simple structure, compliance costs

18 will be $85.  For one with an intermediate structure,

19 compliance costs are $1,350.  And then for one with a complex

20 structure, projected compliance costs are over $2,600.

21     That same document, which is one that I should add, that

22 the government put into the record as attached to its motion

23 for summary judgment.  There's another table projecting what

24 continuing compliance costs will be for companies when

25 beneficial ownership changes in those companies.  And there

 1   will be other, I would suggest, less tangible injuries

 2   associated with the privacy concerns that we've raised.

 3       So those are the four background points that I'm hoping

 4   frame both our argument on the standing and the merits.  And

 5   with that in mind, I will hand the podium over to Mr. Lee.

 6           THE COURT:  I do have a question before you leave.

 7       So one thing I'm not clear on, maybe you can clear it up

 8   for me, is how is this funded for, you know, secretaries of

 9   state and things like that in this process?  What's the

10   funding?  I see references to a funding, you know, to help pay

11   for some of these things, but it's not clear to me what that

12   is.

13           MR. NEIMAN:  So I don't believe that there would be

14   any costs to the secretaries of state associated with the

15   company's act of reporting itself.  That all comes through the

16   individuals and then the companies.

17       The costs that the secretary of state would sustain would

18   be associated, I guess, with notifying companies that they have

19   this obligation.

20       As I understand it -- Mr. Lee knows more about this than I

21   do.  But as I understand it, that obligation is tied to

22   congressional appropriations that would go to the states.

23       As of last check -- and I will defer also to Ms. Pitz and

24   Mr. Robinson about whether this has changed.  As of last check,

25   Congress had not issued that appropriation.  I believe that

1  means a secretary of state don't have a formal obligation under

2  the statute to provide that notification right now.

3       But I believe, unless there's something that's not readily

4  apparent to me right now, that would be the only --

5            THE COURT:  So if that notification is not given,

6  what's the practical effect of that?

7            MR. NEIMAN:  Well, it may mean that they're certainly

8  absent notification from -- or an educational program from the

9  NSBA and other organizations, there won't necessarily be notice

10  beyond the fact that the law has been passed and is being

11  implemented by FinCEN that individuals and companies have this

12  obligation to file these reports.

13            THE COURT:  Got it.

14            MR. NEIMAN:  Thank you.

15            THE COURT:  Uh-huh.

16            MR. LEE:  Good morning, Your Honor.  May it please the

17  Court.

18       Before I talk about standing, in reference to your last

19  question to Mr. Neiman, Your Honor, in the statute it does talk

20  about authorization of appropriations.  This is at Section 6509

21  of the statute.  And says there are authorized to be

22  appropriated to FinCEN for each of the three fiscal years

23  beginning on the effective date of the regulations such sums as

24  may be necessary to carry out this section, including

25  allocating funds to the states.

1    I believe -- and, again, it's for the government -- I
2  believe that they have not actually authorized a specific
3  amount.  That may be an error.  I mean, the government would
4  know better than I do.

5    The other part of the answer to the question is the
6  penalties for willful violations.  And I suppose if you can
7  imagine a situation in which the states, you know, you have got
8  a filer who doesn't actually know because the states would be
9  the front line of defense to notify the people.  I mean, maybe
10 perhaps that would implicate whether or not the violation was
11 willful.  So that's one thing that might be an implication of
12 that.

13    I'm going to talk about the constitutional standing of
14 Mr. Winkles and NSBA to bring this suit.

15    And the government has basically challenged their standing
16 alleging that the CTA does not impose an injury in fact on
17 either Mr. Winkles nor NSBA.  Mr. Winkles and Mr. McCracken,
18 the CEO of NSBA, are actually in the courtroom with us today.

19    And I think that it's -- we argue in our briefs that the
20 right way to read binding Supreme Court Eleventh Circuit
21 precedence is that both Mr. Winkles and NSBA have standing.

22    There are three requirements of constitutional standing --
23 injury in fact, traceability, and redressibility.  The
24 government doesn't seriously contest traceability or
25 redressibility.  And that's because the injury plaintiffs Isaac

1   Winkles and NSBA have pled and shown is directly traceable to

2   the reporting requirements in the CTA.  And a court order

3   enjoining the CTA from coming into effect will redress that

4   injury.  So it really does boil down to injury.

5       And the government makes essentially three types of

6   arguments.  And to some extent, it's based on how to read the

7   relevant cases.  And so I am going to walk us through their

8   arguments.

9       First, in their opening motion to dismiss, or in the

10  alternative motion for summary judgment, the government argued

11  that Mr. Winkles and NSBA did not make a showing of standing

12  and that we didn't also allege standing.

13      And I will just turn to the complaint at page -- at

14  allegation 14, which was one of the allegations that

15  Mr. Robinson did not read.  We said, open quotations, Winkles

16  will be subject to the acts and reporting requirements to give

17  his sensitive personal information to FinCEN.

18      So we actually do explicitly articulate this idea that

19  it's turning the information over to FinCEN that's the alleged

20  injury.

21      Now, let's try figure out exactly what the claim of injury

22  that Mr. Winkles and NSBA allege and have shown.  Let's start

23  with Isaac Winkles.

24      He and his wife are the sole shareholders in a real estate

25  company here in Huntsville.  He set up two Alabama S

1   corporations -- Isaac Winkles, Inc., and Alabama Property
2   Management, which is a member entity of plaintiff NSBA.

3       And the CTA will require his companies to turn over his
4   name, address, birth date, and a unique identifying number from
5   acceptable identification, such as an unexpired U.S. passport,
6   an Alabama driver's license.  And the regs also require him to
7   upload a digital image of that ID.  If his companies willfully
8   do not do this, Mr. Winkles himself can be fined up to $10,000
9   or imprisoned for two years.

10      And this information must be turned over to FinCEN, the
11  Department of Treasury's financial intelligence unit, which
12  will keep it in a database that can be accessed by federal,
13  state, and foreign law enforcement intelligence agencies.

14      We believe that there are two sorts of injury in fact that
15  this reporting requirement CTA causes to Isaac Winkles.  First,
16  I will call it the wallet injury.

17      By the government's own estimate is that it will cost him
18  $85.14 to comply with the reporting requirements of the CTA.
19  That's his time, his money that he could be using to run his
20  business.  And wallet injury, according to Supreme Court
21  precedence, clearly counts.

22      Recently, the Supreme Court in the Preczewski case, which
23  involved Gwinnett College across the border in Georgia, said a
24  dollar is enough.  And so wallet injury is clearly present here
25  in the amount of $85.14.

1          The trickier question is the privacy injury.  And we might
2     also call this the digital mug-book injury, or the digital
3     database injury.
4          As I said, Your Honor, the CTA requires Isaac to give his
5     name, birth date, address, and active ID number, including an
6     image of his ID to FinCEN for its law enforcement database,
7     when he or his wife have done nothing wrong, and there's no
8     suspicion that he has done anything wrong.
9          Now, we think either wallet injury or digital mug-book
10    injury is sufficient for constitutional standing.  And the
11    government really doesn't have an answer to the wallet injury
12    point because, well, those are their own financial cost
13    estimates.  It's FinCEN itself that says that it will cost
14    $85.14 to comply with the CTA.
15         But as to the privacy or digital mug-book injury, the
16    government's basic point, which Mr. Robinson emphasized, is
17    that he has already disclosed this information to the IRS to
18    file his taxes, to Alabama to get his driver's license, and to
19    the state department to get his passport.  Plus, his website
20    lists Isaac as the owner of Alabama Property Management on
21    social media.
22         And so the government says he can't claim any injury to
23    his privacy interests by having to turn over this information
24    to FinCEN.  But as we alleged, and as his declaration shows,
25    the privacy interest and injury is that FinCEN is putting his

1   information into a digital mug book for future law enforcement

2   use without any specific suspicion of wrongdoing.

3       By contrast to the factual context that the government

4   raises, Mr. Winkles is not actually getting anything, like a

5   passport or driver's license in return for turning over the

6   information, and the image of his photo ID.  Nor is the

7   government asking for the information to levy taxes or any

8   other legitimate regulatory interests in the present for which

9   he's submitting the information.

10      Indeed, when the government does ask for sensitive

11  personal information, Congress has legislated strict guidelines

12  limiting the use of that data solely for the regulatory

13  purpose, not for broader law enforcement purposes.

14      Now, Amicus Transparency International argued in support

15  of the government that the CTA is just like the Huntsville

16  Madison County Public Library's requirement for getting a

17  library card.  Yes, Huntsville Madison County may have

18  legitimate interest in getting Isaac's name and address because

19  they need to know who to charge overdue fees for if the book is

20  overdue.  But just because a county resident gives that

21  information doesn't mean the library cardholder doesn't have a

22  privacy interest as against turning over that information for

23  database that may be accessed by state, federal, or foreign law

24  enforcement or intelligence agencies.

25      Now, let's talk about injury to the NSBA.  NSBA is an Ohio

1    nonprofit mutual benefit association with 65,000 small business
2    entity members in all 50 states.  Sixteen of those member
3    entities have addressed zip codes that are in the Northern
4    Eastern District of -- Northern District of Alabama, including
5    ten in Huntsville proper.
6         NSBA also has two sorts of injuries that the CTA causes so
7    that they qualify from a constitutional standing perspective.
8    And, Your Honor, I talked about wallet injury and digital
9    mug-book injury.
10        Now, in the case of an organization, as Mr. Robinson
11   indicates, the Supreme Court precedence say an organization can
12   have two types of injury.  One is association injury, and the
13   other is organizational injury.
14        The way associational injury works is if a member has
15   standing, the organization has standing.  And because
16   Mr. Winkles has standing, and it is actually his company,
17   Alabama Property Management, that is the NSBA member, then NSBA
18   has standing on an associational theory.
19        There's one exception by the Fifth Amendment that
20   Mr. Neiman will talk about when we get to the bill of rights
21   provisions.
22        The government focused -- so, anyway, associational injury
23   depends on whether or not Mr. Winkles and his company have
24   injury.  So if they have injury, then on his associational
25   injury theory, NSBA has injury, too.

1      Organizational injury, which is where the government

2  spends more of its energy and briefing space -- if, Your Honor,

3  if you could allow me to approach the bench, I copied out for

4  your convenience the critical case, which is Florida State

5  Conference of the NAACP vs. Browning.  And I made four copies

6  for opposing counsel, your law clerk and yourself, Your Honor.

7      So organizational injury is tricky.  I mean, the critical

8  Supreme Court case is Havens vs. Coleman.  And the idea of

9  organizational standing is that if an organization is forced to

10  divert its resources because of the requirements of a new law,

11  then it has standing as an organization.  That's the Havens

12  case by the Supreme Court.

13      The Eleventh Circuit actually has especially favorable law

14  on this aspect of organizational standing for diversion of

15  resources, which explains why I think the government's

16  distinction of the relative case law is not persuasive.

17      The Eleventh Circuit has held that if an organization has

18  to divert -- open quotation, divert personnel and time because

19  of a new statute's requirements that fall within its purview,

20  then that counts.  That's the Browning case at page 1153.

21      Now, Mr. McCracken the CEO of NSBA's declaration plainly

22  states that once the CTA comes into effect, open quotation,

23  given the finite resources of the association, closed

24  quotation, CTA were, open quotation, will necessarily result in

25  fewer opportunities for NSBA to educate and train member

1    companies on raising capital, finding training, and retaining

2    workers complying with employment laws and protecting

3    themselves, their customers, and their employees from a range

4    of cyber security threats, closed quotations.

5         Now, if you look at the Browning case, Browning involved a

6    Florida law concerning matching.  And the idea was that in

7    order to register for voting, you have to -- the person who's

8    doing the registration has to check your ID and your social

9    security number against a list that they have had.

10        And so the NAACP challenged this new law and said, look,

11   this is actually susceptible to discrimination.  There are a

12   lot of circumstances in which, for example, you might have

13   registered under a maiden name, and it's not a match because

14   now you're -- you have a married name on your identification,

15   or you might not know your social security number.

16        And so the NAACP argued to try to enjoin enforcement of

17   the law that, you know, we are going to have to -- we are going

18   to have to take away from voter registration drives and all

19   these other kinds of activities because we're going to have to

20   be in a situation where we're going to have to help people

21   understand how they may meet these matching requirements when

22   they go to register for voting.  And the Eleventh Circuit

23   clearly said that that was okay.

24        Now, if you read the opinion carefully, there is -- it's

25   pretty clear that our allegations and our facts, to the extent

1   that Browning is good law, clearly compel the conclusion that

2   NSBA has organizational standing.

3        And a couple of specific quotations from Browning that

4   line up to what Mr. Robinson said, and I respectfully submit

5   that operate against his conclusions, if you look at page 1165,

6   about ten lines down.

7        Moreover -- this is citing favorably -- the Court held

8   that the fact that the added costs has not been estimated and

9   may be slight does not affect standing, which requires only a

10  minimal showing of injury.  Later on, what about the idea that

11  the allegations made -- or, strike that -- not the allegations,

12  but the statements in the declaration are too fuzzy, too

13  anticipatory.

14       Browning says, if you look at page 1166 in the handout,

15  the second column, about 14 lines down, it says, costs

16  unrelated to the legal challenge are different and do qualify

17  as injury whether they are voluntarily incurred or not.  The

18  Court expressly held that when a drain on the organization's

19  resources arises from the organization's need to counteract the

20  defendant's assertedly legal practices, that drain is simply

21  another manifestation of the injury to the organization's

22  non-economic goals.

23       That is precisely what NSBA's arguing.  The CTA is

24  unlawful.  And Mr. Neiman, my friend in law school, our

25  classmate, will make the argument as to why.  But if it is

1  unlawful, the NSBA will have to expend resources and divert

2  them from other measures such as cyber security, protection

3  initiatives, to inform people about the requirements of what

4  they believe is an unlawful law.  So that's organization

5  injury.

6      Your Honor, Mr. Robinson didn't really talk -- I don't

7  want to spend too much of your time on this other argument that

8  they make in their briefs that basically you have to have

9  injury on a claim-by-claim basis.

10     And that law is rather complicated.  It involves cases --

11  the critical cases is a case called City of Los Angeles vs.

12  Lyons, which involved a situation in which --

13         THE COURT:  I will note we're 35 minutes in and we

14  haven't had their arguments on standing.  If you want to wrap

15  up real quick, I will let you, but we are going to blow through

16  all our time here if we are not careful.

17         MR. LEE:  I understand, Your Honor.  So I will rest --

18  I think I have sufficiently addressed Mr. Robinson's arguments

19  as he made them today.

20         THE COURT:  All right.

21     All right.  I will give you a one-minute bite at the apple

22  if you want it.

23         MR. ROBINSON:  I will take it, Your Honor.  Thank you.

24     Thank you, Your Honor.  Just to briefly address a couple

25  of Mr. Lee's points.

1          The $85 number that he has referenced is an average for

2     simple structures.  And probabilistic reasoning is insufficient

3     to demonstrate Article 3 injury.  And so while it may be on

4     average a cost that's incurred, it does not establish that

5     Mr. Winkles himself is likely to incur any costs, and,

6     therefore, has not established standing.

7          This idea of digital privacy is not one that appears

8     anywhere in the briefing, and is somewhat new.  I will note

9     that Attachment 86 has a picture of Mr. Winkles on his LinkedIn

10    profile.

11         I don't think Mr. Winkles can deny that state or federal

12    entities already have a picture of him, whether in a passport

13    or in a driver's license.  And his declaration certainly does

14    not establish any concern of injury based on that theory.

15         Finally, in terms of organizational standing, one critical

16    distinction that I'll emphasize beyond what I have already

17    mentioned before between this case and others cited by

18    plaintiffs is that here, FinCEN, the agency charged in planning

19    the statute is itself is engaged in tremendous efforts to

20    educate and reach out to the public.

21         To the extent Mr. McCracken is talking about undertaking

22    that education campaign once the law comes into effect, I would

23    refer the Court to the Cousins case, which casts doubt on

24    whether injury is certainly impending, noting that is not

25    reasonable to infer the questions regarding a new law will

```
 1   continue indefinitely, or that an organization will have to
 2   continue to divert resources to creating educational materials
 3   if the law is not changed.
 4        Thank you, Your Honor.
 5             THE COURT:  Gotcha.
 6        I misspoke when I said we haven't heard your arguments.
 7   We heard your arguments.  I wanted to hear your rebuttal.
 8        You will figure this out about me.  I always allow
 9   everybody a second bite at the apple at the end just to cover
10   very briefly.
11        So, anyway, let's get on, then, into the meat of your
12   argument.  Is that going to be you, Mr. Neiman?  Mr. Lee?  Or
13   will you split it up?
14             MR. NEIMAN:  This will be me.
15             THE COURT:  All you.
16        Okay.  So why don't you lead by telling me what you think
17   your strongest arguments are.
18             MR. NEIMAN:  Great.
19        Well, thank you, Your Honor.  And let me fudge a little
20   bit by saying I'm equally enamored with our enumerated powers
21   argument, what Mr. Robinson referred to as our Article 1
22   arguments and also our Fourth Amendment argument.
23        If I don't get time to address the others today, I will be
24   sad, but those are the two that I really would like to focus
25   the Court's attention on and spend time on today.
```

 1          THE COURT:  All right.  And why don't you just lay out

 2   for me the order you want to take these individual arguments

 3   in.  I am going to let you speak on all the issues, you know,

 4   as long as we can keep it within a reasonable time.

 5          MR. NEIMAN:  Would it make sense for me to address the

 6   Article 1 slash enumerated powers argument, then let

 7   Mr. Robinson respond at that point in time and then --

 8          THE COURT:  That's the way I would like to do it is

 9   just issue by issue, point, counterpoint.  I think it will flow

10   a lot better.

11          MR. NEIMAN:  I agree.

12      Now, the enumerated powers argument is multifaceted, in

13   the sense that the government has relied on several different

14   aspects of the Constitution, in terms of Congress's

15   authorization to pass a statute.

16      So I will not only be addressing the Commerce Clause, but

17   also the taxing power and foreign affairs, and the like.  But I

18   would suggest I will do that, then let Mr. Robinson respond,

19   and we can move forward.

20          THE COURT:  Good with you, Mr. Robinson?

21          MR. ROBINSON:  Yes, Your Honor.

22          THE COURT:  All right.  Here we go.

23          MR. NEIMAN:  So, Your Honor, the Supreme Court in the

24   Affordable Care Act case, NFIB vs. Sibelius, wrote that the

25   most telling indication of a severe constitutional problem with

 1   a federal statute is the lack of historical precedent for

 2   Congress's action.

 3        So one thing that's telling, when it comes to really both

 4   the enumerated powers and Fourth Amendment issue here, is that

 5   we really are on novel ground.  Congress has never enacted any

 6   statute quite like the Corporate Transparency Act, extending

 7   the reach of the federal government into the state governmental

 8   entity formation process.

 9        The reason the statute's unconstitutional generally fall

10   into three buckets:  The enumerated powers, the privacy issues,

11   and, finally, the vagueness.

12             THE COURT:  Out of curiosity, are there any other like

13   cases pending in other jurisdictions?

14             MR. NEIMAN:  I'm certainly aware of none, Your Honor.

15   Mr. Robinson and Ms. Pitz would probably be able to answer that

16   question even more definitively than I would.

17             THE COURT:  Got it.

18             MR. NEIMAN:  The most fundamental argument we make

19   deals with the fact that this statute's not within Congress's

20   enumerated powers.

21        The government begins its brief by focusing not on any

22   powers specifically enumerated in the Constitution, but rather

23   on powers that the government refers to as the foreign affairs

24   power, the government calls the national security power.

25        There are at least two problems with their reliance on

1   those unenumerated powers.

2        The first is that it's simply erroneous to say that

3   Congress has the power to act in a way that affects Americans'

4   lives internally as to domestic issues, even if no enumerated

5   power authorizes Congress to do so.

6        If you look at the Supreme Court decisions that the

7   government cites in its motion for summary judgment or its

8   brief in support, generally those laws could be grounded or

9   were expressly grounded on some enumerated power.

