No. 24-10736

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

JANET YELLEN, in her
official capacity as Secretary of
the Treasury, *et al.*,

*Plaintiffs-Appellees*,

v.

NATIONAL SMALL
BUSINESS UNITED, d/b/a the
NATIONAL SMALL
BUSINESS ASSOCIATION, *et
al.*,

*Defendants-Appellants*.

_____

On Appeal from the United States District Court for
the Northern District of Alabama,
No. 5:22-cv-1448-LCB

_____

## BRIEF OF *AMICI CURIAE* TRANSPARENCY
## INTERNATIONAL U.S., THE FOUNDATION FOR DEFENSE
## OF DEMOCRACIES, AND NATE SIBLEY IN SUPPORT OF
## PLAINTIFFS-APPELLEES

_____

Scott Greytak
*Counsel of Record for Amici
Curiae*
(D.C. Bar # 1011515)
1100 13th St. NW
Suite 800
Washington, D.C. 20005
(614) 668-0258
sgreytak@us.transparency.org

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record certifies that the following listed persons and entities as described in 11th Cir. R. 26.1-2(a) have an interest in the outcome of this case.[1]

1. Transparency International U.S.

2. The Foundation for Defense of Democracies

3. Sibley, Nate

Transparency International U.S. (as a project of the Fund for Constitutional Government) and the Foundation for Defense of Democracies are not-for-profit corporations exempt from income tax under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3). Transparency International U.S. is a project of the Fund for Constitutional Government. The Foundation for Defense of Democracies does not have a parent corporation, and no publicly-held company has a 10 percent or greater ownership interest in either of the organizations.

*/s/ Scott Greytak*
Scott Greytak
*Counsel of Record for Amici Curiae*

---

[1] Counsel for amici has conferred with counsel for both parties, who have consented to this filing.

No. 24-10736, *Yellen v. NSBU*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE

STATEMENT ..................................................................................................2

TABLE OF CONTENTS.....................................................................................3

TABLE OF AUTHORITIES ...............................................................................4

INTERESTS OF *AMICI CURIAE*.....................................................................12

STATEMENT OF THE ISSUE............................................................................14

SUMMARY OF ARGUMENT ...........................................................................14

ARGUMENT ......................................................................................................14

    I.    Bringing transparency to the ownership of anonymous companies is a

    national security priority of the highest order.........................................14

CONCLUSION....................................................................................................27

CERTIFICATE OF SERVICE………………………………………...……........29

CERTIFICATE OF COMPLIANCE………………………………………...…...29

No. 24-10736, *Yellen v. NSBU*

# TABLE OF AUTHORITIES

**Statutes, Rules, and Regulations**

Corporate Transparency Act, Pub. L. No. 116-283, 134 Stat. 4604 (2021) ..............16

Secure Federal Leases from Espionage and Suspicious Entanglements Act, Pub. L. No. 116–276, 134 Stat. 3362 (2020)...................................................................20, 21

Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59,498 (Sept. 30, 2022)…………………………………………………………………..27

**Cases**

*National Small Business United v. Yellen*, Case No. 5:22-cv-1448-LCB (N.D. Ala. 2024)...................................................................................................................15, 18

**Other Authorities**

CNN, *Shell Game: Hidden owners and motives*, Sept. 11, 2012, *available at* https://www.cnn.com/2011/10/26/opinion/ostfeld-shell-companies/index.html.......22

Colby Goodman, *Holes In The Net: U.S. Arms Export Control Gaps In Combatting Corruption*, Transparency International Defense and Security Program, Jan. 14, 2020, *available at* tidefence.org/publications/united-states-arms-export-sales-corruption-fraud-risk/...................................................................................................22

Ely Ratner et al., *Rising to the China Challenge*, Center for a New American

Security, Jan. 28, 2020, *available at*

https://www.cnas.org/publications/reports/rising-to-the-china-

challenge..................................................................................................................23


Emile van der Does de Willebois et al., World Bank, *The Puppet Masters: How

the Corrupt Use Legal Structures to Hide Stolen Assets and What to Do

About It* (2011),

https://openknowledge.worldbank.org/server/api/core/bitstreams/e80259c9

-d3ca-5d16-adef-fec02a3989dd/content ...................................................................19


Financial Accountability and Corporate Transparency (FACT) Coalition, *More than

100 National Security and Foreign Policy Experts Call on Congress to Tackle

Anonymous Shell Companies*, Nov. 13, 2019, *available at*

https://thefactcoalition.org/more-than-100-national-security-and-foreign-policy-

experts-call-on-congress-to-tackle-anonymous-shell-companies/...........................16


Financial Action Task Force, *Guidance on Beneficial Ownership of Legal Persons*,

Mar. 10, 2023, *available at* https://www.fatf-

gafi.org/en/publications/Fatfrecommendations/Guidance-Beneficial-Ownership-

Legal-Persons.html..................................................................................................17

No. 24-10736, *Yellen v. NSBU*

Global Financial Integrity, *The Library Card Project: The Ease of Forming Anonymous Companies in the United States* (2019), *available at* https://gfintegrity.org/wp-content/uploads/2019/03/GFI-Library-Card-Project.pdf............................................15

