No. 24-10736

# In the United States Court of Appeals for the Eleventh Circuit

———————————————

NATIONAL SMALL BUSINESS UNITED, ET AL.,
*Plaintiffs-Appellees,*

v.

U.S. DEPARTMENT OF THE TREASURY, ET AL.,
*Defendants-Appellants.*

———————————————

On Appeal from the United States District Court
for the Northern District of Alabama
Case No. 5:22-cv-01448-LCB (The Hon. Liles C. Burke)

**BRIEF OF AMICUS CURIAE
TAX LAW CENTER AT NYU LAW
IN SUPPORT OF APPELLANTS**

JONATHAN E. TAYLOR
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
jon@guptawessler.com

April 22, 2024                    *Counsel for Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS

As required by Eleventh Circuit Rule 26.1-1, I certify that in addition to the individuals set forth in the appellants' brief, the following individuals have an interest in the outcome of this matter:

1.    Tax Law Center at NYU Law (amicus curiae)

2.    Jonathan E. Taylor (counsel for amicus curiae)

April 22, 2024                              /s/ Jonathan E. Taylor
                                            Jonathan E. Taylor


## CORPORATE DISCLOSURE STATEMENT

Amicus curiae is not a corporation, has no parent corporation, and does not issue stock.

                                            /s/ Jonathan E. Taylor
                                            Jonathan E. Taylor

i

## TABLE OF CONTENTS

Certificate of interested persons ..................................................................i

Corporate disclosure statement ..................................................................i

Table of authorities ..................................................................................iii

Interest of amicus curiae and summary of argument ................................1

Statement of the issue ...............................................................................3

Argument....................................................................................................3

    I.    The CTA is a constitutional exercise of Congress's taxing power because it is "in aid of a revenue purpose." ...........................................3

    II.    Neither the challengers nor the district court provided any basis for holding that the statute falls outside the taxing power. ..................13

Conclusion................................................................................................17

# TABLE OF AUTHORITIES

## Cases

*California Bankers Association v. Shultz,*
   416 U.S. 21 (1974) ............................................................... 17

*Helvering v. Mitchell,*
   303 U.S. 391 (1938) ............................................................... 7

*Hunter v. United States,*
   73 F.3d 260 (9th Cir. 1996) ................................................... 4

*McCulloch v. Maryland,*
   17 U.S. 316 (1819) ................................................................. 3

*Polselli v. IRS,*
   598 U.S. 432 (2023) ............................................................ 4, 8

*Sonzinsky v. United States,*
   300 U.S. 506 (1937) ............................................................ 3, 4

*Spies v. United States,*
   317 U.S. 492 (1943) .............................................................. 15

*United States v. Bisceglia,*
   420 U.S. 141 (1975) .......................................................... 4, 7, 13

*United States v. Bolatete,*
   977 F.3d 1022 (11th Cir. 2020) ........................................... 3, 13

*United States v. Browning,*
   723 F.2d 1544 (11th Cir. 1984) ............................................. 14

*United States v. Clarke,*
   573 U.S. 248 (2014) .............................................................. 12

*United States v. Dodge,*
   61 F.3d 142 (2d Cir. 1995) ..................................................... 5

*United States v. Doremus,*
   249 U.S. 86 (1919) ................................................................ 13

*United States v. Hall,*
   171 F.3d 1133 (8th Cir. 1999) ......................................................... 4

*United States v. Hough,*
   803 F.3d 1181 (11th Cir. 2015) ..................................................... 15

*United States v. Jones,*
   976 F.2d 176 (4th Cir. 1992) ........................................................ 5

*United States v. Kahriger,*
   345 U.S. 22 (1953) ................................................................ 3, 14

*United States v. Matthews,*
   438 F.2d 715 (5th Cir. 1971) ........................................................ 5

*United States v. Powell,*
   379 U.S. 48 (1964) ................................................................. 10

