No. 24-10736

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————

NATIONAL SMALL BUSINESS UNITED D.B.A. NATIONAL SMALL
BUSINESS ASSOCIATION, ISAAC WINKLES,

*Plaintiffs-Appellees*,

versus

U.S. DEPARTMENT OF TREASURY, SECRETARY OF THE U.S.
DEPARTMENT OF THE TREASURY, DIRECTOR OF THE FINANCIAL
CRIMES ENFORCEMENT NETWORK,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court for the
Northern District of Alabama, No. 5:22-CV-01448-LCB

———————————

BRIEF FOR APPELLEES

———————————

John C. Neiman, Jr.                Thomas H. Lee
MAYNARD NEXSEN P.C.                HUGHES HUBBARD & REED LLP
1901 Sixth Ave. N., Suite 1700     One Battery Park Plaza
Birmingham, Alabama 35203          New York, New York 10004
(205) 254-1000                     (212) 837-6000

*Counsel for Plaintiffs-Appellees*

*NSBA v. Yellen*, 24-10736

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, undersigned counsel certifies that there are no known persons and entities who have an interest in the outcome of this case, in addition to those listed in the certificate in Defendants-Appellants' opening brief.

s/ *Thomas H. Lee*
Thomas H. Lee

## STATEMENT REGARDING ORAL ARGUMENT

This Court has already granted expedited review in this time-sensitive case of nationwide importance and set oral argument during the week of September 16, 2024.  The District Court enjoined the enforcement of the Corporate Transparency Act against Plaintiffs-Appellees, holding that it exceeds Congress's Article I powers.  That ruling is due to be affirmed, and, for reasons explained below, it is equally clear that the CTA violates the Fourth Amendment, such that this Court could affirm on that alternative ground without calling for further proceedings in the District Court.  Because the District Court tailored its injunction to the parties before it, the CTA is currently effective and enforced as against other, non-party State-law entities and their owners and applicants throughout this Circuit and the nation.  Absent a prompt and definitive resolution of the issue, covered non-parties formed before January 1, 2024, will need to comply with the CTA by January 1, 2025.  It was therefore appropriate for this Court to schedule oral argument in accordance with the order granting expedited review.

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ................................................................... C-1 of 1

STATEMENT REGARDING ORAL ARGUMENT ................................................... i

STATEMENT OF ISSUES ............................................................................... 1

STATEMENT OF THE CASE ........................................................................... 2

    A.    Statute and Regulations ...................................................... 4

    B.    Proceedings Below............................................................. 10

SUMMARY OF ARGUMENT ......................................................................... 13

ARGUMENT ............................................................................................... 15

I.    THE CTA EXCEEDS CONGRESS'S POWERS. ........................................ 15

    A.    Congress does not have power to enact the CTA under
        the Commerce Clause and the Necessary and Proper
        Clause. ............................................................................. 17

        1.    The Commerce Clause does not justify the CTA
            because it facially regulates only non-economic,
            non-commercial activity............................................. 18

        2.    The CTA is not de minimis regulation of
            intrastate non-commercial activity that is
            essential to avoid undermining a comprehensive
            scheme of interstate commerce regulation. ................. 22

        3.    Congress does not have power to enact the CTA
            under the Necessary and Proper Clause to
            facilitate enforcement of federal Commerce
            Clause enactments. .................................................... 30

            (a)    The Necessary and Proper Clause does not
                authorize Congress to regulate entities that
                are not already subject to federal
                regulation. ......................................................... 33

i

(b)    The CTA is not justified under the Necessary and Proper Clause because it invades State sovereign power over entity formation. ........................................................ 34

(c)    Even if the CTA were "necessary" to enforce validly enacted federal criminal laws, it is a not a "proper" means to do so. ........................... 40

B.    The CTA Is Not Authorized by the Taxing Power and the Necessary and Proper Clause. ....................................... 43

C.    The CTA is not authorized by Congress's powers over foreign affairs and national security and the Necessary and Proper Clause. ............................................... 47

II.    THIS COURT SHOULD ALSO AFFIRM ON THE ALTERNATIVE GROUND THAT THE CTA VIOLATES THE FOURTH AMENDMENT. ........ 53

A.    The CTA's reporting requirement is a modern analogue to the general warrants the Fourth Amendment was ratified to proscribe. ........................................... 54

B.    The CTA's reporting requirement is a Fourth Amendment "search" of covered entities and of their owners. .................................................. 57

C.    The search of beneficial owners and entities the CTA effects is unreasonable. ........................................... 62

CONCLUSION .......................................................... 67

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Afroyim v. Rusk*, 387 U.S. 253 (1967) ..................................................... 49

\*Airbnb v. City of New York*, 373 F.Supp.3d 467 (S.D.N.Y 2019) ........................................................................ 61, 62, 67

\*Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250 (11th Cir. 2007) ............................................. 23, 25, 26

*American Power & Light Co. v. Securities & Exchange Commission*, 329 U.S. 90 (1946) ...................................... 21, 22

*Bond v. United States*, 572 U.S. 844 (2014) (Scalia, J., concurring in the judgment) ...................................... 38, 52

*Boyd v. United States*, 116 U.S. 616 (1886) .......................................... 55

*Brown v. Texas*, 443 U.S. 47 (1979) ...................................................... 59

*California Bankers Association v. Shultz*, 416 U.S. 21 (1974) .............. 21

\*Carpenter v. United States*, 585 U.S. 296 (2018) .................. 60, 61, 65, 66

*City of Indianapolis v. Edmond*, 531 U.S. 32 (2000) ............................ 65

*City of Los Angeles v. Patel*, 576 U.S. 409 (2015) ................................. 61

*Cort v. Ash*, 422 U.S. 66 (1975) ............................................................ 35

\*Gonzales v. Raich*, 545 U.S. 1 (2005) ................... 13, 17, 23, 24, 26, 27, 31

*Helvering v. Mitchell*, 303 U.S. 391 (1938) .......................................... 46

*Katz v. United States*, 389 U.S. 347 (1967) .......................................... 62

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963) ....................... 50, 51

i

*Lopez v. United States*, 516 U.S. 549 (1995) ............................... 16, 23, 27

*Mata Chorwadi, Inc. v. City of Boynton Beach,* 66 F.4th 1259
(11th Cir. 2023) ..................................................................... 53

\**McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ............. 34, 36, 37

*Michigan Dep't of State Police v. Sitz*, 496 U.S. 444 (1990) .................. 65

\**National Federation of Independent Business v. Sebelius*,
567 U.S. 519 (2012) ............................... 13, 15, 29, 33, 34, 37, 40, 41, 45

*Okla. Press Pub. Co. v. Walling*, 327 U.S. 186 (1946) ........................... 60

*Olmstead v. United States*, 277 U.S. 438 (1928) .................................... 66

*Sabri v. United States*, 541 U.S. 600 (2004) ......................................... 33

*Silverthrone Lumber Co. v. United States*, 251 U.S. 385
(1920) ...................................................................................... 57

*Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602 (1989) ................... 64

*Smith v. Maryland*, 442 U.S. 735 (1979) .............................................. 62

*Sonzinsky v. United States*, 300 U.S. 506 (1937) .................................. 47

*Stanford v. Texas*, 379 U.S. 476 (1965) ................................................ 55

*Students for Fair Admissions v. Pres. & Fellows of Harvard
College*, 600 U.S. 191 (2023) .................................................... 38

*Ullmann v. United States*, 350 U.S. 422 (1956) .................................... 50

*United States v. Bolatete*, 977 F.3d 1022 (11th Cir. 2020*)* .................... 46

\**United States v. Comstock*, 560 U.S. 126 (2010) ................. 13, 15, 31, 33,
38, 39, 40, 41, 45, 49

*United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304
(1936) ...................................................................................... 48

*United States v. Davila-Mendoza*, 972 F.3d 1264 (11th Cir. 2020)........................................................................... 30

*United States v. Doremus*, 249 U.S. 86 (1919)........................................ 46

*United States v. Kahriger*, 345 U.S. 22 (1953), *overruled on other grounds by Marchetti v. United States*, 390 U.S. 39 (1968)........................................................................................ 46

*United States v. Kebodeaux*, 570 U.S. 387 (2013) (Roberts, C.J., concurring in the judgment)......................................... 43

\**United States v. Lopez*, 514 U.S. 549 (1995).................. 17, 22, 23, 27, 28

*United States v. Martinez-Fuerte*, 428 U.S. 543 (1976).......................... 65

\**United States v. Maxwell*, 446 F.3d 1210 (11th Cir. 2006)............. 22, 23, 24, 25, 26

*United States v. Miller*, 425 U.S. 435 (1976) ........................................ 59

\**United States v. Morrison*, 529 U.S. 598 (2000) .................. 22, 23, 27, 28

*United States v. Morton Salt Co.,* 338 U.S. 632 (1950) ......................... 60

*Veronia Sc. Dist. 47J v. Acton*, 515 U.S. 646 (1995).............................. 65

*Wickard v. Filburn*, 317 U.S. 111 (1942) ......................................... 26, 37

**Constitutional Provisions**

U.S. Const. Amendment I ......................................................... 11, 12, 53

U.S. Const. Amendment IV.................. 1, 3, 11, 12, 14, 32, 53, 54, 55, 56, 57, 59, 60, 61, 62, 64, 65, 66, 67

U.S. Const. Amendment V ................................................... 11, 12, 51, 53

U.S. Const. Amendment VI.......................................................... 51

U.S. Const. Amendment IX.......................................................... 11

iii

U.S. Const. Article I, § 8, cl. 3 ........................................................ 17, 51

U.S. Const. Article II, § 2 ...................................................................... 49

