No. 24-10736

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

NATIONAL SMALL BUSINESS UNITED, ET AL.,

*Plaintiffs–Appellees*,

v.

U.S. DEPARTMENT OF THE TREASURY, ET AL.,

*Defendants–Appellants*.

_____

Appeal from the United States District Court for the
Northern District of Alabama, Northeastern Division
(No. 22-cv-1448, Hon. Liles C. Burke)

_____

# BRIEF OF AMICUS CURIAE
# AMERICANS FOR PROSPERITY FOUNDATION
# IN SUPPORT OF APPELLEES

_____

Michael Pepson
Cynthia Fleming Crawford
AMERICANS FOR PROSPERITY FOUNDATION
4201 Wilson Blvd., Ste. 1000
Arlington, VA 22203
571.329.4529
mpepson@afphq.org

May 17, 2024                    *Attorneys for Amicus Curiae*

*NSBU, et al. v. U.S. Dep't of the Treasury, et al.*, No. 24-10736

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1, *amicus curiae* Americans for Prosperity Foundation states that it is a nonprofit corporation. It has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public.

Pursuant to Eleventh Circuit Rule 26.1-1, in addition to those identified in the other parties' briefs and in the *amicus curiae* briefs, the following persons and entities may have an interest in the outcome of this appeal:

1. Americans for Prosperity Foundation, *Amicus Curiae*

2. Cynthia Fleming Crawford, Counsel for *Amicus Curiae*

3. Michael Pepson, Counsel for *Amicus Curiae*


/s/ Michael Pepson
Michael Pepson

C–1

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT……………………………………………………..C-1

TABLE OF CONTENTS.........................................................................................i

TABLE OF AUTHORITIES ................................................................................iii

INTEREST OF *AMICUS CURIAE*.......................................................................1

STATEMENT OF ISSUES ....................................................................................1

SUMMARY OF ARGUMENT ..............................................................................2

ARGUMENT ........................................................................................................4

   I.   Our System of Federalism Protects Liberty ................................................4

  II.  As a Matter of Constitutional First Principles, Congress's Legislative Power Is Not Plenary But Narrow and Limited.....................................................6

      A.  The Commerce Clause, As Originally Understood, Only Grants Congress Power to Regulate Interstate Trade and Transportation.........................8

      B.  The Necessary and Proper Clause Is Not a Free-Floating Source of Federal Power Untethered to Congress's Enumerated Powers..........................12

 III. The CTA Exceeds Constitutional Limits on Federal Power Under Any Test...............................................................................................................15

      A.  The CTA Infringes States' Sovereign Power to Create Corporate Entities and Regulates Wholly Intrastate Noneconomic Activity Lacking Any Nexus to Interstate Commerce ...........................................................15

      B.  The CTA Is Unconstitutional Under the Original Understanding of the Commerce Clause.....................................................................................17

      C.  The CTA Fails the Judicially Created "Substantial Effects" Test .........17

 IV. The "Substantial Effects" Test Has No Basis In the Constitution .............22

i

V. This Court Should Enforce the Constitution's Original Public Meaning to the Maximum Extent Permissible Under Existing Precedent ...........................25

CONCLUSION .....................................................................................................27

CERTIFICATE OF COMPLIANCE......................................................................28

CERTIFICATE OF SERVICE ..............................................................................29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bond v. United States*,
572 U.S. 844 (2014) ................................................................4, 5

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936) ................................................................9

*Cort v. Ash*,
422 U.S. 66 (1975) ................................................................15

*CTS Corp. v. Dynamics Corp. of Am.*,
481 U.S. 69 (1987) ................................................................15

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) ................................................................8

*Edmo v. Corizon, Inc.*,
949 F.3d 489 (9th Cir. 2020) ................................................26

*Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*,
561 U.S. 477 (2010) ................................................................20

*Gamble v. United States*,
139 S. Ct. 1960 (2019) ................................................................22

*Garza v. Idaho*,
139 S. Ct. 738 (2019) ................................................................26

*Gibbons v. Ogden*,
22 U.S. (9 Wheat.) 1 (1824) ................................................6, 8, 9, 11

*Gonzales v. Raich*,
545 U.S. 1 (2005) ........................ 4, 5, 9, 10, 11, 14, 18, 21, 23, 24, 25

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ................................................................4, 5

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ................................................................11, 12

*Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Local 229, AFL-CIO*,
    974 F.3d 1106 (9th Cir. 2020) ...........................................................26

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018) ..........................................................................21

*Kinsella v. United States*,
    361 U.S. 234 (1960) ..........................................................................13

*License Tax Cases*,
    72 U.S. (5 Wall.) 462 (1867) .............................................................11

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020) ..........................................................................21

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) .......................................................7, 21

*Martin v. Hunter's Lessee*,
    14 U.S. (1 Wheat.) 304 (1816) ............................................................6

*McCulloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819) ......................................6, 13, 14, 15

*New State Ice Co. v. Liebmann*,
    285 U.S. 262 (1932) ............................................................................5

*New York v. United States*,
    505 U.S. 144 (1992) ............................................................................5

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) ............................................4, 5, 7, 19, 20, 23

*Printz v. United States*,
    521 U.S. 898 (1997) ......................................................................4, 13

*Sabri v. United States*,
    541 U.S. 600 (2004) ..........................................................................19

*Sackett v. EPA*,
    598 U.S. 651 (2023) .................................................................8, 22, 23

iv

*Seila Law LLC v. Consumer Financial Protection Bureau*,
    591 U.S. 197 (2020)...............................................................................21

*Taylor v. United States*,
    579 U.S. 301 (2016)........................................................................16, 24

*Texas v. Rettig*,
    993 F.3d 408 (5th Cir. 2021) ........................................................25, 26

*United States v. Allen*,
    86 F.4th 295 (6th Cir. 2023) ........................... 5, 9, 11, 16, 22, 23, 25

