No. 24-10736

_____

# In the United States Court of Appeals
# for the Eleventh Circuit

_____

### NATIONAL SMALL BUSINESS UNITED, et al.,

*Plaintiffs – Appellees*

### v.

### U.S. DEPARTMENT OF TREASURY, et al.,

*Defendants – Appellants*

_____

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA, NO. 5:22-CV-01448

_____

### BRIEF OF *AMICI CURIAE* NATIONAL FEDERATION OF INDEPENDENT BUSINESS SMALL BUSINESS LEGAL CENTER, INC., NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC., AND AMERICAN FARM BUREAU FEDERATION, IN SUPPORT OF PLAINTIFFS-APPELLEES FOR AFFIRMANCE

_____

### Attorneys for *Amici*:

**Tripp DeMoss**
**Email: tdemoss@balch.com**
**BALCH & BINGHAM LLP**
**445 Dexter Avenue**
**Suite 8000**
**Montgomery, AL  36104**
**Telephone: (334) 834-6500**

**Ed R. Haden**
**Email: ehaden@balch.com**
**BALCH & BINGHAM LLP**
**1901 Sixth Avenue North**
**Suite 1500**
**Birmingham, AL  35203**
**Telephone: (205) 226-8795**

*National Small Business United, et al. v. U.S. Dept. of the Treasury, et al.,*
No. 24-10736

<u>**CERTIFICATE OF INTERESTED PERSONS**</u>

*Amici Curiae* National Federation of Independent Business Small Business Legal Center, Inc., National Association of Home Builders of the United States, The Associated General Contractors of America, Inc., and American Farm Bureau Federation (collectively, *Amici*) submit this Certificate of Interested Persons and Corporate Disclosure Statement. *See* Fed. R. App. P. 26.1; 11th Cir. R. 26.1-1, -2, & -3. In addition to the individuals set forth in the Appellants' Brief, the following entities and individuals have an interest in the outcome of this matter:

1. **American Farm Bureau Federation (AFBF)**, *Amicus Curiae* in support of Plaintiffs-Appellees;

2. **Associated General Contractors of America, Inc. (AGC)**, *Amicus Curiae* in support of Plaintiffs-Appellees;

3. **Balch & Bingham LLP**, law firm of counsel for *Amici*;

4. **DeMoss, Tripp**, counsel for *Amici*;

5. **Haden, Ed**, counsel for *Amici*;

6. **National Association of Home Builders of the United States (NAHB)**, *Amicus Curiae* in support of Plaintiffs-Appellees; and

*National Small Business United, et al. v. U.S. Dept. of the Treasury, et al*.,
No. 24-10736

7. **National Federation of Independent Business Small Business Legal Center, Inc. (NFIB Legal Center)**, *Amicus Curiae* in support of Plaintiffs-Appellees.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

No *Amici* has a parent corporation and no publicly traded corporation owns 10% or more of any *Amici*.

     /s/ *Ed R. Haden*
     Ed R. Haden
     One of the Attorneys for *Amici* National Federation of Independent Business Small Business Legal Center, Inc., National Association of Home Builders of the United States, The Associated General Contractors of America, Inc., and American Farm Bureau Federation

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

TABLE OF AUTHORITIES ................................................................. ii

INTEREST OF *AMICI CURIAE* ...........................................................1

SUMMARY OF ARGUMENT ...............................................................3

ARGUMENT ...........................................................................5

    I.    Under the Commerce Clause's Substantial Effects Test, the Activity to be Regulated Must be Economic, i.e., the Introduction, Production, or Exchange of Goods or Services. ............6

        A.    Only Laws Regulating Economic Activity Are a Valid Exercise of Congress's Power Under the Substantial Effects Test. .........................................................7

        B.    Where the Supreme Court has Struck Down Lawmaking Efforts Under the Substantial Effects Test, the Regulated Activity Did Not Involve the Introduction, Production, or Exchange of Goods or Services. ..............................13

    II.    The Corporate Transparency Act Does Not Regulate Economic Activity and Fails the Substantial Effects Test. .................17

CONCLUSION .......................................................................26

CERTIFICATE OF COMPLIANCE ....................................................28

# TABLE OF AUTHORITIES

**Cases**

*Gonzales v. Raich*,
 545 U.S. 1 (2005)..........................................................................6, 10, 11, 13, 16

*Heart of Atlanta Motel, Inc., v. United States*,
 379 U.S. 241 (1964)............................................................................................9, 10

*Hodel v. Virginia Surface Mining and Reclamation Assoc., Inc.*,
 452 U.S. 264 (1981).................................................................................10, 13, 21

*Katzenbach v. McClung*,
 379 U.S. 294 (1964)............................................................................................9, 13

*NFIB v. Sebelius*,
 567 U.S. 519 (2012)..................................................... 15, 16, 17, 23, 24, 26

*Perez v. United States*,
 402 U.S. 146 (1971)...................................................................... 10, 13, 21, 24

*Taylor v. United States*,
 579 U.S. 301 (2016)................................................................................12, 13, 21

*United States v. Darby*,
 312 U.S. 100 (1941)............................................................................. 7, 8, 13, 20

*United States v. Lopez*,
 514 U.S. 549 (1995)............................................... 9, 11, 12, 13, 14, 15, 17, 22

