No. 24-10736

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

NATIONAL SMALL BUSINESS UNITED, et al.,

*Plaintiffs-Appellees*,

v.

U.S. DEPARTMENT OF THE TREASURY, et al.,

*Defendants-Appellants.*

---

Appeal from the United States District Court
for the Northern District of Alabama
Docket No. 5:22-cv-1448-LCB

---

**BRIEF OF THE SMALL BUSINESS ASSOCIATION OF MICHIGAN,
THE CHALDEAN AMERICAN CHAMBER OF COMMERCE, AND
THE JOB CREATORS NETWORK FOUNDATION
AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES**

---

Matthew T. Nelson
Charles R. Quigg
Warner Norcross + Judd LLP
150 Ottawa Avenue NW, Suite 1500
Grand Rapids, MI 49503
(616) 752-2000
mnelson@wnj.com
cquigg@wnj.com

Counsel for Amici Curiae

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1, counsel for Amici certify that, in addition to those listed in the certificate in the Government's opening brief, the following persons or entities have an interest in the outcome of this appeal:

Small Business Association of Michigan and its members

Chaldean Chamber of Commerce, Inc.
d/b/a Chaldean American Chamber of Commerce and its members

Job Creators Network Foundation

Job Creators Network Inc.

Matthew T. Nelson

Charles R. Quigg

Amici the Small Business Association of Michigan, Chaldean Chamber of Commerce, Inc. d/b/a the Chaldean American Chamber of Commerce, and Job Creators Network Foundation are nonprofit corporations. None of them has any parent corporation or publicly held corporation that owns 10 percent or more of its stock.

*/s/ Matthew T. Nelson*
Matthew T. Nelson
Charles R. Quigg
Warner Norcross + Judd LLP

Counsel for Amici Curiae

i

## TABLE OF CONTENTS

Page

TABLE OF CITATIONS ........................................................ iv

INTEREST OF AMICI CURIAE ............................................1

STATEMENT OF THE ISSUES..........................................3

INTRODUCTION AND SUMMARY OF THE ARGUMENT .............................4

ARGUMENT .......................................................................6

    I.    Even if Congress had authority to enact the CTA, the CTA violates the Fourth Amendment. .............................................6

        A.    The CTA's disclosure requirement is a search for Fourth Amendment purposes....................................................8

        B.    The CTA's digital, warrantless, and suspicionless dragnet violates the Fourth Amendment................................13

            1.    The CTA is presumptively invalid because it is a warrantless search for law-enforcement purposes..........13

            2.    The "special needs" doctrine does not save the CTA. ..............................................................14

    II.    The Government's "authority to engage in commerce" argument proves too much. ...............................................19

III.    The Government's reading of the taxing, foreign-affairs, and

foreign-commerce powers also has no limiting principle...................23

IV.    The CTA imposes undeniable burdens on small businesses and

their beneficial owners and exposes millions of law-abiding

Americans to criminal prosecution. ....................................................25

CONCLUSION AND REQUESTED RELIEF ......................................................28

## TABLE OF CITATIONS

Page(s)

**Cases**

*Airbnb, Inc. v. City of New York*,

373 F. Supp. 3d 467 (S.D.N.Y. 2019) ...............................................10

*Bond v. United States*,

572 U.S. 844 (2014)...........................................................22, 24

*Brock v. Emerson Electric Co., Electronic & Space Division*,

834 F.2d 994 (11th Cir. 1987) ...........................................11

*Brown v. Texas*,

443 U.S. 47 (1979)...........................................................13

*Carpenter v. United States*,

585 U.S. 296 (2018)...........................................................9, 19

*Chandler v. Miller*,

520 U.S. 305 (1997)...........................................................14, 16

*City of Indianapolis v. Edmond*,

531 U.S. 32 (2000)...........................................................16, 17, 19

*City of Los Angeles v. Patel*,

576 U.S. 409 (2015)...........................................................10, 14, 18

Page(s)

*Hale v. Henkel*,

    201 U.S. 43 (1906)............................................................................11

*Katz v. United States*,

    389 U.S. 347 (1967)............................................................................9

*Marshall v. Barlow's, Inc.*,

    436 U.S. 307 (1978)........................................................................7, 11

*\*National Federation of Independent Business v. Sebelius* (*NFIB*),

    567 U.S. 519 (2012)................................................................20, 21, 23

*National Treasury Employees Union v. Von Raab*,

    489 U.S. 656 (1989)..........................................................................16

*Patel v. City of Los Angeles*,

    738 F.3d 1058 (9th Cir. 2013) ...........................................................12

*PDVSA US Litigation Trust v. LukOil Pan Americas LLC*,

    65 F.4th 556 (11th Cir. 2023) .............................................................6

*Riley v. California*,

    573 U.S. 373 (2014)............................................................................6

*See v. City of Seattle*,

    387 U.S. 541 (1967)........................................................................9, 11

Page(s)

