No. 24-10736

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

NATIONAL SMALL BUSINESS UNITED, ET AL.,

*Plaintiffs-Appellees*,

*v.*

U.S. DEPARTMENT OF THE TREASURY, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court
For the Northern District of Alabama, Hon. Liles C. Burke
No. 5:22-cv-1448

## *AMICUS CURIAE* BRIEF OF
## NATIONAL TAXPAYERS UNION FOUNDATION
## IN SUPPORT OF APPELLEES AND AFFIRMANCE

Tyler Martinez
NATIONAL TAXPAYERS UNION FOUNDATION
122 C Street N.W., Suite 700
Washington, D.C. 20001
703.683.5700
tmartinez@ntu.org

May 20, 2024                    *Counsel for* Amicus Curiae

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for *Amicus Curiae* certifies that in addition to the entities set forth in the parties' briefs, the following have an interest in the outcome of this matter:

(1) National Taxpayers Union Foundation as *Amicus Curiae*; and

(2) Martinez, Tyler as counsel for *Amicus Curiae*.

s/ Tyler Martinez
Tyler Martinez

Dated: May 20, 2024                          *Counsel for* Amicus Curiae


## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *Amicus Curiae* certifies that the National Taxpayers Union Foundation is a nonprofit, tax-exempt organization under Internal Revenue Code §501(c)(3) and is incorporated in the District of Columbia. *Amicus* further states that it has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

s/ Tyler Martinez
Tyler Martinez

Dated: May 20, 2024                          *Counsel for* Amicus Curiae

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................... i

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF CONTENTS ............................................................................................ ii

TABLE OF AUTHORITIES ..................................................................................... iii

INTEREST OF *AMICUS CURIAE* ........................................................................ 1

STATEMENT OF THE ISSUE ................................................................................. 1

SUMMARY OF ARGUMENT ................................................................................. 2

ARGUMENT ............................................................................................................. 3

   I.   DRAGNET DATA COLLECTION BY THE CTA IS NOT AUTHORIZED BY THE FEDERAL TAXING POWERS. ................................ 3

   II.   THE CTA JEOPARDIZES THE PRIVACY RIGHTS OF TAXPAYERS ............................................................................................................ 8

CONCLUSION ......................................................................................................... 13

CERTIFICATE OF COMPLIANCE ...................................................................... 15

CERTIFICATE OF SERVICE ............................................................................... 16

# TABLE OF AUTHORITIES

## Cases

*Americans for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021) ....................................................................... 10, 11

*Bates v. Little Rock*,
  361 U.S. 516 (1960) ............................................................................10

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) .............................................................11

*Brown v. Socialist Workers '74 Campaign Comm.*,
  459 U.S. 87 (1982) ..............................................................................11

*Buckley v. Valeo*,
  424 U.S. 1 (1976) .............................................................................8, 10

\* *CIC Servs., LLC v. Internal Rev. Serv.*,
  593 U.S. 209 (2021) ....................................................................... 5, 6, 7

*Cohen v. United States*,
  650 F.3d 717 (D.C. Cir. 2011) ...............................................................5

\* *Direct Marketing Assn. v. Brohl*,
  575 U.S. 1 (2015) ......................................................................... 5, 6, 7

*Duplantier v. United States*,
  606 F.2d 654 (5th Cir. 1979) ................................................................12

*Harper v. Rettig*, |
  46 F.4th 1 (1st Cir. 2022) .....................................................................7

*Kusper v. Pontikes*,
  414 U.S. 51 (1973) ..............................................................................10

*Lady J. Lingerie v. City of Jacksonville*,
  176 F.3d 1358 (11th Cir. 1999).............................................................11

*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958) ............................................................................10

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) ......................................................................3, 6

*Nat'l Small Bus. United v. Yellen*,
   ___ F.Supp.3d ___, No. 5:22-CV-1448-LCB, 2024 WL 899372
   (N.D. Ala. Mar. 1, 2024) ...............................................................6

*O'Brien v. DiGrazia*,
   544 F.2d 543 (1st Cir. 1973) ..................................................... 12, 13

