No. 24-10736

# In the United States Court of Appeals for the Eleventh Circuit

———————

NATIONAL SMALL BUSINESS UNITED, D.B.A. NATIONAL SMALL BUSINESS ASSOCIATION, ISAAC WINKLES,
*Plaintiffs-Appellees*,

v.

U.S. DEPARTMENT OF THE TREASURY, ACTING DIRECTOR OF THE FINANCIAL CRIMES ENFORCEMENT NETWORK, SECRETARY, U.S. DEPARTMENT OF THE TREASURY,
*Defendants-Appellants*.

———————

**Appeal from a Judgment of the United States District Court for the Northern District of Alabama, The Hon. Liles C. Burke (Dist. Ct. No. 5:22-cv-01448-LCB)**

———————

**BRIEF OF ADVANCING AMERICAN FREEDOM, INC.; CATHOLICS COUNT; GALEN INSTITUTE; CHARLIE GEROW; TIM JONES, FORMER SPEAKER, MISSOURI HOUSE AND CHAIRMAN, MISSOURI CENTER-RIGHT COALITION; MANHATTAN INSTITUTE; MEN AND WOMEN FOR A REPRESENTATIVE DEMOCRACY IN AMERICA, INC.; NATIONAL CENTER FOR PUBLIC POLICY RESEARCH; STAND UP MICHIGAN; STUDENTS FOR LIFE ACTION; STUDENTS FOR LIFE OF AMERICA; WOMEN FOR DEMOCRACY IN AMERICA, INC.; WISCONSIN FAMILY ACTION, INC.; AND YOUNG AMERICA'S FOUNDATION AS *AMICI CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE**

———————

J. MARC WHEAT
  *Counsel of Record*
ADVANCING AMERICAN FREEDOM, INC.
801 Pennsylvania Avenue, N.W., Suite 930
Washington, D.C. 20004
(202) 780-4848
MWheat@advancingamericanfreedom.com

*Counsel for Amicus Curiae*

May 20, 2024

24-10736, *National Small Business United, et al. v. U.S. Department of the Treasury, et al.*

### CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to the Eleventh Circuit rules, the following persons and corporation have an interest in the outcome of this appeal:

1) Advancing American Freedom, Inc., Amicus Curiae

2) Catholics Count, Amicus Curiae

3) Galen Institute, Amicus Curiae

4) Charlei Gerow, Amicus Curiae

5) Tim Jones, Former Speaker, Missouri House and Chairman, Missouri Center Right Coalition, Amicus Curiae

6) Manhattan Institute, Amicus Curiae

9) Men and Women for a Representative Democracy in America, Inc. Amicus Curiae

10) National Center for Public Policy Research, Amicus Curiae

11) Stand Up Michigan, Amicus Curiae

12) Students for Life Action, Amicus Curiae

13) Students for Life of America, Amicus Curiae

14) Women for Democracy in America, Inc., Amicus Curiae

15) Wisconsin Family Action, Inc., Amicus Curiae

16) Young America's Foundation, Amicus Curiae

17)    J. Marc Wheat, Counsel for Amicus Curiae

The amici curiae Advancing American Freedom, Inc.; Catholics Count; Galen Institute; Charlie Gerow; Tim Jones, Former Speaker, Missouri House and Chairman, Missouri Center-Right Coalition; Manhattan Institute; Men and Women for a Representative Democracy in America, Inc.; National Center for Public Policy Research; Stand Up Michigan; Students for Life Action; Students for Life of America; Women for Democracy in America, Inc.; Wisconsin Family Action, Inc.; and Young America's Foundation are nonprofit corporations. They do not issue stock and are neither owned by nor are the owners of any other corporate entity, in part or in whole. They have no parent companies, subsidiaries, affiliates, or members that have issued shares or debt securities to the public. The corporations are operated by volunteer boards of directors.

Respectfully submitted,

/s/ J. Marc Wheat
J. MARC WHEAT
   *Counsel of Record*
ADVANCING AMERICAN FREEDOM, INC.
801 Pennsylvania Avenue, N.W., Suite 930
Washington, D.C. 20004
(202) 780-4848
MWheat@advancingamericanfreedom.com
*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ...................................................................C1

TABLE OF AUTHORITIES ....................................................................... ii

STATEMENT OF INTEREST OF AMICI...................................................... 1

STATEMENT OF ISSUES ........................................................................ 2

SUMMARY OF THE ARGUMENT ........................................................... 3

ARGUMENT ........................................................................................ 4

I.      Governments Must be Subject to the Rule of Law if They Are to Fulfill
        Their Reason for Being: The Protection of the Rights of the People............. 4

II.     The Commerce Clause is a Limited Delegation of Power, not a Grant of a
        General Police Power ................................................................... 8

        A.      The text of the Commerce Clause, understood as it was by the
                ratifying public at the time of its adoption, grants to Congress only
                the ability to regulate interjurisdictional trade .................................. 10

        B.      The context of the Commerce Clause makes clear that the Clause
                grants to Congress only the ability to regulate interjurisdictional
                trade ................................................................................. 13

III.    The CTA is Not a Necessary and Proper Exercise of Congress's
        Commerce Clause Power............................................................... 20

CONCLUSION .................................................................................... 25

CERTIFICATE OF COMPLIANCE........................................................... 27

CERTIFICATE OF SERVICE ................................................................. 28

i

# TABLE OF AUTHORITIES

## Cases

*Carter v. Carter Coal Co.*,
  298 U.S. 238 (1936) ............................................................................23

