No. 24-10736

=============================================================

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

◆

NATIONAL SMALL BUSINESS UNITED D.B.A. NATIONAL SMALL
BUSINESS ASSOCIATION and ISAAC WINKLES,

*Plaintiffs-Appellees*,

v.

U.S. DEPARTMENT OF THE TREASURY, et al.,

*Defendants-Appellants*.

◆

On Appeal from the United States District Court
for the Northern District of Alabama (No. 5:22-cv-1448-LCB)

=============================================================

## BRIEF OF AMICI CURIAE STATES OF WEST VIRGINIA,
## KANSAS, SOUTH CAROLINA, AND 19 OTHER STATES
## IN SUPPORT OF APPELLEES AND AFFIRMANCE

=============================================================

PATRICK MORRISEY
  *Attorney General*

OFFICE OF THE WEST
VIRGINIA ATTORNEY
GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
michael.r.williams@wvago.gov

LINDSAY S. SEE
  *Solicitor General*

MICHAEL R. WILLIAMS
  *Principal Deputy*
  *Solicitor General*
  *Counsel of Record*

GRANT A. NEWMAN
  *Assistant Solicitor General*

*Counsel for* Amicus Curiae *State of West Virginia*

[additional counsel listed at end]

*NSBA v. Yellen, 24-10736*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 and 26.1-2, the undersigned counsel certifies that in addition to the parties listed in the parties' briefs, the following listed persons may have an interest in the outcome of this case:

Bailey, Andrew, Missouri Attorney General

Bird, Brenna, Iowa Attorney General

Cameron, Daniel, Kentucky Attorney General

Carr, Christopher M., Georgia Attorney General

Commonwealth of Kentucky

Commonwealth of Virginia

Cook, Robert D., Counsel for Amicus Curiae, State of South Carolina

Fitch, Lynn, Mississippi Attorney General

Griffin, Tim, Arkansas Attorney General

Hilgers, Michael T., Nebraska Attorney General

Labrador, Raúl R., Idaho Attorney General

Hill, Bridget, Wyoming Attorney General

Hydrick, Thomas T., Counsel for Amicus Curiae, State of South Carolina

Jackley, Marty, South Dakota Attorney General

Kambli, Abhishek S., Counsel for Amicus Curiae, State of Kansas

Kobach, Kris W., Kansas Attorney General

Knudsen, Austin, Montana Attorney General

Marshall, Steve, Alabama Attorney General

Miyares, Jason, Virginia Attorney General

Moody, Ashley, Florida Attorney General

Morrisey, Patrick, West Virginia Attorney General

Murrill, Liz, Louisiana Attorney General

Newman, Grant A., Counsel for Amicus Curiae, State of West Virginia

Paxton, Ken, Texas Attorney General

Powell, Anthony J., Counsel for Amicus Curiae, State of Kansas

See, Lindsay S., Counsel for Amicus Curiae, State of West Virginia

Skrmetti, Jonathan, Tennessee Attorney General and Reporter

Smith Jr., J. Emory, Counsel for Amicus Curiae, State of South Carolina

Spate, Joseph D., Counsel for Amicus Curiae, State of South Carolina

State of Alabama

State of Arkansas

State of Florida

State of Georgia

State of Idaho

State of Iowa

State of Kansas

State of Louisiana

State of Mississippi

State of Missouri

State of Montana

*NSBA v. Yellen, 24-10736*

State of Nebraska

State of Ohio

State of South Carolina

State of South Dakota

State of Tennessee

State of Texas

State of Utah

State of West Virginia

State of Wyoming

Reyes, Sean, Utah Attorney General

Williams, Michael R., Counsel for Amicus Curiae, State of West Virginia

Wilson, Alan, South Carolina Attorney General

Yost, Dave, Ohio Attorney General

/s/ Michael R. Williams
Michael R. Williams

# TABLE OF CONTENTS

Introduction and Interests of *Amici Curiae* ........................................................1

Statement of the Issues.............................................................................2

Summary of the Argument ........................................................................3

Argument ..................................................................................................4

I.   The CTA Regulates Purely Local Concerns That The Constitution
     Leaves To The States ........................................................................4

     A.   Federalism drives the analysis when Congress intrudes into
          corporate regulation ............................................................5

     B.   Federalism confirms that the Commerce Clause cannot justify
          the CTA.....................................................................14

II.  The CTA Harms The States And Their Residents...................................22

     A.   The CTA's costs are massive..................................................23

     B.   The CTA's toll hurts the States' economies.........................28

Conclusion................................................................................................32

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alden v. Maine*,
    527 U.S. 706 (1999) .................................................................. 6

*Bond v. United States*,
    572 U.S. 844 (2014) ................................................ 9, 10, 12, 17

*Brzonkala v. Va. Polytechnic Inst. & State Univ.*,
    169 F.3d 820 (4th Cir. 1999) ................................................. 17

*CTS Corp. v. Dynamics Corp. of Am.*,
    481 U.S. 69 (1987) ............................................... 2, 6, 8, 11

*Freedman v. magicJack Vocaltec Ltd.*,
    963 F.3d 1125 (11th Cir. 2020) ............................................... 6

*Gonzales v. Raich*,
    545 U.S. 1 (2005) ........................................ 21, 22, 23, 24, 25, 26

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ............................................................. 8, 9

*Jones v. United States*,
    529 U.S. 848 (2000) ............................................................... 17

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991) ................................................................... 6

*NLRB v. Jones & Laughlin Steel Corp.*,
    301 U.S. 1 (1937) ................................................................... 15

*Springboards to Educ., Inc. v. McAllen Indep. Sch. Dist.*,
    62 F.4th 174 (5th Cir. 2023) ................................................... 5

*Trs. of Dartmouth Coll. v. Woodward*,
    17 U.S. (4 Wheat.) 518 (1819) ................................................. 6

