No. 24-10736

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

—————————————

NATIONAL SMALL BUSINESS UNITED, et al.,

Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF THE TREASURY, et al.,

Defendants-Appellants.

—————————————

On Appeal from the United States District Court
for the Northern District of Alabama

—————————————

## REPLY BRIEF FOR APPELLANTS

—————————————

*Of Counsel:*

NEIL H. MACBRIDE
*General Counsel*

JACOB LOSHIN
*Assistant General Counsel for Enforcement
and Intelligence*

SEAN BOYCE
*Deputy Chief Counsel, Financial Crimes
Enforcement Network*

*Department of the Treasury*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

PRIM F. ESCALONA
*United States Attorney*

DANIEL TENNY
STEVEN H. HAZEL
*Attorneys, Appellate Staff
Civil Division, Room 7217
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-2498*

## AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, undersigned counsel certifies that the following have an interest in the outcome of this appeal:

*Advancing American Freedom

Alabama Property Management, Inc.

*American Farm Bureau Federation

*Americans for Prosperity Foundation

*Associated General Contractors of America, Inc.

Bardwell, Will

Barger, James Frederick Jr.

*Bailey, Andrew, Attorney General of Missouri

*Berry, Thomas A.

*Bird, Brenna, Attorney General of Iowa

Boyce, Sean

Burke, Liles C., U.S. District Judge

Boynton, Brian M.

Brown, Kenyen

*Cameron, Daniel, Attorney General of Kentucky

*Carr, Christopher M., Attorney General of Georgia

*Catholics Count

* Additions to previous certificate marked with an asterisk.

*NSBU v. Yellen*, No. 24-10736

*Cato Institute

*Chaldean Chamber of Commerce

*Commonwealth of Kentucky

*Commonwealth of Virginia

*Cook, Robert D.

*Crawford, Cynthia Fleming

Das, Himamauli, former Acting Director of the Financial Crimes Enforcement

Network

*DeMoss, Trip

Escalona, Prim F., United States Attorney

*Fitch, Lynn, Attorney General of Mississippi

Gacki, Andrea, Director of the Financial Crimes Enforcement Network

*Galen Institute

*Gerow, Charlei

*Greytak, Scott

*Griffin, Tim, Attorney General of Arkansas

*Hamilton Lincoln Law Institute

*Haden, Ed

Hazel, Steven H.

Healy, Terence M.

*Hedley, Neville S.

*NSBU v. Yellen*, No. 24-10736

*Hilgers, Michael T., Attorney General of Nebraska

*Hill, Bridget, Attorney General of Wyoming

*Hydrick, Thomas T.

*Jackley, Marty, Attorney General of South Dakota

*Job Creators Network Foundation

*Job Creators Network Inc.

*Jones, Tim.

*Kambli, Abhishek S.

Kelleher, Diane

*Khoury, Alexander R.

*Kobach, Kris W., Attorney General of Kansas

*Knudsen, Austin, Attorney General of Montana

*Labrador, Raul R., Attorney General of Idaho

Lee, Thomas

Loshin, Jacob

MacBride, Neil H.

*Manhattan Institute

*Marshall, Steve, Attorney General of Alabama

*Martinez, Tyler

McCracken, Todd

*Men and Women for a Representative Democracy in America, Inc.

Miller, Kristen Paige

*Miyares, Jason, Attorney General of Virginia

*Moody, Ashley, Attorney General of Florida

*Morrisey, Patrick, Attorney General of West Virginia

*Murrill, Liz, Attorney General of Louisiana

*National Association of Home Builders of the United States

*National Center for Public Policy Research

*National Federation of Independent Business Small Business Legal Center, Inc.

National Small Business United

*National Taxpayers Union Foundation

Neiman, John C. Jr.

*Nelson, Matthew T.

*Newman, Grant A.

*Park, Heeyoung (Linda)

*Paxton, Ken., Attorney General of Texas

*Pepson, Michael

Pitz, Taylor

*Powell, Anthony J.

*Quigg, Charles R.

*Reed, Jack, United States Senator

*NSBU v. Yellen*, No. 24-10736

*Reyes, Sean, Attorney General of Utah

Robinson, Stuart Justin

*Schulp, Jennifer J.

*See, Lindsay S.

*Sibley, Nate

*Skorup, Brent

*Skrmetti, Jonathan, Attorney General of Tennessee

*Small Business Association of Michigan

*Smith Jr., J. Emory

*Spate, Joseph D.

*Stand Up Michigan

*State of Alabama

*State of Arkansas

*State of Florida

*State of Georgia

*State of Idaho

*State of Iowa

*State of Kansas

*State of Louisiana

*State of Mississippi

*State of Missouri

*State of Montana

*State of Nebraska

*State of Ohio

*State of South Carolina

*State of South Dakota

*State of Tennessee

*State of Texas

*State of Utah

*State of West Virginia

*State of Wyoming

*Students for Life Action

*Students for Life of America

*Tax Law Center at NYU Law

Taylor, Jonathan E.

Tenny, Daniel

*The Foundation for Defense of Democracies

*Thurston, Robin F.

*Transparency International U.S.

U.S. Department of the Treasury

Walthall, James Elliott

*Warren, Elizabeth, United States Senator

*Waters, Maxine, Member of the House of Representatives

*Wheat, Mark J.

*Whitehouse, Sheldon, United States Senator

*Williams, Michael R.

*Wilson, Alan, Attorney General of South Carolina

Winkles, Isaac

*Wisconsin Family Action, Inc.

*Women for Democracy in America, Inc.

