IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

—————————————

NATIONAL SMALL BUSINESS UNITED, et al.,

Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF THE TREASURY, et al.,

Defendants-Appellants.

—————————————

On Appeal from the United States District Court
for the Northern District of Alabama

—————————————

## AMICUS BRIEF OF COMMUNITY ASSOCIATIONS INSTITUTE IN SUPPORT OF PLAINTIFF-APPELLEE

—————————————

Steve Casey
Jones Walker LLP
420 20th Street N
Suite 1100
Birmingham, AL 35203
scasey@joneswalker.com
205-244-5282

Thomas Ware
Kulik Gottesman
Siegel & Ware LLP
16303 Ventura BLVD
Suite 1400
Sherman Oaks, CA 91403
tware@kgswlaw.com
310-557-9200

Edmund Allcock
Norman F. Orban
Allcock Marcus LLC
10 Forbes Rd, 420W
Braintree, MA 02184
ed@amcondolaw.com
norm@amcondolaw.com
781-884-1660

Brendan P. Bunn
Chadwick, Washington
Moriarty, Elmore & Bunn PC
Three Flint Hill
3201 Jermantown Road
Fairfax, VA 22030
bpbunn@chadwickwashington.com
703-352-1900

Julie Howard
NowackHoward LLC
One Alliance Center, 1650
350 Lenox Road NE
Atlanta, GA 30326
julie@nowackhoward.com
770-863-8903

Todd A. Sinkins
Rees Broome, PC
1900 Gallows Road,
Suite 700
Tysons Corner, VA 22182
tsinkins@reesbroome.com
703-790-1911

Dated: September 5, 2024

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

|                                              |     |                |
| -------------------------------------------- | --- | -------------- |
| NATIONAL SMALL BUSINESS UNITED, et al.,      | )   |                |
|                                              | )   |                |
| Plaintiffs-Appellees,                        | )   |                |
|                                              | )   |                |
| v.                                           | )   | No. 24-10736   |
|                                              | )   |                |
| U.S. DEPARTMENT OF THE TREASURY, et al.,     | )   |                |
|                                              | )   |                |
| Defendants-Appellants.                       | )   |                |

**CERTIFICATE OF INTERESTED PERSONS**

Amicus Curiae Community Associations Institute submits this Certificate of Interested Persons and Corporate Disclosure Statement.  See Fed. R. App. P. 26.1; 11th Cir. R. 26.1-1, 1-2, & 1-3.   In addition to the individuals set forth in the Appellants' Brief, Appellees' Brief, and Briefs of other Amici Curiae, the following entities and individuals have an interest in this matter:

1.  **Community Associations Institute**, *Amicus Curiae* in support of Plaintiffs- Appellees;

2.  **Allcock, Edmund**, counsel for *Amicus;*

3.  **Bunn, Brendan P.**, counsel for *Amicus;*

4.  **Casey, Steven F.**, counsel for *Amicus;*

5.  **Gottesman, Kulik**, counsel for *Amicus;*

1

6.     **Howard, Julie**, counsel for *Amicus;*

7.     **Jones Walker, LLP**, law firm of counsel for *Amicus*;

8.     **Orban, Norman F.**, counsel for *Amicus;*

9.     **Sinkins, Todd A.**, counsel for *Amicus;*

10.    **Ware, Thomas**, counsel for *Amicus;*


## CORPORATE DISCLOSURE STATEMENT

Amicus has no parent corporation and no publicly traded corporation owns more than 10% of Amicus.

Respectfully submitted,

/s/  Steven F. Casey
Steven F. Casey
Jones Walker, LLP
420 20th Street N
Suite 1100
Birmingham, AL 35203

#102570422v1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.........................................................................................ii

I.      IDENTITY AND INTEREST OF AMICUS CURIAE...................................1

II.     DECLARATION OF AMICUS....................................................................5

III.    APPLICATION OF COMMUNITY ASSOCIATIONS AND THEIR
        VOLUNTEER HOMEOWNER BOARD MEMBERS TO THE
        CORPORATE TRANSPARENCY ACT DEMONSTRATES THAT
        THE ACT EXCEEDS ITS STATED PURPOSE AND IS
        OVERBROAD. ...............................................................................................6

IV.     THE CTA IS UNCONSTITUTIONALLY VAGUE AS TO
        COMMUNITY ASSOCIATIONS ...................................................................8

V.      THE CORPORATE TRANSPARENCY ACT CREATES AN
        UNREASONABLE AND UNCONSTITUTIONAL BURDEN ON
        COMMUNITY ASSOCIATIONS. ...............................................................12

