Nos. 24-10736

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

NATIONAL SMALL BUSINESS UNITED D.B.A. NATIONAL SMALL BUSINESS ASSOCIATION, ISAAC WINKLES,

*Plaintiffs-Appellees*,

v.

U.S. DEPARTMENT OF TREASURY, SECRETARY OF THE U.S. DEPARTMENT OF THE TREASURY, DIRECTOR OF THE FINANCIAL CRIMES ENFORCEMENT NETWORK,

*Defendants-Appellants*.

On appeal from the United States District Court for the Northern District of Alabama, No. 5:22-CV-01448-LCB

## APPELLEES' SUPPLEMENTAL BRIEF ADDRESSING GOVERNMENT'S INTERIM FINAL RULE EXEMPTING U.S. PERSONS AND DOMESTIC REPORTING COMPANIES FROM CTA REPORTING REQUIREMENTS

| | |
|---|---|
| Thomas H. Lee | John C. Neiman, Jr. |
| HUGHES HUBBARD & REED LLP | MAYNARD NEXSEN PC |
| One Battery Park Plaza | 1901 Sixth Ave. N, Ste. 1700 |
| New York, New York 10004 | Birmingham, Alabama 35203 |
| (212) 837-6000 | (205) 254-1000 |

**Attorneys for Plaintiffs-Appellees**

*NSBU v. U.S. Department of Treasury*
No. 24-10736

# CERTIFICATE OF INTERESTED PERSONS

The following is a list of all **additional** known judges, attorneys, persons, associations of persons, firms, partnerships, corporations, and other legal entities that have an interest in the outcome of this case, including subsidiaries, conglomerates, affiliates and parent corporations, any publicly held company that owns 10 percent or more of a party's stock, and other identifiable legal entities related to a party, **in addition to those listed in the parties' previously filed briefs:**

**[no new entries]**

# TABLE OF CONTENTS

Certificate of Interested Persons ......................................................... C-1

Table of Contents ................................................................................... i

Table of Citations .................................................................................. ii

Summary of the Argument ................................................................... 1

Argument ............................................................................................... 2

    I.    The Secretary's justifications for the interim final rule highlight the CTA's constitutional infirmities ..................... 2

    II.   Limiting the CTA to foreign-law entities does not repair the CTA's constitutional defects ........................................ 6

    III.  The interim final rule does not remove the unconstitutional features of the CTA .......................................... 9

Certificate of Compliance .................................................................... 11

# TABLE OF CITATIONS

## JUDICIAL DECISIONS

*Brown v. Texas*,
    443 U.S. 47 (1979) .................................................................................. 4

*California Bankers Association v. Shultz*,
    416 U.S. 21 (1974) .................................................................................. 5

*City of Indianapolis v. Edmond*,
    531 U.S. 32 (2000) .................................................................................. 4

*Clinton v. City of New York*,
    524 U.S. 417 (1998) .............................................................................. 10

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
    591 U.S. 1 (2020) .................................................................................. 10

*FBI v. Fikre*,
    601 U.S. 234 (2024) .............................................................................. 10

*Naturist Soc. v. Fillyaw*,
    958 F.2d 1515 (11th Cir. 1992) .............................................................. 9

*Small Bus. Ass'n v. Yellen*,
    No.1:24-cv-314-RJJ-SJB,
    2025 WL 704287 (W.D. Mich. Mar. 3, 2025) ........................................ 5

*United States v. Morrison*,
    529 U.S. 598 (2000) ................................................................................ 8

*United States v. Pugh*,
    90 F.4th 1318 (11th Cir. 2024) ............................................................... 6

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) ................................................................................ 8

**STATUTES AND ORDINANCES**

12 U.S.C. § 3401 ............................................................................................... 5

31 U.S.C. § 5336 ........................................................................................ 2, 6, 9

5 U.S.C. § 552a ................................................................................................. 5

**REGULATIONS AND ADMINISTRATIVE MATERIALS**

Beneficial Ownership Information Reporting Requirement
  Revision and Deadline Extension,
  90 FED. REG. 13,688 (March 26, 2025) ................................................. 2

## SUMMARY OF THE ARGUMENT

The Treasury Department's issuance of a new interim final rule marks a welcome—and long-overdue—recognition of the CTA's infirmities. But far from undermining this lawsuit, it reinforces the need for this Court to affirm the district court's judgment in three important ways.

