FOR PUBLICATION

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 24-10736

_____

NATIONAL SMALL BUSINESS UNITED,

   d.b.a. National Small Business Association,

ISAAC WINKLES,

*Plaintiffs-Appellees,*

*versus*

U.S. DEPARTMENT OF THE TREASURY,

ACTING DIRECTOR OF THE FINANCIAL CRIMES

ENFORCEMENT NETWORK,

SECRETARY, U.S. DEPARTMENT OF THE

TREASURY,

*Defendants-Appellants.*

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 5:22-cv-01448-LCB

_____

Before JORDAN, NEWSOM, and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

The question in this appeal is whether a federal law requiring corporations to report information about their owners is constitutional. Congress found that bad actors have been using the anonymity of the corporate form to commit financial crimes, such as money laundering and financing terrorism. To prevent these anonymous business dealings, Congress passed the Corporate Transparency Act as part of the Anti-Money Laundering Act of 2020. Pub. L. No. 116-283, 134 Stat. 4604 (codified at 31 U.S.C. § 5336). The CTA requires certain corporate entities to report their "beneficial owners"—i.e., the actual people who exercise control over the entity—to the Department of the Treasury.

To be constitutional, every federal law must, first, be consistent with one of Congress's enumerated powers and, second, not violate any of the Constitution's individual rights guarantees. National Small Business United, a business association, and Isaac Winkles, a real-estate manager, argue that the CTA fails on both counts. As relevant here, they say that the CTA is not an appropriate exercise of Congress's power to regulate interstate commerce and is therefore facially unconstitutional. *See* U.S. CONST. art. I, § 8, cl. 3. In the alternative, they say that the CTA violates the Fourth Amendment's prohibition on unreasonable searches and is facially unconstitutional for that reason. *See* U.S. CONST. amend IV.

The district court concluded that the CTA did not regulate economic activity and, on that basis, granted the plaintiffs summary judgment. We disagree. We believe that, by effectively

prohibiting anonymous business dealings, the CTA facially regulates economic activities having a substantial aggregate impact on interstate commerce. Moreover, as a uniform and limited reporting requirement, the CTA does not facially violate the Fourth Amendment. Accordingly, we reverse.

## I.

Financial crime is a serious problem. According to one recent estimate, money laundering costs the government billions of dollars every year. DEP'T OF THE TREASURY, NATIONAL MONEY LAUNDERING RISK ASSESSMENT 3 & n.1 (2024). Financial criminals often use shell companies to conceal their fraud and their identities. *Id.* at 53. Because most states do not require businesses to report information about their owners, law enforcement has long suffered from an information gap when fighting financial crime. H.R. REP. NO. 116-227, at 2 (2019).

To combat this problem, Congress passed the CTA. In doing so, it made a series of findings. It found that more than 2,000,000 corporations and limited liability companies are formed each year, mostly in states that do not require beneficial ownership information. *Id.* These anonymous companies sometimes abuse the corporate form to commit crimes "affecting interstate and international commerce." *Id.* Congress therefore concluded that the CTA was necessary to combat securities and financial fraud. *Id.* Congress also found that uniform reporting laws would support "national security, intelligence, and law enforcement efforts to counter money

laundering, the financing of terrorism, and other illicit activity." Pub. L. No. 116-283, § 6402(5)(D), 134 Stat. 4604.

The CTA provides for the "collection of beneficial owner-ship information" of designated reporting companies. *Id.* § 6402(5), 134 Stat. 4604. Under the law, those companies must disclose infor-mation about "each beneficial owner" and "each applicant" to the Department of the Treasury's Financial Crimes Enforcement Net-work. 31 U.S.C. § 5336(b)(1)(A), (b)(2)(A). A "reporting company" is a corporation, LLC, or other similar entity incorporated under the laws of a state, or formed under the law of a foreign country and registered to do business in the United States. *Id.* § 5336(a)(11). "Beneficial owner" is defined as an individual who exercises sub-stantial control over an entity or otherwise controls at least twenty-five percent of its ownership interests. *Id.* § 5336(a)(3)(A). "Appli-cant" refers to an individual who files an application to form an en-tity. *Id.* § 5336(a)(2). Reporting companies must provide FinCEN with their beneficial owners' and applicants' full legal name, date of birth, home or business address, and government ID. *Id.* § 5336(b)(2)(A).