10       So when Congress banned the sale of weapons to Bolivia in

11   the Curtiss-Wright case, that enactment would have been well

12   justified by the Foreign Commerce Clause.  Likewise, when

13   Congress stripped certain Americans of their citizenship for

14   going into other countries and abating the draft in that way,

15   in Kennedy vs. Mendoza Martinez, Congress had ample power to do

16   so, in light of the numerous provisions in Article 1 that give

17   Congress power to regulate the military in numerous ways.

18       So it's simply not the law that Congress can rely on some

19   unenumerated power to regulate Americans' internal lives in the

20   way that the CTA effectuates.  And Congress can't do that --

21   rely on some unenumerated power solely to bring U.S. policy

22   into alignment with the policy preferences of foreign

23   governments.  It also can't do that and rely on unenumerated

24   power merely for the sake of promoting national security.

25   There needs to be a tie to an enumerated power.

1          A second problem with the reliance on foreign

2     affairs/national security interests is that even if those --

3     the case law discussing those issues would allow Congress to

4     regulate in some way purely external to the United States in a

5     way that's consistent with, say, the acts of sovereigns,

6     according to the law of nations, as some of these cases

7     suggest, this statute doesn't operate in this way.

8          The statute affects millions of ordinary Americans who are

9     not going to set foot outside the country, in terms of the way

10    that they're administering these reporting companies.

11    Mr. Winkles, for example, is a realtor here in Huntsville, that

12    Congress can't justify a statute that regulates him in this way

13    based on some unenumerated notion of foreign affairs or a

14    national security.  There needs to be some grounding in an

15    enumerated power like the tax clause or the Commerce Clause.

16         So unless the Court has questions about those issues, I

17    will turn to one of those enumerated powers, the taxing power.

18         I'll just say a few words about that.  This power can't be

19    the authority for this particular statute, the Corporate

20    Transparency Act.  It may well be that the Corporate

21    Transparency Act may help prevent tax fraud.  But by its plain

22    terms, it is directed at activities that are far broader and

23    more expansive than simply tax fraud or other taxing related

24    issues.

25         The congressional findings say that this criminal law

1    enforcement database is necessary to combat terrorism financing

2    and money laundering.  The database it creates is accessible to

3    all federal agencies, not just the IRS.

4         Now, if the statute itself were limited to the IRS, if the

5    statute were limited to dealing with the enforcement of tax

6    laws, it would be a different statute.  And the analysis of the

7    taxing power as authority for the statute would be quite

8    different and much more favorable to the government.  But the

9    CTA is simply not that statute.

10        The government suggests that in making that argument,

11   we're conceding that the CTA isn't facially unconstitutional.

12   We're conceding that it's constitutional as applied to the

13   enforcement of tax laws.  But that's not what we're saying at

14   all.

15        We're saying that if Congress were to pass this different

16   statute that were limited to the IRS and tax law enforcement,

17   then the government's argument that that was a tax power

18   statute would be much more persuasive and much more valid.  But

19   because the CTA is not that statute, the government can't rely

20   on the taxing power.  The main event here has to be the

21   Commerce Clause.

22        So with that in mind, Your Honor, I will turn to the

23   Commerce Clause, unless the Court has questions for me about

24   the tax issue.

25        All right.  So let me turn to the main event, the Commerce

1  Clause.  The government has made a critical concession on page
2  11 of its sur-reply.

3       So if -- Tom, if I can get you to queue up slide number 8.
4       So on page 11, the government says as follows:  Defendants
5  have not argued, the government has not argued as plaintiffs,
6  we suggested, that entity formation itself is a commercial
7  activity that substantially affects interstate commerce.  That
8  concession really should end the Commerce Clause analysis here.

9       The statute on its face regulates only this activity that
10  the government concedes to be noncommercial.  The entity
11  formation process is really no different from many other
12  licensing processes that the states and local governments have
13  long had exclusive domain over.

14      The government doesn't really dispute that these sorts of
15  processes have been the exclusive domain of the states since
16  the founding.  Our motion for summary judgment noted historical
17  evidence that James Madison tried to get a provision into the
18  Constitution that would have allowed the federal government to
19  get into the entity formation area specifically.  That
20  provision was roundly rejected.  And the statute itself
21  recognizes that the process it's regulating is one that's
22  controlled by the states.

23      Tom, if you can turn to slide number 3 for me.
24      Remember, the language of the statute defining reporting
25  company defines it as an entity that is created by the filing

of a document with a secretary of state or similar office under
the law of a state or Indian tribe.  Not an entity that has
registered with the federal government in any way.

     With all those things in mind, the government has fallen
back on a couple of U.S. Supreme Court cases that mark sort of
the outer limits of Congress's Commerce Clause authority --
Wickard v. Filburn from the New Deal era, as well as the more
recent Gonzales vs. Raich.

     The government has also understandably relied on recent
Eleventh Circuit precedence, applying both Wickard and Raich to
statutes like the Endangered Species Act, as well as the
federal prohibition on a child pornography.

     Those cases generally stand for the proposition that I am
going to put up on the screen.

     Tom, it is at slide 9.

     This is Judge Tjoflat in the Eleventh Circuit child
pornography case.  The statement of law is this:  Thus, where
Congress comprehensively regulates economic activity, it may
constitutionally regulate interstate activity, whether economic
or not, so long as the inability to do so would undermine
Congress's ability to implement effectively the overlying
economic regulatory scheme.

     On that premise, the Supreme Court upheld the application
of the general federal prohibition on marijuana possession,
Cannibis possession, as to Cannibis that was grown for a single

 1   individual's use and didn't cross state lines.  That was Raich.

 2        On the same premise, Judge Tjoflat in the Maxwell case

 3   upheld the application of the general federal prohibition on

 4   possession of child pornography as to the possession of child

 5   pornography that did not cross state lines, what he referred to

 6   as the intrastate possession of child pornography.

 7        I understand why the government is quoting this language.

 8   I would quote it if I were in their position, as well.  But

 9   these statutes and these cases are simply not like the

10   Corporate Transparency Act in this case.

11        In each of those cases, the challenger had to concede that

12   there was an application of those statutes at issue that

13   touched on interstate commercial activity.

14        In the Raich case, the marijuana statute undoubtedly

15   regulated and prohibited interstate sales of marijuana.

16   Likewise, in the pornography case decided by the Eleventh

17   Circuit, that statute on its face regulated interstate

18   distribution and sale of child pornography.

19        The CTA is quite different.  It's directed solely at this

20   creation of entities by the state process, which the government

21   has said it does not believe to be economic activity at all.

22   That process is governmental.  It's administerial.  And that is

23   the focal point of the regulation here.

24        The most the government can say about interstate commerce

25   here is that some of these entities that are formed under state

1  law eventually will engage in interstate commerce after the

2  formation process.  That's not enough.

3      On that rationale, Congress could regulate almost any

4  state licensing process under the Commerce Clause and the

5  theory that the people who got the licenses eventually would

6  engage in interstate commerce.  So Congress could require

7  disclosures of anyone who gets a marriage license or marriage

8  certificate under state law on the theory that many couples

9  eventually will cross state lines, go on honeymoons, or the

10 like.

11     That is not how the Commerce Clause works.  And the

12 Affordable Care Act, NFIB vs. Sibelius, makes that clear.  The

13 majority wrote there that the Court has never permitted

14 Congress to anticipate economic activity in order to regulate

15 individuals who are not currently engaged in commerce.  That's

16 what the CTA is doing.

17     Now, Mr. Lee and I recognize, and Mr. Winkles and

18 Mr. McCracken recognize that we're walking in to the Court

19 today and making a significant ask, asking the Court to

20 invalidate a federal statute under the Commerce Clause and is

21 outside Congress's authority.  But there really is no

22 precedence for the CTA in this regard.  Congress really did

23 throw outside the strike zone.  And Congress really did walk

24 over the lines that are set out in Supreme Court precedent.

25     I can answer any questions the Court has about the

1  Commerce Clause or any other issue related to enumerated

2  powers.

3       If not, I am glad to turn the podium over to Mr. Robinson.

4            THE COURT:  All right.  Mr. Robinson.

5            MR. ROBINSON:  Thank you, Your Honor.

6       Your Honor, I might take these arguments a little bit out

7  of turn, and start with Mr. Neiman's most recent one on the

8  Commerce Clause, with the Court's permission.

9       If I could just take a step back and note that since the

10  1930s, the Supreme Court has made clear that Congress can

11  regulate corporate entities whose structures pose risks to the

12  national interest.  I would refer the Court to the American

13  Power Case, page 100 to 101; the North American Company case at

14  pages 706 to 07; Electric Bond case; and the Shultz case.

15       Just to set a little of the table there, in American Power

16  vs. SEC, the Supreme Court affirmed orders requiring

17  disillusion of sub-holding companies because the corporate

18  structure unreasonably complicated the bond and share system.

19       In Northern American Company, the Supreme Court held that

20  agencies can require -- an agency can require holding companies

21  to dispose of security holdings because the evil that may

22  result from the business structure.

23       Just as those statutes did not regulate the act of forming

24  the corporate entities, but rather the operation of those

25  entities, so, too, does the CTA not regulate mere corporate

1   formation, but, rather, the operation of certain corporate

2   entities that have availed themselves of certain state laws.

3        I would, again, North American Company at page 607.  And

4   I'm quoting.  The fact that an evil may involve a corporation's

5   business structure does not detract from the power of Congress

6   under the Commerce Clause to promulgate rules in order to

7   destroy that evil.

8        A few decades later in Shultz, the Supreme Court said that

9   corporations have a collective impact upon society from which

10  they derive the privilege of acting as artificial entities.

11  The federal government allows them the privilege of engaging in

12  interstate commerce.  Favors from the government also carry

13  with them an enhanced measure of regulation.

14       Further confirming that the CTA does not regulate entity

15  formation is the fact that in our voluminous record there is no

16  indication, certainly not one pointed out by the plaintiffs,

17  where secretaries of state or other state officials have

18  indicated in any way that the CTA encroaches on their authority

19  to grant licenses, to dictate what terms of corporate formation

20  are required under state law, or anything similar along those

21  lines.

22       The fact is, is that the CTA regulates commercial

23  activity.  The exemptions from the reporting requirement at

24  xxiii, which exempt 501(c) organizations, political

25  organizations, organizations that are not engaged in business

activity or not owned by foreign owners and meet other criteria
shows that this is appropriately tailored towards entities that
have commercial aims and not other types of organizations that
are not even before the Court.

Congress also found expressly the CTA requirements are
needed to protect interstate commerce, at Section 6402(5)(C).
That entities involved in commercial activity intentionally
conduct transactions that cause various secretive
jurisdictions.  And concealment of ownership information
facilitates federal crimes such as money laundering, fraud and
the financing of terrorism.

The record shows that there is more than a rational basis
for these findings, and, accordingly, the Court must defer to
them under Supreme Court precedent such as Hodel.

This is very unlike a situation where a couple is getting
a marriage license.  Getting a marriage license is not economic
activity.  The operation of corporate entities is
quintessentially economic activity.

If we need further indicia of that, we can see that
there's the movement of billions of dollars by shell companies
and foreign companies who operate without disclosing beneficial
ownership and application -- and applicant information.  But
the shielding of that information threatens the United States'
financial system as a whole.  And it's immaterial that many
reporting companies are not engaging in any wrongdoing.

1          What I think the plaintiffs are often getting at, whether

2     in terms of their Commerce Clause argument or the national

3     security and foreign affairs argument is a question of fit.

4     They want something that's much more narrowly tailored to, you

5     know, for example, to corporate entities that engage in

6     commerce and are suspected of engaging in wrongdoing.

7          But the means chosen by Congress must be reasonably

8     adapted to the end permitted by the Constitution.  Reasonably

9     adapted, not narrowly tailored.

10         The Supreme Court has never required Congress to legislate

11    with scientific exactitude.  When Congress decides the total

12    instance or practice poses a threat to the national market, it

13    may regulate the entire class.

14         In terms of the Maxwell case that plaintiffs reference,

15    again that is aimed at purely interstate activities.  That's a

16    secondary argument.  Our argument is not that the CTA regulates

17    purely interstate activity.  But even if it did, our point is

18    that Congress can regulate that activity if it can frustrate --

19    if it's concerned about frustrating a broader regulation of

20    interstate activity.

21         And under that criteria set out in Maxwell and other

22    cases, that would certainly be true.  The CTA is part of a

23    comprehensive regulatory scheme.  A statement of Senator Brown

24    actually refers to it as comprehensive.  The scope and

25    consequences of withholding beneficial ownership and applicant

 1   information are clear.  These corporate entities are engaged in

 2   again, quintessential economic activity.  And it's part of a

 3   broader regulation.

 4        If there are no questions for me, Your Honor, on the

 5   Commerce Clause, I can turn to the national security and

 6   foreign affairs.

 7        Thank you.

 8        Mr. Neiman placed some emphasis on whether these powers

 9   are enumerated or unenumerated in the Constitution.  I would

10   first refer the Court to the Bancoult decision at 433, a D.C.

11   circuit case, which explains in an extensive list of

12   constitutional provisions, entrust foreign affairs and national

13   security powers to the political branches, including Article 1,

14   Section 8, Clause 1, which is providing for the common defense,

15   and Clause 3, regulating commerce with foreign nations.

16        That argument also simply can't be reconciled with cases

17   such as Ullmann and Curtiss-Wright.  In fact, Curtiss-Wright at

18   length rejected this idea that when it comes to foreign

19   affairs, this distinction between enumerated and unenumerated

20   is dispositive.

21        To the contrary, the distinction is based on preserving

22   the relationship between the federal government and the states.

23   And when it comes to the foreign affairs, it is the federal

24   government that has much broader authority than just simply

25   what is enumerated in the Constitution.

 1        So that's -- I think addresses that aspect of the

 2   argument.

 3        Again, to the extent Mr. Neiman is saying that the CTA is

 4   not narrowly tailored, that it affects some people who are not

 5   engaged in foreign commerce, does not have any connection to

 6   foreign commerce, I think that demands too much.  Again, the

 7   test is reasonable adaptation, a rational basis.  And given

 8   Congress's findings, it's more than met here.

 9        Again, the CTA was enacted to ensure compliance with

10   international standards related to anti-money laundering and

11   the countering the financing of terrorism.  Those are set by

12   the Financial Action Task Force.  Section 6402(5)(E) is

13   Congress's finding on that aspect.

14        Back in 2006, FATF raised concerns about the adequacy and

15   accuracy of beneficial ownership information of corporate

16   entities formed under state law.  The United States was rated

17   as noncompliant in a peer review by FATF in 2016.  And the CTA

18   is a direct response to this criticism.

19        CTA is also needed, as Congress found, to protect against

20   national security threats arising from the anonymous misuse of

21   corporate entities, including misuse that's been tied to

22   sanctions evasion, weapons proliferation, the financing of

23   terrorism, drug trafficking, and corruption.

24        Again, these facts are undisputed in the record.  What

25   plaintiffs are concerned about is the fit, but the fit is one

1   of just a rational basis.

2        Does the Court have any questions on --

3           THE COURT:  I don't.

4           MR. ROBINSON:  Oh, and I can just add NFIB simply

5   doesn't apply here, Your Honor.

6        The CTA does not compel individuals to become active in

7   commerce by purchasing a product, which is what the Supreme

8   Court was concerned about in that case.  Corporate entities

9   already engage in commerce, and, therefore, are subject to

10  regulation.  Again, dating back to the 1930s and 1940s.

11       And also I would refer the Court to the Rivers decision of

12  the Eleventh Circuit.  And based on that, I think it's fair to

13  conclude that reporting companies have opted into the group of

14  regulated entities by filing documents of incorporation, which

15  is unlike the uninsured and NFIB.

16       Morrison and Lopez also again did not concern economic

17  activity.  Lopez did not even include any congressional

18  findings, whereas here we are talking about the operation of

19  corporate entities with a documented evil that results from the

20  shielding of beneficial ownership information.

21       I think the fact that the plaintiffs are raising a facial

22  challenge makes it very difficult to say that it's

23  unconstitutional, in light of Congress's taxing authority.  And

24  Congress has the authority under the necessary and proper

25  clause, as well, to legislate to ensure that taxable income is

1  properly reported, including through disclosure requirements.

2           THE COURT:  Does any state currently require entities

3  to provide beneficial owner information?

4           MR. ROBINSON:  I don't know the answer to that

5  question, Your Honor.

6      I know that the FATF report indicated there was a severe

7  deficiency in this case.  Even if there were some, it is not

8  collected in a timely way, necessarily.  It's not collected in

9  a centralized database.  It doesn't necessarily capture all the

10 beneficial owners or applicants who might be subject to the

11 CTA.

12     One other point on the taxing authority, Your Honor.  I

13 note that the Shultz decision --

14          THE COURT:  Y'all are absolutely terrible estimators

15 of time, by the way.

16          MR. ROBINSON:  I apologize, Your Honor.

17     The Shultz decision and the Hodel decision have very

18 helpful comparisons to legislative history that was found to

19 confirm a rational basis for Congress's findings and concerns.

20 In Shultz especially, those congressional testimonies and

21 hearings indicated exactly the type of concerns that are at

22 issue here, including the concern about money laundering and

23 tax run.

24     Thank you.

25          THE COURT:  What issue do you want to take up next,

1    Mr. Neiman?

2           MR. NEIMAN:   The Fourth Amendment, if that would be

3    all right.

4         So in talking about the Commerce Clause, Your Honor, I

5    spoke of the lines that the jurisprudence draws and Congress

6    throwing outside the strike zone.   The Fourth Amendment claim

7    looks quite similar.   Let me start with the lines that the case

8    law draws.

9         If any of us were to walk outside this courtroom today,

10   and on the steps, an officer were to stop us and ask us for our

11   names, our dates of birth, our addresses, and a copy of our

12   license, if the officer didn't have reasonable suspicion or

13   probable cause to stop us, we would have a constitutional right

14   to say, respectfully, no, sir, or, no, ma'am, no thank you, and

15   the Constitution would preclude the officer from arresting us

16   for declining that invitation.

17        The Supreme Court held as much in a case called Brown vs.

18   Texas, decided in 1979.   Those are the lines the case law

19   draws.   And the CTA goes beyond them on a federal level.

20        Once again, we find ourselves on novel ground.   The states

21   haven't done anything quite like this.   Neither has Congress.

22   But the --

23           THE COURT:   Would it matter if the states had done

24   something like this previously?

25           MR. NEIMAN:   Well, I think that it would matter

1    because a challenge might have been brought to such a statute,

2    and the courts would have decided whether that statute violated

3    the Fourth Amendment.

4         I do think that the states would have a little more leeway

5    in this regard, with respect to the Fourth Amendment, because

6    this is the state's program, right?  And so the state could say

7    as a condition of participating in our program, this formation

8    program, we are going to ask you entity formation -- the

9    individuals who either own the entities or trying to form the

10   entities are going to ask you to waive your Fourth Amendment

11   rights.

12        But that's another problem with this particular exercise

13   of a federal power, is that the federal government doesn't

14   control the program here.  And it never asked any of these

15   entities or these people to waive their Fourth Amendment rights

16   as a condition of being a part of this state program.

17        So how does the CTA throw outside the strike zone here?

18   It effectuates an unreasonable warrantless search.  It does so

19   critically for the purposes of assembling this database that's

20   all about criminal investigation and criminal prosecution.  And

21   it does so with respect to people and entities that the

22   government admits it has no suspicion have committed any

23   wrongdoing.

24        I'm relatively starved to point you to a precedent that

25   deals with a statute of this sort, Your Honor.  But the one

that I think is most on point and most helpful is a case out of
the Eastern District of New York dealing with Airbnb that we
cited in a couple of times in our brief.  There the Court
enjoined -- the district court enjoined a New York City
ordinance that compelled an airbnb to turn over certain
information regarding its customers.

There are a couple of things about that opinion that I
think are very noteworthy and helpful to the assessment of the
Fourth Amendment issues here.

The first is that the opinion quite thoroughly and quite
convincingly explains that disclosures of this sort amount to
searches for the purpose of the Fourth Amendment.  For the
Fourth Amendment to apply, you don't have to have a police
officer actually walking onto a premises, or conducting a
bodily search of somebody.  Compelled disclosure can be a
Fourth Amendment search.

The other aspect of the Eastern District's analysis in
Airbnb that's helpful and insightful is about the role that the
end goal of criminal law enforcement plays here.  That statute
in those circumstances had some civil aspects that led the
Court to engage in a looser Fourth Amendment analysis.  But the
Court noted that, in the context of criminal investigations,
the analysis is a lot easier.  The balances normally tip
towards the requirement of probable cause and a warrant under
the Fourth Amendment.