Global Witness, *Hidden Menace*, July 12, 2016, *available at* https://www.globalwitness.org/en/reports/hidden-menace/......................................22

Global Witness, *Inside Malaysia's Shadow State: Backroom Deals Driving the Destruction of Sarawak*, March 2013, *available at* https://www.globalwitness.org/en/campaigns/forests/inside-malaysias-shadow-state/..................................................................................................................20

International Consortium of Investigative Journalists, *Are oligarchs hiding money in US real estate? Ownership information is a missing link, research says*, Apr. 1, 2022, *available at* https://www.icij.org/investigations/panama-papers/are-oligarchs-hiding-money-in-us-real-estate-ownership-information-is-a-missing-link-research-says/..................................................................................................................23

Janet Yellen, Sec'y, U.S. Dep't of the Treasury, *Remarks at the Summit for Democracy*, Dec. 9, 2021, *available at* https://home.treasury.gov/news/press-releases/jy0524...........................................................................................15

No. 24-10736, *Yellen v. NSBU*

Julie Satow, *Seizing Iran's Slice of Fifth Avenue*, The New York Times, Sept. 24, 2013, *available at* https://nyti.ms/2nEDDUl...............................................................26

Michael Findley, et al., *Global Shell Games: Experiments in Transnational Relations, Crime, and Terrorism*, Cambridge University Press, March 24, 2014, *available at*
http://bit.ly/2uTLptQ......................................................................................21

Organized Crime and Corruption Reporting Project, *The General and His Corporate Labyrinth*, Apr. 10, 2020, *available at* https://www.occrp.org/en/revolution-to-riches/the-general-and-hiscorporate-labyrinth............................................................26

Senator Sheldon Whitehouse, et al., *Letter from Sens. Sheldon Whitehouse et al., to the Financial Crimes Enforcement Network*, May 5, 2021, *available at* https://www.whitehouse.senate.gov/imo/media/doc/Senators%20CTA%20Comment%20Letter%2005.04.2021.pdf.....................................................................................11

The Economist, *The Incorporation Business: They Sell Sea Shells*, Apr. 07, 2012, *available at* http://www.economist.com/node/21552197...........................................19

The White House, *Memorandum on Establishing the Fight Against Corruption as a Core United States National Security Interest*, June 3, 2021, *available at*

No. 24-10736, *Yellen v. NSBU*

https://www.whitehouse.gov/briefing-room/presidential-actions/2021/06/03/memorandum-on-establishing-the-fight-against-corruption-as-a-core-united-states-national-security-interest/.............................................................18

U.S. Dep't of Justice, *$26.6 Million In Allegedly Illicit Proceeds to Be Used To Fight COVID-19 and Address Medical Needs in Equatorial Guinea*, Sept. 20, 2021, *available at* https://www.justice.gov/opa/pr/266-million-allegedly-illicit-proceeds-be-used-fight-covid-19-and-address-medical-needs..................................................20

U.S. Dep't of Justice, *Acting U.S. Attorney Announces Extradition Of Dominican Citizen For Narcotics Trafficking Through Sham Internet Pharmacy*, Sept. 2, 2022, *available at* https://www.justice.gov/usao-sdny/pr/acting-us-attorney-announces-extradition-dominican-citizen-narcotics-trafficking#_ftn1..................................24, 25

U.S. Dep't of Justice, *CPA Sentenced for Role in Racketeering Enterprise*, Oct. 2, 2018, *available at* https://www.justice.gov/usao-sdca/pr/cpa-sentenced-role-racketeering-enterprise...............................................................................................25

U.S. Dep't of Justice, *Dallas Attorney Charged in Narcotics Money Laundering Scheme,* Feb. 16, 2021, *available at* https://www.justice.gov/usao-ndtx/pr/dallas-attorney-charged-narcotics-money-laundering-scheme.............................................25

No. 24-10736, *Yellen v. NSBU*

U.S. Dep't of Justice, *Four Defendants Plead Guilty To Racketeering Conspiracy In Nationwide Prescription Drug Diversion Case*, May 27, 2020, *available at* https://www.justice.gov/usao-ndca/pr/four-defendants-plead-guilty-racketeering-conspiracy-nationwide-prescription-drug....................................................................25

U.S. Dep't of Justice, *Fujing Zheng Indictment*, Aug. 17, 2018, *available at* https://www.justice.gov/opa/press-release/file/1089101/download...........................24

U.S. Dep't of Justice, *Husband and wife co-owners of subcontracting company plead guilty to contract fraud related to Afghanistan rebuilding*, Sept. 9, 2009, *available at* https://oig.usaid.gov/sites/default/files/2018-03/pressrelease_090909.pdf..........................................................................................23

U.S. Dep't of Justice, *Iranian Nationals Charged with Conspiring to Evade U.S. Sanctions on Iran by Disguising $300 Million in Transactions Over Two Decades*, Mar. 19, 2021, *available at* https://www.justice.gov/opa/pr/iranian-nationals-charged-conspiring-evade-us-sanctions-iran-disguising-300-million..................26, 27

U.S. Dep't of Justice, *Justice Department Seeks Forfeiture of Two Commercial Properties Purchased with Funds Misappropriated from PrivatBank in Ukraine*, Aug. 6, 2020, available at https://www.justice.gov/opa/pr/justice-department-seeks-forfeiture-two-commercial-properties-purchased-funds-misappropriated.................21