**Statutes**

18 U.S.C. § 1956 ......................................................................... 14

26 U.S.C. § 5311 .................................................................... 13, 16

26 U.S.C. § 6011 .......................................................................... 4

26 U.S.C. § 7602 .......................................................................... 4

31 U.S.C. § 5311 ........................................................................ 10

31 U.S.C. § 5336 ................................................................ 6, 7, 9, 10

Pub. L. No. 116-283, div. F, § 6402(3), 134 Stat. 3388 (2021) ..................... 5, 6

**Regulatory materials**

87 Fed. Reg. 59,498 ...................................................................... 7

**Other authorities**

163 Cong. Rec. S4770 (daily ed. Aug. 2, 2017) ......................................... 9

165 Cong. Rec. H8318 (daily ed. Oct. 22, 2019) ....................................... 11

Emmanuel Mathias & Adrian Wardzynski,
  *Leveraging Anti-Money Laundering Measures to Improve Tax Compliance and
  Help Mobilize Domestic Revenues*, International Monetary Fund
  Working Paper (Apr. 2023) ...................................................................14

FBI,
  Testimony of Steven M. D'Antuno, Section Chief, Criminal
  Investigative Division, *Combatting Illicit Financing by Anonymous Shell
  Companies* (May 21, 2019)...........................................................................8

FinCEN,
  *Testimony for the Record, Kenneth A. Blanco, Director, S. Comm. on Banking,
  Housing, and Urban Affairs* (May 21, 2019).............................................8, 9

IRS Criminal Investigation: BSA Data Is Key to Unlocking Financial
  Crimes (Jan. 17, 2024)...............................................................................13

IRS Research, Applied Analytics & Statistics,
  *Tax Gap Projections for Tax Years 2020 and 2021* (Oct. 2023) ....................12

*IRS Updates Tax Gap Projections for 2020, 2021; Projected Annual Gap Rises to
  $688 Billion*, IR-2023-187 (Oct. 12, 2023)..................................................11

IRS, Data Book 2023, Publication 55-B, at 36 (Apr. 2024) ........................12

IRS: CI Annual Report 2023 (2023) ...........................................................14

Michael Cooper et al.,
  *Business in the United States: Who Owns It, and How Much Tax Do They
  Pay?*, 30 Tax Policyy & the Economy 91 (2016) .........................................7

Nathan J. Richman,
  *Departing IRS Criminal Investigation Head Sees Data-Driven Future*, Tax
  Notes (March 28, 2024)...............................................................................11

Steven T. Mnuchin,
  *Transcript: Hearing on the President's Fiscal Year 2021 Budget before the
  Senate Committee on Finance* (Feb. 12, 2020)..............................................7

U.S. Department of Justice,
  *Owner and Operator of Telemedicine and Telemarketing Companies Sentenced
  to 14 Years for $20 Million Fraud Scheme and $4 Million Tax Evasion* (June
  16, 2022) ......................................................................................................15

v

U.S. Department of Justice,
*Real Estate Developer Sentenced for Investment Fraud, Bank Fraud, Money
Laundering, and Tax Evasion Schemes* (July 31, 2023) ................................................... 15

U.S. Government Accountability Office,
*Company Formations: Minimal Ownership Information Is Collected and Available,
Report to the Permanent Subcommittee on Investigations, Senate Committee on Homeland
Security and Governmental Affairs*, GAO-06-376 (Apr. 7, 2006) ................................... 7

U.S. Government Accountability Office, Tax Gap: IRS Can Improve
Efforts to Address Tax Evasion by Networks of Businesses and
Related Entities, GAO-10-968 (2010) ....................................................................... 8

U.S. Senate Committee on Finance, *Wyden, Rubio Unveil Bill to Increase
Transparency, Crack Down on Illicit Financial Crimes: Bipartisan legislation
follows abuses exposed by the Panama Papers leaks* (Aug. 3, 2017) ................................... 6

**INTEREST OF AMICUS CURIAE AND SUMMARY OF ARGUMENT[1]**

The Tax Law Center at NYU Law is a nonpartisan, nonprofit center dedicated to improving the integrity of the federal tax system. Its staff comprises tax-law experts with experience in tax policymaking, administration, and litigation, including experts who have written extensively on implementation of the statute at issue here, the Corporate Transparency Act (or CTA). The Center submits this brief to offer its perspective on the implications of this case for the federal tax system.