**Statutes**

18 U.S.C. § 2252A(a)(5)(B) ................................................................... 24

31 U.S.C. § 5336 .................................................................................... 19

31 U.S.C. § 5336(a)(11) .......................................................................... 20

31 U.S.C. § 5336(a)(11)(A) & (3)(A) ...................................................... 6

31 U.S.C. § 5336(a)(11)(B) ...................................................................... 6

31 U.S.C. § 5336(a)(11)(B)(xxiv) .......................................................... 40

31 U.S.C. § 5336 (b)(1)-(2) ...................................................................... 5

31 U.S.C. § 5336(b)(1)(A) ........................................................................ 6

31 U.S.C. § 5336(c)(2)(B) ............................................................ 10, 40, 44

31 U.S.C. § 5336(c)(2)(B)(i)(I) .............................................................. 44

31 U.S.C. § 5336(f) .................................................................................. 39

31 U.S.C. § 5336(h)(1)(A)-(B) & (h)(3)(A)(i)-(ii) .................................. 9

31 U.S.C. §§ 5336(h)(1) & (h)(3)(A) ...................................................... 60

Agricultural Adjustment Act ................................................................ 26

Ala. Code §§ 10A-1-4.02, 10A-2A-2.01 ................................................ 18

Ala. Code § 10A-5A-2.01(a) ............................................................. 16, 62

Anti-Money Laundering Act ............................................................ 27, 45

Chemical Weapons Act .......................................................................... 52

iv

Child Pornography Prevention Act..........................................23

Controlled Substances Act .............................................23, 24

Endangered Species Act.................................................23, 25

Fair Labor Standards Act ....................................................60

Gun-Free School Zones Act .................................................23

Pub. L. No. 116-283, div. F, § 6403(d)(1), 134 Stat. 3388,
    4624 (2021) (codified at 31 U.S.C. § 53311 note) ...........4, 35

Public Utility Holding Act...................................................21

Violence against Women Act...............................................23

**Regulations**

31 C.F.R. § 1010.230(a) .....................................................42

31 C.F.R. § 1010.380(a)(1)(iii) ..............................................8

31 C.F.R. § 1010.380(b)(1)(ii)(E) ...........................................7

31 C.F.R. § 1010.380(d)(1)(i)(C)-(D) ...................................7, 44

31 C.F.R. § 1020.210(a)(2)(5)..............................................42

86 Fed. Reg. 69589 (Dec. 8, 2021) .......................................19

87 Fed. Reg. 59498 (Sept. 30, 2022).......................6, 41, 56, 64

89 Fed. Reg. 12424 (Feb. 16, 2024) ......................................42

**Others/ Miscellaneous**

2 M. Farrand, *Records of the Federal Convention of 1787*, at
    325 (Pinckney) & 615-16 (Madison) ...................................36

1 Stewart Kyd, A *Treatise on the Law of Corporations* 28
    (1793)....................................................................37

## STATEMENT OF ISSUES

1.    Whether this Court should affirm because the District Court correctly ruled that the CTA exceeds Congress's powers by requiring entities formed under State law to report personal information of their owners and applicants solely due to the fact of their formation, regardless of whether they participate in interstate commerce.

2.    Whether this Court should also affirm because the CTA's blanket requirement that State-law entities and their individual owners and applicants report personal information to FinCEN for criminal law-enforcement purposes—in the absence of a warrant, probable cause, or reasonable suspicion of wrongdoing—violates "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures" under the Fourth Amendment.

STATEMENT OF THE CASE

In 2021, for the first time in the history of the United States, Congress passed a law compelling entities formed under State laws to collect and turn over personal information about their "beneficial owners" and "applicants" to the federal government. Tens of millions of people are affected, including countless Americans who set up entities under State laws every day for lawful purposes. Meanwhile, the bad actors the CTA seeks to target will either ignore it or provide false information. The statutory trigger for the reporting obligation is the act of entity formation under State law, which is a ministerial act solely within the purview of each State. An entity need not be engaged in any activity, much less commercial activity, for the reporting obligation to arise.

The CTA thus encroaches upon the sovereign power of the States to charter corporations and other entities under their laws. Any "beneficial owner" of an entity under State laws must have their names, birthdates, addresses, and identification document numbers (with a digital image of the document) reported to the Financial Crimes Enforcement Network ("FinCEN") of the Department of the Treasury unless exempted. This mandate applies without any probable cause or reasonable suspicion of

2

wrongdoing by these individuals, for general law-enforcement purposes. Any person who "willfully" fails to report their information may be fined and imprisoned.

Simply put, the CTA creates a nationwide Big-Brother-type database, filled with digital mugshots of millions of law-abiding Americans, which federal, state, and foreign law-enforcement and intelligence agencies may access to investigate and prosecute crimes. In enacting the CTA, Congress has wielded a general federal police power contrary to the Constitution and trampled upon the privacy rights of millions of Americans. The Constitution constrains what the government may do, even in the service of laudable goals. The Court below correctly ruled that Congress exceeded its constitutional powers, declared the CTA unconstitutional, and permanently enjoined its enforcement against plaintiffs Isaac Winkles and the National Small Business Association ("NSBA"). The District Court had no need to address the other constitutional claims raised by Winkles and the NSBA, but it is equally clear that the CTA's compilation of this database violates the Fourth Amendment. This Court should affirm.

## A.     Statute and Regulations

The CTA was enacted as part of the National Defense Authorization Act for Fiscal Year 2021.  *See* Pub. L. No. 116-283, 134 Stat. 3388 (2021). The "sense of Congress" was that "[f]ederal legislation providing for the collection of beneficial ownership information for corporations, limited liability companies, or other similar entities formed under the laws of the States" was "needed" to, in Congress's words:

> "(A) set a clear, Federal standard for incorporation practices;
>
> (B) protect vital United States national security interests;
>
> (C) protect interstate and foreign commerce;
>
> (D) better enable critical national security, intelligence and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity; and
>
> (E) bring the Unite[d] States into compliance with international anti-money laundering and countering the financing of terrorism standards[.]"

*Id.* div. F, § 6402(5), 134 Stat. at 4604 (codified at 31 U.S.C. § 5336 note). Congress found that "most or all States do not require information about the beneficial owners of" entities formed under their laws.  *Id.* § 6402(2).

Accordingly, the CTA's core provision requires every "reporting company" to "submit to FinCEN" (the Financial Crimes Enforcement Network of the Treasury Department) a "report" with information of every "beneficial owner" and "applicant." 31 U.S.C. § 5336 (b)(1)-(2). The report must contain the full legal name, date of birth, current residential or business street address, and either a "unique identifying number from an acceptable identification document" or what the statute refers to as the "FinCEN identifier" of the entity's beneficial owners and applicants. *Id.* § 5336(b)(2)(A).

The CTA defines each key term capaciously. A "reporting company" is any "corporation, limited liability company, or similar entity" "created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe" or "formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." A "beneficial owner" is, with exceptions, any "individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise" "owns or controls" 25 percent or more of the equity in the entity or "exercises substantial

control over the entity." 31 U.S.C. § 5336(a)(11)(A) & (3)(A). Entities must update FinCEN with any changes to reported beneficial-owner information. *See id.* § 5336(b)(1)(D). The CTA exempts 24 kinds of entities from beneficial-owner reporting, including financial institutions, dormant entities with no assets, and companies with more than 20 full-time U.S. employees, $5 million in annual gross receipts or sales, and a physical office in the United States. *See* 31 U.S.C. § 5336(a)(11)(B). The CTA directs FinCEN to retain reported information for "not fewer than 5 years" after an entity terminates. *Id.* § 5336(c)(1).

Despite these exemptions, FinCEN estimates that the CTA reporting requirements will apply to 32.6 million existing entities, as well as 5 million new entities each year from 2025 to 2034. *See* Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59498, at 59549 (Sept. 30, 2022). FinCEN also estimates that complying with initial reporting will cost these entities between $85.14 and $2,614.87 each, depending on how they are structured. *See id.* at 59573.

The CTA directs the Secretary of the Treasury to "prescribe[]" regulations as to the information entities "shall submit to FinCEN." 31 U.S.C. § 5336(b)(1)(A). In September 2022, FinCEN issued a Final Rule

6

requiring, among other things, that for any beneficial owner for whom the entity reports a "unique identifying number" from a government-issued document such as a driver's license, the entities' reports must also include an image of the beneficial owner's "identification document" itself. 31 C.F.R. § 1010.380(b)(1)(ii)(E).

The Final Rule also tries to explain how entities should determine who "exercises substantial control over the entity" and so must be reported to FinCEN as a "beneficial owner." Beneficial owners are not limited to the entity's equity owners. They also encompass senior officers and people with authority to appoint or remove senior officers and board members. *See id.* § 1010.380(d)(1)(i)(A)-(B). They extend, even further, to any person who "[d]irects, determines, or has substantial influence over important decisions" made by the entity or "[h]as any other form of substantial control over" the entity. *Id.* § 1010.380(d)(1)(i)(C)-(D). The Rule elaborates that an individual "may directly or indirectly, including as a trustee of a trust or similar arrangement, exercise substantial control" through "[a]rrangements or financial or business relationships, whether formal or informal," or "any other contract, arrangement, understanding, relationship or otherwise." *Id.* § 1010.380(d)(1)(ii)(E)-(F). As

for "company applicant," the Rule defines the term as any individual "who directly files the document that creates" or "registers" the entity and "the individual who is primarily responsible for directing or controlling such filing if more than one individual is involved in the filing of the document." *Id.* § 1010.380(e)(1)-(3).

Regarding deadlines to comply, the Rule (as amended) requires all reporting companies formed or registered:

(1) before January 1, 2024, to report beneficial-owner information by January 1, 2025, *see* 31 C.F.R. § 1010.380(a)(1)(iii);

(2) between January 1 and December 31, 2024, to report beneficial-owner and applicant information within 90 days of formation or registration, *see id*. § 1010.380(a)(1)(i)(A) & ii(A); and

(3) after December 31, 2024, to report beneficial-owner and applicant information within 30 days of formation or registration, *see id*. § 1010.380(a)(1)(i)(B) & (ii)(B).

Any changes to beneficial-owner information previously reported to FinCEN must be filed within 30 days of the change. *See id.* § 1010.380(a)(2)(i).