*United States v. Al-Maliki*,
    787 F.3d 784 (6th Cir. 2015) ...............................................................22

*United States v. Ballinger*,
    395 F.3d 1218 (11th Cir. 2005) ..........................................................18

*United States v. Bryant*,
    No. 19-12283, 2023 WL 9018411 (11th Cir. Dec. 29, 2023) ...........20

*United States v. Comstock*,
    560 U.S. 126 (2010)........................................................................13, 14

*United States v. Darby*,
    312 U.S. 100 (1941)..............................................................................23

*United States v. Davila-Mendoza*,
    972 F.3d 1264 (11th Cir. 2020) ............................................................8

*United States v. Dewitt*,
    76 U.S. (9 Wall.) 41 (1869) .................................................................11

*United States v. E.C. Knight Co.*,
    156 U.S. 1 (1895)...................................................................................4

*United States v. Kebodeaux*,
    570 U.S. 387 (2013)...............................................................................7

*United States v. Lopez*,
    514 U.S. 549 (1995)........................... 6, 9, 10, 12, 13, 17, 18, 19, 20, 21, 24, 25

*United States v. Morrison*,
  529 U.S. 598 (2000)...........................................................6, 7, 19, 20, 24

*United States v. Pugh*,
  90 F.4th 1318 (11th Cir. 2024) ..........................................................19

*United States v. Rife*,
  33 F.4th 838 (6th Cir. 2022) ..................................... 8, 10, 11, 16, 23, 24, 25, 26

*United States v. Sec'y Fla. Agency for Health Care Admin.*,
  21 F.4th 730 (11th Cir. 2021) ............................................................25

*United States v. Seekins*,
  52 F.4th 988 (5th Cir. 2022) ..........................................................6, 25

*Wickard v. Filburn*,
  317 U.S. 111 (1942)...................................................................23, 24

## Constitution

U.S. Const., art. I, § 8...........................................................................22

U.S. Const., art. I, § 8, cl. 3...............................................................2, 7

U.S. Const., art. I, § 8, cl. 18........................................................2, 7, 13, 14

U.S. Const. amend. X..................................................................2, 6, 25

## Statutes

Ala. Code § 10A-1-2.01 ......................................................................15

8 Del. Code § 101(b)..........................................................................15

31 U.S.C. § 5336 ...................................................................................

31 U.S.C. § 5336(a)(11)......................................................................16

31 U.S.C. § 5336(h) ..............................................................................3

## Rules

FRAP 29(a)(4)(E) .................................................................................1

## Other Authorities

Antonin Scalia,
*Foreword: The Importance of Structure in Constitutional Interpretation*,
83 Notre Dame L. Rev. 1417 (2008) .................................................................2

George A. Mocsary,
*Freedom of Corporate Purpose*,
2016 B.Y.U.L. Rev. 1319 (2016) ....................................................................15

Joseph Story,
Commentaries on the Constitution of the United States (1833)..........................8

N. Webster's 1828 Dictionary ...........................................................................9

Randy E. Barnett,
*New Evidence of the Original Meaning of the Commerce Clause*,
55 Ark. L. Rev. 847 (2003)..............................................................................11

Randy E. Barnett,
*The Original Meaning of the Commerce Clause*,
68 U. Chi. L. Rev. 101 (2001) ...............................................................8, 9, 12

Randy E. Barnett,
*The Original Meaning of the Necessary and Proper Clause*,
6 U. Pa. J. Const. L. 183 (2003) .................................................................13, 21

1 S. Johnson, A Dictionary of the English Language (6th ed. 1785) ..................8, 9

The Federalist No. 17 (Hamilton)......................................................................10

The Federalist No. 22 (Hamilton)......................................................................22

The Federalist No. 28 (Hamilton)........................................................................5

The Federalist No. 45 (Madison).......................................................................10

The Federalist No. 51 (Madison).........................................................................5

William J. Seidleck,
   *Originalism and the General Concurrence: How Originalists Can
   Accommodate Entrenched Precedents While Reining in Commerce
   Clause Doctrine*,
   3 U. Pa. J. L. & Pub. Affs. 263 (2018) ........................................................10, 11

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Americans for Prosperity Foundation ("AFPF") is a 501(c)(3) nonprofit organization committed to educating and training Americans to be courageous advocates for the ideas, principles, and policies of a free and open society. Some of those key ideas include the vertical and horizontal separation of powers, federalism, and constitutionally limited government. As part of this mission, AFPF appears as *amicus curiae* before state and federal courts.

## STATEMENT OF THE ISSUES

*Amicus* will address the following question only:

Whether this Court should affirm because the district court correctly ruled that the Corporate Transparency Act ("CTA") exceeds Congress's powers by requiring entities formed under State law to report personal information of their owners and applicants solely due to the fact of their formation, regardless of whether they participate in interstate commerce.

---

[1] All parties have consented to the filing of this brief. Pursuant to FRAP 29(a)(4)(E), *amicus curiae* states that no counsel for a party other than AFPF authored this brief in whole or in part, and no counsel or party other than AFPF made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amicus curiae* or its counsel made a monetary contribution to its preparation or submission.

1

## SUMMARY OF ARGUMENT

In this country, all governmental power must flow from its proper source: We the People. Our system of government relies on the consent of the governed, memorialized in the Constitution. As Justice Antonin Scalia has explained: "The constitutional structure of the United States has two main features: (1) separation and equilibration of powers and (2) federalism. Each functions to safeguard individual liberty in isolation, but they provide even greater protection working together." *Foreword: The Importance of Structure in Constitutional Interpretation*, 83 Notre Dame L. Rev. 1417, 1418 (2008).