*United States v. Morrison*,
 529 U.S. 598 (2000)........................................... 5, 11, 14, 15, 17, 22, 26

*United States v. Perez*,
 426 F. 2d 1073 (2d Cir. 1970), *aff'd*, 402 U.S. 146 (1971)...............................24

*United States v. Wrightwood Dairy Co.*,
 315 U.S. 110 (1942)......................................................................... 9, 13, 20

*Wickard v. Filburn*,
 317 U.S. 111 (1942)................................................7, 8, 11, 13, 14, 16, 20, 22, 24

**Statutes**

31 U.S.C. § 5336 ........................................................ 4, 18, 19, 20, 21, 22, 23, 24, 25

42 U.S.C. § 891 ............................................................................................24

82 Stat. 146 (1968) ......................................................................................24

Pub. L. No. 90–321, § 202 ...........................................................................24

**Rules**

31 C.F.R. § 1010.380 ...................................................................................19

Fed. R. App. P. 29 .........................................................................................1

**Constitutional Provisions**

U.S CONST. art. 1, § 8, cl. 3 ..........................................................................5

**Other Authorities**

*Economic activity*, Cambridge Advanced Learner's Dictionary & Thesaurus
   (4th Ed. 2013) ...........................................................................................7

*Economic activity*, Cambridge Business English Dictionary (2011) .......................7

## INTEREST OF *AMICI CURIAE*[1]

The National Federation of Independent Business Small Business Legal Center, Inc. (NFIB Legal Center) is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses in the nation's courts through representation on issues of public interest affecting small businesses. It is an affiliate of the National Federation of Independent Business, Inc. (NFIB), which is the nation's leading small business association. NFIB's mission is to promote and protect the right of its members to own, operate, and grow their businesses. NFIB represents, in Washington, D.C., and all 50 state capitals, the interests of its members.

The National Association of Home Builders of the United States, Inc. (NAHB) is a Washington, D.C.-based trade association whose mission is to enhance the climate for housing and the building industry. Chief among NAHB's goals are providing and expanding opportunities for all people to have safe, decent, and affordable housing. Founded in 1942, NAHB is a federation of more than 700 state and local associations. About one-third of NAHB's approximately 120,000 members are home builders or remodelers and are responsible for the construction of 80% of

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici curiae* state that no counsel for any party authored this brief in whole or in part and no entity or person, other than *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund its preparation or submission. Counsel for both parties have consented to the filing of this brief.

1

all new homes in the United States. The remaining members are associates working in closely related fields within the housing industry, such as environmental consulting, mortgage finance and building products and services. NAHB frequently participates as a party litigant and *amicus curiae* to safeguard the rights and economic interests of its members and those similarly situated.

The Associated General Contractors of America, Inc. (AGC) is the nation's largest and most diverse trade association in the commercial construction industry, now representing more than 28,000 member companies that include general contractors, specialty contractors, and service providers and suppliers to the industry through a nationwide network of chapters in all 50 states, the District of Columbia, and Puerto Rico. AGC members are engaged in construction for both public and private property owners and developers. AGC works to ensure the continued success of the commercial construction industry by advocating for federal, state, and local measures that support the industry. AGC's goal is to serve its members by advancing the profession of construction and improving the delivery of the industry's services consistent with the public's interest.

The American Farm Bureau Federation (AFBF), headquartered in Washington, D.C., was formed in 1919 and is the largest nonprofit general farm organization in the United States. Representing about six million member families in all fifty states and Puerto Rico, AFBF's members grow and raise every type of

2

agricultural crop and commodity produced in the United States. Its mission is to protect, promote, and represent the business, economic, social, and educational interests of American farmers and ranchers. To that end, AFBF regularly participates in litigation, including as *amicus curiae*.

*Amici curiae* regularly engage in Commerce Clause cases on behalf of their members. *Amici* file this brief specifically because all of their members contribute to the economic activity of the nation; some of their members do so by way of interstate commerce, while others conduct only intrastate affairs; and the vast majority of their members will be negatively impacted by the Corporate Transparency Act's reach.

## SUMMARY OF ARGUMENT

Congress's power to regulate under the Commerce Clause is broad, but not unlimited. The outer limit of this power has always been regulating purely intrastate *economic activity*, like the growing of a fungible commodity for personal use. Permitting Congress to reach this type of purely intrastate economic activity was historically based on the increased supply of the commodity, even in a local market, impacting the supply, demand, or price of the commodity in the national market. The Government seeks to plow through that outer limit in this case. It argues that Congress must be given the power to regulate purely intrastate *noneconomic activity*, that is activity containing no introduction, production, or exchange of goods or

3

services, no fungible commodity, and no national market with implications on interstate supply, demand, or pricing. This dispute thus boils down to a simple question: Is the Commerce Clause's grant of authority to Congress limitless? The district court correctly concluded that it is not.

The Corporate Transparency Act (CTA or Act), Pub. L. No. 116-283, 134 Stat. 4604 (2021) (codified at 31 U.S.C. § 5336) regulates entity incorporation. It does so by imposing reporting requirements on individuals and entities who file for incorporation through their state. These entities must, based on their filing for incorporation, report to the Department of Treasury sensitive identifying information of the person who filed for incorporation and each person exercising substantial control over the entity. Failure to provide this information, or providing false information, may lead to criminal or civil penalties.