*Skinner v. Railway Labor Executives' Association*,

489 U.S. 602 (1989)......................................................................14, 16

*United States v. Di Re*,

332 U.S. 581 (1948)..........................................................................4, 7

*United States v. Jones*,

565 U.S. 400 (2012).............................................................................9

*United States v. Lopez*,

514 U.S. 549 (1995)................................................................21, 23, 24

*United States v. Miller*,

425 U.S. 435 (1976)...........................................................................13

*United States v. Morton Salt Co.*,

338 U.S. 632 (1950).............................................................................9

**Statutes**

31 U.S.C. § 5336.......................................................................*passim*

**Other Authorities**

31 C.F.R. § 1010.380.................................................................*passim*

Beneficial Ownership Information Reporting Requirements,

87 Fed. Reg. 59,498 (Sept. 30, 2022)........................................*passim*

vi

Page(s)

**Constitutional Provisions**

U.S. Constitution Amendment IV ...............................................................8

U.S. Constitution Article I ........................................................................23

## INTEREST OF AMICI CURIAE[1]

Amicus the Small Business Association of Michigan ("SBAM") is the only statewide and state-based association that focuses solely on serving the needs of Michigan's small business community. SBAM is the premier organization for small business owners in Michigan, with over 30,000 members. SBAM's mission is the success of Michigan's small businesses. SBAM serves this mission in part by advocating on public policy issues in the legislature and the courts.

Amicus the Chaldean American Chamber of Commerce (the "Chaldean Chamber") exists to advocate and promote small businesses and economic opportunities, particularly in the context of businesses and individuals who are affiliated with the Chaldean American community. Chaldeans are Aramaic-speaking, Eastern Rite Catholics indigenous to Iraq. More than 4,000 businesses are members of the Chaldean Chamber.

Amicus the Job Creators Network Foundation ("JCNF") is a 501(c)(3) nonpartisan organization founded by entrepreneurs committed to educating employees of main street America about government policies that harm economic freedom. JCNF's Legal Action Fund defends against government overreach to

---

[1] No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund this brief, and no person other than amici curiae and their members contributed money to fund this brief. All parties have consented to the filing of this brief.

1

ensure that America's free-market system is not only protected but allowed to thrive.

Amici's interest in this case arises from their grave concerns regarding the Corporate Transparency Act's impact on small businesses. Among other things, the CTA imposes an unprecedented requirement that millions of law-abiding Americans, including SBAM's and the Chaldean Chamber's members, report sensitive, private information to law enforcement without any suspicion of wrongdoing. And it does so in a vague and ambiguous manner, increasing compliance costs and creating traps for unwary small business owners. Because of these and other concerns, SBAM, the Chaldean Chamber, and other plaintiffs filed a constitutional challenge to the CTA in the U.S. District Court for the Western District of Michigan, which remains pending (*SBAM v. Yellen*, No. 24-cv-00314).

## STATEMENT OF THE ISSUES

1.     Whether this Court should affirm the district court's judgment because the CTA's warrantless, suspicionless digital dragnet violates the Fourth Amendment.

2.     Whether this Court should affirm the district court's judgment because the CTA exceeds Congress's powers.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

When the Framers drafted the Fourth Amendment, one of their primary targets was the reviled general warrant, under which colonial law-enforcement officers could rummage through businesses and homes without any suspicion that a crime had been committed. The Fourth Amendment was meant to put a stop to such warrantless, suspicionless searches designed to root out evidence of criminal activity. The Framers intentionally "designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment." *United States v. Di Re*, 332 U.S. 581, 595 (1948).

The Corporate Transparency Act is the modern, tech-enabled equivalent of the general warrant. It requires millions of law-abiding Americans to report sensitive, private information to a federal law-enforcement agency for the express purpose of creating a database that is highly useful for law-enforcement purposes. Its requirements apply regardless of whether the Government has any reason to believe a crime has been committed. Law enforcement may then review and analyze the database for as long and as often as they see fit—almost certainly leveraging artificial intelligence and other technological tools to do so—in hopes that they might detect evidence of wrongdoing. The CTA's digital dragnet violates

4

the Fourth Amendment, and the Court may affirm the district court's judgment on that basis.

The Court also should affirm the district court's judgment because Congress lacked authority to enact the CTA. The Government principally hangs its hat on the Commerce Clause, which it says authorizes the CTA because companies are authorized to and predictably engage in economic activity. But expansive as the commerce power may be, it requires, at a minimum, preexisting economic activity; it does not allow Congress to regulate a person or entity based solely on their propensity to engage in such activity. Otherwise, Congress could exercise a general police power over every person in the United States. The CTA falls outside Congress's commerce power because it regulates at the moment of incorporation, before any company has engaged in any economic activity.