*Plante v. Gonzalez*,
   575 F.2d 1119 (5th Cir. 1978) .................................................. 11, 12

*Shelton v. Tucker*,
   364 U.S. 479 (1960) .......................................................................10

**Constitutional Provisions**

U.S. Const. art. I, § 8 cl. 1 ...............................................................1

U.S. Const. amend. XVI...................................................................1

**Statutes**

26 U.S.C. § 6103 ...............................................................................8

26 U.S.C. § 7213(a)(2) .....................................................................8

26 U.S.C. § 7216 ...............................................................................8

\* 26 U.S.C. § 7421(a) .....................................................................4, 8

26 U.S.C. § 7431 ...............................................................................9

26 U.S.C. §7213(a)(1)......................................................................8

28 U.S.C. § 1341 ...............................................................................4

28 U.S.C. § 2201(a) ..........................................................................5

31 U.S.C. § 5336................................................................................3

31 U.S.C. § 5336(a)(11)(B)(xix)(I)...............................................................8

**Other Authorities**

Andrew Wilford and Andrew Moylan, "What's the Fallout From the ProPublica Leak?" Nat'l Taxpayers U. Found. (July 27, 2021)................................................9

*Dragnet*, BLACK'S LAW DICTIONARY (10th ed. 2014)................................................4

GAO, "Information Technology, IRS Needs to Address Operational Challenges and Opportunities to Improve Management," GAO-21-178T (Oct. 7, 2020) .......9

Julia Angwin, *Dragnet Nation: A Quest for Privacy, Security, and Freedom in A World of Relentless Surveillance*, 12 COLO. TECH. L.J. 291 (2014)...........................................................................4

Kristin E. Hickman and Gerald Kerska, *Restoring the Lost Anti-Injunction Act*, 103 VA. L. REV. 1683 (Dec. 2017).........................................................................5

Michael Tasselmyer, "IRS Security Breach Impacts 100,000 Taxpayers," Nat'l Taxpayers U. Found. (May 28, 2015) ..................................................................9

## INTEREST OF *AMICUS CURIAE*

Founded in 1973, the National Taxpayers Union Foundation ("NTUF") is a non-partisan research and educational organization dedicated to showing Americans how taxes, government spending, and regulations affect everyday life. NTUF advances principles of limited government, simple taxation, and transparency on both the state and federal level. NTUF's Taxpayer Defense Center advocates for taxpayers in the courts, produces scholarly analyses, and engages in direct litigation and *amicus curiae* briefs upholding taxpayers' rights and challenging administrative overreach by tax authorities. Accordingly, *Amicus* has an institutional interest in this case. All parties consented to the filing of this brief.[1]

## STATEMENT OF THE ISSUE

*Amicus* will address the following question:

The Corporate Transparency Act is not directly tied to tax administration for past tax activities, only mandating citizens supply forward-looking data that might, *one day*, generate tax revenue. Did the District Court correctly hold that the Corporate Transparency Act's dragnet data mandate exceeded the Taxing Power of the federal government, U.S. Constitution article I, § 8 clause 1 and amendment XVI?

---

[1] *Amicus Curiae* confirms that this brief was not authored in whole or in part by counsel for any party, and no person or entity other than *Amicus* and its counsel made a monetary contribution to the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

The Corporate Transparency Act ("CTA") is not a tax administration law, but a data collection law aimed at regulating businesses. The District Court below was correct in its holding that Congress exceeded its Taxing Powers in demanding the wholesale collection of data under the CTA. To justify the new law, the government argues it is justified on a wide range of constitutional authorities, but *Amicus* only focuses on the taxing power arguments.

That is because the collection of data—"useful" information as the District Court described it—is a step removed from the assessment, levy, or collection of taxes. The Supreme Court has long held that regulations demanding information disclosure is distinct from the tax administration. Thus, the former may be challenged in federal court without worry about the strong jurisdictional bar of the Anti-Injunction Act. Notably, the government here, despite claiming the CTA is essential to the collection of taxes, has not made an Anti-Injunction Act argument.