*Gonzales v. Raich*,
  545 U.S. 1 (2005) ....................................................................... 10-11

*INS v. Chadha*,
  462 U.S. 919 (1983) .............................................................................5

*Kinsella v. Singleton*,
  361 U.S. 234 (1960) ...........................................................................23

*Marbury v. Madison*,
  5 U.S. 137 (1803) ............................................................................7, 9

*McCulloch v. Maryland*,
  17 U.S. 316 (1819) ..................................................... 4, 21, 22, 23, 24

*McDonald v. Chicago*,
  561 U.S. 742 (2010) .............................................................................7

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ...........................................................................21

*Nat'l Small Bus. Ass'n v. Yellen*,
  5:22-cv-1448-LCB (N.D. Ala. Mar. 1, 2024) ................................. 2, 9, 20, 21, 24

*Obergefell v. Hodges*,
  576 U.S. 644 (2015) .............................................................................5

*Sabri v. United States*,
  541 U.S. 600 (2004) ...........................................................................24

*United States v. Comstock*,
  560 U.S. 126 (2010) .............................................................. 22, 23, 24

*United States v. Lopez*,
514 U.S. 549 (1995) .............................................................9-11, 14-19

*United States v. Morrison*,
529 U.S. 598 (2000) ....................................................................8, 9

*Wickard v. Filburn*,
317 U.S. 111 (1942) ........................................................................18

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886) .........................................................................6

**Constitution and Statutes**

The Declaration of Independence para. 2 (U.S. 1776) ............................5

U.S. Const. amend. IX ....................................................................5

U.S. Const. art. I, § 8, cl. 3.............................................................8, 10

U.S. Const. art. I, § 8, cl. 18.......................................................... 21, 23

U.S. Const. art. II, § 1, cl. 7 ...........................................................7

U.S. Const. art. VI, cl. 3 ...............................................................7

Mass. Const. pt. 1 art. XXX............................................................6

31 U.S.C. §5336(a)(3)...................................................................20

**Other Authorities**

*American Political Thought* (Kenneth M. Dolbeare & Michael S. Cummings eds.,
CQ Press 5th ed. 2004) ...............................................................22

The Antifederalist No. 32 (Brutus) (Morton Borden ed. 1965)...............................17

Randy Barnett, *New Evidence of the Original Meaning of the Commerce Clause*,
55 Ark. L.Rev. 847 (2003) .......................................................10, 11, 12

iii

Randy Barnett, *Our Republican Constitution* (1st ed. 2016) ................................7, 8

Randy Barnett, *Restoring the Lost Constitution* (Rev. ed. 2004) ............................7

Randy Barnett, *The Original Meaning of the Commerce Clause*, 68 U. Chi. L.Rev. 101 (2001)................................................................................................11, 12, 16

Jonathan Elliot, ed, 2 *Debates in the Several State Conventions on the Adoption of the Constitution* (Taylor & Maury 2d ed. 1863)....................................................16

The Federalist No. 17 (Alexander Hamilton) (George W. Carey and James McClellan, eds., The Liberty Fund 2001)...................................................... 15, 18

The Federalist No. 33 (Alexander Hamilton) (George W. Carey and James McClellan, eds., The Liberty Fund 2001)...................................................... 21, 23

The Federalist No. 35 (Hamilton), in Rossiter, ed, The Federalist Papers (Penguin 1961) ................................................................................................................12

The Federalist No. 45 (James Madison) (George W. Carey and James McClellan, eds., The Liberty Fund 2001).................................................... 14, 15, 16

The Federalist No. 78 (Alexander Hamilton) (George W. Carey and James McClellan, eds., The Liberty Fund 2001).......................................................... 7-8

The Federalist No. 78 (Alexander Hamilton) (J.R. Pole, ed., 2005) .........................8

Edwin J. Feulner, Jr, *Conservatives Stalk the House: The Story of the Republican Study Committee* (Green Hill Publishers, Inc. 1983).............................................1

Thomas Jefferson, Notes on the State of Virginia, Query XIII (J.W. Randolf 1853) (1785)..................................................................................................................6

Montesquieu, *Spirit of the Laws*, § 11.4 (Thomas Nugent trans. 1752) (1748) ........6

Robert J. Pushaw, Jr. & Grant S. Nelson, *A Critique of the Narrow Interpretation of the Commerce Clause*, 96 NW. L. Rev. 695 (2002) ............................................11

John Taylor, *Arator: Being a Series of Agricultural Essays, Practical &*
  *Political, in Sixty-One Numbers* (J.M. Carter, Georgetown, Columbia 2nd ed.
  1814) ............................................................................................................ 12, 13

## STATEMENT OF INTEREST OF AMICI

Advancing American Freedom (AAF) is a nonprofit organization that promotes and defends policies that elevate traditional American values, including the uniquely American idea that all people are created equal and endowed by their Creator with unalienable rights to life, liberty, and the pursuit of happiness.[1] AAF "will continue to serve as a beacon for conservative ideas, a reminder to all branches of government of their responsibilities to the nation"[2] and believes that the governmental structures established by the Constitution are necessary for the preservation of the liberty of the people. When Congress exceeds its constitutionally delegated authority and the courts fail to intervene, the rights of the people are imperiled.