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*,
    590 U.S. 604 (2020) ................................................................. 9

*United States v. Ballinger*,
    395 F.3d 1218 (11th Cir. 2005) ............................................. 18

*United States v. Bass,*
  404 U.S. 336 (1971)............................................................................9

*United States v. Lopez,*
  514 U.S. 549 (1995).......................................... 15, 16, 18, 19, 20, 21, 22

*United States v. Morrison,*
  529 U.S. 598 (2000)................................................15, 16, 17, 19, 20

*West Virgina v. EPA,*
  597 U.S. 697 (2022)........................................................................14

*Wickard v. Filburn,*
  317 U.S. 111 (1942)........................................................................20

*Will v. Mich. Dep't of State Police,*
  491 U.S. 58 (1989)..........................................................................9

## Constitutional Provision

U.S. Const. art. 1, § 8, cl. 3 ...........................................................19

## Statutes

15 Pa. Cons. Stat. § 403 .................................................................19

31 U.S.C. § 5336 ..............................................1, 11, 18, 26, 27, 28

31 U.S.C. § 5336 ...........................................................1, 11, 18

Canada Business Corporations Act, R.S.C. 1985, c. C-44...................8

Pub. L. No. 116-283, § 6402............................................................11

## Regulation

87 Fed. Reg. 59,498 (Sept. 30, 2022) .....................23, 24, 25, 26, 27, 29

## Other Authorities

DUSTIN CHAMBERS, ET AL.,
HOW DO FEDERAL REGULATIONS AFFECT CONSUMER
PRICES? AN ANALYSIS OF THE REGRESSIVE EFFECTS OF
REGULATION (2019) ............................................................30

Carl W. Mills,
*Breach of Fiduciary Duty as Securities Fraud:* Sec v.
Chancellor Corp.,
10 FORDHAM J. CORP. & FIN. L. 439 (2005) ...............................7, 8

Christine Fletcher,
*Navigating the Corporate Transparency Act: Estate Plan
Implications*, FORBES (Mar. 4, 2024, 3:49 PM) ...........................30

Erin C. Blondel,
*The Structure of Criminal Federalism,*
98 NOTRE DAME L. REV. 1037 (2023) ....................................11

Federal Rule of Appellate Procedure 29 ...................................2

Jeffrey J. Polich,
*Judicial Review and the Small Business Regulatory
Enforcement Fairness Act,*
41 WM. & MARY L. REV. 1425 (2000) .....................................29

Jens Dammann & Matthias Schündeln,
*The Incorporation Choices of Privately Held Corporations,*
27 J.L. ECON. & ORG. 79 (2011) ..........................................7

Kevin L. Shepherd,
*Compliance with the New Reporting Regulations Under the
Corporate Transparency Act,*
40 PRAC. REAL EST. LAW. 3 (Jan. 2024).................................10

Matthew B. Edwards, D. Parker Baker III,
*The Basic Ins and Outs of the Corporate Transparency Act,*
35 S.C. LAWYER 24 (Sept. 2023)........................................26

Reid Kress Weisbord & Stewart E. Sterk,
*The Commodification of Public Land Records,*
97 NOTRE DAME L. REV. 507 (2022) ....................................13

Richard J. Pierce, Jr.,
*The Combination of* Chevron *and Political Polarity Has
Awful Effects*,
70 DUKE L.J. ONLINE 91 (2021) ....................................................30

Sandra Feldman,
*Nonprofit Organization Considerations for FinCEN
Beneficial Ownership Information Reporting Requirements*,
WOLTERS KLUWER (Feb. 27, 2024) ................................................30

Lisa C. Thompson,
*Thou Shalt Report: CYA from the CTA*,
ARIZ. ATTORNEY (Dec. 2023) ........................................................12

William E.H. Quick,
*The Corporate Transparency Act: A New Federal Reporting
Obligation That Impacts Almost Everyone*,
79 J. MO. B. 270 (2023)..............................................................10

## INTRODUCTION AND INTERESTS OF *AMICI CURIAE*

The federal government thinks federalism is a non-issue when it comes to the Corporate Transparency Act, 31 U.S.C. § 5336. It insists there's "nothing to see here" because the statute "leaves untouched the States' authority to determine which entities can be incorporated and the means by which they are incorporated." Appellants' Br. 32. And it contends the States have nothing to say here because the comments "Secretaries of State and other State entities" submitted did "not claim that the CTA amends existing State incorporation requirements." Br. in Support of Defs.' Mot. to Dismiss, or, in the Alternative, Cross-Motion for Sum. Judgment, and Opp. to Pls.' Mot. for Sum. Judgment, Dkt. No. 24-1, at 54 (N.D. Ala. Mar. 29, 2023).

But federalism concerns *are* something to see here, and the States *do* have something to say. The district court got it right when it recognized that the CTA takes an unprecedented swipe at the quintessentially state-controlled area of corporate law. And the costs from that unlawful play are staggering for the States and the people who live and work there.

The *amici* States of West Virginia, Kansas, South Carolina, Alabama, Arkansas, Florida, Georgia, Idaho, Iowa, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, South Dakota, Tennessee, Texas, Utah,

1

Virginia, and Wyoming take seriously our longstanding and primary role in regulating corporations—that is, "entities whose very existence and attributes are a product of state law." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987). We are also concerned with Congress overstepping into our traditional zones of authority when it abuses its enumerated Commerce Clause power. And we are sensitive to the ways burdensome legislation (and its implementing regulations) hurt our residents and small businesses. The CTA implicates all three of these concerns. Appellees have already explained the law's many problems. In this brief filed under Federal Rule of Appellate Procedure 29(a)(2), the States further explain how the CTA disrupts the balance of federalism—on which our constitutional system depends—and burdens too many real Americans along the way.