*Wyden, Ron, United States Senator

Yellen, Janet, Secretary of the U.S. Department of the Treasury

*Yost, Dave, Attorney General of Ohio

*Young America's Foundation, Inc.

*s/ Steven H. Hazel*
Steven H. Hazel

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY .............................................................................. 1

ARGUMENT ................................................................................................................. 2

I.      The Corporate Transparency Act Is a Valid Exercise of Congress's
        Powers ................................................................................................................ 2

        A.      The CTA Is Authorized by the Commerce Clause .................................... 3

        B.      The CTA Is Authorized by the Necessary and Proper Clause ................. 7

II.     The CTA Is Consistent with the Fourth Amendment ....................................... 17

CONCLUSION ............................................................................................................ 24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                                        **Page(s)**

*Airbnb Inc. v. City of New York,*
   373 F. Supp.3d 467 (S.D.N.Y. 2019) .......................................................................... 22

*Barry v. City of New York,*
   712 F.2d 1554 (2d Cir. 1983) ...................................................................................... 18

*Brown v. Texas,*
   443 U.S. 47 (1979) ...................................................................................................... 22

*California Bankers Ass'n v. Shultz,*
   416 U.S. 21 (1974) ........................................................................ 3, 10, 18, 19, 20, 21

*Carpenter v. United States,*
   585 U.S. 296 (2018) ............................................................................................... 22, 23

*City of Los Angeles v. Patel,*
   576 U.S. 409 (2015) .................................................................................................... 22

*Donovan v. Lone Steer, Inc.,*
   464 U.S. 408 (1984) ............................................................................................... 18, 19

*Electric Bond & Share Co. v. Securities & Exch. Comm'n,*
   303 U.S. 419 (1938) ...................................................................................................... 9

*Jinks v. Richland County,*
   538 U.S. 456 (2003) .................................................................................................... 16

*Karstendick, Ex parte,*
   93 U.S. 396 (1876) ........................................................................................................ 8

*Katzenbach v. McClung,*
   379 U.S. 294 (1964) ...................................................................................................... 6

*Legal Tender Cases,*
   79 U.S. 457 (1870) ...................................................................................................... 13

*McCulloch v. Maryland,*
   17 U.S. (4 Wheat.) 316 (1819) ............................................................ 2, 9, 10, 11, 14, 17

*National Fed'n of Indep. Businesses v. Sebelius,*
   567 U.S. 519 (2012) ............................................................................. 8, 10, 11, 14, 17

*Overstreet v. Lexington-Fayette Urban Cty. Gov't,*
   305 F.3d 566 (6th Cir. 2002) ................................................................ 18

*Sabri v. United States,*
   541 U.S. 600 (2004) .................................................................... 7, 16

*Sonzinsky v. United States,*
   300 U.S. 506 (1937) ........................................................................ 14

*United States v. Bolatete,*
   977 F.3d 1022 (11th Cir. 2020) ........................................................ 14

*United States v. Comstock,*
   560 U.S. 126 (2010) ................................................................ 8, 10, 16

*United States v. Curtiss-Wright Exp. Corp.,*
   299 U.S. 304 (1936) ........................................................................ 15

*United States v. Darby,*
   312 U.S. 100 (1941) ........................................................................ 11

*Wickard v. Filburn,*
   317 U.S. 111 (1942) ........................................................................ 11

## U.S. Constitution:

Art. I, § 8, cl. 18 ............................................................................. 15

## Statutes:

Pub. L. No. 116-283, div. F, 134 Stat. 4547 (2021):
   § 6002(2), 134 Stat. at 4547 ............................................................. 4
   § 6002(5)(B), 134 Stat. at 4547 ...................................................... 18
   § 6002(5)(C), 134 Stat. at 4548 ...................................................... 18
   § 6402(3), 134 Stat. at 4604 ............................................................. 6
   § 6402(5), 134 Stat. at 4604 ........................................................ 4, 18
   § 6402(5)(B), 134 Stat. at 4604 .................................................. 16, 20
   § 6402(5)(D), 134 Stat. at 4604 .................................................. 16, 20
   § 6402(5)(E), 134 Stat. at 4604 ...................................................... 16
   § 6402(8)(C), 134 Stat. at 4605 .................................................. 14, 20

8 U.S.C. § 1324a ............................................................................. 19

26 U.S.C. § 5841 *et seq.* ............................................................................. 15

26 U.S.C. § 6012 ......................................................................................... 19

26 U.S.C. §§ 6031-6060 .............................................................................. 19

31 U.S.C. § 5311(1) ................................................................................ 19, 20

31 U.S.C. § 5313 ......................................................................................... 18

31 U.S.C. § 5336(a)(11)(A) ..................................................................... 5, 21

31 U.S.C. § 5336(a)(11)(A)(ii) ...................................................................... 5

31 U.S.C. § 5336(a)(11)(B) ..................................................................... 5, 21

31 U.S.C. § 5336(a)(11)(B)(i)-(xviii) ......................................................... 10

31 U.S.C. § 5336(a)(11)(B)(xix)(I) ............................................................... 7

31 U.S.C. § 5336(b)(1)(B) ...................................................................... 5, 12

31 U.S.C. § 5336(b)(1)(D) ............................................................................ 5

31 U.S.C. § 5336(b)(2)(A) .......................................................................... 20

31 U.S.C. § 5336(c)(2) ............................................................................... 22

31 U.S.C. § 5336(c)(3) ............................................................................... 22

31 U.S.C. § 5336(c)(4) ............................................................................... 22

31 U.S.C. § 5336(d) ................................................................................... 13

31 U.S.C. § 5336(f) .................................................................................... 13

31 U.S.C. § 5336(h) ................................................................................... 18

52 U.S.C. § 30104 ...................................................................................... 19

Ala. Code § 10A-5a-2.01(a) ....................................................................... 21