VI.     THE INTRASTATE ORIGIN AND OPERATION OF COMMUNITY
        ASSOCIATIONS, WITH LARGELY NON-COMMERCIAL
        ACTIVITIES, PUTS THEM BEYOND THE REACH OF THE
        COMMERCE CLAUSE AS IMPLEMENTED THROUGH THE
        CTA..............................................................................................................15

        A.      The CTA is Unconstitutional as to Community Associations
                Because They Are Created Wholly Through Intrastate Action
                and Conduct Primarily Intrastate Commerce.....................................15

        B.      Many Core Functions of Community Associations Are Entirely
                Non-Commercial, Thus Making Their Activities Beyond the
                Reach of the Commerce Clause and the CTA.....................................17

VII.    THE CORPORATE TRANSPARENCY ACT IS
        UNCONSTITUTONAL AS IT HAS NO EXPRESS
        JURISDICTIONAL HOOK THAT LIMITS ITS REACH TO A
        DISCRETE SET OF ACTIVITIES THAT HAS AN EXPLICIT
        SUBSTANTIAL EFFECT ON INTERSTATE COMMERCE......................19

CERTIFICATE OF COMPLIANCE.................................................................. 25

# TABLE OF AUTHORITIES

**CASES**

*Bama Tomato Co. v. United States Dep't of Agriculture*,
   112 F.3d 1542 (1997) ........................................................ 10

*Familias Unidas v. Briscoe*,
   619 F.2d 391 (5th Cir.1980) ............................................... 10

*Gibbons v. Ogden*,
   9 Wheat. 1 (1824) ............................................................. 19

*Gonzalez v. Raich*,
   545 U.S. 1 (2005) ......................................................... 17, 18

*Grayned v. City of Rockford*,
   408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ........................ 10

*Kolender v. Lawson*,
   461 U.S. 352 (1983) .......................................................... 14

*Lamie v. U.S.*,
   540 U.S. 526 (2004) .......................................................... 24

*National Federation of Independent Business v. Sebelius*,
   567 U.S. 519 (2021) ............................................. 19, 21, 22, 24

*Netchoice, LLC V. Paxton*,
   142 S.Ct. 1715 (2022) ........................................................ 13

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
   487 U.S. 781 (1988) .......................................................... 13

*Secretary of State of Maryland v. Munson Co.*,
   467 U.S. 948 (1984) ........................................................... 8

*Springfield Armory, Inc. v. City of Columbus*,
   29 F.3d 250 (6th Cir.1994) ............................................... 14, 15

*United States v. Lopez*,
   514 U.S. 549 (1995) .................................................................................... *passim*

*United States v. Orito*,
   413 U.S. 139 (1973) ............................................................................. 16

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
   471 U.S. 626 (1985) ............................................................................. 13

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Art. I, §8 ............................................................................. 19

Tenth Amendment to the U.S. Constitution ........................................... 19

**STATUTES**

26 U.S.C. § 528 ................................................................................... 23
31 U.S.C. § 5336 ........................................................... 9, 11, 22, 23, 24
42 U.S.C. § 139 (1997) .......................................................................... 7

**RULES**

Fed. R. App. P. 29 .................................................................................. 5

**REGULATIONS**

Beneficial Ownership Information Reporting Requirements,
   87 Fed. Reg. (2022) ......................................................................... 9, 12

**OTHER AUTHORITIES**

The Federalist No. 45 (C. Rossiter ed. 1961) ....................................... 19

William M. (Mac) Thornberry National Defense Authorization Act for
   Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388 ....................... 9

# I. IDENTITY AND INTEREST OF AMICUS CURIAE.

The Community Associations Institute ("CAI") is an international nonprofit research and education organization formed in 1973 by the Urban Land Institute, the National Association of Home Builders, and the United States Counsel of Mayors to provide the most effective guidance for the creation and operation of condominiums, cooperatives, and homeowners associations. CAI is dedicated to providing information, education, resources, and advocacy for community association leaders, members, and professionals with the intent of promoting successful communities through effective, responsible governance and management. CAI's more than 45,000 members include homeowners, board members, association managers, community management firms, and other professionals who provide services to community associations. CAI is the largest organization of its kind, serving more than 75.5 million homeowners who live in more than 365,000 community associations in the United States. These residents constitute roughly 25% of the population of the United States.

Community associations are property developments in which a developer, or declarant, has willingly submitted an interest in real property to some form of community association regime. The regimes include, among others, condominiums, homeowners associations, and co-operatives. The community association presents a unique form of ownership where responsibility for the

submitted property is shared between the individual owner or member, on the one hand, and an association, trust, or corporation, on the other. To that end, many commentators have suggested that community associations make up and comprise the last bastion of affordable housing in the United States.