**I.** First, the Government's brief says nothing about the determinations the Secretary of the Treasury made when justifying his decision to exempt all domestic entities and U.S. persons from the CTA's requirements. Those determinations fatally undermine the Government's continuing defense of the CTA's constitutionality here.

**II.** Second, the Government's new defense of the CTA based on its applicability to entities formed under the law of foreign countries comes at a tellingly late stage of this litigation. That argument is neither correct nor relevant to this case. The Executive Branch is not free to amend a statute mid-litigation and then provide a rationale that supports the amended statute, but not Congress's initial handiwork.

**III.** Third, no rule issued by Treasury can moot this case, which is directed to the constitutional defects in the statute, not the regulations associated with it. Executive Branch rulemakings leave the current administration and all future administrations free to issue new rules reversing course and enforcing the CTA. With the issues fully briefed and argued, this Court should affirm the judgment of the district court.

1

# ARGUMENT

## I. The Secretary's justifications for the interim final rule highlight the CTA's constitutional infirmities

In justifying the decision to exempt all domestic entities and U.S. persons from the statute's reach, the Secretary of the Treasury made numerous written determinations that fatally undermine the Government's arguments on both constitutional issues before this Court.

1. On the enumerated-powers issue, the Government has argued that "the CTA is necessary and proper to support a number of Congressional and Executive Branch powers." Govt. Appellant Br. 26. But the statutory sections the Treasury Secretary invoked when exempting all domestic entities and U.S. persons required him to determine that forcing their disclosures of their beneficial-ownership information "would *not* serve the public interest" and "would *not* be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes." 31 U.S.C. § 5336(a)(11)(B)(xxiv)(I) & (II) (emphases added). The Treasury Secretary, with the requisite concurrence of the Attorney General and Secretary of Homeland Security, made both determinations when issuing the interim final rule. *See* Beneficial Ownership Information Reporting Requirement Revision and Deadline Extension, 90 FED. REG. 13,688, 13,691 (March 26, 2025) (attached as exhibit hereto). The Government has made

2

no attempt to reconcile those determinations with the critical takeaway from the "central premises" of its "invocation of the Necessary and Proper Clause" here—namely, that forcing law-abiding Americans to disclose these details was "a critical component of the government's 'comprehensive regulatory scheme' to combat financial crime." Govt. Reply Br. 7-8.

The Secretary now correctly rejects that conclusion. Finding that the burdens associated with the prior reporting rule did not provide "sufficient benefits," the statement accompanying the interim final rule observes that the preexisting 2016 customer due diligence rule—on which both Plaintiffs and the district court relied in refuting the Government's constitutional arguments here, *see* Pltf. Appellee Br. 41-42—will "mitigate certain illicit finance risks associated with exempting domestic reporting companies from reporting their BOI." 90 FED. REG. at 13,691. The Treasury Department thus determined that the CTA is not "appropriately tailored to advance the public interest" insofar as it reaches *any* domestic entity or citizen of the United States. *Id.*

Those determinations devastate the Government's analysis of the Necessary and Proper Clause in this case. Extracting beneficial ownership information from innocent Americans, as it turns out, would not "play[] an essential role in the federal government's larger program to combat financial crime." Govt. Appellant Br. 13. The CTA therefore does not, in fact, "fall readily within Congress's authority under the Necessary

3

and Proper Clause." Govt. Appellant Br. 13. It is, in reality, unnecessary and improper, as the Executive Branch has now proclaimed.

2. On the Fourth Amendment issue, the implications of the Secretary's determinations are even more stark. In explaining why compelling law-abiding Americans to disclose their personal information would not serve the public interest or be highly useful to criminal-law enforcement, the Secretary observed that "[t]he vast majority of domestic small businesses are legitimate and owned by hard-working American taxpayers who are not engaged in illicit activity." 90 FED. REG. at 13,691. That has been Plaintiffs' Fourth Amendment argument all along. The Constitution demands that before the Government can force any person to reveal their sensitive personal information for criminal law-enforcement purposes under the threat of criminal punishment, it must at the very least have reasonable suspicion that the person has committed a crime. *See* Pltf. Appellee Br. 59-65 (citing, *inter alia, City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), and *Brown v. Texas*, 443 U.S. 47 (1979)).