The CTA applies differently depending on when the report-ing company incorporates. Under the CTA and subsequent Treas-ury regulations, businesses created before March 26, 2025, were re-quired to comply with the CTA by April 25, 2025. 31 C.F.R. § 1010.380(a)(1)(ii); U.S.C. § 5336(b)(1)(B). Companies formed after that date must file a report within thirty days of registration. 31 C.F.R. § 1010.380(a)(1)(i); 31 U.S.C. § 5336(b)(1)(C). The reporting

requirement is an ongoing obligation. If there is any change with respect to required information previously submitted to FinCEN, the company must file an updated report within thirty days. 31 C.F.R. § 1010.380(a)(2)(i); 31 U.S.C. § 5336(b)(1)(D).

The CTA contains numerous exceptions. Excluded from the definition of "reporting company" are banks, credit unions, brokers, investment companies, insurance companies, accounting firms, and 501(c) nonprofits. 31 U.S.C. § 5336(a)(11)(B). Also excluded are entities that employ more than twenty employees and make more than $5,000,000 in annual gross sales. *Id.* § 5336(a)(11)(B)(xxi). Entities in existence on or before January 1, 2020, that are not engaged in active business, are not owned by a foreign person, have not experienced a recent change in ownership, do not hold assets, and have not sent or received funds in an amount greater than $1,000 in the past year are likewise exempt. 31 C.F.R. § 1010.380(c)(2)(xxiii); 31 U.S.C. § 5336(a)(11)(B)(xxiii).

The CTA also permits the Secretary of the Treasury to pass regulations exempting other groups from the reporting requirement. 31 U.S.C. § 5336(a)(11)(B)(xxiv). After passage, FinCEN issued an interim final rule exempting domestic companies from the CTA's requirements. The interim final rule still requires foreign companies to report ownership information except as to American owners.[1] *See* Beneficial Ownership Information Reporting

---

[1] The parties agree that this rulemaking does not render this case moot. We believe they correct. *See Naturist Soc'y v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992).

Requirement Revision and Deadline Extension, 90 Fed. Reg. 13688, 13690 (Mar. 26, 2025) (to be codified at 31 C.F.R. pt. 1010).

The CTA was controversial from the start. *See* Kate Kelly, *On Eve of Money Laundering Law's Activation, a Lobby Cries Foul*, N.Y. TIMES, Dec. 18, 2023, at B4. After it was enacted, NSBU and Winkles sued the Secretary of the Treasury, the Department of the Treasury, and FinCEN's Acting Director, seeking declaratory and injunctive relief. NSBU represents "over 65,000 businesses and entrepreneurs located in all 50 states. [Its] members come from every sector of the U.S. economy, including manufacturing, retail, food service, and professional services." McCracken Decl. at 2. Winkles owns a small business with three full-time employees and "annual turnover of under $20 million." Winkles Decl. at 1-2.

NSBU and Winkles claimed that the CTA is facially unconstitutional and that it violates the First, Fourth, Fifth, Ninth, and Tenth Amendments. The parties agreed that the case could be resolved on dispositive motions without discovery. They then cross-moved for summary judgment.

The district court granted the plaintiffs' motion for summary judgment and denied the defendants' cross-motion for summary judgment. The court held that neither the Commerce, Taxing, and Necessary and Proper Clauses, nor Congress's foreign affairs and national security powers, justified the CTA. Regarding the Commerce Clause, the court ruled that the CTA primarily regulates the non-commercial act of incorporation and that the connection between the act of incorporation and the activities Congress

sought to curb was too attenuated. The court also emphasized the CTA's lack of any jurisdictional hook limiting its reach to interstate commerce. Because it held that the CTA exceeded Congress's enumerated powers, the court did not address whether it violated the First, Fourth, or Fifth Amendments.

The government timely appealed.

## II.

This Court reviews *de novo* the district court's disposition of a motion for summary judgment. *See Lowery v. AmGuard Ins. Co.*, 90 F.4th 1098, 1103 (11th Cir. 2024). We also review *de novo* the constitutionality of a challenged statute. *United States v. Paige*, 604 F.3d 1268, 1270 (11th Cir. 2010).

## III.

NSBU and Winkles advance two main arguments against the facial constitutionality of the CTA. First, they argue that Congress did not have the power, under the Commerce Clause or otherwise, to enact the CTA. Second, in the alternative, they argue that the CTA violates the Fourth Amendment's prohibition on unreasonable searches. We address each argument in turn.

### A.

Turning to the Commerce Clause, we start with first principles. Every law enacted by Congress must be based on one or more of its constitutionally enumerated powers. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803) (Marshall, C.J.). One of those

enumerated powers is the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3.