1          THE COURT:  And specifically what was that information

2     sought about Airbnb customers?

3          MR. NEIMAN:  So the information sought by the New York

4     City ordinance dealt with, I guess the identity of the airbnb

5     customers.  I don't want to make too many representations on

6     that front, Your Honor.  But it was about the identity of those

7     persons.  And the statute was designed or the ordinance was

8     designed to figure out who was subletting basically their

9     apartments for airbnbs in violation of a New York law.

10         So I imagine it was the addresses, and perhaps some

11    information about the extent to which those people had engaged

12    in those transactions.

13         The difference, in terms of this statute involving

14    criminal law enforcement database explains why this isn't a

15    special needs case.  Special needs cases turn on the

16    government's need to conduct searches and seizures for reasons

17    that don't deal with criminal law enforcement.

18         The government can require suspicionless drug testing of

19    people who work for the railways because the government has an

20    interest in making sure that the railways remain safe.

21         This case is different.  The entire theory of the statute

22    is that everyone who owns or applies to own or run one of these

23    reporting companies is a potential criminal.  And when the

24    government conducts these searches, requires these disclosures

25    for the purposes of enforcing criminal law, it has to obtain a

1  warrant.  At the very least, it needs reasonable suspicion.

2       Now, the justification that the agency has given for the

3  need to bypass the warrant requirement here just highlights how

4  contrary the statute is to the basic assumptions of the Fourth

5  Amendment.

6       Tom, if you can turn to slide number 10 for me.

7       This is a discussion in the Federal Register notice of the

8  final rule, in which FinCEN says that the reason why we're

9  requiring disclosure here is effectively that the Fourth

10 Amendment normal requirements are just too inconvenient.

11      So if you look at the column on the left side of the

12 slides, the former director of FinCEN noted that, ultimately,

13 if you are trying to figure out who the beneficial owners are,

14 you have to do things like witness interviews, obtain search

15 warrants.  And the director said that takes an enormous amount

16 of time; thus, justifying the statute and the rule.

17      I'm not sure you will ever see a more direct statement by

18 someone who works for a federal agency that the reason for a

19 statute is to get around the normal requirements of the Fourth

20 Amendment.

21      Now, the government responds that people like Mr. Winkles

22 don't have a reasonable expectation of privacy in this

23 information because it's already been disclosed to certain

24 entities in some form or fashion.  To a certain extent, that's

25 wrong on the facts.

1          Recall that FinCEN's rule requires a disclosure of the

2    image of a driver's license, or a similar ID.  Those images are

3    not floating around on Mr. Winkles's LinkedIn page, for

4    example.

5          But I think more fundamentally that's not the way to

6    analyze the Fourth Amendment.  I revealed my name to the Court

7    when we started today.  Someone can figure out my address

8    pretty easily by looking at court records.  But that doesn't

9    mean I can walk outside the courthouse today and the police can

10   demand this information from me for criminal law enforcement

11   purposes without a warrant, without reasonable suspicion.

12         The government also cites the third-party doctrine, which

13   is discussed in the Carpenter case.  But it also isn't on

14   point.  That doctrine deals with the government's ability to

15   obtain records and such from third parties to whom the

16   individual has disclosed that information voluntarily.

17         Recall that's not the way the statute works.  I mean,

18   first of all, it requires disclosure directly from the company.

19   But there's a direct line between the individual and the

20   government in this regard, because, as FinCEN's analysis

21   indicated, the discussion I showed you at the outset, the -- an

22   individual can be held criminally responsible if they do not

23   turn the information over to the company that makes the

24   disclosure.  So the third-party doctrine simply has no

25   application here.

1          With that, we believe that also the statute is due to be

2     enjoined under the Fourth Amendment.  We would ask the Court to

3     do so.  I'm happy to answer any questions the Court may have

4     about that claim.

5               THE COURT:  I am zero and one at enjoining statutes at

6     the Eleventh Circuit this year.

7               MR. NEIMAN:  Well, I hope you remain undaunted.

8               THE COURT:  All right.  Government.

9               MS. PITZ:  Good morning, Your Honor.  May it please

10    the Court.

11              THE COURT:  Good morning.

12              MS. PITZ:  To begin, one thing I want to emphasize

13    with respect to all of plaintiffs' claims under the bill of

14    rights is that plaintiffs contend the statute on its face

15    violates these constitutional provisions.  That means they must

16    show that there's no set of circumstances under which the

17    statute could be applied validly.  They have fallen short of

18    doing so.  And even if one could imagine particular

19    circumstances that might pose a closer question, those

20    questions are not presently before the Court and do not justify

21    invalidating the statute on its face.

22         Turning to the Fourth Amendment.  The one thing I really

23    would like to reiterate to the Court is that the Supreme Court

24    has consistently stated the ultimate touchstone of the Fourth

25    Amendment is reasonableness.  There can be little doubt that

1  the CTA's reporting requirements are reasonable.

2        The statute requires merely that reporting companies

3  provide four discrete pieces of information:  Legal name, date

4  of birth, residential or business address, and the unique

5  identifying number from an accepted identification document.

6        These pieces of information are frequently required in

7  other regulatory context, such as filing tax returns, passport

8  forms, and bank account applications.  This information is also

9  frequently disclosed in day-to-day transactions.

10        As amici highlight, this information may be required to

11  apply for a library card.  Personally, I provide much of this

12  information every time I enter a D.C. public pool.

13        Simply put, the reporting requirement is not an unduly

14  intrusion into an individual's privacy, and is entirely

15  reasonable, particularly in light of the government interest

16  the CTA represents.

17        And even looking to the Katz test, the framing employed in

18  the parties' brief and referenced by the parties' arguments

19  here today, the CTA may not even implicate Fourth Amendment

20  protections.

21        The plaintiffs before the Court have not demonstrated

22  subjective expectation of privacy in beneficial ownership

23  information, and SBA does not allege that it's subject to the

24  reporting requirements.  And Mr. Winkles has already disclosed

25  publicly the beneficial ownership information he seeks to

 1  protect now.

 2        But regardless, any expectation of privacy is not

 3  objectively reasonable.  Under Eleventh Circuit and Supreme

 4  Court case law, a plaintiff cannot claim a legitimate

 5  expectation of privacy in information that has been exposed to

 6  the public.  So that's the United States vs. Segura-Baltazar

 7  case cited in our briefs.

 8        As is the case with Mr. Winkles, information -- this type

 9  of information is publicly disclosed in many contexts.

10        Plaintiffs rely on Carpenter, but that reliance is

11  misplaced.  That case dealt with cell phone location

12  information, information that amounts to a detailed log of a

13  person's movements over several years.  That's qualitatively

14  different than the types of information required by the

15  reporting requirement.

16        This is a discrete reasonable amount of information that

17  agencies are requesting.  It does not involve, as the Supreme

18  Court referenced it, information like CSLI, that its depth,

19  breadth, and comprehensive reach and inescapable and automatic

20  nature of its collection.  The Court there was obviously

21  concerned with a completely different type of information than

22  what the reporting requirement today represents.

23        Although plaintiffs today focus on the Airbnb opinion, I

24  would like to draw a few points of distinction from the

25  Patel -- City of Los Angeles vs. Patel case cited in our

1  briefs.  There, the Court was considering similar reporting

2  requirement -- or not reporting requirement, but administrative

3  search.

4      But in contrast there, the special needs exemption was not

5  appropriate.  That was -- in that case, the Court considered a

6  hotel registry that required hotels in the city to make

7  publicly available or available for inspection to the L.A.P.D.

8  significantly more information that was more akin to

9  indiscriminate rummaging into the records of hotels and guests.

10      So there, the information at issue was name and address,

11  and in some cases, photo ID.  But it also requested information

12  such as the number of guests that were staying with a party,

13  the make, model, and year of any vehicle the party had on the

14  premises, the date and time of arrival, scheduled departure,

15  assigned room number, rate charged, amount collected, method of

16  payment.  In some cases, credit card information.

17      By contrast here, again, I just want to reiterate it's

18  just the four discrete pieces of information.  And, again, that

19  case considered a city municipal code, whereas by contrast

20  here, the CTA is a congressionally mandated reporting

21  requirement, which focuses on the national security interests

22  of the United States.

23      So the balancing that should be conducted into whether or

24  not, even assuming Your Honor would be inclined to find the CTA

25  is a search under the Fourth Amendment, the balancing here

 1   looks very different.  It's these important national security

 2   interests against a very minimal intrusion.

 3        And under the Supreme Court's case Maryland vs. King, the

 4   balancing here clearly tilts in the government's favor.

 5        If Your Honor has no further questions, I will turn it

 6   back over to the plaintiffs.

 7             MR. NEIMAN:  Your Honor, we've raised three additional

 8   claims -- Fifth Amendment, First Amendment, and vagueness.

 9        The Fifth Amendment and First Amendment arguments resemble

10   in many ways the Fourth Amendment argument that Ms. Pitz and I

11   have been discussing.

12        I think that we have adequately briefed those two issues.

13   And in the interest of time, I would suggest I could move

14   directly to the vagueness arguments at this point in time.

15             THE COURT:  That's fine.

16             MR. NEIMAN:  I would just say just one sentence about

17   those two claims before I let them go.

18        On the Fifth Amendment, one of the government's arguments

19   is that companies don't have privilege against

20   self-incrimination, and, therefore, the Fifth Amendment doesn't

21   apply here.

22        Our response to that is the guidance that we have shown to

23   you today, where the government says that if the information is

24   not revealed by the individual, the individual will be

25   prosecuted.  So the rights we are seeking to vindicate in that

1    claim are Mr. Winkles's rights, not the company's.

2          On the First Amendment issue, I would refer the Court to

3    the Lady J. case out of the Eleventh Circuit.  We believe

4    that's squarely on point and applies not only to adult

5    businesses, but all businesses that have an expressive

6    component such as Mr. Winkles.

7          The final claim here, unless the Court has questions about

8    those issues, is -- stems from the vagueness of the statutory

9    definitions that purport to establish whose sensitive

10   information has to be disclosed for this database.

11         Tom, if you would, pull up slide 11 for me.

12         So 5336(a)(3) defines beneficial owner, the key term here,

13   in two ways:  The principal or the first stop for the statute

14   here is to define beneficial owner as anyone who exercises

15   substantial control over the entity.  The statute doesn't limit

16   the number of beneficial owners there may be, and, thus, the

17   number of people who may be deemed to exercise substantial

18   control.  So the statutory definition is not just about who

19   owns equity in the company, it's about primarily, first and

20   foremost, the people who exercise substantial control.

21         That term is not a term of art in corporate practice.

22   It's a novelty to corporate law.  And FinCEN's attempt to give

23   it more definition in the regulations has just exacerbated the

24   problem.

25         So slide 12, Tom.

1          FinCEN's recent guidance to small businesses about what

2    substantial control means.  It parrots the regulation, the

3    final rule that FinCEN implemented here.  It defines

4    substantial control as someone who meets any of four general

5    criteria:  Senior officers, individuals with authority to

6    appoint or remove officers, and then critically, for number

7    three and four, the individual is a, quote, unquote, important

8    decision maker, or the individual has, quote, any other form of

9    substantial control.

10         Who falls in the third and fourth provisions of this

11   guidance is really anyone's guess, including, I would suggest,

12   FinCEN's consultants who work with the company.  It's unclear

13   whether they exercise substantial control -- in-house attorneys

14   who are not the general counsel, in-house accountants, just

15   talented employees whose success tends to be central to the

16   company.  Will those people need to hand over their driver's

17   license images to the database?

18         We can't really know, in light of what FinCEN tells us

19   about the -- what this language means, and especially the

20   fourth prong.

21         So next slide, Tom.

22         This shows FinCEN's guidance about how this catch-all

23   works.  It refers to it as a catch-all.  And it says, this

24   includes any other form of substantial control over the

25   reporting company.  Control exercised in new and unique ways,

 1  FinCEN tells us, can still be substantial.

 2      I think here the agency has made as compelling an argument

 3  as any as to why the very heart of the statute, its definition

 4  of who has to provide the evidence or the information is

 5  unconstitutionally vague.  I think they're saying substantial

 6  control means substantial control.  The statute is circular in

 7  that way.

 8      The government can't get around this problem by responding

 9  that it will prosecute only -- and statute allows for

10  prosecution only of willful violations of the statute.  It's

11  not clear what willful will mean in this context.

12      And the statement that the government will only prosecute

13  willful violations will be little comfort to the numerous

14  individuals who are trying to determine whether they are

15  required to provide this information to the government under

16  threat of criminal prosecution.

17      So like the other concerns I've raised today, this

18  vagueness problem renders the statute unconstitutional.  We

19  would ask the Court to enjoin it by January 1st, 2024, the

20  first effective date that the statute will become effective.

21      Thank you.

22          THE COURT:  Uh-huh.  Government?

23      Mr. Neiman, have you ever done any research in to what a

24  principal is under Alabama's Ethics Act?

25          MR. NEIMAN:  Long ago, Your Honor.  Fortunately, I

1  haven't had to look at that in some time.

2         THE COURT:  Similar argument.

3     Go ahead.

4         MS. PITZ:  Thank you.

5     First I want to respond to a few things that plaintiffs

6  have said today.

7     First, regarding four Fifth Amendment right against

8  self-discrimination claims, yes, the government's position is

9  that companies themselves don't have a Fifth Amendment right

10 against self-incrimination.  And really, if you focus on the

11 core of that right, it is the right about who must not be

12 compelled to actually provide the evidence.

13     And here, the report that is being made goes from the

14 government -- or, excuse me -- goes directly from the reporting

15 company to the government.  And, therefore, that is the

16 relevant production of information for which the Fifth

17 Amendment self-incrimination rate should be considered.

18     But even setting aside from that -- excuse me --

19 apologies.  But even setting that aside, plaintiffs haven't

20 shown here that any report necessarily contains incriminating

21 information, much less that every or many reports would be

22 likely to contain incriminating evidence.  Plaintiffs

23 repeatedly state throughout their briefs most entities are

24 lawful.  Indeed, in response to amici, they specifically argue

25 the CTA is overkill because most state entities are formed and

1    used for lawful purposes.

2        Providing four pieces of basic identifying information in

3    connection with a lawful state entity cannot, then, create a

4    risk of substantial hazard, or real and appreciable risk of

5    self-incrimination sufficient to support a facial challenge.

6        Moving to their First Amendment arguments, first I would

7    like to point out it's not clear at all from the record what

8    type of expressive conduct Mr. Winkles or his entity is engaged

9    in.  And, regardless, it's not clear that all reporting

10   companies are engaged in expressive conduct subject to First

11   Amendment protection.

12       The lady lingerie is distinguishable for the reasons that

13   we cite in our brief.  There, the statute specifically

14   considered whether the ordinance at issue applied to lingerie

15   shops showcasing nude dancing.  That is conduct the Eleventh

16   Circuit has expressly found to be expressive and deserving of

17   First Amendment protection.  Plaintiffs cite no authority for

18   the proposition that any entity anywhere doing business or not

19   is necessarily engaged in expressive conduct.

20       And second, here, unlike the ordinance at issue in lady

21   lingerie or Lady J, there's obviously a relevant correlation

22   and substantial relation between the disclosure that FinCEN is

23   asking for here and the secondary harmful effects there.  That

24   counseled against upholding the statute.  But here that balance

25   tilts in the government's favor.

 1          Finally, turning to plaintiffs' due process claims.
 2   Importantly, plaintiffs do not contend that the CTA is vague
 3   with respect to Mr. Winkles.
 4          And the case, the Ivey case out of the Middle District of
 5   Alabama, plaintiffs lack standing to challenge a statute's
 6   hypothetical application to others as vague.  Here, Mr. Winkles
 7   is not disputing that he understands he has a substantial -- he
 8   is a beneficial owner.  His company has a reporting
 9   requirement.  He will be required to turn over that
10   information.  He, therefore, is not in a position to challenge
11   the vagueness of the statute as applied to others.
12          But, in any event, the CTA's definitions are not
13   unconstitutionally vague.  And the plain text allows ordinary
14   people to understand what the law requires.  And courts have
15   concluded similar statutory terms don't pose a constitutional
16   concern.
17          We also would emphasize contrary to what plaintiffs argue
18   that the scienter requirement here does help to ensure that the
19   requirements of due process are satisfied under the CTA.  And
20   the CTA does specifically define willfully.  But individuals
21   are reporting companies are only subject to penalties for
22   willful violations.  And willfully is defined as voluntary,
23   intentional, violation of a known legal duty.
24          So that will ensure that even in instances in which there
25   may be a close case, companies are -- or penalties will only be

 1  imposed where conduct is found to be willful.

 2       And, lastly, to respond to plaintiffs' points regarding

 3  the catch-all provision, many courts have upheld that catch-all

 4  provisions in other statutes where the other defining criteria

 5  provide guidance as to how to interpret the catch-all category,

 6  they do not run afoul of due process.  One case the Court might

 7  look to is Roy vs. City of Monroe, 950 F.3d 245.  And in that

 8  case the Court upheld a similar catch-all provision.

 9       If Your Honor has no other questions, I will turn it back.

10            THE COURT:  I may have some on this.

11            MS. PITZ:  Okay.

12            THE COURT:  So can you put your -- that reg back up

13  that defined --

14            MR. LEE:  All right, Judge.  You said the reg, right?

15            THE COURT:  That's it right there.

16       So if I am looking at Section 3 and 4, an individual is an

17  important decision maker, that seems wide open to me --

18  literally wide open.

19       A company could have -- you know, if you have got a

20  company that's got a thousand people in it, you could have a

21  hundred of them who are an important decision maker on

22  different issues.  Would that include, then, everybody who's

23  the head of a local office and makes decisions for that office?

24  Would it include the person who's their deputy?  That seems

25  like a really wide-open term to me.

1          Do you want to give me some more guidance on where courts

2     in similar cases specifically something that would point say,

3     hey, that's okay?

4          MS. PITZ:  I'm not sure I have a specific citation

5     response, but I'm happy to respond to that question.

6          Your Honor, I would like to emphasize once again

7     plaintiffs have brought a facial challenge.  So even if you can

8     hypothetically imagine certain scenarios in which perhaps it

9     maybe would be a closer call.  Maybe there would be an issue

10    deciding who effects substantial control over an entity.

11         The challenge today is that there is no world in which --

12    or, excuse me -- there is no valid application of the statute

13    as to anyone where it would be clear.  And here it's very

14    obvious, as even the plaintiff before the Court, Mr. Winkles,

15    the application of the statute is clear and can be understood

16    by ordinary people.

17         Further --

18         THE COURT:  I practiced law for some years before a

19    judicial career.  And I think back, there were three attorneys,

20    and then, you know, probably ten other employees in our office.

21    Everybody in that office would have been an important decision

22    maker on some issue.  Everybody.

23         MS. PITZ:  All of them?

24         THE COURT:  Everybody.  On an important decision -- on

25    some decision, on some issue, everybody in that office would

 1  have been.  That looks awfully worrisome to me.

 2          MS. PITZ:  But if that's the case, Your Honor,

 3  respectfully, if you are able to decide today that clearly

 4  those individuals, every one of them would have been an

 5  important decision maker, the question is not whether that's

 6  inappropriate.  It's whether that's sufficiently definite that

 7  we know they must provide information.

 8          THE COURT:  I guess I would say they would be an

 9  important decision maker on some key issue.  So I would out of

10  fear just report all of them.  But this reg doesn't say what is

11  an important decision maker.

12      So I guess my point is that I would fear everybody would

13  just default to reporting everybody because they don't know

14  what that's really calling for.

15          MS. PITZ:  Well, I would respond that the agency is

16  doing a lot to clarify who -- how to apply these definitions.

17  In particular, plaintiffs have included as with their notice of

18  supplemental authority the attachment of the small entity

19  compliance guide.  And that really walks through --

20          THE COURT:  Yeah.  Again, I don't think that what the

21  agency wants or what the statute is asking for would be the

22  scenario I just gave you, where everybody in my office is a

23  decision maker.  I think they would want it at a higher level.