No. 24-10736, *Yellen v. NSBU*

U.S Dep't of Justice, *Queens Man Admits Orchestrating $653 Million Money Laundering Conspiracy, Operating Unlicensed Money Transmitting Business, and Bribing Bank Employees*, Feb. 22, 2022, *available at* https://www.justice.gov/usao-nj/pr/queens-man-admits-orchestrating-653-million-money-laundering-conspiracy-operating.....................................................................................................................24

U.S. Dep't of Justice, *Russian Oligarch Oleg Vladimirovich Deripaska And Associates Indicted For Sanctions Evasion And Obstruction Of Justice*, Sept. 29, 2022, *available at* https://www.justice.gov/usao-sdny/pr/russian-oligarch-oleg-vladimirovich-deripaska-and-associates-indicted-sanctions-evasion........................27

U.S. Dep't of Justice, *Sophisticated Sinaloa Cartel Money Laundering Organization Dismantled*, Apr. 11, 2023, *available at* https://www.justice.gov/usao-sdca/pr/sophisticated-sinaloa-cartel-money-laundering-organization-dismantled.....26

U.S. Dep't of Justice, *Two Chinese Nationals Charged with Operating Global Opioid and Drug Manufacturing Conspiracy Resulting in Deaths*, Aug. 22, 2018, *available at* https://www.justice.gov/opa/pr/two-chinese-nationals-charged-operating-global-opioid-and-drug-manufacturing-conspiracy....................................24

No. 24-10736, *Yellen v. NSBU*

U.S. Dep't of Treasury, *Financial Action Task Force Highlights Treasury's Efforts to Counter Illicit Finance*, Mar. 26, 2024, *available at* https://home.treasury.gov/news/press-releases/jy2208...............................................18

U.S. Dep't of Treasury, *National Strategy for Combating Terrorist and Other Illicit Financing* (2020), *available at* https://home.treasury.gov/system/files/136/National-Strategy-to-Counter-Illicit-Financev2.pdf.............................................................................................................15

U.S. Government Accountability Office, *Federal Real Property: GSA Should Inform Tenant Agencies When Leasing High-Security Space from Foreign Owners*, Jan. 2017, *available at* https://www.gao.gov/assets/gao-17-195.pdf................................20

Yaya J. Fanusie, *Terror Finance Briefing Book*, Foundation for Defense of Democracies, Dec. 7, 2017, *available at* https://www.fdd.org/analysis/2017/12/07/terror-finance-briefing-book/...................26

No. 24-10736, *Yellen v. NSBU*

## INTEREST OF *AMICI CURIAE*

Transparency International U.S.[2] (TI US) is part of the largest global coalition dedicated to fighting corruption, partnering with businesses, governments, and citizens to promote transparency and develop and implement effective measures to tackle and deter corruption. Anonymous companies are frequently used to facilitate corruption and launder its proceeds across the world. The Corporate Transparency Act, which TI US helped to enact, will help prevent the use of anonymous companies to facilitate corruption by requiring covered entities to identify and report information regarding their beneficial owners. TI US therefore has an interest in defending the Corporate Transparency Act's beneficial owner reporting requirements.

The Foundation for Defense of Democracies (FDD) is a Washington, DC-based nonpartisan 501(c)(3) research institute focusing on national security and foreign policy. FDD conducts in-depth research, produces accurate and timely analyses, identifies illicit activities, and provides policy options—all with the aim of strengthening U.S. national security and reducing or eliminating threats posed by adversaries and enemies of the United States and other free nations. FDD does not accept donations from any foreign governments. For more information, visit www.fdd.org. As a think tank focused on the areas of national security and foreign policy, FDD is keenly interested in the Corporate Transparency Act, which addresses

---

[2] No party's counsel authored this brief in whole or in part. No person, other than amicus curiae's counsel, funded the preparation or submission of this brief.

No. 24-10736, *Yellen v. NSBU*

the core illicit risk presented by anonymous companies to the security of the homeland and the integrity of the financial system. FDD therefore has an interest in defending the Corporate Transparency Act's beneficial ownership reporting requirements.

Nate Sibley is the Director of the Kleptocracy Initiative and a Fellow at the Hudson Institute. He advised congressional offices and other key stakeholders during enactment of the Corporate Transparency Act, which will help prevent the use of anonymous companies by kleptocratic and other corrupt regimes to facilitate corruption across the world. Nate Sibley therefore has an interest in defending the Corporate Transparency Act's beneficial owner reporting requirements.

No. 24-10736, *Yellen v. NSBU*

## STATEMENT OF THE ISSUE

Whether the district court erred in declaring the Corporate Transparency Act unconstitutional and in enjoining its enforcement against defendants-appellants.

## SUMMARY OF THE ARGUMENT

The Corporate Transparency Act is an historic anti-money laundering law that the United States Congress correctly understood would strengthen the ability of the U.S. national security communities to curtail the abuse of anonymous companies to commit crimes. Amici believe that the district court erred in ignoring these realities and ask that this Court reverse the district court's ruling.

## ARGUMENT

### I.   Bringing transparency to the ownership of anonymous companies is a national security priority of the highest order.