Enacted with broad bipartisan support, the CTA seeks to accomplish purposes that are undeniably important: preventing money laundering, terrorism financing, and tax fraud. These crimes are often carried out through shell companies and other entities designed to conceal the perpetrators' identities. Because states generally don't require these entities to identify who owns them, there was no repository with this information before the CTA's enactment. So federal agencies like the Internal Revenue Service (or IRS) had to try other ways to track down their owners. Congress determined that these ways were too slow and cumbersome or incomplete to keep pace with the shell game, and that agencies needed ready access to this information.

Enter the CTA. It requires certain corporations, limited liability companies, and similar entities to report beneficial ownership information to a bureau within the

---

[1] This brief does not represent the views, if any, of NYU School of Law. No counsel for a party authored any part of this brief, no one other than amicus curiae paid for its preparation or submission, and all parties have consented to its filing.

Department of the Treasury called the Financial Crimes Enforcement Network (or FinCEN, for short). FinCEN stores this information in a database and, subject to security protocols, makes it available to certain law-enforcement agencies and federal regulators, including the IRS. In doing so, the statute shrinks the prior reporting gap, allowing the IRS to better trace ownership of income, uncover tax fraud and evasion, and therefore more accurately and efficiently assess and assign tax liability.

The district court below did not question Congress's judgment that beneficial ownership information is highly useful to tax administration and collection, among other things. Yet it held that Congress exceeded its authority in enacting the statute.

That conclusion is wrong. As the government explains, the CTA is authorized by Congress's national-security and commerce powers, either of which is enough to uphold the statute on its own. This Court may reverse on those grounds alone.

But as the government also explains—and this brief expands upon—the CTA is authorized by Congress's taxing power too. This power can be effective only if the IRS can identify who is responsible for paying tax on particular income (which, for business income, is often the individual owners, at their individual rates, rather than the entity itself). Tax evaders erect entities between themselves and their income for this very reason: to hide their tracks and thwart the law. The CTA counteracts this method of tax evasion. It gives the IRS the data it needs to assess and collect taxes at the correct rates and amounts, and from the correct taxpayer. It is constitutional.

## STATEMENT OF THE ISSUE

Did the district court correctly hold that the Corporate Transparency Act—which mandates the collection of information that is highly useful for tax collection and tax administration—exceeds Congress's taxing powers?

## ARGUMENT

### I.  The CTA is a constitutional exercise of Congress's taxing power because it is "in aid of a revenue purpose."

**A.** Congress has broad constitutional authority to "lay and collect Taxes" and "[t]o make all laws which shall be necessary and proper" to that end. U.S. Const. art. I, § 8, cl. 1. That includes not only the authority to collect taxes, but also the authority to collect information that is necessary for tax collection, or that makes tax collection easier or more effective. *See United States v. Kahriger*, 345 U.S. 22, 31–32 (1953), *overruled on other grounds by Marchetti v. United States*, 390 U.S. 39 (1968); *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937); *McCulloch v. Maryland*, 17 U.S. 316, 324–25, 353–54 (1819).

The "constitutional restraints on [this authority] are few." *Kahriger*, 345 U.S. at 28. For an information-reporting requirement, the key question is whether it is "in aid of a revenue purpose," *id.* at 32—that is, whether it is "part of the web of regulation aiding enforcement of [a] tax," *United States v. Bolatete*, 977 F.3d 1022, 1033 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 1754 (2021). A requirement that "make[s] the tax simpler to collect," for example, is "directly and intimately related to the collection of the tax" and falls within Congress's taxing power. *Kahriger*, 345 U.S. at 31–32; *see*