8

The CTA prescribes fines and prison terms for non-compliance. "Any person" who "willfully" fails to report or update beneficial-owner information or files "false or fraudulent" information "shall be liable to the United States for a civil penalty" of not more than $500 per day and "may be fined up to $10,000, imprisoned for not more than 2 years, or both." 31 U.S.C. § 5336(h)(1)(A)-(B) & (h)(3)(A)(i)-(ii). The word "willfully" is defined as "the voluntary, intentional violation of a known legal duty." *Id.* § 5336(h)(6).

The CTA authorizes FinCEN to share reported beneficial-owner information with:

(1) a "Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity;"

(2) a "State, local or Tribal law enforcement agency, if a court of competent jurisdiction . . . has authorized the law enforcement agency to seek the information in a criminal or civil investigation;"

(3) a "law enforcement agency, prosecutor, or judge of another country" via "a request from a Federal agency" pursuant to "an international treaty, agreement, convention, or official request made by law enforcement, judicial, or prosecutorial authorities in trusted foreign countries"

9

for "authorized investigation or national security or intelligence activity" by the foreign country;

(4) a "financial institution subject to customer due diligence [CDD] requirements, with the consent of the reporting company, to facilitate compliance" with CDD requirements; and

(5) a "Federal functional regulator or other appropriate regulatory agency" such as the Securities and Exchange Commission.

31 U.S.C. § 5336(c)(2)(B).  The CTA also mandates that FinCEN's beneficial-owner information "shall be accessible for inspection or disclosure to officers and employees" of the Treasury Department "whose official duties require such inspection or disclosure" including IRS agents for "tax administration."  *Id.* § 5336(c)(5)(A)-(B).

## B.    Proceedings Below

Issac Winkles owns real-estate businesses in Huntsville, Alabama. *See* Doc. 39-3 at 2-3, ¶3.  The NSBA is an association whose membership consists of approximately 65,000 small businesses across the United States.  *See* Doc. 39-2 at 2-3, ¶¶2-3.  Winkles and NSBA filed suit in the District Court against the Department of the Treasury and Secretary Yellen and FinCEN's then-Acting Director Das in their official capacities.

10

*See* Doc. 1 at 12, ¶¶15-17.  They claimed that the CTA exceeded Congress's powers and violated their rights under the First, Fourth, Fifth, and Ninth Amendments.  *See* Doc. 1 at 24-37, ¶¶41-66.

The District Court granted the parties' joint motion for expedited briefing and to stay discovery, and the parties cross-moved for summary judgment.  *See* Docs. 20, 23, & 24.  After hearing argument and conducting a telephonic follow-up hearing, *see* Docs. 46 & 48, the District Court issued a 53-page memorandum opinion and accompanying final judgment for the plaintiffs.  *See* Doc. 51 & 52.

As a preliminary matter, the court rejected the Government's argument that Winkles and NSBA lacked standing to challenge the CTA.  The court ruled that Winkles had standing because he would be injured by his entities' turning over his personal information to FinCEN and the CTA's threatened imposition of "serious criminal penalties . . . for non-compliance" on him personally if he did not comply.  Doc. 51 at 10-13.  The court ruled that NSBA had associational standing because Winkles' entities are NSBA members.  *See* Doc. 51 at 11-15.

On the merits, the District Court held that the CTA "cannot be justified as an exercise of Congress' enumerated powers," rejecting all three

arguments the Government asserted. Doc. 51 at 52. First, the District Court rejected the Government's argument that Congress had power to enact the CTA pursuant to its plenary powers over foreign affairs and national security and the Necessary and Proper Clause. *See* Doc. 51 at 17-25. Second, the court rejected the Government's argument that the CTA was within Congress's power under the Commerce Clause on its own or combined with the Necessary and Proper Clause, reasoning that the "CTA does not regulate the channels and instrumentalities of commerce," or intrastate non-commercial activity that "taken in the aggregate, substantially affects interstate commerce.'" Doc. 51 at 21 & 33. Third, the District Court rejected the Government's argument that the CTA was justified by Congress's taxing power and the Necessary and Proper Clause. *See* Doc. 51 at 49-52.

The District Court then held the CTA unconstitutional and permanently enjoined its enforcement against Winkles and the NSBA. Doc. 51 at 52; Doc. 52. The court determined that its conclusion that the CTA was outside Congress's powers made it "unnecessary to decide whether the CTA violates the First, Fourth, and Fifth Amendments." Doc. 51 at 52.

SUMMARY OF ARGUMENT

The CTA is unconstitutional because the unprecedented federal police power relating to entity formation under State laws it ordains is contrary to constitutional text, history, and precedent.  The Constitution does not give Congress any explicit powers to encroach upon State powers to incorporate, which preceded ratification.  The Commerce Clause does not justify such power because the act of incorporation itself is not a commercial act and the CTA does not confine itself to entities that use or engage in interstate commerce or to regulation of *de minimis* intrastate, noncommercial activity to avoid undermining a comprehensive regulatory regime.  *See Gonzales v. Raich*, 545 U.S. 1, 17 (2005).  As to the Government's unbounded necessary and proper argument, *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012), forecloses it, and *United States v. Comstock*, 560 U.S. 126 (2010), is easily distinguished.  *NFIB* also ruled out the idea that the CTA is justified based on the likelihood that an entity that has been formed will engage in interstate commerce in the future.  *See* 567 U.S. at 557.  Additionally, as the District Court correctly ruled, the CTA cannot be justified under Congress's powers over foreign relations and national security, Congress's

taxing power, or any of these powers in conjunction with the Necessary and Proper Clause, because entity formation under States laws is too attenuated from any of those powers.

Because the CTA will be enforced as to all entities as of January 1, 2025, it is also appropriate for this Court to affirm on the alternative ground—unreached by the District Court—that the CTA compels unreasonable, suspicionless searches of the plaintiffs and millions of other people in violation of the Fourth Amendment. The CTA forces Americans who own or form entities under State law to report their personal information to the federal government without a warrant or any suspicion of wrongdoing, to populate a criminal law-enforcement and financial-intelligence database. These persons can be fined and imprisoned if they fail to comply. That is a paradigmatic—and unprecedented—violation of the Fourth Amendment.

If this Court does not affirm on one or both of these grounds, it should remand to the District Court to decide the claims it did not reach.

ARGUMENT

## I.   THE CTA EXCEEDS CONGRESS'S POWERS.

It is disconcerting that Senator Whitehouse and the four other Members of Congress who have filed an amicus brief in this case would call a statute as novel and wide-sweeping as the CTA a "garden-variety" enactment of their power under Article I of the Constitution.   Sen. Whitehouse et al. Br. 2.  The Government says the CTA "bears no resemblance to the enactments that the Supreme Court has held to exceed Congress' authority," Gov't Br. 21, but in truth, the CTA bears no resemblance to *any* prior enactment of Congress.  "'[T]he most telling indication of [a] severe constitutional problem . . . is the lack of historical precedent' for Congress's action." *Nat'l Fed'n of Ind. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012) *("NFIB")* (citation omitted).  By contrast to "the long history of federal involvement in this arena" as to the statute upheld under the Necessary and Proper Clause in *United States v. Comstock*, 560 U.S. 126, 149, 137 (2010), there is, by the Government's own admission, *no* prior history of enactments requiring the reporting of the personal information of the owners and applicants of State-chartered entities upon formation to the federal government for law-enforcement purposes.

15

The CTA is thus a sweeping and unprecedented information dragnet that overwhelmingly affects law-abiding Americans to aid federal and foreign law enforcement while encroaching upon centuries of State sovereign authority over entity formation and individual privacy rights with no discernible limiting principle. Most States do not compel persons forming entities to submit the beneficial-owner and applicant information that the CTA requires, reflecting a policy choice by State lawmakers and citizens that individuals should have some privacy from government oversight when creating entities. Each State's laws are different, but Alabama, for example, does not require the organizers of LLCs to disclose even their names or addresses. *See* Ala. Code § 10A-5A-2.01(a). Under the Government's theory of what is necessary and proper to fight international money laundering, "it is difficult to perceive any limitation on federal power, even in areas . . . where States historically have been sovereign," such as entity formation. *Lopez v. United States*, 516 U.S. 549, 564 (1995).

A.   **Congress does not have power to enact the CTA under the Commerce Clause and the Necessary and Proper Clause.**

Congress's power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes" does not extend far enough to enact the CTA.   U.S. Const. art. I, § 8, cl. 3.   Congress has power to regulate (1) "the channels of interstate commerce," (2) "the instrumentalities of interstate commerce" and "persons or things in interstate commerce," and (3) "activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005).  With respect to the third category, the Supreme Court has held that, in regulating activities that substantially affect instate commerce, Congress can regulate "*de minimis*" intrastate, non-economic or non-commercial activity only if doing so is essential to avoid undermining a larger, comprehensive regulatory scheme that clearly and directly regulates interstate commerce. *Id.* at 17 & 19; *see also United States v. Lopez*, 514 U.S. 549, 561 (1995) ("Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme would be undercut unless the intrastate activity were regulated.").

17

The District Court ruled that the CTA "does not regulate" either "the channels" or "instrumentalities of" commerce." Doc. 51 at 27. That ruling is unassailable, and the Government does not challenge it here. *See* Gov't Br. 15. The questions at issue then are whether the CTA regulates intrastate, non-commercial activities that affect interstate commerce or whether it is a necessary and proper means of doing so. The District Court correctly answered no on both questions.

## 1.    The Commerce Clause does not justify the CTA because it facially regulates only non-economic, non-commercial activity.

The actual process of incorporation today confirms that entity formation itself is not a commercial activity. A State official (usually the secretary of state) charters a corporation upon the filing of a document. *See, e.g.*, Ala. Code §§ 10A-1-4.02, 10A-2A-2.01. Corporate formation under State law is thus a governmental and ministerial act, just as the issuance of any other sort of license by a state or local government like a marriage license is a governmental and ministerial act. It is not a private commercial or economic activity. The Government implicitly concedes as much, as its brief before this Court goes to great lengths to maintain that the CTA "regulates commercial entities, not the act of incorporation."

Gov't Br. 29.  Indeed, in its briefing to the District Court, the Government disclaimed any argument "that 'entity formation itself is a commercial activity that "substantially affects" interstate commerce[.]'"  Doc. 40 at 11.