"In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments." *Id.* at 1418–19. Under this system of dual sovereignty, the federal government's powers are not unlimited but rather narrow and defined. Thus, while the Constitution grants Congress authority "to regulate Commerce" "among the several States," U.S. Const., art. I, § 8, cl. 3, and to "make all Laws which shall be necessary and proper for carrying into Execution" that power, U.S. Const. art. I, § 8, cl. 18, it does not grant the federal government a general police power. The Constitution instead reserves to the States the general task of governing. U.S. Const. amend. X.

The CTA is an affront to our system of federalism. And it is as unprecedented as it is unconstitutional. The statute lacks any pretense of regulating commerce. It does not reference or condition its applicability on commercial activities. Instead, the CTA's federal disclosure regime is triggered by a wholly *intra*state ministerial act—entity formation under state law—without any necessary link to commerce, let alone *inter*state commerce. "The ultimate result of this statutory scheme is that tens of millions of Americans must either disclose their personal information to FinCEN through State-registered entities, or risk years of prison time and thousands of dollars in civil and criminal fines." Dkt. No. 51, at 8;[2] *see* 31 U.S.C. § 5336(h). This ultra vires assertion of federal power should not be allowed to stand.

To be sure, the judicially created "substantial effects" test for federal authority under the Interstate Commerce Clause strays from the Constitution's original public meaning to expand the scope of federal power well beyond that which the People agreed to surrender. But even under that lax test, the CTA fails to pass constitutional muster. Neither Supreme Court nor this Court's precedent blesses the CTA's sweeping and unprecedented intrusion on the States' sovereign powers and the liberties of tens of millions of law-abiding Americans. This Court should therefore reject the Government's proposal to extend constitutionally spurious—and easily

---

[2] References in this format refer to a document's district court docket number and page number.

distinguishable—precedent and instead decide this case based on the Constitution's original public meaning.

For the foregoing reasons, the district court's decision should be affirmed.

## ARGUMENT

### I.    Our System of Federalism Protects Liberty.

"[O]ur Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). Under our federalist system, "[t]he States have broad authority to enact legislation for the public good—what we have often called a 'police power.' The Federal Government, by contrast, has no such authority[.]" *Bond v. United States*, 572 U.S. 844, 854 (2014) (cleaned up)); *see Gonzales v. Raich*, 545 U.S. 1, 66 (2005) (Thomas, J., dissenting) (noting "States' traditional police powers to define the criminal law and to protect the health, safety, and welfare of their citizens"). This means that the "general power of governing" belongs to the States, not the federal government. *See NFIB v. Sebelius*, 567 U.S. 519, 535–36 (2012). *Cf. United States v. E.C. Knight Co.*, 156 U.S. 1, 12 (1895) ("That which belongs to commerce is within the jurisdiction of the United States, but that which does not belong to commerce is within the jurisdiction of the police power of the State.").

"This separation of the two spheres is one of the Constitution's structural protections of liberty." *Printz v. United States*, 521 U.S. 898, 921 (1997). "State

sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *New York v. United States*, 505 U.S. 144, 181 (1992) (cleaned up). It is "a check on the power of the Federal Government[.]" *NFIB*, 567 U.S. at 536; *see Gregory*, 501 U.S. at 458 ("Perhaps the principal benefit of the federalist system is a check on abuses of government power."). "By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Bond*, 564 U.S. at 222.  Dual sovereignty is designed to provide "a double security [] to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself." The Federalist No. 51 (Madison). "If [the People's] rights are invaded by either, they can make use of the other as the instrument of redress." The Federalist No. 28 (Hamilton).

Federalism "protect[s] the liberty of the local communities in each State to choose the policies that would govern their local conduct."[3] *United States v. Allen*, 86 F.4th 295, 313 (6th Cir. 2023) (Murphy, J., concurring) (citing *Bond*, 564 U.S. at 220–22). It "ensur[es] that laws enacted in excess of delegated governmental power cannot direct or control their actions." *Bond*, 564 U.S. at 222 (citation omitted).

---

[3] Federalism also "promotes innovation by allowing for the possibility that 'a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.'" *Raich*, 545 U.S. at 42 (O'Connor, J., dissenting) (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting)).

## II.    As a Matter of Constitutional First Principles, Congress's Legislative Power Is Not Plenary But Narrow and Limited.

Under the Constitution, the federal government is "one of enumerated powers." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 405 (1819). "The enumeration presupposes something not enumerated[.]" *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 195 (1824). "With its careful enumeration of federal powers and explicit statement that all powers not granted to the Federal Government are reserved, the Constitution cannot realistically be interpreted as granting the Federal Government an unlimited license to regulate." *United States v. Morrison*, 529 U.S. 598, 618 n.8 (2000).

To the contrary, the federal government "can claim no powers which are not granted to it by the [C]onstitution, and the powers actually granted, must be such as are expressly given, or given by necessary implication." *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 326 (1816); *see* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."). "And those powers are 'few and defined.' This enumeration ensures 'a healthy balance of power between the States and the Federal Government [and] reduce[s] the risk of tyranny and abuse from either front.'" *United States v. Seekins*, 52 F.4th 988, 990 (5th Cir. 2022) (Ho, J., dissenting from denial of rehearing en banc) (quoting *United States v. Lopez*, 514 U.S. 549, 552 (1995)).

To exercise power, the federal government "must show that a constitutional grant of power authorizes each of its actions." *NFIB*, 567 U.S. at 535. "Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." *Morrison*, 529 U.S. at 607. Without a constitutional grant of authority to Congress, it simply cannot act. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803) ("The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.").

"The Constitution sets forth Congress' limited powers in Article I. That Article begins by 'vest[ing]' in Congress '[a]ll legislative Powers herein granted,' and then enumerates those powers in § 8." *United States v. Kebodeaux*, 570 U.S. 387, 409 (2013) (Thomas, J., dissenting). As relevant here, Article I grants Congress authority to regulate "to regulate Commerce . . . among the several States," U.S. Const., art. I, § 8, cl. 3, and "make all Laws which shall be necessary and proper for carrying into Execution" that power, U.S. Const. art. I, § 8, cl. 18.