In passing the Act, Congress exceeded its authority under the Commerce Clause. The current interpretation of that authority permits Congress to regulate activities that substantially affect interstate commerce. For Congress's regulation of an activity substantially affecting interstate commerce to be valid, the activity to be regulated must be economic activity—the introduction, production, or exchange of goods or services. Over 80 years of Supreme Court precedent confirms as such; where the underlying activity regulated has been economic activity, congressional action was upheld; where the activity has not been economic activity, the

4

congressional action was not. Put differently, Congress's regulation of *economic activity* is a necessary condition for a law's validity under the Commerce Clause.

The Act does not regulate economic activity. Instead, it regulates the noneconomic activity of incorporation and imposes reporting obligations based solely on whether that noneconomic activity occurs. It requires no introduction, production, or exchange of goods or services for the reporting obligations to take effect. The Act neither targets nor imposes restrictions on a fungible commodity that impacts the national market. And Congress's commerce reach cannot be based on speculative future activity. Because the Act clearly regulates the noneconomic activity of incorporation, it cannot be upheld under the Commerce Clause.

The Court should affirm the judgment of the district court.

## **ARGUMENT**

Section 5336 of Title 31 of the United States Code exceeds Congress's power under the Commerce Clause. The Commerce Clause allows Congress "to regulate Commerce . . . among the several States[.]" U.S CONST. art. 1, § 8, cl. 3. Congress may regulate three categories under that Clause: 1) "the channels of interstate commerce"; 2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce"; and 3) "activities that substantially affect interstate commerce." *United States v. Morrison*, 529 U.S. 598, 609 (2000) (quoted sources

5

omitted). This case primarily concerns the third category, whether the Act regulates activities that substantially affect interstate commerce (hereinafter "substantial effects test"). To pass muster under the substantial effects test, Congress's lawmaking must regulate economic activity. Because the Act seeks to regulate noneconomic activity involving no introduction, production, or exchange of goods or services—the act of incorporation—it cannot be justified under the Commerce Clause.

## I. Under the Commerce Clause's Substantial Effects Test, the Activity to be Regulated Must be Economic, i.e., the Introduction, Production, or Exchange of Goods or Services.

The Supreme Court's caselaw on the substantial effects test has not been a linear progression. The current test has been heavily criticized as untethered from the original meaning of the Commerce Clause. *See, e.g., Gonzales v. Raich*, 545 U.S. 1, 67 (2005) (Thomas, J., dissenting) ("[T]he 'substantial effects' test is a 'rootless and malleable standard' at odds with the constitutional design." (quoted source omitted)).[2] Even so, there is one common denominator running through the major substantial effects cases. For Congress to regulate activity under the substantial effects test, that activity must be economic in nature. Economic activity means the

---

[2] *Amici* would support the Supreme Court's review of whether the current substantial effects test comports with the original meaning of the Commerce Clause. In this brief, however, *amici* demonstrate that the Corporate Transparency Act fails even the controversial modern test because the Act does not regulate economic activity.

introduction, production, or exchange of goods or services. *Economic activity*, Cambridge Advanced Learner's Dictionary & Thesaurus (4th Ed. 2013) ("the actions and processes involved in producing, buying, and selling products and services"); *Economic activity*, Cambridge Business English Dictionary (2011) ("the activity of producing, buying, or selling products or services").

### A. Only Laws Regulating Economic Activity Are a Valid Exercise of Congress's Power Under the Substantial Effects Test.

The Commerce Clause's substantial effects test traces back to *United States v. Darby*, 312 U.S. 100 (1941), and *Wickard v. Filburn*, 317 U.S. 111 (1942). In *Darby*, the Court considered whether Congress could prohibit "the shipment in interstate commerce of *lumber manufactured* by employees" whose wages were less than the minimum, or whose hours exceed the maximum, imposed by the Fair Labor Standards Act (FLSA), and whether "it ha[d] power to prohibit the employment of workmen in the *production of goods* 'for interstate commerce[.]'" 312 U.S. at 105 (emphasis added). Darby manufactured raw materials into finished lumber, which he would thereafter ship to customers in other states. The relevant provision of the FLSA prohibited the "shipment in interstate commerce of *any goods*" produced by employees paid less than the FLSA required or working more hours than it permitted. *Id.* at 110 (emphasis added). The Court held that the "prohibition of the *shipment interstate of goods produced* under the forbidden substandard labor conditions is within the constitutional authority of Congress." *Id.* at 115 (emphasis

7

added). Addressing the second question, the Court upheld the wage and hour requirements of the FLSA by repeatedly noting the Act's addressing of working conditions tied to the production of goods for interstate commerce. *Id.* at 118–24 ("Congress, having by the present Act adopted the policy of excluding from interstate commerce *all goods produced* for the commerce which do not conform to the specified labor standards" and "The means adopted by [the provision] for the protection of interstate commerce by the *suppression of the production of the condemned goods* for interstate commerce is so related to the commerce and so affects it as to be within the reach of the commerce power." (emphasis added)). The production of goods for interstate commerce was vital to the Court's holding in *Darby*.