The Government also half-heartedly relies on Congress's taxing, foreign-commerce, and foreign-affairs powers. Here too, the Government's arguments prove too much. Congress cannot regulate a matter traditionally left to the states (and which involves no action aside from filing a document with a state) simply by confecting some connection to tax collection, foreign commerce, or foreign affairs. Asserting that a particular measure is necessary and proper does not make it so.

Meanwhile, America's small businesses are in the crosshairs. The CTA imposes significant financial burdens on small businesses and their beneficial

owners as they seek to avoid the statute's traps for the unwary. It also puts them at risk of federal criminal prosecution if they get it wrong.

To be sure, Amici recognize that preventing and detecting crime is a laudable purpose. But as worthy a purpose as that may be, the tail should not wag the dog, particularly in constitutional matters. The Court should affirm the district court's judgment.

## ARGUMENT

## I. Even if Congress had authority to enact the CTA, the CTA violates the Fourth Amendment.

Amici agree with the district court and Plaintiffs-Appellees that Congress lacked authority to enact the CTA. *See* Parts II & III below. But even if the CTA falls within Congress's enumerated powers, this Court should affirm the district court's judgment because the CTA violates the Fourth Amendment.[2]

"[T]he Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage" through homes and businesses "in an unrestrained search for evidence of criminal activity." *Riley v. California*, 573 U.S.

---

[2] "[T]his Court 'may affirm on any ground supported by the record, regardless of whether that ground was relied upon or even considered below.' " *PDVSA US Litig. Tr. v. LukOil Pan Ams. LLC*, 65 F.4th 556, 562 (11th Cir. 2023) (quoting *Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017)).

373, 403 (2014). Indeed, "[t]he general warrant was a recurring point of contention in the Colonies immediately preceding the Revolution." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311 (1978). "The particular offensiveness it engendered was acutely felt by the merchants and businessmen whose premises and products were inspected for compliance with the several parliamentary revenue measures that most irritated the colonists." *Id.* Because of these abuses, the Framers "designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment." *Di Re*, 332 U.S. at 595.

The CTA is a modern incarnation of the general warrant. It requires millions of law-abiding Americans to report sensitive, private information to a federal law-enforcement agency (i.e., FinCEN—the Financial Crimes Enforcement Network) for the express purpose of creating a database that is "highly useful in . . . facilitating important national security, intelligence, and law enforcement activities." 31 U.S.C. § 5336(b)(1)(F)(iv); *accord* Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59,498, 59,509 (Sept. 30, 2022) (emphasizing that the CTA is designed to create a database that is "highly useful to law enforcement and the intelligence community"). This requirement applies across the board, regardless of whether the Government has any reason to believe a crime has been committed. Law enforcement may then rifle through the database

for as long and as often as they see fit—almost certainly leveraging artificial intelligence and other technological tools to do so—for purposes of general crime detection.

Tellingly, the Government has admitted that the CTA is an end-run around the Fourth Amendment's requirements with which the Government heretofore had to comply. Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. at 59,504 (reciting the then-director of FinCEN's congressional testimony that "identifying the ultimate beneficial owner" of a company "often requires . . . grand jury subpoenas . . . [and] search warrants," and therefore "takes an enormous amount of time"). Laudable a purpose as crime detection may be, the CTA's digital dragnet is inconsistent with the Fourth Amendment. The Court should invalidate it on that basis even if it were to conclude that Congress had the power to enact the statute.

### A.    The CTA's disclosure requirement is a search for Fourth Amendment purposes.

As an initial matter, the CTA's disclosure requirement is a search for purposes of the Fourth Amendment. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Until the latter half of the twentieth century, "Fourth Amendment jurisprudence was tied to common-law

8

trespass," focusing on whether the Government physically intruded on private property. *United States v. Jones*, 565 U.S. 400, 404–05 (2012). "More recently, the Court has recognized that 'property rights are not the sole measure of Fourth Amendment violations.' " *Carpenter v. United States*, 585 U.S. 296, 304 (2018) (quoting *Soldal v. Cook Cnty.*, 506 U.S. 56, 64 (1992)). "In *Katz v. United States*, 389 U.S. 347, 351 (1967), [the Supreme Court] established that 'the Fourth Amendment protects people, not places,' and expanded [its] conception of the Amendment to protect certain expectations of privacy as well." *Id.* Under that broader conception, "[w]hen an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' " the Court has "held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Id.* (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

At the same time, the Supreme Court has recognized that governmental demands to produce information implicate the Fourth Amendment even absent a physical entry onto private property to inspect it. For instance, in *United States v. Morton Salt Co.*, 338 U.S. 632 (1950), the Court held that the Fourth Amendment "is not confined literally to searches and seizures as such, but extends as well to the orderly taking under compulsion of process." 338 U.S. at 651–52 (collecting cases); *see also See v. City of Seattle*, 387 U.S. 541, 544 (1967) ("[W]hen an

9

administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome."). Much more recently, in *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467 (S.D.N.Y. 2019), the U.S. District Court for the Southern District of New York considered an ordinance that required home-sharing platforms to produce to a regulator a monthly transaction report with information regarding New York City rentals booked on their platforms. 373 F. Supp. 3d at 481. The court had no trouble concluding that the required disclosure of user records "is an event that implicates the Fourth Amendment." *Id.* at 483.