Financial records are deeply personal, but the CTA provides *none* of the protections typically associated with tax information disclosed to the Internal Revenue Service. Indeed, that's because the very purpose of the CTA is to gather and disseminate large quantities of financial information among multiple departments of the government. While the CTA specifically exempts nonprofit organizations from having to disclose their donor lists, making the *donors*

themselves register their activities is simply one extra step to achieve the same ends. This is not mere hyperbole; it has happened before in cases ranging from Civil Rights groups to police officers in Boston. This Circuit, like the Supreme Court, has long protected the privacy of financial information because it protects the privacy of association. The CTA is a dangerous tool to hand the federal government.

The District Court below correctly held that the CTA cannot be justified by the federal taxing powers. The well-reasoned opinion below should be affirmed. To do otherwise will allow the tax laws to become the general police powers for the federal government so long as it can assert that *some* taxes might *some day* be collected thanks to the data collection. That is a too tenuous governmental interest to justify the CTA's data collection scheme.

## ARGUMENT

## I.    DRAGNET DATA COLLECTION BY THE CTA IS NOT AUTHORIZED BY THE FEDERAL TAXING POWERS.

Contrary to the government's assertions, the Corporate Transparency Act ("CTA," 31 U.S.C. § 5336) cannot be justified as "necessary and proper" to administration of the nation's tax laws. *See*, *e.g.*, Opening Br. at 24; *cf.* Br. of Tax L. Cntr. at NYU Law 3. The Supreme Court has long held that while "the breadth of Congress's power to tax is greater than its power to regulate commerce, the taxing power does not give Congress the same degree of control over individual behavior." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 573 (2012) ("*NFIB*"). To hold

otherwise is to allow the federal government to hold general police powers in the name of tax administration.

Tax law has long distinguished information-gathering mandates from the actual assessment, levy, or collection of taxes. For example, court challenges to the latter are subject to strong jurisdictional bars set by Congress to protect revenue from interference by the federal courts. But the former—challenges to dragnet data collection[2]—face no such jurisdictional bar because they are too far removed from the administration of taxes.

The Anti-Injunction Act ("AIA") bars preenforcement challenges to federal taxes, as the statute provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person." 26 U.S.C. § 7421(a). The Tax Injunction Act ("TIA") is based upon the AIA, but applies to challenges to state tax. 28 U.S.C. § 1341. These jurisdictional bars are strong medicine that express Congress's desire to avoid delay-by-litigation tactics for deferring tax payments. *See generally* Kristin E. Hickman and Gerald Kerska,

---

[2] Dragnet refers to "a system in which the police look for criminals using systematic and through methods." *Dragnet*, BLACK'S LAW DICTIONARY (10th ed. 2014) *see also* Julia Angwin, *Dragnet Nation: A Quest for Privacy, Security, and Freedom in A World of Relentless Surveillance*, 12 COLO. TECH. L.J. 291 (2014) ("[T]echnology has enabled a new era of supercharged dragnets that can gather vast amounts of personal data with little human effort. These dragnets are extending into ever more private corners of the world").

4

*Restoring the Lost Anti-Injunction Act*, 103 VA. L. REV. 1683, 1719-34 (Dec. 2017) (detailing history surrounding adoption of the AIA).

But *regulatory* challenges to information gathering schemes are *not* subject to the AIA or TIA, *See CIC Servs., LLC v. Internal Rev. Serv.*, 593 U.S. 209, 216 (2021); *Direct Marketing Assn. v. Brohl*, 575 U.S. 1 (2015).[3] In *CIC Services*, 593 U.S. at 216 , the Court held that registration and reporting obligations do not fall with the AIA's bar on federal court jurisdiction. It "did not matter," the Court said, that those reporting requirements would "facilitate collection of taxes." *Id*. at 217 (citation omitted).