This case is important to *amici* Catholics Count; Galen Institute; Charlie Gerow; Tim Jones, Former Speaker, Missouri House and Chairman, Missouri Center-Right Coalition; Manhattan Institute; Men and Women for a Representative Democracy in America, Inc.; National Center for Public Policy Research; Stand Up Michigan; Students for Life Action; Students for Life of America; Women for

---

[1] No counsel for a party authored this brief in whole or in part. No person other than Amicus Curiae and its counsel made any monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this amicus brief.

[2] Edwin J. Feulner, Jr, *Conservatives Stalk the House: The Story of the Republican Study Committee*, 212 (Green Hill Publishers, Inc. 1983).

1

Democracy in America, Inc.; Wisconsin Family Action, Inc.; and Young America's Foundation because they believe that limitations on government power are essential for the preservation of liberty and that courts play an essential role in the preservation of those limitations.

## STATEMENT OF ISSUES

The Constitution creates a government of limited powers, hemmed in by a system of checks and balances to ensure the liberty of the people. For that reason, no provision of the Constitution can rightly be treated as Mary Poppins' bottomless carpetbag of previously unknown extensive federal powers not contemplated at the time of the Founding or, with respect to later amendments, at the time of their adoption.

The Corporate Transparency Act ("CTA"), which "requir[es] most entities incorporated under State law to disclose personal stakeholder information to the Treasury Department's criminal enforcement arm," *Nat'l Small Bus. Ass'n v. Yellen*, 5:22-cv-1448-LCB at 2 (N.D. Ala. Mar. 1, 2024) (hereinafter *NSBA*), would require just such an expansive reading. Incorporated entities can include for-profit corporations as well as non-profits, holding companies, and political organizations. *Id*. As the district court explained, the government's defense of the CTA is "not supported by precedent." *Id*. at 3. Further, when considered in light of the original meaning of the Commerce Clause and the Necessary and Proper Clause, it is clear

2

that the CTA is beyond the power of Congress to enact. For these reasons, this Court should rule for Plaintiffs-Appellees and uphold the district court's decision finding the CTA unconstitutional.

## SUMMARY OF THE ARGUMENT

Government exists to secure the pre-existent rights of the people. However, because government itself presents a significant threat to the rights of the people, whether by the tyranny of the minority or of the majority, the Framers of the United States Constitution created a system of checks and balances and limited, enumerated powers to ensure that the powers of government could not easily be used to destroy the liberty of the people. One of those checks is judicial review. The Courts thus have the responsibility to protect the liberty of the people by enforcing the structural and substantive limitations the Constitution places on the powers of the political branches.

The Constitution only delegates limited and enumerated powers to the federal government. One of those powers, the power to regulate commerce among the states, has for decades been interpreted to grant Congress nearly unlimited power. However, the original meaning of the clause is clear. Commerce meant trade and among the states meant—well—among the states. A broader reading turns much of the rest of the Constitution, including the Tenth Amendment on its head.

Similarly, the original meaning of the Necessary and Proper Clause conveys to Congress only the power to carry out the powers already granted to it. The clause is not a grant of some separate general power. A misinterpretation of Chief Justice John Marshall's reasoning in *McCulloch v. Maryland* has led the Court to apply, to varying degrees, what amounts to rational basis review of congressional action under the Necessary and Proper Clause. Chief Justice Marshall's opinion in *McCulloch*, however, is much more restrictive as to the powers contained within the Clause.

The district court correctly found that even under the Supreme Court's broad reading of the Commerce and Necessary and Proper Clauses, the CTA is unconstitutional. However, courts have a duty to the Constitution as written because it is through the Constitution that the people delegate the authority to govern for the sake of their liberty. Because Congress exceeded its authority when it passed the CTA, this Court should uphold the district court's decision and rule for Plaintiffs-Appellees.

## ARGUMENT

### I.    Governments Must be Subject to the Rule of Law if They Are to Fulfill Their Reason for Being: The Protection of the Rights of the People.

The founding generation understood the purpose of government to be the protection of the people's rights. Because governments are a threat to those rights, the Framers understood that government itself had to be restrained. The constitutional separation of powers was implemented as just such a protection.

The rights of the people pre-exist government and come from man's Creator. The Declaration of Independence, which imbues meaning into the later documents of our Republic, including the Constitution, expresses the fundamental philosophy of American government: "Governments are instituted among Men" to secure "certain unalienable rights," which come from man's Creator and among which "are Life, Liberty, and the pursuit of Happiness." The Declaration of Independence para. 2 (U.S. 1776). These provisions of the Declaration of Independence "refer[] to a vision of mankind in which all humans are created in the image of God and therefore of inherent worth." *Obergefell v. Hodges*, 576 U.S. 644, 735 (2015) (Thomas, J., dissenting).

The Constitution, "like the Declaration of Independence before it—was predicated on a simple truth: One's liberty, not to mention one's dignity, was something to be shielded from—not provided by—the State." *Obergefell*, 576 U.S. at 736 (Thomas, J., dissenting). According to the Ninth Amendment, "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX. In other words, the people were to retain their *pre-existing* rights, both enumerated and unenumerated, under the new government.

The Founder's view of government "was rooted in a general skepticism regarding the fallibility of human nature." *See INS v. Chadha*, 462 U.S. 919, 949

5

(1983). In a state of anarchy, the rights of individuals are real, but are subject to violation by the strong. Under a government, the rights of individuals are real but are subject to the whims of those exercising government power. According to Montesquieu, "constant experience shows us that every man invested with power is apt to abuse it, and to carry his authority as far as it will go."[3] In thousands of years of recorded human history, that nature has not changed.[4]

Who, then, will rule? John Adams suggested the answer in the Massachusetts Constitution. Proper government does not impose the rule of one man, nor of the few or the many. Under proper government, the *law* must rule. *See* Mass. Const. pt. 1 art. XXX. That is the only means of ensuring the rights of the people. Citing this provision of the Massachusetts Constitution, the Court in *Yick Wo v. Hopkins*, wrote that the idea of a person's rights held "at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself." 118 U.S. 356, 370 (1886).