## STATEMENT OF THE ISSUES

Did Congress have constitutional authority to enact the CTA, which requires many corporations (and even some non-commercial entities) to report information about their beneficial owners before they engage in commerce, interstate or otherwise?

## SUMMARY OF THE ARGUMENT

**I.A.** The States' authority to regulate the domestic corporations that do business within their borders is about as traditional as state powers come. Corporations are creatures of state law. And the States have kept primary watch over corporate affairs throughout the Nation's history. Courts are rightly skeptical of laws that displace traditional state powers like these, and the district court was right to put the CTA in that unlawful category. In purpose and effect, the CTA displaces the States when it comes to the requirements that do—and do not—attach to an entity's incorporation decisions.

**I.B.** The federal government's claim to Commerce Clause authority shows the CTA's federalism distaste for what it is. Modern Commerce Clause jurisprudence insists that federalism-based themes infuse the analysis. The Supreme Court holds the line when Congress tries to stretch its commerce power into something approaching the general police power that only the States hold. Congress did just that in the CTA because the law regulates non-commercial conduct that does not substantially affect the interstate economy.

**II.** As a practical matter, the CTA will harm the States and their residents—too much. Even the federal agency that enforces the CTA, the

Financial Crimes Enforcement Network, or FinCEN, doesn't say otherwise. FinCEN admits that in just the first two years after its implementing rule goes into effect, American small businesses will be forced to spend over 150 million hours and nearly $30 billion trying to comply with the CTA's reporting requirements. And those estimates are likely far too low. The States will also face significant costs complying with their own requirements under the law in educating the regulated public and offering up sensitive data to FinCEN. All of this comes at the expense of our economies and the people who make them run.

## ARGUMENT

### I. The CTA Regulates Purely Local Concerns That The Constitution Leaves To The States.

Some statutes wrongly blur the line between state and federal powers even though they stop short of direct preemption. The CTA is one of them. So letting federalism and state sovereignty concerns permeate the analysis only confirms the district court's black-letter law holdings. This Court should affirm.

**A.   Federalism drives the analysis when Congress intrudes into corporate regulation.**

**1.**   Though "the Federalists and Anti-Federalists" rarely agreed completely on anything, they all insisted that "corporations were *not* sovereigns." *Springboards to Educ., Inc. v. McAllen Indep. Sch. Dist.*, 62 F.4th 174, 191 (5th Cir. 2023) (Oldham, J., concurring) (emphasis added). Instead, the Founding "embraced the English conception of corporations"— meaning corporations "could only be created with the consent of the sovereign." *Id.* (citing 1 WILLIAM BLACKSTONE, COMMENTARIES *460). The Federalists would have pushed further by enshrining into law the idea that the States themselves were "akin to corporations," with "mere 'corporate rights.'" *Id.* (quoting 1 M. FARRAND, RECORDS OF THE FEDERAL CONVENTION OF 1787, at 323, 328 (1907)). But "[t]he Anti-Federalists responded strongly and persuasively" and "proved triumphant" when the "Federalists eventually conceded that States were not corporations and hence would retain sovereign immunity." *Id.* at 191-92.

From that debate flowed one of our country's most lasting norms: the Constitution may grant "broad power to Congress," but "our federalism *requires* that Congress treat the States in a manner consistent with their

status as residuary sovereigns and joint participants in the governance of the Nation." *Alden v. Maine*, 527 U.S. 706, 748 (1999) (emphasis added).

A key way the States exercise that sovereign status is in regulating those same corporations the Federalists once likened them to. "A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law." *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 636, 4 L. Ed. 629 (1819). That means (much like federal agencies created and limited by statute) a corporation "possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence." *Id.* And it's *state* law that does the creating. *E.g.*, *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("state law" "is the font of corporate directors' powers" (quoting *Burks v. Lasker*, 441 U.S. 471, 478 (1979))). So as the Supreme Court has long recognized, when States pass "corporate governance" laws, they are regulating "entities whose very existence and attributes are a product of state law." *CTS Corp.*, 481 U.S. at 89. Or as this Court recently put it: "state-law standards create the boundaries within which a corporation must operate both internally and externally." *Freedman v. magicJack Vocaltec Ltd.*, 963 F.3d 1125, 1132-33 (11th Cir. 2020) (cleaned up).

Part and parcel with federalism principles and the States' traditional powers is that the States get to be "laboratories for experimentation with various regulatory regimes."  Carl W. Mills, *Breach of Fiduciary Duty as Securities Fraud: Sec v. Chancellor Corp.*, 10 FORDHAM J. CORP. & FIN. L. 439, 447 (2005).  In other words, federalism expects different States to make different choices when it comes to corporate law.  Corporations, in turn, "can shop around for attractive corporate domiciles" by comparing those different "legal regimes."  *Id.*; *see also* Jens Dammann & Matthias Schündeln, *The Incorporation Choices of Privately Held Corporations*, 27 J.L. ECON. & ORG. 79, 79 (2011) (corporations "choose the corporate law applicable to their internal affairs by incorporating in the state of their choice").  And the States can benefit (or not) from the consequences of their decisions.  *See* Mills, *supra*, at 447 (describing benefits that flow to the States when corporations set up shop, including "franchise taxes," "fee revenues," and "patronage").

Whether this sort of competition creates a "race to the bottom," a "race to the top," or something in between is a matter of "heated debate."  Mills, *supra*, at 448.  But that doesn't change the load-bearing reality that the States get to choose their own course.  Nor the fact that our constitutional system believes that the States' ability to adopt "alternative solutions to the many

7

difficult regulatory problems that arise in corporate law" is valuable—and "cannot be adequately replaced by a uniform federal standard." *Id.* at 498 (quoting STEPHEN M. BAINBRIDGE, THE CREEPING FEDERALIZATION OF CORPORATE LAW, REGULATION, 26, 27-28 (Apr. 1, 2003)). Although other nations provide the ability to incorporate federally, for instance, *see, e.g.*, Canada Business Corporations Act, R.S.C. 1985, c. C-44, we never have. It remains just as true now as at the Founding that incorporation specifically is a state function. *E.g.*, Mills, *supra*, at 445 (explaining how States "set the rules for incorporation," have "the ability to create corporations" in the first place, and keep "primary responsibility for regulating internal corporate affairs").