Ala. Code. § 10A-1-3.05(a)(6) ................................................................... 21

Ala. Code. § 10A-1-3.05(a)(6)(A) .............................................................. 21

**Regulations:**

31 C.F.R. § 1010.230(a) ................................................................ 17

31 C.F.R. § 1010.312 ..................................................................... 19

**Other Authorities:**

87 Fed. Reg. 59,498 (Sept. 30, 2022) ...................................... 7, 16, 17, 18, 24

Letter from Nat'l Ass'n of Attorneys Gen. to Michael Crapo, Chairman,
Senate Banking, Hous. & Urban Affairs Comm., and Sherrod Brown,
Ranking Member, Senate Banking, Hous. & Urban Affairs Comm.
(June 30, 2020), https://perma.cc/D3YN-FWPB ....................................... 11

## INTRODUCTION AND SUMMARY

Plaintiffs urge this Court to hold facially invalid corporate reporting requirements that Congress deemed essential to combatting money laundering and terrorist financing. Plaintiffs' brief, like the ruling it defends, rests on the mistaken premise that the Corporate Transparency Act (CTA) is designed to regulate the isolated act of filing incorporation papers. The statutory text makes clear, however, that the CTA is directed at commercial entities, without regard to when, where, or how they are incorporated. It refers to incorporation only to identify those businesses with authority to conduct commercial transactions in their own names and thus with the potential to facilitate financial crime. That the CTA regulates economic enterprises subject to the commerce power is illustrated by plaintiffs' continued failure to identify any covered business not engaged in economic activity.

The CTA is independently authorized by the Necessary and Proper Clause. Plaintiffs largely do not dispute that the CTA effectuates the federal government's powers to regulate commerce, collect taxes, and protect national security. Instead, plaintiffs insist that reporting requirements are not a permissible means of advancing those indisputably valid ends. But since the time of Chief Justice Marshall, the Supreme Court has recognized that Congress holds broad authority to determine the appropriate means for effectuating its powers. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819). And reporting requirements represent a conventional legislative measure for addressing enforcement challenges. The CTA thus embodies a

far more modest exercise of federal power than creating a national bank, establishing a federal prison system, or enacting significant portions of the federal penal code—all of which the Supreme Court has sustained under the Necessary and Proper Clause.

Plaintiffs' alternative Fourth Amendment argument, which the district court did not address, is meritless.  Reasonable reporting requirements raise no Fourth Amendment concern.  *See California Bankers Ass'n v. Shultz*, 416 U.S. 21, 59-68 (1974). And even in comparison with reporting requirements that have long been understood as constitutional, the CTA advances particularly important government interests, including combatting serious crime and safeguarding national security.  At the same time, plaintiffs come nowhere near establishing that the limited ownership information at issue here implicates any protected privacy interest—let alone an interest sufficient to overcome government interests of the highest order.  Any intrusion on a privacy interest would be especially minimal because the CTA establishes detailed safeguards restricting the use and disclosure of reported information.

## ARGUMENT

## I.    The Corporate Transparency Act Is a Valid Exercise of Congress's Powers

As our opening brief explained, the CTA falls within Congress's authority for two independent reasons.  First, the statute regulates commercial entities and is thus directly authorized by the commerce power.  Second, corporate ownership reporting

requirements effectuate a number of powers vested in the federal government, including the commerce, tax, and national-security powers, and are therefore authorized by the Necessary and Proper Clause.

### A.    The CTA Is Authorized by the Commerce Clause

Plaintiffs' Commerce Clause argument reflects a basic misunderstanding of the CTA.  Plaintiffs do not appear to dispute that if the statute is directed at commercial entities, it regulates activity with a substantial effect on interstate and foreign commerce and thus falls within the commerce power.  Plaintiffs urge, however, that the CTA should be construed as regulating only the "process of incorporation" and that incorporation is a "ministerial act" rather than an economic one.  Pls.' Br. 18.

But the CTA is aimed at harmful economic transactions, not the act of incorporation.  Congress enacted the CTA as part of the Anti-Money Laundering Act of 2020, a regulatory scheme designed to combat "money laundering," "the financing of terrorism," and other illicit transactions.  Pub. L. No. 116-283, div. F, § 6002(2), 134 Stat. 4547, 4547 (2021).  Included within that scheme of commercial regulation are reporting requirements that prevent companies from engaging in transactions anonymously, a tactic criminals frequently used to evade detection.  Congress determined that these reporting requirements are "needed" to "better enable critical national security, intelligence, and law enforcement efforts" to fight financial crime and "protect interstate and foreign commerce."  § 6402(5), 134 Stat. at 4604.

The CTA cannot plausibly be characterized as regulating the act of incorporation. Rather, it is a reporting requirement applicable to "corporation[s]" and "similar entit[ies]" authorized to do business in the United States, without regard to where, when, or how those businesses are incorporated. 31 U.S.C. § 5336(a)(11)(A). For example, businesses that were incorporated years ago are subject to the reporting requirement for at least as long as they remain operational. *See id.* § 5336(b)(1)(B). Requiring a decades-old business to report its ownership at the time the CTA takes effect bears no resemblance to regulating the act of incorporation.