All community associations are governed by nonprofit organizations led initially by the developer or declarant and eventually by a group of volunteer homeowners elected by their fellow homeowners. Depending on the locality, community associations are formed as a nonprofit corporation, trust, or, less frequently, unincorporated associations. The primary role of community associations is to manage the common areas of the community, i.e. fix the roofs, maintain the lawns, shovel the snow, insure the buildings, etc. The elected board of volunteer homeowners take on or oversee these tasks free of charge. Volunteer board members of community associations cycle on and off their boards frequently, at least annually through the election process, and sometimes more frequently because of relocation, resignation, death and/or removal.

CAI submits this amicus brief on behalf of its members who recognize that the sustained health of the community association form of ownership in the United States depends in large part upon the willingness of owners to continue to serve on their associations' volunteer boards to make their homes and communities better places to live.

Community associations were not given one of the twenty-three (23) exemptions under the Corporate Transparency Act ("CTA").[1] CAI believes that this was an oversight. CAI respectfully submits that community associations are not "hotbeds" of financial crimes or terrorist activity by anonymous players using shell corporations to disguise their activities, which is the stated purpose of the CTA. First, community associations are anything but anonymous. Their owners are on public record with local registries of deeds when they buy property in a community. Community associations also record the identities of their volunteer board members with the local registry or secretary of state's office annually. Second, given that community association boards are made up of volunteer homeowners who ensure the lawns are cut, roofs are repaired, and the swimming pools are maintained in affordable housing across America, they are as far from a terrorist or financial threat as could be. They are the backbone of America, homeowners living in and volunteering to make their communities better.

Notwithstanding this, the Financial Crimes Enforcement Network ("FinCEN") and the Department of the Treasury (collectively the "Government") have specifically refused to grant community associations an exemption from reporting under the CTA. This could be because they recognize that community

---

[1] A small number may be exempt as 501(c)(4) organizations, however, that is the exception to the norm.

associations make up 25% of the United States population and because an underlying goal of the Government is to create as large of a facial recognition database as possible. However, CAI respectfully submits that requiring community associations and their volunteer homeowner leaders to comply with the beneficial ownership reporting requirements will chill volunteer participation going forward and is contrary to other express legislative intent in promoting volunteerism in nonprofit organizations.

Volunteerism is the backbone of every community association. Board members are not paid for their service. CAI respectfully submits that volunteer homeowners will be less likely to serve in that capacity if they are required to file a beneficial ownership report with the Government, proving their sensitive personal information including their driver's license and photo identification and then to amend their filings each time their board brings on new board members or obtain new state issued driver's licenses. This is especially true where failure to comply brings with it $500.00 per day fines and the possibility of imprisonment.

It's horrifying to imagine that a homeowner could be subject to imprisonment in the United States of America because they purchased a home and volunteered to serve on the board of directors for their community association but failed to upload a photograph of their state issued driver's license to a federal

database.  Homeowners will no doubt be reluctant to volunteer in light of the potential Orwellian consequences imposed by the CTA.

CAI submits that the CTA will have a devastating and unintended consequence on community associations and their operations throughout the United States. CAI respectfully submits that the CTA exceeds the power of Congress to regulate activity that is governed entirely by the states in which the community associations are located. The CTA's application to community associations and their volunteer homeowners but <u>not</u> to business corporations that have more than $5,000,000.00 in profits per year demonstrates the absurdity of its reach and the reality that it is not in furtherance of its stated purpose. Moreover, as detailed herein, the CTA is constitutionally vague and its application to community associations is like attempting to fit a square peg into a round hole.

In keeping with CAI's long-standing interest in promoting understanding regarding the operation and governance of community associations, CAI urges this Court to affirm the Judgment of the Trial Court declaring the CTA unconstitutional.

## II.     <u>DECLARATION OF AMICUS.</u>

Pursuant to Fed. R. App. P. 29, CAI makes the following declarations:

1.     This brief was not authored in whole or in part by counsel for any of the parties to this case.

2.    Neither the parties to this case nor their counsel contributed

money that was intended to fund preparing or submitting this brief.

3.    The amicus curiae and its counsel have not represented the

parties to this appeal in another proceeding involving similar issues.

## III.   APPLICATION OF COMMUNITY ASSOCIATIONS AND THEIR VOLUNTEER HOMEOWNER BOARD MEMBERS TO THE CORPORATE TRANSPARENCY ACT DEMONSTRATES THAT THE ACT EXCEEDS ITS STATED PURPOSE AND IS OVERBROAD.

The CTA was enacted on January 1, 2021, and has a stated purpose to

combat money laundering, the financing of terrorism, and other illicit activity by

cracking down on the use of anonymous "shell companies."[2]  Requiring every

homeowner in the United States who volunteers to serve on their community

association board for the purpose of managing and maintaining the shared portion

of their homes and common areas to report their personal information to FinCEN

does not help the United States government combat terrorism or money laundering.