Even in the face of the Secretary's determination that the lack of individualized suspicion of wrongdoing is an important factor supporting the wholesale exemption of every U.S. person from the CTA's scope, the Government continues to insist that the statute is simply one of many "reasonable reporting" regimes the federal government administers that "raise no Fourth Amendment concern." Govt. Suppl. Br. 5. But the examples on which the Government relies involve mandates that—unlike the

4

CTA—are used for well-defined and circumscribed federal activities such as tax collection and financial-institution regulation. *See* Govt. Reply Br. 17-23. Those programs, unlike the CTA, also come with statutory limitations on how the Government can use and disseminate any collected information. *See, e.g.*, 5 U.S.C. § 552a (Privacy Act of 1974); 12 U.S.C. § 3401 (Right to Financial Privacy Act). The Government has not identified a single information-collection regime in our national history, other than the CTA, that forces law abiding Americans to register their personal information with the Government and to update that information each time they move their business or residence—all for generalized criminal law-enforcement purposes and in contravention of over two centuries of leaving corporate registration to the States.

The Government's supplemental brief also reinvokes *California Bankers Association v. Shultz*, 416 U.S. 21 (1974), but fails to address the Eastern District of Michigan's recent conclusion that "'a Fourth Amendment ruling against the CTA is not only compatible with *Shultz*[;] it is a faithful application of its core rationale.'" Pltf. 28(j) Ltr. 2 (March 4, 2025) (quoting *Small Bus. Ass'n v. Yellen*, No.1:24-cv-314-RJJ-SJB, 2025 WL 704287, at *10 (W.D. Mich. Mar. 3, 2025)). The Secretary's determinations justifying the interim final rule are more consistent with that decision's reasoning—and Plaintiffs' arguments here—than with the Government's position in this case.

5

## II. Limiting the CTA to foreign-law entities does not repair the CTA's constitutional defects

The Government has shifted constitutional theories throughout this litigation, and its supplemental brief continues the trend. *See* Pltf. Appellee Br. 30-31. In the latest twist, the Government latches onto the Secretary's decision not to exempt entities formed under laws of foreign countries, asserts that "[t]here can be no serious dispute that" the CTA is valid as to them, and claims that this "illustrates that plaintiffs' facial constitutional claim fails." Govt. Suppl. Br. 3-4. To be clear, the CTA has applied to entities formed under the law of foreign countries all along—such that the Government could have raised this defense previously, and its belated argument should be deemed forfeited. The late-breaking justification also is wrong for numerous reasons.

1. First, the CTA's enumerated-powers problem applies equally to entities "formed under the law of a foreign country and registered to do business" here. 31 U.S.C. § 5336(a)(11)(A)(ii). Whether a regulated entity was formed under domestic or foreign law, the CTA falls outside Congress's commerce power because it does not regulate commercial "'conduct.'" Pltf. 28(j) Resp. 1 (Dec. 27, 2024) (quoting *United States v. Pugh*, 90 F.4th 1318, 1325-26 (11th Cir. 2024)). In addition, by Congress' own admission, the personal information reported under the CTA is not commercial information but "sensitive information." 31 U.S.C. § 5336 Statutory Notes, Sense of Congress, note (6). The CTA is invalid because it

6

draws beneficial owners into the scope of federal regulation not by virtue of any commercial activity they undertake, but by the mere fact that they exist and a "'predict[ion]'" that they will "'engage in particular transactions'" in the future. Pltf. Appellee Br. 29 (quoting *NFIB v. Sebelius*, 567 U.S. 519, 557 (2012)).

These defects apply equally to all entities and people the statute encompasses. The action qualifying domestic and foreign entities for regulation is the same: "the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11)(A)(i); *accord id.* § 5336(a)(11)(A)(ii). That action is governmental and ministerial, not commercial or economic. *See* Pltf. Appellee Br. 18-22. The power to authorize entities to do business within a State's borders, moreover, is the epitome of a sovereign power that the Constitution reserves to that State. *See* Pltf. Appellee Br. 34-40.