To preserve a "distinction between what is truly national and what is truly local," *United States v. Lopez*, 514 U.S. 549, 567-68 (1995), the Supreme Court has identified three categories of activity that Congress may regulate under its Commerce Clause power: (1) channels of interstate commerce; (2) instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) activities that substantially affect interstate commerce. *Id.* at 558-59. The district court held, and the parties do not dispute, that the CTA does not regulate the channels or instrumentalities of commerce. Therefore, the question is whether the CTA passes muster under the third category: the "substantial effects" test.

Under the substantial effects test, the Court has distinguished between laws having "nothing to do with 'commerce' or any sort of economic enterprise," *id.* at 561, and those laws regulating "quintessentially economic" activities, *Gonzales v. Raich*, 545 U.S. 1, 25 (2005). The substantial effects test is ordinarily met only when the underlying activity is economic in nature or where the statute contains a jurisdictional element linked to interstate commerce. *See Lopez*, 514 U.S. at 560-61; *United States v. Morrison*, 529 U.S. 598, 613 (2000) ("[O]ur cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature."); *United States v. Olin Corp.*, 107 F.3d 1506, 1511 (11th Cir. 1997) ("have an economic character"). In short, for a law

to be facially constitutional under the substantial effects test in the absence of a jurisdictional element, the law ordinarily must be directed at some kind of commercial or economic activity and Congress must have rationally concluded that the regulated activity in the aggregate substantially affects interstate commerce.

Applying the substantial effects test, we hold that the CTA is a constitutional exercise of Congress's power under the Commerce Clause. First, on its face, the CTA regulates activity that is economic in nature. It effectively prohibits anonymous corporate dealings, regulates commercial entities that are active in the stream of commerce, and requires them to report information related to their ownership. Second, Congress rationally concluded that anonymous corporate dealings have a substantial aggregate effect on interstate commerce. We address each point below.

1.

We will start with whether the CTA regulates economic activity. The Supreme Court has held that run-of-the-mill criminal laws flunk this test. For example, criminal statutes prohibiting firearms in school zones and gender-motivated violence are not directed at economic activity. *Lopez*, 514 U.S. at 561; *Morrison*, 529 U.S. at 613, 617. But a law can regulate economic activity even if the connection between the challenged law and commerce isn't airtight. It is enough that the regulated activity involves "some sort of economic endeavor" with "an apparent commercial character." *Morrison*, 529 U.S. at 611 & n.4.

We think the CTA is sufficiently connected to economic activity to meet the first part of the substantial effects test. The law applies to "corporation[s], limited liability compan[ies], or other similar entit[ies]." 31 U.S.C. § 5336(a)(11). Corporations are formed when prospective shareholders exchange money, property, or both, in return for stock. A corporation conducts business, realizes losses or gains, pays taxes, and distributes dividends to its shareholders. Holger Spamann, Scott Hirst & Gabriel Rauterberg, Corporations in 100 Pages 1-12 (2020); Richard D. Freer & Douglas K. Moll, Principles of Business Organizations 194-96 (2d ed. 2018). Like corporations, LLCs offer owners protection from personal liability, although profits are passed through to a member's personal income without facing corporate taxes. Franklin A. Gevurtz, Corporation Law 4-6 (3d ed. 2021); Stephen M. Bainbridge, Agency, Partnership & LLCs 269 (4th ed. 2024).

These entities are commercial by their very nature. As the Supreme Court has long recognized, a corporation is never created "for its own sake," but instead exists "for the purpose of effecting something else." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 411 (1819). For-profit business entities are a means to an economic end. They exist primarily to "use [their] resources and engage in activities designed to increase [their] profits." Milton Friedman, Capitalism and Freedom 133 (1962); Stephen M. Bainbridge, Corporation Law And Economics 419-29 (2002) (traditional fiduciary duties require corporations to maximize profits). Aside from being profit maximizers, business entities also exist to efficiently

pool capital and allow creditors and shareholders to invest without disclosing their identities. William J. Moon, *Anonymous Companies*, 71 DUKE L.J. 1425, 1429-32 (2022). For all these reasons, the corporate form is understood to be "the foundation of the modern market economy." Giuseppe Dari-Mattiacci, Oscar Gelderblom, Joost Jonker & Enrico C. Perotti, *The Emergence of the Corporate Form*, 33 J.L. ECON. & ORG. 193, 225 (2017).