24  But that's very unclear.  It's very, very unclear.

25          MS. PITZ:  Well, in such a circumstance, perhaps, a

 1  particular company would be in a position to bring an

 2  as-applied challenge.  But here today, we have a facial

 3  challenge.  And even if you can imagine particular

 4  circumstances that might pose closer questions, the statute as

 5  a whole permits ordinary people to understand what it requires.

 6  And that is all that due process requires, with respect to

 7  vagueness.

 8            THE COURT:  If there were no punishment clause to any

 9  of this, I think I would agree with you.

10       All right.  Anything else you want to say about this?

11            MS. PITZ:  No.  I would just once again emphasize that

12  the scienter requirement would prevent against, you know -- if

13  you are concerned about criminal applications as to vagueness,

14  once again, it's willful and intentional violation by a known

15  legal duty I believe is what I quoted.  And so if there's some

16  type of uncertainty, that could be grounds against penalties.

17  And so the scienter requirement further ensures the

18  requirements of due process are met here.

19       Thank you.

20            THE COURT:  Mr. Neiman, do you want to take another

21  bite at the apple?  Mr. Lee?

22            MR. LEE:  If I may take rebuttal time, Your Honor.  I

23  will be brief.  I was taught never to keep people from lunch.

24       So I am just going to be very quick, Your Honor, and start

25  with this point of vagueness and standing related.

1    NSBA certainly has standing because they're going to have
2  to talk to their member entities about precisely the type of
3  issue that you have identified, with respect to the guidance as
4  it goes out that all of the small businesses will have to
5  comply with.
6    And with respect specifically to individual decision
7  maker, I mean, my law firm is planning a holiday party.  There
8  is a committee.  And a holiday party is actually a really big
9  event.  Do we have to have everyone who's on the committee
10 reported as an individual decision maker, with respect to this
11 kind of guidance?
12    And so in reality, it's so vague that a good faith --
13 someone who wants to in good faith comply with this
14 requirement, it's almost impossible to do that.  And it's
15 particularly people who, like our clients, who really want to
16 comply with the law that will try hardest, whereas the bad
17 faith compliance people, precisely the people that the
18 government wants to target, they're not going to pay any
19 attention to things like this.
20         THE COURT:  What of her argument that the scienter
21 requirement swallows the problem?
22         MR. LEE:  Yes, Your Honor.  I mean, at the point of
23 compliance, people, regardless of the fact that they may have
24 the shelter of the scienter requirement, all of the member
25 entities will seek to comply, and NSBA will devote resources to

1    making sure that they're in full compliance with the law.  So

2    regardless of whether or not there's a scienter -- they are not

3    going to say, well, make a good faith effort to figure out who

4    all your individual decision makers are, and if you don't

5    identify everyone, you will only be punished if you are

6    willful.  I mean, that's just not the way the NSBA is going to

7    operate.  So to the extent that the scienter is sort of a safe

8    harbor, I don't think it's going to change very much the way my

9    clients are going to have to deal with this reg.

10       I will say with regards to the as-applied, the critical

11   case is City of Chicago vs. Morales, which is a Supreme Court

12   decision from 1999.  And although some of the justices thought

13   that the Salerno as-applied challenge went -- applied to a

14   vagueness challenge.  That involved the anti-gang loitering

15   ordinance in Chicago.

16       The latest Supreme Court pronouncement on this topic was

17   that because the problem with vagueness is just is both notice

18   to the public that are going to have to comply and the

19   discretion it affords to the enforcer that the as-applied

20   standard of Salerno, the one that says you have to strike --

21   you have to -- it has to be valid and invalid in all its

22   applications does not apply.

23       One point about the reasonableness -- reasonable

24   expectation of privacy.  As we said in the complaint, and as we

25   said in our briefing, the claim is when somebody sets up a

1    small business entity, they expect to turn over data.  And as

2    you pointed, Your Honor, I can verify that no state currently

3    requires beneficial ownership information, particularly of the

4    nature that FinCEN does as a condition of setting up an entity.

5        I mean, we have certain expectations when we turn over

6    information to the government.  And whether it's a library card

7    or a driver's license.  And if you turn it over, for example,

8    to the IRS to file taxes, the Financial Information Privacy Act

9    ensures that the government will actually use that information

10   strictly for the purposes that you're turning it over for.

11       And so the idea that it's going to be put into some

12   galactic database that law enforcement and intelligence,

13   including foreign intelligence agencies, with no required

14   resort to judicial process can access at some point if they

15   feel that they want to, then that's the problem that we're

16   really complaining about.  And I think both as a subjective and

17   objective matter, I think that Mr. Winkles and NSBA members

18   have a reasonable expectation of privacy with respect to that.

19       The third point about powers, the constitutional powers.

20   I think one point that the government doesn't really answer in

21   our briefing is, as strange as it may seem to us today, at the

22   founding of the United States and the framing of the

23   Constitution, the power to charter entities -- and entities

24   were not necessarily exclusively business entities.  As we say

25   in our first brief, in fact, a lot of entities were villages,

1   public entities, building canals, building roads, building

2   turnpikes.  That was considered a fundamental state sovereign

3   power.

4        Now, that is -- regardless of how the 1930s -- post 1930s

5   Commerce Clause precedence had proceeded, the government has

6   pointed to nothing in the record, no cases that suggest that

7   there has been any sense in which the reconstruction and other

8   amendments somehow rebalanced that specific allocation of

9   original sovereign power to the states, to charter corporations

10  and entities.  And so that's why we make this argument that

11  entity formation is something that is outside even the Commerce

12  Clause powers.

13       With regards to the precedence, the government's best case

14  is the Shultz case, and that involves bank records.  But as we

15  point out in our reply brief, that particular holding targets

16  negotiable instruments moving in the channels of interstate

17  commerce.  And it says Congress could have closed the channels

18  of commerce entirely to negotiable instruments.

19       Well, negotiable instruments also include a check that's

20  been -- it's essentially a state law contract.  So if a check

21  has been endorsed, but you put it in your desk drawer, that is

22  a negotiable instrument.  But it's that movement in interstate

23  commerce that the Bank Secrecy Act regulates.

24       It doesn't require you, if you have endorsed a check and

25  you put it in your desk drawer to turn over that record to the

1  government.  That's effectively what our argument amounts to.

2  If the government were to enact a statute saying that, look,

3  once that entity moves in interstate commerce, then you are

4  subject to the reporting requirement.  That would presumably be

5  okay under the Shultz authority, but not the CTA as it's

6  currently framed, Your Honor.

7      As a conclusion, I will just say the reason why no one

8  else challenges this statute is because there are a lot of

9  carve-outs to it.  And I think as often happens in this digital

10  world, something comes along, we have -- fortunately on small

11  businesses -- and I think that part of the issue is there are

12  so many carve-outs and exceptions that people aren't really --

13  this statute isn't on their radar screen.  And that's why our

14  particular clients are concerned about it, Your Honor.

15      If there are no further questions.

16          THE COURT:  All right.  Let's take a five-minute

17  break.  I may have some questions after that.  I may not.  But

18  we will gather back in five minutes.

19          (Recess.)

20          THE COURT:  All right.  I think we are wrapped up.

21  Good arguments, ladies and gentlemen.

22      I will get something as quick as I can.  It won't be

23  tomorrow, but we will get to work on it.

24      Safe travels.

25          (Whereupon, the above proceedings were concluded at

1    12:13 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              <u>CERTIFICATE</u>

2

3

4          I certify that the foregoing is a correct

5     transcript from the record of proceedings in the

6     above-entitled matter.

7

8

9

10

11                                                    <u>11-29-2023</u>

12     Christina K. Decker, RMR, CRR              Date

13     Federal Official Court Reporter

14     ACCR#:   255

15

16

17

18

19

20

21

22

23

24

25

Tab 6

```
1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ALABAMA
2                       NORTHEASTERN DIVISION

3

4
        NATIONAL SMALL BUSINESS UNITED,  *
5               Plaintiffs,              *   5:22-cv-1448-LCB
                                         *   February 2, 2024
6       vs.                              *   Huntsville, Alabama
                                         *   2:00 p.m.
7       YELLEN, ET AL.,                  *
                Defendant.               *
8       ********************************

9

10

11               TRANSCRIPT OF TELEPHONE CONFERENCE
                BEFORE THE HONORABLE LILES C. BURKE
12                 UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23      Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
        pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
24       and Procedures Vol. VI, Chapter III, D.2.  Transcript
                   produced by computerized stenotype.
25
```

1                        <u>APPEARANCES</u>

2

<u>FOR THE PLAINTIFFS</u>:
3    John C Neiman, Jr
     MAYNARD NEXSEN, PC
4    1901 Sixth Avenue North
     Suite 1700
5    Birmingham, AL 35203
     205-254-1000

6

     Thomas Lee
7    HUGHES HUBBARD & REED LLP
     310 East 15th Street #2A
8    New York, NY 10003
     347-324-6000
9    Thomas.lee@hugheshubbard.com

10

11   <u>FOR THE DEFENDANT</u>:
     Stuart J Robinson
12   U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
     Federal Programs Branch
13   450 Golden Gate Ave., Suite 7-5395
     San Francisco, CA 94102
14   415-436-6635
     Stuart.j.robinson@usdoj.gov
15
     Taylor Pitz
16   DEPARTMENT OF JUSTICE
     Civil
17   1100 L Street NW
     Washington, DC 20005
18   202-305-5200
     Taylor.n.pitz@usdoj.gov

19

20

     <u>AMICI</u>:
21   Kristen Paige Miller
     DEMOCRACY FORWARD FOUNDATION
22   PO Box 34553
     Washington, DC 20043
23   202-701-1782
     Kmiller@democracyforward.org

24

25

1          COURTROOM DEPUTY:  Stephanie P. Tolen

2

3          COURT REPORTER:  Christina K. Decker, RMR, CRR
                            101 Holmes Avenue, NE
4                           Huntsville, Alabama 35801
                            ChristinaDecker.rmr.crr@aol.com
5                           (256) 506-0085

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **P R O C E E D I N G S**

2            THE COURTROOM DEPUTY CLERK:  Good afternoon.  This is

3    Stephanie, Judge Burke's courtroom deputy.  Who do we have with

4    us today for the plaintiff?

5            MR. NEIMAN:  Good afternoon.  This is John Neiman here

6    for the plaintiffs.

7            MR. LEE:  Good afternoon.  This is Thomas Lee for the

8    plaintiffs, as well.

9            THE COURTROOM DEPUTY CLERK:  Thank you.

10       And who do we have for the Yellen and the Department of

11   Treasury?

12           MR. ROBINSON:  Good afternoon.  This is Stuart

13   Robinson from the Justice Department on behalf of the

14   defendants.

15           MS. PITZ:  This is Taylor Pitz, also from the Justice

16   Department, and on behalf of the defendants.

17           THE COURTROOM DEPUTY CLERK:  And who do we have for --

18   I think it's Ms. Miller for the remaining amicus defendants,

19   right?

20           MS. MILLER:  Yes.  This is Kristen Miller from

21   Democracy Forward for amici.

22           THE COURTROOM DEPUTY CLERK:  Is there anyone on the

23   call whose name I haven't received who just got on?

24       Before we start, if you all would just state your name

25   before you speak, that way Judge Burke will know who's talking,

1  please.

2          THE COURT:  All right.  Good afternoon, everybody.

3  This is Liles Burke.

4          Thanks for coming together on a really short notice.  I

5  know everybody is eager to have an opinion on this.  But I know

6  you all agree with me this is pretty complicated stuff or we

7  wouldn't be here.

8          So let me say that we are very close to being finished

9  with our work.  But I do want to dig a little deeper into the

10  issue that I noticed you all on, which is the Commerce Clause.

11          Before we get to that, I also want to say that at the 11th

12  hour, as I'm sitting around with my staff talking about the

13  application of this, I realized that I am a limited partner in

14  a partnership that is controlled entirely by my mother, who is

15  the general partner.

16          And so I have reached out to the Administrative Office of

17  Court's ethics committee to seek formal guidance on this, as to

18  whether that would be a recusal or not a recusal.

19          In talking informally with their counsel, they do not

20  believe that it is a recusal issue, just because this Act has

21  so much application.

22          However, I don't want to act on informal guidance.  So I

23  have asked them to give me a formal written opinion.

24          And I spoke with the chairman of their committee

25  yesterday, and they anticipate that that can happen fairly

1   quickly.

2       So, obviously, I don't want to act until I have guidance

3   from them on that issue.

4       And I will tell you just for your knowledge, this is a

5   partnership that owns assets that were transferred into it from

6   my grandparents' estate and from my mother.  My sister and I

7   are limited partners.  My mother is the general partner.

8       I'm sure that each of you knows in a limited partnership a

9   limited partner has ownership, but no say, no decision making.

10  That all resides strictly with the general partner in that

11  situation.

12      So, anyway, I wanted everybody to be aware what some of

13  the delay here is.  But I'm hopeful that I will have an answer

14  there.

15      Okay.  Let's dive deep again here.  And let me just start

16  off with questions for plaintiffs.

17      For the sake of argument, let's assume that the CTA is

18  unconstitutional.  And I know you touched on this some in your

19  arguments a few weeks ago.

20      But assuming, just for the sake of argument, that the CTA

21  is unconstitutional, in specificity, tell me how Congress could

22  have drafted the CTA to be constitutional.

23      And, of course, specifically, I'm talking about that prong

24  of the Commerce Clause.

25          MR. NEIMAN:  This is John Neiman, Your Honor.  I'm

1  here for the plaintiffs, along with Tom Lee.  I will endeavor
2  to at least begin the answer to your question.

3      The U.S. Supreme Court, and to a certain extent, Eleventh
4  Circuit jurisprudence on the substantial effects test lays out
5  several different prongs that are relevant to the Court's
6  assessment of whether a statute falls within Congress's powers
7  in this regard.

8      Of critical importance here, I would suggest, is the fact
9  that the Corporate Transparency Act does not have any sort of
10  jurisdictional provision like the ones that were flagged by the
11  Supreme Court in Lopez and Morrison, limiting the scope --

12          THE COURT:  And I get that.  Let's get forward here.

13      So what would you have added to the statute to make it
14  constitutional if you were to sponsor this bill?

15          MR. NEIMAN:  The first thing I would add, Your Honor,
16  is a jurisdictional provision providing that the statute only
17  applies to entities that are engaged in commerce.

18      The second thing I would want to do to the statute is make
19  it look a lot more like the Bank Secrecy Act, in the sense that
20  the regulated act would be something that would be economic and
21  commercial in nature.

22      So the Bank Secrecy Act applies once a banking transaction
23  occurs.  Here, the regulated act is the act of entity
24  formation, which, as we've noted, is not an economic act.  And
25  the government has conceded that it, by itself, isn't

1  necessarily an economic or commercial act.

2      So I think between those two things -- providing a

3  jurisdictional provision and situating the regulated activity

4  in something that's decidedly economic and commercial -- the

5  statute would be much closer to satisfying the Commerce Clause.

6      I'm not getting in on the Fourth Amendment and the other

7  constitutional challenges we have raised.  But as to the

8  Commerce Clause, I believe that those two actions would go a

9  long way towards satisfying the constitutional test.

10      THE COURT:  All right.  The government suggested in

11  oral argument that the exceptions in the CTA's definition of a

12  reporting company are enough to narrow the scope of the Act to

13  state entities that are engaged in commerce.

14      Tell me why I shouldn't leave the statute that way.

15      MR. NEIMAN:  This is John Neiman again.

16      Your Honor, I don't believe the statute can be read in

17  that way.  The statute on its face applies to any entity,

18  especially smaller entities that are formed, regardless of the

19  ultimate purpose of the entity.

20      So if an individual were to form an LLC for the purposes

21  of owning a piece of property -- a home, a vacation home, or

22  the like -- the statute would apply on its face to that

23  individual and that LLC.  But that action, forming that LLC,

24  would not be within Congress's commerce power.

25      THE COURT:  What if the Act had exempted entities

1 that, quote, engaged in business?

2         MR. NEIMAN:  This is John Neiman again.

3     I'm not sure I understand the question about the

4 exemption.

5         THE COURT:  Yeah.  So, you know, obviously the Act

6 does exempt some businesses that were already formed prior to

7 the Act.

8     What if the Act itself just exempted all entities which

9 were, quote, engaged in business.  Would that save it?

10         MR. NEIMAN:  This is John Neiman.

11     No, Your Honor, it would not.  And any entity that was

12 formed in the future under that statute, including entities

13 that were not formed for the purposes of engaging in interstate

14 commerce, would be covered.  And the statute on its face, I

15 think, would -- the government's task of defending that

16 statute, I think, would be even more difficult than its' task

17 of defending the Corporate Transparency Act, as drafted.

18         THE COURT:  I asked that question vaguely.

19     What I mean was what if the CTA exempted entities, except

20 that were engaged in business?

21         MR. NEIMAN:  Your Honor --

22         MR. LEE:  Your Honor, this is Thomas Lee.

23     Go ahead, John.  Sorry.

24         MR. NEIMAN:  I was just going to say -- this is John

25 Neiman -- that statute would do one of the two things, or at

1  least come close to doing one of the two things that I
2  suggested in response to your earlier question about a better
3  drafted statute.

4      That provision would look a lot like the jurisdictional
5  hooks that the Supreme Court has suggested are necessary.  I'm
6  not sure that would be enough because there wouldn't be an
7  interstate element of business.  But putting that to the side,
8  that would aid the government's defense of that statute.

9      There still would be a problem, however, with that
10 statute, because it still would regulate the act of formation,
11 rather than the act of engaging in commerce itself.

12         THE COURT:  All right.  Let's change gears a little
13 bit.  Let's make it Maxwell and Raich.

14     So those courts -- this case has certainly expanded the
15 Substantial Effects Doctrine.

16     So my question, then, to plaintiffs would be:  Why
17 shouldn't I uphold this Act if I find that Congress reasonably
18 concluded that anonymity in corporate formation was
19 substantially affecting interstate commerce?

20         MR. NEIMAN:  This is John Neiman again.

21     The answer is that the act of incorporation, as we've
22 argued, and as I believe the government's reply brief concedes,
23 is not in and of itself economic and commercial activity.

24     The statutes in Raich and Maxwell are decidedly different
25 because the -- excuse me -- those statutes on their face apply

1  not just in part, but primarily to economic and commercial

2  activity.

3      In Raich, the Controlled Substances Act is applying, in

4  its vast majority of applications, to the inherently commercial

5  act of interstate distribution of marijuana.  And the question

6  was whether Congress could sweep in an intrastate distribution

7  and use of marijuana in the course of regulating that

8  commercial interstate act.

9      Same thing for the Eleventh Circuit's decision in Maxwell.

10  Congress's statute on its face was regulating the commercial

11  economic activity of distribution of pornography across state

12  lines.  In doing so, Congress could also sweep into the scope

13  of that statute an intrastate, perhaps, noncommercial activity.

14      Here, there is simply no application of the statute that

15  applies to commercial economic activity.  Every single

16  application of the statute is to the act of corporate

17  formation, which simply is not a commercial or economic

18  activity.  It's been inherently something that the states have

19  dealt with since the time of the founding.

20      THE COURT:  All right.  Ms. Pitz or Mr. Robinson,

21  anything you want to add in based on those responses you heard

22  from the plaintiffs on these questions?

23      MR. ROBINSON:  Thank you, Your Honor.  This is Stuart

24  Robinson from the Justice Department on behalf of defendants.

25  And I would appreciate the opportunity to respond.

1    Just with respect to some of the initial points that

2    plaintiffs' counsel made, we would emphasize that there is no

3    requirement for a jurisdictional provision in order for the

4    Court to find that Congress has acted within its Commerce

5    Clause authority.

6    With respect to sort of the object of the CTA, we disagree

7    that the CTA regulates corporate entity formation itself.

8    Rather, it regulates the operation of corporate entities by

9    anonymous owners or beneficial owners.

10    The fact that reporting companies have filed incorporation

11    documents with the secretary of state is a condition that is

12    met in order for the reporting requirements to be triggered.

13    But that does not mean that the Act itself regulates corporate

14    formation.

15    I think that's evidenced by the fact that no state, for

16    example, has come forward to complain that the Corporate

17    Transparency Act has amended their state incorporation laws or

18    practices or -- and no entity has suggested that the CTA

19    operates as some kind of licensing regime, whereby they are

20    precluded from operating unless and until they fulfill these

21    reporting requirements.