Anonymous companies—entities that are owned or controlled by individuals whose identities are hidden or otherwise unavailable—play a central role in some of the gravest threats to U.S. national security and foreign policy goals, including, as detailed below, the financing of terrorism and terrorism-supporting foreign regimes, the financing of hostile foreign regimes and their networks of support, the trafficking of deadly drugs, including fentanyl, into and throughout the United States, the evasion of U.S. sanctions, and the undermining of the U.S.'s fight against corruption.

This brief serves to connect the incorporation of entities covered by the Corporate Transparency Act (CTA) and these national security and foreign policy priorities, helping to illustrate that incorporation is not a "purely internal affai[r]"

14

No. 24-10736, *Yellen v. NSBU*

and that the CTA's reporting requirement for covered entities that voluntarily incorporate is in fact authorized by Congress's foreign affairs power.[3]

The United States has been identified by numerous senior U.S. Government officials, including Secretary of the U.S. Treasury (Treasury) Janet Yellen, as arguably "the best place to hide and launder ill-gotten gains" because of the ease with which individuals can conceal their identities when forming and using U.S. companies.[4] The abuse of anonymous companies has been prevalent in the United States—which is home to more corporations than any other jurisdiction in the world[5]—and is regarded as "a safe haven for criminals...looking to disguise their identities for nefarious purposes."[6] Treasury has similarly stressed the connection between this ownership opacity and U.S. national security. For example, under the administration of President Trump, Treasury concluded that the "lack of a requirement to collect beneficial ownership information at the time of company formation and after changes in ownership" was "one of the most significant threats and vulnerabilities that allow illicit proceeds to enter the United States."[7] Buttressing

---

[3] *See NSBU v. Yellen*, Case No. 5:22-cv-1448-LCB, 19 (N.D. Ala. 2024).

[4] Janet Yellen, Sec'y, U.S. Department of the Treasury, "Remarks at the Summit for Democracy," Dec. 9, 2021, available at https://home.treasury.gov/news/press-releases/jy0524.

[5] Global Financial Integrity, "The Library Card Project: The Ease of Forming Anonymous Companies in the United States," 1 (2019), available at https://gfintegrity.org/wp-content/uploads/2019/03/GFI-Library-Card-Project.pdf.

[6] U.S. Department of Justice, *supra* note 4.

[7] U.S. Department of Treasury, "National Strategy for Combating Terrorist and Other Illicit Financing," 12, 3 (January 2020) available at https://home.treasury.gov/system/files/136/National-Strategy-to-Counter-Illicit-Financev2.pdf.

No. 24-10736, *Yellen v. NSBU*

these concerns, in 2019 over 100 national security and foreign policy experts spoke

with one voice in calling on Congress to end anonymous ownership of companies.[8]

Responding to these threats, the U.S. Congress enacted the CTA with strong

bipartisan support and with the backing of various national security agencies. In

short, the CTA requires limited liability companies, corporations, and other similar

entities to report their true, or "beneficial," owners at the time of formation or of

registration in the United States to the Financial Crimes Enforcement Network

(FinCEN), and to provide updates as this beneficial ownership information changes.[9]

In enacting the CTA, Congress expressly stated that the Act was necessary to

protect U.S. national security and foreign policy interests. The text of the CTA reads:

"Federal legislation providing for the collection of beneficial ownership information

for corporations...is needed to protect vital United States national security interests;

protect interstate and foreign commerce; [and] better enable...law enforcement

efforts to counter money laundering...and other illicit activity."[10]

These conclusions are consistent with remarks made by Senators Whitehouse,

Grassley, Wyden, and Rubio—long-time champions of the CTA who were closely

involved with its development and passage—who explained in a 2021 letter to

---

[8] *See* FACT Coalition, "More than 100 National Security and Foreign Policy Experts Call on Congress to Tackle Anonymous Shell Companies," Nov. 13, 2019, available at https://thefactcoalition.org/more-than-100-national-security-and-foreign-policy-experts-call-on-congress-to-tackle-anonymous-shell-companies/.

[9] *See generally* Corporate Transparency Act, Pub. L. No. 116-283, 134 Stat. 4604 (2021).

[10] *Id.* at § 6402(5).

No. 24-10736, *Yellen v. NSBU*

FinCEN that the CTA "marked the culmination of a years-long effort in Congress to combat money laundering, international corruption, and kleptocracy[.]"[11]

Moreover, the CTA is part of a *global* effort to confront cross-border security risks from corrupt officials, terrorists, drug traffickers, sanctions evaders, and other criminals. The United States, through its membership in the Financial Action Task Force (FATF)—the global standard-setting body for anti-money laundering, countering the financing of terrorism, and countering proliferation financing—is under a specific obligation to establish mechanisms to collect beneficial ownership information for a wide range of corporate forms, as FATF's Recommendation 24 "requir[es] countries to ensure that competent authorities have access to adequate, accurate and up-to-date information on the true owners of companies.[12]

Sure enough, in the wake of the establishment of the beneficial ownership database authorized by the CTA, the FATF announced that the United States had been upgraded to "largely compliant" with Recommendation 24; the FATF published this updated rating in the *Seventh Enhanced Follow-Up Report of the United States*, recognizing Treasury's historic efforts through its implementation of the CTA to increase beneficial ownership transparency and address key