*also Sonzinsky*, 300 U.S. at 513 (upholding registration requirement as "obviously supportable as in aid of a revenue purpose"). That is why Congress may grant the IRS authority to require taxpayers to include information on their returns, 26 U.S.C. § 6011(a), or to summon people with information about a delinquent taxpayer, *id.* § 7602(a)(2)—because these provisions facilitate the collection of revenue. *See United States v. Bisceglia*, 420 U.S. 141, 150 (1975) (upholding IRS authority to require a bank to disclose the identity of people behind certain deposits, while noting the difficulties of obtaining tax information when "criminal activity is afoot [and] the persons involved may well have used aliases or taken other measures to cover their tracks"); *Polselli v. IRS*, 598 U.S. 432, 434–35, 440 (2023) (discussing the IRS's summons authority and explaining that even information that "may not itself reveal taxpayer assets that can be collected may nonetheless help the IRS find such assets," such as where it allows the IRS to identify entities that a taxpayer "has control over without formal ownership" and any associated bank accounts, or to subsequently uncover "assets parked elsewhere that the IRS could collect" to satisfy the taxpayer's liability).

Consistent with these principles, lower courts have held that reporting requirements are "in aid of a revenue purpose" if the required information "helps the government to learn 'the chain of possession'" of something that is subject to a tax, "and thus to identify the [person] liable for the tax." *United States v. Hall*, 171 F.3d 1133, 1142 (8th Cir. 1999) (quoting *Hunter v. United States*, 73 F.3d 260, 262 (9th Cir. 1996)

4

(per curiam)); *accord United States v. Jones*, 976 F.2d 176, 184 (4th Cir. 1992), *cert. denied*, 508 U.S. 914 (1993) (upholding registration requirement under the taxing power because "knowing the chain of possession and transfer assists in determining who [may be liable for taxes] and hence is 'supportable as in aid of a revenue purpose'"). Further, as this Court's predecessor held over half a century ago, Congress has the authority to collect information under the taxing power even if the information is not "coupled with a concurrent tax" but is "designed to aid the collection of tax [in the] future." *United States v. Matthews*, 438 F.2d 715, 717 (5th Cir. 1971); *see also United States v. Dodge*, 61 F.3d 142, 146 (2d Cir. 1995), *cert. denied*, 516 U.S. 969 (1995) (making same point).

**B.** The CTA is a constitutional exercise of Congress's taxing power under these precedents. Congress made express findings—in the text of the statute—that requiring the collection of beneficial ownership information is necessary to allow the government to better detect and deter tax evasion. And there is ample support for these congressional findings: The CTA facilitates revenue collection in at least three different ways, each of which is by itself enough to uphold the statute.

***Statutory text and history.*** The CTA's facilitation of tax collection is apparent from its text and history. Congress expressly found that "malign actors" had often interposed shell companies between themselves and their income in an attempt "to conceal their ownership" and "facilitate illicit activity," including "serious tax fraud." Pub. L. No. 116-283, div. F, § 6402(3), 134 Stat. 3388, 4604 (2021)

(codified at 31 U.S.C. § 5336 note). Congress also expressly found that "the collection of beneficial ownership information for corporations, limited liability companies, or other similar entities formed under the laws of the States is needed to … better enable critical … law enforcement efforts to counter" such "illicit activity," *id.* § 6402(5)(D), 134 Stat. at 4604, and that this information is "highly useful in … tax" administration, *id.* § 6101(a)(1)(A), 134 Stat. at 4549 (codified at 31 U.S.C. § 5311). Congress therefore mandated the collection of beneficial ownership information and ensured that it be available specifically "for tax administration purposes." 31 U.S.C. § 5336(c)(5)(B).