But the Government cannot reasonably maintain that the CTA only "regulates commercial entities."  Gov't Br. 29.  As FinCEN has conceded, people create many so-called "shell companies" for lawful non-commercial reasons, including to protect privacy regarding real-property ownership such as LLCs formed to hold family homes for personal security reasons. Anti-Money Laundering Regulations for Residential Real Estate Transactions, 86 Fed. Reg. 69589, 69591 (Dec. 8, 2021).  Shell companies may also be used to structure ownership over other family assets or to set up non-profit associations without tax-exempt status, such as social clubs and neighborhood associations.  The critical fact that subjects a "reporting company" to regulation under the CTA, however, is its "creat[ion]" or "regist[ration]" by "the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe."  31 U.S.C. § 5336(a)(11).  No further activity, much less commercial activity, is required.

It makes no sense therefore to say that the CTA doesn't regulate entity formation but only "commercial entities." Yet the Government makes that assertion repeatedly:

- "the CTA regulates a class of entities—primarily active, for-profit businesses—whose defining feature is their authority and propensity to conduct commercial transactions." Gov't Br. 23;

- "The record does not reflect any entities that register as corporations but then decline to engage in any economic activity." Gov't Br. 30; and

- "Thus, no jurisdictional element is needed here, where Congress crafted the CTA to focus on active, for-profit businesses." Gov't Br. 32.

These assertions reveal a fundamental disconnect between the characterizations of the CTA that the Government draws in its brief and Congress's findings and reports regarding the statute. By the CTA's plain terms, it gathers information about individuals who "create[]" or "register[]"entities under State law, for the sake of creating a massive financial-intelligence and law-enforcement database. 31 U.S.C. § 5336(a)(11). Congress did not, in the words of the Government, "tailor the reporting requirements to active, for-profit businesses with an especially close connection to commerce." Gov't Br. 12-13. This statement is

20

flatly inconsistent with the Government's claim that the CTA targets "shell companies," which it defines as "entities that have no physical presence beyond a mailing address, generate little to no economic value, and generally are created without disclosing their beneficial owners." Gov't Br. 4 & n.2.

The fact that the CTA does not contain a "jurisdictional hook" specifying that it applies to entities that use channels of interstate commerce or conduct activities in interstate commerce is an important factor in Commerce Clause analysis. As the District Court reasoned, the lack of a jurisdictional element distinguishes the CTA from the Bank Secrecy Act provisions upheld in *California Bankers Association v. Shultz*, 416 U.S. 21 (1974). The "reporting and record-keeping requirements at issue in *Shultz* were upheld largely because they governed negotiable instruments and money *actually* moving in foreign and interstate commerce." Doc. 51 at 30. Likewise, in *American Power & Light Co. v. Securities & Exchange Commission*, 329 U.S. 90 (1946), the Supreme Court affirmed Congress's power to enact the Public Utility Holding Act because "the challenged statute was 'directed solely to public utility holding company

systems that use[d] the channels of interstate commerce.'" Doc. 51 at 31 (quoting *American Power*, 329 U.S. at 100).

> ### 2. The CTA is not de minimis regulation of intrastate non-commercial activity that is essential to avoid undermining a comprehensive scheme of interstate commerce regulation.

The District Court correctly parsed the precedents to conclude that the CTA cannot be justified based on the substantial-effects prong of Commerce Clause doctrine: the "Supreme Court's Commerce Clause decisions all point to the same conclusion: No." Doc. 51 at 35.

In addition to *NFIB*, the District Court found *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), most on-point for two reasons. First, those statutes, like the CTA, did not have an express jurisdictional hook requiring the regulated subject's "use" or "engage[ment] in" interstate commerce. Doc. 51 at 45-49. Second, as the District Court reasoned, "incorporation is a single, discrete action far closer to 'possession of a gun in a school zone or gender-motivated violence' than a general regulation of controlled substances." Doc. 51 at 42 (quoting *United States v. Maxwell*, 446 F.3d 1210, 1216 n.6 (11th Cir. 2006)). And, as the Government conceded, the act of incorporation

by filing a document with the relevant State authority—like gender-motivated violence or possessing a gun in a school zone—is not by itself "enough to invoke the Commerce power." Doc. 51 at 40. Nor, the Court continued, does aggregation create the requisite substantial effect: incorporation is "'in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce.'" Doc. 51 at 40 (quoting *Lopez*, 514 U.S. at 567).

The CTA is similar to the unconstitutional "single-subject" statutes struck down in *United States v. Lopez* (Gun-Free School Zones Act) and *United States v. Morrison* (Violence against Women Act), and unlike the constitutional "comprehensive" statutes upheld against as-applied challenges by the Supreme Court in *Raich* (Controlled Substances Act) and by this Court in *Maxwell* (Child Pornography Prevention Act) and *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250 (11th Cir. 2007) (Endangered Species Act). *Lopez*, *Morrison*, and this case involve facial constitutional challenges to statutes that touch only on a "single" activity that is not commercial and interstate in nature. In the latter cases, the object of the constitutional challenge was the application of a comprehensive statute clearly regulating interstate commercial activity

23

as a general matter, to a specific *de minimis* instance of intrastate, non-commercial activity that did not directly implicate interstate commerce.

For instance, *Raich* upheld the Controlled Substances Act, which erected "a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA." 545 U.S. at 13. The plaintiffs did not "dispute that passage of the CSA . . . was well within Congress's commerce power" but sought an "as applied" exemption to the CSA for the for "the intrastate manufacture and possession of marijuana for medical purposes" as permitted by California law. *Id.* at 15.

Similarly, the Child Pornography Prevention Act at issue in this Court's decision in *Maxwell* criminalized knowing possession, transport, shipping, receiving, production, and reproduction of child pornography "transported in interstate or foreign commerce by any means, including by computer . . . or . . . produced using materials . . . transported in interstate or foreign commerce by any means, including by computer." *Maxwell*, 446 F.3d at 1211 n.1 (quoting 18 U.S.C. § 2252A(a)(5)(B)). This Court rejected Maxwell's argument that the statute was not constitutional "as applied to the facts of his case," which involved his prosecution

for possession of digital images on disks found in his home that did not travel through interstate commerce. *Id.* at 1213. This Court reasoned that "where Congress comprehensively regulates economic activity, it may constitutionally regulate intrastate activity, whether economic or not, so long as the inability to do so would undermine Congress's ability to implement effectively the overlying economic regulatory scheme." *Id.* at 1215 (footnote omitted).

This Court's decision in *Alabama-Tombigbee Rivers* was much the same. There, industry groups unsuccessfully challenged a Final Rule implemented under the Endangered Species Act, a landmark enactment to protect global rare animal species, "as-applied" to include the Alabama sturgeon, a freshwater fish found only in Alabama. *Ala.-Tombigbee Rivers Coal.* 477 F.3d at 1272. This Court concluded that "Congress was not constitutionally obligated to carve out an exception for intrastate species from the otherwise comprehensive statutory scheme that is the Endangered Species Act." *Id.* at 1276.

Unlike the plaintiffs here, the plaintiffs in those three cases did not attack the facial constitutionality of the respective comprehensive statutes at issue. That was because each of those statutes on its face plainly

25

regulated conduct that was commercial and interstate in nature. *Wickard v. Filburn*, 317 U.S. 111, 115 (1942), the pathmarking substantial-effects decision, similarly involved the Supreme Court rejecting an as-applied challenge to a comprehensive statutory scheme regulating interstate commerce on its face. *See id* at 128 (upholding Agricultural Adjustment Act as applied to wheat grown by a farmer to feed his livestock because "[h]ome-grown wheat . . . competes with wheat in commerce"). All these cases flowed from *Wickard*, and they stand for the proposition that Congress may, in enacting a comprehensive regulatory scheme that clearly regulates interstate commerce, sweep in *de minimis* intrastate, non-commercial activity to avoid undermining the regulatory system as a whole.

That is not the reality of the CTA. The CTA is a "'single-subject'" enactment focused, as the District Court reasoned when invoking the language of this Court's jurisprudence, exclusively on the "'isolated, discrete act[]'" of "entities, owners, and applicants . . . incorporat[ing] an entity" within a State. Doc. 51 at 41-42 (quoting *Maxwell*, 446 F.3d at 1216 n.6). Unlike the statutes at issue in *Raich, Maxwell*, and *Alabama-Tombigbee*, the CTA is not constitutional as applied to *any* entity.

The Government misses the point in this regard when it claims that the CTA is not a single-subject statute because it was "included" "within the Anti-Money Laundering Act, a statute intended to 'modernize' federal 'anti-money laundering and countering the financing of terrorism laws.'" Gov't. Br. 33. A statute is "comprehensive" for these purposes when it regulates interstate commerce but incidentally has *de minimis* applications that touch on noncommercial, intrastate conduct. The CTA, by contrast, does not regulate any commercial activity at all, and its effect on noncommercial activity is not even close to "*de minimis*." *Raich*, 545 U.S. at 17.

The Government attempts to link the non-commercial act of incorporation to interstate commerce based in part on attenuated effects on interstate commerce, a justification the Supreme Court decisively rejected in *Lopez* and *Morrison*. In *Lopez*, the Court reasoned that if Congress could regulate gun possession near schools to prevent violent crimes in interstate commerce, "it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement . . . where States historically have been sovereign." 514 U.S. at 564. And in

27

*Morrison*, the Court rejected the Government's substantial-effects argument that gender-motivated violence deterred victims from interstate travel and business, diminished national productivity, and increased medical costs. *See* 529 U.S. at 615. The Court reasoned that, "[i]f accepted, petitioners' reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption." *Id.* at 615. This would "completely obliterate the Constitution's distinction between local and national authority." *Id.*

The same logic applies to the CTA. There are surely instances in which bad actors will, *after* they form or register their entities, use them to impact interstate commerce in a negative way. But that does not mean that aggregating those instances counts as "substantial effects" for Commerce Clause purposes. If it did, then the Constitution would permit Congress to wield a "general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567.