Neither the Interstate Commerce Clause nor the Necessary and Proper Clause can justify the CTA's sweeping scope.

A.    **The Commerce Clause, As Originally Understood, Only Grants Congress Power to Regulate Interstate Trade and Transportation.**

First, the Interstate Commerce Clause.[4] Its "text, structure, and history all indicate that, at the time of the founding, the term 'commerce' consisted of selling, buying, and bartering, as well as transporting for these purposes."[5] *Sackett v. EPA*, 598 U.S. 651, 708 (2023) (Thomas, J., concurring) (cleaned up).

"Constitutional analysis must begin with 'the language of the instrument,' which offers a 'fixed standard' for ascertaining what our founding document means." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 235 (2022) (quoting *Gibbons*, 22 U.S. (9 Wheat.) at 189; 1 J. Story, Commentaries on the Constitution of the United States § 399, p. 383 (1833)). "The public meaning of 'commerce' at the time of the Constitution's ratification was hardly obscure[.] . . . 'Commerce,' at that time, meant 'trade' or economic 'intercourse,' which consisted of 'exchange of one thing for another,' 'interchange,' or 'traffick.'" *United States v. Rife*, 33 F.4th 838, 842 (6th Cir. 2022) (Kethledge, J.) (citing 1 S. Johnson, A Dictionary of the

---

[4] This Court has "assume[d], without deciding, that the Foreign Commerce Clause has the same scope as the Interstate Commerce Clause." *United States v. Davila-Mendoza*, 972 F.3d 1264, 1271 (11th Cir. 2020).

[5] "The most persuasive evidence of original meaning—statements made during the drafting and ratification of the Constitution as well as dictionary definitions and The Federalist Papers—strongly supports Justice Thomas's and the Progressive Era Supreme Court's narrow interpretation of Congress's power" under the Interstate Commerce Clause. Randy Barnett, *The Original Meaning of the Commerce Clause*, 68 U. Chi. L. Rev. 101, 146 (2001).

English Language 422 (6th ed. 1785)); *see* N. Webster's 1828 Dictionary (defining "Commerce" as "an interchange or mutual change of goods, wares, productions, or property of any kind, between nations or individuals, either by barter, or by purchase and sale; trade; traffick"); Barnett, 68 U. Chi. L. Rev. at 146 ("'Commerce' means the trade or exchange of goods (including the means of transporting them)").

As Chief Justice Marshall put it: "Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse."[6] *Gibbons,* 22 U.S. (9 Wheat.) at 189–90; *see Carter v. Carter Coal Co.,* 298 U.S. 238, 298 (1936) ("[T]he word 'commerce' is the equivalent of the phrase 'intercourse for the purposes of trade,' and includes transportation, purchase, sale, and exchange of commodities between the citizens of the different states."). "[W]hen Federalists and Anti-Federalists discussed the Commerce Clause during the ratification period, they often used trade (in its selling/bartering sense) and commerce interchangeably." *Lopez,* 514 U.S. at 586 (Thomas, J., concurring).

"Commerce, or trade, stood in contrast to productive activities like manufacturing and agriculture." *Raich,* 545 U.S. at 58 (Thomas, J., dissenting); *see*

---

[6] "[E]conomic exchanges have always required more than a handshake or a contract. They have also required the physical transfer of goods from seller to buyer." *Allen*, 86 F.4th at 308 (Murphy, J., concurring).

*Lopez*, 514 U.S. at 587 (Thomas, J., concurring) ("Agriculture and manufacturing involve the production of goods; commerce encompasses traffic in such articles."). "[T]he founding generation would not have seen production activities, such as manufacturing, mining, and agriculture, as being part of commerce. The writings of the framers and the purpose behind . . . the Commerce Clause also confirm its intended narrow scope." William J. Seidleck, *Originalism and the General Concurrence: How Originalists Can Accommodate Entrenched Precedents While Reining in Commerce Clause Doctrine*, 3 U. Pa. J. L. & Pub. Affs. 263, 269 (2018).

"Federalists and Antifederalists alike . . . distinguished 'commerce' from manufacturing and agriculture. Commerce itself, then, meant trade and transportation thereof, as opposed to activities preceding those things."[7] *Rife*, 33 F.4th at 842 (citations omitted). "[D]espite being well aware that agriculture, manufacturing, and other matters substantially affected commerce, the founding generation did not cede authority over all these activities to Congress. Hamilton, for instance, acknowledged that the Federal Government could not regulate agriculture and like concerns[.]" *Lopez*, 514 U.S. at 591 (Thomas, J., concurring) (citing The Federalist No. 17). "The term 'commerce' commonly meant trade or exchange (and

---

[7] Given its limited intended scope, the Framers did not view the Commerce Clause as a threat to liberty. James Madison, for example, characterized it as "an addition [to the Constitution] which few oppose and from which no apprehensions are entertained." The Federalist No. 45.

shipping for these purposes) not simply to those involved in the drafting and ratification processes, but also to the general public." *Raich*, 545 U.S. at 59 (Thomas, J., dissenting) (citing Randy Barnett, *New Evidence of the Original Meaning of the Commerce Clause*, 55 Ark. L. Rev. 847, 857–62 (2003)).

In short, "[t]he founding generation understood the term 'commerce' to mean only 'trade or exchange of goods.'" Seidleck, 3 U. Pa. J. L. & Pub. Affs. at 269. As originally understood, then, the Interstate Commerce Clause "allowed Congress to regulate both 'trade' and the 'transportation' of the traded products." *Allen*, 86 F.4th at 308–09 (Murphy, J., concurring) (quoting *Rife*, 33 F.4th at 842).