Likewise, *Wickard* involved economic activity through a fungible commodity—wheat. The Agricultural Adjustment Act of 1938 controlled the national wheat market by limiting the amount one could grow. Wickard exceeded the prescribed limit. Often overlooked in *Wickard* is the presence of economic activity—the effect on the national market of growing a fungible commodity. The Court placed heavy emphasis on this, devoting much of its discussion to the "economics of the wheat industry," the "surplus of wheat," situations where "production has been below consumption," and the "effect of consumption of homegrown wheat on interstate commerce." *Id.* at 125–27. The presence of a

fungible good was central to the Court's holding: "[T]he power to regulate commerce includes the power to regulate the prices at which *commodities* in that commerce are dealt in and practices affecting such prices. One of the primary purposes of the Act in question was to increase the market price of wheat and to that end to limit the volume thereof that could affect the market." *Id.* at 128 (emphasis added; internal footnote omitted).

Necessary to the outcome of multiple mid-twentieth century substantial effects cases was the presence of economic activity, i.e., the introduction, production, or exchange of goods and services. In *United States v. Wrightwood Dairy Co.*, the Court upheld price regulations on "milk and certain other *commodities*" because the marketing of the intrastate fungible good—milk—would impact the national market. 315 U.S. 110, 116, 120 (1942) (emphasis added). *Katzenbach v. McClung* upheld the Civil Rights Act's prohibition against discrimination as applied to restaurants "which *serve food* a substantial portion of which has moved in commerce." 379 U.S. 294, 298 (1964) (emphasis added). *Katzenbach* included two pillars of economic activity: service and the production of goods.[3] *Perez v. United States* involved a quintessential economic activity—the

---

[3] *Heart of Atlanta Motel, Inc., v. United States*, 379 U.S. 241 (1964) was decided concurrently with *Katzenbach*. It is not clear whether the case was decided based on the national highways being channels of interstate commerce, *see United States v. Lopez*, 514 U.S. 549, 558 (1995) (citing *Heart of Atlanta Motel* for the notion that Congress can regulate the channels of interstate commerce), or a substantial effects

illic exchange of money (a fungible commodity) and extortionate credit transactions. 402 U.S. 146, 147–48 (1971). And in *Hodel v. Virginia Surface Mining and Reclamation Assoc., Inc.*, the Supreme Court upheld Congress's regulations on coal mining, concluding that "coal is a *commodity*" and "Congress may regulate the conditions under which *goods* shipped in interstate commerce are *produced* where the 'local' activity of *producing these goods* itself affects interstate commerce." 452 U.S. 264, 268, 281 (1981) (emphasis added).

In the mid-2000's, the Supreme Court again made clear the requirement that economic activity be present for a law to be upheld under the substantial effects test. Congress passed the Controlled Substances Act (CSA), which banned the manufacture, distribution, or possession of marijuana. In *Gonzales v. Raich*,[4] the challengers cultivated and used marijuana for medicinal purposes, pursuant to California law. The question in *Raich* was "whether Congress' power to regulate interstate markets for medicinal substances encompasses the portions of those

_____

case, *see Heart of Atlanta Motel*, 379 U.S. at 258 (noting that even local activity like motel operations can fall under the power of Congress to promote interstate commerce so long as those local incidents have a "substantial and harmful effect upon that commerce"). Regardless, providing accommodation service is undoubtedly an economic activity.

[4] *Gonzales v. Raich* can be read as a strict Commerce Clause case, given the citation to Commerce Clause precedents, or a Necessary and Proper Clause case based on language in the opinion. For purposes of this brief, *amici* treat *Raich* as a Commerce Clause case.

markets that are supplied with drugs *produced* and consumed locally." 545 U.S. at 9 (emphasis added). *Raich*, in a sense, was a highly controversial case. But like the prior 60-plus years of substantial effects jurisprudence, one thing was clear: economic activity, i.e., the introduction, production, or exchange of goods or services, was necessary to uphold Congress's action.

The majority upheld the CSA, concluding that "case law firmly establishes Congress' power to regulate purely local activities that are part of an *economic* 'class of activities' that have a substantial effect on interstate commerce." *Id.* at 17 (Stevens, J., joined by Kennedy, Souter, Ginsburg, and Breyer, JJ.) (emphasis added) (citations omitted). They found the case "striking[ly]" similar to *Wickard*, because both the challengers in *Raich* and the farmer in *Wickard* were "*cultivating*, for home consumption, *a fungible commodity* for which there is an established, albeit illegal, interstate market." *Id.* at 18 (emphasis added). Distinguishing *United States v. Lopez*, 514 U.S. 549 (1995), and *Morrison*, the *Raich* majority correctly observed that "[t]he Act [at issue in *Lopez*] did not regulate any economic activity" and "[d]espite congressional findings that [gender-motivated crimes of violence] had an adverse impact on interstate commerce, [*Morrison*] held the [Violence Against Women Act of 1994] unconstitutional because, like the statute in *Lopez*, it did not regulate economic activity." *Id.* at 23, 25. In contrast, the activity regulated by the CSA—

11

"production, distribution, and consumption of commodities"—was "quintessentially economic." *Id.* at 25–26.[5]

Recently, the Supreme Court again made clear that the underlying activity Congress seeks to regulate under its Commerce Clause power must be economic activity. In *Taylor v. United States*, 579 U.S. 301 (2016), the Court considered what evidence the Government must prove to satisfy the Hobbs Act's commerce element for the crime of affecting commerce by robbery. *Id.* at 302. While not a Commerce Clause case, the Court relied on its Commerce Clause caselaw for the definition of commerce. It determined that the activity in the case, the sale of marijuana, was "unquestionably an *economic activity*." *Id.* at 306 (emphasis added).