Here, the CTA effects a search of both reporting companies and their beneficial owners and company applicants:

Reporting Companies. The CTA's disclosure requirement constitutes a search of reporting companies for two separate and independent reasons. First, under the traditional property-based understanding of the Fourth Amendment, the CTA effects a search because it requires the disclosure of business records in which reporting companies have a property interest. The Fourth Amendment, which protects "papers," covers business records on its face. *See, e.g.*, *City of Los Angeles v. Patel*, 576 U.S. 409, 412, 428 (2015) (holding that a law requiring production of business records for inspection on demand was facially unconstitutional under the

Fourth Amendment); *Marshall*, 436 U.S. at 312 ("[I]t is untenable that the ban on warrantless searches was not intended to shield places of business as well as of residence."); *See*, 387 U.S. at 543 ("The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property."); *Hale v. Henkel*, 201 U.S. 43, 76 (1906) ("[A]n order for the production of [corporate] books and papers may constitute an unreasonable search and seizure within the 4th Amendment."); *Brock v. Emerson Elec. Co., Elec. & Space Div.*, 834 F.2d 994, 996 (11th Cir. 1987) (business had privacy interest in corporate records required to be kept by law).

Second, reporting companies have a reasonable expectation of privacy in the information that CTA requires them to disclose. Even indulging the fanciful assumption that the Government already has complete access to the biographical information the CTA requires about beneficial owners and company applicants, *see* Doc. 24-1 at 40–42 (contending that the CTA requires disclosure of already-public information), a company's internal power dynamics—i.e., who exercises "substantial control" over the company—is the type of information reporting companies typically keep private, as the Government's own justifications for the CTA illustrate. *See, e.g.*, Gov't Br. 12 ("Under state law, an applicant typically can form a corporation or similar entity without disclosing the entity's owners."). And

the fact that, since the Founding, reporting companies have *not* been required to publicly report such information shows that their expectation of privacy is one society recognizes as reasonable. *See Patel v. City of Los Angeles*, 738 F.3d 1058, 1062 (9th Cir. 2013) (en banc) ("That expectation of privacy is one society deems reasonable because businesses do not ordinarily disclose, and are not expected to disclose, the kind of commercially sensitive information contained in the records . . . .").

Individuals. For similar reasons, individual beneficial owners and company applicants also have a reasonable expectation of privacy in the information— including images of their identification documents—the CTA requires them to disclose to their reporting companies on pain of possible criminal prosecution. *See, e.g.*, 31 C.F.R. § 1010.380(g)(4) (liability extends to any person who willfully "causes" an entity to fail to report complete or updated beneficial ownership information to FinCEN). A person does not lose her reasonable expectation of privacy in her personal biographical information and the connection of that information to a reporting company simply by, for example, becoming an officer of the company, *see* 31 C.F.R. § 1010.380(d)(1)(i)(A) (any senior officer exercises "substantial control"), or walking the company's articles of incorporation to the state office that receives them, *see* Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. at 59,536 (asserting that "a paralegal who directly files

12

[incorporation documents]" must be reported under the CTA). *Cf. Brown v. Texas*, 443 U.S. 47, 52 (1979) ("[E]ven assuming [the purpose of preventing crime] is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it."). Again, the CTA exists precisely because prevailing law honors that expectation of privacy. *See, e.g.*, Gov't Br. 12. And because the CTA compels individual beneficial owners and company applicants to disclose their personal information to their reporting companies, it cannot be said that they voluntarily provide such information and therefore forfeit their expectation of privacy in it. *Cf. United States v. Miller*, 425 U.S. 435, 442 (1976) (holding that a bank customer had no reasonable expectation of privacy in bank records because "[a]ll of the documents obtained, including financial statements and deposit slips, contain only information *voluntarily conveyed* to the banks and exposed to their employees *in the ordinary course of business*" (emphasis added)).

### B. The CTA's digital, warrantless, and suspicionless dragnet violates the Fourth Amendment.

1. *The CTA is presumptively invalid because it is a warrantless search for law-enforcement purposes.*

Because the CTA's disclosure requirement constitutes a Fourth Amendment search, the CTA must comply with the Fourth Amendment to be valid. The

13

Supreme Court has "repeatedly held that 'searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.' " *Patel*, 576 U.S. at 419 (alterations in original) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). The CTA's digital dragnet, the express purpose of which is to create a massive database that is "highly useful in . . . facilitating important national security, intelligence, and law enforcement activities," 31 U.S.C. § 5336(b)(1)(F)(iv), falls squarely within this rule, and no exception applies to save it from invalidation.