And in *Direct Marketing*, the Court made clear that a regulatory challenges to data collection schemes are distinct from challenges to the "assessment" of taxes. *See*, *e.g.*, *Direct Marketing*, 575 U.S. at 12. Since information gathering is a step before "assessment," it is not subject to the TIA's jurisdictional bar. *See id*. at 7-8. The *CIC Services* decision reiterated that because "[a] reporting requirement is not a tax…. [A] suit brought to set aside such a rule is not one to enjoin a tax's

---

[3] The two statutes have long been read conterminously. *See*, *e.g.*, *CIC Servs.*, 593 U.S. at 216-17  (analyzing the AIA by looking to TIA discussion in *Direct Marketing*, 575 U.S. at 8-12); *Cohen v. United States*, 650 F.3d 717, 724 (D.C. Cir. 2011) (en banc) (noting that the AIA and TIA are "comparable"). Relatedly, the Declaratory Judgment Act ("DJA") bars courts from issuing declarations "with respect to Federal taxes." 28 U.S.C. § 2201(a). In practical effect, "[t]he DJA falls out of the picture because the scope of relief available under the DJA is subsumed by the broader injunctive relief available under the AIA." *Cohen*, 650 F.3d at 730-31.

assessment or collection… even if the reporting rule will help the IRS bring in future tax revenue"— and consequently it is not barred by the AIA. 593 U.S. at 216.

It is a bedrock principle that "Congress's authority under the taxing power is limited to requiring an individual to pay money into the Federal Treasury, no more." *NFIB*, 567 U.S. at 574. But mere data collection is not actually bringing in money to the federal fisc, and there is already an extensive system for the gathering of financial data for the purposes of collecting taxes: all of Title 26 of the United States Code. The District Court was therefore correct in holding that Congress could not "bring its taxing power to bear just by collecting 'useful' data and allowing tax-enforcement officials access to that data." *Nat'l Small Bus. United v. Yellen*, ___ F.Supp.3d ___, No. 5:22-CV-1448-LCB, 2024 WL 899372, at *21 (N.D. Ala. Mar. 1, 2024) (citing *NFIB*, 567 U.S. at 560). Data collection is not the same as tax administration.

Indeed, "assessment, levy, and collection" should be read narrowly and not including information gathering, *Direct Marketing*, 575 U.S. at 8, meaning that any argument that the CTA aids in the future collection of taxes is unfounded. The *Direct Marketing* Court defined these three terms as (respectively) "the official recording of a taxpayer's liability," the "mode of collection under which the [government authority] distrains and seizes a recalcitrant taxpayer's property," and "the act of

obtaining payment of taxes due." *Id.* at 9-10. None of those three things are present here in the CTA's registration scheme.

The First Circuit read *CIC Services* and *Direct Marketing* the same way. In a challenge to the IRS subpoenaing information targeting cryptocurrency transactions, it held that "information gathering is a phase of tax administration procedure that occurs *before* assessment or collection." *Harper v. Rettig*, 46 F.4th 1, 7 (1st Cir. 2022) (cleaned up, emphasis added) (quoting *CIC Servs.*, 593 U.S. at 216, and *Direct Marketing*, 575 U.S. at 8, 12). The *Harper* court rejected the IRS's contention that the purpose of that suit was to restrain the assessment or collection of taxes—because the aim was at the regulatory burdens and subpoenas, not the taxes themselves. *See id*. at 8-9.

The CTA here is similarly not about the taxes themselves. The statute demands all sorts of financial information from citizens in a *prospective* manner. It is not aimed at assessing the tax liability for the past year—the existing tax forms from the Internal Revenue Service take care of that aspect tax administration. And the information is spread among other, non-taxing agencies. The Constitution does not allow the bootstrapping of a dragnet data scheme into the taxing powers simply because the government asserts the data might one day lead to more tax revenue.

How far removed the CTA is from real tax administration is shown by the government not using the AIA as one of the arguments to stop the courts from

hearing this case. *See*, *e.g.*, Opening Br. at vii (failing to list 26 U.S.C. § 7421(a)). That is because stopping the operation of the CTA has not been shown to impact the federal fisc. The "useful" data generated by the CTA is too remote to the administration of tax collection.

## II.    THE CTA JEOPARDIZES THE PRIVACY RIGHTS OF TAXPAYERS.

Financial records are deeply personal and "financial transactions can reveal much about a person's activities, associations, and beliefs." *Buckley v. Valeo*, 424 U.S. 1, 96 (1976) (per curiam) (cleaned up, citation omitted). While the CTA specifically exempts nonprofit organizations from having to disclose their donor lists, 31 U.S.C. § 5336(a)(11)(B)(xix)(I), making the *donors* themselves register their activities is simply one extra step to achieve the same ends.