---

[3] Montesquieu, *Spirit of the Laws*, § 11.4 (Thomas Nugent trans. 1752) (1748).

[4] *See* Thomas Jefferson, Notes on the State of Virginia, Query XIII, 130 (J.W. Randolf 1853) (1785) ("Human nature is the same on every side of the Atlantic, and will be alike influenced by the same causes. The time to guard against corruption and tyranny is before they shall have gotten hold on us. It is better to keep the wolf out of the fold, than to trust to drawing his teeth and talons after he shall have entered.").

The law that must rule is the Constitution. The Declaration describes the higher law upon which government is based, and the truths explicated in Declaration, including the reality of "inalienable rights" are "embedded in our constitutional structure." *McDonald v. Chicago*, 561 U.S. 742, 807 (2010) (Thomas, J., concurring in part and concurring in the judgment). The Constitution, in turn, is "the supreme Law of the Land." U. S. Const. art. VI, cl. 2. It is also "the law that governs those who govern [the people]," and "is put in writing so that it can be enforced against the servants of the people."[5] Those who administer American government swear an oath to uphold and defend it.[6] Thus, those who govern the people are bound by the Constitution.

Chief Justice John Marshall was not innovating when he wrote, "It is emphatically the province and duty of the judicial department to say what the law is."[7] *Marbury v. Madison*, 5 U.S. 137, 177 (1803). In Federalist 78, Hamilton explained that the courts are "an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned

---

[5] Randy Barnett, *Our Republican Constitution* 23 (1st ed. 2016).

[6] U. S. Const. art. II, § 1, cl. 7; U. S. Const. art. VI, cl. 3.

[7] Marshall was echoing his own comments at the Virginia ratifying convention where he said that "a law not warranted by any of the powers enumerated . . . would be considered by the judges [reviewing it] as an infringement of the Constitution which they are to guard. They would not consider such a law as coming under their jurisdiction. They would declare it void." Randy Barnett, *Restoring the Lost Constitution* 136 (Rev. ed. 2004).

to their authority."[8] Hamilton did not "speak of a '*power* of judicial review.' Instead he referred to 'courts of justice, whose *duty* it must be to declare all acts contrary to the manifest tenor of the Constitution void.'"[9]

If America is to be a nation ruled by law and not by the whims of its elected or unelected officials, the Constitution must rule. In order for the Constitution to rule, the courts must faithfully apply its structural constraints on the powers of the other branches. Because the CTA was not enacted based on any power delegated to Congress, the Court must strike it down and thereby ensure the liberty of the people.

## II.   The Commerce Clause is a Limited Delegation of Power, not a Grant of a General Police Power.

The CTA regulates the non-commercial, wholly intrastate activity of incorporating an organization under state law. Yet, the federal government advances as one justification for Congress's passage of the law, the Commerce Clause, which delegates to Congress power to "regulate Commerce . . . among the several States," as well as with foreign nations and Indian tribes. U.S. Const. art. I, § 8, cl. 3. The Supreme Court in *United States v. Morrison*, 529 U.S. 598, 608 (2000) found three areas over which Congress has regulatory authority under the Commerce Clause.

---

[8] The Federalist No. 78, at 404 (Alexander Hamilton) (George W. Carey and James McClellan, eds., The Liberty Fund 2001).

[9] Barnett, *supra* note 5, at 60 (emphasis in original) (quoting The Federalist No. 78, at 403 (Alexander Hamilton) (J.R. Pole, ed., 2005)).

8

These are, "(1) the channels of interstate and foreign commerce, (2) the instrumentalities of, and things and persons in, interstate and foreign commerce, and (3) activities that have a substantial effect on interstate and foreign commerce." *NSBA,* 5:22-cv-1448-LCB at 26 (citing *Morrison*, 529 U.S. at 609). The district court correctly found that the CTA is outside even the Court's broad interpretation of Congress's Commerce Clause power.

After all, the Court has, in recent decades, found limits to that power. In *United States v. Lopez*, 514 U.S. 549, 551-52 (1995), the Court found that the Gun-Free School Zones Act of 1990 was beyond the power of Congress to enact under the Commerce Clause. As the Court concluded, to allow Congress the power to regulate even the intrastate possession of a handgun without showing some greater relation to interstate commerce, the Court "would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id*. at 568.

More importantly, however, the CTA falls outside of the narrow Commerce Clause power actually granted to Congress in the Constitution. While the application of this narrower meaning is not determinative in this case, courts' "duty to . . . say what the law is," *Marbury*, 5 U.S. at 177, requires attention to the Constitution's original meaning.

A.    *The text of the Commerce Clause, understood as it was by the ratifying public at the time of its adoption, grants to Congress only the ability to regulate interjurisdictional trade.*

For Courts to effectively carry out their duty to enforce the limits of the Constitution against the political branches for the sake of the liberty of the people, the Courts must first understand what those limits are. In this case, the interpretation of the Commerce Clause of Article I is at issue. The Clause grants Congress the power to "regulate Commerce . . . among the several States," as well as with foreign nations and Indian tribes. U.S. Const. art. I, § 8, cl. 3. Thus, the questions of interpretation are, what counts as "commerce" and when is that commerce "among the several states"?