In short, "[n]o principle of corporation law and practice" has been "more firmly established than a State's authority to regulate domestic corporations." *CTS Corp.*, 481 U.S. at 89.

**2.** Courts are rightly skeptical when a statute jumps into an area of traditional state authority like that. They do not presume Congress meant to go there—Congress's ability to "legislate in areas traditionally regulated by the States" is an "extraordinary power in a federalist system," so courts "must assume Congress does not exercise [that power] lightly." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Courts instead adopt non-federalism-erasing

constructions unless Congress deployed "unmistakably," *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (cleaned up), or "exceedingly" clear language "to place [its] intent beyond dispute," *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 621-22 (2020).  Short of that, statutes "will not be deemed to have significantly changed" the constitutional "balance" favoring the States' traditional zones of authority.  *United States v. Bass*, 404 U.S. 336, 349 & n.16 (1971) (collecting cases).

That analysis admittedly carries less of a punch where Congress made its intent to intrude into the States' realm clear (though the Tenth Amendment can also have something to say about cases like that).  But the "background principle[s]" federalism brings to the table, including skepticism about whether and how far Congress can mess with "traditional state authority," *Bond v. United States*, 572 U.S. 844, 858 (2014), shouldn't fade entirely.  They are "grounded in the very structure of the Constitution," after all, and "protect[] the liberty of the individual from arbitrary power."  *Id.* at 862-63 (cleaned up); *see also*, *e.g.*, *Gregory*, 501 U.S. at 458 ("In the tension between federal and state power lies the promise of liberty.").  Precepts that vital might well (as some have said) lead courts to "reason[] backwards" by giving a statute's "disruptive effect on the federal-state balance" primary weight.

*Bond*, 572 U.S. at 870 (Scalia, J., concurring) (cleaned up) (rejecting majority's approach but explaining he would also limit Congress's legislative power under strict view of Necessary and Proper Clause). And if that can be true where the Supreme Court had never "held that a statute implementing a valid treaty exceeds Congress's enumerated powers," *id.* at 855 (majority op.), it stands to reason federalism norms should inform how much slack courts afford the federal government where (as here) it relies on powers with which Congress has had more mixed success.

**3.** So the CTA's constitutionality brings with it this baggage. And the CTA raises all the federalism red flags.

"At its core, the CTA" reflects Congress's choice to "embrace a reporting regime where the federal government, not the states, would collect, hold, and share beneficial ownership information." Kevin L. Shepherd, *Compliance with the New Reporting Regulations Under the Corporate Transparency Act*, 40 PRAC. REAL EST. LAW. 3, 6 (Jan. 2024). And it shifts to the federal level "oversight to the regulation of business entities and their operations" which "traditionally has resided with U.S. states." William E.H. Quick, *The Corporate Transparency Act: A New Federal Reporting Obligation That Impacts Almost Everyone*, 79 J. MO. B. 270, 273 (2023). True,

it doesn't touch directly on state incorporation laws or require States to do the federal government's work for it.  But by intent and scope, it still overtakes too much state-law ground.

Start with its purposes.  The "sense of Congress" was that it needed to "set a clear, Federal standard for incorporation practices."  Pub. L. No. 116-283, § 6402(5)(A) (appended as a statutory note to 31 U.S.C. § 5336).  Given that the first rule of "corporation law and practice" is that the States—not Congress—"regulate domestic corporations," *CTS Corp.*, 481 U.S. at 89, the CTA starts on shaky ground.

Its remaining purposes aren't much better—especially "enabl[ing] … law enforcement efforts to counter money laundering" and "bring[ing] the United States into compliance with international anti-money laundering" standards.  Pub. L. No. 116-283, § 6402(5)(D)-(E); *see also* Appellants' Br. 3 (CTA closed purported "gap in the government's ability to detect and prosecute financial crime").  Money laundering and related crimes are serious.  But when it comes to law enforcement, it's the States who have "near-complete autonomy, historical primacy, and enormous institutional advantages."  Erin C. Blondel, *The Structure of Criminal Federalism*, 98 NOTRE DAME L. REV. 1037, 1099 (2023).  So the default in criminal matters is for the "federal system"

11

to "provid[e] a thin, roving backup to the states' broad defensive line." *Id.* at 1099. Congress needs to rely on more before flipping that default and "convert[ing] an astonishing amount of traditionally local criminal conduct into a matter for federal enforcement." *Bond*, 572 U.S. at 863 (cleaned up). Particularly so when the ripple effects of "[s]ubtracting the states from an area" of traditional enforcement often "push federal enforcement to build up the capacity to take on more primary responsibilities, which increases the overall federal footprint." Blondel, *supra*, at 1098.

The statute's scope underscores the problem. "Despite the limited number of bad actors who form the target of the CTA, the law casts a very wide net"—so wide that "[m]uch of the business community swept into" it "will be unwitting and innocent bycatch." Quick, *supra*, at 271; *see also* Lisa C. Thompson, *Thou Shalt Report: CYA from the CTA*, ARIZ. ATTORNEY 28 (Dec. 2023) (explaining that virtually everyone in the country "will know" someone associated with millions of existing and future entities who "will be subject to [the CTA's] reporting requirements"). The financial and administrative burdens for these many entities are huge. *See infra* Part II. The law's "reporting obligations" also "touch on the sensitive issue of personal anonymity historically enjoyed by U.S. beneficial owners." Quick, *supra*, at

12

273.  *And* they create new risks of "serious civil and criminal penalties," including thousands in fines and penalties and up to 2 years in prison, for the thousands of reporting companies doing legal business in the States. Appx.178.