The same understanding is confirmed by other statutory provisions that the government previously highlighted but that plaintiffs ignore. Businesses that are subject to the CTA must report changes in ownership on an ongoing basis, without regard to whether they take any new action relating to incorporation. *See* 31 U.S.C. § 5336(b)(1)(D). And some businesses covered by the CTA never incorporate in the United States at all: a business incorporated in a foreign country is subject to the CTA if it is "registered to do business in the United States." *Id.* § 5336(a)(11)(A)(ii). Conversely, the reporting requirements do not extend to various categories of businesses—such as banks, insurers, and certain utilities—that are incorporated but are subject to other federal reporting requirements or are otherwise less likely to be used for financial crimes. *See id.* § 5336(a)(11)(B).

In short, Congress prevented certain anonymous transactions by requiring entities with the capacity to engage in commerce to identify the human beings behind

4

the corporate form. Plaintiffs' argument that the statute regulates incorporation rather than commerce would disappear if Congress had defined the relevant class of entities in terms of their capacity to engage in commercial transactions in their own name. Congress's decision to identify those entities in a precise and administrable way, in terms of the incorporation or registration that is a prerequisite to engaging in commercial transactions, does not transform the CTA into a regulation of incorporation or registration. Instead, the statute's reference to those activities serves only to limit its scope to businesses with the potential to facilitate "money laundering," "the financing of terrorism," "serious tax fraud," and other harmful transactions. § 6402(3), 134 Stat. at 4604.

Plaintiffs continue to struggle to explain why the CTA reaches any noncommercial entity, much less a sufficient number of those entities to cast doubt on the statute's status as a commercial regulation. As their leading example of a covered business that is allegedly beyond the reach of the commerce power, plaintiffs invoke a "[s]hell compan[y]" "formed to hold family homes" or "other family assets." Pls.' Br. 19. Thus, plaintiffs' preferred example involves a company that engages in real-estate or other financial transactions. There is no serious argument that such entities are beyond the commerce power. Plaintiffs emphasize (Pls.' Br. 20-21) that the government has noted that shell companies have "no physical presence beyond a mailing address" and "generate little to no economic value," but the relevant point— as the government went on to observe—is that because of those attributes, shell

5

companies "can be used to conduct financial transactions while concealing [the] true beneficial owners' information." Gov't Br 4 n.2 (alteration in original) (quoting 87 Fed. Reg. 59,498, 59,501 (Sept. 30, 2022)).

Other examples introduced by plaintiffs illustrate the same point. Plaintiffs hypothesize (Pls.' Br. 19) that "[s]hell companies" could be used by "social clubs and neighborhood associations." As an initial matter, a typical neighborhood association or social club would likely qualify as a non-profit under "section 501(c) of the Internal Revenue Code" and would thus not be covered by the CTA. *See* 31 U.S.C. § 5336(a)(11)(B)(xix)(I). In any event, the function of the hypothesized clubs and associations is presumably to acquire event space, purchase food and similar commodities, and perform other economic transactions that fall comfortably within Congress's regulatory authority. *See Katzenbach v. McClung*, 379 U.S. 294, 302 (1964) (sustaining under the Commerce Clause legislation regulating local restaurants).

Moreover, as the government previously observed, plaintiffs themselves are commercial entities. Plaintiffs' own declarations establish that the individual plaintiff owns businesses that "manage and lease real property," Dkt. No. 39-3, at 1-2, and that the associational plaintiff represents "small businesses" from "every sector of the U.S. economy," Dkt. No. 39-2, at 2. It is difficult to square plaintiffs' contention that covered entities normally do not engage in economic activity with their inability to identify a single business for which that contention is accurate. And to the extent plaintiffs seek to rely on the CTA's application to a hypothetical entity that

6

incorporates but neither conducts nor intends to conduct economic transactions, that narrow hypothetical would not support an argument that the statute is invalid on its face or as applied to plaintiffs.  *See Sabri v. United States*, 541 U.S. 600, 608 (2004) (warning, in the context of an enumerated-powers challenge, that "laws should not be invalidated by 'reference to hypothetical cases'").

Plaintiffs therefore err in seeking (Pls.' Br. 29) to compare Congress's regulatory approach here with its approach in *National Federation of Independent Businesses v. Sebelius*, 567 U.S. 519 (2012) (*NFIB*).  The health-insurance mandate there was directed at individuals "whose commercial inactivity rather than activity is [their] defining feature," and who would "predictably engage" in economic acts only at some unspecified point in the future.  *NFIB*, 567 U.S. at 556-57 (opinion of Roberts, C.J.). In this case, by contrast, Congress sought to regulate incorporated businesses because the "defining feature" of those businesses is their ability and propensity to conduct commercial transactions.  *Id.* at 556.

### B.    The CTA Is Authorized by the Necessary and Proper Clause

Plaintiffs similarly fail to refute the central premises underlying the government's invocation of the Necessary and Proper Clause.  *See* Pls.' Br. 32.  They do not dispute that Congress has validly enacted—under its commerce, tax, and foreign-affairs powers—prohibitions on harmful economic transactions.  And they provide no basis to second-guess Congress's determination that the absence of corporate ownership information represents a "primary obstacle" to enforcing those

prohibitions. H.R. Rep. No. 116-227, at 10 (2019). The reporting requirements at issue here remove that obstacle and thus form a critical component of the government's "comprehensive regulatory scheme" to combat financial crime, as the government explained in district court, *see* Dkt. No. 24-1, at 30-31, and in its opening brief, *see* Gov't Br. 17-27.

**1.** In nonetheless contesting Congress's authority to enact the CTA, plaintiffs primarily argue (Pls.' Br. 30-40) that corporate reporting requirements are not a "proper means" for effectuating the legislature's indisputably valid ends.