Condominium associations, homeowners associations, and cooperatives are

**not** anonymous shell companies.  All community associations take the form of a

nonprofit entity, trust, or unincorporated association.  They are largely creatures of

statute required to be formed by their state government to manage shared property.

All board members are identified in some local governmental filing. Community

---

[2] William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388.

association boards range in number and are comprised entirely of unpaid volunteers who cycle on and off the board, annually, and sometimes more frequently.

The CTA reporting requirements discourage volunteer service on community association boards.[3] If homeowner volunteers fail to file or amend their beneficial ownership report timely, they will be subject to penalties or imprisonment.[4] The CTA is also unclear on the consequences if one volunteer board member fails to file their beneficial ownership report with FinCEN. Does that subject the other members to penalties? Are volunteer board members now required to police the other volunteers' CTA reporting?

The overbroad nature of the CTA contradicts Congress's prior express intent in encouraging and providing immunity for volunteers of nonprofit entities. The Federal Volunteer Immunity Act of 1997, 42 U.S.C. § 139 (1997), expressly provides immunity for negligent acts of volunteers with nonprofit entities. In enacting this legislation, Congress specifically found that "the willingness of

---

[3] If a volunteer homeowner becomes a board member, they are required to file a beneficial ownership report with FinCEN or be subject to penalties. However, that same board member is further required to amend their beneficial ownership report with FinCEN within thirty (30) days if they change their e-mail address or renew their driver's license.

[4] Many community associations are comprised of elderly citizens, who may not have the technological savvy to upload their driver's license to the FinCEN website.

volunteers to offer their services is deterred by the potential for liability actions against them and the withdrawal of volunteers has had an adverse effect on organizations." Yet the CTA is so overbroad that it subjects volunteer homeowners to imprisonment and civil fines if they don't upload their driver's license to a government website the moment they begin their service. CTA is so overbroad and vague that it undermines prior legislation and prior stated legislative intent. *Secretary of State of Maryland v. Munson Co.*, 467 U.S. 948, 958 (1984) (Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but the benefit of society).

CTA's burden will fall substantially and disproportionately on community associations and their homeowners who have volunteered to manage their shared property, regardless of whether there is any reason to believe that these community associations have engaged in any misconduct whatsoever. Accordingly, this Court should __affirm__ the Trial Court's Decision holding that the CTA is unconstitutional.

## IV. __THE CTA IS UNCONSTITUTIONALLY VAGUE AS TO COMMUNITY ASSOCIATIONS.__

The CTA requires "reporting companies" to provide to FinCEN data regarding each "beneficial owner" and "applicant." Each of these terms is broadly

and ambiguously defined.[56]  Despite containing 23 exemptions, the CTA does **not** exempt community associations.[7]  As noted, 25% of the population of the United States resides in community associations and some community associations even include a number of units or homes that are set aside as "affordable housing" for lower income owners.[8]  The creation, organization, and management of community associations in the United States is governed by their applicable state statute and all

---

[5] A "reporting company" is defined as a "corporation, limited liability company, or similar entity that is (i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11)(A).  A "beneficial owner" is defined as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise" (i) "exercises substantial control over the entity;" or (ii) "owns or controls not less than 25 percent of the ownership interests of the entity." *Id*. § 5336(a)(3)(A).

[6] According to FinCEN, the "reporting companies" subject to the CTA will include approximately 32.6 million existing entities in 2024, plus roughly five million additional corporate entities created or registered under State law every year from 2025 to 2035, as well as foreign companies registered to do business in the United States. Beneficial Ownership Information Reporting Requirements for Financial Crimes Enforcement Network (FinCEN), 87 Fed. Reg. at 59549 (2022).

[7] There are three primary types of Community Associations in the United States: (1) condominiums, (2) homeowners associations, and (3) cooperatives.

[8] A significant number of community associations serve owners with low to middle class incomes, as community associations have often been described by Community Association experts as the "last bastion of affordable housing in the United States."

community associations file some document and update that document at an office controlled by their state identifying the volunteer board members.

"A statute is vague if it fails to afford a 'person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.'" *Bama Tomato Co. v. United States Dep't of Agriculture,* 112 F.3d 1542, 1547 (1997) (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). Thus, "[v]ague laws are objectionable as transgressions of due process guarantees on two grounds: (1) they fail to provide fair warning to citizens charged with their observance, and (2) by failing to provide clear guidelines, they lend themselves to arbitrary applications by those charged with their enforcement." *Bama Tomato,* 112 F.3d at 1547 (quoting *Familias Unidas v. Briscoe,* 619 F.2d 391, 399 n. 8 (5th Cir.1980)).