Plaintiffs' prior briefing refuted the Government's contentions that the CTA is a necessary and proper means of enforcing Congress's "powers to regulate foreign commerce and foreign affairs." Govt. Suppl. Br. 5. The fact that the statute applies to entities formed under the law of a foreign country and then authorized to operate within a State's borders by that State does not change the analysis in any meaningful way. Forcing just foreign-born citizens or lawful permanent residents to purchase health insurance would be no more compatible with the Commerce Clause than forcing everyone to do so. *See NFIB*, 567 U.S. at 548-59. That same logic

7

applies here. As Plaintiffs have explained, just like the interstate Commerce Clause, the foreign Commerce Clause does not "allow Congress to regulate non-commercial activity such as entity formation, especially when that entity formation results from the ministerial acts of States" within their own borders. Pltf. Appellee Br. 30.

2. Second, the CTA's Fourth Amendment infirmities also apply with full force with respect to these foreign entities. Noncitizens, the Supreme Court has held, "receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990). Even when a foreign entity is authorized to operate within a State, the Fourth Amendment guarantees its beneficial owners the same protections from suspicionless extraction of personal information that their domestic counterparts enjoy.

3. Third, even if the CTA were constitutional as to foreign entities, the statute remains unconstitutional as to Plaintiffs and every other U.S. person who beneficially owns an entity formed under State law. To succeed with a facial challenge, a plaintiff need show only that a particular sub-part of a statute—not the statute in its entirety—is incapable of being constitutionally applied. *See, e.g.*, *United States v. Morrison*, 529 U.S. 598, 605-06 (2000) (invalidating the civil-remedy provision of the Violence Against Women Act while leaving the remainder in place). The CTA extends its requirements to domestic and foreign entities via separate

8

clauses—to domestic entities via clause (i) of 31 U.S.C. § 5336(a)(11)(A), and to foreign entities via clause (ii). So even if the Government were correct to assert that the CTA constitutionally regulates foreign entities, that proposition would only mean that clause (ii), which applies the statute to foreign entities, could be severed and upheld. Clause (i), which extends the statute's requirements to domestic entities and U.S. persons, is facially unconstitutional and due to be struck down.

## III. The interim final rule does not remove the unconstitutional features of the CTA

Finally, while the Government is right to say that the interim final rule has not mooted this case, it is wrong to say that if the process "results in a final rule exempting domestic companies from the reporting requirements, any requests for relief by those companies would likely be[come] moot" then. Govt. Suppl. Br. 6.

Even if a final rule is adopted that is identical to the interim final rule, the parties' dispute over the constitutionality of the CTA still presents a controversy requiring resolution by this Court. A "superseding statute or regulation moots a case" only "to the extent that it removes challenged features of the prior law." *Naturist Soc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992). Although a finalized rule could certainly remove certain unlawful features of the previous administration's reporting *rule*, it cannot remove the unlawful features of *the statute*. "There is no provision in the Constitution that authorizes the President to enact,

9

to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Moreover, even if the current administration adopts a final rule later this year, the next administration will be free to change that rule (as the current administration did with the reporting rule here) through the same administrative process, and to provide for the CTA's renewed enforcement then. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 12-13 (2020).

The Government has the "burden to establish that it cannot reasonably be expected to resume *its* challenged conduct," and "[n]othing the government offers here satisfies that formidable standard." *FBI v. Fikre*, 601 U.S. 234, 243 (2024) (internal quotation marks omitted). This Court should affirm the district court's judgment in full.

          Respectfully submitted,

          s/ John C. Neiman
          One of the Attorneys
          for Plaintiffs-Appellees

Thomas H. Lee
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

John C. Neiman, Jr.
MAYNARD NEXSEN PC
1901 Sixth Ave. N, Ste. 1700
Birmingham, Alabama 35203
(205) 254-1000

10

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable type-volume limitation under the Federal Rules of Appellate Procedure, 11th Circuit Rule 32-4, and this Court's order calling for supplemental briefs. In compliance with that order, the relevant parts of this brief do not exceed 10 pages. This brief complies with the applicable type-style requirements limitation under Rule 32 of the Federal Rules of Appellate Procedure. I prepared this brief in a proportionally spaced Century Schoolbook font sized 14 point or, for headings, a larger point size, and used 28-point spacing—and, thus, double spacing—between each line.

s/ John C. Neiman, Jr.<br>OF COUNSEL