Considering the nature of the corporate form and modern business, we can safely say that the CTA facially regulates economic activity. The statute is specifically directed at domestic companies created under the laws of a state and foreign companies registered to do business in the United States. 31 U.S.C. § 5336(a)(11)(A). By requiring these corporate entities to provide beneficial ownership information, the CTA regulates how they operate and the level of secrecy with which they do business. The maintenance and operation of a separate corporate entity is comparable to other regulated activities the Supreme Court has found commercial in nature. *See Wickard v. Filburn*, 317 U.S. 111 (1942) (consumption of home-grown wheat); *Perez v. United States*, 402 U.S. 146 (1971) (extortionate intrastate credit transactions).

NSBU's and Winkles's own declarations emphasize the point. NSBU represents tens of thousands of businesses in every sector of the economy. According to NSBU, eighty percent of its members fall under the CTA's definition of "reporting company." Winkles co-owns two corporations that "manage and lease real property" and generate "annual turnover of under $20 million."

Winkles Decl. at 1-2. Winkles's two companies earn approximately $8 million and $5 million in annual gross sales. Neither NSBU nor Winkles has identified any reporting companies that do not engage in commercial activity. That both plaintiffs are clearly economically active and failed to provide evidence of a non-commercial entity regulated by the CTA is strong evidence that the statute regulates commerce.

Moreover, to the extent a corporate entity is not involved in commerce, the CTA's many carveouts will likely exempt it. The statute excludes trusts, banks, government agencies, public utilities, political organizations, and nonprofits. 31 U.S.C. § 5336(a)(11)(B). The CTA also exempts inactive businesses that are created on or before January 1, 2020, hold no assets, and have not sent or received funds exceeding $1,000 in a year. 31 C.F.R. § 1010.380(c)(2)(xxiii); 31 U.S.C. § 5336(a)(11)(B)(xxiii). Congress's decision to tailor the CTA to active businesses is further evidence the statute regulates commerce on its face.

NSBU and Winkles make three arguments to resist this conclusion. None works.

First, they argue, like the district court, that the CTA regulates the noneconomic "isolated, discrete act" of incorporation. We'll assume without deciding that this "isolated, discrete act" is not itself commercial in character. Even indulging that assumption, we believe the CTA's text establishes that it does not regulate the act of incorporation. Instead, the CTA regulates entities after they have been incorporated. Even though the statute defines

"reporting company" as one "created by the filing of a document," this provision serves only to identify those entities that must comply with the statute's reporting requirements. 31 U.S.C. § 5336(a)(11)(A)(i). The statute in no way affects how businesses incorporate. It does not alter any relevant state law. It addresses only what entities must do *after* they are registered to do business—provide beneficial owner information to the Treasury Secretary.

Other parts of the text confirm that the CTA is not regulating the act of incorporation. The statute requires existing businesses that have already incorporated to continue reporting changes in ownership. *Id.* § 5336(b)(1)(D). Foreign entities registered to do business in the United States, but that were incorporated abroad, are also subject to the CTA. *Id.* § 5336(a)(11)(A)(ii). And, as we've already explained above, the CTA exempts businesses that are not actively engaged in commerce from the reporting requirement.

Second, NSBU and Winkles argue that the CTA is constitutionally infirm because it lacks a jurisdictional element. Again, we disagree. A jurisdictional element "ensure[s], through case-by-case inquiry, that the [activity] in question affects interstate commerce." *Lopez*, 514 U.S. at 561. We have held that a jurisdictional element—because it allows a case-by-case assessment—immunizes criminal statutes from facial challenges. *United States v. Pugh*, 90 F.4th 1318, 1326 (11th Cir.), *cert. denied*, 145 S. Ct. 236 (2024). *See also United States v. Dupree*, 258 F.3d 1258, 1259 (11th Cir. 2001) (jurisdictional hook defeated facial challenge to statute prohibiting a felon from

possessing a firearm). But neither we nor the Supreme Court has ever suggested that a jurisdictional element is necessary for an *economic* regulation. *See United States v. Moghadam*, 175 F.3d 1269, 1275-76 (11th Cir. 1999) (holding that a jurisdictional element was unnecessary where the statute regulated economic activities having a substantial effect on interstate commerce). In *Lopez* and *Morrison*, for example, a case-by-case jurisdictional assessment was necessary because the statutes facially regulated non-economic activity. "The absence of such a jurisdictional element simply means that courts must determine independently whether the statute regulates activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affect interstate commerce." *Id.* (citation modified).