22    While there are penalties associated with the CTA, they

23    are for local violations and do not prevent the operation of

24    the reporting company.

25    You know, I would say to Your Honor that the -- the

1   question before the Court is, is quite a narrow one under the

2   Commerce Clause test.  It's whether there is any rational basis

3   for Congress's finding that interstate commerce is affected by

4   the shielding of beneficial ownership information or the

5   failure of the government to collect that beneficial ownership

6   information.

7       Those are Congress's findings.  And they're amply

8   supported by both legal precedent and the legislative record.

9       With respect to the former, I think it's important to

10  emphasize the distinction that the Supreme Court has made

11  explaining that corporate entities are unique.  They're not

12  simply like natural persons.  And that's one of the reasons

13  that NFIB did not apply.

14      And we would again direct the Court to the Shultz

15  decision, where the Supreme Court said without equivocation the

16  corporations have a collective impact on society from which

17  they derive the privilege of acting as artificial entities.

18      The federal government allows them the privilege of

19  engaging in interstate commerce.  Favors from the government

20  often carry with them an enhanced regulation.

21      Again, the plaintiffs don't dispute the factual findings

22  supporting that explanation.  The CTA involves the movement --

23  excuse me -- the operation of corporate entities that fall

24  within the definition of reporting companies, you know,

25  billions of dollars across jurisdictions.

1        Those corporate entities have been used to commit crimes

2   affecting interstate commerce.  Those crimes have weakened the

3   financial system and the economy of the United States as a

4   whole.  And these measures will help level the playing field.

5        And those are exactly the kinds of concerns that the

6   Supreme Court pointed to in the Hodel decision, where the

7   Supreme Court cited the legislative history, explaining or

8   citing that the hearings about the effects of surface mining on

9   the nation's environment and economy, and Congress's

10  explanation that inadequacies in existing state laws and the

11  need for uniform minimum nationwide standards made federal

12  regulations imperative.  And that's exactly true here, as well.

13       I would just conclude, Your Honor, on the Maxwell

14  discussion, I want to make sure the government's position,

15  which was that, and as you stated in page 11, footnote 8 of our

16  reply, that while we disagree that the act of forming -- excuse

17  me -- or we disagree that the CTA is simply targeting the mere

18  act of corporate formation, we noted the Eleventh Circuit's

19  discussion in Maxwell that Congress has substantial leeway to

20  regulate purely intrastate activity whether economic or not,

21  that it deems to have the capability in the aggregate of

22  frustrating broader regulation of interstate economic activity.

23       THE COURT:  All right.  Well, you mentioned the

24  rational basis test.  And so I want to jump ahead with you on a

25  question right there.

1       So you're saying that all I have do is conclude that

2   Congress has a rational basis to, you know, to make the

3   connection.  But can the CTA be necessary and proper if it's

4   not first made a legitimate exercise of the commerce power

5   itself?  In other words, do you automatically lose on the

6   necessary and proper clause if the CTA is not first authorized

7   by the Commerce Clause?

8           MR. ROBINSON:  I believe the necessary and proper

9   clause has to rationally be related to another power that the

10  government has.  And so if the government would say the

11  government has no such power, then I think that would be the

12  end of the inquiry.

13          THE COURT:  All right.  Let me ask a few more

14  questions of the government, and then I am going to have some

15  questions for everybody.

16      So, Mr. Robinson, give me your best argument of why the

17  lack of a jurisdictional element shouldn't doom the Act under

18  Lopez.

19          MR. ROBINSON:  All right.  Well, to begin, Your

20  Honor --

21          THE COURT:  Even the statute at issue in Maxwell had a

22  jurisdictional element, you know.  The quote there from the

23  statute is it limited it to in or affecting interstate or

24  foreign commerce by any means, or shipped or transported in or

25  affecting interstate or foreign commerce by any means, et

1  cetera.

2       So give me your thoughts on that.

3            MR. ROBINSON:  Sure.

4       So there is certainly Eleventh Circuit precedent

5  explaining that the absence of a jurisdictional element does

6  not doom a statute that is authorized -- otherwise authorized

7  under the Commerce Clause test.  And we can provide the Court

8  the cites for that.  But I think it is a well-established

9  position.

10      I think Lopez is distinguishable on numerous fronts.

11  Again, there were no congressional findings in Lopez, where

12  there are substantial congressional findings here that are

13  well-supported by legislative record.

14      And in Lopez, the Supreme Court's holding boiled down to

15  the fact that possession of a gun in a local school zone was

16  not itself economic activity that substantially affected

17  interstate commerce.  It had nothing to do with commerce.

18  There's no commercial nexus.

19      Here, by contrast, the operation of CTA reporting

20  companies is itself economic activity.  That's clear from the

21  way the Supreme Court discusses corporate entities.  It's clear

22  from the legislative record.  And it's clear from plaintiffs'

23  own submissions.

24      Their complaint at paragraph 12 discusses the types of

25  entities represented by NSBU.  And they are engaging in

1   commerce.  They are engaging in economic activity.  And that is
2   the design of the CTA here.

3        I don't think that the exemption that the Court referenced
4   with plaintiffs' counsel are necessary for the Court to uphold
5   the exercise of authority on the Commerce Clause, but they
6   certainly helped, because they established that -- they
7   recognized that there are some entities or organizations that
8   may have availed themselves of some corporation practices that
9   are not the target of the CTA and can become exempt.  And that
10  includes political organizations.  It includes organizations
11  that are not engaged in active business and meet certain other
12  criteria.

13       So, really, I think that just giving you the type of
14  activity that's at issue here, Lopez should not be read to
15  apply.

16            THE COURT:  All right.  Last question just for the
17  government.

18       So the Maxwell court noted that, quote, we are not here
19  dealing with a single subject statute whose single subject is
20  itself noneconomic.  Rather here, as in Raich, appellant
21  challenges a component of a broader regulatory scheme whose
22  subject is decidedly economic.

23       So given that the Act is a single subject statute, and
24  Raich itself doesn't regulate economic or commercial activity,
25  why should a case like Maxwell or Raich govern?

1      MR. ROBINSON:  I'm sorry.  I did not hear the last

2  part of the question -- why should Maxwell or Raich?

3      THE COURT:  Govern.  Why should they govern my

4  decision here?

5      MR. ROBINSON:  Well, I would say Maxwell and Raich is

6  one of multiple lines of precedent whereby the Court can and

7  should uphold the CTA as constitutional, which it should

8  presume to be -- it should presume to be constitutional under

9  Supreme Court precedent.

10     So the test, again, boils down to whether there was a

11  rational basis for Congress's finding that the regulated

12  activity affects interstate commerce.  We think the fact that

13  these are corporate entities being regulated really answers the

14  question there.

15     To the extent that the Court is saying that or is thinking

16  that what's being regulated here is purely intrastate

17  activity -- and we don't think that's the best reading -- but

18  even if the Court were to say that, then Maxwell and Raich

19  would apply, and the Judge should hold that because the

20  intrastate activity is part of an economic class of activities

21  that have a substantial affect on interstate commerce, Congress

22  can regulate that class and that purely intrastate activity.

23     THE COURT:  All right.  Mr. Neiman, does that generate

24  anything from you on the questions I just asked Mr. Robinson?

25     MR. LEE:  Your Honor, this is Thomas Lee.  I know

1  Mr. Neiman is still there.  I'm sorry -- I mean, I could --

2       MR. NEIMAN:  I was muted.

3       I'll start, Tom.  And if you need to supplement, let me

4  know.

5       So this is John Neiman.  Apologies.

6       I was saying that I would like to address Mr. Robinson's

7  answer to the Court's question as to why the lack of a

8  jurisdictional element doesn't doom the Corporate Transparency

9  Act.

10      His response, as I understood it, was to say that this

11 case is unlike Lopez, in the sense that in the government's

12 estimation, the regulated act here of forming a corporate

13 entity is commercial and economic in nature.

14      In response, I'd say that it's important to keep in mind

15 that there are really two Commerce Clause related problems with

16 the Corporate Transparency Act.  It has a problem of scope, and

17 it has a problem of timing.

18      The scope problem is related to the question that the

19 Court asked about the Maxwell Eleventh Circuit decision's

20 remark that it was not dealing with a statute that was a single

21 subject type statute.

22      The Corporate Transparency Act is such a single subject

23 statute.  It is dealing solely with the question of corporate

24 formation.  And, therefore, case law like Raich and Maxwell and

25 Alabama Tombigbee that deal with multiple comprehensive

1  statutes that cover a universe of activities -- some of which

2  are commercial, some of which are not -- simply do not apply.

3     The second problem that the CTA faces under the

4  substantial act -- or the Substantial Effects Doctrine is a

5  problem of timing.

6     It simply is not the case that the act of forming a

7  corporation is inherently commercial and economic.  That's

8  because the act of forming a corporation involves individuals

9  going to state and local government entities, filling out

10  forms, and getting the state's permission to form these

11  entities, which may or may not be involved in commerce and

12  economic activity in the future.

13     That's why this case is, in fact, governed by the Supreme

14  Court's reasoning in NFIB vs. Sebelius, the Affordable Care

15  Act, where the Court said that Congress is not permitted to

16  anticipate economic activity in the future in order to regulate

17  activity now.

18     The government's argument that this Act that's being

19  regulated in the statute is economic and commercial in nature

20  is based on the premise that it is anticipating economic and

21  commercial activity in the future.

22     NFIB vs. Sebelius says Congress cannot take that step.

23        THE COURT:  All right.  I'm going to have a few

24  questions for all parties.  And so I just am going to let

25  plaintiffs answer first on each of these.

1     All right.  Mr. Neiman, can you give me or does there
2  exist a workable rule for determining when Congress is allowed
3  to aggregate the effects of purely intrastate noneconomic
4  activity?

5          MR. NEIMAN:  Congress can aggregate the effects of
6  noneconomic intrastate activity when doing so is part of a
7  comprehensive statute that also on its face regulates economic
8  commercial interstate activity, and Congress has found that the
9  regulation of the intrastate noneconomic activity is necessary
10 in order to make its regulation of the commercial interstate
11 activity effective.

12     That was Raich.  That was Wickard vs. Filburn.  That was
13 Maxwell and Alabama Tombigbee.

14     In each of those circumstances, there was economic
15 interstate activity that Congress clearly could regulate under
16 the Commerce Clause.  The reasoning of the courts in each of
17 those circumstances was that initial set of activity that was
18 being regulated was the foothold for Congress to regulate the
19 intrastate noneconomic activity.

20     That's simply not what we have with the CTA, which on its
21 face regulates only noneconomic, noncommercial activity without
22 simultaneously regulating the economic and commercial activity.

23          THE COURT:  All right.  Mr. Robinson, do you agree
24 with his analysis, as far as the ruling from those cases?  Is
25 there anything you want to add to that?  Or do you disagree?

1      MR. ROBINSON:  Your Honor, I think the clear and more
2  precise articulation of the rule comes from Maxwell itself,
3  which says that Congress has substantial leeway to regulate
4  intrastate activity, economic or not, that it deems to have the
5  capability in the aggregate of frustrating the broader
6  regulation of interstate economic activity.
7      There's no requirement of finding that certain activities
8  are necessary to achieve that goal, or anything beyond what the
9  Eleventh Circuit stated there.
10     And, again, we disagree with the framing that plaintiffs
11 have offered.  We disagree that the CTA is not a comprehensive
12 statute.  We think it is.  Congress -- members of Congress
13 certainly described it that way.
14     And so we just point the Court to cases like Maxwell and
15 Hodel that articulate it in a much more simple fashion.
16     THE COURT:  All right.  This next question I will let
17 the government answer first.
18     So one of the exceptions to the definition of a reporting
19 company in the Act.  I'm talking about Section
20 5336(a)(11)(B)(xxiii).
21     And don't worry about looking it up.  I am going to read
22 to you.
23     It exempts entities from reporting if they meet five
24 criteria:  They existed for more than a year; two, they don't
25 engage in active business; three, have not changed ownership in

1  the past year or sent or received more than a thousand dollars;

2  four, do not have assets; and, five, are not owned by a foreign

3  person.

4       Tell me how you interpret that section.

5            MR. ROBINSON:  I think generally the exemptions listed

6  in that subsection are carved out because they represent

7  entities that are either regulated by other schemes or have

8  such dispersed ownership that they present a low risk of the

9  types of elicited activities that Congress is seeking to

10  curtail, or they otherwise have indicia of low risk.

11      And so I'm giving an, you know, initial reaction.  And I'm

12  happy to follow up with legislative history, because I don't

13  have that on this particular subject or this particular

14  exemption.

15      But my inclination, Your Honor, is that these are perhaps

16  long-standing companies where because of the low volume of

17  business and lack of ties to foreign persons and low asset

18  amount, that they simply don't raise the level of concerns that

19  other types of corporate entities otherwise needing the

20  definition of reporting company would present.

21           THE COURT:  Do you read it as I do that it

22  grandfathers in existing entities that basically don't engage

23  in commerce?

24           MR. ROBINSON:  Well, I think the lack of engagement in

25  active business can be restated as not engaging in commerce,

1    perhaps.

2        But I think the -- the driving idea I would presume would

3    be that it is the type of entity that just presents a lower

4    risk profile, in terms of the type of evils that Congress is

5    trying to address.

6        THE COURT:  All right.  Mr. Neiman, we'll throw this

7    in your direction.

8        Do you interpret that exemption the same way that the

9    government does?

10       MR. NEIMAN:  I think the answer to that question is

11   no, Your Honor.

12       In response to what I understand to be the fundamental

13   question about whether it effectively exempts all entities that

14   are not engaged in interstate commerce -- I'm not looking at

15   the provision now, but I understood the Court to suggest that

16   the exemption only applies to entities that do not have assets.

17       Before I make my argument based on that premise, I want to

18   be sure I heard you correctly.

19       THE COURT:  Yes.  That's correct.  The fourth criteria

20   is that the entity does not have assets.

21       MR. NEIMAN:  So --

22       THE COURT:  Does not engage in active business.

23       MR. NEIMAN:  -- I think the fact that the exception

24   only applies if the entity has no assets means that the CTA

25   would sweep into its ambit numerous entities that do not engage

1  in interstate commerce, but simply have assets.  The

2  paradigmatic example that we have raised is the entity that is

3  formed to hold a piece of real property -- a home, a vacation

4  home, or the like.

5      That entity, I would suggest, is not engaged in interstate

6  commerce, but it would not be excepted by that provision.

7          THE COURT:  All right.  Last question.  Here is

8  your softball, and I can probably predict your answers.  We'll

9  start with the government.

10     If I had to write this opinion using just two cases on the

11 Substantial Effects Doctrine, what would they be, most

12 beneficial to you, Mr. Robinson?

13         MR. ROBINSON:  Thank you, Your Honor.

14     I think the Shultz -- excuse me -- the Shultz decision is

15 important in the sense of how the Supreme Court has described

16 corporate entities and the facts that they engage in interstate

17 commerce.

18     And beyond that, I would refer the Court to Raich for the

19 substantial effects test.

20         THE COURT:  And, Mr. Neiman, same question to you.

21         MR. NEIMAN:  My answers, Your Honor, would be mostly

22 tied to my earlier statement that the CTA has a problem of

23 scope and a problem of timing.

24     On the scope issue, I believe the U.S. Supreme Court's

25 decision in Lopez is most instructive -- a statute with a

1 single subject that is not -- noneconomic in nature, is not

2 within the commerce power under the substantial effects test.

3     On the problem of timing, I'd refer the Court again to

4 NFIB vs. Sebelius, and the Court's warning there that Congress

5 cannot anticipate economic activity and justify its regulation

6 of noneconomic activity on the premise that economic activity

7 or commercial activity will occur in the future.

8     THE COURT:  All right.  Well, ladies and gentlemen,

9 I'm sure that you see the bear that I am wrestling with today.

10     I am very grateful that everybody could come together and

11 we could take -- well, it's been about 45 minutes to get really

12 in-depth on this issue.

13     I realize also that, you know, when y'all got that notice

14 yesterday, I probably put you all to a lot of prep that you

15 didn't anticipate, and I apologize for doing that on short

16 notice.

17     This has helped me a lot.  I very much appreciate your

18 arguments today.

19     And I also will just say that I very much appreciate that

20 all counsel in this case are first-rate and well-prepared.  I

21 appreciate the way you're representing your clients.

22     So with that said, I'll go back to wrestling the bear.

23 And I certainly, when I receive this ethics opinion, will let

24 you know what it says.

25     And until then, we'll just keep working toward an outcome.

1       I do think we're very close.  This has taken longer than I

2  had intended even without the ethics opinion.

3       But, obviously, I want to get it right, as well.

4       So thanks so much.  I hope all of you have a wonderful

5  weekend.

6            MR. NEIMAN:  Likewise.

7       Thank you, Your Honor.

8            MR. ROBINSON:  Thank you, Your Honor.

9

10           (Whereupon, the above proceedings were concluded at

11       2:41 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>CERTIFICATE</u>

2

3

4          I certify that the foregoing is a correct

5     transcript from the record of proceedings in the

6     above-entitled matter.

7

8

9

10

11                                              <u>02-06-2024</u>

12     Christina K. Decker, RMR, CRR              Date

13     Federal Official Court Reporter

14     ACCR#:   255

15

16

17

18

19

20

21

22

23

24

25

Tab 7


FILED
2024 Mar-01  PM 04:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **NATIONAL SMALL BUSINESS UNITED, d/b/a the NATIONAL SMALL BUSINESS ASSOCIATION,** *et al.*, | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 5:22-cv-1448-LCB** |
| **JANET YELLEN, in her official capacity as Secretary of the Treasury,** *et al.*, | ) ) ) ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

The late Justice Antonin Scalia once remarked that federal judges should have a rubber stamp that says STUPID BUT CONSTITUTIONAL. *See* Jennifer Senior, *In Conversation: Antonin Scalia*, New York Magazine, Oct. 4, 2013. The Constitution, in other words, does not allow judges to strike down a law merely because it is burdensome, foolish, or offensive. Yet the inverse is also true—the wisdom of a policy is no guarantee of its constitutionality. Indeed, even in the pursuit of sensible and praiseworthy ends, Congress sometimes enacts smart laws that violate the Constitution. This case, which concerns the constitutionality of the Corporate Transparency Act, illustrates that principle.

1

When Congress passed the 2021 National Defense Authorization Act, it included a bill called the Corporate Transparency Act ("CTA"). Although the CTA made up just over 21 pages of the NDAA's nearly 1,500-page total, the law packs a significant regulatory punch, requiring most entities incorporated under State law to disclose personal stakeholder information to the Treasury Department's criminal enforcement arm.

By requiring these disclosures, Congress aimed to prevent financial crimes like money laundering and tax evasion, which are often committed through shell corporations. Broadly defined, a shell corporation is a legal entity with no (or minimal) employees, customers, business, or assets. Although shell corporations serve many legitimate purposes, it's also possible to disguise the identity of interested individuals and the flow of money by layering shell companies on top of each other, "such that each time an investigator obtains ownership records for a domestic or foreign entity, the newly identified entity is yet another corporate entity, necessitating a repeat of the same process[.]" Pub. L. 116-283 § 6402(4).

Yet corporate formation includes far more than for-profit enterprise. Each year, the States grant formal status to millions of entities that can and do serve "any lawful purpose," including benefit corporations, non-profits, holding companies, political organizations, and everything in between.

With that in mind, this case presents a deceptively simple question: Does the Constitution give Congress the power to regulate those millions of entities and their stakeholders the moment they obtain a formal corporate status from a State? The Government thinks so. While it acknowledges that Congress "can exercise only the powers granted to it," the Government says that the CTA is within Congress' broad powers to regulate commerce, oversee foreign affairs and national security, and impose taxes and related regulations.

The Government's arguments are not supported by precedent. Because the CTA exceeds the Constitution's limits on the legislative branch and lacks a sufficient nexus to any enumerated power to be a necessary or proper means of achieving Congress' policy goals, the Plaintiffs are entitled to judgment as a matter of law. As a result, the Court **GRANTS** the Plaintiffs' motion for summary judgment and **DENIES** the Government's motion to dismiss and alternative cross-motion for summary judgment.