---

[11] Senator Sheldon Whitehouse, et al., "Letter from Sens. Sheldon Whitehouse et al., to the Financial Crimes Enforcement Network," May 5, 2021, available at https://www.whitehouse.senate.gov/imo/media/doc/Senators%20CTA%20Comment%20Letter%2005.04.2021.pdf.
[12] *See* Financial Action Task Force, "Guidance on Beneficial Ownership of Legal Persons," Mar. 10, 2023, available at https://www.fatf-gafi.org/en/publications/Fatfrecommendations/Guidance-Beneficial-Ownership-Legal-Persons.html.

vulnerabilities in the U.S. anti-money laundering and countering the financing of terrorism [13] The CTA, therefore, allows the United States to address a critical area of foreign affairs: developing coordinated multilateral mechanisms to address concrete threats by transnational criminal actors.

Nevertheless, these clear connections were lost on the district court, which concluded that incorporation is a "purely internal affai[r]" and that the CTA's reporting requirement for covered entities that voluntarily incorporate is not authorized by Congress's foreign affairs power.[14] In response, this brief serves to outline numerous examples of how legal entity formation or registration in the U.S. impacts first-order national security and foreign policy priorities for the United States in order to illustrate the connection between Congress's foreign affairs power and anonymous companies. Collectively, these examples make unassailably clear that the CTA is a proper exercise of Congress' foreign affairs power.

1.  Undermining the United States' fight against corruption.

President Biden designated the fight against corruption as a core national security interest of the United States three years ago, expressly stating that "[c]orruption threatens United States national security".[15] This designation was, in

---

[13] U.S. Department of Treasury, "Financial Action Task Force Highlights Treasury's Efforts to Counter Illicit Finance," Mar. 26, 2024, available at https://home.treasury.gov/news/press-releases/jy2208.

[14] *See NSBU v. Yellen*, Case No. 5:22-cv-1448-LCB (N.D. Ala. 2024).

[15] *See* The White House, "Memorandum on Establishing the Fight Against Corruption as a Core United States National Security Interest," Jun. 3, 2021, available at https://www.whitehouse.gov/briefing-room/presidential-actions/2021/06/03/memorandum-on-establishing-the-fight-against-corruption-as-a-core-united-states-national-security-interest/.

part, a reflection of how America's permittance of anonymous companies had enabled corruption abroad and the laundering of corrupt foreign assets here at home. For these and other reasons, Congress chose to articulate the national security and foreign policy interests underpinning the CTA in the text of the law itself.

Numerous studies evidence these connections. Big picture, for instance, according to the World Bank and the United Nations Office on Drugs and Crime, anonymous companies were used in over 70 percent of grand corruption cases they reviewed to either carry out the corrupt activity or to hide the proceeds of it.[16] The World Bank also found that for grand corruption cases, U.S. shell companies were used to move dirty money more often than shell companies registered in any other country.[17] Additional studies have reached similar results, finding that anonymous companies formed in the United States were used to facilitate corruption more often than similar entities formed in any other country.[18]

Furthermore, reports from the U.S. Government, reporting by U.S. and foreign media, and indictments from the U.S. Department of Justice (DOJ) have all detailed the role of American anonymous companies in transnational corruption schemes. For example, the Pandora Papers, the largest investigation in journalism history, and

---

[16] *See* Emile van der Does de Willebois et al., World Bank, "The Puppet Masters: How the Corrupt Use Legal Structures to Hide Stolen Assets and What to Do About It," 2011, available at https://openknowledge.worldbank.org/server/api/core/bitstreams/e80259c9-d3ca-5d16-adef-fec02a3989dd/content.

[17] The Economist, "The Incorporation Business: They Sell Sea Shells," Apr. 07, 2012, available at http://www.economist.com/node/21552197.

[18] Emile van der Does de Willebois et al., *supra* note 17 at 34, 121 tbl. B3.

No. 24-10736, *Yellen v. NSBU*

related reporting described how the family of Teodorin Obiang, the authoritarian President of Equatorial Guinea, allegedly embezzled millions of dollars that were then used to purchase luxury assets in the United States, including mansions in California and Maryland, through the use of anonymous companies.[19]

Corrupt foreign officials have even used anonymous companies to penetrate the very buildings in which U.S. national security agencies operate. In 2017, a report from the U.S. Government Accountability Office (GAO) found that "the FBI field office in Seattle is ultimately owned by the Taib family of Malaysia through a series of domestic and foreign companies."[20] Members of the Taib family, which included a Minister of Development and Forestry, member of parliament, and governor of Malaysia's largest state, are notorious for profiting from corrupt practices in Malaysia.[21] The GAO further noted that it "was unable to identify ownership information for about one-third of [the U.S. Government's] 1,406 high-security leases as of March 2016 because ownership information was not readily available for all buildings."[22] Congress responded to this national security vulnerability in December 2020 by passing the "Secure Federal Leases from Espionage and

---

[19] *See* U.S. Department of Justice, "$26.6 Million In Allegedly Illicit Proceeds to Be Used To Fight COVID-19 and Address Medical Needs in Equatorial Guinea," Sept. 20, 2021, available at https://www.justice.gov/opa/pr/266-million-allegedly-illicit-proceeds-be-used-fight-covid-19-and-address-medical-needs.