These express textual indicators are confirmed by the CTA's history. The CTA was a direct response to the Panama Papers leak, which exposed the use of anonymous domestic shell companies to facilitate tax evasion, among other crimes. *See* U.S. Sen. Comm. on Finance, *Wyden, Rubio Unveil Bill to Increase Transparency, Crack Down on Illicit Financial Crimes: Bipartisan legislation follows abuses exposed by the Panama Papers leaks* (Aug. 3, 2017), https://perma.cc/VU9M-DD26. "Following that leak[,] [Senator] Wyden urged the Treasury Department and the IRS to assess the effectiveness of federal disclosure requirements intended to fight the misuse of shell companies," *id.*, and it became clear that they were inadequate. Prior investigations had shown that most states did not require corporations and limited liability companies to report beneficial ownership information. *See* U.S. Gov't Accountability Off., *Company Formations: Minimal Ownership Information Is Collected and Available, Report*

*to the Permanent Subcomm. on Investigations, S. Comm. on Homeland Sec. and Governmental Affairs*, GAO-06-376, at 4–6 (Apr. 7, 2006). Congress found that this was still true for "most or all States" (a finding that it wrote into the CTA). 31 U.S.C. § 5336 note.

The CTA was thus necessary to provide the IRS with information that would "not exist" otherwise. 87 Fed. Reg. 59,498, 59,504; *see* Steven T. Mnuchin, *Transcript: Hearing on the President's Fiscal Year 2021 Budget before the S. Comm. on Finance*, at 25 (Feb. 12, 2020), https://perma.cc/FT7C-KKP4 (former Treasury Secretary testifying that it is "critical" to fill this "glaring hole in our own system"). This information is critical to tax collection because the IRS cannot accurately levy a tax without knowing who may owe it. *See Helvering v. Mitchell*, 303 U.S. 391, 299 (1938); *Bisceglia*, 420 U.S. at 150. In the case of "pass-through" entities (including limited liability companies and other entities now covered by the CTA), the tax is generally owed not by the entity but by its owners. (Hence the term "pass-through," which means that income passes through the entity to its owners for taxation.) Tax-return data alone, however, is insufficient for the IRS to trace income to the owners behind complex multi-entity structures, creating a major tax-compliance issue. *See* Michael Cooper et al., *Business in the United States: Who Owns It, and How Much Tax Do They Pay?*, 30 Tax Pol'y & the Economy 91, 92, 94, 121 (2016), https://perma.cc/HES7-H84S (using IRS data to show that 30% of income earned by partnerships, a common type of pass-through, cannot be reliably traced to "either the ultimate owner or the originating partnership").

Even when the IRS could obtain this information through other channels, it was (and remains) often difficult and time-consuming to do. The IRS must work through multiple levels of enormously complex entities and engage with people who have an incentive not to cooperate. *See* U.S. Gov't Accountability Off., Tax Gap: IRS Can Improve Efforts to Address Tax Evasion by Networks of Businesses and Related Entities, GAO-10-968, at 11-12 (2010). For instance, the IRS may obtain information "in aid of" tax collection by summons or subpoena, but that is typically just one "step in a paper trail leading to assets." *Polselli*, 598 U.S. at 441. To use these procedures "to determine the true owner of a shell company or front company," then, can take "an enormous amount of time," "waste resources," and "prevent[] investigators from getting to other equally important investigations," as the former Director of FinCEN testified to Congress. FinCEN, *Testimony for the Record, Kenneth A. Blanco, Director, S. Comm. on Banking, Housing, and Urban Affairs*, at 4 (May 21, 2019), https://perma.cc/X6ZP-BNSZ ("*FinCen Director Testimony*"). These routes can take "many years" and significantly hamper tax-collection efforts. FBI, Testimony of Steven M. D'Antuno, Section Chief, Criminal Investigative Division, *Combatting Illicit Financing by Anonymous Shell Companies* (May 21, 2019), https://perma.cc/9MPU-LJU5.