The most the Government can say in response is that many of these entities will engage in interstate commerce *in the future*. "The reporting requirements," we are told, "serve to ensure that ownership information

28

is available when those entities do engage in commercial activity." Gov't Br. 30. But that is not enough. The Supreme Court held in *NFIB* that it has "never permitted Congress to anticipate" economic activity "in order to regulate individuals not currently engaged in commerce." 567 U.S. at 557. That is so because "[t]he commerce clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions." *Id.*

The Government's attempt to deflect *NFIB* by characterizing the individual mandate as addressed to "inactivity by requiring individuals to engage in commercial transactions in which they would prefer not to engage" is also unpersuasive. Gov't Br. 17. A shell corporation newly formed under State laws that has not engaged in any activity is a legal person analogous to the hale natural person who doesn't want to buy health insurance. Neither has engaged in conduct that the relevant federal statute can act upon.

Finally, the Government suggests that the Foreign Commerce Clause gives the federal government more power to enact the CTA than the Interstate Commerce Clause. *See* Gov't Br. 26. But it offers no explanation why. This Court previously has "assume[d], without deciding"

29

that the interstate and foreign commerce components have the "same scope." *United States v. Davila-Mendoza*, 972 F.3d 1264, 1271 (11th Cir. 2020). Even if it could be assumed that the foreign commerce clause gives Congress more authority over foreign commerce than domestic commerce, nothing in the case law suggests that this clause could allow Congress to regulate non-commercial activity such as entity formation, especially when that entity formation results from the ministerial acts of States within the borders of this country. Neither of these clauses can justify the CTA.

### 3. Congress does not have power to enact the CTA under the Necessary and Proper Clause to facilitate enforcement of federal Commerce Clause enactments.

One telling indicator that a federal statute may be unconstitutional is when, after the statute is enjoined in the District Court, the Department of Justice develops an entirely new theory in support of the statute on appeal. That is what the Government has done here with respect to its analysis of the relationship between the Commerce Clause and the Necessary and Proper Clause.

30

In the proceedings below, the Government's defense of the CTA under the Commerce Clause focused on its assertion that "Congress rationally concluded that the ability of certain legal entities to withhold beneficial ownership and applicant information, 'taken in the aggregate, substantially affect[s] interstate commerce[.]'" Doc. 24-1 at 46 (quoting *Raich*, 545 U.S. at 22).  After losing in the District Court, the Government is trotting out a new argument under the Necessary and Proper Clause. The Government now tells us that the CTA is "'rationally related to the implementation' of valid prohibitions" on financial crimes that were passed under Congress's Commerce Clause authority and thus "falls readily within the established scope of Congress' authority under both the Commerce and Necessary and Proper Clauses."  Gov't Br. 21 (quoting *Comstock*, 560 U.S. at 134).  This argument is not just new in the context of this litigation.  It also has no basis in constitutional text, history, or precedents at all.

The Government's logic is this: (1) the United States has an interest in fighting "harmful forms of economic activity" and has validly enacted statutes criminalizing those activities under the Commerce Clause, Gov't

31

Br. 17; (2) Congress has made "findings rest[ing] on an extensive legisla-
tive record" that anonymous shell corporations formed under State laws
are complicit in such illicit activities, Gov't Br. 20; (3) Congress could rea-
sonably "close this enforcement gap" by requiring millions of innocent
beneficial owners to hand over their personal information to FinCEN,
even if they are not suspected of violating those Commerce Clause enact-
ments, Gov't Br. 20; and so (4) Article III courts must accept the CTA as
necessary and proper for the political branches to "effectuate[] concededly
legitimate prohibitions on harmful forms of economic activity." Gov't Br.
21.

Propositions (1) and (2) may be true. Proposition (3) is debatable
but is also effectively an admission by the Government that the CTA is a
paradigmatic violation of the Fourth Amendment, as argued *infra* Part
II. Proposition (4), in any event, both overstates the Supreme Court's
Necessary and Proper Clause jurisprudence and understates the perva-
sive scope of the CTA and its unprecedented intrusion into the States'
sovereign power to incorporate these entities. This Court should decline
the Government's invitation to dramatically enhance the powers of Con-
gress, at the expense of the States, in this way.

32

**(a)    The Necessary and Proper Clause does not authorize Congress to regulate entities that are not already subject to federal regulation.**

*NFIB v. Sebelius* clearly forecloses the Government's new necessary- and- proper argument.  The Supreme Court explained that Congress cannot use the Necessary and Proper Clause to regulate "those" who are not "by some pre-existing activity" *already* "within the sphere of federal regulation."  *NFIB*, 567 U.S. at 560.  The Court thus emphasized that its "prior cases upholding laws under [the Necessary and Proper] Clause involved, for example, "provisions permitting continued confinement of those *already in federal custody* when they could not be safely released, *Comstock*, [560 U.S. at] 129, 130; criminalizing bribes involving organizations *receiving federal funds*, *Sabri v. United States*, 541 U.S. 600, 602, 605 (2004), and tolling state statutes of limitations while cases are *pending in federal court*, *Jinks v. Richland County*, 538 U.S. 456, 459, 462 (2003)." (emphasis in original).

The CTA, by contrast, regulates State-law entities over which the federal government has *no* pre-existing regulatory power, and does so based on the mere fact of entity formation on the premise that some entities, *in the future*, may violate federal criminal laws.  It does so even

though they have not yet even engaged in commerce, much less committed the financial crimes the detection of which Congress claims the CTA to be a "necessary and proper" means of effectuating its powers under the Commerce Clause. Put differently, the Government's new theory of the CTA uses the Necessary and Proper Clause not as an "exercise[] of authority derivative of, and in service to, a granted power" but rather as a "'great substantive and independent power.'" *NFIB,* 567 U.S. at 560-61 (quoting *McCulloch*, 17 U.S. at 411). *NFIB* plainly holds that the Necessary and Proper Clause does not allow Congress to go that far.

>    **(b)    The CTA is not justified under the Necessary and Proper Clause because it invades State sovereign power over entity formation.**

Related to the fact that the CTA cannot be premised on a pre-existing federal power to regulate State-law entity formation is the fact that the CTA encroaches upon State sovereign powers to charter corporations that preceded and were preserved in the Constitution. There is no pre-existing federal power for the Necessary and Power Clause to attach to in justifying the CTA because entity formation was historically regulated by the States. That is another reason why the CTA is not a necessary and proper exercise of federal power.

34

As the District Court observed, while the CTA is "not a direct regulation of corporate formation," it imposes "a federal reporting requirement" on entities that are "'creatures of state law,' which are ordinarily within the sovereign purview of the States." Doc. 51 at 20-21 (quoting *Cort v. Ash*, 422 U.S. 66, 84 (1975)). Stated differently, under the CTA, any person who has formed an entity under State law or continues an entity they previously formed under State law must comply with the CTA's mandates unless Congress has provided an exemption. Congress expressly found that "most or all States do not require information about the beneficial owners of the corporations, limited liability companies, or other similar entities formed under the laws of the States." Pub. L. 116-283 § 6402(2), 134 Stat. at 4604. Congress also found that the CTA is "needed to set a clear, Federal standard for incorporation practices" for entities "formed under the laws of the States." *Id.* §6402(5)(A). The CTA sets this "clear Federal standard" not by directly overriding permissive State entity-formation laws but by grafting an additional federal reporting requirement onto entities formed under those laws and the owners and applicants who form the entities.

35

The Constitution's text and Framing history illuminate why this encroachment by the CTA on State sovereign powers cannot be justified under the Necessary and Proper Clause. The Constitution gives Congress no explicit power to regulate the States' incorporation practices, which preceded the Constitution. In fact, two different proposals at the Constitutional Convention to give Congress an explicit power to incorporate, made by Thomas Pinckney and James Madison, were decisively rejected because of fears of encroaching on State powers to charter corporations. 2 M. Farrand, *Records of the Federal Convention of 1787*, at 325 (Pinckney) & 615-16 (Madison). Madison wanted "to grant charters of incorporation where the interest of the U.S. might require & the legislative provisions of individual States may be incompetent." *Id*. at 615. His rationale of the federal government's functional need resembles the Government's present argument that the CTA is needed to plug an enforcement gap enabled by permissive State entity-formation laws. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), did uphold Congress's power to charter the Bank of the United States as necessary and proper to implement enumerated powers, but nothing in *McCulloch* suggests that Congress may establish a "Federal standard for incorporation practices"

36

if it thinks it necessary and proper to enforce other validly enacted federal criminal laws.  To the contrary, *McCulloch* explicitly said that "a great substantive and independent power" cannot be derived from the Necessary and Proper Clause.  17 U.S. at 411; *quoted in NFIB*, 567 U.S. at 561.

Not only does the Framing history confirm the original understanding regarding the lack of Congress's powers to interfere with the States' power to charter corporations, it also reinforces, as the District Court held and the Government conceded below, that forming an entity is not itself a commercial or economic activity, much less one that affects interstate commerce.  *See* Doc 51 at 35; Doc. 40 at 11.  If forming a corporation were a commercial act, then Madison and Pinckney would not have felt the need to propose an explicit Article I power to incorporate—Congress's power to regulate commerce would have sufficed.  Furthermore, in the late eighteenth century, corporations were chartered not only to carry on business but also "for the purpose of local government, such as the corporations of cities and towns."  1 Stewart Kyd, A *Treatise on the Law of Corporations* 28 (1793).

37

The upshot of this Framing history is that the CTA, even if it is not a direct regulation of entity formation, encroaches upon State sovereignty over entity formation to such a degree that it cannot be justified as necessary and proper. When it comes to the Constitution's limits, "[w]hat cannot be done directly cannot be done indirectly." *Students for Fair Admissions v. Pres. & Fellows of Harvard College*, 600 U.S. 191, 230 (2023) (quotation marks and citation omitted). That principle applies to State sovereign powers as much as to individual liberties. To wit, invocations of federal power under the Necessary and Proper Clause may not "invade state sovereignty or otherwise improperly limit the scope of powers that remain with the States." *Comstock*, 560 U.S. at 144 (internal quotation marks omitted). "It is of fundamental importance to consider whether essential attributes of state sovereignty are compromised by the assertion of federal power under the Necessary and Proper Clause; if so, that is a factor suggesting that the power is not one properly within the reach of federal power." *Id.* at 153 (Kennedy, J., concurring in the judgment). "No law that flattens the principle of state sovereignty, whether or not 'necessary,' can be said to be 'proper.'" *Bond v. United States*, 572 U.S. 844, 879 (2014) (Scalia, J., concurring in the judgment).