Further, under the original understanding, the Clause empowered Congress to regulate *inter*state (as opposed to *intra*state) trade and transportation. *See United States v. Dewitt*, 76 U.S. (9 Wall.) 41, 43–44 (1869) (Constitution's "express grant of power to regulate commerce among the States has always been understood as limited by its terms; and as a virtual denial of any power to interfere with the internal trade and business of the separate States[.]"). That is, "Congress's power under the Interstate Commerce Clause operates only on commerce that involves 'more States than one.'" *Haaland v. Brackeen*, 599 U.S. 255, 323 (2023) (Gorsuch, J., concurring) (quoting *Gibbons*, 22 U.S. (9 Wheat.) at 194); *see License Tax Cases*, 72 U.S. (5 Wall.) 462, 470–71 (1867) ("Congress has no power of regulation nor any direct control" over "internal commerce or domestic trade of the States").

11

This commonsense conclusion flows from the Clause's text. *See* Barnett, 68 U. Chi. L. Rev. at 132. "[T]he term 'among' found in the Interstate Commerce Clause most naturally suggests that Congress may regulate only activities that extend in their *operation* beyond the bounds of a particular State and into another." *Brackeen*, 599 U.S. at 321–22 (Gorsuch, J., concurring) (cleaned up). The Federalist Papers, ratification debates, and "a scholarly and judicial consensus" further support this reading. *See* Barnett, 68 U. Chi. L. Rev. at 132–36. "In other words, commerce that takes place 'among' (or between) two or more *territorial* units, and not just any commerce that involves *some* member of *some* State." *Brackeen*, 599 U.S. at 323 (Gorsuch, J., concurring) (citation omitted); *see* Barnett, 68 U. Chi. L. Rev. at 146 ("'among the several States' means between persons of one state and another").

In sum, the Commerce Clause gives Congress "power to specify rules to govern the manner by which people may exchange or trade goods from one state to another . . . and to both regulate and restrict the flow of goods to and from other nations (and the Indian tribes) for the purpose of promoting the domestic economy and foreign trade." Barnett, 68 U. Chi. L. Rev. at 146. But that is all.

**B.     The Necessary and Proper Clause Is Not a Free-Floating Source of Federal Power Untethered to Congress's Enumerated Powers.**

Next, the Necessary and Proper Clause. "In addition to its powers under the Commerce Clause, Congress has the authority to enact such laws as are 'necessary and proper' to carry into execution its power to regulate commerce

12

among the several States." *Lopez*, 514 U.S. at 588 (Thomas, J., concurring) (quoting U.S. Const., art. I, § 8, cl. 18).

Justice Scalia colorfully described the Clause as the "best hope of those who defend *ultra vires* congressional action[.]" *Printz*, 521 U.S. at 923. But "[t]he Necessary and Proper Clause does not give Congress *carte blanche.*" *United States v. Comstock*, 560 U.S. 126, 158 (2010) (Alito, J., concurring). It "is not itself a grant of power, but a caveat that the Congress possesses all the means necessary to carry out the specifically granted 'foregoing' powers of § 8 'and all other Powers vested by this Constitution[.]'" *Kinsella v. United States*, 361 U.S. 234, 247 (1960). The "Clause empowers Congress to enact only those laws that 'carr[y] into Execution' one or more of the federal powers enumerated in the Constitution." *Comstock*, 560 U.S. at 159 (Thomas, J., dissenting) (quoting U.S. Const. art. I, § 8, cl. 18). In other words, it is not a free-floating source of federal power and thus cannot save laws that are untethered to any of Congress's enumerated powers.[8]

As Chief Justice Marshall described the Clause's sweep: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but

---

[8] Federalists "insisted that the Necessary and Proper Clause was not an additional freestanding grant of power, but merely made explicit what was already implicit in the grant of each enumerated power." Randy E. Barnett, *The Original Meaning of the Necessary and Proper Clause*, 6 U. Pa. J. Const. L. 183, 185 (2003).

consist with the letter and spirit of the constitution, are constitutional." *McCulloch*, 17 U.S. (4 Wheat.) at 421. This means that for a law to fall within the scope of Congress's power under the Clause it "must be directed toward . . . the powers expressly delegated to the Federal Government by some provision in the Constitution," and "there must be a necessary and proper fit between the 'means' (the federal law) and the 'end' (the enumerated power or powers) it is designed to serve." *Comstock*, 560 U.S. at 160 (Thomas, J., dissenting).

In short, "no matter how 'necessary' or 'proper' an Act of Congress may be to its objective, Congress lacks authority to legislate if the objective is anything other than 'carrying into Execution' one or more of the Federal Government's enumerated powers." *Id.* at 161 (Thomas, J., dissenting) (quoting U.S. Const. art. I, § 8, cl. 18).; *see id.* at 158 (Alito, J., concurring). *Cf. id.* at 150 (Kennedy, J., concurring in the judgment) ("When the inquiry is whether a federal law has sufficient links to an enumerated power to be within the scope of federal authority, the analysis depends not on the number of links in the congressional-power chain but on the strength of the chain."). Thus, as relevant here, "[w]hatever additional latitude the Necessary and Proper Clause affords, the question is whether Congress' legislation is essential to the regulation of interstate commerce itself[.]" *Raich*, 545 U.S. at 67 (Thomas, J., dissenting) (citation omitted).

**III.    The CTA Exceeds Constitutional Limits on Federal Power Under Any Test.**

**A.    The CTA Infringes States' Sovereign Power to Create Corporate Entities and Regulates Wholly Intrastate Noneconomic Activity Lacking Any Nexus to Interstate Commerce.**

"The plain text of the CTA does not regulate the channels and instrumentalities of commerce, let alone commercial or economic activity." Dkt. No. 51, at 27. Instead, the CTA regulatory regime is triggered by purely *intra*state noncommercial conduct (entity formation under state law) that may not have any nexus with commercial activity, let alone *inter*state commerce.