***

"Where *economic activity* substantially affects interstate commerce, legislation regulating that activity will be sustained." *Lopez*, 514 U.S. at 560

---

[5] Even for the dissenters, the presence of economic activity, or lack thereof, was dispositive for the substantial effects analysis. Concluding that the Court's substantial effects "cases generally have upheld federal regulation of economic activity that affected interstate commerce," the principal dissent would have concluded that the personal cultivation, possession, and use of marijuana was not an economic activity. *Id.* at 44, 49 (O'Connor, J., joined by Rehnquist, C.J., and Thomas, JJ. dissenting). It took issue with the breadth of the majority's definition of economic activity as "any activity involving the production, distribution, and consumption of commodities." *Id.* at 49. Justice Thomas, separately dissenting, viewed the CSA's ban on the entire marijuana market, including intrastate and noncommercial activity, as exceeding the Commerce Clause, which gave Congress the power to regulate economic activity in the form of "buying and selling of goods and services trafficked across state lines." *Id.* at 58 (Thomas, J., dissenting).

(emphasis added). In *Darby* it was the production of lumber for shipment out of state. *Wickard* involved the cultivation of wheat, a fungible commodity whose supply would impact the nationwide market. So too with milk and other fungible commodities in *Wrightwood Dairy Co.*, *Katzenbach*'s economic activity was the service and sale of food. In *Perez*, it was the illicit exchange of money. *Hodel* involved the production of coal. In *Raich*, the cultivation and distribution of an illegal fungible commodity served as the underlying economic activity. Finally, in *Taylor*, the sale and trafficking of an illegal fungible commodity was the necessary economic activity. Thus, only where the activity regulated is economic activity can Congress's lawmaking be upheld under the Commerce Clause's significant effects test.

**B. Where the Supreme Court has Struck Down Lawmaking Efforts Under the Substantial Effects Test, the Regulated Activity Did Not Involve the Introduction, Production, or Exchange of Goods or Services.**

Economic activity being necessary to uphold laws under the Commerce Clause's substantial effects test leads to the following corollary: the lack of economic activity is fatal.

At issue in *Lopez* was the Gun-Free School Zones Act of 1990, which made it a federal crime to "possess a firearm" in a school zone. Lopez took a handgun to his then-high school and was convicted of violating the Act. He challenged the law as exceeding Congress's power under the Commerce Clause.

The Court agreed, holding that the Gun-Free School Zones Act was a criminal statute having "nothing to do with 'commerce' or any sort of *economic* enterprise[.]" *Lopez*, 514 U.S. at 561 (emphasis added). Distinguishing *Wickard*, which "involved *economic activity* in a way that the possession of a gun in a school zone [did] not[,]" the Court quoted *Wickard*'s discussion of the Agricultural Adjustment Act's regulation of the supply and market price for wheat, which would be affected by the home-grown cultivating and selling of that fungible commodity. *Id.* at 560. The Government argued that firearm possession in school zones "may result" in violent crime, and violent crime could impact the national economy because it may raise insurance costs, may decrease travel expenses, and may produce a less educated and productive citizenry, meaning that handgun possession in school zones had a substantial effect on interstate commerce. *Id.* at 563–64. Accepting this tenuous linkage would require the piling of "inference upon inference" that would "convert congressional authority under the Commerce Clause to a general police power …." *Id.* at 567. Mere handgun possession in a school zone was in "no sense an *economic activity* that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id.* at 567 (emphasis added).

The absence of economic activity in what Congress sought to regulate likewise doomed a provision of the Violence Against Women Act of 1994, which created a federal civil remedy for victims of gender-motivated violence. *Morrison*,

14

529 U.S. at 601, 617. As was the case with firearm possession in *Lopez*, the Court in *Morrison* concluded that "[g]ender-motivated crimes of violence [were] *not*, in any sense of the phrase, *economic activity*." *Id.* at 613 (emphasis added). Rejecting the Government and dissent's attempt to distinguish *Lopez*, the Court made clear that "the *noneconomic*, criminal nature of the conduct at issue was central to [the] decision in that case." *Id.* at 610 (emphasis added). Presented with inference-piling congressional findings and Government arguments that gender-motivated crimes of violence affect interstate commerce by decreasing interstate travel, increasing medical costs, and decreasing national productivity, *Morrison* "reject[ed] the argument that Congress may regulate *noneconomic*, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617 (emphasis added).

Not only does the substantial effects analysis require that Congress be regulating economic activity, but also, that it target existing economic activity. *See NFIB v. Sebelius*, 567 U.S. 519 (2012). *Sebelius* involved the Patient Protection and Affordable Care Act's individual mandate to purchase qualified health insurance, and whether requiring people to purchase health insurance was a valid exercise of Congress's Commerce Clause power. Five justices agreed that the mandate could not be upheld under the substantial effects test.