2.    *The "special needs" doctrine does not save the CTA.*

In the district court, the Government asserted that the "special needs" doctrine insulates the CTA from Fourth Amendment scrutiny. Doc. 24-1 at 45. To be sure, the Supreme Court has recognized that a warrantless search may be reasonable "when special needs, *beyond the normal need for law enforcement*, make the warrant and probable-cause requirement impracticable." *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 619 (1989) (emphasis added) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)). Stating the rule demonstrates its facial inapplicability to the CTA. The special-needs doctrine applies only when "concerns *other than* crime detection" motivate a search. *Chandler v. Miller*, 520 U.S. 305, 314 (1997) (emphasis added); *accord Patel*, 576 U.S. at 420 ("Here, we assume

14

that the searches authorized by § 41.49 serve a 'special need' *other than conducting criminal investigations . . . .*" (emphasis added)). Even the Government has not attempted to show that the CTA's disclosure requirement is designed to do anything other than detect crimes—and how could it, given its repeated, extensive arguments that the CTA is essential for that purpose? *See, e.g.*, Gov't Br. 2 ("This case arises from the federal government's efforts to combat financial crime."); *id.* at 3 (before the CTA, "there remained a significant gap in the government's ability to detect and prosecute financial crime"); Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. at 59,500 ("Access to BOI reported under the CTA would significantly aid efforts to protect the U.S. financial system from illicit use. It would impede illicit actors' ability to use legal entities to conceal proceeds from criminal acts . . . .").

Indeed, in the district court, the Government summarily identified only "U.S. national security and foreign policy interests" as the purported special needs that justify the CTA's requirement. Doc. 24-1 at 45. The Government's half-hearted invocation of "national security" and "foreign policy" fails for several reasons. For one thing, the purported national-security and foreign-policy interests the Government references are simply the detection of crime and the need for law enforcement by other names. *See, e.g.*, Gov't Br. 5 (arguing that "the absence of

15

company-ownership information threatens U.S. national-security and foreign-policy interests" because sanctions evaders are harder to detect).

What's more, the special-needs doctrine requires any warrantless, suspicionless search to fit the problem the Government seeks to solve. *See, e.g.*, *City of Indianapolis v. Edmond*, 531 U.S. 32, 42–43 (2000) ("[T]he gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose. Rather, in determining whether individualized suspicion is required, we must consider the nature of the interests threatened and their connection to the particular law enforcement practices at issue."); *Chandler*, 520 U.S. at 319 ("Georgia's certification requirement is not well designed to identify candidates who violate antidrug laws. Nor is the scheme a credible means to deter illicit drug users from seeking election to state office."). In this regard, the CTA sharply contrasts with the much more limited search regimes the Supreme Court previously upheld, such as drug testing of U.S. Customs Service employees whose positions directly involved drug interdiction or required them to carry a firearm, *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 677 (1989), or blood and urine tests of rail employees involved in train accidents, *Skinner*, 489 U.S. at 633–34.

Unlike those targeted search regimes, the CTA requires millions of innocent, law-abiding Americans to disclose their private information for purposes of

16

creating a vast law-enforcement database that might help an array of crime-detection activities. *See, e.g.*, Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. at 59,501 ("The integration of BOI reported pursuant to the CTA with the current data collected under the BSA, and other relevant government data, is expected to significantly further efforts to identify illicit actors and combat their financial activities."). As Plaintiffs-Appellees correctly argue, Appellees' Br. 65, the CTA is akin to the Indianapolis highway drug checkpoint program the Supreme Court struck down in *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000). The Court readily concluded that the Indianapolis program "unquestionably ha[d] the primary purpose of interdicting illegal narcotics" and that the "law enforcement problems that the drug trade creates . . . remain daunting and complex." 531 U.S. at 40, 42. This was not enough to justify the program under the special-needs doctrine. "Because the primary purpose of the Indianapolis narcotics checkpoint program [was] to uncover evidence of ordinary criminal wrongdoing," the Court explained, "the program contravene[d] the Fourth Amendment." *Id.* at 41–42. The Court could not "sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." *Id.* at 44; *see also id.* at 43 ("We are particularly reluctant to recognize exceptions to the general rule of individualized suspicion where governmental authorities primarily pursue their

17

general crime control ends."). That logic applies with even greater force to the CTA, under which the Government hopes its massive database might help uncover evidence that some of the millions of companies and people forced to disclose their private information—the vast majority of whom are concededly innocent—might have committed crimes.