There are extensive protections of tax information data in federal law, but those only apply to the IRS, not FinCEN or the other users of CTA data. The Internal Revenue Code provides for the general confidentiality of tax returns. *See* 26 U.S.C. § 6103 (general confidentilly of tax returns). There are also stiff penalties for the unauthorized inspection and/or disclosure of tax return information. *See* 26 U.S.C. §§ 7213(a)(1) (criminal sanctions for disclosure of returns or return information by federal employees); 7213(a)(2) (criminal sanctions for disclosure of returns or return information by state officials); 7216 (criminal sanctions for disclosure of tax return or return information by tax preparers). Congress provided for civil relief too. *See*

26 U.S.C. § 7431 (civil damages for unauthorized inspection or disclosure of returns or return information). These protections are not applied under the CTA: indeed, the very purpose of the CTA is to clearinghouse this information to "Federal, State, local, Tribal and foreign law enforcement agencies." 31 U.S.C. § 310(b)(2)(C)(i) (FinCEN data disclosure obligations); *see also* Opening Br. at 2-3 (the government describing purpose of CTA).

Even then, the IRS struggles to keep this data secure. *See*, *e.g.*, GAO, "Information Technology, IRS Needs to Address Operational Challenges and Opportunities to Improve Management," GAO-21-178T at 6-7 (Oct. 7, 2020).[4] This has resulted in leaks used to make political hay against ideological foes. *See*, *e.g.*, Andrew Wilford and Andrew Moylan, "What's the Fallout From the ProPublica Leak?" Nat'l Taxpayers U. Found. (July 27, 2021);[5] *see also* Michael Tasselmyer, "IRS Security Breach Impacts 100,000 Taxpayers," Nat'l Taxpayers U. Found. (May 28, 2015).[6] The government needs to collect less sensitive information, not more.

Privacy of financial records helps enable constitutional rights. Under the First Amendment, all Americans have the right "to pursue their lawful private interests

---

[4] *Available at*: https://www.gao.gov/assets/gao-21-178t.pdf.

[5] *Available at*: https://www.ntu.org/foundation/detail/whats-the-fallout-from-the-propublica-leak.

[6] *Available at*: https://www.ntu.org/foundation/detail/irs-security-breach-impacts-100000-taxpayers-05-28-2015.

privately and to associate freely with others in so doing." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 466 (1958) ("*NAACP*"). This "basic constitutional protection[]," *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973), "'lies at the foundation of a free society,'" *Buckley*, 424 U.S. at 25 (quoting *Shelton v. Tucker*, 364 U.S. 479, 486 (1960)). Indeed, just three years ago the Supreme Court reaffirmed that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," and there is a "vital relationship between freedom to associate and privacy in one's associations" via financial support. *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) ("*AFPF*") (citations omitted, brackets in *AFPF*). Consequently, the Supreme Court has long protected the right not only to associate, but to do so privately, free from government surveillance or interference—including broad financial surveillance without a warrant or probable cause.

There is no clear distinction between mere financial records and sussing out someone's affiliations. Indeed, the Civil Rights Era cases on donor privacy were generated by generally applicable business statutes that could be banally described as mere financial records. *NAACP* centered on the state's use of foreign corporation registration statutes as a means of getting the civil rights group's donor list. *NAACP*, 357 U.S. at 451. *Bates v. Little Rock*, 361 U.S. 516, 517 (1960), examined the city's use of business license tax registration. *Shelton*, 364 U.S. at 481, dealt with

employment paperwork to be employed as schoolteacher. *AFPF*, 594 U.S. at 600, centered on what should be routine charities registration with the Attorney General of California.

These cases on financial privacy protect not only political dissent, *see e.g.*, *Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87 (1982), but also simple privacy in investments. For instance, this Circuit has ruled that a city violated the First Amendment when it sought to "require[] corporate applicants for adult business licenses to disclose the names of 'principal stockholders'" privately to a regulatory agency, and invalidated the ordinance when the agency was unable to demonstrate a sufficient need for that information. *Lady J. Lingerie v. City of Jacksonville*, 176 F.3d 1358, 1366, 1367 (11th Cir. 1999) (citation omitted).