"[T]he Commerce Clause empowers Congress to regulate the buying and selling of goods and services trafficked across state lines." *Gonzales v. Raich*, 545 U.S. 1, 57 (2005) (Thomas, J., dissenting) (citing *Lopez*, 514 U.S. at 586-89 (Thomas, J., concurring)). This understanding of "commerce" as trade was common not only to the drafters of the Constitution but to the general public including those who ratified it. *Id*. (citing Randy Barnett, *New Evidence of the Original Meaning of the Commerce Clause*, 55 Ark. L.Rev. 847, 857-862 (2003)). Commerce did not include, on the other hand, agriculture and manufacturing, which were wholly intrastate activities. *Gonzales*, 545 U.S. at 58 (Thomas, J., dissenting) ("Commerce, or trade, stood in contrast to the productive activities like manufacturing and

agriculture."). In fact, "the term 'commerce' was used in contradistinction to" such "productive activities." *Lopez*, 514 U.S. at 586.[10]

"Throughout founding-era dictionaries, Madison's notes from the Constitutional Convention, the Federalist Papers, and the ratification debates, the term 'commerce' is consistently used to mean trade or exchange—not all economic or gainful activity that has some attenuated connection to trade or exchange." *Gonzales*, 545 U.S. at 58 (Thomas, J., dissenting) (citing *Lopez*, 514 U.S. at 586-87 (Thomas, J., concurring); (quoting Randy Barnett, *The Original Meaning of the Commerce Clause*, 68 U. Chi. L.Rev. 101, 112-125 (2001)). Of thirty-four appearances of the term "commerce" in Madison's notes on the constitutional convention:

> Eight of these are unambiguous references to commerce with foreign nations which can only consist of trade. In every other instance, the terms "trade" or "exchange" could be substituted for the term "commerce" with the apparent meaning of the statement preserved. In

---

[10] These three (commerce, agriculture, and manufacturing) are listed alongside one another many times. Nor is this listing merely redundant, as suggested by Professors Pushaw and Nelson. Robert J. Pushaw, Jr. & Grant S. Nelson, *A Critique of the Narrow Interpretation of the Commerce Clause*, 96 NW. L. Rev. 695, 705 (2002). In one example from the *Philadelphia Gazette* from 1790, the three terms are used and then each defined separately, with the term "commerce" explained as encompassing "the whole extent of navigation with foreign countries." Randy Barnett, *New Evidence of the Original Meaning of the Commerce Clause*, 55 Ark. L. Rev. 847, 859 (2003).

no instance is the term "commerce" clearly used to refer to "any gainful activity" or anything broader than trade.[11]

Similarly, "In none of the sixty-three appearances of the term 'commerce' in *The Federalist Papers* is it ever used to unambiguously refer to any activity beyond trade or exchange."[12] One helpful example of the use of "commerce" in the Federalist Papers from Federalist 35. Hamilton asks, "Will not the merchant understand and be disposed to cultivate, as far as may be proper, the interests of the mechanic and manufacturing arts to which his commerce is so nearly allied?"[13] Further, in the reports of the ratification debates, "commerce" "was uniformly used to refer to trade or exchange, rather than all gainful activity."[14]

Finally, "commerce" also had the meaning of "trade" in common usage. In the *Pennsylvania Gazette* from 1728-1800, the term "commerce" was used 1,594 times.[15] In 1787, one instance of the term's use was to define it as "the exports as

---

[11] Randy Barnett, *The Original Meaning of the Commerce Clause*, 68 U. Chi. L.Rev. 101, 114-15 (2001).

[12] *Id*. at 116.

[13] *Id*. (internal quotation marks omitted) (quoting Federalist No. 35 (Hamilton), in Rossiter, ed, The Federalist Papers at 216 (Penguin 1961)).

[14] *Id*.

[15] Barnett, *supra* note 10 at 857. *See also*, John Taylor, *Arator: Being a Series of Agricultural Essays, Practical & Political, in Sixty-One Numbers* 181 (J.M. Carter, Georgetown, Columbia 2nd ed. 1814) ("Whilst the English nation have proved the high value of our cotton, and opened an inexhaustible demand for the abundance we can spare, it is certainly a responsible hostage for the small portion of her woollens

well as the imports of a country."[16] Of the 1,549 uses of the term, Professor Barnett's researchers found only 31 instances they believed might have suggested a meaning broader than "trade."[17] Even among this relatively miniscule sample, none were "*unambiguously broad*."[18] Thus, whether used in relation to the drafting and ratification of the Constitution or for public consumption, the word "commerce" was understood at the time of the Founding to refer to "trade," not all things that today would constitute commercial activity. Thus, there is overwhelming evidence that the power originally granted by the Commerce Clause was the power to regulate interjurisdictional trade. This understanding, and the scope of "among the several states" is further clarified and reinforced by the historical and political context of the Constitution's adoption.

B.    *The context of the Commerce Clause makes clear that the Clause grants to Congress only the ability to regulate interjurisdictional trade.*

Not only is the evidence supporting the narrow meaning of the term "commerce" overwhelming, but the historical and constitutional context also

---

we may want; and an exchange is probably better than turning our corn fields into sheep pastures. It is exactly the case in which commerce renders mutual benefit, as we under our warm and dry climate, an in our sandy soil, can raise cotton cheaper than England; and she by the help of her moisture and verdure, can raise wool cheaper than the United States.").