All this shows the CTA as an example of "overly punitive" federal lawmaking that strips law-abiding corporations of the ability to "check excessive regulation by opting out of federal regulation and selecting a different jurisdiction for incorporation." Mills, *supra*, at 498. When left to the States as the constitutional structure expects, comparing State-by-State financial crime rates can test how needed measures like this might be. Not so with federally imposed uniformity. And the States and their residents must bear these burdens for a statute whose "effectiveness may be undercut" because it relies on "money launderers who, by definition, are already willing lawbreakers," to "comply voluntarily" with the CTA's reporting mandate. Reid Kress Weisbord & Stewart E. Sterk, *The Commodification of Public Land Records*, 97 NOTRE DAME L. REV. 507, 557-58 (2022).

So the CTA lands not with the elegance of a tailored and tested enforcement mechanism, but with the blunt force of federal overreach. And the district court was right to treat the federal government's claimed bases of

authority with skepticism because of it.  Cutting away the States' space for "social and economic experiments" in their zones of traditional authority gets the Constitution's fondness for "more local and more accountable" government backward.  *West Virgina v. EPA*, 597 U.S. 697, 739 (2022) (Gorsuch & Alito, JJ., concurring) (cleaned up).  In a constitutional case like this, the federal-state asymmetry a statute leaves behind matters.

### B.  Federalism confirms that the Commerce Clause cannot justify the CTA.

The district court was right on every score in striking the CTA down, as Appellees explain.  That's especially true when it comes to the federal government's Commerce Clause theory.  Holding the line on Congress's enumerated power to regulate interstate commerce matters precisely because erasing it also erases the States' constitutional power to regulate the truly local.  Here, the CTA's attempt to usurp the States' role by regulating entities at the time they incorporate and before they engage in commerce of *any* stripe—intra- or interstate—is wrong.  The Court should affirm because allowing Congress to regulate incorporation in this manner would blur the distinction between what is local and what is national in a way the Constitution and its federalism framework discussed above does not allow.

1. Start from the beginning. Article 1, section 8, clause 3 of the Constitution grants Congress power "[t]o regulate Commerce with foreign Nations, and among the several [S]tates, and with the Indian Tribes." Courts "invalidate a congressional enactment only upon a plain showing that Congress has exceeded [the Commerce Clause's] bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000). But Congress's power here is not limitless, and courts evaluate purported exercises "in the light of our dual system of government." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937). Congress may not extend its power "so as to embrace effects upon interstate commerce so indirect" as to "effectually obliterate the distinction between what is national and what is local." *Id.* The "completely centralized government" a rule like that would allow, *id.*, leaves no room for the States.

Next take two of the seminal cases in modern Commerce Clause jurisprudence: *United States v. Lopez*, 514 U.S. 549 (1995) and *Morrison*, 529 U.S. 598. Recognizing that the Commerce Clause's distinction between national and local power could have been seen as on a path to obliteration in the prior decades, both cases insist that limit still matters. And though the Court focused on several factors that doomed the laws at issue, both cases also highlight federalism-protecting themes that required the Court's results.

15

Existing precedent had come dangerously close to converting "congressional authority under the Commerce Clause to a general police power *of the sort retained by the States*." *Lopez*, 514 U.S. at 567 (emphasis added). So the Court put an end to the federal government's reliance on tenuous causal chains that tried to dress up local issues as affecting interstate commerce. In *Morrison*, for instance, the Court could "think of no better example of the police power, which the Founders denied the National Government and reposed in the States," than the type of criminal law Congress had enacted. 529 U.S. at 618. Adopting the federal government's approach would have let Congress reach most "*any* crime," *id.* at 615, as well as legislate in other quintessential state zones like "family law and direct regulation of education," *Lopez*, 514 U.S. at 565.

That result would have been flatly at odds with the Framers' intent—their "insight" was "that freedom was enhanced by the creation of two governments, not one." *Lopez*, 514 at 576 (Kennedy, J., concurring). Preserving the States' sovereignty protects that design, and that freedom. Concluding otherwise, in the Court's view, would have been "remarkable" because it would "undermine[] th[e] central principle of our constitutional system" that "the people's rights would be secured by the division of power"

16

between the federal government and the States. *Morrison*, 529 U.S. at 616 n.7 (collecting cases).

Even before *Morrison*, lower courts had started to notice the Supreme Court's "considered judgments" that "incrementally, but jealously, enforced the structural limits on congressional power that inhere in Our Federalism." *Brzonkala v. Va. Polytechnic Inst. & State Univ.*, 169 F.3d 820, 826 (4th Cir. 1999), *aff'd sub nom. Morrison*, 529 U.S. 598. And the pattern continued. Just one other example: in *Jones v. United States*, 529 U.S. 848 (2000), the Court refused to extend the federal arson statute to "an owner-occupied private residence" in large part because "arson is a paradigmatic common-law state crime" and the Court was loathe to "significantly change the federal-state balance" in that way. *Bond*, 572 U.S. at 859 (cleaned up). The common denominator at work in all these cases is that "power bestowed and power withheld under the Constitution" is a "foundational principle[]" of federalism—even when allowing the federal government more power may seem "expedient." *Brzonkala*, 169 F.3d at 826. In short, the Commerce Clause's boundary line is "not solely a matter of legislative grace," but a constitutional imperative. *Morrison*, 529 U.S. at 616.