The Supreme Court has recognized, however, that Congress holds "broad authority" to identify the means for carrying into execution its enumerated powers. *United States v. Comstock*, 560 U.S. 126, 133-34 (2010). If "the end be legitimate," "all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819). Applying that standard, the Court has sustained under the Necessary and Proper Clause many significant exercises of federal authority, including the creation of a national bank, *see id.*; the formation of the federal prison system, *see Ex parte Karstendick*, 93 U.S. 396, 400 (1876); and the enactment of a substantial portion of the federal penal code, *see Comstock*, 560 U.S. at 136 (identifying numerous criminal prohibitions authorized by the Necessary and Proper Clause).

8

In comparison with these benchmarks, the CTA represents a modest and conventional means for achieving Congress's objectives. As the government previously observed, "[r]egulation requiring the submission of information" is a "familiar" legislative response to enforcement challenges. Gov't Br. 23-24 (quoting *Electric Bond & Share Co. v. Securities & Exch. Comm'n*, 303 U.S. 419, 437 (1938)). The CTA itself recognizes that numerous categories of businesses—including banks, issuers of securities, insurers, and certain utilities—are already subject to federal reporting requirements. *See* 31 U.S.C. § 5336(a)(11)(B)(i)-(xviii). The Supreme Court has understood that such requirements "facilitate the detection and apprehension" of criminals and has never cast doubt on Congress's authority to enact them. *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 46-47 (1974).

Thus, the CTA stands in stark contrast to the "extraordinary" assertion of legislative authority at issue in *NFIB*, 567 U.S. at 560, the case on which plaintiffs chiefly rely, *see* Pls.' Br. 34. In *NFIB*, the Court understood Congress as claiming the "power to compel citizens" to engage in commercial activity. 567 U.S. at 554 (opinion of Roberts, C.J.). The Court identified that as a "great substantive and independent power," *id.* at 561 (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 411), that might "undermine the structure of government established by the Constitution," *id.* at 559; *see id.* at 654 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting) (similar). The same concerns are not implicated by the CTA's requirement that certain businesses report limited information necessary to identify their owners.

9

Plaintiffs strip from its context (*see* Pls.' Br. 33) the statement from *NFIB* that the Necessary and Proper Clause should not be read to expand congressional power beyond "those who by some preexisting activity bring themselves within the sphere of federal regulation." *NFIB*, 567 U.S. at 560 (opinion of Roberts, C.J.).  That statement was focused on the distinction between forcing regulated entities to engage in activity and regulating "preexisting" activity that was not compelled by the government.  It did not suggest that Congress could not impose requirements ancillary to the regulation of interstate commerce as such.  To the contrary, as the opinion explained, the relevant inquiry is whether Congress exercised "authority derivative of, and in service to, a granted power." *Id.*  And that principle goes back centuries: in *McCulloch*, the Court upheld the creation of a national bank not on the ground that the bank was already authorized by the commerce power, but because establishing a national bank would "facilitate [the] execution" of that and other enumerated powers.  17 U.S. (4 Wheat.) at 408.

Plaintiffs likewise fail to advance their argument by asserting (Pls.' Br. 34) that the CTA "invades State sovereign power over entity formation."  That assertion is legally flawed and factually inaccurate.  As a legal matter, any "authority granted by the Necessary and Proper Clause" is "[v]irtually by definition" not a power "reserved to the States." *Comstock*, 560 U.S. at 144.  The Supreme Court has accordingly concluded that the Clause allows Congress to legislate in areas that were previously subject only to state regulation, such as civil commitment, *see id.* at 130, 135, minimum-wage and

10

maximum-hour requirements, *see United States v. Darby*, 312 U.S. 100, 105 (1941), and home-grown wheat, *see Wickard v. Filburn*, 317 U.S. 111, 113 (1942).

Regardless, the CTA leaves state oversight of entity formation undisturbed. The statute does not determine what entities are entitled to incorporate or the means by which they may be incorporated. Nor does it preempt or otherwise override any aspect of the incorporation processes created by states. Instead, the CTA continues the long congressional practice of enacting statutes—from securities registration requirements to auditing and disclosure requirements for public companies—that regulate corporations and other entities established under state law. *See* Gov't Br. 23-24 (collecting examples). Those federal statutes have never been understood as interfering with state laws regarding entity formation. That approach is particularly appropriate here, where the CTA in many applications regulates businesses that incorporated decades ago and that may never again take any of the actions that plaintiffs insist that the CTA seeks to regulate. *See* 31 U.S.C. § 5336(b)(1)(B). Notably, when Congress was considering the CTA, the attorneys general of 42 states expressed support for federal legislation "mandating disclosure of entities' beneficial ownership information" and emphasized that such legislation would facilitate state efforts to curb financial crime. *See* Letter from Nat'l Ass'n of Attorneys Gen. to Michael Crapo, Chairman, Senate Banking, Hous. & Urban Affairs Comm., and Sherrod Brown, Ranking Member, Senate Banking, Hous. & Urban Affairs Comm. (June 30, 2020), https://perma.cc/D3YN-FWPB.

11

Plaintiffs' attempts to demonstrate that the CTA regulates state entity-formation processes highlight the absence of any such regulation. First, they assert that "the CTA . . . prohibits the States from authorizing their entities to issue 'a certificate in bearer form.'" Pls.' Br. 39 (quoting 31 U.S.C. § 5336(f)). The quoted provision prohibits corporations or other entities formed under state or tribal law from issuing such certificates. *See* 31 U.S.C. § 5336(f). Plaintiffs cannot transform a restriction on corporate entities into a regulation of incorporation through artful use of the phrase "prohibits the States from authorizing their entities." In any event, no State authorizes the issuance of the relevant certificates, and no plaintiff has asserted an interest in doing so. *See* Dkt. No. 1, at 26. Next, plaintiffs refer to a provision directing "[r]elevant Federal, State, and Tribal agencies, . . . to the extent practicable, and consistent with applicable legal protections," to "cooperate with and provide information" to FinCEN. 31 U.S.C. § 5336(d), *cited in* Pls.' Br. 39. That provision—even apart from its significant caveats and limitations—has no evident relevance to the reporting requirements imposed on corporations that are at issue here.