The CTA requires homeowner volunteers to interpret the CTA or hire lawyers *just to volunteer*.

It is unclear whether the CTA applies only to incorporated community associations as opposed to those that are unincorporated associations or take the form of a trust. The language of the CTA suggests that entities that are formed with the recording of a document at an office like the secretary of state includes unincorporated community associations and trust associations. It would not make sense that only a subset of community associations must comply with the CTA.

The CTA provides that an individual who "indirectly" by any "understanding" "exercises substantial control" over an entity must be reported as a "beneficial owner." 31 U.S.C. § 5336(a)(3)(A).  With respect to community associations, the term "substantial control" applies to the association's board of directors, but it could also arguably apply to their property manager or possibly the entire community of homeowners.[9]  There is no clear answer and no guidance from FinCEN.

In addition, it is not uncommon for a single owner to own 25% of the units in a community association.  The CTA defines such a person as someone having "substantial control" and is required to report, even if they are *not* on the association's board.  This would require the board to monitor whether or not anyone at any one time gains a 25% ownership stake, and then request that individual also file a beneficial ownership report with FinCEN under the CTA.[10]

A **<u>volunteer</u>** homeowner board member cannot know the actual meaning of "beneficial ownership" or "substantial control" when the CTA defines it using such

---

[9] Certain state statutes and governing documents require 100% owner consent for the approval of certain items/actions.  Is that substantial control?

[10] What would happen if that owner refused to comply with his BOI/CTA reporting requirements?  Would the remainder of the volunteer board members and the community association itself become subject to fines and imprisonment for non-compliance?

vague terms.[11] The law is unconstitutionally vague and has serious unforeseen and unintended consequences. Accordingly, this Court should **affirm** the Trial Court's Decision.

## V. THE CORPORATE TRANSPARENCY ACT CREATES AN UNREASONABLE AND UNCONSTITUTIONAL BURDEN ON COMMUNITY ASSOCIATIONS.

The CTA has the unintended consequence of making it more difficult for certain types of entities to function in furtherance of their intended purposes. As addressed above, community associations are created to fulfill a small, entirely local purpose of maintaining property and providing for the operations of their specific community for their residents. These associations, which consist solely of residential housing and, in many cases, of a single building, are run by volunteers who own the individual housing units within such associations. Because of the nature of community associations, the members of their board turn over with frequency, in some cases several times in a single year. Since the CTA requires a corporate entity to timely update their BOI any time it changes, the volunteers on these boards will constantly face the burden of updating the filing of their BOI with FinCEN.

---

[11] In another instance, the Final Rule defines "substantial control" as including a circumstance where an individual, "[h]as **any other form of substantial control** over such reporting company." 87 Fed. Reg. at 59595 (emphasis added). This definition is not only vague ("any other form"), but also self-referential and thus virtually meaningless.

A law is unconstitutional if it is unduly burdensome and if it is not narrowly tailored to a specific government interest that is outweighed by the burden imposed on the persons subject to the law. *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988). A law governing a business disclosure is constitutional only when the information disclosed by such business is "purely factual and uncontroversial information" and is not "unjustified or unduly burdensome." *Netchoice, LLC v. Paxton*, 142 S.Ct. 1715 (2022) (Alito dissenting) citing to *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985).

Community associations are not operated on a professional basis. There are many condominiums throughout the country with less than 10 units total. With the implementation of the CTA, homeowner volunteers will be required to be familiar and comply with a federal statute that on its face has no relationship with the interests of the community association that they serve and also brings with it the penalty of imprisonment. For many community associations, they will not be aware or even have reason to believe that their board members have an obligation to provide their information to FinCEN.

Application of the CTA to community associations is already having a chilling effect on volunteerism within these communities. Many people are uncomfortable providing their personal information for inclusion in FinCEN's

database. Potential volunteers have expressed concern that their personal information is subject to theft if and when the FinCEN database is hacked. Additionally, the penalties for noncompliance are so severe as to discourage individuals from volunteering to serve their neighbors on their association's board of directors. Why would someone volunteer for a position that provides no compensation or personal benefit when they are subjected to potential fines of up to $250,000.00 and two years in jail if the person fails to provide their personal information to FinCEN?