Finally, citing *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012), NSBU and Wrinkles say that the CTA regulates inactivity. But the CTA does not "compel [entities] not engaged in commerce" to do so. *Id.* at 549. Because of the tailored scope of the act, it regulates entities that are active in commerce. *See* 31 U.S.C. § 5336(a)(11)(B), (b)(1)(B). The CTA does not regulate based on an entity's anticipated future conduct. Instead, the CTA anticipates the *effects* on commerce of active businesses not reporting ownership information. *See NFIB*, 567 U.S. at 557.

In sum, the CTA regulates economic activity on its face. Accordingly, the only question for its facial constitutionality under the Commerce Clause is whether the intrastate economic activity it regulates substantially affects interstate commerce.

2.

We turn now to that second question: did Congress rationally conclude that the regulated conduct has a substantial aggregate effect on interstate commerce? We believe that it did.

Apart from its scope, the CTA is a routine federal law. Federal reporting requirements are very common. *See Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 47 (1974) ("[P]rovisions requiring reporting or recordkeeping . . . are by no means unique."). The United States Code is replete with them. *See, e.g.*, 31 U.S.C. § 5313 (requiring banks to file reports with the Secretary of the Treasury whenever they are involved in cash transactions exceeding a certain amount); 52 U.S.C § 30104 (requiring political committees to file reports of receipts and disbursements); 2 U.S.C. § 1604 (requiring registered lobbyists to file reports with Congress that include their name, a list of lobbying activities, and a list of employees). So the CTA is hardly based on a "new conception[] of federal power." *NFIB*, 567 U.S. at 550.

This particular reporting requirement is an effort to curtail abuses of the corporate form. In its report accompanying the CTA, the House Committee on Financial Services found that anonymous ownership and the corporate form were contributing to fraud. The Committee concluded that anonymous shell companies "afford a high level of secrecy" to money launderers. H.R. REP. NO. 116-227, at 10 (2019). The report also found that the United States was not meeting international standards regarding disclosure requirements, making it a target for money laundering. *Id.* at 2,11.

In reaching these conclusions, Congress relied on input from numerous national security and law enforcement experts about how anonymous shell companies affect interstate and international commerce. Congress held a hearing on the CTA, during which the former Director of the FBI's Terrorist Financing Operation Section testified that the CTA was "necessary and long overdue." *Promoting Corporate Transparency: Examining Legislative Proposals to Detect and Deter Financial Crimes: Hearing on H.R. 2513 Before the Subcomm. on Nat'l Sec., Int'l Dev., & Monetary Pol'y of the H. Comm. on Fin. Servs.*, 116th Cong. 49 (2019) (statement of Dennis M. Lormel). Lormel also stated that he believed reporting requirements would help reduce drug trafficking. *Id.* at 28. Congress heard additional testimony in support of the CTA from law enforcement associations such as the Fraternal Order of Police. The Fraternal Order said that collecting beneficial ownership information would help combat the threat posed by "[t]ransnational criminal organizations and terrorist operations." *Id.* at 69. Finally, an array of industry representatives concluded the CTA would protect financial institutions of all stripes from financial crime. *Id.* at 75-76.

Congress could rationally conclude that the freedom of beneficial owners to operate anonymously through shell companies had a substantial aggregate impact on interstate commerce. Congress found that 2,000,000 corporations and LLCs are formed annually. Congress reasonably concluded that failing to require businesses to report beneficial ownership information would undercut its goal of regulating interstate financial crime. Indeed, it explicitly found that the CTA was necessary to prevent the use of the

corporate form to commit fraud. Anti-Money Laundering Act of 2020, Pub. L. No. 116-283, § 6402(5), 134 Stat. 4547, 4604 (2021).

Although congressional findings are not necessary, *Katzenbach v. McClung*, 379 U.S. 294, 299, 304 (1964), and alone cannot sustain Commerce Clause legislation, *see Morrison*, 529 U.S. at 614, such findings may better "enable us to evaluate the legislative judgment that the activity in question substantially affect[s] interstate commerce." *Lopez*, 514 U.S. at 563. Congress's findings here are entitled to deference. *See United States v. Viscome*, 144 F.3d 1365, 1371 (11th Cir. 1998) (holding that "explicit findings that the proscribed activity in issue substantially affected interstate commerce" are accorded "substantial deference"). Here the connection between the thing being regulated—the anonymous ownership and operation of businesses—and its effect on interstate commerce is direct and straightforward. Congress had a rational basis for believing that, in the aggregate, the anonymous operation of businesses substantially affected interstate commerce.