## I.    Background

***Plaintiffs.*** Plaintiff National Small Business Association is "an Ohio non-profit corporation that represents and protects the rights of small businesses across the United States," including "over 65,000 businesses and entrepreneurs located in all 50 states." (Doc. 39-2 at 1-2). The NSBA's stated purpose is "to advocate for its

members" and their employees, and "to provide its members guidance and data on how to navigate government regulations." *Id.* at 2.

Plaintiff Isaac Winkles is an NSBA member and owner of two small businesses, one of which "is a small family business with 3 full-time employees and annual turnover of under $20 million." (Doc. 39-3 at 1-2).

***Procedural Background.*** The Treasury Department's criminal-enforcement bureau, the Financial Crimes Enforcement Network ("FinCEN"), issued a final rule implementing the CTA on September 29, 2022, slated to go into effect on January 1, 2024. 87 Fed. Reg. 59498 (Sept. 30, 2022) (codified at 31 C.F.R. § 1010.380). Six weeks later, Plaintiffs sued the Treasury Department, along with Treasury Secretary Janet Yellen and Acting Director of FinCEN Himamauli Das in their official capacities, alleging that the CTA's mandatory disclosure requirements exceed Congress' authority under Article I of the Constitution and violate the First, Fourth, Fifth, Ninth, and Tenth Amendments. (Doc. 1). The parties agreed that the case could be resolved on dispositive motions without discovery, so the parties cross-moved for summary judgment in early 2023, with the Government simultaneously moving to dismiss. (Docs. 23 & 24). In the following months, the parties and amici exchanged hundreds of pages of briefing, and oral argument on the parties' motions was held in November 2023.

*The Operation of the Corporate Transparency Act.* As always, "[o]ur analysis begins and ends with the text," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 572 U.S. 545, 553 (2014), and the text of the CTA is wide-ranging in scope. The CTA regulates "reporting company[ies]," defined as "corporation[s], limited liability company[ies], or other similar entit[ies]" that are either "(i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe, or (ii) formed under the law of a foreign country and registered to do business in the United States." 31 U.S.C. § 5336(a)(11)(A). The CTA exempts twenty-four kinds of entities from its reporting requirements, including banks, insurance companies, and entities with more than twenty employees, five million dollars in gross revenue, and a physical office in the United States. § 5336(a)(11)(B).

In total, FinCEN estimates that the CTA applies to 32.6 million currently existing entities and 5 million new entities formed each year from 2025 to 2034. Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. at, 59,549. The CTA requires these millions of entities to disclose the identity and information of any "beneficial owner." § 5336(b)(1)(A). A beneficial owner is defined as "an individual who . . . (i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity," with some exceptions for children, creditors, and a few others. § 5336(a)(3). The definition of

"substantial control" is as vague as it sounds—although it includes some clear categories like "senior officer[s]," FinCEN's regulations "clarify" that a person with substantial control also includes someone who "[h]as any other form of substantial control over the reporting company" besides those listed. 31 C.F.R. § 1010.380(d)(1)(i)(D).

For new entities incorporated from January 1, 2024, onward, the CTA requires them to disclose the identity and information of both Beneficial Owners and "Applicants," defined as "any individual who files an application to form a corporation, LLC, or other similar entity under the laws of a State or Indian Tribe; or registers [a foreign entity] to do business in the United States." 31 U.S.C. § 5336(a)(2).

Reporting entities must give FinCEN a Beneficial Owner or Applicant's full legal name, date of birth, current address, and identification number from a driver's license, ID card, or passport. § 5336(a)(1), (b)(2)(A). Under the final rule, reporting entities are also required to submit an image of the identifying document. 31 C.F.R. § 1010.380(b)(1)(ii)(E). If any of that information changes, the reporting company must update FinCEN, 31 U.S.C. § 5336(b)(1)(D), and FinCEN retains Applicant and Beneficial Owner information on an ongoing basis for at least five years after the reporting company terminates. § 5336(c)(1).

The CTA's disclosure requirements aren't toothless, either: knowing or willful violations carry serious civil and criminal penalties. A willful provision of false or fraudulent beneficial ownership information or failure to report "complete or updated beneficial ownership information to FinCEN" by "any person" is punishable by a $500 per day civil penalty and up to $10,000 in fines and 2 years in federal prison, § 5336(h)(1), (3)(A); a knowing and unauthorized disclosure or use of beneficial ownership information by "any person" is punishable by a $500 per day civil penalty, along with a $250,000 fine and 5 years in federal prison, § 5336(h)(2), (3)(B); and a knowing and unauthorized use or disclosure while violating another federal law "or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period" by "any person" is punishable with a $500,000 fine and 10 years in federal prison, § 5336(h)(3)(B)(ii)(II).

Crucially (at least for standing purposes), these severe penalties apply to individuals, not reporting entities. For starters, a disembodied corporate entity cannot be sentenced to federal prison. Beyond that, although the CTA does not define "person," it *does* define both "United States person" (§5336(a)(14)) and "Foreign person" (§5336(a)(7)) to include corporations, partnerships, and trusts, and uses those terms in other provisions. *See* § 5336(a)(11)(B)(xx). Yet the statute does not use those terms in its penalty provisions, so the statute can be read only to penalize individual beneficial owners and applicants, not reporting entities.

The ultimate result of this statutory scheme is that tens of millions of Americans must either disclose their personal information to FinCEN through State-registered entities, or risk years of prison time and thousands of dollars in civil and criminal fines.

## II.     Legal Standards

Although the Government requested summary judgment as an alternative to its motion to dismiss, summary judgment is the most appropriate means for resolving this case. The parties have waived discovery and agreed that this case can be "resolved through dispositive motions." (Doc. 16 at 3). Furthermore, when there are no genuine issues of material fact and "the only issues before the Court are pure questions of law," disposition of the case by summary judgment is particularly appropriate. *Maxim Crane Works, L.P. v. Zurich Am. Ins.,* 11 F.4th 345, 350 (5th Cir. 2021) (cleaned up); *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011) ("When the only question a court must decide is a question of law, summary judgment may be granted.").

Under Federal Rule of Civil Procedure 56(a), summary judgment is warranted if "there is no genuine dispute as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Because there are no disputed issues of fact here, the Court need only decide which parties are entitled to judgment as a matter of law.

## III.    Discussion

The Court's opinion is in two parts. First, the Court considers its own jurisdiction, looking mainly to the Plaintiffs' standing. Having found that Winkles is a regulated party and a member of the NSBA, and that the NSBA has associational standing as a result, the Court concludes that both Plaintiffs have standing to bring their constitutional claims.

With standing out of the way, the Court then addresses the Government's proffered justifications for the CTA's constitutionality—that the CTA falls within the ambit of the Commerce, Taxing, and Necessary and Proper Clauses, along with Congress' foreign affairs and national security powers. After a close look at each of these putative justifications, the Court concludes that the CTA is not authorized by the Constitution.

### A.    Standing

The first order of business is to make sure the Court has jurisdiction to decide the merits of this case. Article III, § 2 of the U.S. Constitution confines the federal judicial power to "cases" and "controversies," and an "essential and unchanging part of the case-or-controversy requirement of Article III" is the requirement that a plaintiff have standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To satisfy the "irreducible constitutional minimum of standing," *id.*, "a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly

traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008).

According to the Government, neither Plaintiff has standing to bring this suit: Winkles, it suggests, has failed to show a concrete and particularized injury, while NSBA has failed to support its claim to organizational, third-party, or associational standing. Neither argument is persuasive.

### 1.    Plaintiff Isaac Winkles

Winkles has standing to challenge the CTA's beneficial owner provisions because the compelled disclosure of Winkles' sensitive personal information to FinCEN is a concrete, imminent injury that is traceable to the government, and redressable by a favorable decision. The Government does not dispute that the CTA will require Winkles, as the beneficial owner of at least one reporting entity, to submit his beneficial owner status and information to FinCEN. As a result, because Winkles has "challeng[ed] the legality of government action" and is undisputedly the "object of the action," there is "little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561-62.

The Government disagrees. In its view, Winkles' injuries aren't traceable to the CTA or redressable by a favorable decision because he has already disclosed at least some of the required information while complying with other regulatory

requirements, like "tax returns, passport forms, and bank account applications."
(Doc. 24-1 at 19-20). The Government also argues that Winkles isn't injured by
disclosing government-provided information like a passport number to the
government. *Id.* at 20.

Yet federal subdivisions like FinCEN must still follow standard judicial
procedures to obtain even federally provided information without an express
authorization like the CTA's. And although the Government says that disclosure to
FinCEN is no big deal because it's "no secret" that Winkles is the beneficial owner
of at least one company, *id.*, the Government never explains why it needs to compel
Winkles to disclose beneficial owner information at all if that information is so easily
discovered by other means. After all, FinCEN already compels banks and other
financial institutions to obtain nearly identical information from State entity
customers and provide it to FinCEN. *See* 31 C.F.R. § 1010.230(a) (requiring
"covered financial institutions" to "identify and verify beneficial owners of legal
entity customers.").

The Government's standing arguments miss the mark for an additional reason:
the injury to Winkles is not disclosure itself, but disclosure to FinCEN, the Treasury
Department's criminal enforcement division. The mandatory disclosure of personal
information to FinCEN for law-enforcement purposes satisfies the injury
requirement for Winkles' First, Fourth, and Fifth Amendment claims, since courts

"accept as valid the merits of [the non-movant's] legal claims" for standing purposes when deciding a motion for summary judgment, *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022), and Winkles has alleged that the CTA requires disclosure of "sensitive personal information to FinCEN for law enforcement purposes." (Doc. 1 at 4); *see also id.* at 11 ("Winkles will be subject to the Act's reporting requirements to give his sensitive personal information to FinCEN."); and *id.* at 12-14, 21 (describing the injury as disclosure to FinCEN). Thus, the Court "must assume" that the CTA violates constitutional "right[s] we must assume [Winkles] has." *Cruz*, 596 U.S. at 298.

Winkles also has standing to challenge the CTA's applicant disclosure requirement. Because "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358, n.6 (1996), Winkles is obligated "to demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). In a pre-enforcement challenge like this one, the injury-in-fact requirement is met when the plaintiff "alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution" under that statute. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (internal quotation marks omitted).

Here, Winkles has submitted sworn testimony that he has "formed [other Alabama entities] in the past," and he "anticipate[s] forming other Alabama entities

over the next few years." (Doc. 39-3 at 2). Because the CTA would impose serious criminal penalties on Winkles for non-compliance with the CTA's applicant disclosure requirements, "it is not necessary that [Winkles] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). And because there is no doubt the CTA will be applied with its full force, "the plaintiffs' fear of prosecution [is] not imaginary or wholly speculative." *Susan B. Anthony List*, 573 U.S. at 160 (internal quotation marks omitted). As a result, Winkles has standing to challenge the CTA's applicant provisions because they present Winkles with a choice between compliance and felony prosecution. (Doc. 35-3 at 3) (Winkles' Affidavit: "[i]f I do not comply with these rules, I understand that I may face fines and even imprisonment.").

Finally, Winkles' standing to challenge the CTA's applicant and beneficial owner provisions on First, Fourth, and Fifth Amendment grounds gives him standing to challenge the CTA as a congressional overreach. Although "[i]ndividuals have no standing to complain simply that their Government is violating the law," Winkles "is a party to an otherwise justiciable case or controversy," and is therefore allowed "to object that [his] injury results from disregard of the federal structure of our Government." *Bond v. United States*, 564 U.S. 211, 225-26 (2011).

2.      **National Small Business Association**

The Government attacks NSBA's standing on three fronts, asserting that the NSBA lacks organizational, third party, and associational standing. When it comes to federal jurisdiction, however, standing on one leg is as good as standing on three. Because Winkles is a member of the NSBA and has standing as an individual, the NSBA has associational standing.

"An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right." *Georgia Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1203 (11th Cir. 2018). "[O]rganizations can assert the standing of their members." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). That said, organizations can't merely allege that a member has standing—instead, "an organization must make specific allegations establishing that at least one identified member has suffered or will suffer harm." *Georgia Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1203 (11th Cir. 2018) (cleaned up).

NSBA has done so here. Winkles has standing on his own and has been a dues-paying member of the NSBA since 2021. (Doc. 39-2 at 4; Doc. 39-3 at 2). Furthermore, "the interests at stake are germane to the [NSBA]'s purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't*

*Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). As a result, the NSBA has satisfied the requirements of associational standing.

Having determined that both Winkles and the NSBA have standing to challenge the CTA, the Court next considers whether Congress had the authority to enact it.

### B.      Constitutionality of the CTA

The powers of the federal government are expressly enumerated in the Constitution. *McCulloch v. Maryland,* 4 Wheat. 316, 405 (1819). To protect individual liberty, the Founders also drafted the Constitution to ensure "separation and independence of the coordinate branches of the Federal Government," which "prevent[s] the accumulation of excessive power in any one branch." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). Within the green pastures of its enumerated powers, however, Congress may frolic with "great latitude." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012).

Still, because enumeration itself "presupposes something not enumerated," Congress cannot range wherever it pleases. *Gibbons v. Ogden*, 9 Wheat. 1, 195 (1824). It's as simple as *expressio unius est exclusio alterius*: "The Constitution's express conferral of some powers makes clear that it does not grant others. And the federal government 'can exercise only the powers granted to it.'" *NFIB*, 567 U.S. at 534-35 (quoting *McCulloch*, 4 Wheat. at 405).

To be sure, a "[p]roper respect for a coordinate branch of the government requires that [a court] strike down an Act of Congress only if the lack of constitutional authority to pass the act in question is clearly demonstrated." *Id.* at 538 (cleaned up). But appropriate judicial deference to Congressional action ends at the borders of the Constitution, because "there can be no question that it is the responsibility of [the courts] to enforce the limits on federal power by striking down acts of Congress that transgress those limits." *Id.* After all, a law "beyond the power of Congress" is "no law at all." *Nigro v. United States*, 276 U.S. 332, 341 (1928).

The Government offers three sources of constitutional authority for Congress' enactment of the CTA. First, the Government argues that Congress has the power to enact the CTA under its foreign affairs powers. That is so, the Government says, because the political branches have plenary power to conduct foreign affairs, and Congress' motivating interest in curbing foreign money laundering and other malign foreign influences places the CTA under the aegis of those powers. Second, the Government argues that Congress has the power to enact the CTA via its Commerce Clause authority. Because many State entities engage in activities that qualify as or affect "commerce," the argument goes, the act of corporate formation itself is enough to invoke Congress' Commerce powers. Finally, the Government asserts that the CTA is a necessary and proper exercise of Congress' taxing power, since one

purpose of the FinCEN database created by the CTA is to assist in efficient tax administration.

### 1.      Foreign Affairs & National Security

The Government first turns to Congress' extensive powers over foreign affairs and national security and the Necessary and Proper Clause. The Government's theory is this: In enacting the CTA, "Congress concluded that collecting beneficial ownership information 'is needed to . . . protect vital Unite[d] States national security interests'; 'better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity'; and 'bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards.'" (Doc. 24-1 at 27) (quoting Pub. L. 116-283 § 6402(5)).

And because the Executive Branch agrees with Congress about the "necessity" of the CTA, says the Government, "there is a rational relationship between FinCEN's collecting limited beneficial ownership and applicant information and advancing the national security and foreign policy interests of the United States." *Id.* The Government also contends that the Court should defer to the political branches' policy determination that compliance with international financial standards is best achieved through the CTA, and that the CTA is within Congress' foreign affairs and national security powers because foreign parties use domestic

shell companies to harm the United States' interests. (Doc. 40 at 8). Not only that, but "the Court *must* defer to the political branches on these matters, not to advocacy groups or private citizens." *Id.* at 28 (emphasis added).

The Government is absolutely right to say that courts should defer to the political branches on matters of policy. As a matter of first principles, "[t]he conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918). This is so not only because foreign policy "should be undertaken only by those directly responsible to the people whose welfare they advance or imperil," but because "the Judiciary has neither aptitude, facilities nor responsibility" for those policies. *Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948). Thus, judicial deference to the political branches is most stringently required in the arena of foreign affairs.

All the same, the Court's "deference in matters of policy cannot . . . become abdication in matters of law," and its "respect for Congress's policy judgments thus can never extend so far as to disavow restraints on federal power that the Constitution carefully constructed." *NFIB*, 567 U.S. at 538. As already explained, "[o]ur constitution limits the government to those powers specifically granted or those that are necessary and proper to carry out the specifically granted ones." *Afroyim v. Rusk*, 387 U.S. 253, 257 (1967). Of course, Congress' foreign affairs

powers are different from its domestic powers in at least one important way: the enumerated powers limitation "is categorically true only in respect of our internal affairs." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 315-16 (1936).

In any event, Congress is bound by the Constitution's enumerated powers limitation here, because incorporation is an internal affair. It is blackletter law that "[c]orporations are creatures of state law." *Cort v. Ash*, 422 U.S. 66, 84 (1975), *abrogated on other grounds by Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 (1979). In fact, "[n]o principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987) (holding that federal securities law did not preempt state law regulating corporate takeovers).

At the Constitutional Convention of 1787, both James Madison and Thomas Pinkney proposed granting powers of incorporation to the federal government. 2 M. Farrand, *Records of the Federal Convention of 1787*, at 325 (1911). The defenders of these proposals made similar arguments to those the Government makes in defense of the CTA. James Wilson, for instance, claimed that federal incorporation was "necessary to prevent a State from obstructing the general welfare." *Id.* at 615. Even so, these proposals were rejected outright. *Id.* at 616. Although the Founders "were aware that leaving business regulation primarily to the individual states might cause friction within the overall American economy[, t]hey were more reluctant . . .

to allow concentrations of economic power, which they visualized as a government-sponsored monopoly, and therefore chose" to leave incorporation to the States. Allen D. Boyer, *Federalism and Corporation Law: Drawing the Line in State Takeover Regulation*, 47 Ohio St. L.J. 1037, 1041 (1986).

Apart from quasi-public corporations like the Tennessee Valley Authority and Amtrak (which were formed by acts of Congress), the Founders' deliberate choice to leave general incorporation to the States has gone unchanged, even at times when calls for federal incorporation were at a fever pitch and Congress was perhaps most willing to upset the balance of state and federal power. For instance, Congress rejected twenty bills to establish federal incorporation between 1903 and 1914 alone. *Id.* at 1049.

To be sure, the CTA is not a direct regulation of corporate formation. There are no preemption or commandeering concerns here, *contra* (Doc. 23-1 at 21 n.9), because the CTA does not establish general federal incorporation or force States to demand beneficial owner and applicant information as a filing requirement for incorporation; rather, the CTA is a federal reporting requirement imposed on entities that voluntarily incorporate. Thus, the operative question in light of "[t]he underlying assumptions of our dual form of government," *Kelly v. Robinson*, 479 U.S. 36, 49 n.11 (1986) (citation omitted), is whether Congress' Foreign Affairs powers justify the CTA's regulation of "creatures of state law," which are ordinarily

20

within the sovereign purview of the States. *Cort*, 422 U.S. at 84. In this case, the answer is no.

The Supreme Court's unanimous decision in *Bond v. United States* is instructive. 572 U.S. 844 (2014). In *Bond*, a woman inflicted "irritating" but ultimately harmless chemical burns on her husband's mistress. *Id.* at 861. For that, Bond was prosecuted and convicted for violating the Chemical Weapons Convention Implementation Act of 1998, which "ma[d]e it a federal crime for a person to use or possess any chemical weapon, and . . . punishe[d] violators with severe penalties." *Id.* at 848. The Chemical Weapons Act implemented the international Convention on Chemical Weapons "pursuant to the Federal Government's constitutionally enumerated power to make treaties." *Id.*

On appeal, the Supreme Court overturned Bond's conviction, ruling that the Chemical Weapons Act did not "reach purely local crimes." *Id.* at 860. Instead, the Court held that because "our constitutional structure leaves local criminal activity primarily to the States," courts "have generally declined to read federal law as intruding on that responsibility, unless Congress has clearly indicated that the law should have such reach." *Id.* at 848. Thus, absent a clear indication from Congress, the Court concluded that Congress' treaty powers did not extend to Bond's "unremarkable" and "purely local" offense. *Id.*

Although *Bond*'s central question was one of statutory (rather than Constitutional) interpretation, the logical parallels between *Bond* and this case are obvious. For starters, Congress' treaty and foreign affairs powers are closely related. And like local criminal law, corporate formation has always been the province of the States. So although the CTA does not directly interfere with or commandeer State incorporation practices, the CTA still "convert[s] an astonishing amount of traditionally local . . . conduct into a matter for federal enforcement, and involve[s] a substantial extension of federal police resources." *Id.* at 863 (internal quotation marks omitted).