[20] *See* U.S. Government Accountability Office, "Federal Real Property: GSA Should Inform Tenant Agencies When Leasing High-Security Space from Foreign Owners," Jan. 2017, 25, available at https://www.gao.gov/assets/gao-17-195.pdf.

[21] *See* Global Witness, "Inside Malaysia's Shadow State: Backroom Deals Driving the Destruction of Sarawak," March 2013, available at https://www.globalwitness.org/en/campaigns/forests/inside-malaysias-shadow-state/.

[22] *Id.*

Suspicious Entanglements Act," which required federal government agencies to identify the beneficial owners of any building in which it leased space and to report whether the building was owned by any foreign parties.[23]

Lastly, indictments from the DOJ continue to shed light on how corrupt officials exploit anonymous companies to move, hide, and grow their illicit funds in the U.S. In one high-profile recent example, the Ukrainian oligarch Igor Kolomoisky and his associates allegedly embezzled billions of dollars from a Ukraine-based bank and routed the money through a Cyprus branch before purchasing commercial real estate in Cleveland, Ohio, and Louisville, Kentucky, using anonymous companies.[24]

2. Financing of terrorism, and of hostile regimes and their networks of support.

Ten years ago, a seminal academic study concluded that the United States was the easiest country in the world for terrorists and criminals to incorporate anonymous companies in order to launder their money with impunity.[25] Five years later, a 2019 report by Transparency International's Defence & Security Program concluded that "Anonymous shell companies are a well-established means of diverting contract

---

[23] *See* Secure Federal Leases from Espionage and Suspicious Entanglements Act, Public Law 116–276, 134 Stat. 3362 (2020).
[24] U.S. Department of Justice, "Justice Department Seeks Forfeiture of Two Commercial Properties Purchased with Funds Misappropriated from PrivatBank in Ukraine," Aug. 6, 2020, available at https://www.justice.gov/opa/pr/justice-department-seeks-forfeiture-two-commercial-properties-purchased-funds-misappropriated.
[25] Michael G. Findley et al. "Global Shell Games: Experiments in Transnational Relations, Crime, and Terrorism," Cambridge University Press, 74 Mar. 24, 2014, available at http://bit.ly/2uTLptQ.

No. 24-10736, *Yellen v. NSBU*

funds to political cronies and those tied to insurgents, terrorists, warlords, criminal networks, and other malign actors."[26]

Perhaps no single example better illustrates the long-running and serious nature of this connection than that of Viktor Bout, convicted in 2011 for "charges of conspiring to sell millions of dollars' worth of weapons to a terrorist organization for use in trying to kill Americans,"[27] who "set up a global network of shell companies to disguise illicit activities", including "12 American shell companies...incorporated in Texas, Florida, and Delaware," and who "provided weapons used to fuel conflicts throughout Africa, South America, and the Middle East."[28]

Consider as well two cases featured in the advocacy organization Global Witness's groundbreaking report, *Hidden* Menace. In the first, a U.S.-Afghan contractor channeled over $3 million in U.S. taxpayer dollars to "Afghan power brokers" who intentionally concealed their ownership interests in companies within the contractor's network in order to avoid association with the Taliban insurgency.[29] These individuals in turn funded the purchase of weapons for the Taliban and its insurgents.[30] And in the second, an American couple with ties to Afghan fighters

---

[26] Colby Goodman, "Holes In The Net: U.S. Arms Export Control Gaps In Combatting Corruption," Transparency International Defence & Security Program, Jan. 14, 2020, available at tidefence.org/publications/united-states-arms-export-sales- corruption-fraud-risk/.

[27] *See* CNN, "Shell Game: Hidden owners and motives," Sept. 11, 2012, available at https://www.cnn.com/2011/10/26/opinion/ostfeld-shell-companies/index.html.

[28] *See id.*

[29] *See* Global Witness, "Hidden Menace," Jul. 12, 2016, available at https://www.globalwitness.org/en/reports/hidden-menace/.

[30] *See id.*

No. 24-10736, *Yellen v. NSBU*

used a Texas-based anonymous company in a scheme to obtain over $5 million in U.S. Government contracts, despite the fact that they were disbarred and facing criminal charges for overbilling the U.S. Government for at least $17 million under a previous contract they won to supply security services in Afghanistan.[31]

Furthermore, in 2020, a leading U.S. national security organization determined that requiring beneficial ownership information "will limit the ability of China to set up anonymous front companies in the United States to purchase U.S. assets or technology and otherwise threaten critical sectors, data, or infrastructure."[32] Additional reporting has shown that corrupt actors with links to the Kremlin have also relied on anonymous companies to maintain and grow their economic power and influence. For example, a U.S. corporate formation agent formed an anonymous company in Delaware that reportedly owns a $15 million mansion in Washington, D.C., linked to one of Vladimir Putin's closest allies; also reportedly connected to the oligarch is a $14 million townhouse in New York City owned by a separate anonymous company.[33]

---

[31] *See*, *e.g.,* U.S. Department of Justice, "Husband and wife co-owners of subcontracting company plead guilty to contract fraud related to Afghanistan rebuilding," Sept. 9, 2009, available at https://oig.usaid.gov/sites/default/files/2018-03/pressrelease_090909.pdf.