By contrast, obtaining "beneficial ownership information at the time of company formation significantly reduce[s] the amount of time required to research who is behind anonymous shell companies, and at the same time, prevent[s] the

flight of assets and the destruction of evidence." *FinCen Director Testimony*. That is an important difference. When the government is dealing with criminals who "evade detection" by using corporate structures layered like "Russian nesting 'Matryoshka' dolls," time is of the essence. 31 U.S.C. § 5336 note. "[E]ach time an investigator obtains ownership records for a domestic or foreign entity, the newly identified entity is yet another corporate entity, necessitating a repeat of the same process." *Id.*

The CTA was meant to change that. In introducing an earlier version of the law in 2017, Senator Wyden explained that it would "help us end the abuse of anonymous shell companies by criminals who use these entities" to commit crimes, "evade taxes," and "rip off taxpayers"—abuse that had been "highlighted" when "the Panama Papers leaked." 163 Cong. Rec. S4770 (daily ed. Aug. 2, 2017).

***Practical effect.*** Congress's judgments about the CTA's effects on tax administration are well-founded. Although the full effects of the statute cannot yet be measured because it hasn't been fully implemented, the CTA will likely support the collection of revenue in at least three ways, each of which is independently sufficient to uphold the statute under the taxing power: First, the CTA will likely make audits and investigations to detect tax fraud and other tax non-compliance more effective and efficient. Second, it will likely allow for better targeting of audits and investigations. And third, it will likely facilitate voluntary compliance.

*1. More effective and efficient audits and investigations.* To begin, the CTA will likely improve the efficiency of IRS audits and investigations. As just discussed, the statute allows the IRS to immediately access information that is "highly useful" for "tax administration," 31 U.S.C. §§ 5311(1)(A), 5336(c)(5)(B), and that might have otherwise required a drawn-out process to obtain (a process that might not have even produced the same quality of ownership information as the CTA would). Allowing the IRS to more efficiently access beneficial ownership information means that the IRS can conduct audits and investigations more quickly and accurately and can ultimately recover more revenue owed in taxes. A database of this information also helps the IRS to corroborate other important tax-related information, identify inconsistencies (including deliberate ones), and prevail under heightened evidentiary standards for civil tax fraud and criminal tax liability, *see United States v. Powell*, 379 U.S. 48, 53 (1964)—all of which further helps the IRS to maximize the recovery of tax revenue.

*2. Better audit and investigation targeting.* In addition to improving the efficiency of IRS audits and investigations, the CTA also makes them more effectively targeted.

To increase the effectiveness of its audits, the IRS has developed tools to focus on non-compliant taxpayers rather than auditing taxpayers entirely at random. Random audits are inefficient and burden law-abiding taxpayers. Targeted audits, however, help the IRS to maximize tax recovery, gain more insight into taxpayers whose activities entail criminal liability, and potentially produce more criminal

referrals. Indeed, the part of the IRS that is responsible for investigating potential criminal activity is an increasingly "data-centric law enforcement agency," which "has meant a revolution in case selection." Nathan J. Richman, *Departing IRS Criminal Investigation Head Sees Data-Driven Future*, Tax Notes (March 28, 2024).

Because the IRS has not previously had a database of beneficial ownership information, it has not had the information needed to effectively target its auditing and investigatory resources. The agency itself has essentially admitted as much. In its most recent projections of the annual "tax gap"—that is, the gap that exists between the taxes owed and the taxes paid—the IRS admitted that it does not know "the full extent of potential non-compliance" with tax laws related to "offshore activities, issues involving digital assets and cryptocurrency as well as corporate income tax" and "income from flow-through entities and illegal activities." *IRS Updates Tax Gap Projections for 2020, 2021; Projected Annual Gap Rises to $688 Billion*, IR-2023-187 (Oct. 12, 2023). Put another way, the IRS's data in these areas is so insufficient that the agency cannot even fully *estimate* the tax owed, let alone collect it.

The CTA seeks to shore up this data deficiency—and with it, to shrink the tax gap. It is designed to provide the IRS with more insight into each of these areas of taxation. That includes (1) illegal activities (*e.g.*, money laundering); (2) offshore activities (*e.g.*, using shell companies to cross jurisdictions); (3) cryptocurrency misuse, *see* 165 Cong. Rec. H8318 (daily ed. Oct. 22, 2019) (statement of Rep. Foster);

(4) corporate-income-tax issues (because the CTA applies to many corporations); and (5) income from pass-through entities (*e.g.*, limited liability companies and limited partnerships, many of which are also subject to the CTA's reporting requirements). Further, beneficial ownership information enables the IRS to adjust its overall compliance strategy and resource allocation at the operational and policy level.