38

*Comstock* did hold that a federal statute that demonstrates "accommodation of state interests" in view of federal interests in law enforcement may pass constitutional muster, but the CTA evidences no such accommodation. *Comstock*, 560 U.S. at 149. The whole point of the CTA was to plug "a significant gap in the government's ability to detect and prosecute financial crime" because State laws did not require entities to report beneficial-owner information. Gov't Br. 3. The Government and its *amici* do not cite anything in Congress's copious findings and reports indicating concern that the CTA would effectively override or subordinate State entity-formation laws. To the contrary, the CTA also prohibits the States from authorizing their entities to issue "a certificate in bearer form," 31 U.S.C. §5336(f), and compels the States to "provide information requested by FinCEN for purposes of maintaining an accurate, complete, and highly useful database for beneficial ownership information," *id.* § 5336(d)(2)(A). By way of comparison, the statute for civil confinement of sexually dangerous, mentally ill federal prisoners upheld in *Comstock* required the Attorney General to "inform the State in which the federal prisoner 'is domiciled or was tried' that he is detaining someone with respect to whom those States may wish to assert their authority, and he

must encourage those States to assume custody of the individual."  560 U.S. at 144.

The CTA has no such analogous provisions for cooperative federalism.  No State official can grant a discretionary exemption to the CTA for State-law entities—only the Secretary of the Treasury can, with the written concurrence of the Attorney General and the Secretary of Homeland Security.  *See* 31 U.S.C. § 5336(a)(11)(B)(xxiv).  State law-enforcement agencies must obtain court approval before FinCEN can share the information it has collected, unlike federal and foreign law-enforcement and intelligence agencies.  *See id.* § 5336(c)(2)(B).  The requirement of court approval should be the norm, not an exception that discriminates against States.  *See infra* Part II.

> **(c)  Even if the CTA were "necessary" to enforce validly enacted federal criminal laws, it is a not a "proper" means to do so.**

Even if the CTA were "necessary" because it was grounded in pre-existing federal powers and did not invade State sovereign powers, it is not a "proper" means because it is disproportionate to the end of fighting financial crimes.  *NFIB,* 567 U.S. at 560.  The CTA is not "narrow in scope." *Comstock*, 560 U.S. at 148 ("105 inmates have been subject to §

40

4248 out of over 188,000 federal inmates")).  It will apply to 32.6 million entities according to FinCEN's own estimates, and millions more in each passing year.  *See* Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59498, at 59549 (Sept. 30, 2022)).  Nor are the CTA's requirements limited only to those already convicted of violating federal criminal laws like the federal prisoners in *Comstock*; the CTA compels millions of innocent Americans and their entities to report to help enforce federal criminal laws.

In fact, the argument against the Necessary and Proper Clause justifying the CTA is even stronger than the argument against its application to the health-insurance mandate in *NFIB*.  The Court in *NFIB* did not dispute "Congress's determination" that the mandate was "necessary" or essential to effectuate health-insurance reforms.  *NFIB*, 567 U.S. at 559.  But, as the District Court held, the fact that some anonymous entities formed under State laws have facilitated financial crimes does not compel the conclusion that a federal statute imposing a reporting requirement affecting millions of innocent entities and owners is "essential" to fight illicit money laundering, because the FinCEN's Customer Due Diligence (CDD) Rule is already in effect.  Doc. 51 at 43-45.

Specifically, the CDD Rule requires "[c]overed financial institutions" to "establish and maintain written policies and procedures that are reasonably designed to identify and verify beneficial owners of legal entity customers" and to "[c]onduct[] ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information."   31 C.F.R. §§ 1010.230(a) & 1020.210(a)(2)(5). Thus, the CDD Rule, unlike the CTA, tracks when *money* is actually moving in commerce and thus possibly being *laundered*.  FinCEN itself has recently admitted, in a Notice of Proposed Rulemaking, that "beneficial ownership information collected under the CTA . . . concerns the ownership composition of a given entity at a given point in time."  Anti-Money Laundering Regulations for Residential Real Estate Transfers, 89 Fed. Reg. 12424, 12447 (proposed February 16, 2024).  Because "*such reporting does not dynamically extend to include information on the market transactions of the beneficially owned legal entity*," CTA-compelled reporting "would not alert law enforcement officials focused on reducing money laundering that [a transaction] had been conducted."  *Id.* (emphasis added).

On the Government's view, *any* law that Congress finds "conven-

ient" or "useful" to enforce federal financial-crime laws would be neces-

sary and proper.  Why stop at requiring digital images of beneficial owner

IDs, which are easily manipulable by photoshopping?  Cheek swabs of

owners to enable FinCEN to verify owner information and to create a

DNA database of potential financial-crimes suspects would surely help

law-enforcement agencies.  Accepting the Government's theory that the

Necessary and Proper Clause justifies a federal statute whenever Con-

gress has "rationally determined" that it would have "public safety bene-

fits" is tantamount to recognizing a "federal police power" forbidden by

the Constitution.  *United States v. Kebodeaux*, 570 U.S. 387, 399, 401-02

(2013) (Roberts, C.J., concurring in the judgment).

### B.    The CTA Is Not Authorized by the Taxing Power and the Necessary and Proper Clause.

The CTA also cannot be justified as "necessary and proper for car-

rying into execution" Congress's power to "levy and collect Taxes."  Gov't

Br. 24; *see* NYU Tax Law Center Br. 2.

First, the officials who have access to the database aren't just IRS

agents.  The CTA authorizes FinCEN to share beneficial owner infor-

mation with federal "national security, intelligence, and law-enforcement" agencies. 31 U.S.C. § 5336(c)(2)(B)(i)(I). The CTA authorizes FinCEN to share the information with "State, local, or Tribal law enforcement." *Id.* § 5336(c)(2)(B)(i)(II). The CTA even authorizes FinCEN to share the information with a "law enforcement agency, prosecutor, or judge of another country, including a foreign central authority or competent authority." *Id.* § 5336(c)(2)(B) (ii). These agencies do not have any federal tax levying or collection functions.

Second, the definition of "beneficial owner" includes not only those persons who actually own the reporting company, but also any individual who has "substantial control" of an entity or "substantial influence" over its "important decisions" even if they are not on the payroll or entitled to profits. *Id.* § 5336(a)(3)(A)(i); 31 C.F.R. § 1010.380(d)(1)(i)(C)-(D). Such individuals may or may not derive taxable income from these roles with the entity, but the CTA requires the entity to report all their personal information to FinCEN anyway.

The Government and amicus Tax Law Clinic are trying to masquerade the CTA as a U.S. tax-enforcement statute when it is, in fact, a global

44

law-enforcement statute. The Government itself emphasizes that "Congress included the CTA within the Anti-Money Laundering Act," not the Internal Revenue Code. Gov't Br. 33. It mentions the "authority to 'lay and collect Taxes'" only in passing, in a single paragraph in the argument section of its brief. Gov't Br. 24.

A statute with the CTA's scope cannot be justified under the Necessary and Proper Clause as "rationally related to the implementation of" the taxing power when facilitating revenue collection is only one of its several functions. *Comstock*, 560 U.S. at 134. "Congress's authority under the taxing power is limited to requiring an individual to pay money into the Federal Treasury, no more." *NFIB*, 567 U.S. at 574. The District Court was therefore correct in holding that Congress could not "bring its taxing power to bear just by collecting 'useful' data and allowing tax-enforcement officials access to that data." Doc. 51 at 52 (quoting *NFIB*, 567 U.S. at 559). If Congress were to enact a different statute that limited the sharing of beneficial-owner information to IRS agents exclusively and for the enforcement of U.S. federal tax laws alone, that would be a different matter. That is not this statute.

The cases the Government and its amici rely on do not support the assertion that any statute Congress passes that "makes tax collection easier or more effective" in some way is necessary and proper in furtherance of the taxing power. NYU Tax Law Center Br. 3. The cases stand for the far more modest principle that Congress has power to require information disclosures directly connected to the federal taxes to be collected. In *Helvering v. Mitchell*, 303 U.S. 391, 399 (1938), the Supreme Court held that the taxing power justified Congress requiring taxpayers to disclose personal information "*on [their] annual return*" punishable by fines for nondisclosure. (emphasis added). In *United States v. Doremus*, 249 U.S. 86, 92 (1919), the Supreme Court held only that a statute levying a tax on cocaine and opium products was not beyond the taxing power simply because it had "a moral end"—namely, discouraging drug use— "as well as revenue in view." Likewise, this Court noted in *United States v. Bolatete* that Congress could, through the taxing power, pass a statute that not only levied a tax but also made it a crime not to pay the tax, because "even though it punishes," the law also "aids a revenue-raising purpose." *United States v. Bolatete*, 977 F.3d 1022 ,1034 (11th Cir. 2020*). See also United States v. Kahriger*, 345 U.S. 22 (1953), *overruled on other*

46

*grounds by Marchetti v. United States*, 390 U.S. 39 (1968) (upholding a law requiring any person "engaged in the business of accepting wagers" to register with the district Commissioner of Revenue and pay a federal excise tax); *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937) (same, with respect to tax on firearms dealers). In each of these cases, the statute was directed only to the end of revenue collection, and the information disclosure was directly tied to the imposition of a tax on a specified activity. None of these cases supports the Government's position that the taxing power requires courts to rubber stamp any law that goes far beyond revenue-collection functions.

### C. The CTA is not authorized by Congress's powers over foreign affairs and national security and the Necessary and Proper Clause.