Regulation of entity formation is a core exercise of State police power. "Corporations are creatures of state law[.]" *Cort v. Ash*, 422 U.S. 66, 84 (1975). "No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations[.]" *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987). Indeed, "[a] State can create a corporation, in virtue of its sovereignty, without any specific authority for that purpose, conferred in the State constitutions." *McCulloch*, 17 U.S. (4 Wheat.) at 400.

In many states, including Alabama, corporations may be formed for any lawful purpose, many of which are noncommercial. *See, e.g.*, Ala. Code § 10A-1-2.01; 8 Del. Code § 101(b); *see* George A. Mocsary, *Freedom of Corporate Purpose*, 2016 B.Y.U.L. Rev. 1319, 1365 (2016) ("most states' statutes allowed the formation of corporations for any lawful purpose since the early 1900s"). People form entities

for noncommercial reasons, including solely to exercise freedom of association, protect privacy, or hold real property. "Each year, the States grant formal status to millions of entities that can and do serve 'any lawful purpose,' including benefit corporations, non-profits, holding companies, political organizations, and everything in between." Dkt. No. 51, at 2.

Yet the CTA's regulatory regime and reporting requirements are triggered by the bare act of entity formation under state or tribal law the moment an entity is formed, irrespective of the entity's purpose and without regard to whether the entity will ultimately engage in interstate commercial activity or, for that matter, any activity at all. The CTA's definition of "reporting company" sweeps in entities engaged solely in intrastate activities within the borders of the State in which they are formed and noncommercial entities. *See* 31 U.S.C. § 5336(a)(11). For example, entities formed to hold a family residence and entities formed with the intent to seek 501(c) federal tax-exempt status that have not received that status are subject to the CTA's requirements. So, too, are non-profit entities like local private social clubs that do not intend to seek 501(c) federal tax-exempt status. The CTA thus reaches entirely *intra*state noneconomic conduct.

"The CTA's disclosure requirements aren't toothless, either: knowing or willful violations carry serious civil and criminal penalties." Dkt. No. 51, at 7.

16

### B.    The CTA Is Unconstitutional Under the Original Understanding of the Commerce Clause.

As a matter of constitutional first principles, this is not a close case. The CTA plainly exceeds Congress's power under the Commerce Clause as understood by the Framers. As discussed above, the clause "empowers Congress to regulate the buying and selling of goods and services trafficked across state lines." *Taylor v. United States*, 579 U.S. 301, 313 (2016) (Thomas, J., dissenting) (cleaned up). That is, it "originally allowed Congress to regulate both 'trade' and the 'transportation' of the traded products." *Allen*, 86 F.4th at 308–09 (Murphy, J., concurring) (quoting *Rife*, 33 F.4th at 842). The CTA regulates neither. *See* Dkt. No. 51, at 27–33.

Because the CTA's objective has nothing to do with Congress's enumerated powers under the Interstate Commerce Clause, it also falls outside the scope of Congress's power under the Necessary and Proper Clause, which is not itself a free-floating grant of legislative power. It thus exceeds the scope of federal power under the Constitution.

### C.    The CTA Fails the Judicially Created "Substantial Effects" Test.

Even under the Supreme Court's modern light-touch Interstate Commerce Clause doctrine, the CTA fails to pass constitutional muster.

The Court's modern jurisprudence—which departs from the Constitution's original public meaning—authorizes Congress to regulate three categories of interstate commerce: "First, Congress may regulate the use of the channels of

17

interstate commerce.[9] Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities.[10] Finally, Congress' commerce authority includes the power to regulate . . . those activities that substantially affect interstate commerce."[11] *Lopez*, 514 U.S. at 558–59 (citations omitted). The CTA regulates none of those things.

As the district court found, "the CTA doesn't regulate the channels and instrumentalities of commerce or prevent their use for a specific purpose[.]" Dkt. No. 51, at 33. "The word 'commerce,' or references to any channel or instrumentality of commerce, are nowhere to be found in the CTA." Dkt. No. 51, at 28 (citing 31 U.S.C. § 5336). It "is not a facial regulation of commercial activity[.]" Dkt. No. 51,

---

[9] Channels of interstate commerce "include highways, railroads, navigable waters, and airspace[.]" *United States v. Ballinger*, 395 F.3d 1218, 1225–26 (11th Cir. 2005) (en banc) (citations omitted).

[10] By way of example, "automobiles, airplanes, boats, and shipments of goods" are instrumentalities of interstate commerce. *Ballinger*, 395 F.3d at 1226 (en banc).

[11] As Justice Scalia has explained, "unlike the channels, instrumentalities, and agents of interstate commerce, activities that substantially affect interstate commerce are not themselves part of interstate commerce, and thus the power to regulate them cannot come from the Commerce Clause alone." *Raich*, 545 U.S. at 34 (Scalia, J., concurring). Instead, under Supreme Court precedent, "Congress's regulatory authority over intrastate activities that are not themselves part of interstate commerce (including activities that have a substantial effect on interstate commerce) derives from the Necessary and Proper Clause." *Id.* (Scalia, J., concurring). But as a matter of constitutional first principles, that Clause cannot justify federal regulation of this class of activity. *See Lopez,* 514 U.S. at 588–89 (Thomas, J., concurring).

18

at 36. Thus, if the CTA is to be upheld under current precedent, it must fall within Congress's authority to regulate "activities that substantially affect interstate commerce." *Morrison*, 529 U.S. at 608–09 (cleaned up). It does not.

To be sure, "[u]nder [this Court's] precedents, if a criminal statute contains a jurisdictional element that limits the statute to constitutional applications, that jurisdictional element" forecloses facial Commerce Clause challenges. *United States v. Pugh*, 90 F.4th 1318, 1326 (11th Cir. 2024). But the CTA has "no express jurisdictional element which might limit its reach" to entities that "have an explicit connection with or effect on interstate commerce." *Lopez*, 514 U.S. at 562. That is a fatal constitutional defect.