15

Chief Justice Roberts, in the principal Commerce Clause opinion, explained that the "power to *regulate* commerce presupposes the existence of commercial activity to be regulated" and that the individual mandate did not "regulate *existing* commercial activity." *Id.* at 550, 552 (cleaned up). Going further, the Chief Justice rejected the Government's argument that Congress's Commerce Clause power could rest on the regulated entities potentially engaging in future economic activity. *Id.* at 556. Congress can "anticipate" how currently existing "*economic activity*" will affect commerce, but the idea that "Congress may dictate the conduct . . . today because of *prophesied future activity* finds no support in [Court] precedent." *Id.* at 557 (emphasis added). Every Supreme Court case prior to *Sebelius* "involved *preexisting economic activity*." *Id.* at 557 (emphasis added) (citing *Wickard* and *Raich*).

Four others agreed that the mandate failed to regulate existing economic activity. *See id.* at 646–60 (Scalia, Kennedy, Thomas, and Alito, JJ. dissenting). Even the most extreme Commerce Clause jurisprudence, *Wickard*, involved the "economic activity of growing wheat." *Id.* at 647–48. They too rejected the notion that engaging in future economic activity allowed Congress to exercise its Commerce Clause power. *Id.* at 657 ("[I]f every person comes within the Commerce Clause power of Congress to regulate by the simple reason that he will one day engage in commerce, the idea of a limited Government power is at an end."). In a

separate one-paragraph dissent, Justice Thomas made clear that the Commerce Clause presupposes Congress's regulation of "economic activity." *Id.* 707–08.

Notably, even the justices concurring/dissenting on the mandate's lawfulness agreed that Congress must be regulating economic activity under the Commerce Clause. "Congress has the power to regulate *economic activities* 'that substantially affect interstate commerce.'" *Id.* at 602 (Ginsburg, J., joined by Breyer, Sotomayor, and Kagan, JJ., concurring and dissenting) (emphasis added) (quoted source omitted). In their view, Congress could regulate even future economic activity (such as participation in the healthcare market) so long as the future activity was "certain to occur." *Id.* at 607.

***

A law that does not regulate economic activity cannot be upheld under the Commerce Clause's substantial effects test. *See Sebelius*, 567 U.S. at 557; *id.* at 602 (Ginsburg, J., dissenting); *Morrison*, 529 U.S. at 601; *Lopez*, 514 U.S. at 567. That economic activity must be presently existing, not speculative claims of future conduct. *Sebelius*, 567 U.S. at 557; *id.* at 657 (Scalia, Kennedy, Thomas, and Alito, JJ. dissenting).

## II. The Corporate Transparency Act Does Not Regulate Economic Activity and Fails the Substantial Effects Test.

The CTA cannot be upheld under the Commerce Clause's substantial effects test because it does not regulate economic activity.

17

The Act requires that "each reporting company" report to the Financial Crimes Enforcement Network (FinCEN) the "sensitive" identifying information of individuals connected to the act of incorporation for the entity. 31 U.S.C. § 5336(b)(1)(A); *id.* at § 5336 note (acknowledging that the beneficial ownership information is "sensitive"). Demonstrating the focus of the Act's regulation of entity incorporation, the Act establishes different reporting deadlines for reporting companies based on the date they were "formed or registered." *Id.* at § 5336(b)(1)(B—C). A "reporting company" is likewise defined based on the act of incorporation, instead of any business, economic, or financial activity. *Id.* at § 5336(a)(11)(A)(i) (defining "reporting company" as a "corporation, limited liability company, or other similar entity that is—created by the filing of a document with a secretary of state or a similar office"). Reporting companies must report the name, date of birth, address, and unique identifying number from a government-issued document of each "beneficial owner" and "applicant" of the reporting company. *Id.* at § 5336(b)(2)(A)(i—iv) (required information); § 5336(a)(1) (A—D) (identifying documents that provide the required unique identifying number). A "beneficial owner" is an individual who "exercises substantial control" or "owns or controls not less than 25 percent of the ownership interests of the entity[.]" *Id.* at

18

§ 5336(a)(3)(A)(1)(ii).[6] An "applicant" is the person who "files an application to form a corporation, limited liability company, or other similar entity[.]" *Id.* at § 5336(a)(2)(A).

With these definitions and requirements, the Act seeks to control the noneconomic activity of entity incorporation by requiring those who file for state incorporation to submit personal information to the federal government. For example, if the Act were truly focused on the economic activity of illicit financial transactions, it would focus on persons within companies who have *financial* control, such as a Chief Financial Officer, Accountant, Personal Representative, or other agents with access to the company's assets. But instead, the Act focuses on all people with substantial control or owning more than 25 percent of the entity, and the person who files for incorporation, regardless of whether these people have any financial responsibilities or access to company assets.

---

[6] FinCEN's regulations implementing the Act broaden the category of individuals required to be listed as beneficial owners. Whereas the Act only lists those actually having, i.e. "exercising," substantial control over an entity, 31 U.S.C. § 5336(a)(3)(i), FinCEN presumes that every senior officer of an entity, based solely on their title, exercises "substantial control" over that entity. 31 C.F.R. § 1010.380(d)(1)(i)(A). For example, it defines "senior officer" to include general counsels. 31 C.F.R. 1010.380(f)(8). General counsels often perform ministerial or advisory functions with little control over the actual company, let alone "substantial control."