The problems with the Government's reliance on the special-needs doctrine don't end with its failure to identify a special need other than crime prevention. Even where the Government successfully identifies a special need "other than conducting criminal investigations," the Supreme Court "has held that absent consent, exigent circumstances, or the like, . . . the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Patel*, 576 U.S. at 420 (collecting cases). "In most contexts, business owners can be afforded at least an opportunity to contest an administrative search's propriety without unduly compromising the government's ability to achieve its regulatory aims." *Id.* at 423. Here, the CTA indisputably provides no opportunity for precompliance review, rendering the CTA facially invalid. *See id.* at 421.

In short, the Government's desire to avoid the time and resources the Fourth Amendment's requirements entail, *see* Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. at 59,504, cannot qualify as a "special

18

need" to set the amendment aside. Just as in *Edmond*, if the CTA—a digital dragnet designed to serve the general interest in crime control—qualifies under the special-needs exception, "the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life." 531 U.S. at 42. The Court should not sustain the CTA under the special-needs doctrine.

*     *     *

At bottom, while preventing and detecting crime are worthy purposes, they do not give the federal government license to run roughshod over individual rights. "[A] central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.' " *Carpenter*, 585 U.S. at 305 (quoting *Di Re*, 332 U.S. at 595). The CTA, which demands that millions of law-abiding American businesses and individuals provide heretofore private information to the Government on pain of criminal prosecution for purposes of creating a law-enforcement database, runs directly counter to this animating principle. The Court should hold that the CTA violates the Fourth Amendment even if it were to conclude that Congress had authority to enact it.

## II.    The Government's "authority to engage in commerce" argument proves too much.

The district court correctly held that the CTA falls outside the scope of Congress's commerce power. On appeal, the Government principally contends that

19

the CTA is an appropriate exercise of the commerce power because it "regulates businesses with legal authority to conduct commercial transactions." Gov't Br. 17–18. The Government's "authority to engage in commerce" argument is both illogical and unmoored from the Supreme Court's Commerce Clause jurisprudence.

Congress's power under the Commerce Clause is broad. *E.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 549 (2012). For instance, "Congress's power . . . is not limited to regulation of an activity that by itself substantially affects interstate commerce, but also extends to activities that do so only when aggregated with similar activities of others." *Id.* (opinion of Roberts, C.J.) (citing *Wickard v. Filburn*, 317 U.S. 111, 127–28 (1942)). But a broad power is not a limitless one. "As expansive as [the] cases construing the scope of the commerce power have been, they all have one thing in common: They uniformly describe the power as reaching 'activity.' " *Id.* at 551.

Thus, Congress exceeds its power when it "does not regulate existing commercial activity." *Id.* at 552. The Supreme Court has "never permitted Congress to anticipate [an economic activity] itself in order to regulate individuals not currently engaged in commerce." *Id.* at 557. Quite the opposite. Even the Supreme Court's cases describing the commerce power most expansively still "involved preexisting economic activity." *Id*. "The Commerce Clause is *not* a

general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions." *Id.* (emphasis added); *accord id.* at 657 (Scalia, J., dissenting) ("[T]he mere fact that we all consume food and are thus, sooner or later, participants in the 'market' for food, does not empower the Government to say when and what we will buy.").

The Government's "authority to engage in commerce" argument runs directly counter to this precedent and implicitly shows why the CTA exceeds Congress's authority under the Commerce Clause. Like any individual, a company has authority to engage in economic activity, and doubtless many companies do engage in economic activity. But the CTA's requirements apply at the moment of incorporation, before the company has engaged in any economic activity. *See* 31 U.S.C. § 5336(b)(1)(C). Because the CTA rests on the prediction of future economic activity, *e.g.*, Gov't Br. 23 ("The CTA regulates a class of entities . . . whose defining feature is their *authority and propensity* to conduct commercial transactions." (emphasis added)), it exceeds Congress's commerce power.

Indeed, accepting the Government's "authority to engage in commerce" argument would leave one "hard pressed to posit any activity by an individual that Congress is without power to regulate." *United States v. Lopez*, 514 U.S. 549, 564 (1995). Like many companies, all natural persons have the "authority and propensity to conduct commercial transactions," Gov't Br. 23; the person who goes

21

through life without participating in interstate commerce is exceedingly rare. So, if "authority to engage in commerce" were enough to invoke the commerce power, then the federal government would have a general police power over every person in the United States. The CTA's disclosure requirement is just the beginning.[3] The Founders, however, denied the federal government a general police power; it remains reposed in the states. *E.g.*, *Bond v. United States*, 572 U.S. 844, 854 (2014) ("The States have broad authority to enact legislation for the public good—what we have often called a 'police power.' The Federal Government, by contrast, has no such authority and 'can exercise only the powers granted to it' . . . ." (citations

---

[3] As the district court in SBAM's and the Chaldean Chamber's parallel challenge to the CTA observed,

> [Y]ou need a limiting principle . . . . I mean, there's lots of things that if I wanted to fight money laundering I would like to know. And what's the limit? You know, beneficial owners, sure, that's a great start, but why not include my fingerprint with my ID, because that would sure help. Maybe I should include a list of my social media accounts because that would sure help. Let the Treasury know if I use crypto or Venmo or other systems outside the national monetary system. I mean, I'm not sure I understand what the limiting principle is. If the desire to combat money laundering and terrorism is enough, why don't I see next year the next laundry list of information that the government wants people to provide . . . . That's the worry, isn't it, that incrementally in 10 years we're in big brother / big sister land where the government has all the information and we have nothing that's private?