Furthermore, courts have had to examine the scope of privacy interests in financial information for public employees. For example, in *Plante v. Gonzalez*, 575 F.2d 1119, 1121 (5th Cir. 1978),[7] members of the Florida Legislature challenged a state constitutional amendment requiring extensive financial and tax return disclosures from elected officials. This was the result of "[p]olitical scandals [that] rocked Florida in the seventies." *Id*. at 1122; *see also id*. at 1122 n.3 (detailing scandals). The Fifth Circuit recognized the right to financial privacy: "Ranged

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the Fifth Circuit handed down prior to October 1, 1981.

against these important interests are the senators' interests in financial privacy. *Their interest is substantial*." *Id*. at 1135 (emphasis added). The Fifth Circuit further held that "[f]inancial privacy is a matter of serious concern, deserving strong protection." *Id*. at 1136.

The challengers there were "not ordinary citizens, but state senators," and while that did "not strip them of all constitutional protection" from disclosure of their finances, it did "put some limits on the privacy they may reasonably expect." *Id*. at 1135. Thus the "public interests supporting public disclosure for these elected officials are even stronger" in that instance. *Id*. at 1136. A year later, the same Circuit recognized privacy interests in financial data for federal judges, but the jurists lost because they were public servants, similar to the senators in *Plante*. *Duplantier v. United States*, 606 F.2d 654, 670 (5th Cir. 1979) ("Like the state senators in *Plante*, judges are not ordinary citizens but are rather people who have chosen to accept public office.") (quotation marks removed).

Similarly, in the First Circuit case of *O'Brien v. DiGrazia*, 544 F.2d 543, 545 (1st Cir. 1973), the Boston Police Commissioner suspected some of his officers of involvement in organized crime. He therefore demanded that the patrolmen fill out a financial questionnaire "listing all sources of income in 1972 for themselves and their spouses, all significant assets held by them and any members of their households, and, for the years 1966 through 1971, a general estimate of their

expenditures and copies of their state and federal income tax returns." *Id*. Officers who refused to supply the information were suspended, and asserted a right to privacy based on the Fourth, Fifth, Seventh, and Fourteenth Amendments. *See id*. Assuming, without deciding, that there was such a privacy interest, the First Circuit ultimately held that the governmental interests in an honest police force outweighed the privacy interest for those specific officers. *See id*. at 546.

The key difference between public employees—Boston's police officers, Florida's state senators, and federal judges—and the CTA's broad demands is that the latter concerns private citizens and private business affairs. Transparency is for government actors to keep them accountable. Privacy rights for private citizens is to keep the government from snooping—and is a substantial right protected by multiple constitutional provisions. Statutory law also protects taxpayer privacy interests. The lower court's dismissal of these viable constitutional and statutory claims is error.

## CONCLUSION

For the foregoing reasons, the well-reasoned decision of the District Court should be affirmed.

Respectfully submitted,

/s/ Tyler Martinez
Tyler Martinez
NATIONAL TAXPAYERS UNION FOUNDATION
122 C St. N.W., Suite 700
Washington, D.C. 20001
(703) 683-5700
tmartinez@ntu.org

Dated: May 20, 2024               *Counsel for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because this brief contains 3,078 words, as counted by Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word in Times New Roman 14-point font.

/s/ Tyler Martinez
Tyler Martinez
NATIONAL TAXPAYERS UNION FOUNDATION

Dated: May 20, 2024                    *Counsel for* Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing *Amicus Curiae* Brief of National Taxpayers Union Foundation in Support of Appellees and Affirmance using the court's CM/ECF system. A Notice of Docket Activity will be emailed to all registered attorneys currently participating in this case, constituting service on those attorneys:

/s/ Tyler Martinez

Tyler Martinez
NATIONAL TAXPAYERS UNION FOUNDATION

Dated: May 20, 2024                    *Counsel for* Amicus Curiae

16