[16] *Id*. at 858.

[17] *Id*. at 859.

[18] *Id*. at 860.

demand a narrow interpretation of the power granted by the Clause. An interpretation of the Commerce Clause that grants Congress power over more than interstate trade is inconsistent with the purpose of the federal government as it was understood by the Founding generation. As Justice Thomas has explained, the federal government does not have a general police power. It cannot "regulate marriage, littering, or cruelty to animals, throughout the 50 states . . . Any interpretation of the Commerce Clause that even suggests that Congress could regulate such matters is in need of reexamination." *United States v. Lopez*, 514 U.S. 549, 585 (1995).

The purpose of the federal government was national unity, not national uniformity. "The powers delegated by the proposed constitution to the federal government are few and defined. Those which are to remain in the state governments are numerous and indefinite."[19] The Founding generation understood that the powers delegated to the federal government "will be exercised principally on external objects, as war, peace, negociation, and foreign commerce; with which last the power of taxation will for the most part be connected."[20]

On the other hand, "The powers reserved to the several states [were to] extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties

---

[19] The Federalist No. 45, at 241 (James Madison) (George W. Carey and James McClellan, eds., The Liberty Fund 2001).

[20] *Id.*

and properties of the people; and the internal order, improvement and prosperity of the state."[21] Or, as Hamilton explained, "The administration of private justice between the citizens of the same State, the supervision of agriculture and of other concerns of a similar nature, all those things in short which are proper to be provided for by local legislation, can never be desirable cares of a general jurisdiction."[22] In other words, the Founders understood that the relationship between the daily lives of the people and the federal government would usually be distant while the relationship between the states and their people's liberties would be much closer. This subsidiary view of government ensured that the greater the control over the daily lives of the people, the more locally those decisions were made, leaving to the individual and the family the overwhelming majority of decision-making authority.

This understanding of the federal government as concerned with national, not local, issues is also evident in the way those of the Founding generation discussed commerce as related to productive industries. There are many instances of speakers and writers around the time of drafting and ratification using "the term 'commerce' . . . in contradistinction to . . . productive activities," such as agriculture and manufacturing. *Lopez*, 514 U.S. at 586 (Thomas, J., concurring). Arguing that

---

[21] *Id*.

[22] The Federalist No. 17 at 80-81 (Alexander Hamilton) (George W. Carey and James McClellan, eds., The Liberty Fund 2001).

the power to regulate navigation was encompassed in the power to regulate commerce, Professor Barnett quotes discussions from ratification debates distinguishing between "commerce and navigation" on the one hand and "'various branches of business thereon dependent' as well as specifically from agriculture" on the other.[23] In the context of the purpose of the Constitution, this distinction between agriculture and manufacturing, activities that take place within a state, and commerce or trade, an activity that may cross state lines, makes perfect sense. The federal government was to be concerned with those things that are moving between the states, not those things that stay within the states.

Further, unlike the Necessary and Proper Clause, the Commerce Clause caused relatively little controversy during the pre-ratification debates on the Constitution. Madison noted that, in comparison to the Articles of Confederation, "The regulation of commerce . . . is a new power; but that seems to be an addition which few oppose, and from which no apprehensions are entertained."[24] As Justice Thomas explains, "when Federalists and Anti-Federalists discussed the Commerce Clause during the ratification period, they often used trade (in its selling/bartering sense) and commerce interchangeably." *United States v. Lopez*, 514 U.S. 549, 586

---

[23] Barnett, *supra* note 11 at 126 (quoting Jonathan Elliot, ed, 2 *The Debates in the Several State Conventions on the Adoption of the Constitution* at 170, 83 (Taylor & Maury 2d ed. 1863).

[24] Madison, *supra* note 19, at 242.

(1995) (Thomas, J., concurred). The anti-federalists were deeply concerned about the federal government having expansive powers, a fact which motivated the assurances of the Federalists Papers that the general government's powers were "few and defined."[25] Of particular concern to them was the Necessary and Proper Clause.[26] What this shows is that at the time of the founding, even those who were worried about an expansive federal government were apparently largely unconcerned with the expansiveness of the commerce power. This strongly suggests that that power was not understood by anyone to be a general grant of power.[27]

For the better part of a century, Congress has been allowed to exercise an almost unlimited power through the Commerce Clause. Would the Constitution have been ratified if the people of the states believed that it granted Congress the power to limit, for example, the growing of wheat to feed one's animals? *See generally*

---

[25] *Id*. at 241.

[26] *See, e.g.,* The Antifederalist No. 32, at 82-86 (Brutus) (Morton Borden ed. 1965) ("If then the objects of this power cannot be comprehended, how is it possible to understand the extent of that power which can pass all laws which shall be necessary and proper for carrying into execution? It is truly incomprehensible. A case cannot be conceived of, which is not included in this power.").

[27] Of course, the inverse is not thereby true. It is not true that just because the anti-federalists were concerned about the Necessary and Proper Clause, therefore the clause was in fact a general grant of authority. As will be discussed below, the Federalists were right to give their assurances that the Necessary and Proper Clause itself was not a source of unbridled federal authority.

*Wickard v. Filburn*, 317 U.S. 111 (1942). Almost certainly not.[28] Those who ratified the Constitution relied on the limited enumeration of powers as the protection of the liberties of the people and the prerogatives of the states.