**2.** Given all that, the district court was right to reject the CTA on Commerce Clause grounds. It should be easy enough first to reject the federal government's idea that corporate incorporation is a "channel[]" or "instrumentalit[y] of interstate commerce." *Lopez*, 514 U.S. at 558. "Channels" mean "the interstate transportation routes through which persons and goods move," while "instrumentalities" refers to "the people and things themselves moving in commerce, including automobiles, airplanes, boats, and shipments of goods." *United States v. Ballinger*, 395 F.3d 1218, 1225-26 (11th Cir. 2005) (cleaned up). The CTA deals with reporting requirements for beneficial owner information when an entity incorporates, *see generally* 31 U.S.C. § 5336—things that neither move themselves nor create a route for others.

The CTA doesn't "substantially affect" interstate commerce, either. *Lopez*, 514 U.S. at 559. Again, we're dealing with incorporation, the act of forming a legal corporation under state law. It is a preliminary step *before* commercial action; at the point of incorporation, a company is not engaging in any commerce at all. In fact, it's not a certainty that an incorporated entity will ever engage in commerce. State statutes envision non-business activities as valid for incorporated entities, for example, like "[m]aintaining, defending,

18

mediating, arbitrating, or settling" actions or engaging in "activit[ies] concerning its internal affairs." 15 Pa. Cons. Stat. § 403(a)(1)-(2). Even those who incorporate with the intent of engaging in commerce can later decide not to do business for various reasons. So without more, the act of incorporation and any reporting obligations that come with it cannot be said to be commerce.

Arguing that the act of incorporation substantially affects interstate commerce instead requires Rube Goldberg-style analysis similar to what the Court rejected in *Lopez* and *Morrison*. In *Lopez*, the federal government unsuccessfully argued that possessing a firearm in a local school zone substantially affected interstate commerce because that possession might result in violent crime that could affect the national economy through increased insurance costs and by reducing Americans' willingness to travel to areas they deem unsafe. 514 U.S. at 563-64. Likewise, *Morrison* rejected the argument that gender-motivated violence substantially affects interstate commerce based on congressional findings that it could deter potential victims from interstate travel, which could reduce transactions with businesses and places involved in interstate commerce. 529 U.S. at 615-17. The same principles apply here because the Commerce Clause rationale turns on what *could* happen after incorporation—again, no one is engaging in economic

19

activity at the early stage the CTA targets. But Congress needs more than "inference[s]" before trying to exert "a general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567.

Indeed, the CTA even lacks a jurisdictional element—a textual requirement for case-by-case determinations that incorporation activity substantially affects interstate commerce. As in *Lopez* and *Morrison*, "no express jurisdictional element which might limit [the statutes'] reach to a discrete" conduct that has "an explicit connection with or effect on interstate commerce" confirms the constitutional defect. *Morrison*, 529 U.S. at 611-12 (quoting *Lopez*, 514 U.S. at 562). Nor is it enough that much of what a corporation may do after incorporation affects interstate commerce. Congress can regulate areas of traditional state responsibility, like some parts of corporate conduct, so long as those areas also "substantially affect interstate commerce." *Lopez*, 514 U.S. at 566. But courts still look at the particular assertion of authority at issue—"though broad," Congress's power in these overlapping contexts "does not include the authority to regulate each and every aspect" of the historically state-law matter. *Id.*

Finally, the CTA looks nothing like the statutes the Court has upheld under Congress's commerce power. Even *Wickard v. Filburn*, 317 U.S. 111

(1942)—"perhaps the most far reaching example of Commerce Clause authority over intrastate activity"—"involved *economic* activity." *Lopez*, 514 U.S. at 560 (emphasis added). Incorporation is a purely legal activity, not a good or service or otherwise traditionally understood as commerce. And *Gonzales v. Raich*, 545 U.S. 1, 22 (2005), where the Court held that Congress had authority to regulate local cultivation and possession of marijuana, doesn't help the federal government, either. Unlike this case, no one in *Raich* disputed that the Controlled Substances Act "was well within Congress' commerce power." 545 U.S. at 15. Only "individual applications of a concededly valid statutory scheme" were at stake. *Id.* at 23. Also unlike here, *Raich* involved "a lengthy and detailed statute creating a comprehensive framework for regulating the production, distribution, and possession" of the whole host of illegal substances. *Id.* at 24. So exempting the local application would have "undercut" that comprehensive and indisputably interstate commercial regime. *Id.* at 18. No broader, comprehensive regulatory scheme exists to be frustrated here. And it's easy to see why not: Congress *can't* regulate the "total incidence" of corporate practices that might "pose[] a threat to a national market," *id.* at 17 (cleaned up), because that goal would quickly extend to all

21

aspects of corporate law—which no one thinks is "well within Congress' commerce power," *id.* at 15.

*Raich*, then, is about starting with federal power and sweeping in local applications needed for uniformity. It's not about reaching into the States' zone from the get-go. So even it supports the idea that federalism's background principles come home to roost in Commerce Clause cases. Congress cannot claim a theory of power that makes it "difficult to perceive any limitation," "even in areas … where States historically have been sovereign." *Lopez*, 514 U.S. at 564. If the Court were to find this a close or difficult case, then, federalism's protections generally and the State-protecting philosophy behind Commerce Clause jurisprudence specifically would say to resolve it on the side of keeping historically state-law matters under state control.

## II. The CTA Harms The States And Their Residents.

Apart from its legal flaws, the CTA also significantly injures the States and our residents and small businesses. From hefty compliance costs that business owners shoulder directly to regulatory burdens that the States will have to incur, the CTA's effects will be felt far and wide. It creates more harms

than it purports to solve—making the federalism intrusion even more concrete.

### A. The CTA's costs are massive.

Complying with the CTA's demands will cost billions of dollars and tens of millions of personnel hours. *First*, consider the time demands for small businesses across the country. FinCEN estimates the burden to file initial reports will range between 90 minutes for reporting companies with a "simple structure," to 370 minutes for those with an "intermediate structure," to 650 minutes for those whose structure is "complex." 87 Fed. Reg. 59,498, 59,573 (Sept. 30, 2022). Those estimates translate to *118,572,335* hours nationwide filing reports in the CTA's first year—followed by another 18,204,421 hours in its second. *Id.* at 59,581.