The absence of support for plaintiffs' position is illustrated by their reliance (Pls.' Br. 36-37) on Founding Era debates regarding federal authority to charter corporations. Those debates have no bearing on this case, where the CTA does not charter a corporation or create a federal incorporation process. Plaintiffs' argument on this score is particularly puzzling because the Supreme Court held, not long after

the founding, that Congress has authority to charter corporations.  *See McCulloch*, 17 U.S. (4 Wheat.) at 316.

**2.** That the Necessary and Proper Clause authorizes the CTA is especially apparent given that the statute effectuates not just one federal power, but many, including Congress's tax and foreign-affairs powers and the President's law-enforcement and national-security powers.  *See Legal Tender Cases*, 79 U.S. 457, 535 (1870) ("Congress has often exercised, without question, powers that are not . . . ancillary to any single enumerated power," but that "aris[e] from the aggregate powers of the government."); *id.* at 536 ("[A] power may exist as an aid to the execution of an express power, or an aggregate of such powers.").

Plaintiffs do not take issue with Congress's determination that corporate ownership reporting requirements are "highly useful" to combatting tax fraud and other forms of tax evasion.  § 6402(8)(C), 134 Stat. at 4605.  And plaintiffs appear to concede (Pls.' Br. 45) that the CTA would be constitutional if it "limited the sharing of beneficial-owner information to IRS agents exclusively and for the enforcement of U.S. federal tax laws alone."  Plaintiffs' argument thus recognizes that ownership reporting requirements do not inherently involve the sort of "great substantive and independent power" that gave the Supreme Court pause in *NFIB*.  567 U.S. at 561 (opinion of Roberts, C.J.); *cf. McCulloch*, 17 U.S. (4 Wheat.) at 411 ("The power of creating a corporation . . . is not, like the power of making war, or levying taxes, or of regulating commerce, a great substantive and independent power.").

13

Although plaintiffs accept that Congress can require businesses to report ownership information for tax collection purposes, plaintiffs insist (Pls.' Br. 45) that the CTA is invalid because it permits the same information to also be used for law-enforcement purposes. But "a law does not stop being a valid tax measure just because it also serves some other goal." *United States v. Bolatete*, 977 F.3d 1022, 1032 (11th Cir. 2020). The leading example involves a statute imposing tax and registration requirements on the owners of short-barreled shotguns and certain other weapons. *See* 26 U.S.C. § 5841 *et seq.* In upholding that statute under the taxing power, the Supreme Court deemed it irrelevant that the tax might in practice constitute "a penalty imposed for the purpose of suppressing traffic in a certain noxious type of firearms." *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937). Instead, the Court found it sufficient that the statute "is productive of some revenue." *Id.* at 514. Here, likewise, it is undisputed that ownership reporting requirements play a significant role in preventing tax evasion. The fact that the requirements also further other important government objectives—objectives that fall squarely within Congress's authority to regulate interstate and foreign commerce—supports rather than undermines Congress's power to enact them.

Congressional authority to promulgate the CTA is particularly clear because the statute vindicates foreign-affairs and national-security powers vested in both Congress and the President. Plaintiffs' primary response is to claim (Pls.' Br. 49, 52) that only powers specifically enumerated in Article I are "Constitutional powers" subject to the

14

Necessary and Proper Clause. But in language plaintiffs do not address, the Clause empowers Congress to carry into execution not only the powers delineated in Article I, but also "all other Powers vested by this Constitution in the Government of the United States," including "Powers vested . . . in any Department or Officer." U.S. Const. art. I, § 8, cl. 18. That includes Congress's powers over foreign affairs and national security, *see United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936), as well as the President's powers to conduct "law enforcement," gather "intelligence," prevent "terrorism," and safeguard "national security," § 6402(5)(D), 134 Stat. at 4604.

Plaintiffs are on no firmer ground in seeking to downplay the significance of the foreign-policy and national-security interests at stake here. Although plaintiffs depict (Pls.' Br. 50-52) as insubstantial Congress's objective of "bring[ing] the United States into compliance with international anti-money laundering and countering the financing of terrorism standards," § 6402(5)(E), 134 Stat. at 4604, that objective reflects the federal government's recognition that international coordination is critical to curbing financial crime, *see* 87 Fed. Reg. at 59,506. In any event, Congress separately found that the CTA "protect[s] vital United States national security interests," including by supporting "efforts to counter . . . the financing of terrorism." § 6402(5)(B), (D), 134 Stat. at 4604. That finding warrants substantial weight.

Contrary to plaintiffs' suggestion (Pls.' Br. 16), the fact that the Necessary and Proper Clause authorizes the reporting requirements at issue here does not indicate

that congressional authority under the Clause has "no discernible limiting principle." Legislation enacted pursuant to the Clause must effectuate a power vested in the federal government, *see Comstock*, 560 U.S. at 133-34; preserve "the structure of government established by the Constitution," *NFIB*, 567 U.S. at 559 (opinion of Roberts, C.J.); and comport with other constitutional provisions, *see McCulloch*, 17 U.S. (4 Wheat.) at 421. Those constraints leave Congress with broad but bounded authority to enact legislation in support of the federal government's powers.