The substantial burden imposed by compliance with the CTA and the lack of clarity as to the nature and extent of its applications to certain entities, including unincorporated community associations, means that the CTA should not be enforced as it is both overly burdensome and unconstitutionally vague. Indeed, the fact that criminal penalties attach to a failure to comply with the CTA implicates the due process clause of the Fifth Amendment to the Constitution. Where "a statute imposes criminal penalties, the standard of certainty [that due process requires] is higher." *Kolender v. Lawson*, 461 U.S. 352, 358 n. 8 (1983); *Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 252 (6th Cir.1994). Failure to satisfy this stringent standard of law requires the statute to be struck as unconstitutionally vague even if the law "could conceivably have had some legitimate application." *Kolender*, *supra*; *Springfield Armory*, *supra*, 29 F.3d at

251–54 (invalidating statute on vagueness grounds under strict review applicable to criminal statutes). Because the CTA imposes criminal penalties on individuals that in many instances will have no reason to believe that the CTA applies to them or even exists, the CTA is unconstitutional and should not be enforced.

## VI. THE INTRASTATE ORIGIN AND OPERATION OF COMMUNITY ASSOCIATIONS, WITH LARGELY NON-COMMERCIAL ACTIVITIES, PUTS THEM BEYOND THE REACH OF THE COMMERCE CLAUSE AS IMPLEMENTED THROUGH THE CTA.

### A. The CTA is Unconstitutional as to Community Associations Because They Are Created Wholly Through Intrastate Action and Conduct Primarily Intrastate Commerce.

Community associations are created in accordance with the laws of the states where they are located. These entities – whether homeowners associations, condominiums, or housing cooperatives – are formed by a myriad means, from filing charters with state agencies to recording founding documents in the land records division of local courts or even by creating private trusts or LLCs. But in each and every case, the creation of a community association is a wholly in-state function dictated entirely by state law.

In addition to their creation being local, community associations are formed with the core purpose of managing and maintaining land and facilities shared by the community's homeowners. This typically means hiring local landscape companies, maintenance workers, or trash collectors. As such, the essence of a

community association's activity is necessarily intrastate, with associations being but an occasional *de minimis* participant in any kind of interstate commerce.

The Government argues that the CTA validly regulates the channels and instrumentalities of commerce, broadly arguing that "common sense" indicates that "entities constituting CTA reporting companies frequently utilize the channels of interstate commerce." (Doc. 24-1 at 33). Indeed, it is well-settled that Congress has the power to regulate those who use the channels of interstate commerce "in order that those channels will not become the means of promoting or spreading evil, whether of a physical, moral or economic nature." *United States v. Orito*, 413 U.S. 139, 144 (1973). However, this argument could not be less true as it relates to community associations. Condominium and homeowners associations are necessarily local entities, with homes within any community located entirely within one state and one locality.

While the CTA's reporting requirements are aimed at organizations created by the filing of documents with certain state offices, there is an underlying, fallacious assumption that such entities <u>must</u> engage in interstate commerce. While this might be true of a chartered corporation selling products or services on a nationwide or regional level, it is decidedly untrue as to community associations. Not only are community associations created at an entirely in-state level, their core

mandate of maintaining their property drives them to primarily intrastate and local commercial activity.[12]

In sum, to suggest that a homeowners association comprised of 25 homes in a local county – which is not uncommon – frequently "uses the channels of commerce [so that] Congress can impose conditions on that use" (as argued by the Government, citing *California Bankers Ass'n v. Shultz*, 416 U.S. 21 [1974)]) belies the necessarily local and intrastate nature of community associations, both as to their formation and actual operation. As such, the CTA is unconstitutional in its application to such entities.

### B. Many Core Functions of Community Associations Are Entirely Non-Commercial, Thus Making Their Activities Beyond the Reach of the Commerce Clause and the CTA.

Another core purpose of a community association is to promote a sense of "community" among the homeowners who live there, with governance carried out by member volunteers serving on committees to organize events ranging from "clean up the community" day to picnics or movie nights on the common area. In

---

[12] The Supreme Court has held that Congress, in regulating activities that substantially affect in-state commerce, can regulate non-economic, non-commercial or *de minimis* intrastate activity only if doing so is necessary to avoid undermining a comprehensive regulatory scheme that directly regulates interstate commerce. *Gonzalez v. Raich*, 545 U.S. 1, 171-9 (2005). The question here is whether the CTA's regulation of intrastate or non-commercial activities that affect interstate commerce is a necessary and proper means of doing so – and that answer is no with respect to community associations.

most associations, these volunteers meet in the evenings (after returning home from work) to plan such events, usually in community clubhouses, under gazebos or even at local schools or people's homes.

While many associations engage in local commerce to maintain their property, these other community-promoting activities are decidedly <u>non-commercial</u>, arguably placing associations entirely beyond the reach of the Commerce Clause. The CTA, by its terms, would force an association to comply with the requirements of a "reporting company" solely because the entity was formed by filing a document with a state agency. The CTA – which does not even mention the term "commerce" – cannot be used to drag a volunteer-run entity with non-commercial purposes under an arduous federal reporting law. Put another way, the Commerce Clause cannot be used as a basis to regulate non-commercial activity.