NSBU and Winkles resist this conclusion by citing examples of hypothetical entities that engage in purely intrastate activity but may still be regulated by the CTA. The existence of some edge cases doesn't help in this facial challenge. "[W]here a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." *Lopez*, 514 U.S. at 558 (citing *Maryland v. Wirtz*, 392 U.S. 183, 196 n.27 (1968) (citation modified), *overruled on other grounds by*, *Nat'l League of Cities v. Usery*, 426 U.S. 833 (1976)). This

argument about corporations that are uniquely focused on intra-state activity is the stuff of an as-applied challenge. *See, e.g., Gonzales v. Raich*, 545 U.S. 1 (2005). Because Congress reasonably determined that this cumulative activity would substantially affect commerce, the existence of some purely intrastate entities does not invalidate the CTA as a facial matter.

$$\star \quad \star \quad \star$$

In short, the CTA is a constitutional exercise of Congress's enumerated power to regulate interstate commerce. Because it is directed at the ownership and maintenance of corporations, it is a regulation of economic activity. And Congress rationally concluded that this activity has a substantial aggregate impact on interstate commerce.

### B.

Having determined that Congress had the power to enact the CTA, we now ask whether the CTA facially violates any individual rights amendment. A facial challenge under an individual rights amendment is "hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). A plaintiff cannot succeed on such a facial challenge unless he "'establish[es] that no set of circumstances exists under which the [law] would be valid,' or he shows that the law lacks a 'plainly legitimate sweep.'" *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987) and *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450–451 (2008)).

NSBU and Winkles urge us to affirm on the ground that the CTA facially violates the Fourth Amendment. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. NSBU and Winkles argue that the reporting requirement is unconstitutional because it permits suspicionless searches for general law enforcement purposes.[2] We disagree.

The Supreme Court has previously considered Fourth Amendment challenges to uniform reporting requirements. In *Shultz*, the Court addressed a statute requiring banks to report domestic currency transactions above a certain amount. 416 U.S. 21 (1974). The reports contained the "name, address, business or profession and social security number of the person conducting the transaction," as well as a description of the transaction itself. *Id.* at 39 n.15. The Court upheld the statute against a Fourth Amendment challenge, concluding that the regulations "do not impose unreasonable reporting requirements on the banks." *Id.* at 67. Even though the law required banks to obtain information "simply because the Government want[ed] it," the information was limited in nature and "sufficiently related to a tenable congressional

---

[2] NSBU and Winkles vaguely reference First, Fifth, Ninth, and Tenth Amendment claims but make no argument in support of them. These arguments are abandoned for purposes of appeal. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (a party fails to adequately brief a claim when it fails to clearly present it or refers to it only in passing).

determination as to improper use of transactions of that type in interstate commerce." *Id.*

Under this precedent, the CTA does not violate the Fourth Amendment. It is a uniform reporting requirement applied to all businesses that meet the CTA's definition of "reporting company." There is nothing arbitrary or discretionary about its application. *See Brock v. Emerson Elec. Co., Elec. & Space Div.*, 834 F.2d 994, 996 n.2 (11th Cir. 1987) (concluding that a "uniform statutory or regulatory reporting requirement satisfies the Fourth Amendment concern regarding the potential for arbitrary invasions of privacy"). The information it requires is "sufficiently described and limited in nature" and is no more detailed than the reports in *Shultz*. 416 U.S. at 67.

The CTA also has several privacy guarantees. It permits disclosure of beneficial ownership information only upon request by discrete categories of agencies under certain circumstances. 31 U.S.C. § 5336(c)(2). The statute requires the Secretary of the Treasury to protect ownership information and prevent breaches of confidentiality. *Id.* § 5336(c)(8). And the Comptroller General must conduct periodic audits to ensure the Department of the Treasury is using beneficial ownership information appropriately. *Id.* § 5336(c)(10).

In support of their argument, NSBU and Winkles cite a series of decisions involving substantial arbitrary privacy intrusions in which the government collected an array of detailed and sensitive information. But these decisions bear no resemblance to the facts of this case. Here, "[t]he inquiry is within the authority of the

agency, the demand is not too indefinite and the information sought is reasonably relevant." *Shultz*, 416 U.S. at 67 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)). Because the CTA's disclosure requirement is reasonable, there is no Fourth Amendment issue. *See id.*

## IV.

We **REVERSE** and **REMAND** for further proceedings consistent with this opinion.