The CTA also cannot be justified as necessary and proper to carry out Congress' foreign affairs powers. When Congress invokes the Necessary and Proper Clause, it must "involve[] exercises of authority derivative of, and in service to, a granted power." *NFIB*, 567 U.S. at 560. This is a showing the Government has failed to make. Instead, the Government seems to argue that regulation of purely internal affairs may be necessary and proper to effectuate Congress' foreign affairs powers if foreign actors (or enough foreign actors) participate in those internal affairs to illicit ends.

The Court can find little support in history or precedent for that position. The *only* support, in fact, seems to be the CTA's congressional findings, including the finding that "malign actors seek to conceal their ownership of [corporate] entities in

the United States to facilitate illicit activity, . . . harming the national security interests of the United States and allies of the United States." (Doc. 24-1 at 26-28) (quoting Pub. L. 116-283 § 6402(3)). The Government offers these findings as proof that the CTA is "rationally related to the implementation of a constitutionally enumerated power" and thus is a necessary and proper exercise of Congress' foreign affairs powers. *Id.* at 26 (citing *United States v. Comstock*, 560 U.S. 126, 134 (2010)). But the CTA's congressional findings are not enough to conclude that a regulation in the purely domestic arena of incorporation is an "exercise[] of authority derivative of, and in service to" Congress' foreign affairs powers, especially in light of the States' historically exclusive governance of incorporation. *NFIB*, 567 U.S. at 560.

The Government also asserts that the Necessary and Proper Clause "extends not only to Article I, § 8 powers, but to 'all other Powers vested by th[e] Constitution in the Government of the United States, or in any Department or Officer thereof,'" (Doc. 40 at 11) (citing U.S. Const. art. I, § 8, cl. 18), but never explains what "other Powers" it could invoke in the arena of foreign affairs to justify the CTA. Instead, the Government cites Congress' finding that the CTA is needed to "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards." (Doc. 24-1 at 27) (citing Pub. L. 116-283 § 6402(5)(E)).

Compliance with international standards may be good policy, but it is not enough to make the CTA "necessary" or "proper." As admirable as Congress' goals may be, this Court's only job is to consider whether the CTA follows the Constitution, not whether it is good policy. *See Lester v. United States*, 921 F.3d 1306, 1318 (11th Cir. 2019) (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)) (courts must "'say what the law is,' not what it should be."). The law is clear on this much: the Necessary and Proper Clause, "gives Congress authority to 'legislate on that vast mass of incidental powers which must be involved in the constitution,'" but "it does not license the exercise of any 'great substantive and independent power[s]' beyond those specifically enumerated." *NFIB*, 567 U.S. at 559 (quoting *McCulloch*, 4 Wheat. at 411, 421).

The Government's reading of the Necessary and Proper Clause is far afield from that principle. It would sanction almost any exercise of Congressional power given the existence of a relevant international standard. Read that way, the Necessary and Proper Clause would give Congress carte blanche to do as it pleases, allowing it to "reach beyond the natural limit of its authority and draw within its regulatory scope those who otherwise would be outside of it." *NFIB*, 567 U.S. at 560; *see also Bond*, 572 U.S. at 877-78 (Scalia, J., concurring) (reasoning that Congress' general foreign affairs powers cannot "come[] with no implied subject matter limitations,"

otherwise "the possibilities of what the Federal Government may accomplish, with the right [international standard] in hand, are endless and hardly farfetched.").

Given the limits on Congress' authority under the Necessary and Proper Clause, *Bond* yields an unavoidable conclusion: the CTA is not authorized by Congress' foreign affairs powers, because those powers do not extend to purely internal affairs, especially in an arena traditionally left to the States. Nor can Congress look to international standards or agreements to extend those powers, no matter how praiseworthy the policy goal, because "no agreement with a foreign nation," formal or informal, "can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution." *Reid v. Covert*, 354 U.S. 1, 16 (1957). As a result, this Court must look somewhere other than Congress' foreign policy powers to justify the CTA.

### 2.    Commerce Clause

The Government also says that the CTA is within Congress' power under the Commerce Clause and the Necessary and Proper Clause. In relevant part, the Constitution gives Congress the "Power . . . To regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. As for the power to regulate foreign commerce, "jurisprudence addressing Congress's positive Foreign Commerce Clause power is sparse," and "the Supreme Court has never clearly articulated the bounds of the positive foreign commerce power." *United*

25

*States v. Davila-Mendoza*, 972 F.3d 1264, 1270 (11th Cir. 2020). That said, the Court "assume[s], without deciding, that the Foreign Commerce Clause has the same scope as the Interstate Commerce Clause," *id.* at 1271, so the analysis is identical.

Although "the path of" Commerce Clause jurisprudence "has not always run smooth . . . it is now well established that Congress has broad authority under the Clause." *NFIB*, 567 U.S. at 549. The Supreme Court has identified "three broad categories of activity that Congress may regulate under its commerce power." *United States v. Morrison*, 529 U.S. 598, 608 (2000).

In the Government's view, the CTA's regulations fit squarely within all three categories:  (1) the channels of interstate and foreign commerce,  (2) the instrumentalities of, and things and persons in, interstate and foreign commerce, and (3) activities that have a substantial effect on interstate and foreign commerce. (Doc. 24-1 at 28); *see Morrison*, 529 U.S. at 609. For brevity's sake, and in line with the Government's arguments, the Court addresses the channels and instrumentalities of commerce as a single category.

a)    ***Channels and Instrumentalities of Commerce***

First, the Government says the CTA is a valid regulation of the channels and instrumentalities of commerce because "[b]oth the record and common sense indicate that entities constituting CTA reporting companies frequently utilize the

channels of interstate commerce." (Doc. 24-1 at 33). Yet this argument can't be reconciled with the plain text of the CTA.

It is "well-settled" that Congress has the power to regulate "those who use the channels of interstate commerce in order that those channels will not become the means of promoting or spreading evil, whether of a physical, moral or economic nature." *United States v. Orito*, 413 U.S. 139, 144 (1973). The channels of commerce are "interstate transportation routes through which persons and goods move." *United States v. Ballinger*, 395 F.3d 1218, 1225 (11th Cir. 2005) (quoting *Morrison*, 529 U.S. at 613 n.5). These transportation routes "include highways, railroads, navigable waters, and airspace, as well as telecommunications networks, and national securities markets." *Id.* at 1225-26 (cleaned up and collecting cases).

Congress can also "regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558 (1995). Unlike channels of commerce, instrumentalities of commerce make the conduct of interstate commerce possible—typically "the people and things themselves moving in commerce, including automobiles, airplanes, boats, and shipments of goods," along with "pagers, telephones, and mobile phones." *Ballinger*, 395 F.3d at 1226 (cleaned up and collecting cases).

The plain text of the CTA does not regulate the channels and instrumentalities of commerce, let alone commercial or economic activity. The CTA applies to

"reporting companies," defined (with a list of exceptions) as entities "created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11). The CTA then mandates that those entities report information about their beneficial owners and applicants to FinCEN. *Id. §* 5336(b)(1)-(2)(A). The word "commerce," or references to any channel or instrumentality of commerce, are nowhere to be found in the CTA. *See* 31 U.S.C. § 5336.

The Government points to the Supreme Court's decisions in *California Bankers Ass'n v. Shultz* and *American Power & Light Co. v. Sec. & Exch. Comm'n* to prove that reporting entities "frequently use the channels of commerce[, so] Congress can impose conditions on that use." (Doc. 40 at 13). The Government reads those cases too broadly.

In *Shultz*, banks and bank customers sought to enjoin the enforcement of reporting and record keeping requirements authorized by the Bank Secrecy Act and promulgated by the Treasury Department. *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 25-26 (1974). First, the *Shultz* plaintiffs challenged the Treasury Department's requirement that banks maintain copies of each check for more than $100, as well as "extension[s] of credit in an amount exceeding $5,000 except those secured by

interest in real property," as well as any "advice, request, or instruction . . . regarding the transfer of funds, currency, or other money or credit in amounts exceeding $10,000 to a person, account, or place outside the United States." *Id.* at 34.

Second, the *Shultz* plaintiffs challenged the BSA's requirement that "anyone connected with the transportation into or out of the country of monetary instruments exceeding $5,000 on any one occasion" must report the transaction. In tandem, they also challenged the BSA's grant of authority to the Treasury Secretary "to prescribe regulations requiring residents and citizens of the United States, as well as nonresidents in the United States and doing business therein, to maintain records and file reports with respect to their transactions and relationships with foreign financial agencies." *Id.* at 36-37.

Third, the *Shultz* plaintiffs challenged the Treasury Secretary's requirement "that financial institutions file" a report "for each deposit, withdrawal, exchange of currency, or other payment or transfer 'which involves a transaction in currency of more than $10,000.'" *Id.* at 39.

*Shultz* is not on point for two reasons. First, *Shultz* did not address Congress' constitutional authority to enact the Bank Secrecy Act, only "the Act's asserted violation of specific constitutional prohibitions," the First, Fourth, and Fifth Amendments. *Id.* at 30, 44. Second, *Shultz* also illustrates the CTA's over-

inclusiveness problem: unlike the challenged disclosure requirements in *Shultz*, the CTA regulates most State entities, not just entities that move in commerce.

The reporting and record-keeping requirements at issue in *Shultz* were upheld largely because they governed negotiable instruments and money *actually* moving in foreign and interstate commerce. As the *Shultz* Court concluded, Congress "was not limited to any one particular approach to effectuate its concern that negotiable instruments moving in the channels of [interstate] commerce were significantly aiding criminal enterprise." *Id.* at 46. Further, the BSA's requirements were imposed on banks, not bank customers, because "Congress recognized that the use of financial institutions, both domestic and foreign, in furtherance of activities designed to evade the regulatory mechanisms of the United States, had markedly increased." *Id.* at 38.

In sum, *Shultz* doesn't stand for the principle that Congress may regulate an entire class whenever some sub-class engages in commerce; *Shultz* affirms that Congress may regulate a class's use of the channels and instrumentalities of commerce based on the activities of a sub-class. That is why Congress "could have made the transmission of the proceeds of any criminal activity by negotiable instruments *in interstate or foreign commerce* a separate criminal offense . . . [or] required that each individual engaging in the sending of negotiable instruments

*through the channels of commerce* maintain a record of such action." *Id.* at 47 (emphasis added). But that is as far as *Shultz* goes.

*American Power & Light Co. v. Sec. & Exch. Comm'n* further proves the point. 329 U.S. 90 (1946). There, two public utility holding companies challenged congressional authority to enact the Public Utility Holding Act, which authorized the Securities and Exchange Commission to require holding companies and their subsidiaries to ensure that their structure "d[id] not unduly or unnecessarily complicate the structure, or unfairly or inequitably distribute voting power among security holders." *Id.* at 97. Both plaintiffs in *American Power & Light* were part of the same corporate structure, composed of an umbrella corporation, five sub-holding companies (including the plaintiffs), and 237 "direct and indirect subsidiaries." *Id.* at 95-96. This "vast system embrace[d] utility properties in no fewer than 32 states from New Jersey to Oregon and from Minnesota to Florida, as well as in 12 foreign countries." *Id.* at 98.

The Supreme Court affirmed the constitutionality of the act, noting first that the challenged statute was "directed solely to public utility holding company systems that use[d] the channels of interstate commerce." 329 U.S. at 100. The Court held that:

> Congress, of course, has undoubted power under the commerce clause to impose relevant conditions and requirements *on those who use the channels of interstate commerce* so that those channels will not be conduits for promoting or perpetuating economic evils. Thus *to the*

> *extent that corporate business is transacted through such channels*, affecting commerce in more states than one, Congress may act directly with respect to that business to protect what it conceives to be the national welfare. It may prescribe appropriate regulations and determine the conditions under which that business may be pursued.

*Id.* at 99-100 (emphasis added) (citations omitted).

Thus, the Government misses the mark when it argues that the Commerce Clause allows Congress to regulate an entire class just because *some* members of the class use the channels and instrumentalities of commerce. The shared principle between *Shultz* and *American Power & Light Co.* is that Congress may "regulate the channels and instrumentalities of commerce . . . to prohibit their use for harmful purposes, even if the targeted harm itself occurs outside the flow of commerce and is purely local in nature." *United States v. Ballinger*, 395 F.3d 1218, 1226 (11th Cir. 2005) (affirming Congressional power to prohibit destruction of religious property "in or affect[ing] interstate or foreign commerce."). The Commerce Clause thus allows Congress to regulate "commerce to the extent of forbidding and punishing the use of such commerce," but no further. *Brooks v. United States*, 267 U.S. 432, 436 (1925) (emphasis added).

These cases also illustrate how easily Congress could have written the CTA to pass constitutional muster. For instance, nothing in *Shultz* or *American Power & Light Co.* would bar Congress from imposing the CTA's disclosure requirements on State entities as soon as they engaged in commerce, or from prohibiting the use of

interstate commerce to launder money, "evade taxes, hide . . . illicit wealth, and defraud employees and customers." Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. at 59,501. Indeed, Congress has already done so in countless other statutes. *See, e.g.*, 18 U.S.C. § 1343 (criminalizing the communication of information "in interstate or foreign commerce" for the purpose of wire fraud).

But that is not what the CTA does. Because the CTA doesn't regulate the channels and instrumentalities of commerce or prevent their use for a specific purpose, it cannot be justified as a valid regulation of those channels and instrumentalities.

### b)      *Substantial effect on Interstate and Foreign Commerce*

The Government also says that the CTA is within Congress' commerce power because "Congress rationally concluded that the ability of certain legal entities to withhold beneficial ownership and applicant information, taken in the aggregate, substantially affects interstate commerce." (Doc. 24-1 at 29) (cleaned up). Indeed, Congress has broad Commerce Clause power "extend[ing] to activities that have a substantial effect on interstate commerce," including "activities that do so only when aggregated with similar activities of others." *NFIB*, 567 U.S. at 549 (internal quotation marks omitted).

In brief, this "substantial effects" doctrine allows Congress to regulate purely intrastate, non-economic activity that (1) has a substantial effect on interstate commerce in the aggregate, when (2) the regulation is in the service of a comprehensive statute that regulates commercial activity on its face, and (3) regulation of the non-economic, non-commercial activity is necessary to make the broader regulation effective. Yet even under this expansive doctrine, the Commerce Clause does not extend far enough to sanction the CTA.

First, the *future* activities of state entities are not enough to invoke Congress' "substantial effects" commerce powers. Even a near certainty of future conduct is insufficient—"[t]he Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions." *NFIB*, 567 U.S. at 557. Congress may "anticipate the effects on commerce of an economic activity," but it has never been "permitted . . . to anticipate that activity itself in order to regulate individuals not currently engaged in commerce." *NFIB*, 567 U.S. at 549. The Supreme Court's commerce-clause jurisprudence has always "involved preexisting economic activity." *Id.*

If future activities are off the table, a substantial effects justification for the CTA is limited to two possibilities: either (1) entity formation itself is a commercial activity that substantially affects interstate commerce, or (2) the fact that "many entities subject to the CTA *do engage* in interstate commercial activity" is enough

34

to extend the Commerce power to a regulation of incorporated entities. (Doc. 24-1 at 30) (emphasis added). The Government wisely hangs its hat on the latter option and concedes that "[i]t is the activities of these entities, not the mere fact that they submitted documents to a Secretary of State, that implicates the Commerce Clause and permits Congress to exercise its authority." (Doc. 40 at 12).

That brings us to the central question: Does Congress have authority under the Commerce Clause to regulate non-commercial, intrastate activity when "certain entities, which have availed themselves of States' incorporation laws, use the channels of commerce, and their anonymous operations substantially affect interstate and foreign commerce?" (Doc. 40 at 11). The Supreme Court's Commerce Clause decisions all point to the same conclusion: No.

For starters, "the most telling indication of [a] severe constitutional problem . . . is the lack of historical precedent' for Congress's action." *NFIB*, 567 U.S. at 549. The Court cannot find, and the parties have not identified, any other State or federal law like the CTA. The Government correctly points out that Congress routinely requires entities to submit information to the government without a suspicion of wrongdoing, but the cases it cites in support are not on point. (Doc. 40 at 11) (citing *Helvering v. Mitchell*, 303 U.S. 393, 399 (1938) (upholding statute criminalizing tax evasion as an exercise of Congress' enumerated taxing power); and *Elec. Bond & Share Co. v. SEC*, 303 U.S. 419, 432-33, 437 (upholding public utility holding

company regulation where petitioners conceded that their corporate structure and operations "involve[d] continuous and extensive use of the mails and instrumentalities of interstate commerce.")).

Furthermore, "[i]n addition to being a historical anomaly," *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2202 (2020), the CTA runs into trouble because it is not a facial regulation of commercial activity, a hallmark of valid substantial effects legislation. *United States v. Morrison*, 529 U.S. 598, 613 (2000). As already noted, the Government concedes that "submitt[ing] documents to a Secretary of State" does not "implicate[] the Commerce Clause." (Doc. 40 at 12). Thus, the Government's real argument is that the connection between the act of incorporation and the activities Congress sought to curb through the CTA is strong enough to "permit[] Congress to exercise its authority." *Id.* But the connection between incorporation and criminal activity is far too attenuated to justify the CTA. Indeed, if such an attenuated connection were enough, Congress' commerce powers would be functionally limitless.

The Supreme Court's decision in *United States v. Morrison* is helpful on this point: Congress, it said, can validly regulate intrastate activity where the regulated activity is "economic in nature." *Morrison*, 529 U.S. at 613. The *Morrison* Court considered a challenge to a provision of the Violence Against Women Act that "provide[d] a federal civil remedy for the victims of gender-motivated violence"

without requiring "a prior criminal complaint, prosecution, or conviction to establish the elements of a cause of action." *Morrison*, 529 U.S. at 601-02, 606 (2000).

In defense of the law, the government asserted that it fell within Congress' substantial effects commerce power, arguing that "gender-motivated violence affect[ed] interstate commerce by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; [and] by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products." *Morrison*, 529 U.S. at 615 (cleaned up).

The *Morrison* Court rejected the government's substantial effects justification, in large part because "the but-for causal chain from the initial occurrence of violent crime . . . to every attenuated effect upon interstate commerce" would expand Congress' power far beyond constitutional boundaries. *Id.* The chief indicator of this excessive attenuation was that "[i]f accepted, [the government's] reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption." *Id.*

The *Morrison* Court also observed that although there is no "categorical rule against aggregating the effects of any noneconomic activity in order to decide these cases," the Supreme Court has "upheld Commerce Clause regulation of intrastate

activity only where that activity is economic in nature." *Id.* at 613. And because

"[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic

activity," the Court concluded that aggregation of effects was not permissible. *Id.*

Finally, as the Supreme Court later explained, the cause of action created by

the Violence Against Women Act at issue in *Morrison* was "unconstitutional

because . . . it did not regulate economic activity." *Raich*, 545 U.S. 1, 25

(distinguishing *Morrison*). *Morrison* thus established a "clear pattern of analysis"

for Commerce Clause cases: "Where economic activity substantially affects

interstate commerce, legislation regulating that activity will be sustained." *Id.*

In *Gonzalez v. Raich*, the Supreme Court applied *Morrison*'s "clear pattern of

analysis" in upholding the federal regulation of purely intrastate manufacturing and

possession of marijuana. *Id.* In *Raich*, individuals who used medical marijuana,

which was legal under California law, challenged the enforcement of the Controlled

Substances Act after federal agents destroyed a plaintiff's personal cannabis plants.