[32] *See* Ely Ratner et al., "Rising to the China Challenge," Center for a New American Security, Jan. 28, 2020, available at https://www.cnas.org/publications/reports/rising-to-the-china-challenge.

[33] *See* International Consortium of Investigative Journalists, "Are oligarchs hiding money in US real estate? Ownership information is a missing link, research says," Apr. 1, 2022, available at https://www.icij.org/investigations/panama-papers/are-oligarchs-hiding-money-in-us-real-estate-ownership-information-is-a-missing-link-research-says/.

No. 24-10736, *Yellen v. NSBU*

3.  Trafficking of deadly drugs into and throughout the United States.

Drug trafficking organizations have similarly relied on anonymous companies to move their illicit products into and throughout the United States. For example, the Zheng drug trafficking organization manufactured and shipped deadly fentanyl analogues and 250 other drugs to some 37 U.S. states, with drugs sold by the group directly tied to the fatal overdoses of two people in Ohio.[34] The traffickers used anonymous companies formed in Massachusetts as they mailed, repackaged, and redistributed the drugs across the country.[35] Drug trafficking schemes with links to foreign countries are not uncommon: In February 2022, a New York man plead guilty to helping launder over $650 million worth of illegal narcotics proceeds through bank accounts associated with shell companies in multiple U.S. states before wiring funds back to entities in China.[36] Similarly, after the death of an individual in Idaho from elevated levels of prescription opioids and fentanyl, law enforcement agents began investigating a drug trafficking organization that operated an online marketplace for a variety of controlled substances, including the fentanyl analogue

---

[34] *See* U.S. Department of Justice, "Two Chinese Nationals Charged with Operating Global Opioid and Drug Manufacturing Conspiracy Resulting in Deaths," Aug. 22, 2018, available at https://www.justice.gov/opa/pr/two-chinese-nationals-charged-operating-global-opioid-and-drug-manufacturing-conspiracy; *see also* U.S. Department of Justice, "Fujing Zheng Indictment," Aug. 17, 2018, available at https://www.justice.gov/opa/press-release/file/1089101/download.
[35] *Id*.
[36] *See* U.S Department of Justice, "Queens Man Admits Orchestrating $653 Million Money Laundering Conspiracy, Operating Unlicensed Money Transmitting Business, and Bribing Bank Employees," Feb. 22, 2022, available at https://www.justice.gov/usao-nj/pr/queens-man-admits-orchestrating-653-million-money-laundering-conspiracy-operating.

No. 24-10736, *Yellen v. NSBU*

p-fluoroisobutyryl fentanyl and the synthetic opioid U-47700.[37] It was discovered that the organization used wire transfers between U.S. and Dominican Republic-based anonymous company bank accounts to send millions of dollars' worth of drug proceeds from the U.S. to the Dominican Republic.[38]

The consequences of such operations know no geographic bounds. For example, a drug trafficking group operated a $200-million prescription drug diversion scheme across multiple U.S. states by forming anonymous companies to open bank accounts to receive and distribute the proceeds of their transactions.[39] In Texas, a lawyer was found guilty of laundering the proceeds of what he believed to be opioid trafficking through anonymous companies,[40] while in California an accountant pled guilty to using anonymous companies to launder money on behalf of an international drug trafficking organization.[41]

Those who exploit the U.S. southern border in order to traffic illegal drugs have also taken advantage of hidden company ownership. For instance, the infamous

---

[37] *See* U.S. Department of Justice, "Acting U.S. Attorney Announces Extradition Of Dominican Citizen For Narcotics Trafficking Through Sham Internet Pharmacy," Sept. 2, 2022, available at https://www.justice.gov/usao-sdny/pr/acting-us-attorney-announces-extradition-dominican-citizen-narcotics-trafficking#_ftn1.
[38] *Id.*
[39] *See* U.S. Department of Justice, "Four Defendants Plead Guilty To Racketeering Conspiracy In Nationwide Prescription Drug Diversion Case," May 27, 2020, available at https://www.justice.gov/usao-ndca/pr/four-defendants-plead-guilty-racketeering-conspiracy-nationwide-prescription-drug.
[40] *See* U.S. Department of Justice, "Dallas Attorney Charged in Narcotics Money Laundering Scheme," Feb. 16, 2021, available at https://www.justice.gov/usao-ndtx/pr/dallas-attorney-charged-narcotics-money-laundering-scheme.
[41] *See* U.S. Department of Justice, "CPA Sentenced for Role in Racketeering Enterprise," Oct. 2, 2018, available at https://www.justice.gov/usao-sdca/pr/cpa-sentenced-role-racketeering-enterprise.

No. 24-10736, *Yellen v. NSBU*

Sinaloa Cartel relied on a criminal organization to arrange the pickup of bulk cash proceeds from the sales of heroin and methamphetamine in multiple states across the U.S. before laundering the funds through a network of anonymous companies.[42]

4. Evasion of U.S. sanctions.

Anonymous companies are also routinely used to circumvent U.S. sanctions, including those relating to Venezuela, Iran, and Russia. For example, General Vladimir Padrino Lopez, Venezuela's Minister of Defense, established a web of U.S. anonymous companies that listed relatives as owners so that he could continue operating his illicit businesses after U.S. sanctions had been imposed on him.[43] Similarly, FDD's 2017 *Terror Finance Briefing Book* describes how Hezbollah supporters were running a network of commercial and illicit businesses, using anonymous shell companies to evade U.S. sanctions.[44] Perhaps most astonishingly, a U.S. anonymous company owned part of a Manhattan skyscraper and used it as a front for the Iranian government, resulting in millions of dollars in rent being illegally funneled to Iran.[45] And 10 Iranian nationals were charged by the U.S.