*3. Voluntary compliance.* Finally, the CTA will likely increase voluntary compliance with the tax laws. Because the IRS audits only a very small set of filers, most taxes are collected through voluntary compliance. *See* IRS, Data Book 2023, Publication 55-B, at 36 (Apr. 2024), https://perma.cc/C59S-JJ48. Research has shown that more information reporting is associated with higher rates of voluntary compliance. *See* IRS Research, Applied Analytics & Statistics, *Tax Gap Projections for Tax Years 2020 and 2021*, at 5 (Oct. 2023), https://perma.cc/32BS-EUBT. That is true for two primary reasons. First, information reporting can help law-abiding taxpayers understand the taxes that they owe and pay them. *See id.* Second, where there is more information reporting, taxpayers who might otherwise evade tax will instead comply because the IRS is more likely to discover evasion. *See id.*; *cf. United States v. Clarke*, 573 U.S. 248, 254 (2014) (explaining in the context of reviewing an IRS summons that "an investigatory tool . . . is a crucial backstop in a tax system based on self-reporting"). Information-reporting laws that increase voluntary compliance can therefore decrease the tax gap without the need for the IRS to take any further action.

*    *    *

These three ways to facilitate revenue collection are just some of the ways that beneficial ownership information can be "highly useful" to tax administration. 26 U.S.C. § 5311(a)(1). In the future, the IRS will be able to show how this information has supported tax collection in practice, as the agency has done with other sources of information reporting, and may identify additional ways in which the statute has helped the tax system. *See, e.g.*, IRS Criminal Investigation: BSA Data Is Key to Unlocking Financial Crimes (Jan. 17, 2024), https://perma.cc/9S64-G4ZS; *Bisceglia*, 420 U.S. at 149. But these three ways are independently enough to uphold the CTA.

## II.    Neither the challengers nor the district court provided any basis for holding that the statute falls outside the taxing power.

None of the reasons set forth below—by either the challengers or the district court—justifies holding that the statute inconsistent with Congress's taxing power.

The challengers argued that the statute may not be upheld under the taxing power because its tax administration purposes were an "afterthought" to Congress, which was in their view primarily concerned with combatting money laundering and international terrorism. Doc. 39 at 21–22. But repeated references in the statutory text are not an "afterthought." And while the CTA undoubtedly has other objectives as well, "a law does not stop being a valid tax measure just because it also serves some other goal besides raising revenue." *Bolatete*, 977 F.3d at 1032; *see also United States v. Doremus*, 249 U.S. 86, 94 (1919).

The CTA's other goals, moreover, are not "extraneous to any tax need." *Kahriger*, 345 U.S. at 31. To the contrary, the statute's purposes are all interrelated and mutually reinforcing. Money laundering and tax evasion, for example, tend to go hand in hand, so tackling them effectively means tackling them together. *See, e.g.*, Emmanuel Mathias & Adrian Wardzynski, *Leveraging Anti-Money Laundering Measures to Improve Tax Compliance and Help Mobilize Domestic Revenues*, Int'l Monetary Fund Working Paper (Apr. 2023); 18 U.S.C. § 1956(a)(1)(A)(ii); *United States v. Browning*, 723 F.2d 1544, 1545–49 (11th Cir. 1984).

The numbers bear this out. In 2023, the IRS's criminal investigative unit spent 16.8% of its time investigating non-tax cases, including money laundering. *See* IRS:CI Annual Report 2023, at 10 (2023), https://perma.cc/C45F-8BQS. Accordingly, when the IRS uses beneficial ownership information for tax administration, this can help deter, expose, and stop money laundering and other financial crimes. And when other agencies use the information to investigate and prosecute non-tax financial crimes, it can help deter, expose, and stop tax evasion. In particular, it can give the IRS notice of which entities and owners might be using fronts through which money passes to hide the true source of income, and the ability to identify a fuller set of entities and individuals involved.