Congress's foreign-affairs and national-security powers, whether standing alone or in conjunction with the Necessary and Proper Clause, also do not authorize Congress to compel State-law entities to turn over their beneficial owners' personal information to FinCEN merely because those entities exist. As an initial matter, although compliance with international standards and catching foreign bad actors may have been key motivations behind it, the CTA clearly regulates entities formed under

47

U.S. State and Tribal entity laws.  *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304 (1936), clarified that "the enumerated powers limitation 'is categorically true" as to "our internal affairs," as the District Court noted.  Doc. 51 at 19 (quoting 299 U.S. at 315-16).  Specifically, *Curtiss-Wright* rejected a nondelegation challenge to a statute giving the President authority to declare a foreign arms embargo, and in so doing, the Court observed that the political branches were not constrained by enumeration in foreign affairs, by contrast to internal affairs.  *See* 299 U.S. at 329.  The distinction between foreign and internal affairs may not be easy to draw in some cases.  But entity formation is an easy case on the internal-affairs side of the ledger given the centuries-long history of State governmental regulation as explained in Part I.A.3.b *supra*.  Nor, as the District Court held, is there "support in history or precedent" for the Government's position that regulation of "internal affairs may be necessary and proper to effectuate Congress' foreign affairs powers if foreign actors (or enough foreign actors) participate in those internal affairs to illicit ends."  Doc. 51 at 22.

48

Generally speaking, "in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute," courts ask "whether the statute constitutes a means that is rationally related to the implementation of a constitutionally *enumerated* power." *Comstock*, 560 U.S. at 134 (emphasis added). The Government does not identify any specific enumerated foreign-affairs power to which it ties the CTA, such as the powers to "define and punish . . . Offences against the Law of Nations" and to "declare War," or to "make Treaties" U.S. Const. Art. 1, § 8 & Art. II, § 2.

Instead, the Government and its amici invoke unspecified foreign-affairs and national-security powers. Senator Whitehouse and four other Members of Congress have filed a brief announcing that they believe that they had an unenumerated power to pass the CTA to make the United States "align with international standards." Sen. Whitehouse et al. Br. 11. But the Necessary and Proper Clause supports Constitutional powers, not international standards. "Our Constitution governs us and we must never forget that our Constitution limits the Government to those powers specifically granted or those that are necessary and proper to carry out the specifically granted ones." *Afroyim v. Rusk*, 387 U.S. 253,

49

257 (1967) (overruling *Perez v. Brownell*, 356 U.S. 44, 62 (1958), which upheld a law stripping U.S. citizens of citizenship for voting in foreign elections "pursuant to [Congress's] power to regulate the relations of the United States with foreign countries").

The two cases the Government cites for the contrary proposition are distinguishable. *See* Gov't Br. 25. In *Ullmann v. United States*, 350 U.S. 422 (1956), the Court upheld a statute authorizing U.S. Attorneys to compel the testimony of national-security witnesses before grand juries upon promise of immunity in State criminal cases. The *Ullman* Court recognized such a power because it had "already, in the name of the Commerce Clause, upheld a similar restriction on state court jurisdiction" and could "find no distinction between the reach of congressional power with respect to commerce and its power with respect to national security." *Ullmann*, 350 U.S. at 436. This narrow procedural precedent cannot be extended as support for unenumerated national-security powers to compel the reporting to the federal government of personal information regarding millions of Americans who lawfully form entities under State laws for law-enforcement purposes. In *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963), the Court invalidated statutes divesting the U.S.

citizenship of persons who fled the country to avoid military service during war or national emergency for inadequate procedural safeguards under the Fifth and Sixth Amendments.  *See id.* at 165-66. At the same time, the Court recognized Congress's power under the Necessary and Proper Clause to implement Congress's several *enumerated* powers to "require military service for the common defense."  *Id.* at 159.  Those include the powers to "declare War," to "raise and support Armies," to "provide and maintain a Navy," and "to make Rules for the Government and Regulation of the land and naval Forces."  U.S. Const. art. I, § 8.

Nor does Senator Whitehouse's view that the CTA is "necessary" to comply with international standards suffice to make the CTA a necessary and proper exercise of Congress's foreign-affairs powers.  Sen. Whitehouse et al. Br. 11.  Specifically, the Government and its amici assert that "[t]he United States, through its membership in the Financial Action Task Force (FATF)—the global standard-setting body for anti-money laundering, countering the financing of terrorism, and countering proliferation financing—is under a *specific obligation* to establish mechanisms to collect beneficial ownership information for a wide range of corporate forms."  Transparency Int'l Br. 17 (emphasis added).  As the

District Court held, however, "[c]ompliance with international standards may be good policy, but it is not enough to make the CTA 'necessary' or 'proper.'" Doc. 51 at 24. No precedent supports the Government's proposition that adherence to international standards renders an implementing statute necessary and proper—especially when, as here, those standards are not framed in a ratified treaty of the United States. Even then, as the District Court noted, the Supreme Court interpreted the Chemical Weapons Act, as not extending to a "purely local" offense—even though that Act was designed to implement a ratified treaty of the United States. Doc. 51 at 21 (citing *Bond v. United States*, 572 U.S. 844, 860 (2014)).

The Government also makes a sweeping suggestion, almost in passing, that a statute like the CTA can be justified as necessary and proper to "effectuat[e] the President's 'executive Power' and his duty to 'take Care that the Laws be faithfully executed,' by facilitating 'law enforcement efforts.'" Gov't Br. 26. That argument is also unsupported and untenable. The Government cites no precedent that comes anywhere close to suggesting that Congress can use the Executive Power as an excuse to pass statutes facilitating law enforcement when those statutes otherwise would not be within one of Congress's enumerated powers. The fact that

the Government would even try to justify a statute compelling individuals to hand over personal information for the Executive Branch to use in criminal investigation only underscores the Fourth Amendment infirmities with the statute, to which we will now turn.

## II. THIS COURT SHOULD ALSO AFFIRM ON THE ALTERNATIVE GROUND THAT THE CTA VIOLATES THE FOURTH AMENDMENT.

The District Court correctly ruled that the CTA exceeds Congress's constitutional powers and for that reason did not consider Winkles' and NSBA's claims under the First, Fourth and Fifth Amendments. These claims, however, are equally meritorious, and this Court may affirm summary judgment "on any ground supported by the record." *Mata Chorwadi, Inc. v. City of Boynton Beach,* 66 F.4th 1259, 1263 (11th Cir. 2023). While the word-limits placed on briefing by the Federal Rules of Appellate Procedure will not afford the NSBA and Winkles an opportunity to brief each of these claims at this time, plaintiffs would urge the Court to also consider their Fourth Amendment claim now and affirm on this alternative basis as well. The time-sensitive nature of this case warrants taking that step, because absent definitive resolution by the courts, all other entities in this Circuit will need to make initial reports to FinCEN

by January 1, 2025.  And it is particularly clear that the CTA is facially unconstitutional under the Fourth Amendment.  Mandatory reports of beneficial owner information to FinCEN for general law-enforcement purposes are "unreasonable searches" that the Constitution precludes.

**A.    The CTA's reporting requirement is a modern analogue to the general warrants the Fourth Amendment was ratified to proscribe.**

As with enumerated powers and entity formation, the Constitution's text and Framing history are the starting points in Fourth Amendment analysis.  The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. Amend. IV.  The first clause of the Amendment thus provides a right against "unreasonable searches" of "papers," among other things.  And the second clause provides that only sworn or affirmed Warrants based on "probable cause" and "particularly describing" the place, person, or thing to be searched "shall issue."

54

The CTA is the twenty-first-century digital analogue of eighteenth-century general warrants authorizing British officials to search American merchants to enforce tax laws without any basis to suspect taxes were being evaded. Those warrants inspired the Fourth Amendment. "Vivid in the memory of the newly independent Americans," the Supreme Court has explained, "were those general warrants known as writs of assistance," which "had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws." *Stanford v. Texas*, 379 U.S. 476, 510 (1965); *see also Boyd v. United States*, 116 U.S. 616, 625 (1886) ("'Then and there,' said John Adams, 'then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there, the child Independence was born.'").

The CTA requirement to submit digital reports (including an image of an active identification document) to FinCEN is as unconstitutional as the writs of assistance. Like the writ of assistance, the CTA applies regardless of whether the Government has a basis to suspect the subject of criminal activity. The ostensible aim of both overreaching governmental acts is to enforce the law. The Fourth Amendment reflected the Framers'

55

judgment that any claimed governmental need to make law enforcement easier cannot justify suspicionless searches of the citizenry.

That principle may seem obvious and elementary today, but the CTA runs contrary to it. The Government cannot use the CTA as a work-around to the Fourth Amendment's warrant requirement to fight financial crimes more efficiently. Yet FinCEN's then-Director candidly told Congress that it needed to enact the CTA precisely because obtaining search warrants and using ordinary criminal investigative tools was too burdensome for FinCEN. As FinCEN documented in its Final Rule, its Director testified that identifying beneficial owners "often requires," among other things, "grand jury subpoenas, surveillance operations," and—critically—"search warrants." 87 Fed. Reg. at 59504. "This takes an enormous amount of time," he complained to Congress, and also "wastes resources." *Id.* "The collection of beneficial ownership information at the time of company formation," he explained to Congress, "would significantly reduce the amount of time currently required to research who is behind anonymous shell companies." *Id.*

The two critical Fourth Amendment issues are (1) whether a "search" occurs when the CTA requires entities to make digital reports of

beneficial-owner and applicant information, and (2) whether that search is "unreasonable" when carried out without a warrant, probable cause, or reasonable suspicion, or pursuant to a recognized exception such as for administrative or special-needs searches. Based on constitutional text, history, and precedent, the answer to both questions is yes.

**B.    The CTA's reporting requirement is a Fourth Amendment "search" of covered entities and of their owners.**

Requiring entities to collect and hand over to the Government personal information about beneficial owners for law-enforcement purposes is a "search" for Fourth Amendment purposes. The CTA is a search of both (1) the entities who must report all their beneficial owners and applicants to FinCEN for its law-enforcement database, and (2) the individual beneficial owners and applicants who must turn over their personal information to the relevant entities for reporting to FinCEN or personally face fines and imprisonment. The "rights of a corporation against unlawful search and seizure" under the Fourth Amendment, the Supreme Court has long made clear, "are to be protected" in the same manner as the parallel Fourth Amendment rights possessed by individuals. *Silverthrone Lumber Co. v. United States*, 251 U.S. 385, 392 (1920). Setting up an entity by following the requirements of State law is a lawful activity,

and both the entity and those who own it and set it up have privacy interests regarding disclosure to the federal government of the entity's ownership.