Given that the CTA's regulatory regime is triggered by the mere act of entity formation under state law and sweeps in entities created for noncommercial reasons that may not engage in any activity, let alone *commercial* activity, the absence of a jurisdictional hook or even any reference to commerce renders the statute facially invalid even under current precedent.[12] *See, e.g., Morrison*, 529 U.S. at 613

---

[12] The Government's reliance on *Sabri v. United States*, 541 U.S. 600 (2004), *see* Gov't Br. 31–32, to excuse Congress's inexplicable failure to include a jurisdictional hook is misplaced. Congress enacted the statute at issue in *Sabri* pursuant to its Spending Clause (as opposed to Interstate Commerce Clause) and Necessary and Proper Clause powers. *See Sabri*, 541 U.S. at 605; *see also NFIB*, 567 U.S. at 560 (opinion of Roberts, C.J.). The Government's reliance on congressional findings, *see* Gov't Br. 7, 18–20, is likewise misplaced. "Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Morrison*, 529 U.S. at 614. So too here.

(invalidating statute that "contain[ed] no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce"); *Lopez*, 514 U.S. at 561 (invalidating criminal statute that "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce"); *see also United States v. Bryant*, No. 19-12283, 2023 WL 9018411, at *3 (11th Cir. Dec. 29, 2023) (unpublished) ("Congressional acts will be struck down when they lack a jurisdictional element ensuring the prohibition in question affects interstate commerce."). Indeed, below "the Government concede[d] that 'submitt[ing] documents to a Secretary of State' does not 'implicate[] the Commerce Clause.'" Dkt. No. 51, at 36 (quoting Doc. 40 at 12).

The CTA's novelty further underscores its unconstitutionality. As the Supreme Court has observed, "sometimes 'the most telling indication of [a] severe constitutional problem . . . is the lack of historical precedent' for Congress's action." *NFIB*, 567 U.S. at 549 (quoting *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) (internal quotation marks omitted)). That resonates here. The statute is unprecedented. The district court could not "find, and the parties have not identified, any other State or federal law like the CTA." Dkt. No. 51, at 35.

The Government resists this conclusion, appearing to suggest atextual limitations to the CTA's sweep. *See* Gov't Br. 28–30. But this Court cannot solve the CTA's constitutional problem by judicially editing the statute. "It is a fundamental principle of statutory interpretation that absent provisions cannot be supplied by the courts." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (cleaned up). Nor can constitutional avoidance rescue Congress's constitutionally flawed handiwork. *See Seila Law LLC v. Consumer Fin. Prot. Bureau,* 591 U.S. 197, 230 (2020) ("Constitutional avoidance is not a license to rewrite Congress's work to say whatever the Constitution needs it to say in a given situation."); *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). As the district court put it: "Because '[i]t is emphatically the province and duty of' this Court to interpret the law, not write it, the Court cannot amend the CTA to include a jurisdictional hook. Only Congress can do that." Dkt. No. 51, at 49 (quoting *Marbury*, 5 U.S. (1 Cranch) at 177). Exactly so.

And because the CTA's objectives are untethered to Congress's Interstate Commerce Clause powers, the Necessary and Proper Clause likewise cannot support the CTA's intrusions on individual liberty and State sovereignty, as that Clause is not a freestanding grant of federal power. *See Raich*, 545 U.S. at 34 (Scalia, J., concurring); Barnett, 6 U. Pa. J. Const. L. at 185; *see also Lopez,* 514 U.S. at 588–89 (Thomas, J., concurring).

In sum, the district court correctly found that "the CTA exceeds the Constitution's limits on the legislative branch and lacks a sufficient nexus to any enumerated power to be a necessary or proper means of achieving Congress' policy goals[.]" Dkt. No. 51, at 3. "By legislating beyond its limited powers" under the Interstate Commerce Clause, even as augmented by the Necessary and Proper Clause, "Congress has taken from the People authority that they never gave." *Gamble v. United States*, 139 S. Ct. 1960, 1980 n.1 (2019) (Thomas, J., concurring) (citing U.S. Const. art. I, § 8; The Federalist No. 22). This should not stand.

## IV.    The "Substantial Effects" Test Has No Basis In the Constitution.

The federal government's overreach here, as elsewhere, showcases why it is important to return to the Interstate Commerce Clause's original public meaning.

"[T]he [Supreme] Court's Commerce Clause jurisprudence has significantly departed from the original meaning of the Constitution." *Sackett*, 598 U.S. at 708 (Thomas, J., concurring); *see United States v. Al-Maliki*, 787 F.3d 784, 792 (6th Cir. 2015) ("[A]las in the interstate context, we have long since moved away from the original meaning of 'regulate Commerce[.]'"). "Today, . . . the Supreme Court broadly reads the Commerce Clause to give Congress authority over many things that nobody would describe as interstate trade or the shipment of the traded goods."

*Allen*, 86 F.4th at 309 (Murphy, J., concurring) (citing *NFIB*, 567 U.S. at 549 (opinion of Roberts, C.J.)).

"In the New Deal era, as is well known, th[e Supreme] Court adopted a greatly expanded conception of Congress' commerce authority[.]"[13] *Sackett* , 598 U.S. at 696 (Thomas, J., concurring) (citing *Wickard v. Filburn*, 317 U.S. 111, 127–29 (1942); *United States v. Darby*, 312 U.S. 100, 119 (1941)). "The [Supreme] Court developed th[e] substantial-effects test in the 1930s to uphold federal laws designed to combat the Great Depression. The test allows Congress to regulate local activities (such as growing wheat on a private farm for personal use) if the activities 'have a substantial effect on interstate commerce' when considered in the aggregate." *Allen*, 86 F.4th at 309 (Murphy, J., concurring) (citations omitted). "That addition . . . came during a period of national exigencies peculiar to interstate commerce—namely a national Depression ever since known as such, and (in *Wickard v. Filburn*, 317 U.S. 111 (1942)) the beginnings of a nationwide war effort." *Rife*, 33 F.4th at 844.