The contrast between the CTA and previous laws upheld under the Commerce Clause's substantial effects test due to the presence of economic activity could not be clearer.

First, there is no connection to the production or shipment of goods. The Act imposes reporting requirements based on the act of incorporation, completely unmoored from the production or shipment of goods. In contrast, *Darby* evaluated the FLSA's regulation of the production and shipment of goods in interstate commerce by workers operating under certain labor conditions. 312 U.S. at 110, 115. Whereas the FLSA "set up a comprehensive legislative scheme for *preventing the shipment in interstate commerce of certain products and commodities*[,]" the CTA's reach is tied to neither the production nor shipment of products and commodities. *See id.* at 109 (emphasis added); 31 U.S.C. § 5336.

Nor does the Act's regulated activity—incorporation—involve a fungible commodity introduced into the market, the presence of which could affect the price, supply, and demand in the national market. Even the Agricultural Adjustment Act at issue in *Wickard*, a case representing the outer limit of the Commerce Clause's substantial effects test, regulated the introduction and cultivation of a fungible commodity into the market where increased supply could affect the national market for that commodity. *Wickard*, 317 U.S. at 125–28. The same is true for the Court's other fungible commodity decisions. *See, e.g., Wrightwood Dairy, Co.*, 315 U.S. at

116, 120 (Congress imposed price regulations on "milk and certain other commodities" and the Court upheld the regulations due to the impact of intrastate marketing on the national market); *Hodel*, 452 U.S. at 268, 281 (upholding Congress's regulations on coal because coal was a "commodity" and producing coal locally would affect interstate commerce).

The Act's focus on the act of incorporation through secretaries of state or similar offices, 31 U.S.C. § 5336 (a)(11), is not the exchange of a good that would further an illicit market. It is not like those cases where the Supreme Court upheld Congress's regulation on the sale of marijuana or the illicit exchange of money and extortionate credit transactions. *Taylor*, 579 U.S. at 302 (holding that the sale of a drug with an established black market was economic activity); *Perez*, 402 U.S. at 147–48 (involving the illicit exchange of money). The Act's operative provisions neither targets the exchange of a good nor a fungible commodity.

The Controlled Substances Act reviewed in *Raich* regulated the "quintessentially economic" activity of "production, distribution, and consumption of commodities." 545 U.S. at 25–26. *But see id.* at 49 (O'Connor, J., joined by Rehnquist, C.J., and Thomas, JJ. dissenting) (taking issue with majority's broadly defining economic activity to include the actions involved in the case). Even under the broad definition of economic activity espoused in the *Raich* majority, the Act cannot be upheld because it regulates neither the "production, distribution, [nor]

21

consumption of commodities." *See id.* at 25–26; 31 U.S.C. § 5336. There is no commodity whatsoever.

Like the Gun-Free School Zones Act and Violence Against Women Act, the CTA regulates a noneconomic activity. Its fate should be the same. The filing of incorporation papers is in "no sense an economic activity that might, through repetition elsewhere, substantially affect interstate commerce." *Lopez*, 514 U.S. at 567. For example, when an entity in Alabama files for incorporation, doing so will not impact the availability or desirability for an Ohio entity to do the same in its state. *But see Wickard*, 317 U.S. at 125–27 (noting how a local activity, which is economic, could affect the national market). Like imposing civil liability for gender-motivated crimes of violence, imposing reporting requirements is "not, in any sense of the phrase, economic activity." *Morrison*, 529 U.S. at 613. Similar to gun possession or gender-motivated crimes of violence, there is no introduction, production, or exchange of goods and services involved in entity incorporation and reporting requirements. The only way to tie imposing reporting requirements for entity incorporation to interstate commerce is to suggest that some entities who incorporate, may then engage in economic activity, and that economic activity may then substantially affect interstate commerce. But this type of speculative inference-piling is forbidden because it would transform the Commerce Clause "[in]to a general police power." *Lopez*, 514 U.S. at 565, 567.

For an alternative reason, this inference-piling must fail. Congress's Commerce Clause power reaches only *existing* economic activity. *Sebelius*, 567 U.S. at 552. It cannot use its commerce power based on prophesied future economic activity, such as the possible production or exchange of goods after filing for incorporation. *Id.* at 557; *see also id.* at 657 (Scalia, Kennedy, Thomas, and Alito, JJ. dissenting).[7]

To save the Act, it is argued that Congress is regulating money laundering, terrorist financing, and other illicit transactions. Appellant's Br. 1. Not so. The Act regulates a noneconomic activity—incorporation. One need not take the district court's word for it, because the statute's own provisions clearly demonstrate its focus. Nowhere in the Act did Congress impose financial reporting requirements on monetary transactions. Instead, the Act's provisions regulate incorporation by mandating that those who file for incorporation under state law disclose personal identifying information. *See* 31 U.S.C. § 5336 (a)(11) (defining a "reporting company," the target of the Act's provisions); *id.* at § 5336(b)(1)(B—D) (requiring reporting companies to report the required information of beneficial owners); *id.* at § 5336(b)(2)(A)(i—iv) (identifying the required information). Further evidence is

---

[7] Even under the rationale of the *Sebelius* concurrence/dissent, upholding the CTA would be difficult. Unlike the eventual purchase of healthcare products, which every citizen will undoubtedly perform, economic activity is not "certain to occur" merely based on the filing for incorporation. *Id.* at 607 (Ginsburg, J., joined by Breyer, Sotomayor, and Kagan, JJ., concurring and dissenting).

the Act's criminal and civil penalties targeting the failure to provide accurate beneficial ownership information, instead of penalizing money laundering, terrorist financing, or other illicit transactions. *See* 31 U.S.C. § 5336(h)(1–3).