4/26/24 Hr'g Tr. 26:2–23 (Jonker, J.), *SBAM v. Yellen*, No. 24-cv-00314 (W.D. Mich. Apr. 29, 2024), ECF No. 25 (cleaned up).

omitted)); *Lopez*, 514 U.S. at 566 ("The Constitution . . . withhold[s] from Congress a plenary police power . . . .").

### III.    The Government's reading of the taxing, foreign-affairs, and foreign-commerce powers also has no limiting principle.

The Government's summary reliance on the taxing, foreign-affairs, and foreign-commerce powers suffers from similar flaws. *See* Gov't Br. 24–26. Here too, the Government's arguments have no limiting principle and would convert the federal government's limited enumerated powers into a general license to regulate local activities.

Start with the Taxing Clause, which provides that Congress may "lay and collect Taxes, Duties, Imposts and Excises." U.S. Const. art. I, § 8, cl. 1. "Congress's authority under the taxing power is limited to requiring an individual to pay money into the Federal Treasury, no more." *NFIB*, 567 U.S. at 574. On its face, the CTA has only the most tenuous connection to tax administration, in that Department of the Treasury employees may access the law-enforcement database it creates. *See* 31 U.S.C. § 5336(c)(5). Notably, the CTA's requirements apply immediately on incorporation, 31 U.S.C. § 5336(b)(1)(C), before a reporting company engages in any economic activity that could give rise to federal taxes; the CTA requires disclosure of information about individuals who often could not reasonably be expected to receive taxable income from the company, *see* 31 C.F.R.

§ 1010.380(d)(1) (definition of "substantial control"); *id.* § 1010.380(e) (definition of "company applicant"); and neither the disclosure requirement nor its penalties are found in the Internal Revenue Code. If the mere fact that federal tax officials have access to the CTA's law-enforcement database is enough to invoke the taxing power, then that power could underwrite virtually any collection of information from Americans so long as the Internal Revenue Service may access it.

The same is true with respect to Congress's foreign-commerce and foreign-affairs powers. The Government tautologically asserts that those powers authorize the CTA because Congress found that the statute might assist with regulating foreign affairs and foreign commerce. Gov't Br. 25–26. That is nonsense. Congress cannot regulate a local matter traditionally left to the states (which involves no action aside from filing a document with a state) simply by ginning up a remote, incidental connection to foreign affairs or foreign commerce. *Cf. Bond*, 572 U.S. at 857, 866 (reading the statute implementing the Convention on Chemical Weapons, which made using a chemical weapon a federal crime, not to cover a local crime because it would otherwise "dramatically intrude[] upon traditional state criminal jurisdiction" (alteration in original) (quoting *United States v. Bass*, 404 U.S. 336, 350 (1971))); *Lopez*, 514 U.S. at 584 (Thomas, J., concurring) ("[W]e *always* have rejected readings of . . . the scope of federal power that would permit Congress to exercise a police power; our cases are quite clear that there are real limits to federal

24

power."). Congress's declaration that a particular enactment is a necessary and proper means of executing the enumerated foreign-commerce power and an unenumerated foreign-affairs power does not ipso facto make it so. Otherwise, Congress could exercise a general police power simply by asserting some connection to foreign affairs or foreign commerce.

## IV. The CTA imposes undeniable burdens on small businesses and their beneficial owners and exposes millions of law-abiding Americans to criminal prosecution.

Setting aside the CTA's constitutional defects, the CTA imposes significant burdens on small businesses and their beneficial owners, including the possibility of federal criminal prosecution for failing to comply with its terms. To begin, FinCEN itself estimates that the CTA applies to approximately 32.6 million existing entities and will apply to roughly 5 million newly created entities each year. Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. at 59,549. And FinCEN recognizes that the preparing and filing reports may be costly: it estimated that the average cost of making an initial report ranges from $85 to more than $2,600 and that the aggregate cost of CTA reporting for preexisting companies in 2024 will approach *$22 billion*. *Id.* at 59,549, 59,585–86 & n.404. Because the CTA exempts larger entities from its requirements, the bulk of this financial burden will fall on small businesses.