An interpretation of the Commerce Clause that would grant Congress power over more than interstate trade would also set that Clause at odds with the rest of the Constitution. As Justice Thomas explains, "much if not all of Art. I, § 8 (including portions of the Commerce Clause itself), would have been surplusage if Congress had been given authority over matters that substantially affect interstate commerce."[29] *Lopez*, 514 U.S. at 589 (Thomas, J., concurring). Such an

---

[28] The Court's decision in *Wickard* is particularly surprising in light of Hamilton's recognition in Federalist 17. "The administration of private justice between the citizens of the same State, the supervision of *agriculture* and of other concerns of a similar nature, all those things in short which are proper to be provided for by local legislation, can *never* be desirable cares of a general jurisdiction." Hamilton, *supra* note 22 at 80-81 (emphasis added).

[29] Were the Commerce Clause a grant of power to regulate all things which substantially affect commerce, "there [would be] no need for the Constitution to specify that Congress may enact bankruptcy laws, cl. 4, or coin money and fix the standard of weights and measures, cl. 5, or punish counterfeiters of United States coin and securities, cl. 6. Likewise, Congress would not need the separate authority to establish post offices and post roads, cl. 7, or to grant patents and copyrights, cl. 8, or to 'punish Piracies and Felonies committed on the high Seas,' cl. 10. It might not even need the power to raise and support an Army and Navy, cls. 12 and 13, for fewer people would engage in commercial shipping if they thought that a foreign power could expropriate their property with ease. Indeed, if Congress could regulate matters that substantially affect interstate commerce, there would have been no need to specify that Congress can regulate international trade and commerce with the Indians. As the Framers surely understood, these other branches of trade

interpretation "simply cannot be correct." *Id*. Nor does the broad interpretation comport with the Tenth Amendment which the broad interpretation effectively turns "on its head." *Id*. The Court's caselaw could be read to reserve to the United States all powers not expressly *prohibited* be the Constitution." *Id*.

Because a broad interpretation of the Commerce Clause would directly conflict with the understanding of the purpose of the federal government at the time of ratification, such an interpretation is not plausible. That broad interpretation, be it that the Commerce Clause grants Congress the power to regulate all of what today is considered commercial activity or that it grants Congress the power to regulate those things that have a substantial effect on commercial activity, is inconsistent with the evidence of original meaning of the text, is contrary to the general purpose of the national government as understood by those of the Founding generation, and would render Article I Section 8 of the Constitution a redundant waste of ink and parchment. The Commerce Clause grants Congress exactly the power it says it does: the power to regulate commerce among the several states. It is not a Trojan horse that once ratified would produce an unseen and unanticipated army of federal powers.

---

substantially affect interstate commerce." *Lopez*, 514 U.S. at 588-89 (Thomas, J., concurring).

19

Because the CTA does not regulate trade among the states, it is not a legitimate exercise of the power granted to Congress by the Commerce Clause. The CTA requires that tens of millions of organizations that have incorporated or will incorporate in states reveal information about their "beneficial owner" to the Department of the Treasury. *NSBA*, 5:22-cv-1448-LCB at 5 (citing 31 U.S.C. §5336(a)(3)). These organizational structures are creatures of state law, and the act of incorporation is a noncommercial act that takes place entirely within the state. Indeed, CTA applies to organizations that are noneconomic. *Id*. at 2. Thus, the CTA regulates activities that are wholly intrastate and noncommercial, whether the term is interpreted broadly or, as is consistent with the original meaning of the Constitution, narrowly. For that reason, Congress did not have the authority under the Commerce Clause to enact the CTA.

## III.   The CTA is Not a Necessary and Proper Exercise of Congress's Commerce Clause Power.

The district court in this case correctly explained why, even under the Supreme Court's relatively expansive reading of the Necessary and Proper Clause,[30] the CTA still falls outside of the power it grants to Congress. *NSBA*, 5:22-cv-1448-

---

[30] The Supreme Court has "been very deferential to Congress's determination that a regulation is 'necessary.' [The Court] has thus upheld laws that are 'convenient, or useful or conducive to the authority's beneficial exercise.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 559 (2012).

LCB at 22-24, 42-45, 51-52. However, like the Commerce Clause, the original meaning of the Necessary and Proper Clause is more limited than it has been interpreted, as was recognized in Chief Justice Marshall's often misread opinion in *McCulloch v. Maryland*, 17 U.S. 316 (1819).

Along with its enumerated powers, Congress also has the power to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18. In response to antifederalist criticism of the Constitution out of fear that it would create too expansive a federal government, Hamilton argued that:

> [I]t may be affirmed with *perfect confidence*, that the constitutional operation of the intended government would be *precisely the same*, if the [Necessary and Proper Clause and the Supremacy Clause] were entirely obliterated, as if they were repeated in every article. They are only declaratory of a truth, which would have resulted by the necessary and unavoidable implication from the very act of constituting a Federal Government, and vesting it with certain specified powers.[31]

Hamilton goes on, "What is a power but the faculty of doing a thing? What is the ability to do a thing but the power of employing the *means* necessary to its execution? What is a LEGISLATIVE power but a power of making LAWS?"[32]

---

[31] The Federalist No. 33, at 158 (Alexander Hamilton) (George W. Carey and James McClellan, eds., The Liberty Fund 2001) (emphasis added).

[32] *Id*. at 159.

21

Later, as Secretary of the Treasury in the Washington administration, Hamilton explained in his opinion on the Constitutionality of the bank of the United States that "[t]he relation between the measure and the end; between the nature of the mean employed toward the execution of a power, and the object of that power must be the criterion of constitutionality, not the more or less of necessity or utility."[33]

In his *McCulloch* opinion, Chief Justice Marshall explained his understanding of the meaning of the clause: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *McCulloch*, 17 U.S. at 421.