Bad enough as those admitted numbers are on their own, they're likely underestimates. For example, the time FinCEN allots for a reporting company with a "simple structure" presumes that a single employee will handle the task and will spend a mere 90 minutes to read and "understand" the statutory and regulatory requirements and definitions; "[i]dentify, collect, and review information about beneficial owners and company applicants"; and "fill out and file [the] report." *Id.* at 59,573. Expecting all that to happen well

23

before lunch on a single day is unrealistic—especially when a botched rush job could have severe consequences. (More on that below.)

Indeed, when it came to its rule implementing the CTA, FinCEN had many public comments explaining how its "estimated time burden … for filing initial reports was unrealistically low given the complexity of the requirements." 87 Fed. Reg. at 59,553. As the U.S. Chamber of Commerce explained, for instance, "FinCEN should not underestimate the significant burden that will be caused by simply trying to understand beneficial ownership requirements. Disclosure of beneficial ownership is *an entirely new federal requirement*, from an agency that *most businesses are unfamiliar with*." Comment of U.S. Chamber of Commerce, Dkt. No. FINCEN-2021-0005, at 3 (May 7, 2021), bit.ly/3V0PThm (emphases added). Another commenter explained, reasonably enough, "that the 20[-]minute allotment to read the form and understand the requirement from the initial report time estimate should be increased to no fewer than 4.5 hours per report." 87 Fed. Reg. at 59,553. Still another explained how FinCEN's estimates "are off by at least 400 percent and quite likely several times that." *Id.* at 59,554.

FinCEN's already-faulty initial numbers don't even include the time needed to apply for and update FinCEN identifiers—the "unique identifying

24

number[s] that FinCEN will issue to individuals or reporting companies upon request, subject to certain conditions." 87 Fed. Reg. at 59,507. Here, FinCEN estimates an additional time burden of 110,553 hours in year one and 21,091 hours in year two. *Id.* at 59,581. Then add to *that* the time to update initial filings after circumstances like name and address changes, identification number expirations, beneficial owners who pass away, or "management decision[s] resulting in a change in beneficial owner." *Id.* at 59,574. Companies must file updates within 30 calendar days of each of these triggering circumstances, *id.* at 59,592, requiring (again, under FinCEN's own and questionably low estimates) yet another 7,657,096 hours in year one, *id.* at 59,581. And unlike the other burdens, this one goes *up* in future years: FinCEN estimates 16,826,105 hours will be needed the second year. *Id.*

*Second*, the financial toll of all this is severe. FinCEN estimates each reporting company will incur between $85.14 and $2,614.87 to file an initial report. 87 Fed. Reg. at 59,559. "If all 32,556,929 existing reporting companies have to incur [that expense] in the same single year, the aggregate cost … is approximately $21.7 billion for Year 1" and $3.3 billion after. *Id.* at 59,559, 59,581. FinCEN thinks updating reports will cost another $3.3 billion the first two years. *Id.* at 59,581. Put another way, complying with the CTA will impose

25

"undoubtedly significant costs of approximately *$22.8 billion* in the first year and *$5.6 billion each year thereafter*." *Id.* at 59,582 (emphases added).

Here too, FinCEN's figures are incomplete. They include employee wages (based on the too-low hour estimates discussed above) and costs to engage professionals like attorneys and CPAs—but only for "intermediate structure" and "complex structure" reporting companies. 87 Fed. Reg. at 59,573. The idea that no "simple structure" companies will need help navigating the CTA and completing their filings is irresponsible. After all, "any person"—not just the company itself—who fails to report "complete or updated beneficial ownership information" faces civil penalties of $500 per day, up to $10,000 in fines, and 2 years in federal prison. 31 U.S.C. § 5336(h)(1), (h)(3)(a). As the district court put it, "tens of millions of Americans must either disclose their personal information to FinCEN" "or risk years of prison time and thousands of dollars in civil and criminal fines." Appx.179. To mitigate that risk, most reporting companies will likely seek legal counsel and perhaps other expert help for "navigating their FinCEN reporting responsibilities while safeguarding against potential risks and fraudulent practices." Matthew B. Edwards, D. Parker Baker III, *The Basic Ins and Outs of the Corporate Transparency Act*, 35 S.C. Lawyer 24, 29 (Sept. 2023); *see also, e.g., id.*

26

(explaining that companies that "may temporarily fall below the threshold of either receipts or employees" will need particular "[v]igilance" to avoid liability).

And the financial costs don't end even there. The time to apply for and update FinCEN identifiers will carry associated wage costs—FinCEN is willing to admit at least another $6.2 million for that in the first year and around $950,000 afterward. 87 Fed. Reg. at 59,577. Commenters also pointed out that FinCEN missed the "cost of securing data" for reports, "including images of identification documents, as well as the harms should such information not be kept secure." *Id.* FinCEN acknowledged these "potentially significant costs to businesses for securing the data and in increased identity theft risk to individuals in the event of a data breach." *Id.* But curiously, it neglected any "estimates for these costs." *Id.*

*Third*, the States will incur direct costs on top of what their residents and businesses will suffer. The CTA requires relevant state and tribal agencies (as determined by the Secretary of the Treasury) to "cooperate with and provide information" FinCEN requests to create and maintain a database of sensitive personal information. 31 U.S.C. § 5336(d)(2). It also requires States to notify filers about their reporting obligations; give them copies of the

27

Treasurer's reporting company form; and update forms, websites, and physical premises with CTA reporting information. *Id.* § 5336(e)(2)(A). This all takes time and money, too—resources state governments will be required to divert from other enforcement and regulatory priorities.