**3.** Plaintiffs' remaining arguments are incompatible with Congress's factual findings. Those findings are subject to "review for means-ends rationality," *Sabri*, 541 U.S. at 605, and plaintiffs make no attempt to dispute the findings under that standard.

Notwithstanding Congress's contrary conclusion, plaintiffs briefly contend that a 2016 Treasury rule requiring certain financial institutions to retain records about their customers renders the CTA not "essential." Pls.' Br. 41-42 (citing 31 C.F.R. § 1010.230(a)). The Supreme Court "long ago rejected the view that the Necessary and Proper Clause demands that an Act of Congress be absolutely necessary to the exercise of an enumerated power." *Jinks v. Richland County*, 538 U.S. 456, 462 (2003) (emphasis and quotation marks omitted). Rather, the question is whether a law is "convenient, or useful." *Comstock*, 560 U.S. at 133-34. As we previously explained (Gov't Br. 34-35), the 2016 rule has significant limitations relative to the CTA. *See* 87 Fed. Reg. at 59,505. Congress therefore properly found that statutory reporting

16

requirements remain "needed" to facilitate the detection and prosecution of financial crime. § 6402(5), 134 Stat. at 4604.

Plaintiffs similarly seek to substitute their judgment for that of Congress by asserting, without evidence, that "the bad actors the CTA seeks to target will either ignore it or provide false information." Pls.' Br. 2. But willful failures to report trigger criminal penalties, *see* 31 U.S.C. § 5336(h), and the statute therefore "deter[s] bad actors [from] accessing our financial system in the first place" and makes financial crimes "more costly" for those who persist in using shell companies to conceal their activities, 87 Fed. Reg. at 59,502. Accordingly, Congress reasonably concluded that the reporting requirements would "discourage the use of shell corporations as a tool to disguise and move illicit funds" and would "assist national security, intelligence, and law enforcement agencies with the pursuit of crimes." § 6002(5)(B), (C), 134 Stat. at 4547-48.

## II.    The CTA Is Consistent with the Fourth Amendment

Plaintiffs' Fourth Amendment argument, which the district court did not address, is meritless.

**A.** The Supreme Court has recognized that reporting requirements of the kind at issue here raise no Fourth Amendment concern. In *Shultz*, the Court upheld a statute requiring banks to report transactions over a specified dollar amount to the government. 416 U.S. at 67; *see* 31 U.S.C. § 5313. For each covered transaction, a bank must disclose the "name," "address," and "social security or taxpayer

17

identification number" of "the individual presenting [the] transaction." *See e.g.*, 31 C.F.R. § 1010.312. Congress explained that this information would be "highly useful" in "criminal, tax, or regulatory investigations." 31 U.S.C. § 5311(1). Because the relevant "information is sufficiently described and limited in nature, and sufficiently related to a tenable congressional determination as to improper use of transactions of that type," the Court concluded that the reporting requirements were reasonable and therefore sustained them under the Fourth Amendment. *Shultz*, 416 U.S. at 67. That conclusion reflects the well-established principle that where the government does not seek to make "non-consensual entries into areas not open to the public," and instead merely requires regulated entities to divulge certain records, the Fourth Amendment is more readily satisfied. *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414 (1984).

Consistent with these precedents, legislatures routinely enact reporting requirements. For example, federal law requires taxpayers to file tax returns and various entities to file tax information returns, 26 U.S.C. §§ 6012, 6031-6060; employers to collect and make available information about new employees' eligibility to work, *see* 8 U.S.C. § 1324a; and political campaigns to report contributions and expenditures, *see* 52 U.S.C. § 30104. And at the state and local level, lawmakers have implemented many other reporting requirements. *See, e.g.*, *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 577 (6th Cir. 2002) (recognizing that a public employee was unlikely to succeed on a Fourth Amendment challenge to financial disclosure requirements); *Barry v. City of New York*, 712 F.2d 1554, 1564 (2d Cir. 1983) (similar).

The government is unaware of any case from this or any other circuit casting doubt on the constitutionality of such requirements, and plaintiffs have identified none. As the Supreme Court has explained, "reporting requirements are by no means per se violations of the Fourth Amendment," and "a contrary holding might well fly in the face of the settled . . . history of self-assessment of individual and corporate income taxes in the United States." *Shultz*, 416 U.S. at 59-60.

The CTA falls comfortably within the category of reasonable reporting requirements that have long been understood as constitutional. As with the statute at issue in *Shultz*, the CTA directs the disclosure of information that Congress identified as "highly useful" to combatting serious crimes. *See* § 6402(8)(C), 134 Stat. at 4605; 31 U.S.C. § 5311(1). And with respect to the CTA in particular, Congress found that corporate ownership reporting requirements were "needed" to combat "the financing of terrorism" and to "protect vital United States national security interests." § 6402(5)(B), (D), 134 Stat. 4604. The CTA therefore serves government interests of the highest order.

At the same time, the CTA does not disturb any interest the Fourth Amendment protects. The statute does not involve "non-consensual entr[y] into areas not open to the public." *Donovan*, 464 U.S at 414. Instead, it requires only that a business report an applicant or owner's name, date of birth, address, and "unique identifying number" such as a driver's license number. 31 U.S.C. § 5336(b)(2)(A). The information at issue here thus resembles information that *Shultz* identified as

"sufficiently described and limited in nature." 416 U.S. at 67. And as discussed above, the reporting requirements do not extend to businesses that are already subject to other federal reporting requirements or that lack authority to conduct commercial transactions in their own name. *See* 31 U.S.C. § 5336(a)(11)(A), (B). By limiting who must report and what information must be reported, Congress tailored the CTA to mandate only those disclosures necessary to enable the detection and prosecution of harmful economic activities.