The Supreme Court has held that Congress, in regulating activities that substantially affect in-state commerce, can regulate non-economic, non-commercial or *de minimis* intrastate activity only if doing so is necessary to avoid undermining a comprehensive regulatory scheme that directly regulates interstate commerce. *Gonzalez v. Raich*, 545 U.S. 1, 171-9 (2005). The question here is whether the CTA's regulation of intrastate or non-commercial activities that affect interstate commerce is a necessary and proper means of doing so – and that answer

is no with respect to community associations. The intrastate nature of both the origin and operation of community associations, along with their largely non-commercial purposes, places them outside the reach of the Commerce Clause, at least as it is implemented by the purported purposes and terms of the CTA. Therefore, the CTA, as it applies to community associations, is unconstitutional and should not be enforced.

**VII.  THE CORPORATE TRANSPARENCY ACT IS UNCONSTITUTONAL AS IT HAS NO EXPRESS JURISDICTIONAL HOOK THAT LIMITS ITS REACH TO A DISCRETE SET OF ACTIVITIES THAT HAS AN EXPLICIT SUBSTANTIAL EFFECT ON INTERSTATE COMMERCE.**

The Constitution creates a federal government of enumerated  powers.  See Art. I, § 8. As James Madison wrote:  "The powers delegated by the proposed Constitution to the federal government are few and defined.  Those which are to remain in the State governments are numerous and indefinite."  The Federalist No. 45, pp. 292-293 (C. Rossiter ed. 1961); *United States v. Lopez,* 514 U.S. 549, 552 (1995).  "The enumeration of powers is also a limitation of powers, because '[t]he enumeration presupposes something not enumerated.'" *National Federation of Independent Business v. Sebelius,* 567 U.S. 519, 534 (2021) [*quoting*] *Gibbons v. Ogden,* 9 Wheat. 1, 195 (1824).  This fact is recognized in the Tenth Amendment to the U.S. Constitution which states, in relevant part: "[t]he powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or

to the people." CTA is unconstitutional because it seeks to regulate intrastate conduct that is not within the federal government's enumerated powers.

The Government asserts that the CTA is aimed at "active, for-profit businesses with an especially close connection to commerce." Brief for Appellants, p. 12. However, as pointed out by the Supreme Court in *United States v. Lopez, supra,* 514 U.S. at 562, such an assertion without reference to an expressed jurisdictional hook in the statute is insufficient to establish the requisite nexus with interstate commerce.

In *Lopez,* the Supreme Court struck down the Gun-Free Zones Act of 1990 as unconstitutional. *Id.* at 551. The Act made it a federal offense for "any individual knowingly to possess a firearm at a place that individual knows, or has a reasonable cause to believe, is a school zone." *Id.* The Court rejected the argument that the Act was a valid exercise of Congress' right to regulate interstate commerce. *Id.* The Court noted that Congress' right to regulate commerce is limited to three circumstances: (1) the use of channels of interstate commerce; (2) the instrumentalities of interstate commerce or persons or things in interstate commerce; or (3) activities having a substantial relation to interstate commerce. *Id.* at 558-559. The Court summarily concluded that regulating gun possession on a state school ground did not involve the use of channels of interstate commerce or instrumentalities or persons in interstate commerce. *Id.* at 559. Thus, its

constitutionality depended on whether it was regulation of an activity that substantially affects interstate commerce. *Id.*

To justify the regulation as substantially affecting interstate commerce, the Government must show a requisite nexus with interstate commerce. *Id.* at 562. To do so, it must point to a "jurisdictional element" in the statute that "would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at 561-562. The Court found that the Act had "no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection or effect on interstate commerce." *Id.* at 562. The possession of a gun by itself is not commercial activity and the Act does not "contain[] a requirement that the possession be connected in any way to interstate commerce." *Id.* at 551. Therefore, "[w]e hold that the Act exceeds the authority of Congress '[t]o regulate Commerce . . . among the several states ....' U.S. Const. Art. I, §8, cl. 3." *Id.*

Similarly, the Supreme Court in the *National Federation of Independent Business v. Sebelius*, *supra,* 57 U.S. at 588, held that the Affordable Care Act's individual mandate requiring the procurement and maintenance of minimum health insurance coverage could not be enacted under the Commerce Clause. The Court concluded that the individuals who had not purchased insurance were not engaged in interstate commerce. *Id.* at 552. Rather, the individual mandate was seeking to

compel individuals who are doing nothing to engage in commerce. *Id.* Thus, the individual mandate is "particularly divorced from any link to existing commercial activity." *Id.* at 556. At best, the Act sought to regulate "prophesied future activity." *Id.* at 557. "But we have never permitted Congress to anticipate that activity itself in order to regulate individuals not currently engaged in commerce." *Id.* Such permission is not consistent with Congress' enumerated powers, but rather would be tantamount to creating a general federal police power. *Id.* at 536, 556-557. Such broad police power, however, "remains vested in the States." *Id.* at 557.