*Id.* at 6-7. Among other things, the *Raich* plaintiffs challenged the CSA as a violation

of the Commerce Clause "to the extent it prevent[ed] them from possessing,

obtaining, or manufacturing cannabis for their personal medical use." *Id.*

Unlike the Plaintiffs here, the *Raich* plaintiffs did "not dispute that passage of

the CSA, as part of the Comprehensive Drug Abuse Prevention and Control Act,

was well within Congress' commerce power." *Id.* at 15. Instead, they asserted a

"limited," as-applied claim that "the CSA's categorical prohibition of the manufacture and possession of marijuana as applied to the intrastate manufacture and possession of marijuana for medical purposes pursuant to California law exceeds Congress' authority under the Commerce Clause." *Id.*

On those narrow grounds, the *Raich* Court held that the CSA was a valid exercise of Congress' commerce power because, unlike the domestic violence at issue in *Morrison*, growing marijuana even in small amounts was a "quintessentially economic" activity, defined as "the production, distribution, and consumption of commodities." *Id.* at 25-26 (citation omitted). Thus, "[b]ecause the CSA . . . directly regulate[d] economic, commercial activity . . . *Morrison* cast[] no doubt on its constitutionality." *Id.* at 26.

Leaning on the legislative purpose of the CTA, the Government asserts that *Raich* governs here because Congress similarly sought to regulate "quintessentially economic" activities through the CTA. (Doc. 24-1 at 31). Such activities include the "use [of] shell companies to evade taxes, hide . . . illicit wealth, and defraud employees and customers," as well as money laundering. Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. at 59,501. The Court agrees that "it is difficult to imagine a more obviously commercial activity than engaging in financial transactions involving the profits of unlawful activity." *United States v. Goodwin*, 141 F.3d 394, 399 (2d Cir. 1997).

Even so, the Government has conceded that the act of incorporation is not enough to invoke the Commerce power, so it runs into the same problem here as it does elsewhere—the plain text of the CTA does not regulate the quintessentially economic activities the Government asserts or require entities to engage in those activities to be regulated. As repeatedly shown, incorporation is "in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Lopez*, 514 U.S. at 567.

Here, as in *Morrison*, "the but-for causal chain from" incorporation "to every attenuated effect upon interstate commerce" is too attenuated to be justified under the Commerce Clause. *Morrison*, 529 U.S. at 615. Courts may not "pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567. Thus, "[n]o matter how inherently integrated" corporate formation is with the activities of those entities, "they are not the same thing: They involve different transactions, entered into at different times, with different" parties. *NFIB*, 567 U.S. at 558 (internal quotation marks omitted). Because "[t]he proximity and degree of connection between" the formation of an entity and its activities is too attenuated, "[s]uch a law cannot be sustained under a clause authorizing Congress to 'regulate Commerce.'" *Id.*; *see also Morrison*, 529 U.S. at 616 n.6 (noting that "the but-for causal chain must have its limits in the Commerce

Clause area"). Indeed, such a permissive "view of causation . . . would obliterate the distinction between what is national and what is local in the activities of commerce." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 554 (1935).

The Government also justifies the CTA as a "general regulatory statute bearing a substantial relation to commerce." (Doc. 40 at 11-12) (citing *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1273 (11th Cir. 2007)). It is true that Congress has "substantial leeway to regulate purely intrastate activity (whether economic or not) that it deems to have the capability, in the aggregate, of frustrating the broader regulation of interstate economic activity." *United States v. Maxwell*, 446 F.3d 1210, 1215 (11th Cir. 2006). Congress' "substantial leeway" includes the "aggregation of economic effects . . . where the federal action in question is 'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.'" *Alabama-Tombigbee Rivers Coal.*, 477 F.3d at 1272 (quoting *Lopez*, 514 U.S. at 561).

There are three problems with this argument. First, the "comprehensive regulatory scheme" framework does not apply to a "single-subject statute whose single subject is itself non-economic." *Maxwell*, 446 F.3d at 1216 n.6 (noting that appellant was "challeng[ing] a component of a broader regulatory scheme whose subject [was] decidedly economic."). The CTA is just such a statute. As already

shown, it is not enough that some sub-class of entities engage in illicit, commercial, or economic activity. Nor are legislative statements that the CTA is a "comprehensive bipartisan reform of . . . anti-money laundering laws" enough to make it so. (Doc. 24-1 at 30-31) (quoting 166 Cong. Rec. S7289, S7309 (Dec. 9, 2020) (statement of Sen. Brown)).

Rather, unlike a "constitutionally 'comprehensive'" statute that "regulate[s] an entire market for a commodity," the CTA regulates entities, owners, and applicants that incorporate an entity with their state, an "isolated, discrete act[]" like the statutes "that were the subject of regulation in *Lopez* and *Morrison*." *Maxwell*, 466 F.3d at 1217 n.7. In other words, incorporation is a single, discrete action far closer to "possession of a gun in a school zone or gender-motivated violence" than a general regulation of controlled substances. *Id.* at 1216 n.6.

Second, the Government's argument misses that the "essential part of a larger regulation" analysis typically comes into play when assessing whether an exercise of the Commerce power is necessary and proper, not whether the exercise itself is within Congress' Commerce power. *See NFIB*, 567 U.S. at 558-59 (treating the Commerce Clause and Necessary and Proper Clause analyses as distinct inquiries). The "comprehensive regulatory scheme" analysis "poses a problem for . . . as-applied challenge[s], because when a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under

that statute is of no consequence." *Alabama-Tombigbee Rivers Coal.*, 477 F.3d at 1272 (quotation marks omitted). But the Government's argument fails to explain how this principle applies in the context of the facial challenge here, besides its repeated assertions that Congress need only use means that are "rationally related" to its commerce power. (Doc. 24-1 at 26) (citing *Comstock*, 560 U.S. at 134).

Once again, these arguments simply do not address the fact that the CTA does not regulate economic or commercial activity on its face. More than that, the Government's core cases on this point all involve statutes that did facially regulate commerce. *See, e.g.*, *Raich*, 545 U.S. at 15 (noting that there was no "dispute that passage of the CSA . . . was well within Congress' commerce power."); *Maxwell*, 446 F.3d at 1212 (rejecting as-applied challenge to 18 U.S.C. § 2252A(a)(5)(B), which prohibits possession or access to child pornography that is "transported [or produced] using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means").

Third, the Government's argument that the CTA is necessary and proper to carry out a legitimate exercise of Congress' commerce powers fails because the CTA is far from essential. *Alabama-Tombigbee Rivers Coal.*, 477 F.3d at 1272. FinCEN's 2016 Customer Due Diligence rule requires "covered financial institutions" to "identify and verify beneficial owners of legal entity customers." 31 C.F.R. § 1010.230(a). And how does the CDD rule define a "legal entity customer?" As "a

corporation, limited liability company, or other entity that is created by the filing of a public document with a Secretary of State or similar office, a general partnership, and any similar entity formed under the laws of a foreign jurisdiction that opens an account," unless the entity fits into one of sixteen exemptions, eight fewer than the CTA. *Id.* § 1010.230(e)(1)-(2).

The CDD rule defines beneficial owner broadly as well: "Each individual . . . who owns, directly or indirectly, 25 percent or more" of the entity; has "significant responsibility to control, manage, or direct a legal entity," including "a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, or Treasurer)" and "[a]ny other individual who regularly performs similar functions." *Id.* § 1010.230(d)(1)-(2).

To be clear, FinCEN's CDD rule and the CTA provide FinCEN with nearly identical information, but the CDD rule does so in a constitutionally acceptable manner. *See Shultz*, 416 U.S. at 49 (approving similar bank record-keeping requirements). Even the CTA itself acknowledges the similarity. *See* 31 U.S.C. § 5336(b)(1)(F) (requiring the Secretary of the Treasury to promulgate regulations that "collect [beneficial owner and applicant] information . . . in a form and manner that ensures the information is highly useful in . . . confirming beneficial ownership information provided to financial institutions." (emphasis added); *see also* Pub. L.

116-283 § 6402 (6)(B) "It is the sense of Congress that . . . [collection of] beneficial ownership information . . . [will] confirm beneficial ownership information provided to financial institutions.").

Even at the outer limits of the Necessary and Proper Clause, the practical similarities between these two regulations make it hard to justify a conclusion that "failure to regulate" corporate entities upon formation would "leave a gaping hole" in Congress' fight against illicit corporate activity and money laundering. *Raich*, 545 U.S. at 22; *cf. NFIB*, 567 U.S. at 619 (Ginsburg, J., concurring in part) (reasoning that the ACA's individual insurance mandate was necessary and proper because "[w]ithout the individual mandate . . . guaranteed-issue and community-rating requirements would trigger an adverse-selection death spiral in the health-insurance market").

Finally, as our analysis began with the text, so too does it end with it. *Octane Fitness*, 572 U.S. at 553. And the text of the CTA is missing a crucial component of valid substantial effects legislation: it "has no express jurisdictional element which might limit its reach to a discrete set of [activities] that additionally have an explicit connection with or effect on interstate commerce." *Lopez*, 514 U.S. at 562; *see also* 31 U.S.C. § 5336. The inclusion of a jurisdictional hook is standard operating procedure for Commerce Clause legislation for good reason—it "precludes any serious challenge to the constitutionality of [a] statute as beyond the Commerce

power, because it guarantees 'a legitimate nexus with interstate commerce.'"
*Goodwin*, 141 F.3d at 400 (quoting *Lopez*, 514 U.S. at 561).

The absence of a jurisdictional hook from the CTA is even more mystifying because Congress knows how to include one when it wants to. So commonplace are these jurisdictional phrases that, for purposes of statutory interpretation, courts assume that "Congress uses different modifiers to the word 'commerce' in the design and enactment of its statutes." *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001). When Congress legislates pursuant to its Commerce Clause authority, "[t]he phrase 'affecting commerce' indicates Congress' intent to regulate to the outer limits of its authority under the Commerce Clause," while "the general words 'in commerce' and the specific phrase 'engaged in commerce' are understood to have a more limited reach." *Id.*

There are many examples of this principle, including a recent Eleventh Circuit case which upheld 18 U.S.C. § 231(a)(3), a statute "which prohibits impeding law enforcement officers during a civil disorder affecting interstate commerce." *United States v. Pugh*, 90 F.4th 1318 (11th Cir. 2024). Other examples abound—for instance, Congress has set wage and hour requirements for "[e]nterprise[s] engaged in commerce or in the production of goods for commerce," 29 U.S.C. § 203(s)(1), and imposed registration requirements on "any person engaged in the business of manufacturing gambling devices, if the activities of such business in any way affect

46

interstate or foreign commerce." 15 U.S.C. § 1173(a); *see also Ballinger*, 395 F.3d at 1229 (collecting statutes).

Faced with the loud silence of the text, the Government argues that Congress *meant* to regulate interstate and foreign commerce in the CTA: "The CTA is authorized based on the undisputed facts that certain entities, which have availed themselves of States' incorporation laws, use the channels of commerce, and their anonymous operations substantially affect interstate and foreign commerce." (Doc. 40 at 11); *see also id.* (citing to Congressional findings and legislative history); and (Doc. 24-1 at 29) (citing Congressional findings that the "collection of beneficial ownership information is needed to protect interstate commerce.") (cleaned up).

In any event, what Congress intended to do is not the Court's animating concern, because "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). Of course, the presumption that Congressional action is constitutional gives the CTA a significant head start. *United States v. Ruggiero*, 791 F.3d 1281, 1284 (11th Cir. 2015). And yet even with that head start, "the most formidable argument[s] concerning the statute's purposes c[an] not overcome the clarity [found] in the statute's text." *Kloeckner v. Solis*, 568 U.S. 41, 55 n.4 (2012). Congress, for good or ill, "says in a statute what it means and means in a statute what it says." *Carcieri v. Salazar*, 555 U.S. 379, 392 (2009).

47

As for appeals to congressional findings, "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation. Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Morrison*, 529 U.S. at 614 (cleaned up). On the contrary, "[w]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court." *Lopez*, 514 U.S. at 557 n.2, (alteration in original) (quoting *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S., 241, 273 (Black, J., concurring)). And congressional findings lose their weight in the face of the Government's failure to articulate limiting principles for its Commerce Clause arguments, which makes "the concern . . . that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seem[] well founded." *Morrison*, 529 U.S. at 615. As a result, "Congress' findings are substantially weakened by the fact that they rely so heavily on a method of reasoning that [courts] have already rejected as unworkable if we are to maintain the Constitution's enumeration of powers." *Id.*

All the same, maybe Congress' omission of a jurisdictional hook from the CTA was just inartful drafting. No matter, "it is beyond [the Court's] province to rescue Congress from its drafting errors, and to provide for what we might think is

the preferred result." *Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004) (cleaned up); *see also Arizona v. Mayorkas,* 143 S. Ct. 478, 479 (2022) (Gorsuch, J., dissenting) (observing that federal courts are "court[s] of law, not policymakers of last resort."). Because "[i]t is emphatically the province and duty of" this Court to interpret the law, not write it, the Court cannot amend the CTA to include a jurisdictional hook. *Marbury*, 5 U.S. at 177. Only Congress can do that.

Because the CTA does not regulate commerce on its face, contain a jurisdictional hook, or serve as an essential part of a comprehensive regulatory scheme, it falls outside Congress' power to regulate non-commercial, intrastate activity.

## C.    Taxing Power & Necessary and Proper Clause

The Court turns finally to the Government's argument that the CTA is justified by Congress' taxing power and the Necessary and Proper Clause.

The Government first argues that Plaintiffs have conceded the CTA may be a proper application of Congress' taxing power, and so their facial challenge must fail. (Doc. 40 at 14) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). That is a misreading of Plaintiffs' brief, which said that "[i]f Congress were to limit use and access of the FinCEN database to tax collection purposes, it might be justified under the Necessary and Proper Clause as rationally related to the Taxing Power." (Doc. 39

49

at 21). That statement does not amount to a concession that the CTA might actually be a valid exercise of the taxing power.

Moving on, the Plaintiffs do not dispute Congress' power to levy taxes. *See* U.S. Const. Art. I, § 8, cl. 1; amend. XVI. And although the CTA's civil penalties, like all civil penalties, "yield[] the essential feature of any tax" by "produc[ing] at least some revenue for the Government," the Government does not claim that the CTA's civil penalties are a tax. *NFIB*, 567 U.S. at 564. Nor could it, since revenue production is necessary but not sufficient to qualify a government action as a tax. Under *NFIB*'s "functional approach," the CTA's civil penalties are not a tax: they are not paid into the Treasury and have no income thresholds; the penalty amounts are fixed rather than variable; the penalties are not "found in the Internal Revenue Code and enforced by the IRS"; and the penalties are imposed only on those who "knowingly" or "willfully" violate the law, and "[s]uch scienter requirements are typical of punitive statutes," not taxes. *Id.* at 564-66.

Instead, the Government posits that "the collection of beneficial ownership information is necessary and proper to ensure taxable income is appropriately reported," and that Congress recognized this relationship by "draft[ing] the CTA to allow '[o]fficers and employees of the Department of the Treasury [to] obtain access to beneficial ownership information for tax administration purposes[.]'" (Doc. 24-1 at 36-37) (quoting 31 U.S.C. § 5336(c)(5)(B)). In other words, the CTA's

regulations are constitutional because they are sufficiently "incidental" to the taxing power. *McCulloch*, 4 Wheat. at 418.

Although the relationship between disclosure provisions and the taxing power is "well recognized," (Doc. 40 at 15), the cases relied on by the Government illustrate that providing access to the CTA's database for tax administration purposes is not enough to establish a sufficiently close relationship here. *See Helvering*, 303 U.S. at 399 (noting that tax return disclosure requirements are an exercise of the taxing power itself); *Kramer*, 2008 WL 313827, at *3 (holding that a federal occupational tax and registration requirement for gun manufacturers, dealers, and importers was a "legitimate exercise[] of Congress' taxation power").

As previously discussed, the Necessary and Proper Clause will not justify an act of Congress unless it "involve[s] exercises of authority derivative of, and in service to, a granted power." *NFIB*, 567 U.S. at 560. Thus, Congress' broad authority under the Necessary and Proper Clause depends on the force and vigor of Congress' enumerated powers for its existence. Put plainly, "[w]hen the inquiry is whether a federal law has sufficient links to an enumerated power to be within the scope of federal authority, the analysis depends not on the number of links in the congressional-power chain but on the strength of the chain." *Comstock*, 560 U.S. at 150 (Kennedy, J., concurring); *but see* Randy E. Barnett, *The Original Meaning of the Necessary and Proper Clause*, 6 U. PA. J. CONST. L. 183, 186 (2003) (stating that

the Founders believed the Clause "did not go 'a single step beyond the delegated powers.'").

The chain here is weak indeed. It would be a "substantial expansion of federal authority" to permit Congress to bring its taxing power to bear just by collecting "useful" data and allowing tax-enforcement officials access to that data. *NFIB*, 567 U.S. at 560. Read that way, the Necessary and Proper Clause would sanction any law that provided for the collection of information useful for tax administration and provided tax officials with access. All Congress would have to do to craft a constitutional law is simply impose a disclosure requirement and give tax officials access to the information.

That kind of unfettered legislative power "is in no way an authority that is 'narrow in scope,' or 'incidental' to the exercise of the commerce power." *Id.* (citations omitted). Thus, "even if" the CTA's provisions were "necessary," "such an expansion of federal power is not a 'proper' means for making those [policy goals] effective." *Id.*

## IV.   CONCLUSION

The Corporate Transparency Act is unconstitutional because it cannot be justified as an exercise of Congress' enumerated powers. This conclusion makes it unnecessary to decide whether the CTA violates the First, Fourth, and Fifth Amendments.

For these reasons, the Plaintiffs are entitled to summary judgment as a matter of law. The Court **GRANTS** the Plaintiffs' Motion for Summary Judgment (Doc. 23) and **DENIES** the Defendant's Motion to Dismiss or Alternative Cross Motion for Summary Judgment (Doc. 24). The Court will separately issue a final judgment.

**DONE** and **ORDERED** March 1, 2024.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE

Tab 8



FILED
2024 Mar-01  PM 04:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **NATIONAL SMALL BUSINESS UNITED, d/b/a the NATIONAL SMALL BUSINESS ASSOCIATION, *et al.*,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 5:22-cv-1448-LCB** |
| **JANET YELLEN, in her official capacity as Secretary of the Treasury, *et al.*,** | ) ) ) ) | |
| **Defendants.** | ) | |

**FINAL JUDGMENT**

For the reasons articulated in its March 1, 2024, opinion on the parties' cross-motions for summary judgment, (Doc. 51), the Court **FINDS** that the Plaintiffs are entitled to summary judgment as a matter of law, and **GRANTS** the Plaintiffs' request for relief as follows:

(1)   The Court **ENTERS** this final declaratory judgment: as discussed in the Court's opinion, the Corporate Transparency Act is unconstitutional because it exceeds the Constitution's limits on Congress' power. The

Court makes no ruling as to the constitutionality of the Act on any other grounds.

(2)     The Defendants, along with any other agency or employee acting on behalf of the United States, are **PERMANENTLY ENJOINED** from enforcing the Corporate Transparency Act against the Plaintiffs.

(3)     The Court will hear the parties' arguments concerning the allocation and amount of costs on a date to be determined.

**DONE** and **ORDERED** March 1, 2024.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE

Tab 9

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| NATIONAL SMALL BUSINESS UNITED d/b/a the NATIONAL SMALL BUSINESS ASSOCIATION, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. 5:22-CV-1448-LCB |
| ) | |
| v. ) | |
| ) | |
| JANET YELLEN, in her official capacity as Secretary of the Treasury, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## NOTICE OF APPEAL

On March 1, 2024, the Court found that Plaintiffs are entitled to summary judgment as a matter of law.  *See* ECF No. 51 (Memorandum Opinion); ECF No. 52 (Final Judgment).  Defendants hereby appeal the Court's Final Judgment to the United States Court of Appeals for the Eleventh Circuit.

DATED: March 11, 2024                Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

DIANE KELLEHER
Assistant Branch Director

_/s/ Stuart J. Robinson_
STUART J. ROBINSON
Senior Counsel
TAYLOR N. PITZ
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
450 Golden Gate Ave., Suite 7-5395
San Francisco, CA 94102
Tel: (415) 436-6635
Fax: (415) 436-6632
Email: stuart.j.robinson@usdoj.gov

_Counsel for Defendants_

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2024, I served the foregoing notice on all counsel of record by filing it with the Court by means of its ECF system.

*/s/Stuart J. Robinson*
Stuart J. Robinson

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2024, I electronically filed the foregoing appendix with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Steven H. Hazel*
Steven H. Hazel