---

[42] *See* U.S. Department of Justice, "Sophisticated Sinaloa Cartel Money Laundering Organization Dismantled," Apr. 11, 2023, available at https://www.justice.gov/usao-sdca/pr/sophisticated-sinaloa-cartel-money-laundering-organization-dismantled.

[43] *See* Organized Crime and Corruption Reporting Project, "The General and His Corporate Labyrinth," Apr. 10, 2020, available at https://www.occrp.org/en/revolution-to-riches/the-general-and-hiscorporate-labyrinth.

[44] *See* Yaya J. Fanusie, "Terror Finance Briefing Book," Foundation for Defense of Democracies, Dec. 7, 2017, available at https://www.fdd.org/analysis/2017/12/07/terror-finance-briefing-book/.

[45] Julie Satow, "Seizing Iran's Slice of Fifth Avenue," The New York Times, Sept. 24, 2013, available at https://nyti.ms/2nEDDUl.

Department of Justice (DOJ) with "running a nearly 20-year-long scheme to evade U.S. sanctions on the Government of Iran by disguising more than $300 million worth of transactions…through front companies in California" and other jurisdictions, with the scheme relying on "more than 70 front companies."[46]

Similarly, "Russian elites, state-owned enterprises, and organized crime, as well as the Government of the Russian Federation have attempted to use U.S. and non-U.S. anonymous companies to evade sanctions imposed on Russia" in response its invasion of Ukraine.[47] For example, in September 2022, the DOJ announced the indictment of an associate of a sanctioned Russian oligarch for sanctions evasion.[48] The naturalized U.S. citizen allegedly used the U.S. financial system to maintain and sell real estate that was owned through anonymous companies.[49]

## CONCLUSION

The examples outlined above, while numerous, very likely represent only a small portion of the overall national security and foreign policy risks presented by anonymous companies formed in the United States, as those risks stem from these entities' ability to evade detection. Instead, the total risk to U.S. national security and

---

[46] *See* U.S. Department of Justice, "Iranian Nationals Charged with Conspiring to Evade U.S. Sanctions on Iran by Disguising $300 Million in Transactions Over Two Decades," Mar. 19, 2021, available at https://www.justice.gov/opa/pr/iranian-nationals-charged-conspiring-evade-us-sanctions-iran-disguising-300-million.

[47] *See* Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59, 498 (Sept. 30, 2022).

[48] *See* U.S. Department of Justice, "Russian Oligarch Oleg Vladimirovich Deripaska And Associates Indicted For Sanctions Evasion And Obstruction Of Justice," Sept. 29, 2022, available at https://www.justice.gov/usao-sdny/pr/russian-oligarch-oleg-vladimirovich-deripaska-and-associates-indicted-sanctions-evasion.

[49] *See id.*

No. 24-10736, *Yellen v. NSBU*

foreign policy goals posed by anonymous companies likely remains not only unknown but unknowable, as anonymous companies cause investigations and cases to hit dead ends, allow crimes to go unsolved, and permit illicit funds to covertly co-opt our financial system. As such, the only true means of addressing the national security and foreign policy hazards identified above is to lift the veil of anonymity protecting these entities. As this is precisely what the CTA accomplishes, it therefore indisputably provides the U.S. Government with a means of protecting American national security and furthering American foreign policy goals.

Because the enactment of the CTA was a valid exercise of Congress's foreign affairs power, amici urge that the district court's order be reversed.

Respectfully Submitted,

*/s/ Scott Greytak*
Scott Greytak
(D.C. Bar # 1011515)
Transparency International U.S.
*Counsel of Record for Amici Curiae*
1100 13th St. NW, Suite 800
Washington, DC 20005
(614) 668-0258
sgreytak@us.transparency.org

No. 24-10736, *Yellen v. NSBU*

## CERTIFICATE OF SERVICE

I electronically filed the foregoing with the Clerk of Court for the United

States Court of Appeals for the Eleventh Circuit on April 21, 2024, by using the

appellate CM/ECF system, and service was accomplished on all counsel of record by

the appellate CM/ECF system.

*/s/ Scott Greytak*
Scott Greytak

Date: April 21, 2024

## CERTIFICATE OF COMPLIANCE

1. This brief complies with (1) the type-volume limitation of Federal Rules of
   Appellate Procedure 29(a)(5), 32(a)(7)(B)(i), and 11 Cir. R. 32-4 as it
   contains 3,569 words, excluding the parts of the brief exempted by Rule
   32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. Rule
   32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) and 11
   Cir. R. 32-3 because it has been prepared in a proportionally spaced typeface
   using Microsoft Word (14-point Times New Roman font) and is double-
   spaced.

*/s/ Scott Greytak*
Scott Greytak