Two real-life examples illustrate the point. In one case, a real-estate developer laundered the proceeds of a $30-million fraud through shell companies (including a

domestic limited liability company). He was able to evade $2.75 million in federal income tax and penalties over many years as a result. *See* U.S. Dep't of Justice, *Real Estate Developer Sentenced for Investment Fraud, Bank Fraud, Money Laundering, and Tax Evasion Schemes* (July 31, 2023), https://perma.cc/X8Z7-ZLLH. In a second case, the owner of a telemedicine company carried out a $20-million wire fraud through shell companies that he controlled (and repeatedly opened and closed) but that were held in other people's names (known as nominee owners). He was able to evade over $4 million in tax as a result. *See* U.S. Dep't of Justice, *Owner and Operator of Telemedicine and Telemarketing Companies Sentenced to 14 Years for $20 Million Fraud Scheme and $4 Million Tax Evasion* (June 16, 2022), https://perma.cc/88UH-NZ28.

For both cases—and many more like them—a database of beneficial ownership information could have made a difference. It could have discouraged the schemes in the first place by increasing the risk of detection. It could have allowed investigators to more quickly and comprehensively find the wrongdoers and companies involved. It could have allowed investigators, in the second case, to flag new entities as they emerged and to identify any repeat nominee owners. And it could have made it easier, at the later stages of the cases, to collect evidence, including evidence of intent, *see Spies v. United States*, 317 U.S. 492, 499 (1943); *cf. United States v. Hough*, 803 F.3d 1181, 1189 (11th Cir. 2015), and to identify assets to pay liability.

These are not isolated examples of how complex structures have been used to carry out tax evasion and other crimes. Research indicates that structures like these (and other structures covered by the CTA) are part of a major tax non-compliance problem. U.S. Dep't of the Treasury, *National Strategy for Combating Terrorist and Other Illicit Financing*, at 14 (2020), https://perma.cc/GC53-MX8H; *see also* Cooper, *Business in the United States*, 30 Tax Pol'y & the Economy at 121 (noting that the inability to trace a large portion of partnership income suggests that complex structures are used to "minimize tax burdens").

The district court, for its part, held that the CTA exceeds Congress's taxing power because the relationship between the taxing power and the statute's reporting requirement is not "sufficiently close." *Nat'l Small Bus. United v. Yellen*, — F. Supp. 3d —, 2024 WL 899372, *20 (N.D. Ala. 2024). The court was concerned that upholding the statute would result in a "substantial expansion of federal authority" to authorize Congress to collect information that is "useful for tax administration." *Id.* at *21. But Congress has already granted the IRS authority to collect this information in many instances through a summons, subpoena, or other means, and courts have never questioned its power to do so. Nor have courts suggested that Congress lacked the power to enact the Bank Secrecy Act of 1970, 31 U.S.C. § 5311 *et seq.*, which requires banks to keep records on accountholders and submit reports on certain transactions because they would "have a high degree of usefulness in criminal, tax, or regulatory

investigations or proceedings." *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 26 (1974). The district court did not identify any reason to treat these statutes differently than this one. Nor did it articulate any rationale that would not apply equally to them.

It may be that the Constitution places limits on Congress's authority to impose information-reporting requirements related to tax administration. But this case does not require this Court to define the outer reaches of that authority. The CTA is well within constitutional bounds. It should be upheld.

## CONCLUSION

This Court should reverse the district court's judgment.

Respectfully submitted,

*/s/ Jonathan E. Taylor*
Gupta Wessler LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*jon@guptawessler.com*

April 22, 2024                                    *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 4,198 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font. This brief and the corresponding addendum comply with the virus scan requirements required by Local Rule 28A(h)(2) and is virus-free.

April 22, 2024                                        */s/ Jonathan E. Taylor*
                                                      Jonathan E. Taylor

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Jonathan E. Taylor*
Jonathan E. Taylor