The privacy interests of individuals are particularly implicated because identification documents and digital images of those documents may not be in the possession of the reporting company. FinCEN has announced that if an individual who qualifies as a beneficial owner or a company applicant . . . refuse[s] to provide information" to their reporting company, knowing that it "would not be able to provide complete beneficial ownership information to FinCEN without it," then FinCEN will consider that person "subject to civil and/or criminal penalties" under the CTA "for willfully causing a company not to file a required BOI report or to report incomplete or false beneficial ownership information to FinCEN." Doc. 42-1 at 17 (reproducing Department of the Treasury, Small Entity Compliance Guide, ¶1.3, at 15 (Sept. 2023)). The CTA would thus force those individuals to surrender that information to their entities, or risk personal fines and imprisonment, as the District Court noted. *See* Doc. 51 at 7.

Nor does the third-party doctrine—under which a person is deemed to have no reasonable expectation of privacy in materials he has "voluntarily conveyed" to a third party—apply. *United States v. Miller*, 425 U.S. 435, 442 (1976). The owner or applicant would not be giving over their personal information to their own entity voluntarily, but rather so that the entity can submit it to FinCEN, under threats of criminal liability of both the entity and the individual should they willfully fail to comply.

The CTA is thus the digital version of a State statute the Supreme Court struck down under the Fourth Amendment in *Brown v. Texas*, 443 U.S. 47 (1979). The statute there authorized police officers to detain persons and require them to provide their "name and address" "without any specific basis for believing he is involved in criminal activity," under threat of criminal penalties for non-compliance. *Id.* at 49, 52. Like that statute, the CTA requires individuals to hand over their identifying information to the government, for criminal law-enforcement purposes, including—as the CTA is being enforced by FinCEN—images of their driver's licenses. It does so without any basis for believing that they are involved in criminal activity. The CTA demands this information from

them under threat of criminal fines and imprisonment. *See* 31 U.S.C. §§ 5336(h)(1) & (h)(3)(A).

It is no answer to say, as the Government did below, that the CTA does not violate the Fourth Amendment because it does not effectuate a physical seizure of a person and instead merely requires disclosures of information. The Supreme Court has long recognized that governmental demands for the production of papers in which the holder has a protected privacy interest also implicate the Fourth Amendment, with precedents establishing that the Fourth Amendment requires that "the disclosure sought shall not be unreasonable." *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 208 (1946). In *Oklahoma Press*, the Court held that the Fourth Amendment applied to administrative subpoenas duces tecum issued in an investigation into violations of the Fair Labor Standards Act. *Id.* at 209-10. In *United States v. Morton Salt Co.*, the Court recognized that the protection of the Fourth Amendment "is not confined literally to searches and seizures as such, but extends as well to the orderly taking under compulsion of process." 338 U.S. 632, 651-52 (1950). Most recently in *Carpenter v. United States*, the Court held that "location information obtained" by the Government "from Carpenter's wireless carriers was the

60

product of a search" for Fourth Amendment purposes. 585 U.S. 296, 310 (2018).

In addition to *Carpenter*, other federal courts have held that non-physical compelled disclosures of personal information in digital-data format count as Fourth Amendment searches. The case that may involve a law most similar to the CTA's reporting requirement concerns a New York City ordinance requiring operators of online booking websites for short-term rental apartments to report each host's name, address, advertising website, and transaction data to city officials on a monthly basis. *See Airbnb v. City of New York*, 373 F.Supp.3d 467, 481 (S.D.N.Y 2019). If the booking-service operator did not submit the report, the ordinance provided for a civil penalty to be assessed against the operator for each "missing, incomplete, or inaccurate" listing. *Id*. at 478. The District Court held that the disclosure ordinance was a search for Fourth Amendment purposes. *Id.* at 482-83.

*Airbnb* thus represents a cyberage variant on brick-and-mortar ordinances permitting police to physically inspect motel registers containing guests' personal information without a warrant to aid in crime enforcement. The Supreme Court struck down such an ordinance in *City of*

*Los Angeles v. Patel*, 576 U.S. 409 (2015). Technology now enables the government to request lodging operators to file digital reports of guests' personal information for law-enforcement purposes on its website or to allow digital access to its records as in *Airbnb*. Just because technology makes it easier for the Government to collect personal information online should not entail the conclusion that the Fourth Amendment does not apply.

## C.   The search of beneficial owners and entities the CTA effects is unreasonable.

The search effectuated by the CTA, in turn, is unreasonable and thus violates the Fourth Amendment. Beneficial owners or applicants of entities formed under State laws have a "reasonable expectation of privacy" against having their entities submit their personal information to FinCEN for law-enforcement purposes. *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)). People have privacy interests in their ownership of entities formed under State law. Because the States do not require all the information that the CTA requires to be reported, the relationship between the owners and the entity is not publicly available. *See, e.g.,* Ala. Code § 10A-5a-2.01(a)

(no requirement to file name and address of originators of an LLC). Keeping the ownership confidential may often be a major reason for forming the entity in the first place—such as, for example, when a person places his home or other property in an LLC for security purposes. And, as the District Court noted in confirming Winkles' standing to bring this lawsuit, this privacy interest does not go away because an individual has disclosed some of the requested information elsewhere (*e.g.*, in tax reports, passport forms, bank account applications): "the injury to Winkles is not disclosure itself, but disclosure to FinCEN, the Treasury Department's criminal enforcement division." Doc. 51 at 11.

The CTA's reporting requirements effectuate an unreasonable search as against this privacy interest of the beneficial owners of entities. It applies to every entity upon formation, not entities who actually use or engage in interstate commerce by transferring money to be laundered. The vast majority of owners and applicants whose information must be reported have done nothing wrong, and the Government has no basis to suspect them of having done anything other than set up an entity as lawful under the laws of the relevant State. The Government's professed purpose of compelling the disclosures, under threat of imprisonment, is

63

to "detect and prosecute financial crimes." Gov't Br. 21. These compelled disclosures are paradigmatic Fourth Amendment violations.

Warrantless searches are unreasonable unless they fall within an exception that the Supreme Court has recognized, and no such exception applies here. The special-needs exception, sometimes also called the administrative search exception, is transparently inapplicable. The Court has stated that government agents may conduct a search without a warrant when "special needs, *beyond the normal need for law enforcement*, make the warrant and probable-cause requirement impracticable." *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 619 (1989) (internal quotation marks omitted) (emphasis added). The special-needs exception does not apply here because the CTA is collecting beneficial-owner information for general law enforcement and intelligence-gathering purposes. The FinCEN Director admitted that the agency views the CTA as a work-around to the "warrant" requirement, which "wastes" too much time and resources in investigating and prosecuting money-laundering and other financial crimes. *See supra* at 56 (quoting 87 Fed. Reg. at 59504).

Consequently, each search effected by the CTA is not within the narrow category of targeted searches for specific time- or place-sensitive

64

needs that are unrelated to criminal law enforcement and thus have been upheld under the special-needs doctrine in the past. *See Veronia Sc. Dist. 47J v. Acton*, 515 U.S. 646, 664-65 (1995) (drug test of high school athletes); *United States v. Martinez-Fuerte*, 428 U.S. 543, 562 (1976) (search of persons and vehicles near an international border); *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990) (fixed sobriety checkpoint). The CTA's search for general law-enforcement purposes is actually most like the warrantless searches of vehicles without individualized suspicion that the Supreme Court held was *not* justified by the special-needs exception and struck down as unconstitutional in *City of Indianapolis v. Edmond*, 531 U.S. 32, 48 (2000). As Justice Scalia noted for the Court in a special-needs case, "where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, this Court has said that reasonableness generally requires the obtaining of a judicial warrant." *Veronia*, 515 U.S. at 653.

In sum, the CTA effects a suspicionless, unreasonable search of individuals in violation of the Fourth Amendment, and FinCEN must deal with the inconveniences our Constitution requires. As the Supreme Court declared in *Carpenter*, quoting Justice Brandeis:

[T]he Court is obligated—as "[s]ubtler and more far-reaching means of invading privacy have become available to the Government"—to ensure that the "progress of science" does not erode Fourth Amendment protections. *Olmstead v. United States*, 277 U.S. 438, 473-474 (1928). Here the progress of science has afforded law enforcement a powerful new tool to carry out its important responsibilities. At the same time, this tool risks Government encroachment of the sort the Framers, after consulting the lessons of history, drafted the Fourth Amendment to prevent.

585 U.S. at 320 (internal case citation and quotation marks omitted).

\*           \*           \*

The CTA is an unprecedented federal statute that exceeds Congress's enumerated powers, encroaches upon the States' sovereign power over entity formation, and deploys modern data-collection technology to violate the Fourth Amendment rights of innocent Americans. Fighting money laundering and terrorism financing are important U.S. national interests, but the CTA is not a necessary and proper means to achieve those interests.

## CONCLUSION

This Court should affirm the judgment of the District Court, either on the ground that Congress exceeded its powers in enacting the CTA or the alternative ground that the CTA violates the Fourth Amendment. If this Court does not affirm on either of those grounds, it should remand the case to the District Court for consideration of the plaintiffs' remaining claims.

Respectfully submitted,

s/ Thomas H. Lee

*Counsel for Plaintiffs-Appellees*

John C. Neiman, Jr.
MAYNARD NEXSEN P.C.
1901 Sixth Ave. N., Suite 1700
Birmingham, Alabama 35203
(205) 254-1000

Thomas H. Lee
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Eleventh Circuit Rule 32-4. According to the word-count feature in Microsoft Word, this brief contain 12,752 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the type-style requirements of Rule 32(a)(6). I prepared this brief in Century Schoolbook font, a proportionally spaced typeface.

s/ Thomas H. Lee
_____
*Counsel for Plaintiffs-Appellees*