"By departing from" the Clause's "limited meaning," this line of precedent "ha[s] licensed federal regulatory schemes that would have been unthinkable to the Constitution's Framers and ratifiers." *Sackett*, 598 U.S. at 708–09 (Thomas, J., concurring) (cleaned up); *see, e.g.*, *Raich*, 545 U.S. 1 (local cultivation and

---

[13] AFPF respectfully believes that line of precedent was wrongly decided and should be overruled.

consumption of marijuana); *Wickard*, 317 U.S. 111 (local wheat farming). "[T]he very notion of a 'substantial effects' test under the Commerce Clause is inconsistent with the original understanding of Congress' powers and with this Court's early Commerce Clause cases." *Morrison*, 529 U.S. at 627 (Thomas, J., concurring); *see also Lopez*, 514 U.S. at 599 (Thomas, J., concurring) (noting test's "recent vintage and its corresponding lack of any grounding in the original understanding of the Constitution"). And this "revisionist structure that, 80 years ago, the Supreme Court added to the Interstate Commerce Clause" "has come to overshadow the original structure to which it was attached[.]" *Rife*, 33 F.4th at 843, 844.

Even the Supreme Court's more modern Commerce Clause "precedents emphasize that '[t]he Constitution requires a distinction between what is truly national and what is truly local.' The substantial-effects approach is at war with that principle." *Taylor*, 579 U.S. at 319 (Thomas, J., dissenting) (quoting *Morrison*, 529 U.S. at 617–18). This holds particularly true with respect to the substantial effects test's "aggregation principle," which "has no stopping point." *Lopez*, 514 U.S. at 600 (Thomas, J., concurring). *Cf.* Dkt. No. 51, at 48 (noting "Government's failure to articulate limiting principles for its Commerce Clause arguments").

This judicial gloss on the Interstate Commerce Clause's original public meaning should not be further expanded to bless the CTA's unprecedented disclosure regime and take yet another step toward granting the federal government

the general police power the Constitution reserves to the States. U.S. Const. amend X; *see Lopez*, 514 U.S. at 599–602 (Thomas, J., concurring).

## V. This Court Should Enforce the Constitution's Original Public Meaning to the Maximum Extent Permissible Under Existing Precedent.

Courts "enforce the 'outer limits' of Congress' Commerce Clause authority not for their own sake, but to protect historic spheres of state sovereignty from excessive federal encroachment and thereby to maintain the distribution of power fundamental to our federalist system of government." *Raich*, 545 U.S. at 42 (O'Connor, J., dissenting) (citations omitted). "[C]onstitutional limits on governmental power do not enforce themselves. They require vigilant—and diligent—enforcement." *Seekins*, 52 F.4th at 989 (Ho, J., dissenting from denial of rehearing en banc). And "[i]t's up to the judicial branch to uphold our constitutional structure by policing the limits of federal power." *United States v. Sec'y Fla. Agency for Health Care Admin.*, 21 F.4th 730, 758 (11th Cir. 2021) (Newsom, J., dissenting from denial of rehearing en banc).

"Admittedly, the Supreme Court has taken us a long way from the Commerce Clause's original meaning." *Allen*, 86 F.4th at 311 (Murphy, J., concurring). But "the Constitution's original meaning is law, absent binding precedent to the contrary." *Rife*, 33 F.4th at 843–44. "That should mean that [judges] decide every case faithful to the text and original understanding of the Constitution, to the maximum extent

permitted by a faithful reading of binding precedent." *Texas v. Rettig*, 993 F.3d 408, 409 (5th Cir. 2021) (Ho, J., dissenting from denial of rehearing en banc).

"There is no such precedent here." *Rife*, 33 F.4th at 844. This Court should therefore decide this case based on the original public meaning of the Constitution. For as Judge Ho put it: "[I]f [courts] are forced to choose between upholding the Constitution and extending precedent in direct conflict with the Constitution, the choice should be clear[.]" *Rettig*, 993 F.3d at 417 (Ho, J., dissenting from denial of rehearing en banc) (citation omitted).

So too here. This Court should therefore interpret precedent in light of the Constitution's text, structure, and original understanding, *see Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Local 229, AFL-CIO*, 974 F.3d 1106, 1116–17 (9th Cir. 2020) (Bumatay, J., dissenting from denial of rehearing en banc) (citation omitted), and "tread carefully before extending" it, *Garza v. Idaho*, 139 S. Ct. 738, 756 (2019) (Thomas, J., dissenting). While courts must "faithfully follow" Supreme Court precedents, courts "should resolve questions about the scope of those precedents in light of and in the direction of the constitutional text and constitutional history." *Edmo v. Corizon, Inc.*, 949 F.3d 489, 506 (9th Cir. 2020) (Bumatay, J., dissenting from denial of rehearing en banc) (cleaned up). Here, that direction shows that the CTA is unconstitutional. *See* Dkt. No. 51, at 35.

## CONCLUSION

For these reasons, this Court should affirm the district court's decision.

Respectfully submitted,

/s/ Michael Pepson
Michael Pepson
Cynthia Fleming Crawford
AMERICANS FOR PROSPERITY FOUNDATION
4201 Wilson Blvd., Ste. 1000
Arlington, VA 22203
571.329.4529
mpepson@afphq.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of FRAP 29(a)(5) and FRAP 32(a)(7)(B) because it contains 6,382 words. This brief also complies with the typeface and type-style requirements of FRAP 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Times New Roman 14-point font.


/s/ Michael Pepson
Michael Pepson

Dated: May 17, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2024, I electronically filed the above Brief of Amicus Curiae Americans for Prosperity Foundation in Support of Appellees with the Clerk of the Court by using the appellate CM/ECF system. I further certify that service will be accomplished by the appellate CM/ECF system.


<u>/s/ Michael Pepson</u>
Michael Pepson

Dated: May 17, 2024