The Act's definitions and penalty provisions rebut the Government's argument that it regulates illicit financial conduct. *Perez* represented a "close second" to *Wickard* for the "most expansive assertion of the commerce power" in the Court's history. *Sebelius*, 567 U.S. at 657 (Scalia, Kennedy, Thomas, and Alito, JJ. dissenting). In *Perez*, the Court upheld Title II of the Consumer Credit Protection Act (CCPA) under Congress's Commerce power. The CCPA directly regulated extortionate credit transactions and the threat of violence to collect money. We know this because the CCPA explicitly defined "extortionate extension of credit" and "extortionate means," which included the use or threat of violence. Consumer Credit Protection Act, Pub. L. No. 90–321, § 202(a), 82 Stat. 146, 159–60 (1968) (codified at 42 U.S.C. § 891 et seq.). The CCPA criminalized and penalized making and financing extortionate extensions of credit, as well as collecting extensions of credit by extortionate means. *Id.*; *see also United States v. Perez*, 426 F. 2d 1073, 1074–75 (2d Cir. 1970) (discussing the CCPA provisions Perez was found guilty of violating), *aff'd*, 402 U.S. 146 (1971). In stark contrast, the CTA does neither. It does not define money laundering or terrorist financing, *see* 31 U.S.C. § 5336(a), nor do the penalty provisions punish this conduct. 31 U.S.C. § 5336(h)(1–3). A

person who engages in money laundering, terrorist financing, or other illicit activity cannot be prosecuted under the CTA. But an individual who files, or fails to file, for state incorporation can. *Id.*

Nor does the Act regulate "for-profit businesses with a close connection to commerce." Appellant's Br. 27. The reporting requirements are triggered by only one action—filing for incorporation. The Act does not limit the reporting requirements to those actively engaging in commercial transactions or economic activity. For example, a newly formed entity that does not yet engage in economic activity must still comply with the Act's reporting requirements. *See* 31 U.S.C. § 5336(a)(11)(A)(i) (defining a "reporting company" as one "created by the filing of a document with a secretary of state"); 31 U.S.C. § 5336(a)(11)(B)(xxiii) (only exempting entities not engaged in active business that are over a year old). Consider if Congress imposed a requirement that individuals filing for a marriage certificate (like incorporation, traditionally the province of the states), must report their close relatives who may impact the marriage. It would be farcical to suggest such a requirement is in fact regulating future intimate relations between a married couple. But that is what the Government urges the Court to do here—ignore the action targeted by Congress that triggers the reporting obligation in the first place, and instead, focus on some future activity that may or may not happen (engaging in economic activity).

Section 5336 cannot be saved by reliance on congressional findings either. *See* Appellant's Br. 19–20 (relying on congressional findings). "[T]he existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation." *Morrison*, 529 U.S. at 614.

The CTA cannot withstand scrutiny under the Commerce Clause's substantial effects test. On its face, the Act's provisions clearly target and regulate the act of entity incorporation. The Act establishes reporting requirements to the federal government, solely based on if, and when, an entity files for incorporation. It requires no underlying introduction, production, or exchange of goods or services before the reporting requirements apply. Because of this, it does not regulate economic activity. Every one of the Supreme Court's cases has required "preexisting economic activity." *Sebelius*, 567 U.S. at 557. This case should be no different.

## **CONCLUSION**

For the above-mentioned reasons, the judgment below should be affirmed.

Respectfully Submitted,

 /s/ *Ed R. Haden*

Ed R. Haden
One of the Attorneys for National Federation of Independent Business Small Business Legal Center, Inc., National Association of Home Builders of the United States, The Associated General Contractors of America, Inc., and American Farm Bureau Federation

**OF COUNSEL:**
Ed R. Haden
Email: ehaden@balch.com
BALCH & BINGHAM LLP
1901 Sixth Avenue North
Suite 1500
Birmingham, AL  35203
Telephone: (205) 226-8795

Tripp DeMoss
Email: tdemoss@balch.com
BALCH & BINGHAM LLP
445 Dexter Avenue, Suite 8000
Montgomery, AL  36104
Telephone: (334) 834-6500

27

**<u>CERTIFICATE OF COMPLIANCE</u>**

As required by FRAP 32(g), I certify as follows:

This document complies with the word limit of FRAP 29(a)(5) and 32(a)(7) because, excluding the parts of the document exempted by FRAP 32(f), this document contains 6,057 words.

In addition, this brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6). This brief has been prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

Respectfully submitted, this 20th day of May, 2024,

/s/ *Ed R. Haden*
Ed R. Haden
One of the Attorneys for *Amici* National Federation of Independent Business Small Business Legal Center, Inc., National Association of Home Builders of the United States, The Associated General Contractors of America, Inc., and American Farm Bureau Federation

28