There is good reason to think that FinCEN's estimates are low given the CTA's vague terms, which create questions that are difficult even for lawyers to answer, much less main-street entrepreneurs. For example, the CTA defines "beneficial owner" to include someone who, "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise . . . exercises substantial control over [an] entity." 31 U.S.C. § 5336(a)(3)(A)(i). Clear as mud. To make matters worse, FinCEN's implementing regulation defines "substantial control" to mean, among other things, "any other form of substantial control over the reporting company." 31 C.F.R. § 1010.380(d)(1)(D).

This word salad creates traps for the unwary in small businesses. Consider the case of five family members who form an entity, each of whom owns 20 percent of its equity. Because none of them owns 25 percent or more of the entity's equity, none of them qualifies as a "beneficial owner" unless he exercises "substantial control" over the entity. 31 U.S.C. § 5336(a)(3)(A). If the five family members constitute the entity's board of directors, does that mean all of them exercise "substantial control" over the entity, even though none of them does individually? What if one of the family members has outsize influence on the board, such that when she speaks, the other four members fall in line? Must the reporting company report only the domineering family member's private information to FinCEN?

26

The ambiguity doesn't stop there. What if the five owners consult their spouses before making important decisions related to the entity? Do the spouses qualify as beneficial owners because they "indirectly," though a "relationship," have "substantial influence over important decisions made by the reporting company"? 31 U.S.C. § 5336(a)(3)(A)(i); 31 C.F.R. § 1010.380(d)(1)(C).

Or take the case of a longtime former board member with no ongoing, official role in the reporting company. Nonetheless, due to his long service, current board members consult with the former board member before making important decisions, and, if he disagrees with a proposal, the current board does not adopt it. Does the former board member's informal, indirect, yet arguably substantial influence on the current board's decisions make the former board member a beneficial owner under the CTA?

Because the CTA includes both civil and criminal penalties, these questions are not simply academic. The CTA's potential penalties are steep and include imprisonment for up to two years. 31 U.S.C. § 5336(h)(3). Significantly, criminal penalties apply not only to reporting companies but also to (a) beneficial owners who willfully provide false or fraudulent beneficial ownership information to their reporting company, (b) "senior officers" of a reporting company who willfully fail to cause their reporting company to make a required report to FinCEN, and (c) anyone who willfully causes a reporting company not to make a required report

27

to FinCEN. 31 C.F.R. § 1010.380(g). In other words, not only are the 32+ million

reporting companies at risk of civil and criminal penalties under the CTA, untold

tens of millions (or more) of beneficial owners of those entities now face the risk

of a federal prosecutor deciding that they read the CTA and FinCEN's

implementing regulations wrong and must have known better.[4]

## CONCLUSION AND REQUESTED RELIEF

For the foregoing reasons, the Court should affirm the district court's

judgment.

Dated: May 20, 2024                         */s/ Matthew T. Nelson*
                                            Matthew T. Nelson
                                            Charles R. Quigg
                                            Warner Norcross + Judd LLP
                                            150 Ottawa Avenue NW, Suite 1500
                                            Grand Rapids, MI 49503
                                            (616) 752-2000
                                            mnelson@wnj.com
                                            cquigg@wnj.com

                                            Counsel for Amici Curiae

---

[4] For instance, assume that an innocent beneficial owner refuses to provide his private information to his reporting company as mandated by the CTA. The reporting company, through its senior officers, fully understands the CTA's requirements, but the senior officers elect not to make a report without the renegade beneficial owner's information because such a report would be false or at best incomplete. Who is liable? Just the renegade beneficial owner, who effectively caused the reporting company not to make a required report? The reporting company, which did not make the report? The senior officers who failed to cause the reporting company to make the report, incomplete as it would have been? All three?

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parties of the document exempted by Fed. R. App. P. 32(f), this document contains 6,168 words according to the word count function of Microsoft Word 365 Version 2308.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared using Microsoft Word 365 Version 2308 in 14-point Times New Roman and 14-point Arial fonts.

Dated: May 20, 2024

*/s/ Matthew T. Nelson*
Matthew T. Nelson
Charles R. Quigg
Warner Norcross + Judd LLP
150 Ottawa Avenue NW, Suite 1500
Grand Rapids, MI 49503
(616) 752-2000
mnelson@wnj.com
cquigg@wnj.com

Counsel for Amici Curiae

**CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2024, a true and accurate copy of the

foregoing brief was electronically filed with the Court using the CM/ECF system.

Service on counsel for all parties will be accomplished through the Court's

electronic filing system.

Dated: May 20, 2024                 */s/ Matthew T. Nelson*
                                    Matthew T. Nelson
                                    Charles R. Quigg
                                    Warner Norcross + Judd LLP
                                    150 Ottawa Avenue NW, Suite 1500
                                    Grand Rapids, MI 49503
                                    (616) 752-2000
                                    mnelson@wnj.com
                                    cquigg@wnj.com

                                    Counsel for Amici Curiae

165839.214735 #30514268