As Justice Thomas has explained, *McCulloch* created a two-part test for compliance with the Necessary and Proper Clause. "First, the law must be directed toward a 'legitimate' end, which *McCulloch* defines as one 'within the scope of the [C]onstitution'—that is, the powers expressly delegated to the Federal Government by some provision in the Constitution." *United States v. Comstock*, 560 U.S. 126, 160 (2010) (Thomas, J., dissenting) (alteration in original) (quoting *McCulloch*, 17 U.S. at 421). After all, as Hamilton explained, the Necessary and Proper Clause

---

[33] *American Political Thought* 136 (Kenneth M. Dolbeare & Michael S. Cummings eds., CQ Press 5th ed. 2004).

simply restates what was already implicit in the powers enumerated in the Constitution; it does not create new powers.[34]

> Second, there must be a necessary and proper fit between the "means" (the federal law) and the "end" (the enumerated power or powers) it is designed to serve . . . The means Congress selects will be deemed "necessary" if they are "appropriate" and "plainly adapted" to the exercise of an enumerated power, and "proper" if they are not otherwise "prohibited" by the Constitution and not "[in]consistent" with its "letter and spirit."

*Comstock*, 560 U.S. at 160-61 (Thomas, J., dissenting) (alteration in original) (quoting *McCulloch*, 17 U.S. at 421).

Finally, "no matter how 'necessary' or 'proper' an Act of Congress may be to its objective, Congress lacks authority to legislate if the objective is anything other than 'carrying into Execution' one or more of the Federal Government's enumerated powers." *Id*. at 161 (quoting U.S. Const. art. I, § 8, cl. 18). Since its decision in *McCulloch*, the Court's precedents "uniformly have maintained that the Necessary and Proper Clause is not an independent fount of congressional authority, but rather 'a *caveat* that Congress possesses all the means necessary to carry out the specifically granted 'foregoing' powers of § 8 'and all other Powers vested by this Constitution.'" *Id*. (emphasis in original) (quoting *Kinsella v. Singleton*, 361 U.S. 234, 247 (1960)) (citing *Carter v. Carter Coal Co.*, 298 U.S. 238, 56 (1936)).

---

[34] Hamilton, *supra* note 31 at 158.

As Justice Thomas has explained, while the Court has characterized *McCulloch v. Maryland* as creating "a means-end rationality test," *Sabri v. United States*, 541 U.S. 600, 611 (2004) (Thomas, J., concurring) (quoting *Sabri*, 541 U.S. at 605 (majority opinion)), "'[A]ppropriate' and 'plainly adapted' are hardly synonymous with 'means-end rationality.'" *Id.* at 612.

Because the CTA cannot survive under even the broader view of the Necessary and Proper Clause adopted by the Court, it certainly falls outside the much narrower original meaning as established by the Court in *McCulloch*. First, the CTA is not "'within the scope of the [C]onstitution'—that is, the powers expressly delegated to the Federal Government by some provision in the Constitution." *Comstock*, 560 U.S. at 160 (2010) (Thomas, J., dissenting) (alteration in original) (quoting *McCulloch*, 17 U.S. at 421). As noted in Section II above, Congress was not authorized to enact the CTA under the Commerce Clause. As the district court explained, the CTA is also beyond Congress's other enumerated powers. *NSBA*, 5:22-cv-1448-LCB.

Second, "[t]he means Congress selects will be deemed 'necessary' if they are 'appropriate' and 'plainly adapted' to the exercise of an enumerated power, and 'proper' if they are not otherwise 'prohibited' by the Constitution and not '[in]consistent' with its 'letter and spirit.'" *Comstock*, 560 U.S. at 160-61 (Thomas, J., dissenting) (alteration in original) (quoting *McCulloch*, 17 U.S. at 421). As noted above, the CTA is not "'plainly adapted' to the exercise of an enumerated power."

24

*Id*. Further, while the Constitution may not specifically prohibit the gathering of information related to incorporated entities' beneficial owners, it is inconsistent with the spirit of the Constitution in at least one way. As noted in Section II, the Constitution was intended to create unity, not uniformity among the states. Thus, national policies like the CTA that seek to create uniform standards for activities that take place within individual states do not comport with the spirit of the Constitution.

Thus, the Constitution does not grant to Congress, either in the Commerce Clause or the Necessary and Proper Clause, the power to enact the CTA. Because that authority is also not granted elsewhere in the Constitution, it represents an unconstitutional exercise of power on the part of Congress. For that reason, this Court should affirm the district court's decision.

## CONCLUSION

For the forgoing reasons, this Court should rule for Plaintiffs-Appellees and uphold the district court's decision.

Respectfully submitted,

/s/ J. Marc Wheat
J. MARC WHEAT
  *Counsel of Record*
ADVANCING AMERICAN FREEDOM, INC.
801 Pennsylvania Avenue, N.W.
Suite 930
Washington, D.C. 20004

(202) 780-4848
MWheat@advancingamericanfreedom.com

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

The foregoing Brief complies with the type-volume limit of Fed. R. App. P. 29(a)(5), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,181 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ J. Marc Wheat
J. Marc Wheat

27

**CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2024, an electronic copy of the foregoing brief was filed with the Clerk of this Court using the CM/ECF system, which will serve all counsel of record.

/s/ J. Marc Wheat
J. Marc Wheat