True, subsection 5336(j) authorizes an appropriation that FinCEN can funnel to the States to help cover compliance costs. 31 U.S.C. § 5336(j). But that relief is only potential, and incomplete. The CTA merely "authorize[s]" Congress to appropriate funds to FinCEN; it doesn't guarantee Congress will come through. *Id.* Any funds will dry up after three fiscal years. *Id.* FinCEN will also control any money—if it is dissatisfied with a State's protocols, for instance, it could withhold reimbursement. It could also determine that the States' receipts are not "reasonable" costs "necessary to carry out" the CTA. *Id.* In short, the States remain on the hook for the time and money the CTA requires, not just their resident businesses.

**B. The CTA's toll hurts the States' economies.**

This forced re-direction of small company labor and state resources will strain the States' economic development. It all takes a direct hit on small businesses' productivity, for starters. Businesses that employ 20 or fewer employees—that is, those subject to the CTA, 31 U.S.C. § 5336(a)(11)(A) and

28

(B)(xxi)—rely heavily on each individual employee, so disrupting their workflow matters. Companies will inevitably pass on the costs of tying up significant percentages of their workforces to comply with the CTA's onerous reporting requirements in the form of higher prices for their products and services. FinCEN doesn't say otherwise. Instead, it pleads ignorance, saying it "does not have accurate estimates that are reasonably feasible regarding the effect of the rule on productivity, economic growth, full employment, creation of productive jobs, and international competitiveness of U.S. goods and services." 87 Fed. Reg. at 59,579.

Let's add a few of the numbers FinCEN was not interested in confronting. Some estimate that federal regulations cost the U.S. economy over $1.9 trillion a year. CLYDE WAYNE CREWS, JR., COMPETITIVE ENTER. INST., TEN THOUSAND COMMANDMENTS: AN ANNUAL SNAPSHOT OF THE FEDERAL REGULATORY STATE 6, 33 (2022). Small businesses like those the CTA and FinCEN's implementing rule target *already* bear a heavy share of that staggering figure—63% of the total cost by one estimate. *See* Jeffrey J. Polich, *Judicial Review and the Small Business Regulatory Enforcement Fairness Act*, 41 WM. & MARY L. REV. 1425, 1432 (2000). Costs like these often scare away investors by the prospect of "reduce[d] or eliminate[d] … returns"

29

from "[r]adical and vacillating changes in [the] law."  Richard J. Pierce, Jr., *The Combination of* Chevron *and Political Polarity Has Awful Effects*, 70 DUKE L.J. ONLINE 91, 92, 99 (2021).  And consumers face nearly 1% price increases for every 10% rise in overall federal regulation.  DUSTIN CHAMBERS, ET AL., HOW DO FEDERAL REGULATIONS AFFECT CONSUMER PRICES? AN ANALYSIS OF THE REGRESSIVE EFFECTS OF REGULATION 29 (2019), https://bit.ly/4bH7q3s.

Consider, too, that the CTA's burdens are not limited to for-profit, commercial entities.  Just like their for-profit corporate cousins, any "nonprofit that meets the definition of a reporting company" and that doesn't qualify for one of the statutory exemptions "will have to file" with FinCEN.  Sandra Feldman, *Nonprofit Organization Considerations for FinCEN Beneficial Ownership Information Reporting Requirements*, WOLTERS KLUWER (Feb. 27, 2024), bit.ly/3WE9eWM.  And some estates and trusts will be required to comply as well.  *See* Christine Fletcher, *Navigating the Corporate Transparency Act: Estate Plan Implications*, FORBES (Mar. 4, 2024, 3:49 PM), bit.ly/44JSfEj.  Even everyday Americans and organizations that do not have commercial ends, then, will feel the statute's sting.

So the CTA's requirements are no mere inconvenience. Apart from being illegal, they hurt the States and the people that do business in and otherwise add value to our States in real and lasting ways. The district court was right to invalidate it. This Court should affirm.

## CONCLUSION

This Court should affirm the district court's ruling.

Respectfully submitted,

KRIS W. KOBACH
  ATTORNEY GENERAL

Anthony J. Powell
  *Solicitor General*
Abhishek S. Kambli
  *Deputy Attorney General*

Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-2215
Fax: (785) 296-3131
abhishek.kambli@ag.ks.gov

*Counsel for State of Kansas*

ALAN WILSON
  ATTORNEY GENERAL

Robert D. Cook
  *Solicitor General*
J. Emory Smith, Jr.
  *Deputy Solicitor General*
Thomas T. Hydrick
  *Assistant Deputy Solicitor General*
Joseph D. Spate
  *Assistant Deputy Solicitor General*

State of South Carolina
Office of the Attorney General
1000 Assembly St.
Columbia, SC 29201
(803) 734-4127
thomashydrick@scag.gov

*Counsel for State of South Carolina*

PATRICK MORRISEY
  ATTORNEY GENERAL

*/s/ Michael R. Williams*
Lindsay S. See
  *Solicitor General*
Michael R. Williams
  *Principal Deputy Solicitor General*
  *Counsel of Record*
Grant A. Newman
  *Assistant Solicitor General*

Office of the Attorney General
of West Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

32

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

TIM GRIFFIN
Attorney General
State of Arkansas

ASHLEY MOODY
Attorney General
State of Florida

CHRISTOPHER M. CARR
Attorney General
State of Georgia

RAÚL R. LABRADOR
Attorney General
State of Idaho

BRENNA BIRD
Attorney General
State of Iowa

DANIEL CAMERON
Attorney General
Commonwealth of Kentucky

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DAVE YOST
Attorney General
State of Ohio

MARTY J. JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General and Reporter
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

SEAN REYES
Attorney General
State of Utah

JASON MIYARES
Attorney General
Commonwealth of Virginia

BRIDGET HILL
Attorney General
State of Wyoming

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, this brief contains 6,207 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6), as required by Rule 27(d)(1)(E), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

*/s/ Michael R. Williams*
Michael R. Williams