Plaintiffs' contrary contention is difficult to comprehend. Plaintiffs assert that "the States do not require all the information that the CTA requires to be reported," citing an Alabama statute that does not require reporting of the name and address of originators of a limited liability company. Pls.' Br. 62-63 (citing Ala. Code § 10A-5a-2.01(a)). But that provision is an exception, for limited liability companies, to a general provision of Alabama law that requires all entities, upon formation, to state "the name and address of each[] . . . organizer for the filing entity." Ala. Code. § 10A-1-3.05(a)(6), (A). It is not clear whether plaintiffs believe that this general requirement is unconstitutional, or whether they believe that a State's determination that certain information need not be provided creates a sufficient expectation of privacy to support a meritorious Fourth Amendment claim. Neither position is tenable; the latter would suggest that every new reporting requirement is unconstitutional.

Plaintiffs' efforts to identify a concrete privacy interest fare no better. Plaintiffs rely on an example involving a hypothetical public figure who uses an LLC to conceal

their ownership of a "home or other property" for "security purposes." Pls.' Br. 63. Plaintiffs do not explain, however, why requiring such an individual to report ownership information to the government, but not to the public at large, would imperil that security interest, even while they recognize that the privacy interest must be specific to the context in which the information is revealed. Plaintiffs acknowledge, in particular, that the individual would have "disclosed some of the requested information elsewhere (*e.g.*, in tax reports, passport forms, bank account applications)." *Id.* Again, it is unclear whether those other reporting obligations (to the extent they are imposed by governments) are also alleged to violate the Fourth Amendment, or whether plaintiffs have some (unexplained) reason that FinCEN, unlike other government entities, is likely to compromise their security.

Any asserted privacy interest would in any event be minimized by detailed statutory safeguards that plaintiffs do not address. When FinCEN receives ownership information, it can only disclose that information to law enforcement and other entities in specified circumstances that sometimes require court authorization. *See* 31 U.S.C. § 5336(c)(2). And entities that receive ownership information from FinCEN must restrict access, implement security measures, and comply with many similar protocols. *See id.* § 5336(c)(3). Any individual who violates those protocols is subject to criminal and civil penalties. *See id.* § 5336(c)(4).

**B.** Plaintiffs make no attempt to reconcile their Fourth Amendment argument with *Shultz* or with the many reporting requirements that have long been understood

21

as constitutional. Instead, plaintiffs urge (Pls.' Br. 65) that any "suspicionless" reporting requirement that serves "law-enforcement purposes" categorically violates the Fourth Amendment. Under this theory, vast swathes of state and federal law would be subject to Fourth Amendment challenges, and *Shultz* itself would be wrongly decided. That is fatal to plaintiffs' argument.

Rather than grapple with cases addressing reporting requirements, plaintiffs rely (Pls.' Br. 59-62) on precedents involving substantial privacy intrusions. *Brown v. Texas* concerned the suspicionless seizure of an individual. 443 U.S. 47, 49 (1979). *City of Los Angeles v. Patel* addressed an ordinance that permitted police officers to enter hotels and inspect their guest registers at any time of the day or night, as often as they liked. 576 U.S. 409, 421 (2015). And the Colonial Era "general warrants" to which plaintiffs refer "allowed British officers to rummage through homes in an unrestrained search for evidence." *Carpenter v. United States*, 585 U.S. 296, 303 (2018). None of these examples casts doubt on the constitutionality of a statute that requires certain businesses to identify their owners.[1]

Plaintiffs' misunderstanding of Fourth Amendment precedent is further illustrated by their focus (Pls.' Br. 60-61) on *Carpenter*. That case identified as a Fourth

---

[1] Plaintiffs' reliance on an out-of-circuit district court decision is likewise misplaced. *See* Pls.' Br. 61 (citing *Airbnb Inc. v. City of New York*, 373 F. Supp.3d 467, 481 (S.D.N.Y. 2019)). The law at issue there required each regulated entity to "regularly reproduce" a "breathtaking" amount of data. *Airbnb*, 373 F. Supp. 3d at 481, 490. No similar circumstances are present here.

Amendment search the government's use of new technology that provided "a comprehensive dossier of [a person's] physical movements." 585 U.S. at 300. The information at issue here is far less detailed and far less sensitive. And despite plaintiffs' claim (Pls. Br. 66) that the CTA involves "modern data-collection technology," the only relevant technology is that FinCEN generally anticipates that reports "will be submitted electronically through an online interface," 87 Fed. Reg. at 59,508. An agency's use of an internet form instead of paper submissions hardly qualifies as an "innovati[ve]" "surveillance tool[]" of the kind at issue in *Carpenter*. 585 U.S. at 305.

## CONCLUSION

For the foregoing reasons and those given in our opening brief, the district court's judgment should be reversed.

Respectfully submitted,

*Of Counsel:*

NEIL H. MACBRIDE
  *General Counsel*

JACOB LOSHIN
  *Assistant General Counsel for Enforcement and Intelligence*

SEAN BOYCE
  *Deputy Chief Counsel, Financial Crimes Enforcement Network*

*Department of the Treasury*

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

PRIM F. ESCALONA
  *United States Attorney*

DANIEL TENNY

  *s/ Steven H. Hazel*
STEVEN H. HAZEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7217*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2498*
  *Steven.H.Hazel@usdoj.gov*

June 2024

24

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,584 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Steven H. Hazel*
Steven H. Hazel

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.


*s/ Steven H. Hazel*
Steven H. Hazel