Like the Acts involved in the *Lopez* and *National Federation of Independent Business* cases, the CTA does not regulate interstate commercial activity, nor does it contain a requirement that the persons to be regulated actually engage in interstate commerce. As correctly pointed out by the trial court, "[t]he word 'commerce,' or references to any channel or instrumentality of commerce, are nowhere to be found in the CTA. *See* 31 U.S.C. §5336." Memo of Op., p. 28.

The CTA focuses on documents filed with states connected with incorporation and business formation which, as discussed above, is not interstate commerce activity. (31 U.S.C. §5336(a)(11).) The Government asserts that the CTA's focus on commercial entities is especially apparent given that it addresses for-profit businesses. Other types of entities, such as certain trusts,

political organizations, and non-profit organizations, may incorporate but not be subject to the Act.  *See* 31 U.S.C. § 5336(a)(11)(B)(xix).  Brief for Appellants, p. 29.  Although characterized as regulating "for-profit businesses" likely to engage in prospective "commercial" activities, *id.*, the trial court correctly concluded that the CTA has no express "jurisdictional hook" "which might limit its reach to discrete set of [activities] that additionally have an explicit connection with or effect on interstate commerce."  *See United States v. Lopez, supra,* 514 U.S. at 562; *see also*, 31 U.S.C. § 5336.

For example, common interest development homeowners associations and condominium associations often are formed as nonprofit corporations pursuant to 26 U.S.C. § 528.  Condominium and homeowners associations are not engaged in a "for profit" purpose.  They are typically located wholly within a singular state such that their residential operations constitute intrastate activity. Common interest developments have never been identified as a hotbed of money laundering or terrorist activities.  Nonetheless, such condominium and homeowners associations are not exempted from CTA compliance.  *See* 31 U.S.C. § 5336(a)(11)(B).  These nonprofit entities' mandated disclosure obligations are not triggered or conditioned on their engagement in interstate commerce or any other discrete common interest development activity substantially affecting interstate commerce. Thus, there is no constitutional trigger that justify the CTA's regulation of these entities as there is

no "explicit connection with or effect on interstate commerce." *See United States v. Lopez, supra,* 514 U.S. at 562; *see also*, 31 U.S.C. § 5336.

The bottom line is that the CTA does not regulate interstate commerce on its face or contain a jurisdictional hook to regulation. Therefore, it is unconstitutional as it is not within Congress' enumerated powers. *See United States v. Lopez, supra,* 514 U.S. at 562; *National Federation of Independent Business v. Sebelius, supra,* 57 U.S. at 588. The province of the court is to interpret the law not re-write it. *Lamie v. U.S. Tr.,* 540 U.S. 526, 542 (2004). Thus, the trial court was correct in its assertion that the courts cannot amend the CTA to correct this jurisdictional deficiency. Memo of Op., p. 49. The Court's ruling holding the CTA unconstitutional should be upheld.

## <u>CONCLUSION</u>

For the reasons as set forth above, CAI states that this Court should affirm the decision of the Trial Court.

Respectfully submitted,

/s/ *Steve Casey*

Steve Casey
Jones Walker LLP
420 20th Street N
Suite 1100
Birmingham, AL 35203

Edmund Allcock
Norman F. Orban
Allcock Marcus LLC
10 Forbes Road, 420W
Braintree, MA 02184

Julie Howard
NowackHoward LLC
One Alliance Center, 1650
350 Lenox Road NE
Atlanta, GA 30326

Thomas Ware
Kulik Gottesman
Siegel & Ware LLP
16303 Ventura Blvd.
Suite 1400
Sherman Oaks, CA 91430

Brendan P. Bunn
Chadwick, Washington,
Moriarty, Elmore & Bunn PC
Three Flint Hill
3201 Jermantown Road
Fairfax, VA 22030

Todd A. Sinkins
Rees Broome, PC
1900 Gallows Road
Suite 700
Tysons Corner, VA 22182

Dated: September 5, 2024

<u>**CERTIFICATE OF COMPLIANCE**</u>

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) as the text consists of 6267 words as counted by Word for Microsoft 365 programming program used to generate this brief. This brief also complies with the type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) - (6) as it was prepared using Word for Microsoft 365 in 14-point font.

Dated: September 5, 2024                  /s/ *Steve Casey*

*Counsel for Community Associations Institute*